1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                          AUGUSTA DIVISION

 3

 4   UNITED STATES OF AMERICA,    :
                                  :
 5     v.                         :
                                  :   CASE NUMBER CR-1:17-00034
 6   REALITY LEIGH WINNER,        :
                                  :
 7        Defendant.              :
     _____
 8

 9

10

11

12         TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING

13             BEFORE THE HONORABLE BRIAN K. EPPS
                 United States Magistrate Judge
14
                    United States Courthouse
15                 600 James Brown Boulevard
                       Augusta, Georgia
16                        June 8, 2017

17

18

19

20

21

22
     _____
23   TRANSCRIBED BY:  Victoria L. Root, CCR
                      United States Court Reporter
24                    Post Office Box 10552
                      Savannah, Georgia  31412
25                    (912) 650-4066
```

Proceedings electronically recorded.  Transcript produced
from transcription of electronic recording.

2

1                    A P P E A R A N C E S

2

3    FOR THE GOVERNMENT:

4            JENNIFER G. SOLARI, Esquire
             Assistant United States Attorney
5            Post Office Box 8970
             Savannah, Georgia  31412
6            (912) 201-2561

7            JAMES D. DURHAM, Esquire
             Acting United States Attorney
8            Post Office Box 8970
             Savannah, Georgia  31412
9            (912) 652-4422

10           DAVID AARON, Esquire
             Trial Attorney, United States Department of Justice
11           National Security Division
             950 Pennsylvania Avenue, N.W.
12           Washington, D.C.  20530

13

14   FOR THE DEFENDANT:

15           TITUS T. NICHOLS, Esquire
             JOHN C. BELL, JR., Esquire
16           Bell & Brigham
             457 Greene Street
17           Augusta, Georgia  30901
             (706) 722-2014

18

19

20

21

22

23

24

25

3

1                              I N D E X

2

3                                                            Page

4  I.     ARRAIGNMENT . . . . . . . . . . . . . . . . . .      4

5
   II.    DEFENDANT'S PLEA OF NOT GUILTY. . . . . . . . .      15
6

7  III.   GOVERNMENT'S PROFFER BY MS. SOLARI. . . . . . .      18

8
   IV.    DEFENSE WITNESSES
9
          1. BILLIE WINNER-DAVIS
10             Direct Examination by Mr. Nichols . . . .      28
               Cross-Examination by Ms. Solari . . . . .      37
11             Redirect Examination by Mr. Nichols . . .      45

12        2. GARY DAVIS
               Direct Examination by Mr. Bell. . . . . .      46
13             Cross-Examination by Ms. Solari . . . . .      64
               Redirect Examination by Mr. Bell. . . . .      70
14
          3. ANN P. DEMASI
15             Direct Examination by Mr. Bell. . . . . .      73
               Cross-Examination by Ms. Solari . . . . .      84
16             Redirect Examination by Mr. Bell. . . . .      86

17
   V.     CLOSING ARGUMENTS
18             By Ms. Solari . . . . . . . . . . . . . .      88
               By Mr. Nichols. . . . . . . . . . . . . .      99
19

20 VI.    COURT'S RULING ON DETENTION . . . . . . . . . .     104

21
   VII.   CERTIFICATE OF REPORTER . . . . . . . . . . . .     120
22

23

24

25

4

1            P R O C E E D I N G S

2        (Call to order at 3:59 p.m.)

3            COURT CLERK:  The Court calls Case Number 1:17-CR-34,

4   *United States of America v. Reality Leigh Winner*.  Jennifer

5   Solari, James Durham, and David Aaron for the Government;

6   Titus Nichols and John Bell for the Defense.  Here for

7   arraignment and detention hearing.

8            THE COURT:  Good afternoon, everyone.

9            MR. NICHOLS:  Good afternoon, Your Honor.

10           MS. SOLARI:  Good afternoon, Your Honor.  The

11   Government's ready.

12           THE COURT:  And you're taking the lead for the

13   Government, Ms. Solari?

14           MS. SOLARI:  That's right, Your Honor.

15           THE COURT:  Okay.  All right.  Welcome, everyone.

16           We now have a -- an indictment returned by the grand

17   jury in this matter, Miss Winner.  And I'm sure Mr. Nichols has

18   explained to you -- but just for the sake of making sure, we --

19   the -- you appeared on a complaint that was signed by the

20   investigating agent in this case.  That was your initial

21   appearance earlier this week.  Now that the grand jury has

22   returned that indictment, it supersedes and replaces, in its

23   entirety, the complaint that was filed, so we need to have an

24   initial appearance on that indictment.

25           I'm going to review some things with you that we've

5

1      already talked about, but I do that out of an abundance of

2      caution because the rights that you have are very important,

3      and I want there to be no doubt that the rights we've already

4      discussed in this case apply fully to you now that an

5      indictment has been returned.

6              So that's what we're going to start with is going

7      through the indictment, making sure you understand what your

8      rights are, discussing what discovery the Government has that

9      they're ready to turn over to your counsel, and what procedures

10     that might need to be in place for that exchange to occur.  And

11     then after all those things are taken care of, I'll ask you how

12     you plead to the charges, and we'll move on to the detention

13     hearing that we've previously scheduled in this matter.

14             I've already explained to you your right to counsel.

15     I'm going to remind you of that again.  You have the right to

16     be represented by an attorney at every stage of this case, both

17     in and out of court, and including any questioning by law

18     enforcement.  You have the right to consult with your attorney

19     before questioning may occur at any time.  You may hire your

20     own attorney if you're financially able to do so.  If you're

21     unable to afford an attorney, the Court will appoint one at no

22     cost to you.

23             Do you understand your right to counsel?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  And I understand here you've retained

6

1    Mr. Nichols and Mr. Bell with your own funds and you're not

2    seeking court-appointed counsel in this matter; is that

3    correct?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Okay.  Moving on, I need to remind you

6    of your right to remain silent.  You have the absolute

7    constitutional right to remain silent.  That is, no one

8    associated with the Government or any law enforcement agency

9    can force or compel you to make any statement regarding any

10   subject whatsoever including, most importantly, the allegations

11   contained in the indictment that we're about to review here in

12   court.

13        But you also need to understand that that right to

14   remain silent is not restricted to the allegations in the

15   indictment.  It includes any topic under the sun.  Any

16   statement made by you or the answers you give to any questions

17   asked can be used as evidence not only in connection with this

18   case that we're here for today but also any other cases

19   currently pending against you or that may be brought against

20   you in the future.

21        The bottom line is you're not required to make any

22   statement.  If you have made a statement, you need not say any

23   more.  And if you start to make a statement, you may stop at

24   any time.

25        Do you understand your right to remain silent?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Mr. Nichols, have you received a copy of

3    the indictment and penalty certification and had a chance to

4    review those documents with your client?

5          MR. NICHOLS:  Yes, I have.

6          THE COURT:  And for the record, Ms. Solari, could

7    you please summarize the allegations in that indictment and the

8    maximum penalties and the penalty certification.

9          MS. SOLARI:  Gladly, Your Honor.

10         The indictment has a preamble before the count itself

11   in which it discusses the defendant, Reality Leigh Winner; her

12   employment; her access to classified information; and her

13   class -- and her clearance level.  It discusses various levels

14   of classified information to include SCI, which is sensitive

15   comparted information.  It also discusses the proper handling

16   and dissemination of classified access -- or classified

17   information and who may access that information.

18         Further, the indictment goes on to discuss in more

19   precise detail the defendant's access to national defense and

20   classified information.  It goes on to detail how the defendant

21   went about removing and transmitting national defense

22   information.

23         And then, finally, Count 1 of the indictment alleges

24   a violation of 18, United States Code, Section 793(e), which is

25   willful retention and transmission of national defense

8

1   information.

2           It incorporates the preceding paragraphs and then

3   states that beginning on or about May 9th, 2017, and continuing

4   until on or about a date unknown but no later than June 3rd,

5   2017, in Richmond County, in the Southern District of Georgia

6   and elsewhere, the defendant, Reality Leigh Winner, having

7   unauthorized possession of, access to, or control over a

8   document containing information relating to the national

9   defense, willfully retained the document and failed to deliver

10  it to the officer or employee of the United States entitled to

11  receive it and willfully transmitted the same to a person not

12  entitled to receive it; to wit:  Winner retained the

13  intelligence reporting and transmitted it to a news outlet; all

14  in violation of 18 U.S.C. Section 793(e).

15          Your Honor, the Government certifies that the

16  maximum penalty for violation of 18 U.S.C. Section 793(e) is

17  imprisonment for not more than 10 years, a fine of up to

18  $250,000 or both, not more than 3 years' supervised release,

19  and a $100 special assessment.

20          THE COURT:  Thank you, Ms. Solari.

21          Is it fair to say, Miss Winner, that you understand

22  the nature of this charge and the maximum penalties associated

23  with the charge?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Now, you do have a right to a formal

1    reading of the indictment.  It's simply where, in addition to

2    this in-court summary by Ms. Solari, I would read the entire

3    indictment to you here in court.  Most defendants waive that

4    right.  But if you'd like me to read the indictment to you

5    before I ask you how you plead, I'll be glad to do that.

6            Do you waive a formal reading of the indictment?

7            THE DEFENDANT:  Your Honor, I would like to waive

8    that.

9            THE COURT:  Okay.  All right.  Well, let the

10   record reflect that this defendant has received a copy of the

11   indictment and the penalty certification, waived formal reading

12   of the indictment, and entered a plea of not guilty to the

13   charge contained therein.

14           What is the discovery policy of the Government in

15   this case and the status of providing discovery to defense

16   counsel?

17           MS. SOLARI:  Your Honor, this case is out of the norm

18   because it does involve classified information.  All of the

19   information in this case must be reviewed to determine its

20   classification level.  Additionally, defense counsel need to be

21   cleared for a top secret clearance as well as potentially read

22   into secure compartmented information projects that pertain to

23   this program -- or this case.

24           If there will be any classified information that

25   might be involved in discovery, we would need to proceed under

10

1    the Classified Information Procedures Act, the first step of
2    which would be to start working out a schedule for review and
3    production of discovery under Section 2.  We're not sure at
4    this point how long that process will take.  We're still
5    getting our arms around all of the information involved, and
6    we're trying to find out more about defense counsel's current
7    clearance level and how soon we might be able to bump that up
8    to a level sufficient to review anything that might be provided
9    in this case.

10            THE COURT:  Okay.  In looking at the act, the
11   Classified Information Procedures Act, as well as the
12   associated regulations that were promulgated by the Supreme
13   Court chief justice back in 1981 and also reviewing some sample
14   protective orders, it appears that there is a fair amount of
15   work that needs to be done to make sure that the court
16   personnel, the defense counsel and his staff can have access to
17   the information it needs for the case.

18            My first question to you, though, Ms. Solari, would
19   be:  How much information are we talking about that would
20   likely be subject to a classified designation, and how much
21   discovery can we go ahead and get rolling that doesn't involve
22   classified information that you can produce relatively soon?

23            MS. SOLARI:  It's my understanding, Your Honor, that
24   we're not at liberty to produce anything more than what's been
25   filed in the public record at this point because, again, it has

11

1    to undergo a classification review.  Even if, to my untrained
2    eye, it might appear at first blush to be unclassified, I have
3    to get that final word from the original classification agency
4    that may own the information to see whether it can be
5    disseminated.  So that may take some time.
6            As to the volume of the information involved, this
7    case has moved very quickly, so we do have forensic
8    information.  We have four cell phones, two laptop computers,
9    and a tablet that were recovered from the defendant's
10   residence.  We're trying to get those forensically examined as
11   soon as possible.  We put a priority on that.  I'm not certain
12   yet how long that would take.  But, again, all of that
13   information would have to be reviewed as well to determine how
14   much classified may be on those media storage devices.
15           So, again, I don't mean to dodge your question,
16   Your Honor, but I am afraid we just don't know at this point.
17           THE COURT:  Okay.  Well, back to my original
18   question, in terms of the discovery policy of the Government,
19   is the Government going to pursue the open file discovery
20   policy that it normally does in this case or drop back to more
21   of the Rule 16 obligations?
22           MS. SOLARI:  Rule 16, Your Honor, I think, because we
23   have to be very -- certainly, we will give whatever we are able
24   to defense counsel.  We're not looking to go out of our way to
25   withhold anything.  But already we have been given very strict

1  limitations on what we are able to say and how we're able to

2  say it thus far in the proceedings.  I imagine that will

3  continue to a certain extent, and so I think we will probably

4  be a bit more conservative than usual in our discovery simply

5  because that's required for national security reasons.

6           THE COURT:  Do you have any estimate of how long it's

7  going to take before you're going to know what information is

8  out there that can be produced that's not subject to any kind

9  of confidentiality protection versus what else is left and how

10 long we might be before we get that information exchange?

11          MS. SOLARI:  If I may, Your Honor, I'll ask my

12 co-counsel.  This is Mr. David Aaron, who's with the National

13 Security Division, counterespionage section.  He is much more

14 practiced in these matters than I.  I know he's been talking

15 with people at the National Security Division to try to get an

16 estimate on what we're looking at.  I don't know that one is

17 available.

18          Mr. Aaron.

19          MR. AARON:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. AARON:  Thank you for allowing me to appear here.

22          We don't know yet, with regard to the classified side

23 of this, really how much material we're looking at yet that

24 might potentially be discoverable and that we have to make a

25 motion with respect to under classified information procedures.

1    THE COURT:  Okay.  Well, probably the best way for us

2  to proceed -- I think that the Classified Information

3  Procedures Act in Section 2 contemplates planning conferences

4  with the Court where we can get our arms around this stuff and

5  make sure that we get all of the past completed in a timely

6  manner that we need to because there's some work the Court

7  needs to do in terms of getting a list of personnel for

8  clearances and -- et cetera.  And I don't want us to rest on

9  this.  I want to treat it with the urgency it deserves.

10    So my proposal would be that, Ms. Solari, you get

11  together with defense counsel and have a very open discussion

12  with as much information as you can give him about how this

13  process is going to begin.

14    Is the Government, Mr. Aaron, going to propose a

15  protective order in this case?

16    MR. AARON:  For the classified side, yes, Your Honor.

17  That's under Section 3 of CIPA.  We'll be starting with

18  Section 2 for the conference that Your Honor referenced --

19    THE COURT:  Okay.

20    MR. AARON:  -- and then we'll follow the protective

21  order.

22    THE COURT:  How much time do you need to confer with

23  defense counsel, get your arms around the discovery that's out

24  there, give them a draft protective order, and for us to get

25  back together again and have an informed, productive discussion

1    about these issues?

2           MR. AARON:  Your Honor, I think we're not -- we're

3    still not familiar with the exact volume of particularly

4    digital information that we have to review.  I might

5    respectfully suggest a status conference in short order to give

6    you a better answer.

7           THE COURT:  Okay.  When you say "short order" -- I

8    mean, I don't want to call you back next week and not have any

9    productivity because you've not been able to run down these

10   things.

11          How much time do you reasonably need before we get

12   back together?

13          MR. AARON:  Your Honor, I think that 2 weeks to check

14   in would be a good time frame.

15          THE COURT:  Mr. Nichols, do you have any objection to

16   2 weeks and having that process occur where they discuss it

17   with you and figure out what they have and then us get back

18   together to talk about how we proceed?

19          MR. NICHOLS:  No, Your Honor, I have no objection.  I

20   am fully prepared to meet with the Government.  In regards to

21   my current classif- -- security level, I am prepared to provide

22   any and all documentation necessary to increase my security

23   level.

24          THE COURT:  Okay.  All right.  Well, we'll schedule

25   that for 2 weeks from now.  Ms. Cirillo will confer with

1  counsel to make sure that we accommodate schedules but also

2  have this in a timely manner in that time frame.

3          MS. SOLARI:  Your Honor, given what we've just

4  discussed about the complexity of the information in this case

5  and the time it will take to go through the classified

6  information procedures, may I respectfully ask that the Court

7  designate this case as one that is complex such that we are not

8  bound by the regular restrictions of the Speedy Trial Act?

9          THE COURT:  Mr. Nichols, do you have any objection to

10  designating this as a complex case under the Speedy Trial Act?

11          MR. NICHOLS:  No objection, Your Honor.

12          THE COURT:  Okay.  All right.  We will do so.

13          In terms of the indictment, I believe that's all that

14  we need to discuss today except for the plea itself.

15          How do you plead to the charge, Miss Winner?

16          THE DEFENDANT:  Not guilty, Your Honor.

17          THE COURT:  Let the record reflect that this

18  defendant has received a copy of the indictment and penalty

19  certification, waived formal reading of the indictment, and

20  entered a plea of not guilty to the charge contained therein.

21          Is there anything further with respect to the initial

22  appearance on the indictment that we need to take up from your

23  perspective, Mr. Nichols, before we can begin with the

24  detention hearing?

25          MR. NICHOLS:  Nothing from the Defense, Your Honor.

1          THE COURT:  Ms. Solari, anything from the Government?

2          MS. SOLARI:  No, sir, Your Honor.

3          THE COURT:  All right.  Mr. Nichols, you may take a

4     seat with counsel -- I mean, with your client.

5          Before we begin with the substance of the detention

6     hearing, Miss Winner, there is something I do want to emphasize

7     to you.  At all times, you are entitled to the presumption of

8     innocence.  Nothing that takes place in this hearing today and

9     nothing that I may set forth in my findings with respect to

10    this detention issue is intended or should be construed to

11    affect that very important presumption of innocence that you

12    have.

13         Rather, the purpose of this hearing is to determine,

14    notwithstanding that presumption of innocence, whether you

15    should be detained pending trial.  So I want you to remember

16    that as we go through this process today and as I make my

17    findings and enter a final order with respect to the detention

18    issue.

19         Ms. Solari, are there any opening remarks that the

20    Government would make -- like to make before it begins with any

21    proffers or witnesses?

22         MS. SOLARI:  No, Your Honor.  But because of the

23    nature of the case and how circumspect we have to be about what

24    we say and how we say it, if it please the Court, the

25    Government does like to proceed by proffer.

1          THE COURT:  Okay.  And, Mr. Nichols, anything you'd

2   like to say in opening before Ms. Solari begins with her

3   proffer?

4          MR. NICHOLS:  Yes, Your Honor.  We are here on

5   behalf of Miss Reality Leigh Winner.  We are going to present

6   testimony from several witnesses who will testify to the fact

7   that Miss Winner is not a risk to the community and she is not

8   a risk of flight.  We have testifying both her mother,

9   Billie Winner-Davis; her stepfather, Gary Davis; as well as

10  her friend, Ann Demasi, will testify to the relevant facts

11  and, of course, the 18 U.S.C. 3142 in regards to Miss Winner

12  receiving -- being released pretrial.

13         THE COURT:  Thank you, Mr. Nichols.

14         Would the Government like to invite -- invoke the

15  rule of sequestration?

16         MS. SOLARI:  We would, Your Honor.

17         THE COURT:  All right.  Would those three witnesses

18  please stand if they're in the courtroom.

19         All right.  The Government has invoked the rule of

20  sequestration.  That means that you must exit the room while we

21  begin this process here.  You will be called to testify

22  individually.  While you're waiting to be called, please do not

23  discuss this case with anyone.  Keep those comments and remarks

24  about anything other than the case itself -- the purpose of

25  this rule is to make sure that you don't conform your

1  testimony, either intentionally or unintentionally, to facts

2  and testimony that others may offer in the case.

3          And so with that, if you would please be excused,

4  we'll call you when it's time for your testimony.

5      (The witnesses exited the courtroom.)

6          THE COURT:  Ms. Solari.

7          MS. SOLARI:  Thank you, Your Honor.

8          Do I have the Court's permission to proceed by

9  proffer?

10         THE COURT:  You may.

11         MS. SOLARI:  Thank you, sir.

12         Your Honor, first, the Government reasserts and

13 realleges the facts contained in Special Agent Justin Garrick's

14 sworn affidavits in support of the search warrant and the

15 criminal complaint in this case with which I know the Court is

16 familiar.

17         Your Honor, I'd also like to proffer some additional

18 evidence that we did not include in the affidavits as well as

19 some information we learned from the defendant and from

20 evidence collected at her residence and information that we

21 have learned from publicly available sources.  Some of it

22 confirms what we already knew.  Some of the information is new

23 and disconcerting.  Some of the information is new, and it is

24 downright frightening.

25         First, I'd like to proffer some information to

1    flesh out the summary that Your Honor received in the criminal

2    complaint of the defendant's conversation with FBI agents at

3    her home on June 3rd, 2017, the entirety of which was

4    audio-recorded.

5           Agents approached the defendant with a search warrant

6    issued by this Court, explained to her who they are and that

7    they had a search warrant, asked whether she'd like to speak

8    with them on a voluntary basis; and the defendant said that she

9    would.

10          The defendant then, once the house was cleared, was

11   allowed to go into the home where she let out her dog.  She put

12   her groceries away.  She put up her cat so that it wouldn't run

13   outside.  And then as they got ready to find a more comfortable

14   place to have a more precise discussion, the defendant swapped

15   stories with Special Agent Garrick about their respective dogs.

16          The defendant asked whether she'd be without her cell

17   phone for very long.  She said, "Is this one of these things

18   where I've brought my phone into a classified space?  Are you

19   going to take it for 3 weeks or something?  Because I'm

20   teaching yoga tomorrow, and I'd really like to have it.  It has

21   my music on it."

22          She told agents that she'd be comfortable speaking in

23   a back room of her home rather than them giving her a ride to

24   the FBI office.  They went into that back room escorted by the

25   defendant where, after chatting about her background, her

1    interests, her job, the agents asked her a series of questions

2    about whether she had any idea why they were there and whether

3    she could think of any time that she might have mishandled

4    classified information.

5            After telling several untruths to the agents, the

6    defendant finally admitted that, in fact, she purposely sought

7    out the intelligence-reported issue on a classified system.

8    She admitted she purposely printed it out.  She admitted she

9    secreted it out of a secure building and that she stored it in

10   her car for a couple of days.  She told the agents she then

11   mailed the document from Augusta, Georgia, to a particular news

12   agency that she admired hoping that the information in the

13   document would be published.

14           She acknowledged the information in the report could

15   be used to injure the United States or to assist a foreign

16   nation.  In fact, she specifically mentioned, when asked about

17   that, sources and methods, which is what intelligence personnel

18   call the manner and means by which the U.S. and others gather

19   sensitive and classified information.

20           She told agents how to access her cell phone and told

21   them they'd find a screenshot on there of the news agency's

22   secure drop mailing address.  She also said her laptop had a

23   Tor browser installed which she had used to access WikiLeaks,

24   but she actually said she was, quote, underwhelmed with what

25   WikiLeaks had to offer.

1        When asked why she revealed or transmitted the

2   classified information, the defendant said she was mad about

3   some things she'd seen in the media and she wanted to set the

4   facts right.  She said she couldn't understand why this report

5   hadn't been leaked already.

6        When asked whether she'd ever committed other

7   security violations like inserting a thumb drive or another

8   storage device into a classified computer, the defendant said

9   she once put a thumb drive into a secret-level computer just to

10  figure out how other people were getting personal photos onto

11  their secret computer.

12       Well, agents already knew that, in fact, on

13  November 9th of 2016 while working in the Air Force and holding

14  a TS/SCI clearance, the defendant used her work computer to

15  search, quote, Do top secret computers detect when flash drives

16  are inserted, end quote.

17       Later that same day, the defendant inserted a

18  removable thumb drive into a top secret computer.

19  Unfortunately, we don't know yet what she did with that thumb

20  drive while it was inserted, but we do know she inserted the

21  thumb drive just days before she was read out of classified

22  compartmented programs and her access terminated as she left

23  the Air Force.

24       Following her confession and after a decision was

25  made to arrest the defendant, agents allowed the defendant to

1  call somebody to help care for her pets.  The defendant called

2  an animal rescue organization and asked for their help, telling

3  them that she would not be back.

4        On the Sunday after her arrest, the defendant spoke

5  to her mother on the recorded jail phone.

6        Her mom asked her, "Do you know what you're getting

7  charged with?"

8        The defendant answered, "Mom, those documents.  I

9  screwed up."  The defendant said she was preparing herself like

10  she wasn't coming home.

11        What's most concerting to the Government, though,

12  Your Honor, about that conversation is the defendant's specific

13  use of the word "documents" plural because, so far, she has

14  only admitted to agents taking and sending the single

15  intelligence report that we know about.

16        As I mentioned earlier, Your Honor, agents gathered

17  four cell phones, two laptops, and one tablet from the

18  defendant's house in addition to notebooks and other items

19  listed in the search warrant.  They also found, with the

20  defendant's assistance, an AR-15 rifle, a 12-gauge shotgun,

21  and a Glock handgun.  The defendant agreed to surrender those

22  firearms to law enforcement for temporary storage.

23        While we have been waiting on forensic examinations

24  of those media storage devices, agents have been poring over

25  all of the hard copy material that we were able to retrieve

1   from the residence.  We need to see what we're dealing with

2   here.

3           In particular, agents found two notebooks containing

4   handwriting including numerous doodles of the defendant's own

5   name.  And what we surmised from the notebooks is that she

6   writes down quite a lot of things.  For instance, the agent

7   found handwritten notes in the defendant's notebooks about the

8   following:

9           How to instore [sic] Tor -- install Tor, which, as

10  I'm sure the Court knows, is The Onion Router, which is a means

11  to anonymously access the Dark Web through multiple successive

12  layers of encryption.  The Dark Web has, of course, some

13  legitimate uses, but it's most widely known for illicit

14  criminal marketplaces where one could buy or sell classified

15  information, phoney identification documents, passports, drugs,

16  weapons, and just about any sort of contraband one could want.

17          The defendant had detailed instructions in her

18  notebook regarding how to use the software and, most important,

19  how to use it at its most secure setting.  That would enable

20  her to navigate the Dark Web while hiding her identity and her

21  location.

22          Agents also found handwritten notes that detailed a

23  step-by-step plan for unlocking a cell phone to enable her to

24  change the SIM cards.  Doing that allows a person to untie

25  their cell phone from their regular provider when they remove

1     the issued SIM card, which is tied to the billing and usage

2     data for that particular customer.

3            Unlocking the phone allows the customer to purchase

4     with cash an anonymous SIM card from a grocery store or

5     elsewhere, insert the new card, and hop onto another provider's

6     network.  Use of the phone in that condition, Your Honor, makes

7     it a burner phone that hides the user's identity, usage, and

8     location.

9            More of the defendant's notes indicate she was

10    setting up a single-use burner e-mail account that would only

11    be active for a short period of time and that would allow her

12    to send e-mail without revealing her identity or her location.

13    The founder of the e-mail service I'm describing describes it

14    online as, quote, one-click, read-only burner mailboxes,

15    unquote.

16           Amongst the notes about the defendant's new

17    employment with Pluribus International Corporation where she

18    scribbled notes about dental and health insurance, she also

19    wrote, quote, I want to burn the White House down, and on the

20    next line wrote, Find somewhere in Kurdistan to live or Nepal.

21    Ha ha.  Maybe, end quote.

22           Another note said, quote, Mexico in the spring.

23    Afghanistan in the summer.  Asia and Jordan in between,

24    unquote.

25           One of the more disturbing entries, Your Honor, as

1    if this weren't bad enough, was a one-page writing in which the
2    defendant mentions a number of interesting names that drew our
3    concern, if not alarm.  Those names were Akhtar Mansour;
4    Mullah Omar; and Mullah Omar's son, Yaqoob.  She also mentions
5    Osama bin Laden.
6           As the Court may know, but for your edification,
7    Mullah Akhtar Mohammad Mansour was leader of the Taliban from
8    July 29th, 2015, until May 21st, 2016, when he was killed in a
9    U.S. drone strike in Pakistan.
10          Mullah Mohammed Omar is an Afghan mujahideen
11   commander who founded the Islamic Emirate of Afghanistan in
12   1996.  He was recognized as the supreme leader of the Muslims
13   until he was succeeded by Mullah Akhtar Mansour in 2015.  Omar
14   sheltered Osama bin Laden and Al-Qaeda militants in the years
15   prior to the 9/11 attacks; however, he reportedly passed away
16   in February 2013.
17          "Yaqoob" refers to Mullah Omar's oldest son,
18   Mullah Mohammad Yaqoob.  Yaqoob was assigned by the Taliban to
19   be in charge of the military commission of 15 of Afghanistan's
20   provinces.  Upon the death of Mansour, Yaqoob was appointed
21   second deputy to the new Taliban chief.
22          The defendant ended her page-long writing with,
23   quote, Perhaps bin Laden was the Judas to Omar's Christ-like
24   vision of a fundamental Islamic nation.  Yaqoob would know.
25   Where is Yaqoob?  Pakistan.  I can go there.  Urdo.  Goddamnit,

26

1   end quote.

2          Later in the same notebook, the defendant writes in

3   all capital letters, quote, This is your chance, above

4   notations about a possible 12-month contract job that would

5   bring her to a SCIF in Afghanistan.

6          The defendant is a skilled linguist in the languages

7   of Farsi, Dari, and Pashto.  Some of her notes, Your Honor,

8   appear to be in one or more of those languages.  We've not yet

9   translated them.

10          Agents researched the defendant's travel history and

11   learned that she's traveled to Mexico various times between

12   August 2002 and August 2006.  And we've also learned, as

13   Your Honor saw in the search warrant affidavit, that the

14   defendant went all the way to Belize for a 3-day trip May 27

15   through 29 of this year, which trip she told agents she took

16   alone and insisted that she met with no one.  The agents also

17   know that the defendant, prior to her arrest, was researching

18   travel from Atlanta to Tel Aviv, Israel, departing in September

19   of 2017.

20          We know from open-source online research that

21   Julian Assange, international fugitive and founder of

22   WikiLeaks, has praised the defendant via Twitter posting a

23   photo of her and telling his 223,000 followers, quote, Alleged

24   NSA whistleblower Reality Leigh Winner must be supported.  She

25   is a young woman accused of courage and trying to help us know,

1    unquote.

2         To that end, someone has set up a GoFundMe page for

3    the defendant, which, as of last night, having been up for

4    only 2 days, had collected $12,415 of its $50,000 goal from

5    284 donors.

6         Those people may be quite disappointed, Your Honor,

7    if they heard some of her recorded jail calls.  She told a

8    woman named Brittany, whom we believe to be her sister, about

9    what she'd done.  She said she released a document that we were

10   able to trace to her and it was, quote, kind of an important

11   one, end quote.

12        She then told Brittany about her upcoming bond

13   hearing.  She said she didn't want to spend the rest of her

14   life in jail and that she was, quote, gonna play that card

15   being pretty, white, and cute; braid my hair and all, gonna

16   cry.

17        Also on recorded jail calls, Your Honor, the

18   defendant has just recently asked her mother to transfer

19   $30,000 from the defendant's account to her mother's account

20   because the Court took away her free appointed counsel.  She's

21   also told her mother precisely what to say in various press

22   appearances, some of which appear to have been arranged by

23   defense counsel.

24        She told her mom to say that she feared for her life

25   as well as that of her dog and cat when armed agents swarmed

1  her house.  She told her mom, quote, You've got to play that

2  angle, end quote.

3        And she stated on the jail phone that if she doesn't

4  get bond today, she's going to, quote, go nuclear with the

5  press because that's how Mannon (phonetic) got out.

6        That's the evidence the Government wishes to proffer,

7  Your Honor, and I respectfully request we be allowed to make

8  argument at the appropriate time.

9        THE COURT:  Thank you very much, Ms. --

10        MS. SOLARI:  Thank you, sir.

11        THE COURT:  -- Solari.

12        Mr. Nichols.

13        MR. NICHOLS:  Yes, Your Honor.  Defense calls

14  Billie Winner-Davis to the stand.

15     (The witness, Billie Winner-Davis, was sworn.)

16        COURT CLERK:  Please state your name for the record.

17  Spell your last name.

18        THE WITNESS:  Billie Winner-Davis,

19  W-i-n-n-e-r-D-a-v-i-s.

20        COURT CLERK:  Thank you.

21                    BILLIE WINNER-DAVIS,

22  having been duly sworn, was examined and testified as follows:

23                    DIRECT EXAMINATION

24  BY MR. NICHOLS:

25  Q.   Good afternoon.  How are you doing today?

29

A.    Okay.  I'm a little nervous.

Q.    I know this might sound like a foolish question, but do you recognize the defendant?

A.    I sure do.

Q.    How do you recognize her?

A.    That's my daughter, Reality Winner.

Q.    Where did Reality grow up?

A.    Reality was born in Alice, Texas, which is a small town about 40 miles west of Corpus Christi, Texas.  And about -- when she was 1 years old, we moved over to Kingsville, Texas, which is just about 30 miles -- it's all in the Coastal Bend area.  She grew up in Coastal Bend Texas in the Kingsville area.

Q.    Who all lived with Miss Winner?

A.    In our household, it was myself, her father, and then her sister Brittany.  And then when she was about 8, her dad and I separated, and we divorced.  And then in 2000, I married Gary Davis, so Gary Davis moved into the household.  But those were the primary residents of that household.

            THE COURT:  Mr. Nichols, I don't -- I always hate to interrupt, but you're at a microphone in no man's land right now.  If you could just step back behind the lectern where --

            MR. NICHOLS:  I apologize, Your Honor.

            THE COURT:  -- we're sure everything will be recorded, I'd appreciate it.

30

1          MR. NICHOLS:  Yes, sir.  I apologize.

2          THE COURT:  That's okay.

3     BY MR. NICHOLS:

4     Q.   Where did she attend -- well, after she graduated high

5     school, what did she do after graduation?

6     A.   After she graduated from high school, she was on a

7     delayed-entry program into the Air Force.  She had enlisted,

8     and she was waiting for, you know, her call-up date.  And so

9     the December after she graduated, she went into the Air Force.

10    She went to Lackland Air Force Base for basic.

11    Q.   How long did she serve in the Air Force?

12    A.   6 years.

13    Q.   And do you know where she was posted during those 6 years?

14    A.   She did her basic training at Lackland Air Force Base in

15    San Antonio, Texas.  After that, she went to the Defensive

16    [sic] Language Institute in Monterey, California.  After that,

17    she had to go back to Texas to San Angelo -- I think it's

18    Goodfellow -- for training.

19         Let me think.  Where did she go after that?  Then she was

20    sent to Fort Meade in Maryland.

21    Q.   During her entire time in the military, do you know if she

22    ever got in trouble while serving in the military?

23    A.   She never was in trouble, never.

24    Q.   Do you know if she ever fled or went AWOL, away without

25    leave?

A.    Absolutely not, no.

Q.    What did she do after she -- well, do you know how she left the military?

A.    She was discharged honorably.

Q.    And after she received an honorable discharge, what did she do next as far as employment?

A.    I know that she had applied for a bunch of contract jobs in different areas, and I know that she had contacts here in Augusta with regard to having employment through -- like, at a gym to teach fitness.

      So she rented a house here in Augusta.  She basically just dropped her things off at the house and drove straight through down to Texas to spend Christmas with us.  And after the Christmas and New Year holiday, then she came back up to Augusta, and she was then hired on by whichever company she worked for.

Q.    During this entire time she served in the military, do you know if she ever spent time here in Augusta?

A.    Yes.  She was deployed here.  I'm not certain about the dates, but she served, I think it was, a 6-month deployment here in Augusta at the NSA here where she -- I think it was a -- kind of like a special mission or something, something like that.

Q.    And during her entire time in the military, how often did she come home to visit?

1    A.    She came home during Christmas whenever she could.  When

2    she was on deployment, she couldn't because that wasn't

3    allowed.  But she came home, you know, for Christmas.  I'm

4    trying to think if there's any other times that she came home.

5    And then one time, we met the girls up in Williamsburg,

6    Virginia, for, like, an extended long weekend.

7    Q.    Did she always keep in contact with her family even though

8    she wasn't physically in your presence?

9    A.    Yes, always, always.

10   Q.    During her time here in Augusta, do you know what type of

11   activities she was involved in outside of work?

12   A.    Outside of work, involved in CrossFit, involved in yoga.

13   She teaches yoga.  She practices yoga.  She's involved in

14   spinning.  She teaches spinning.  She has been involved in some

15   marathons.  I think there was a recent mud run for the Marines

16   she was involved in and that she -- she's hooked up with a

17   church here, an Episcopalian --

18   Q.    Do you know which church she attended?

19   A.    I think it's the Good Shepherd Episcopalian church that

20   she attended here.

21         I'm trying to think what else.  What else has she done

22   here?

23   Q.    Do you know if she's had any type of rela- -- profess- --

24   personal relationships with anyone here in Augusta?

25   A.    Yes, she has.  She has very good friends that she actually

1    knew from Monterey DLI that she went to training -- and they

2    actually -- we had a chance to spend time with them and meet

3    them in San Angelo, Texas, because they all went together to

4    the different trainings.  And they were stationed here at Fort

5    whatever here -- Gordon.  Sorry.

6    Q.   In regards to her cell phone, do you know whose account

7    her cell phone is on?

8    A.   It's on our account.  The account is in my husband's name,

9    Gary Davis.

10   Q.   Have you ever known her to have multiple cell phone

11   accounts?

12   A.   No.

13   Q.   Have you ever known her to have multiple working phones?

14   A.   Not working phones, but she -- she switches out a lot.

15   Q.   In regards to traveling the country, do you know when she

16   has ever left the country to, say, go to Mexico?

17   A.   When she was small.  When she was small, you know, it --

18   that was before you needed a passport.  We used to go to Mexico

19   to go shopping.  That was a thing -- that's a thing that you

20   do.  And then she also -- her and her sister got their braces

21   done in Mexico.  All their orthodontic work was done in Mexico,

22   so -- her dad took care of that.  And so on his weekends, they

23   would go and get their orthodontic -- but since then, I don't

24   think she's been to Mexico.

25   Q.   My next question is going to be:  As an adult, do you know

34

1   if she's gone to Mexico?

2   A.   Not to my knowledge, no.

3   Q.   As an adult, do you know what other countries she's gone

4   to?

5   A.   She went to Belize over this last holiday weekend, and

6   that's it.

7   Q.   As a juvenile, did she have any criminal record?

8   A.   No, sir.

9   Q.   As an adult, do you know if she's ever been convicted of

10  any crimes?

11  A.   No.

12          MR. NICHOLS:  Court's indulgence, Your Honor.

13          THE COURT:  Of course.  Take your time.

14  BY MR. NICHOLS:

15  Q.   Now, you previously spoke about her sister Brittany.

16       Does Miss Winner have any other relatives in the country?

17  A.   Yes, she does.  She has another half sister, who's in

18  Texas.  She has three stepsiblings.  One's in Texas.  One's in

19  Monterey, California.  One is in Nashville, Tennessee.

20       My family is in Wisconsin.  She's extremely close to my

21  sister and my sister's family, which would be my sister, her

22  husband, and they have four children and then all of the -- all

23  of their grandchildren.

24  Q.   Does Miss Winner have any godchildren?

25  A.   Yes, she does.  She is the godmother for -- he would be my

1    great nephew, Aries Messerschmitt (phonetic).

2    Q.   In regards to her training, did she have any skills before

3    she went into the Air Force in regards to languages?  Did she

4    teach herself any languages before going into the Air Force?

5    A.   Yes.  She had begun to self- -- teach herself how to speak

6    Arabic.  She had ordered instructional materials online and was

7    studying the Arabic language before she even -- I think before

8    she even approached a military recruiter.

9    Q.   And about what age was she when she began to study the

10   Arabic language?

11   A.   Probably 17.

12   Q.   Are you aware of any other schools or training that she's

13   received?

14   A.   She has college credit.  She has an associate's degree in

15   the Persian-Farsi and Dari course from the DLI.  She also has

16   quite a few college credits: business, business management,

17   nutrition -- I'm trying to think what else -- your basics, the

18   basic (indiscernible), so . . .

19   Q.   Do you know if she had any intentions of attending school

20   locally?

21   A.   Yes.  I know she had applied -- I think she had applied to

22   Georgia here, and she had also applied to Baylor.  I have the

23   acceptance letter at home.

24   Q.   In regards to the schools, do you know what schools she

25   had been accepted into?

1    A.    I received the Baylor acceptance letter.  That's the only

2    one that I'm -- I'm pretty sure she was accepted here, too.

3    Q.    And if you know, what grades did she possess in the -- her

4    training?

5    A.    All A's.  What grades?

6    Q.    Yeah.

7    A.    Yes.  She's -- yes.

8    Q.    In school, grade school specifically, what type of student

9    was she?  That's probably a better question.

10   A.    She was top 10 of her class the entire way entirely.

11   Q.    I know you said that she had no juvenile criminal

12   offenses.

13        Do you know if she ever got in trouble while in school?

14   A.    One time in the eighth grade.

15   Q.    What happened then?

16   A.    Eighth grade, they were preparing for graduation.  It's a

17   big deal.  She was going to a small country school where we

18   live.  We live outside of Kingsville.  And they were preparing.

19   They didn't know if she was going to be the valedictorian or

20   the salutatorian, but they were preparing.

21        And Reality, she -- I guess she got her classmates all

22   together, and they -- they had the biggest, bestest food fight

23   that the school has ever imagined, and she was not allowed to

24   walk the stage.

25   Q.    Other than that incident, are you aware of her getting in

37

1  trouble at all in school -- grade school?

2  A.   No, no.

3  Q.   If the Court were to grant a bond that required property

4  or money, would you and your husband be willing to sign as a

5  bondholder?

6  A.   Yes, absolutely, absolutely.

7  Q.   If you were required to put up money, would you and your

8  husband be willing to do that?

9  A.   Yes, as much as we could.

10  Q.   And would you be willing to do everything within your

11  possible [sic] to ensure that Miss Winner came to every court

12  appearance as required?

13  A.   Yes.  Yes, I would.

14        MR. NICHOLS:  Thank you.

15        Your Honor, I have no further questions for this

16  witness.

17        THE COURT:  Any cross-examination?

18        MS. SOLARI:  Yes, please, Your Honor.

19                    CROSS-EXAMINATION

20  BY MS. SOLARI:

21  Q.   Good afternoon.  I appreciate you being here.  I'm certain

22  your daughter does as well.  I know this is certainly an

23  emotional situation for everybody and one in which you're not

24  able to know the entirety of what's going on right now.  I'm

25  sure that's frustrating for you, and I am sorry for that.

1          I'd just like to ask you a few questions.  I was listening

2    as closely as I could when you were talking about your various

3    relatives, kind of Wisconsin, Texas, and various places.

4          Do you have any family in Georgia?

5    A.   No, not currently.

6    Q.   And as far as the house that your daughter was occupying

7    at the time of her arrest, she was renting that home?

8    A.   Yes, she is.

9    Q.   So she doesn't own any property here in the state of

10   Georgia?

11   A.   No.

12   Q.   And you're aware, I'm sure, much to your disappointment,

13   that she will likely lose her job over the behavior that's been

14   alleged in this case?

15   A.   One of her jobs.

16   Q.   Okay.  The job that she will retain -- she teaches yoga;

17   is that right?

18   A.   And spinning.

19   Q.   And spinning.  Okay.

20         And so those are the jobs that she might be able to carry

21   on with?

22   A.   Yes.

23   Q.   Okay.  How do you and your daughter usually communicate?

24         You live in Texas -- correct? --

25   A.   Yes.

39

Q.    -- while she lives in Georgia?

      What's your typical method of communication?

A.    She calls.  She calls.  She's the -- religiously.  She

calls weekly -- at least once a week, and we talk at length the

one time a week and maybe twice a week.  We text almost daily,

e-mail.  She e-mails me from time to time.

Q.    Has the defendant ever contacted you through a secure

e-mail system, perhaps something other than just Gmail,

Hotmail, Yahoo!, anything like that?

A.    No.

Q.    So nothing out of the ordinary?

A.    No.

Q.    Has she ever contacted you through a service called

slippery.com?

A.    No.

Q.    Has she ever talked to you about any need to set up an

account through that service?

A.    No.

Q.    Now, you said that your daughter has -- and this may be

true for a lot of us.  We have old phones we don't use anymore

but we haven't thrown away.  So we found quite a few at her

home.

      But has she ever talked to you, though, about switching

out SIM cards on her phone, if you know what that is?

A.    Yes.  And she does that.

Q.   Okay.  So she's talked to you about switching SIM cards
out on her phone.

Do you know how many phones she does that with?

A.   No.

Q.   And -- so then you're aware that when she removes the SIM
card from her phone, your provider, since you maintain her
account -- correct?

A.   She's -- her phone is -- her phone number is under our
account.

Q.   Okay.  And so then when she removes the SIM card from
her phone, is it the case that her phone usage doesn't appear
anymore on your billing statement?

A.   No.  Her phone -- that number always appears on our
billing.

Q.   No.  I'm sorry.  I mean the actual usage of her phone.

Are you aware that that's really the consequence of
removing a SIM card from your phone?  It means the --

A.   No.

Q.   -- provider can no longer track your cell phone usage.

A.   I don't have that knowledge.

Q.   Okay.  Fair enough.

Is that something you do?  Do you typically switch the SIM
cards on your phones?

A.   No.

Q.   Would you know how to go about doing that?

1   A.   No.

2   Q.   Okay.  Have you ever heard of Tor or The Onion Router as a

3   software device that would allow you to access certain parts of

4   the Internet?

5   A.   No.

6   Q.   So fair to say you don't use that service or know how to

7   use it?

8   A.   I've never heard of it.

9   Q.   So, then, your daughter's never discussed with you her use

10  of The Onion Router or whether she's ever done that?

11  A.   No.

12  Q.   Has your daughter discussed with you her desire over the

13  years to go to the Middle East, in particular Afghanistan or

14  Pakistan?

15  A.   Yes.  She wants to go.  She wanted to go.

16  Q.   Is it fair to say that, well, ever since she joined the

17  military, she's been trying to deploy to Afghanistan?

18  A.   I don't know if you would say she's been trying to.  I

19  mean, in the military, it wasn't an option for her.

20  Q.   Well, that's what I mean.

21       So was she frustrated that her position in the Air Force

22  was not going to give her an opportunity to go to Afghanistan?

23  A.   I think, in the beginning, that's one of her -- that she

24  had wanted to.  But, I mean, very quickly on, she learned that

25  she wasn't going to.

1   Q.   Isn't that, in fact, why she left the Air Force, because
2   they wouldn't offer her any ability to deploy to Afghanistan;
3   those were -- abilities were being given to special forces-type
4   persons?
5   A.   I don't know if that was the reason.  That might have been
6   one of many reasons.
7   Q.   Okay.  And, of course, listening to you talk about your
8   daughter's accomplishments, she's extremely intelligent;
9   correct?
10  A.   Yes, she is.
11  Q.   And, in fact, I think you said she -- she's essentially
12  self-taught these Middle Eastern languages, begun at the age of
13  about 17?
14  A.   Yes.  She started.
15  Q.   Has she always had that interest in traveling to the
16  Middle East or doing some sort of work over there?
17  A.   No.
18  Q.   Did she ever tell you why she took up an interest at the
19  age of 17 in learning Arabic or Farsi or Dari or any of those?
20  A.   She loves that language.
21  Q.   All right.  Fair enough.
22       Has she ever discussed with you a desire to go to Pakistan
23  to meet with -- I know it's going to sound like a silly
24  question.
25       Has she ever discussed with you a desire to go to Pakistan

43

1  to meet with leaders of the Taliban government?

2  A.   No.

3  Q.   I recognized you when you came in because I've seen you on

4  certain media appearances.  And I commend you.  I know that you

5  are trying to do what you believe is right to get your

6  daughter's side of the story out there.

7      But can I ask you:  Who set up your media appearances for

8  you?  In other words -- I think you were with Anderson Cooper

9  on CNN.  I think I saw you on another program.  I can't

10  remember the name of it.  Who set those up?

11  A.   We arranged them with the people.  I mean, they -- CNN

12  reached out to us, and then CBS called us.  We've told them

13  where we were going to be.  They set up a suite.  NBC, the same

14  thing.  And all the other ones have been ones that have showed

15  up at the house.

16  Q.   I'm sure that's kind of annoying.

17  A.   It's been a whole different experience for us, nothing --

18  we've never experienced anything like this.

19  Q.   I'm sure.  And I'm -- I am sorry for that.

20      Did your daughter's defense attorneys set up any of your

21  media appearances for you?

22  A.   No, he has not.

23  Q.   Did anyone, your daughter or anyone else, tell you

24  expressly what to say in any of your media appearances?

25  A.   No, absolutely not.

44

Q.   Ma'am, are you aware -- I imagine you must be because it's usually on every single call you'd receive from the jail, but are you aware that the phone calls you've had with your daughter since she's been incarcerated have been recorded?

A.   Yes.

Q.   So I'd like you to think back, then, before you answer this question.

At some point, did your daughter ask you to make sure that, in your media appearances and at court, you told everyone the details of how the FBI approached and interviewed her on the day she was arrested?

A.   Yes, she did.

Q.   And she told you she feared for her life and the life of her pets and thought she -- they might make her disappear and things like that?

A.   Yes, she did.

Q.   Now, of course, you were in Texas at the time all this happened; right?  You weren't at her home in Augusta, Georgia, with the agents?

A.   That's right.

Q.   So the best you can do, then, is rely on your daughter's account of how that interaction played out; right?

A.   Yes.

Q.   And do you remember her using the words, when she told you what to say, that you need to, quote, play that angle?

45

1   A.   Yes, I remember her saying that.

2            MS. SOLARI:  Thank you, ma'am.  I appreciate your

3   candor, and I appreciate you being here today.

4            THE COURT:  Any redirect, Mr. Nichols?

5                       REDIRECT EXAMINATION

6   BY MR. NICHOLS:

7   Q.   Ma'am, do you -- based upon everything you know about your

8   daughter and everything you've learned so far, do you have any

9   fear that your daughter was going to flee the country?

10  A.   Absolutely not, no.

11  Q.   Do you know if she owns any property outside of the

12  country?

13  A.   No, she does not.

14  Q.   Do you have any fear that she's going to flee in general?

15  A.   No.

16  Q.   Do you have any fear that she's going to commit a new

17  crime or any violent crime?

18  A.   No.

19            MR. NICHOLS:  No further questions, Your Honor.

20            THE COURT:  Any follow-up to that, Ms. Solari?

21            MS. SOLARI:  No, Your Honor.

22            THE COURT:  Ms. Winner-Davis, I really appreciate you

23  being here today.  Obviously, you're a good mom, and you love

24  your daughter very much.  And so I very much appreciate the

25  love you have for her and the time and expense it took you to

46

1    get here and support her.  So thank you very much.

2              And at this time, you may be seated in the courtroom

3    if you like.  I don't believe there would be any objection if

4    you want to be excused as well.

5              Ms. Solari?

6              MS. SOLARI:  I have no objection, Your Honor.

7              THE COURT:  Mr. Nichols?

8              MR. NICHOLS:  I have no further intention of calling

9    this witness, Your Honor.

10             THE COURT:  Okay.  Well, you're excused.  Thank you

11   for your time.

12             MR. BELL:  Your Honor, we'd call Gary Davis to the

13   stand, please.

14        (Pause in proceedings from 4:51 p.m. to 4:53 p.m.)

15        (The witness, Gary Davis, was sworn.)

16             COURT CLERK:  Please state your name for the record.

17   Spell your last name.

18             THE WITNESS:  Davis, G- -- D-a-v-i-s, Gary, G-a-r-y.

19             COURT CLERK:  Thank you.

20                       GARY DAVIS,

21   having been duly sworn, was examined and testified as follows:

22                     DIRECT EXAMINATION

23   BY MR. BELL:

24   Q.   Mr. Davis, could you tell us your full name and where you

25   live.

1    A.    My name is Gary Davis.  I live in Kingsville, Texas.

2    Q.    And what do you do for a living, sir?

3    A.    I'm a director in a treatment facility for adolescents.

4    Q.    Okay.  And what are you treating these adolescents for?

5    A.    Substance abuse.

6    Q.    Okay.  How long have you done that?

7    A.    I have been at my present facility for more than 10 years.

8    Q.    Okay.  And do you find that to be rewarding work?

9    A.    Yes, sir, I do.

10   Q.    Do you find is to be challenging work?

11   A.    It's challenging and rewarding.

12   Q.    Okay.  What would your educational background be?

13   A.    I graduated from high school in Corpus Christi, Texas, and

14   went to work in the field and went to work -- started out at --

15   study -- planning to be a veterinarian, attended West Texas

16   State University for a few years until my junior year, and then

17   life intervened.

18         Finally, in my mid 30s, I went back to school at Angelo

19   State University, finished my undergraduate degree, and earned

20   a scholarship to attend graduate school.

21   Q.    And what are your degrees in?

22   A.    Counseling psychology, sir.

23   Q.    And the same for undergraduate and master's?

24   A.    Yes, sir.

25   Q.    And where did you get the master's?

48

1   A.   Angelo State University.

2   Q.   Okay.  Now, how old was Reality when you and her mother

3   married?

4   A.   She'd just turned 9.

5   Q.   Okay.  And you were the man in the house from age 9 on?

6   A.   Yes, sir.

7   Q.   Was she a troublesome child?

8   A.   No, sir.

9   Q.   Okay.  How was she as a student as a young child?

10  A.   I'm sorry?

11  Q.   How was she as a student as a young child?

12  A.   Pretty strong-willed.  But, you know, a lot of children

13  are.  It was a difficult time blending a family together.

14  Q.   Okay.

15  A.   My children had as much trouble blending with that as she

16  did.

17  Q.   Okay.  Did she ever -- any trouble at school?

18  A.   (No response.)

19  Q.   I'm talking about, you know, serious things.

20  A.   She was not a disciplinary problem.  She -- the worst

21  thing she ever did was the eighth grade graduation, orchestrate

22  a food fight.

23  Q.   Okay.  How were her grades?

24  A.   She's been a straight-A student all her career.

25  Q.   And what sort of activities did she participate in in

49

1   middle and high school?

2   A.    Since she was small, she played soccer.  She was very

3   interested in soccer.  She played soccer from -- I coached her

4   soccer team when we were -- she was little up through junior

5   high.

6         In high school, she was active one year with cheerleading.

7   She was the mascot of her high school cheerleading team.  And

8   later on, she played tennis.

9   Q.    Uh-huh.  Do you know if she was accepted to any college

10  when she finished high school?

11  A.    The day she left for the military, she told her mother

12  that she had been -- turned down a full scholarship to

13  Texas A&M University in Kingsville as an engineering

14  scholarship.

15  Q.    Reality turned down a scholarship --

16  A.    Yeah.

17  Q.    -- in engineering by Texas A&M offered to her?

18  A.    She chose to enlist in the United States Air Force

19  instead.

20  Q.    Okay.  And how long was she in the Air Force?

21  A.    She served for 6 years.

22  Q.    Okay.  Are you aware of her having any problems during her

23  years in service to our country with the Air Force?

24  A.    I know of no disciplinary actions that were ever taken

25  against her while she was a member of the Air Force.

Q.    Okay.  And do you know whether or not she planned to
continue her education after the Air Force?

A.    While she was in the Air Force, she earned her
bachelor's -- or her associate's degree, and so she'd been
planning on pursuing and finishing up her bachelor's degree.

Q.    Okay.  And when she was in high school, did she get any
college credit?

A.    She was enrolled in real course -- real credit courses,
so she had about a year's worth of college credit when she
graduated high school.

Q.    These are the AP courses they let the really bright,
dedicated students --

A.    Yeah.

Q.    -- take?

A.    They counted for both college credit and for high school.

Q.    Okay.  Now, you heard a good bit about a SIM card in a
cell phone.

      Do you know what a SIM card in a cell phone is?

A.    Yes, sir.

Q.    It's the brains of the phone, isn't it?

A.    Right.  It's, exactly, what runs the phone.

Q.    Are you aware that if your cell phone breaks or if you
drop it or if you're working in a gym and crack it, you can get
another new cell phone, take your SIM card out and put it in a
new phone, and it'll work just like it's been set up?

1   A.   Yes.  And that's exactly what happened when she was home

2   for Christmas.  She broke her phone, and so she used one of my

3   old phones for a while.

4   Q.   Now, when she replaced the SIM card in a new phone because

5   the old phone was breaking, did you think she was doing some

6   dangerous criminal act?

7   A.   No.  She was just trying to make her cell phone work.

8   Q.   Okay.  Have you ever heard it suggested that someone who

9   replaces the SIM card in a broken cell phone by putting it into

10   a new phone, that they're doing something suspicious of future

11   criminal activity?

12   A.   No, sir.  That's --

13   Q.   Okay.

14   A.   -- just not . . .

15   Q.   Now, it's been said that she traveled to Mexico.

16       Have you ever known her to go to Mexico?

17   A.   When she was a child, she had braces, and she was being

18   treated by an orthodontist in Progreso, Mexico --

19   Q.   Did he --

20   A.   -- across the border.

21   Q.   Did he do good work?

22   A.   Yeah, he did.

23   Q.   Was he a lot cheaper than the Texas orthodontist?

24   A.   I -- you know, her father took care of that --

25   Q.   Okay.

52

A.    -- and he was the one who would take them to the
orthodontist.

Q.    And about what age was she when she was making these trips
to Mexico?

A.    She was seventh, eighth grade.

Q.    Okay.  Now, is she the only one in your extended family
who's chosen to serve the United States in the military?

A.    My oldest son, Cole, is a sergeant -- a technical sergeant
in the United States Air Force.

Q.    Okay.  How long has he been in the Air Force?

A.    Since 2002.

Q.    How about any of your siblings?

A.    None of her siblings or my other children have served.

Q.    Well, how about your siblings?  Any of them serve?

A.    My -- her uncles were both in the United States Army.

Q.    Okay.  Did you try to join?

A.    I did try.

Q.    Okay.  And why did you not join?

A.    I have a high-frequency hearing loss, and it was --

Q.    Okay.

A.    -- was not accepted.

Q.    They turned you down?

A.    Yeah.

Q.    But you tried?

A.    I did, sir.

1   Q.   Okay.  Have you ever heard Reality express any un- -- what

2   you thought to be unpatriotic thoughts?

3   A.   Never.

4   Q.   Have you ever had to get her out of any trouble with the

5   police?

6   A.   Myself?

7   Q.   Yeah?

8   A.   No, sir.

9   Q.   Have you ever suspected that she was engaged in any sort

10  of illegal activity?

11  A.   Never.

12  Q.   Okay.  Do you own your home?

13  A.   Yes, sir, we do.

14  Q.   How much equity would you have in that home?

15  A.   We have 20 acres of land that's paid for in Kleberg County

16  along with a house that sits upon it.  We have -- you know,

17  whatever it's worth.  And I don't really know what that's

18  worth, but it's a couple hundred thousand dollars.

19  Q.   Did you -- did it take you a while to pay for your home?

20  A.   Yes, sir.

21  Q.   Is it paid for now?

22  A.   It's paid for.

23  Q.   Would you think you were taking any risk if you pledged

24  your home and that 20 acres --

25  A.   Not at all.

54

1    Q.    -- as bond for Reality so that she can have pretrial

2    release?

3    A.    Yes -- no.  I have no concerns about that.

4    Q.    Okay.

5    A.    I cosigned for her car, and she never missed a payment.

6    Q.    Okay.  Would you have any doubt that she would engage in

7    any sort of criminal activity pending trial if the Court saw

8    fit to give her -- to allow her to be released pretrial?

9    A.    I am confident that she would obey all the terms of her

10   release.

11   Q.    Okay.  If the Court wanted her to go to Texas so she was

12   close to family, would that be okay?

13   A.    Yes, sir.

14   Q.    If the Court wanted her to stay in the Southern District

15   of Georgia or in just the Augusta Division or in just the --

16   Richmond County, would that be okay?

17   A.    Yes, sir.

18   Q.    Would you have any fear of her violating any of those

19   terms?

20   A.    I would have no fear of her violating any of the terms of

21   her probation.  I'd fear for her safety.

22   Q.    Okay.  Now, we've heard that she had guns in her house on

23   Battle Row.

24   A.    Yes, she did.

25   Q.    Okay.  Who gave her those guns?

55

1    A.    I did.

2    Q.    And what guns did you give her?

3    A.    She had a Glock 19 pistol, a AR-15, and a 12-gauge

4    shotgun.

5    Q.    Do you own other guns?

6    A.    Yes, sir, I do.

7    Q.    Do you consider yourself maybe even a fan of owning guns?

8    A.    I enjoy the hobby, sir.

9    Q.    Okay.  Do you use them for hunting or for shooting or for

10   defense or what?

11   A.    Purely recreation and defense.

12   Q.    Okay.  And whose idea was it for you to give Reality a

13   pistol to keep in her home?

14   A.    I did.

15   Q.    Okay.  Have you trained Reality in how to use a gun

16   safely?

17   A.    Yes, since she was a small child.

18   Q.    Okay.  Have y'all shot a lot together?

19   A.    Yes, we have.

20   Q.    Have you ever seen Reality ever use a gun in a -- in what

21   you deemed an improper or dangerous fashion?

22   A.    No, sir, she has not.

23   Q.    Have you ever seen her use a gun towards any person?

24   A.    No.

25   Q.    Have you ever used -- seen her -- Reality ever use a gun

56

1   to kill an animal?

2   A.   No.

3   Q.   You've trained her how to safely use a gun?

4   A.   Yes, sir.

5   Q.   And you wanted her to have that.

6        And why did you want her to have it here in Augusta,

7   Georgia?

8   A.   As a young, single woman living alone and -- you know,

9   I wanted her to have every means possible to protect herself.

10  Q.   Okay.  Now, we've heard about an AR-15.

11       Do you know about that?

12  A.   Yes, sir.

13  Q.   Where did that come from?

14  A.   I built it.

15  Q.   Okay.  And whose idea was it for you to provide it to

16  Reality?

17  A.   It was my idea.  It was a gift.

18  Q.   Okay.  And had she shot that gun with you?

19  A.   Yes, sir.

20  Q.   Had you trained her in the safe use of that gun?

21  A.   Yes, sir, I have.

22  Q.   How -- well, tell me:  How do you view gun safety?  Is

23  that something you take lightly?

24  A.   No, sir.  It's very serious.

25  Q.   Okay.  And do you think that Reality knew how to use that

1    AR-15 safely?

2    A.    Yes, she did.

3    Q.    And why did you want to give it to her?

4    A.    One, she enjoyed it.  She enjoyed having a -- shooting the

5    AR when she was in the military and trained on the use of it,

6    and she enjoyed shooting the long gun.  We had talked about it,

7    and so I built it for her as a gift.  I assembled it and put it

8    together and personalized it for her.

9    Q.    Okay.  And have you ever known her to use that AR-15 for

10   anything other than --

11   A.    Punching holes in paper.

12   Q.    -- target practice?  What?

13   A.    Punching holes in paper.

14   Q.    Okay.  Have you ever seen her aim that gun at anybody?

15   A.    Only a paper target.

16   Q.    Okay.  Have you ever seen her use that gun to even kill an

17   animal such as a deer?

18   A.    She's never engaged in any hunting --

19   Q.    Okay.

20   A.    -- in her life.

21   Q.    Have you ever seen her casually or improperly use that --

22   A.    No.

23   Q.    -- rifle?

24         Now, we've heard about a 12-gauge shotgun.

25         Do you know about that?

58

A.   Yes, sir.  I bought it for her.

Q.   Okay.  And when did you buy it for Reality?

A.   She was still in Maryland when I bought the 12-gauge shotgun for her.

Q.   Okay.  And what -- could -- describe that 12-gauge shotgun.

A.   It's a Mossberg 88 pump, and I bought it for her for self-protection.

Q.   Uh-huh.

A.   I believe it -- we all have the right to defend ourselves, and the means to do that is important.  And as a single woman leaving -- living alone, you know, against home invasion or something like that, she'd be vulnerable if she didn't have the means to protect herself.

Q.   Did you train Reality how to use that gun?

A.   I did, sir.

Q.   Have you watched her use it?

A.   Yes, sir.

Q.   Have you -- do you feel she knows how to use it safely?

A.   Yes, sir.

Q.   Have you ever seen her use it in a way that you thought was not a safe way to use that 12-gauge pump Mossberg?

A.   No, sir.

Q.   Okay.  Did you train her from a young girl how to safely use a gun?

59

1   A.   Yes, sir.

2   Q.   Okay.  Do you think that was part of your duty as a

3   stepfather?

4   A.   It was part of my duty as her father.

5   Q.   Okay.  Did she introduce you to others as her father?

6   A.   She has.

7   Q.   Okay.  Now, have you ever seen her use that shotgun to

8   kill any animal?

9   A.   No, sir.

10  Q.   Have you ever --

11  A.   She doesn't hunt.

12  Q.   Okay.  Have you ever seen her point that gun at anyone?

13  A.   No, sir.

14  Q.   Do you think she knows what my daddy taught me before he

15  gave me my 20-gauge pump shotgun, never point that gun at

16  anything you don't intend to shoot?

17  A.   That is what I taught her.

18  Q.   Okay.  Do you -- did you teach her what my daddy taught me

19  before I got my 20-gauge pump that had been his as a boy, treat

20  all guns as though they're loaded?

21  A.   Yes, sir.

22  Q.   Do you think she understood that?

23  A.   She does.

24  Q.   Now, do you think you were doing something that was

25  helping a potential criminal to commit future crimes when you

60

1  provided your daughter with the -- these guns we've talked

2  about?

3  A.   No, sir.

4  Q.   Have you ever had any fear that Reality would use these

5  guns that you provided to her and trained her in any improper

6  fashion?

7  A.   No, sir, I have no fear of that.

8  Q.   Okay.  Have you ever -- would you have any fear, if she

9  were to get pretrial release, that she would attempt to use any

10 weapon in an improper fashion?

11 A.   She would not violate the terms of her release, and I

12 would take possession of her firearms.

13 Q.   Okay.  And do you have a license to carry?

14 A.   Yes, sir.  I'm a licensed handgun carrier in the state of

15 Texas.

16 Q.   And you think that's important for you?

17 A.   I do.

18 Q.   Has Reality ever sought a handgun carry license?

19 A.   No, she has not.

20 Q.   Okay.  Did she also receive firearms training in the

21 United States Air Force?

22 A.   Yes, she did.

23 Q.   Okay.  Do you think she was using that training in

24 preparation of future crimes?

25 A.   No, sir.  That's part of her duties as an airman.

1  Q.   Okay.  Has Reality maintained strong ties with you and
2  your wife, her mother?
3  A.   Yes.  She calls weekly, talks with her mother; and she
4  texts each of us frequently.
5  Q.   Okay.  Has Reality maintained strong ties with her sister?
6  A.   Yes, sir.
7  Q.   Okay.  Now, where is her sister living now?
8  A.   Her sister lives in Okemos, Michigan.  She attends
9  Michigan State University.
10  Q.   Okay.  Do they, from time to time, visit with each other?
11  A.   They were together at Christmas.
12  Q.   Okay.  And has Reality tried to maintain ties with her
13  godson?
14  A.   Yes, sir.
15  Q.   Okay.  How old is he now?
16  A.   I think Aries is 3.
17  Q.   Okay.  Does she seem to take that as an important
18  relationship?
19  A.   Very important to her.
20  Q.   Are you aware of any close friends and ties that she has
21  outside the bounds of the United States?
22  A.   No.  We have nobody outside of the United States.
23  Q.   Are you aware of any financial resources she might have
24  outside the bounds of the United States?
25  A.   Her wages from -- not outside the United States, no.

62

Q.   Okay.  Have you ever known Reality to get in a fist fight with anyone?

A.   She's never been arrested or been in any kind of physical altercation --

Q.   Have you ever known --

A.   -- since she was a child --

Q.   -- her to have one -- any --

A.   -- not even childhood.

Q.   Okay.  Any physical alteration [sic]?

A.   (No response.)

Q.   Have you ever known her --

A.   No, sir.

Q.   Have you ever known her to steal anything from a store?

A.   No, sir.

Q.   Would you have any fear of any violence on her part should the Court see fit to grant her her constitutional right to bond pending trial?

A.   I know in my heart that she would not do anything to jeopardize that.

Q.   Okay.  Are you willing to bet your 20 acres and your home that you spent all these years paying for and have now paid for?

A.   Everything in -- I own, I'll pledge.

Q.   Okay.  Without fear?

A.   Without fear.

1  Q.   Okay.  What sort of athletic things does she do?  We've

2  heard about yoga and spinning.

3  A.   She's into weightlifting and CrossFit and running half

4  marathons.  Yoga is her release in the way of finding inner

5  peace, and it really helped her focus on a lot of things.

6  Q.   Uh-huh.

7  A.   You know, in speaking with her, I mean, she believes in

8  yoga as a way to find peace and to spread -- and help other

9  people.  In fact, in the jail, she's -- while she's been

10  detained this week, she's actually teaching other residents of

11  the jail how to do yoga and how to help them overcome some of

12  the things they are burdened with.

13  Q.   Have you known her to try -- before being arrested, do

14  things to help other people?  Would that --

15  A.   Yes, sir.

16  Q.   What sort of things?

17  A.   She's been active in a pet rescue here, Hands to Paws.

18  She fostered her dog, who had been abused and neglected, and

19  did wonderful work with the dog and was probably going to adopt

20  that dog prior to this happenstance.

21  Q.   Uh-huh.

22  A.   She's always given back to any community she has been --

23  when she was in Maryland, she was active with a program called

24  Athletes Serving Athletes where they would help disabled people

25  to run marathons and experience sporting events that they would

64

1   never be able to in any other way.

2        She's a wonderful girl who gives back and has given to our

3   nation, and she deserves a chance to prove it.

4   Q.   Okay.  Is there anything else you think you'd like to tell

5   the Court or the Court should know before they make their --

6   A.   I just want to tell the Court, Your Honor, that my

7   daughter, she will do whatever she says she will do.  If you

8   grant her clemency and allow her to be released on bail, she

9   will abide by all the tenets and all the terms of release, and

10  she will show up for any court date and be there.

11            MR. BELL:  Thank you very much.

12            Your witness.

13            MS. SOLARI:  Thank you, sir.

14                     (No omissions)

15                  CROSS-EXAMINATION

16  BY MS. SOLARI:

17  Q.   Good afternoon, sir.  I appreciate you being here.  I'm

18  certain your daughter does as well, hearing you in support of

19  her.  I won't keep you too terribly long, and I'm certainly not

20  going to talk to you much about guns.  I've got no problem with

21  lawful gun ownership.  And I've got friends that tell me it's a

22  whole lot of fun to build an AR-15, so --

23  A.   They are.

24  Q.   -- I've got no problem with that, yeah.

25        I just want to ask you a few questions.  I think -- and

1  tell me if you recall this.

2      Did you speak with one of the FBI agents who interviewed

3  your daughter by phone shortly after her arrest or maybe even

4  before?

5  A.   I did speak with Agent Taylor on the phone.

6  Q.   Okay.  And had you spoken with your daughter shortly

7  before that?

8  A.   She called me on her phone and then put Agent Taylor on.

9  Q.   Okay.  So when she called you on her phone, did she

10  describe to you at all how the agents had treated her, the

11  circumstances of her interview?

12  A.   It was very cryptic.  She stated that she was in trouble

13  and that she was probably going to be arrested and detained and

14  that she -- at that time, she told me she was going to let me

15  speak with the FBI agent, and then Agent Taylor came on the

16  line.

17  Q.   Okay.

18  A.   He told me a little bit about her being arrested and that

19  he couldn't discuss the details because it was classified.

20  Q.   Sure.

21  A.   And then he allowed me to speak with my daughter shortly

22  after he got through.  And I basically asked her if she was

23  okay.

24  Q.   Uh-huh.

25  A.   And she said, "I think so."

66

1      But I could tell that, you know, she was -- she was

2   scared, and she was strained.

3   Q.   Did she tell you in that phone call that the agents were

4   actually very nice to her?

5   A.   Honestly, ma'am, I can't recall.  I --

6   Q.   Do --

7   A.   -- did not see -- you know, I -- honestly, I don't recall

8   that detail.

9   Q.   Okay.  Do you remember telling the agent you talked to

10   right after that -- actually thanking him for being so nice to

11   your daughter during their interaction?

12   A.   Well, he was very cordial and very helpful, as much as he

13   could be, and, yes, I thanked him for that.

14   Q.   Okay.  You mentioned about switching SIM cards on a phone.

15      So is the case -- you said your daughter had broken her

16   phone over the Christmas holiday sometime?

17   A.   Uh-huh.

18   Q.   And you had a spare, I guess, that you gave her?

19   A.   I had my old -- yeah.  My wife and I had recently

20   upgraded, and I had -- she used my -- one of my old phones.

21   Q.   So was it just a pretty easy process, pop out the SIM

22   card, put it in yours, boom, it works?

23   A.   Yes.

24   Q.   Okay.

25   A.   That's -- it's not -- it's not hard at all.

1    Q.   Okay.  So you didn't have to go through some, like,

2    complicated unlocking process or switch --

3    A.   No.

4    Q.   -- provider?  No.

5         So it wasn't something, then, that required any research

6    on your daughter's part?

7    A.   No.

8    Q.   Okay.

9    A.   I mean, I have done it myself when I changed phones, when

10   I upgraded my phone.

11   Q.   Pop it out, pop it in?

12   A.   Pop the SIM card out, you know.

13   Q.   Okay.

14   A.   The only hiccup is if it takes a mini card or a -- the

15   standard-size card.

16   Q.   But there wasn't any hiccups as far as transferring this

17   particular SIM card --

18   A.   No --

19   Q.   -- over?

20   A.   -- there wasn't.

21   Q.   Okay.  So it wouldn't have required an entire page of

22   handwritten instructions, then, on how to go about doing that

23   sort of thing, unlocking the phone -- which wasn't necessary in

24   your case; right?

25   A.   No, it wasn't necessary to do that.

68

1   Q.   Okay.  So it wouldn't require an entire page of

2   handwritten instructions about how to go about switching a

3   SIM card and dealing with passwords and locking codes and

4   things like that?

5   A.   Not on my phones.  The phones that I had, they were

6   unlocked already.

7   Q.   Okay.  Thank you.

8        I ask you this because I admit, you know, I watch the

9   news like other folks.  I've seen you and your wife on a few

10  different news station talk shows kind of thing.  I think I saw

11  you with Anderson Cooper the other day.  And something -- I

12  think it was maybe your wife who mentioned it.  It made sense

13  to me.  And tell me if this is the case.

14       You and your wife were largely unaware of what your

15  daughter did in terms of her employment.

16       Is that fair to say?

17  A.   She carried a top secret security clearance.  She could

18  not discuss the details of what her job entailed.

19  Q.   Right.  So you really didn't know what it was --

20  A.   And --

21  Q.   -- for that reason?

22  A.   You know, because my son is also a linguist in the

23  United States Air Force, I'm familiar with the rules that they

24  abide by.  They can't discuss what they do.

25  Q.   Absolutely.  And so you understood that, so there --

1    A.    Yes.

2    Q.    -- wasn't a whole lot of work talk?

3         Okay.  So you weren't necessarily sure -- or weren't privy

4    to what her projects were, what she dealt with on a daily basis

5    at work; correct?

6    A.    That is correct.

7    Q.    All right.  And that's appropriate -- agreed? --

8    A.    Yes.

9    Q.    -- that she wouldn't tell you?  Okay.

10        Now, I know you've told the Court -- and I understand

11   why -- that if your daughter were granted a bond, you are

12   confident she would not violate the terms of her bond, that you

13   know in your heart, you'd bet everything you own that she will

14   do whatever she says she'll do, and she will abide by all the

15   tenets of her release.

16        You would bet everything you've got on that; is that

17   right?

18   A.    That is correct.

19   Q.    Sir, I have to ask you:  Would you have bet everything you

20   had on your belief that your daughter would never violate her

21   oath to properly safeguard classified information?

22   A.    Yes.

23   Q.    You would have believed with all of your heart, based on

24   everything you knew about your daughter, she would not steal

25   classified information; correct?

1    A.    That's correct.

2    Q.    And that she would not purposely give it to someone who

3    had no reason to have that information and no clearance to have

4    that information; correct?

5    A.    That's correct.

6    Q.    So it's fair to say that you have been completely caught

7    off guard by the allegations in this case?

8    A.    I am.

9              MS. SOLARI:  May I have a moment, Your Honor?

10             THE COURT:  You may.

11             MS. SOLARI:  Thank you, sir.  I know this is a

12   difficult time for you, and I do appreciate you being here.

13             THE COURT:  Any redirect?

14             MR. BELL:  Just a bit.

15                       REDIRECT EXAMINATION

16   BY MR. BELL:

17   Q.    Are you aware of Reality buying phones -- replacement cell

18   phones on Amazon?

19   A.    Oh, yes, yes.

20   Q.    Okay.  And you're aware that sometimes, when you get a

21   phone, it might have been locked by the previous owner and they

22   didn't give you the password?

23   A.    Yes.

24   Q.    And you're aware that then if you're going -- having

25   bought that phone, if you're going to use it, you've got to

1   figure out how to unlock the phone?

2   A.   That is correct.

3   Q.   You've heard that -- other people doing it?

4   A.   Yes.

5   Q.   Anything illegal, criminal, or suspicious about that?

6   A.   No, there's nothing illegal or --

7   Q.   Okay.

8   A.   And to have a page of written instructions is very much

9   like Reality, write everything down.

10  Q.   Yeah.  Is she thorough?

11  A.   Very thorough.

12  Q.   Okay.  Did she ever disclose anything about her work that

13  you thought might be -- she ought to not be telling you?

14  A.   She never discussed any details of what she did.

15  Q.   Okay.  Are you -- with your other kids or Reality or other

16  contact with young people, are you aware of them knowing a

17  whole lot more about computers than you and I know about them?

18  A.   (Indiscernible.)  A whole lot more.

19  Q.   And you're aware of them getting apps and programs and all

20  sorts of things and staying on them for hours?

21  A.   Yes, sir.

22  Q.   Okay.

23  A.   It's what young people do.  I mean, that's --

24  Q.   Okay.

25  A.   That's the world they grew up in.

72

1    Q.    Do you find that suspicious of future criminal activity?

2    A.    Not in the least.

3    Q.    Okay.

4    A.    My daughter's a good person.

5    Q.    And having heard all these things and seen the accusation,

6    read the paper, read the press release, read what the

7    Government's been saying about her, having heard from the FBI

8    agents, any fear of putting up your farm and your land and your

9    house to secure her pretrial release?

10   A.    Not in the least.

11                MR. BELL:  Thank you, sir.

12                THE COURT:  Any --

13                MS. SOLARI:  Nothing further, Your Honor.

14                THE COURT:  All right.  Well, Mr. Davis, I'm going to

15   tell you the same thing I told your wife.  I think y'all are

16   exemplary in terms of parents and the love and care you have

17   for your child.  I appreciate that.  And I certainly appreciate

18   you taking the time and the expense to travel from Texas here

19   to support your daughter.  So thank you for your time and

20   testimony.  You may step down.

21                Any reason this witness can't be excused, Ms. Solari?

22                THE WITNESS:  Thank you, Your Honor.

23                MS. SOLARI:  No, sir, Your Honor.

24                THE COURT:  Any from the Defense, Mr. Nichols or

25   Mr. Bell?

1          MR. BELL:  No, Your Honor.

2          THE COURT:  All right.  Thank you for your testimony.

3   You may remain in the courtroom if you like.  You're excused

4   otherwise.

5          MR. BELL:  Rejoin your wife, sir.  Thank you.

6          And, Your Honor, we would call Ann Demasi, who is

7   out there.  We think she'll be right short, if the Court cares

8   about that.

9          THE COURT:  I don't care about it.  I'm here -- I get

10   paid to be here as long as I need to be, so . . .

11          MR. NICHOLS:  Thank you, Your Honor.  There's no

12   adverse implication.

13       (Pause in proceedings from 5:22 p.m. to 5:25 p.m.)

14       (The witness, Ann P. Demasi, was sworn.)

15          COURT CLERK:  Please state your name for the record.

16   Spell your last name.

17          THE WITNESS:  Ann Demasi, D-e-m-a-s-i.

18                         ANN P. DEMASI,

19   having been duly sworn, was examined and testified as follows:

20                      DIRECT EXAMINATION

21   BY MR. BELL:

22   Q.   Ms. Demasi, could you tell us your full name, please, and

23   where you live.

24   A.   Yes.  My name is Ann P. Demasi, and I live in Grovetown,

25   Georgia.

74

1    Q.    And what do you do for a living?

2    A.    Currently, I am unemployed, but I am in school.

3    Q.    Okay.  Where are you in school?

4    A.    With Columbia College.  It's an online course.

5    Q.    Okay.  And what are you studying?

6    A.    Psychology.

7    Q.    Is this Columbia College out of Columbia, South Carolina?

8    A.    No.  It's Columbia College out of Columbia, Missouri.

9    Q.    Okay.  And are you from around here?

10   A.    I'm sorry?

11   Q.    Are you from around here?

12   A.    No, sir.  I'm from Upstate New York.

13   Q.    Okay.  What city upstate?

14   A.    Watertown.

15   Q.    Okay.  And what have -- what led you from Watertown to

16   Grovetown?

17   A.    My husband is in the Air Force.

18   Q.    Okay.  And have you been in the Air Force?

19   A.    No, sir.

20   Q.    Okay.  Have you -- do you know Reality Winner?

21   A.    Yes, sir.

22   Q.    And how long have you known her?

23   A.    About 6 years.  I believe it was March of 2011 when we

24   met.

25   Q.    Okay.  And what were you -- how did you come to meet her?

1    A.   We were both in California because my husband was

2    stationed in California on the same base that she was.

3    Q.   Okay.  So he was in the Air Force; she was in the

4    Air Force?

5    A.   Uh-huh.

6    Q.   I misunderstood.  I was thinking you were the one in the

7    Air Force.

8    A.   No, sir.

9    Q.   Okay.  And what was your husband doing in the Air Force?

10   A.   He was studying a language.

11   Q.   Okay.  And what languages does he speak?

12   A.   I'm sorry.  I don't know.

13   Q.   Do you know what countries there would be people who speak

14   those?

15   A.   I believe it's Farsi, but I'm not positive.

16   Q.   Okay.  And how long -- how well did you get to know

17   Reality when you were in California?

18   A.   I would say fairly well.  We would see each other maybe

19   every weekend.  There were a couple weekends during there where

20   we didn't see each other, but it was probably every weekend for

21   about a year, year and a half.

22   Q.   She got to be a good buddy of yours?

23   A.   Absolutely.

24   Q.   And your husband was doing -- was working with her in the

25   Air Force?

76

1    A.    Yes.

2    Q.    Okay.  And how did you end up at -- when did he come to

3    Augusta or Fort Gordon?

4    A.    We both were stationed here -- or -- I'm sorry -- he was

5    stationed here, and, of course, I came with him in October of

6    2012.

7    Q.    And was Reality still -- did she come to be stationed here

8    also at that time?

9    A.    No, no.  She was in Maryland at the time.

10   Q.    Okay.  And it was after she got out of the Air Force that

11   you reunited?

12   A.    Yes, with a brief --

13   Q.    If I've got that wrong, you straighten me out.  Okay?

14   A.    Okay.  It was -- there was a brief temporary assignment

15   that she had down here, but it was after that she permanently

16   came down to Augusta.

17   Q.    Okay.  Now, your husband is in the Air Force, and he

18   speaks a Mid Eastern language?

19   A.    Yes, sir.

20   Q.    Does that, to you, indicate he might want to run away from

21   the country?

22   A.    No.  No, not at all.

23   Q.    Is he a loyal and patriotic American?

24   A.    Absolutely.

25   Q.    Okay.

77

A.   It's hard for me to even get him out of the country on
vacations, so . . .

Q.   Okay.  Now, are you aware that Reality speaks some foreign
languages?

A.   Yes.

Q.   Has that ever raised any suspicions in you that she
might want to run away to some land where people speak those
languages?

A.   No, absolutely not.

Q.   Okay.  Now, tell us about reuniting with Reality after you
came to the Augusta area with your husband.

A.   It was wonderful.  It was great to see her.  We -- you
know, I took some of her yoga classes, and it's been a lot --
it's been great having her here.

Q.   Okay.  How long has it been since you reunited with you in
Grovetown and she in Augusta?

A.   Let's see.  I think it's been -- I think it's been maybe
between 3 to 4 years.  We'd travel up to Maryland every once in
a while to see some other friends that were stationed up there,
and we'd get together with her up there as well.  But, you
know, any kind of length of time or reuniting was really here,
so --

Q.   Okay.

A.   -- about 3 years.

Q.   And since she's been here, how often would you see

1   Reality?

2   A.   Not as often as we'd like to.  It's -- you know, between

3   our schedules and hers, we've all been really busy.  I'd say

4   maybe once every couple of months.

5   Q.   Uh-huh.  And you said you took a course.

6        Was that the yoga teaching or the spinning or what?

7   A.   That was the yoga.  Well, actually, no.  I did take her

8   spinning classes as well.

9   Q.   Okay.

10  A.   I forgot about that.

11  Q.   How is she as a teacher?

12  A.   Awesome, awesome.  Her two classes are very, very

13  different from each other.  She's -- you know, she's very

14  intense with her spinning classes, but her yoga classes are all

15  about, you know, peace and tranquility, so . . .

16  Q.   Okay.  Have you learned from her?

17  A.   Absolutely.

18  Q.   Okay.  Is -- have you ever seen any violent tendencies

19  exhibited in her personality?

20  A.   No, absolutely not.

21  Q.   Okay.  Have you never [sic] known Reality to do anything

22  that would cross the line legally?

23  A.   No.  No, absolutely not.

24  Q.   Have you ever known her to engage in "shark" conduct, a

25  desire to cheat anyone?

79

1   A.   No.  No, never.

2   Q.   Okay.  Has she -- is she somebody you'd trust?

3   A.   100 percent.

4   Q.   Okay.  Ever see her do anything that would cause you to

5   doubt her trust?

6   A.   No.

7   Q.   Have you ever known her to do something that would be

8   lying to you?

9   A.   No.

10  Q.   Have you ever known her to express any unpatriotic

11  thoughts?

12  A.   No, sir.

13  Q.   Have you ever known her to express any desire to take up

14  arms against the United States?

15  A.   Never.

16  Q.   Have you ever heard her discuss her desire to go and live

17  with the Taliban or ISIS or Al-Qaeda or some organization

18  adverse to the interest of people allied to the United States?

19  A.   Never, no.

20  Q.   Have you ever known her to hang out with what you might

21  consider disreputable people?

22  A.   No, sir.

23  Q.   Have you ever known her to hang out with people of

24  Mid Eastern descent?

25  A.   No, sir.

1   Q.   Have you ever known her to hang out with or talk about

2   liking people of disreputable character?

3   A.   No.

4   Q.   Have you ever heard her praise the exploits of

5   Osama bin Laden?

6   A.   No, never.

7   Q.   Have you ever heard her praise the endeavors of -- let me

8   see.  It's -- and I may get it wrong -- Mohammad -- the guy who

9   succeeded --

10  A.   No.

11  Q.   -- one of those things?

12  A.   No, never.

13  Q.   Have you ever heard her talk about -- express any praise

14  for the leadership of Al-Qaeda or the things they did?

15  A.   No.

16  Q.   When there have been terrorist acts in the Mid East, have

17  you ever heard her talk about "Wasn't that great how they

18  bombed that church or that mosque?"

19  A.   No, never.

20  Q.   Have you ever heard her praise or show any sympathy with

21  folks who blew up the Trade towers?

22  A.   No.

23  Q.   Have you heard -- ever heard Reality express any sympathy

24  or alliance with whoever it was that put off those bombs at the

25  end of the Boston Marathon?

1    A.    No.

2    Q.    Have you ever heard Reality express any desire to engage

3    in terrorist activity?

4    A.    Not ever.

5    Q.    Okay.  Who would you think Reality's best friend in the

6    Augusta area is?

7    A.    I mean, other than her pets, I'm not really sure as far as

8    people are concerned.  Like I said, we hadn't really seen each

9    other a lot, you know, since she moved down here, but -- I

10   mean, we're pretty close, but, you know, I can't -- I can't

11   stand to -- I can't say.

12   Q.    And how many years is it you've known her?

13   A.    6 years --

14   Q.    Okay.

15   A.    -- about 6 and a half.

16   Q.    Do you think you know her inside and out?

17   A.    I would say I know her fairly well, yes.

18   Q.    Okay.  Were the Court to see fit to grant her her

19   constitutional right of bond pending trial, pretrial release,

20   do you think that there would be any risk that she would engage

21   in criminal activity?

22   A.    Absolutely not.

23   Q.    Do you think there's any risk that she'd engage in any

24   questionable activity?

25   A.    No.

82

Q.   Do you think there's any danger that she would cut all family ties and all friendship ties and seek to flee to a foreign land from which she could not be returned?

A.   No, I definitely don't.

Q.   Okay.  Do you think she has the courage to face whatever this Court deems fit, given the charges that have been brought against her?

A.   Absolutely.

Q.   Okay.  Have you ever seen in her a personality trait of instability such that she would blow up or act irrationally?

A.   No, never.

Q.   Have you ever seen in Reality any signs of a person who cannot, though they may wish to do so, conform her behavior to the commands of society?

A.   I'm sorry.  Can you repeat that question?

Q.   Let me redo that thing.  That was a little . . .

     Is she -- have you ever seen her guilty of impulses that she couldn't control?

A.   No.

Q.   Okay.  How is she towards her animals?

A.   How is she towards her animals?  Extremely loving, very loving.  And mine as well.

Q.   Okay.  And what do you have?

A.   I have a dog.

Q.   What kind of dog?

1   A.   We think he's a dachshund-lab.  He's very goofy looking.

2   Q.   We have a mixed one, too.

3        Have you ever worked with Reality on any computers?

4   A.   No.

5   Q.   Do you know whether or not she's learned in computer

6   science?

7   A.   I really don't know, I mean, other than, you know,

8   basic -- our age group kind of thing.  I don't -- I'm not sure

9   as to the extent of her knowledge.

10  Q.   Do you know her to be an intelligent person?

11  A.   Absolutely.

12  Q.   Have you ever known her to be a gossip who shared with

13  you things that went on at work that you were kind of like, "I

14  don't know whether she ought to be saying that"?

15  A.   No.  No, not ever.  Most of the time, we talk about yoga.

16  Q.   Okay.  And how about your husband?  Does he ever share

17  with you what he --

18  A.   No.

19  Q.   -- learns at work?

20  A.   No, never.

21  Q.   They do about the same thing, don't they --

22  A.   I really --

23  Q.   -- or did?

24  A.   -- don't know.  Yeah.

25        MR. BELL:  Okay.  Thank you.

84

1          Your witness.

2                    CROSS-EXAMINATION

3    BY MS. SOLARI:

4    Q.   So is your -- your husband's still on active duty with the

5    Air Force?

6    A.   Yes.

7    Q.   Okay.  And he is, as far as you know, a Farsi linguist?

8    A.   Yes.

9    Q.   So judging from your statement about the fact that he

10   really can't tell you anything about work, I assume he holds

11   some level of security clearance?

12   A.   I assume so, yes.

13   Q.   Okay.  Does your husband ever use burner phones, if you

14   know what those are?  Those are phones that you really don't

15   register under your true name.  You might buy them at Walmart,

16   set them up.  When you're done, you throw them away.

17   A.   Yeah.  I -- no, not -- never.

18   Q.   Have you ever known him to send e-mails that

19   self-destruct?

20   A.   No.

21   Q.   Okay.  Has the defendant ever used any means like that to

22   contact you?

23   A.   No.

24   Q.   Does your husband spend time, as far as you know, browsing

25   the Dark Web --

85

1    A.   No.

2    Q.   -- where you would find WikiLeaks and things like that?

3    A.   Never.

4    Q.   Has the defendant ever discussed with you her having done

5    that?

6    A.   No.

7    Q.   Has she ever made -- the defendant, I mean -- made

8    statements to you about wanting to go to Pakistan or

9    Afghanistan?

10   A.   No.

11   Q.   Has she ever discussed with you any desire to go there to

12   meet with leaders of the Taliban?

13   A.   No.

14   Q.   I assume, then, you've never read the defendant's personal

15   journals; is that true?

16   A.   No.

17   Q.   That's true, you have not?

18   A.   I'm sorry.  No, I have not read her personal journals.

19   Q.   All right.  Since your husband, as far as you know, holds

20   a security clearance and obviously takes that quite seriously,

21   would you ever think he would steal classified information?

22   A.   No, not ever.

23   Q.   Do you think he would ever give it away to somebody who

24   had no clearance to possess it?

25   A.   No.

1   Q.   Do you think he'd ever send it to a media outlet or

2   anything like that?

3   A.   No.

4   Q.   In your time knowing the defendant, did you ever suspect

5   that she might do anything like that?

6   A.   No.

7   Q.   And, in fact, you said you've never known her to succumb

8   to any impulse that she couldn't control?

9   A.   That's correct.

10   Q.   So in your experience with her, her behavior is very

11   thoughtful, very deliberate, very intentional?

12   A.   Absolutely.

13          MS. SOLARI:  One moment, Your Honor.

14          Thank you.  That's all I have for the witness.

15          THE COURT:  All right.  Mr. Bell?

16                   REDIRECT EXAMINATION

17   BY MR. BELL:

18   Q.   You were asked about notes.

19      What sort of sense of humor has Reality got?

20   A.   I would say she has a very dry sense of humor.

21   Q.   Uh-huh.  Does she say things kiddingly that you perhaps

22   shouldn't take literally?

23   A.   I would say so.  I think, definitely, she's very sarcastic

24   and dry sense of humor, so . . .

25   Q.   Have you known her to ever use hyperbole?

87

A.    Absolutely, yeah.

Q.    And have you known her to use symbolic language that perhaps shouldn't be taken literally?

A.    Yes, definitely.

Q.    Do you ever do that?

A.    Absolutely, yeah.

Q.    Okay.  And she might write something down humorously that she didn't mean, in fact, literally?

A.    That's correct, yeah.

Q.    Okay.  Do you see anything wrong in that?

A.    Not at all.

          MR. BELL:  Okay.  Thank you.

          THE COURT:  Ms. Solari?

          MS. SOLARI:  Nothing, Your Honor.

          THE COURT:  Ms. Demasi, thank you very much for being here today and testifying on behalf of your friend.  I really appreciate your time.

          If you'd like to remain, you're more than welcome to take a seat in the courtroom for the remainder of the proceedings.  Or if you'd like to leave, you're free to do that as well.

          THE WITNESS:  Thank you.

          THE COURT:  Thank you.

          Does that conclude the Defense's witnesses?

          MR. NICHOLS:  Yes, Your Honor.  Defense has no

88

further witnesses.

THE COURT:  Any factual proffers?

MR. NICHOLS:  No, Your Honor.  We're prepared for our closing.

THE COURT:  All right.  Ms. Solari, let's begin with any closing remarks you'd like to make.

MS. SOLARI:  Thank you, Your Honor.

Your Honor, of course, since these are the primary elements for the Court's consideration in determining whether to grant the defendant a bond, I'd like to go through some of the things set forth in 18 U.S.C. Section 3142.

I'd like to start with 3142(g)(1), the nature and circumstances of the charged offense.  In this case, Your Honor, the defendant's position of trust and her security clearance were the very means by which she committed the crime. The defendant used her TS/SCI clearance and position of trust to intentionally seek out, to access, and to print a highly sensitive document that was unrelated in any way to her work duties and her assignments.

The U.S. Government had already determined evidence, by its markings regarding the classification, that disclosing the document would cause exceptionally grave damage to the national security.  But the defendant decided her personal desire to see that information published mattered more than that risk and more than her oath to protect classified

1    information.

2           With the intent to disclose the information to the

3    media, she snuck the document out of the secure building, and

4    she kept it in an unsecure place, in her car, for a couple of

5    days.

6           After a couple of days to think this over, to make

7    that very deliberate, very thoughtful decision to take another

8    action, and with the intent that the document and its contents

9    be published, the defendant then mailed it to a news agency

10   that she knew had absolutely no authority to have that

11   information.

12          She took every one of those deliberate and calculated

13   steps with the full knowledge that disclosure of the TS/SCI

14   document reasonably could be expected to cause exceptionally

15   grave damage to the U.S. national security and it could assist

16   our foreign adversaries.

17          The offense, as the Court knows, carries a maximum

18   term of imprisonment of 10 years.  We're not ruling out a

19   superseding indictment adding more charges as we continue

20   through our review of the information we've collected, and I

21   submit to the Court, Your Honor, that's certainly an incentive

22   to flee if one has the ability to do it.

23          Regarding the weight of the evidence against the

24   defendant, 3142(g)(2), the evidence of the defendant's guilt,

25   Your Honor, was extremely strong even before she added to it by

1    providing a confession.  As far as we know at this point, the

2    defendant was one of only six people in her agency to access

3    that document and print it.  She was the only person in her

4    agency who both printed the document and corresponded by e-mail

5    with the news agency at issue.  And she's the only person in

6    the world, as far as we know, who printed the document,

7    corresponded with a news agency, and lived in Augusta, Georgia,

8    from which it was mailed.  In addition to the screenshot of the

9    news agency's mailing address the defendant told us we would

10   find on her phone, I'd say that evidence of guilt is already

11   overwhelming.

12        But there's more because the defendant did confess.

13   She confessed to seeking out certain national defense

14   information, to retaining it, transmitting it, all with the

15   reason to believe it would harm the U.S. and aid foreign

16   nations.

17        Now, defense counsel, I don't know if he intends to

18   address the elements in his argument, but he's made some

19   statements publicly on television and in news articles claiming

20   that the Government cannot succeed in this case because we

21   cannot prove that the defendant's actions, in fact, caused any

22   harm to the U.S. national security or, in fact, aided one of

23   its adversaries.

24        But, in fact, Your Honor, the Government doesn't have

25   to prove that "reason to believe" language that is found in

1   793 to convict the defendant of the current charge.  All the

2   Government has to prove to convict the defendant of an alleged

3   violation of 793(e) is that she had unauthorized possession

4   of a document relating to the national defense and that she

5   willfully transmitted the document to someone who wasn't

6   entitled to receive it or that she willfully retained the

7   document, such as in her car for 2 days, and failed to give it

8   to a person entitled to receive it.  And, Your Honor, we can

9   prove that quite easily.

10          With regard to history and characteristics of this

11   defendant, 3142(g)(3), the defendant's character -- we have

12   heard from several character witnesses, and we know from the

13   defendant's service record that she did serve in the Air Force

14   for a significant period of time and maintained a top security

15   SCI clearance.

16          But, Your Honor, I submit that where she has used

17   that prior service and that trust as a means to commit the

18   crime, that should not work strongly in her favor.  She used

19   her position, which was granted to her because of her

20   background, to promote her own personal agenda.

21          I submit that, Your Honor, also reflecting on her

22   character is the information we found more recently,

23   particularly in her jail calls.  This defendant has shown her

24   intent and her plan to manipulate this Court by playing a cute

25   white girl with her cute little braids and perhaps shedding

92

1    some tears, by instructing her mother to move $30,000 out of

2    her personal bank account when she learned that the Court would

3    not find her qualified for appointed counsel because she had

4    that money in her account.  And she's also declared her intent

5    to wage war in the media if she doesn't get her way today.

6    That's the defendant's character.

7            As for her family ties, Your Honor, which is also

8    pertinent under 3142(g)(3), the defendant certainly appears to

9    come from some very nice parents who had little, if any, idea

10   specifically what she did for a living, how she felt about it,

11   or why she would steal and disclose classified information.

12   I understand they live in Texas, which is obviously a border

13   state, from which she's already traveled to Mexico several

14   times when she was younger.

15           As for her employment, Your Honor, at this point, I

16   don't think the defendant has been officially fired from her

17   job, although she's been placed on administrative leave pending

18   that determination.  Her future employment prospects in the

19   Government are certainly bleak.  And other than in academia,

20   there probably isn't a whole lot of call in the U.S. for a

21   Farsi, Darcy, Pashto speaker.  She's able to teach yoga

22   classes, but I submit that would hardly be a compelling reason

23   for her to remain here or to return to the Southern District of

24   Georgia.

25           The defendant's financial resources.  We know she

93

has at her disposal between 30- and $35,000 despite whether her
mother may have moved those funds.  The rest of her financial
resources, Your Honor, I submit are unknown because we have
seen that sympathizers across the nation have begun donating
money for her benefit.  I think that's something significant to
think about when we think about whether she would have the
means to flee the district or perhaps the country.

The length of the defendant's residence here and her
community ties.  She moved here to the Southern District of
Georgia very recently, early 2017.  She appears to have no ties
here other than a casual acquaintance and a rented house and a
job that she won't have much longer.  So other than this case,
which might award her 10 years in prison, there's really no
reason for her to stay or to come back.

The defendant's past conduct.  And this pertains to
more than just a defendant's criminal history.  It pertains to
all of her prior conduct that indicates a propensity to flee or
a likelihood that she'll present a danger to the community if
she's released.

This was not the first time the defendant mishandled
classified information.  She's admitted as much, although I
think it's important to note she was not entirely honest with
the agents about it.  She's also admitted the charged conduct
was not, as her friend actually described, a rash decision or
a spur-of-the-moment reaction.  In keeping with what we're told

her personality is, it was thoughtful, and it was deliberate.

The defendant has expressed in her conversations with Probation and with the FBI and in her handwritten notes a strong and persistent desire to travel to the Middle East, particularly Afghanistan.  She has written that she wants to travel to Pakistan, too, purportedly to meet with leaders of the Taliban.

Your Honor, I'd like to make clear that the Government is in no way suggesting this defendant wishes to become a jihadist or that she is a Taliban sympathizer.  We simply think it's worthy of note that she seems to have a pressing desire to travel to Pakistan to meet with people of note.

She says she wants to burn the White House down and then go live in Kurdistan or in Nepal.  She's recently searched for travel from Atlanta to Tel Aviv, Israel.

She had four phones, two laptops, and one tablet. That's certainly not criminal, but it's certainly something of interest.

Given what this defendant has seen in her 6-plus years of top secret access and the information agents found about switching SIM cards and using untraceable phone and e-mail communications, that's frightening not only because it might enable her to disappear quickly and without a trace but because it would also enable her to continue disclosing

1    classified U.S. information.

2            She'll no doubt be a target at this point,

3    Your Honor, for publications that would like to seek out and

4    obtain leaked information.  And what's perhaps more dangerous

5    is she will undoubtedly be a target of recruitment by our

6    adversaries.  She's out of a job.  She's facing significant

7    jail time.  She's under emotional distress.  We know,

8    historically, that these are all things that make people with

9    valuable information prime targets.

10            And there's the handwritten notes about how to

11   download and use Tor in its more secure format, which would

12   allow the defendant to hide her identity and location while

13   accessing the notorious Dark Web.  For what purposes, we don't

14   know.  But I do know that you can buy a fake I.D., a passport,

15   or just about whatever you want on the Dark Web, and she would

16   leave virtually no trace.

17            That, Your Honor, is not humor.  It is not joking.

18   I certainly understand dry humor and sarcasm and things said

19   in passing that may be taken out of context.  That's not what

20   we have here.  Instead, I submit to Your Honor that we have a

21   defendant with maybe a fractured life or a fractured

22   personality.

23            I think her acquaintances and her family know one

24   side of her, the side that teaches yoga and loves dogs and is

25   nice to be around.  But as they've admitted, they have no

insight into her work life, into her interest as it pertains to travel to the Middle East.  And they certainly had no idea of these notations that she was making in her notebook that would enable her to have entirely clandestine communications with persons we might never be able to identify.

She's traveled to Mexico multiple times.  And after she printed the classified documents, she took a trip to Belize by herself for only 3 days, including travel, a Saturday, a Sunday, and a Monday.  Nothing criminal about that, Your Honor, but it seems odd to spend the kind of money necessary for a trip all the way to Central America, to go alone, and then to come right back after such a short period of time with very little idea what she did there.  And she claims that she met with no one.

She wants to be in Mexico in the spring, Afghanistan in the summer, Asia and Jordan in between.  It seems, Your Honor, she wants to be anywhere but in the United States.

Now, I know another part of this -- subpart of the statute asks whether the defendant was under some sort of supervision, probation, or parole at the time the alleged violation was committed.  Certainly not.  This defendant has no criminal history of any significance.

But, to me, it seems very similar to being a TS/SCI contractor with access to the country's most sensitive national defense information.  Like somebody on supervision, this

1   defendant agreed to be held to a very high and a very strict

2   set of standards.  And she didn't just fail.  She didn't simply

3   fall short.  She deliberately violated those standards in a way

4   very harmful to our national security interests.

5          Now, as far as a danger she may present to the

6   community if released, I know the rules are written in such a

7   way that it seems to foresee a physical danger, that she might

8   go out and strangle someone or punch them or run them over with

9   a car.  I don't think that's what we have here.

10         I think there was a bit of an undue focus on the

11  firearms found in her home.  That was not our primary concern.

12  The Government is far more concerned with the indications of

13  covert communications setups and a pressing and persistent

14  desire to leave the United States.

15         But with regard to the danger she would present to

16  the community and to the nation, Your Honor, if released, in

17  the Air Force and as a contractor, the defendant had routine

18  access to some of the nation's most protected secrets for more

19  than 6 years.  We know one of the TS/SCI documents was the one

20  she admitted to stealing and transmitting.  And she only

21  admitted to that, Your Honor, when directly confronted with the

22  evidence.

23         We don't know how much more she knows and how much

24  more she remembers, but we know she is extremely intelligent,

25  so we would have to imagine she's got quite a bit of very

valuable information in her head.  We also don't know how much information she might have taken in physical form when she inserted that USB device into a top secret computer when she was still on active duty with the Air Force.

We are also concerned the defendant may have taken additional documents from her most recent employer and from that physical facility because, in the jail call to her mother, she refers to documents in the plural where we have only identified and she has only admitted to the wrongful taking and dissemination of one document.

Information is only classified, Your Honor, if the classifying official can articulate a specific level of harm that unauthorized disclosure would cause.  For example, information can only be classified top secret if, as you've heard, its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to our national security.

While we don't know precisely what harm the defendant could cause to the public and because we cannot disclose in an unclassified forum the information we believe she knows, we certainly submit to the Court that she could cause damage to the public by making further unauthorized disclosures.  That risk is unquestionably present.

So, again, Your Honor, all the defense witness testimony has established is that this defendant has a separate life.  She has two faces, so to speak.  There is one that is

nice, that is cordial, that is pleasant, that is kind; and there is another that seems motivated by what in particular, I don't know.  To harm the Government by stealing and disclosing its most important secrets?  To perhaps harm the Government in other ways?  I don't know how to take that statement, "I want to burn the White House down and then go live in Kurdistan," but it's disconcerting at the least.  And, again, someone who uses clandestine communications and just wants to travel anywhere but here, particularly in the Middle East . . .

For all those reasons, Your Honor, the Government respectfully requests that this defendant be detained pending trial.

THE COURT:  Thank you, Ms. Solari.

MS. SOLARI:  Thank you, Your Honor.

THE COURT:  Mr. Nichols?  Mr. Bell?

MR. NICHOLS:  May it please the Court.  "Downright frightening," that's the phrase the Government used to describe my client and why she should be denied pretrial release.  As a former prosecutor, I have prosecuted murderers, rapists, child molesters, killers, all types of bad people.  That is downright frightening.  Simply plugging a flash drive into a computer is not downright frightening.  Doodling your name in a notebook is not downright frightening.

The Government has made insinuations that somehow my client wishes to travel to Kurdistan to join the Taliban; that

1    because she has this information, she is at a risk of

2    committing new offense.

3            The case law that we want to direct the Court's

4    attention to is *U.S. v. Al-Arian*.  That is 280 F. Supp. 2d 1345

5    (2003).  In that case, the Court laid out in regards to

6    pretrial release from confinement.

7            The specific factors the Court should look at is,

8    number one, the nature and circumstance of the crime charged

9    and particularly whether the offense is a crime of violence.

10   Here, there's absolutely no question this is not a crime of

11   violence, and our client has absolutely no history of violence.

12           Two, the weight and evidence against the person.  We

13   haven't received any evidence.  In fact, the Government went

14   through a long litany explaining that they have no idea when

15   they'll be able to release the evidence.  All they have is what

16   they found when my client was interrogated by 10 law

17   enforcement officers who were armed in her home.

18           Three, history and characteristics of the person.  We

19   heard considerable testimony from her mother, her stepfather,

20   and her friend as to the type of person she is, not just what

21   they think about her, but what they've known from knowing her

22   for over 25 years, the fact that she was a straight-A student

23   in school, the fact that she trained herself to speak a foreign

24   language before volunteering to join the military, the fact

25   that she served in the military for 6 years and never received

1    any problems, the fact that she was granted an honorable

2    discharge from her service to this country and that when she

3    came to Augusta, a city that she's not from, she became a part

4    of this community both by serving as a gym instructor, by doing

5    yoga, by getting a second job in addition to the job that she

6    had when this offense supposedly took place.

7              Four, the nature and seriousness of the danger to any

8    person or the community that would be posed by the person's

9    release.  The Government has not provided any evidence that

10   she's a threat to anybody.  In fact, the most serious thing

11   they've said is the fact that she described herself as a

12   pretty, blonde white girl.  That's not evidence of being a

13   threat to the community.

14             The fact that she has guns, the Government has even

15   said themselves that they don't believe that's a big issue.  So

16   why even bring it up?

17             Their argument is that because she had a cell phone

18   in which she swapped out the SIM card, that must mean she has

19   some clandestine ulterior motive.

20             Your Honor, cell phones break, SIM cards break.  You

21   can swap out a SIM card as easily as just opening the back of

22   the phone and putting a new one in.  That's why, if you go to

23   an AT&T cell phone store or any cell phone store and ask for a

24   new SIM card, they give you a new one.

25             It's not a violation of national security to give

1    someone a small piece of plastic so their phone will work.  We

2    also heard testimony from her stepfather, the fact that her

3    phone broke on Christmas and she had to swap out a different

4    SIM card.  The Government's argument is that because my client

5    is a millennial and that she knows how to use technology,

6    that's proof that she has some type of evil intent and that she

7    is going to cause injury to this country or somehow help a

8    foreign government.

9         They've made several references to Tor, but they

10   never said what she did with Tor because they have no idea.

11   And they definitely don't have any evidence of her doing

12   anything wrong.  Google Chrome has a feature called incognito

13   mode.  That's legal.  There's no crime to use that.  Using Tor,

14   if there was a crime, the Government would have charged her for

15   using Cor for some -- Tor for some unlegal purpose.

16        The Government is scraping and clawing to build a

17   mountain out of a molehill because they have no evidence that

18   my client is a threat to the community or a risk of flight.

19        They made several mentions to her traveling to

20   Belize, and they said, "Well, we have no idea what she did

21   there."

22        I find that very interesting that they can't go on to

23   her Instagram and see all the photos she took while she was in

24   Belize but they can go on Twitter and pull a quote from

25   Julian Assange, who has absolutely nothing to do with this case

1    and has absolutely nothing to do with my client.

2            As far as the GoFundMe account, she has never

3    received a single dime.  GoFundMe specifically does not allow

4    you to set up an account for anyone that has -- that's being

5    charged with a criminal offense.  So the fact that the

6    Government is harping on a GoFundMe account that is not

7    connected to her once again shows that they are scraping and

8    clawing to build a mountain out of a molehill.

9            As far as the burden goes, the Government has to

10   prove by a preponderance of the evidence that she is a -- of

11   dangerousness and by clear and convincing -- that she is a

12   serious risk of flight by a preponderance of the evidence,

13   that she's a risk of danger to this by clear and convincing

14   evidence.  They have done neither.

15           We have proven -- provided testimony that she has

16   connections to Augusta, Georgia.  Her family is willing to put

17   up property and every single dollar they have to ensure that

18   she comes back to court.  She served our country honorably for

19   6 years and never went AWOL.  There is no risk of her not

20   coming back to court.

21           The strongest argument the Government has is the fact

22   that she has an indictment against her and, therefore, she has

23   a total exposure of 10 years.  She is prepared to come back to

24   court and face every hearing necessary as well as have her fair

25   day in trial.

1          Specifically, we lay all of that out to show that the

2  Government has failed to meet their burden that she should not

3  be released pretrial and that she should not be given a

4  reasonable bond, which she is guaranteed to have by the

5  constitution.  Thank you.

6          THE COURT:  Any rebuttal argument?

7          MS. SOLARI:  No, sir, Your Honor.

8          THE COURT:  All right.  Well, we're going to take a

9  recess.  That recess will be at least 15 minutes long for

10  people who need to take a restroom break or stretch their legs.

11          And, Ms. Cirillo, if you could go in the back there.

12          COURT SECURITY OFFICER:  All rise.

13          Court is in recess.

14     (A recess was taken from 6:01 p.m. to 6:32 p.m.)

15          COURT SECURITY OFFICER:  All rise.

16          Be seated, please.

17          THE COURT:  All right.  I've taken some time in

18  chambers to listen to some key portions of the recording from

19  today's hearing.  I've also gone back and looked at the factors

20  of the Bail Reform Act that we apply here every day in this

21  court and compared that to the arguments and the evidence that

22  we've heard here today.

23          The four factors that we consider -- first is the

24  nature and the circumstances of the offense.  Second is the

25  weight of the evidence; third, the history and characteristics

1    of the person; and fourth, whether there's any danger to the

2    community.

3            In looking at that first factor, the nature and

4    circumstances of the offense, here, the nature and

5    circumstances of the offense alleged is that this defendant

6    violated a top secret security clearance by giving the media

7    information deemed to be top secret by the executive branch

8    agencies in charge of that information.

9            And by deeming it such, the Government has said that

10   publication of this information would put our country in grave

11   danger.  So I think the nature and circumstance of that type of

12   offense militates in favor of detention, not in favor of

13   release.

14           In terms of the weight of the evidence, the weight

15   of the evidence here is strong.  You do have a confession by

16   this defendant when she met with the agents, as detailed in

17   the affidavit by one of the investigating agents.  She made a

18   damning statement to her mom on this recorded phone call, "I

19   screwed up, Mom," with respect to these documents.  Those two

20   things alone are pretty strong indicia of guilt.

21           On top of that, you've got a lot of corroborating

22   facts in the information that the Government's been able to

23   uncover.  She was one of only six people with in- -- with

24   access to this information that actually printed the document

25   that is in question.  And of those six people who printed the

document, she is the only one, according to the evidence we
have to date, that communicated with the news outlet that
eventually received and published the information, and the
information was mailed from Augusta.  So you've got
corroborating evidence that supports the confession she's given
to the agents.

Now, I do want to remind Miss Winner, in making these
findings today and as I go to that weight-of-the-evidence
factor, I'm -- you're still presumed to be innocent of these
charges.  Nothing I say here today touches on whether you're
guilty or innocent.  It's just part of the analysis we have to
conduct in determining whether you should be detained.

Moving on to the -- probably the most debated part of
this today, who is she?  What are her characteristics?  What is
she in terms of her personality and her loyalties and the kind
of person she is?

And so many times when we're in court here, we see a
distinct person that's drawn by the people close to someone,
that loves them so much, like the parents and friends do here,
and then we see a completely different person that is
characterized by the evidence that the Government has in its
hands.  And I think that's what we've got here.

If we were dealing with the person that Miss Winner's
parents know and love, then there would be no question that she
ought to be released.  And when they testified that they would

put up their house and everything else that belongs to them because their daughter, they believe, would never do anything to violate the terms of release, including flight, I believe them wholeheartedly.  There's no doubt in my mind that they feel that way about her.  And they've raised her to be a very successful and loving and diligent member of our society, and I praise them for that.

But then you've got the side that the Government takes the -- takes a -- has described here today, and that's the part that really concerns me in terms of whether she's a risk of flight and a danger to our community.

The person that they describe, unknown to her parents and friends, searched, while she was a member of the armed services, on whether you can detect putting a thumb drive inside of a top secret computer.  And lo and behold, the same day, she did it.  She put a flash drive inside that -- a top secret computer.  And we don't know what happened with it.  We don't know where that flash drive is today.  That concerns me.

Second, you know, you've got this Tor router that she was searching on the most secure setting you could put it on.  She had attempted to set up a single-user burner e-mail account.  She noted she wanted to burn down the White House. Whether that's in jest or not, it's still concerning to me. And she seems to have a fascination with the Middle East and Islamic terrorism.

1            And to me, it's fundamentally at odds with the person

2     her parent knows and -- her parents know and the person that

3     served our country in the ways that she has to put in her

4     personal notes that it's a Christ-like vision to have a

5     fundamentalist Islamic state.  I can't square that kind of

6     remark by her with who her parents know and the service that

7     she's given to our community.

8            And then calling her mom and saying she's going to go

9     nuclear in the press if I make a conscious, well-reasoned

10    decision to keep her detained and asking her mom to transfer

11    money out of her account because I knew it was there and that's

12    why she didn't get a lawyer for free, all those things paint a

13    different image of her than what her parents know as well.

14           And then in terms of danger to the community, I think

15    there's a compelling argument there as well.  Where is that

16    thumb drive?  If that information was downloaded from a top

17    secret computer, by its very nature, that information would

18    be -- put our country in grave danger.  And to me, that falls

19    well within the landscape of danger to our community.  In fact,

20    to me, it's even much more compelling than that.  It's not just

21    danger to the people in the CSRA.  It's danger to the entire

22    nation.

23           Other questions that we don't know the answer to and

24    cannot know -- how much does she know from all the time she's

25    had a top secret security clearance both before and after her

1    time of military service, and who might she tell?  And I'm

2    worried about all those things given the picture the

3    Government's painted of this defendant.

4         And so for all those reasons, I think the Government

5    has carried its burden of proving by a preponderance of the

6    evidence that no condition or combination of conditions will

7    reasonably assure the appearance of the defendant as required

8    for this case and also, by clear and convincing evidence, that

9    no combination of conditions will reasonably assure the safety

10   of the -- of other people and the community here.

11        Certainly, you have the right to appeal that decision

12   to the presiding district judge in this case, J. Randal Hall,

13   if you'd like to do so.

14        And I do want to compliment the lawyers on both sides

15   of this.  Obviously, my decision today does not reflect what I

16   think about the quality of the work on both sides.

17        Mr. Nichols, Mr. Bell, y'all came well-prepared,

18   and you put on some really good witnesses and some compelling

19   arguments, and I appreciate you doing that.

20        And certainly, on the Government's side is

21   Ms. Solari.  Your work was equally high quality in its

22   presentation here today.

23        Is there anything other than detention that we ought

24   to discuss here today before we adjourn, Ms. Solari?

25        MS. SOLARI:  Your Honor, one matter from the

1    Government.

2             I think intending perhaps to serve the best interest

3    of his client, Mr. Nichols has made several appearances in the

4    news media and granted several interviews as well to

5    newspapers.  Our U.S. Attorney, Mr. Durham, delivered to him

6    via e-mail a letter yesterday summarizing some of the comments

7    that we have noticed in the media commenting about the evidence

8    in the case, the defendant's guilt or innocence, and perhaps

9    the credibility of the actions, the evidence, or the witnesses

10   of the Government.  We reminded Mr. Nichols of our local

11   criminal rule, 53.1, cited that rule in our letter, and

12   provided him a copy.

13            I only ask that the Court reinforce that since,

14   obviously, there is a significant media interest in this case

15   that we expect will be ongoing for quite some time.  It is of

16   the utmost importance to us that the defendant receive a fair

17   trial and that the Government also have a fair opportunity to

18   present its case.  And we would only like all counsel to abide

19   by the rules of the Southern District of Georgia in their

20   conduct and comments to the press.

21            THE COURT:  Thank you, Ms. Solari.

22            I will say for the record that I shared that concern.

23   I had a conversation with Mr. Nichols and e-mailed him that

24   local rule 2 days ago.  I don't read all the papers and all the

25   TV accounts of these things, in part, because I don't think

1    that it's consistent with my duty to only focus on the things

2    that actually happen in this room, so I'm not as well-apprised

3    about statements that he's made.  But, certainly, enough got to

4    me that I had that concern, and we had that conversation.

5           Mr. Nichols, you've had a chance to look at that

6    local rule now.  I wouldn't think that we've got any

7    expectation of you having any problems abiding by it from now

8    on.

9           Is that right, Mr. Nichols?

10          MR. BELL:  Your Honor, if I might respond on his

11   behalf.

12          THE COURT:  Sure.

13          MR. BELL:  I'd ask that -- cases came up -- I was

14   hoping -- on media record things, they keep playing it.  Your

15   contact ended it.

16          THE COURT:  Okay.

17          MR. BELL:  Okay.  Then they send a letter.  But they

18   have also sent a press release that I think is more dangerous,

19   more damning, and more in violation of the local rule than what

20   was accused here.

21          He's accused of saying she does not have a prior

22   criminal record.  Absolutely a factual truth.  And if you read

23   the thing, the rule as its written by this Court -- and I'm not

24   challenging it -- what they don't want lawyers doing is

25   disparaging a criminal defendant or opposing party by saying,

1    oh, he's already had all these horrible things happen.  That's

2    what I view the -- the evil is (indiscernible).

3              And I also want to point out that the local rule, the

4    one -- and I'm not saying they're incompatible, but Rule 83.5

5    of this court provides that we are subject to the ABA canon of

6    ethics and the Georgia Bar canon of ethics.  And when they are

7    in conflict, the Georgia Bar canon of ethics applies.

8              And what does the -- what do the cannon of ethics

9    provide?  Let me get it.  I thought I had it right here.

10             They provide you shouldn't say anything to the press

11   that's going to interfere with the function of justice.  And

12   I don't think that's happened here.  I don't think anything's

13   tainting a jury.  Telling the press a factually true thing,

14   that she's got a clean record, does not taint anything.  And I

15   think there was all innocence in the thing.

16             And, you know, the press has been -- gosh, I've never

17   been in a case with so much press.  And they're all doing their

18   duty under the First Amendment, which we all do.

19             But the Georgia Bar rules, which becomes the rule

20   because this provision is both in the ABA canon and in

21   Georgia's canon, and it's Rule 3.6.  Notwithstanding the

22   prohibition of making statements that might interfere with the

23   fairness of a proceeding, which is Section A, a lawyer may make

24   a statement that a reasonable lawyer would believe is required

25   to protect the client from substantial undue prejudicial effect

1    of recent publicity not initiated by the lawyer or the lawyer's

2    client.

3              Now, we've got what they released.  We've got the

4    headline in today's paper that some guy got fed to them.

5    Your Honor, we have a media barrage aimed at my client trying

6    her in the press.  And saying to the press she has a clean

7    record compared to what we have received from the Government,

8    if there is to be chastisement, it should be both sides.

9              We're going to abide by it.  The things we've done,

10   we're pretty -- in fact, we were grateful for hearing from the

11   Court.  This thing kind of came -- they wanted coordination.

12   But it's kind of hard to litigate against this and that and all

13   the things that have been put in there.

14             She's got all these cell phones.  Well, if you went

15   to my house today -- and I've never -- I've got a cell phone

16   for me.  I've got my wife; all my kids, many of them not living

17   there.  I'm still paying.  You'll find piles of cell phones.

18   None of them work.  Some of them are Nokias; some of them are

19   BlackBerrys; and some of them are the iPhone that's out in my

20   car.  We've got a basement full of old computers that aren't

21   worth $10.

22             But this same thing that was fed to the paper by some

23   unknown force that implies a whole cyber warfare going on on

24   Battle Row that I think the evidence will -- that hasn't been

25   examined, as they admit, and they don't know of it having a

1    single implication.

2           But I've been asked, "Why does your client got all

3    those cell phones and computers?" by just bystanders who read

4    today's paper.

5           There has been abuse of the press in this case.

6    But one is a giant over the other.  We appreciate that.  We

7    appreciate the rules.  We want to litigate this case in this

8    courtroom, and we think it's a wonderful place to be.  But the

9    chastisement of the -- as the Bible says, you know, this -- the

10   mote in your eye versus the log in the chastiser's eye applies

11   quite well here.  Thank you.

12          THE COURT:  Thank you, Mr. Bell.  Let me be clear.

13   I'm glad you mentioned the word "chastise."  My purpose here

14   today is not to chastise anyone.

15          MR. BELL:  We appreciate it.

16          THE COURT:  And, you know, all this media stuff

17   occurring outside of these four walls I care nothing about

18   except to the extent that either side accuses the other of

19   improprieties.  And so I'm not out there taking notes about who

20   said what to the press.  I certainly have no basis today to

21   make any finding that anyone's done anything wrong with respect

22   to our rules, the governing rules you just mentioned.

23          So when I reached out to Mr. Nichols the other day,

24   it was not to say I thought he had done anything improper.  It

25   was just to say, "Make sure you understand this local rule is

1    there," because lawyers, all the time in the middle of cases,

2    get caught up in local rules they didn't even know were there.

3              And so that was -- the only intent in me calling him

4    was to put him on top of those local rules because I knew that

5    there was a lot of activity with the media going on.  And

6    certainly, we want to hold both sides to the same standard.

7              MR. BELL:  And, Your Honor, we appreciated that.  We

8    did.

9              THE COURT:  I want to make sure no one thinks I'm

10   coming down on Mr. Nichols today.  I'm not.  All I was simply

11   remarking in reply to Ms. Solari's comments is that we've had

12   this discussion.  I don't think it's going to be a problem.

13             MS. SOLARI:  We're not asking the Court to reprimand

14   defense counsel.  But if Your Honor will indulge me for a

15   second, I do feel compelled to reply to defense counsel's --

16   I don't think they're insinuations.  I think they're flat out

17   accusations.

18             I suspect the reason the press knows several

19   electronic devices were seized from the defendant is --

20             THE COURT:  Ms. Solari --

21             MS. SOLARI:  -- because the --

22             THE COURT:  -- I really --

23             MS. SOLARI:  -- search warrant --

24             THE COURT:  I really don't --

25             MS. SOLARI:  -- returned --

1          THE COURT:  I don't want to get in a back-and-forth.

2          MS. SOLARI:  I just want to make clear, Your Honor,

3     that the U.S. Attorney's Office has in no way violated the

4     local rule.  Press releases are accepted by the local rule,

5     and we have disclosed nothing else to the press about this

6     case.  Whatever was published was discerned from matters of

7     public record that were filed with the court and have nothing

8     to do with us.

9          So rather than defense counsel defending their

10    actions by some ABA rule, all we ask is they comply with the

11    local rules of this Court.

12         THE COURT:  And we're way outside the bounds of me

13    making any findings today.  All I can say is I -- we have

14    wonderful, quality lawyers here on both sides of this.  It's

15    my expectation that everyone's going to follow all of the

16    applicable rules.

17         If there's an allegation that someone has violated

18    one of those rules, then I'm going to need to take evidence, or

19    Judge Hall -- whoever takes that up will need to take evidence

20    on the matter before any factual findings can be made by this

21    Court.  So that's all we can do today.

22         MS. SOLARI:  Thank you, Your Honor.  I appreciate

23    that.

24         If I may bring up one other matter again, if the

25    Court will --

1          THE COURT:  Sure.

2          MS. SOLARI:  -- give me just a moment.  And this

3     is something that Mr. Aaron brought up and reminded me, and I

4     appreciate that.

5          We are possessed of security clearances, so we are

6     privy to certain information.  Defense counsel -- I know

7     Mr. Nichols, at the very least, possesses a secret clearance.

8     We simply need to remind counsel that everybody with a security

9     clearance in this case -- secret, top secret, otherwise -- has

10    a continuing duty to protect classified information, even that

11    which someone may think has been divulged in the public domain.

12    Just because that may have happened does not render anything

13    unclassified.  So everyone with a clearance has a continuing

14    duty to guard classified information.

15         THE COURT:  Well, I'll tell you what.  I think -- I'm

16    glad you mentioned that, not because I'm afraid anybody's going

17    to commit any intentional or reckless violation, but just to

18    say that I think anybody working on this case must read the

19    Classified Information Procedures Act, the security procedures

20    established by the Chief Justice of the United States, and

21    maybe a couple of sample protective orders out there so you can

22    understand the landscape in which we're operating here.  It's a

23    very delicate landscape.

24         And we have a lot of footwork that we've got to

25    accomplish in the next couple of weeks so we can get this up

1    and running because it's so fundamentally different than any

2    criminal litigation that you have outside of classified

3    information.

4           One protective order in particular I looked at that

5    counsel may want to take a look at is in the case -- Docket

6    Number 1:12-CR-134.  That's out of the Eastern District of

7    New York.  That's 1:12-CR-134.  And the case is U.S. against

8    a name that I will not try to pronounce here in court.

9    Hopefully, that case citation will be enough.  But it's a very

10   thorough protective order.  And I'm sure that Mr. Aaron has one

11   in the bag that's probably similar and just as thorough, but

12   that's at least one to take a look at.

13          And certainly, it's not only just a document that's

14   been stamped top secret, but even a brief that makes arguments

15   about a document like that can contain classified information.

16   So we want to make sure we're very careful in what we do, and I

17   think that's why a planning conference very much sooner than

18   later is what we need.

19          MR. NICHOLS:  Yes, Your Honor.  I appreciate that,

20   especially the citation.

21          And, Your Honor, as an officer in the United States

22   Army, I don't need to be chastised by the Prosecution about

23   protecting my security clearance as well as any documents in

24   this case.

25          THE COURT:  I mean, I think "chastise" is not the

1   right word to use, Mr. Nichols.

2          First of all, when you talk in court here, you should

3   stand up.

4          MR. NICHOLS:  Yes, sir.

5          THE COURT:  But second -- I mean, that's a basic rule

6   of lawyer etiquette here.

7          But second, I don't think that's a chastisement.  I

8   think that it's very well worth repeating to everyone in this

9   room that we do not want a violation of classified information

10  on top of the one that's already alleged in the case.  We've

11  got more than one -- more than we need right now anyway.

12         So caution is the word of the day.  And I have no

13  doubt that you're going to exercise that caution, but it starts

14  with reading those sources that I just cited and preparing for

15  us to have that planning conference in 2 weeks.

16         MR. NICHOLS:  Yes, sir.

17         THE COURT:  All right.

18         MR. NICHOLS:  Thank you, Your Honor.

19         THE COURT:  Thank y'all, and we're adjourned.

20         COURT SECURITY OFFICER:  All rise.

21         Court's adjourned.

22     (Proceedings concluded at 6:52 p.m.)

23

24

25

120

1                    C E R T I F I C A T E

2

3

4         I, Victoria L. Root, Certified Court Reporter, in and for

5    the United States District Court for the Southern District of

6    Georgia, do hereby certify that the foregoing transcript of the

7    proceedings held in the above-entitled matter was transcribed

8    to the best of my ability from the Court's electronic recording

9    system and that the transcript page format is in conformance

10   with the regulations of the Judicial Conference of the United

11   States.

12        WITNESS MY HAND AND SEAL this 17th day of June, 2017.

13

14

15

16

17

18

19

20                                   /s/ Victoria L. Root
                                     VICTORIA L. ROOT, CCR B-1691    6/17/17
21                                   United States Court Reporter
                                     Southern District of Georgia
22                                   Savannah Division

23

24   Post Office Box 10552
     Savannah, Georgia  31412
25   (912) 650-4066