# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | |
| v. | * | NO. 1:17-CR-00034 |
| | * | |
| REALITY LEIGH WINNER | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS DEFENDANT'S STATEMENTS AND REQUEST FOR EVIDENTIARY HEARING

NOW INTO COURT, through undersigned counsel, comes Defendant Reality Leigh Winner ("Winner" or the "defendant") who respectfully files, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, the instant Memorandum in Support of her Motion to Suppress Statements and Request for Evidentiary Hearing (the "Motion to Suppress"). For the reasons set forth below, this Court should (i) conduct an evidentiary hearing to determine whether statements made by Winner were elicited by law enforcement in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and (ii) grant the Motion to Suppress.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

On June 3, 2017, Winner came home to a scene she had never witnessed. Within minutes, ten armed male law enforcement agents appeared, equipped with search warrants for Winner's residence, car, and person, ready to take action on a "report" they received regarding alleged mishandling of classified information. Although one of the search warrants was for Winner's "person," there were no female agents present to conduct that search. Two of the male agents then escorted Winner to a back room—one she expressly advised she would rather not go

into and called "creepy"—and began questioning her while approximately eight armed law enforcement agents began rummaging through the entirety of her house.

Winner was isolated during her questioning.  In that small, unfurnished back room, she sat with her back against a wall and with her two questioners in front of her, blocking her view and path to the exit, a door that was nearly shut.

While being questioned about her activities handling classified information, law enforcement never expressly advised Winner that she could leave, nor did they advise Winner that she was under arrest.  In fact, when Winner specifically asked whether she would be arrested, her male questioners kept her in the dark, telling her they did not "know the answer to that _yet_."  It was clear that she was not free to leave, not only from the answer that the agents gave her in response to her question of whether she would be arrested, but also because the agents had not yet searched her person, and no female agents had appeared on the scene to conduct that search.

At the conclusion of her interrogation, the search was still ongoing and Winner was directed by law enforcement to wait in the front yard, and, after some time, they instructed her to go into the fenced part of her yard.  After hours of being detained at the scene, the all-male contingent of agents finally called two female officers.  But even those two female officers did not search her at the scene.  Rather, they formally arrested Winner and transported her to jail, where they searched her for the first time.

During the entirety of the two-plus hours that law enforcement was at her residence, law enforcement never advised Winner of her _Miranda_ rights and, given the circumstances, Winner never believed she was free to leave or terminate her interrogation.  Indeed, she believed quite the opposite.  The most sacred and constitutionally-protected place in her world—her home—had been invaded (albeit legally) by law enforcement.  The atmosphere could not have been

2

more "police-dominated," and, as set forth in more detail below, Winner's freedom of movement had not only been curtailed, it had been eliminated.

Because Winner was not read her *Miranda* rights prior to law enforcement questioning, under the applicable precedent set forth below, any statements elicited by law enforcement from Winner during the encounter must be suppressed, as should any evidence obtained as a result of those statements. Accordingly, for the reasons that follow, Winner requests that the Court grant an evidentiary hearing to determine whether her statements were elicited in violation of *Miranda* and grant the Motion to Suppress.

## II.   FACTUAL BACKGROUND

Within minutes of arriving home from the grocery store in the afternoon of June 3rd of 2017, Winner was confronted with ten armed male law enforcement agents with search warrants for her house, her car, and her person.[1] After she moved her dog into her fenced yard,[2] provided law enforcement her car keys in response to their request,[3] confirmed for the agents what firearms were in her house, which she lawfully possessed,[4] and assisted law enforcement with her cell phone,[5] two of the agents suggested they interview Winner in an unfurnished back room in her house, a room Winner described to them as a "weird" and "creepy" room that she did not like to go into.[6] Despite her characterization, agents escorted her there. The other eight agents began rummaging through her house and her car, executing the search warrant.[7]

After being escorted to the unfurnished back room, Winner sat with her back against the wall. The two agents questioning her were in front of her, and they closed the door almost

---

[1] (Winner Decl. ¶ 3.)
[2] (*Id.* ¶ 5.)
[3] (*Id.*)
[4] (*Id.*)
[5] (*Id.*)
[6] (*Id.* ¶ 6.)
[7] (*Id.* ¶¶ 4, 8.)

entirely (they could not close it completely because there was an item hanging on the door preventing it from fully closing).[8]  Given this arrangement, to reach the exit of this interrogation room, Winner would have had to physically move through *both* agents.[9]

Once they were in the back room, Winner's interrogators began making small talk with her.  They discussed her employment history, how she made her way to Augusta, her history in the armed services, her workout regimen, and various physical injuries she had suffered.[10]  They then reiterated the search warrants they had procured, showed her the warrant for her house, and told her they would like to get her "side of the story."[11]  At that time, the agents specifically advised that, in addition to search warrants for her house and car, they also had a search warrant for Winner's person.[12]  The agents, however, did not search Winner's person at that time; indeed, Winner was never searched until she got to jail later that day.[13]

The questioning then began focusing on Winner, with law enforcement advising they had received a report that she had mishandled classified information.[14]  After a brief discussion of her job, law enforcement pressed further, telling Winner that they "know a lot more" than what they were telling her, that "telling a lie to an FBI agent" is not good, and that this was her "opportunity to [] tell the truth."[15]  While still in the back room, agents then told her that they were there "voluntarily," that she was talking to them voluntarily, and that law enforcement was not "forcing" her to do anything.[16]  Importantly, however, the agents never informed Winner she

---

[8] (*Id.* ¶ 7.)
[9] (*See id.*)
[10] (*Id.* ¶ 9.)
[11] (*Id.* ¶ 10.)
[12] (*Id.*)
[13] (*Id.* ¶ 23.)
[14] (*Id.* ¶ 11.)
[15] (*Id.* ¶ 12.)
[16] (*See id.*)

was free to leave, nor was she free to leave given, among other things, that the search of her person had yet to be conducted.

Winner and law enforcement then had a discussion about an article that later appeared in an online media outlet.  The agents specifically told her she was a suspect in the alleged mishandling of that document, expressly advising her that she was "far and away" the "most likely candidate" to be their prime suspect, characterizing their evidence as "compelling."[17]  The agents then shared more evidence that they believed incriminated Winner: the fact that the document was "folded in half," was post-marked from Augusta, and made its way to an online media outlet Winner purportedly subscribed to.[18]

While still in that back room, agents then zeroed in, telling her they thought she "made a mistake"; that she had had a "good career"; that if she was the culprit and did it because she was angry at the current state of politics, then that idea would make law enforcement "feel a little better", and that they "[would not] have a real serious problem here."[19]  After further discussion regarding the document that later appeared in the online publication, including a discussion about, among other things, whether the disclosure of that document compromised national security (which Winner denied),[20] Winner specifically asked law enforcement if she was going to jail.[21]  Significantly, the agents answered that they did not know the answer to that question "*yet*."[22]  Several minutes later, law enforcement reiterated Winner's uncertain status, telling her they "truly [didn't] know" if she would be arrested and that they were "going to have to make some phone calls."[23]  Her interrogation lasted approximately twenty-five minutes.[24]

---

[17] (*Id.* ¶ 13.)
[18] (*Id.* ¶ 14.)
[19] (*Id.* ¶ 15.)
[20] (*See id.* ¶¶ 16–17.)
[21] (*Id.* ¶ 18.)
[22] (*Id.*)
[23] (*Id.*)

Law enforcement terminated the interview at that time, but Winner's detention continued. Agents instructed Winner to stand outside in her front yard, and then directed her to stand in the fenced part of her yard with her dog.[25] After female law enforcement agents finally arrived on the scene, they arrested Winner and transported her to jail.[26] Winner was never advised of her *Miranda* rights at any point during her interrogation on June 3rd.[27] She was never personally searched pursuant to the warrant until she arrived at the jail.[28]

Given the arrival of ten male armed law enforcement agents at Winner's home and the restraints placed on Winner (*e.g.*, placing her in a back room with the exits blocked and a nearly-shut door), and the fact that law enforcement officers never advised Winner she was "free to leave" but instead that she *might* be under arrest, and would, in any event, be subject to a search of her person, which never occurred before Winner was escorted to jail, there can be no conclusion other than that Winner never believed she free to leave or terminate the questioning.[29]

## III.   BECAUSE WINNER WAS SUBJECTED TO "CUSTODIAL INTERROGATION" BUT WAS NOT ADVISED OF HER *MIRANDA* RIGHTS, ANY STATEMENTS ELICITED BY LAW ENFORCEMENT SHOULD BE SUPPRESSED.[30]

### A.   Governing Law

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[31] As such, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from

---

[24] (*Id.* ¶ 19.)

[25] (*Id.* ¶ 20.)

[26] (*Id.*)

[27] (*Id.* ¶¶ 5, 22.)

[28] (*See id.* ¶ 23.)

[29] (*Id.* ¶¶ 3, 4, 5, 24.)

[30] Because the defendant has not yet received the recording of the custodial interrogation and only has a redacted transcript of that interrogation, the defendant reserves the right to supplement this Motion to Suppress with additional relevant information it receives from the Government.

[31] U.S. CONST. amend. V.

custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[32]

Determining whether a defendant has been subjected to "custodial interrogation" involves two elements: (1) whether the suspect was in "custody" and (2) whether the suspect was subjected to "interrogation." A person is in custody and entitled to *Miranda* warnings if she has been subjected to "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[33] In essence, this "custody" test asks whether, "under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such an extent that he would not feel free to leave."[34] Importantly, the "reasonable person" standard is defined as a "reasonable *innocent* person."[35] The test is an objective one, and generally, the actual, subjective beliefs of the defendant and law enforcement are irrelevant.[36]

While the burden is initially on the defendant to establish a basis for suppression, when she does so, the burden then shifts to the Government, which must establish by a preponderance of the evidence that the statements were not the product of custodial interrogation conducted in the absence of *Miranda* warnings.[37] Custodial statements made in response to interrogation in the absence of *Miranda* warnings are inadmissible.[38]

---

[32] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[33] *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

[34] *United States v. Brown*, 441 F.3d 1330, 1337 (11th Cir. 2006) (quoting *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001)).

[35] *Id.* (quotation omitted).

[36] *See Street*, 472 F.3d at 1309 (citation omitted).

[37] *See Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986); *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)); *see also United States v. Freeman*, 61 F. Supp. 3d 534, 536 (E.D. Va. 2014).

[38] *United States v. Todd*, No. 4:15-CR-305, 2017 WL 1197849, at *14 (S.D. Ga. Feb. 10, 2017).

### B.   Custodial Factors

The determination of whether a suspect is "in custody" is a multi-factor balancing inquiry based on the totality of the circumstances.[39]   Courts in the Eleventh Circuit have specifically considered the following non-exhaustive factors[40] in this analysis: (a) the location of the questioning;[41] (b) whether the officers brandished weapons;[42] (c) whether the law enforcement touched the suspect;[43] (d) whether law enforcement used language or a tone that indicated that compliance with the officers could be compelled;[44] (e) whether law enforcement "unambiguously advis[ed]" the suspect that she was free to leave and not in custody;[45] (f) the duration of the questioning at issue;[46] (g) statements made during the interview;[47] (h) whether restraints were placed on the suspect during the questioning;[48] and (i) the release of the interviewee at the end of the questioning.[49]

While these factors are useful, the Supreme Court has instructed that courts undertaking a custody analysis must determine the *entirety* of the "circumstances surrounding the interrogation,"[50] and should accordingly look "at the broader setting"[51] and obtain the "broader picture"[52] of the scene.[53]   At this direction, courts have not only looked to the above factors, but

---

[39] *See, e.g., Brown*, 441 F.3d at 1347 (quotation omitted).

[40] *See United States v. Miller*, No. 2:15-CR-14, 2015 WL 13238641, at *4 (S.D. Ga. Oct. 30, 2015) (noting that the factors listed by the Supreme Court in the custodial analysis are non-exhaustive).

[41] *See id.* at 1348.

[42] *See Street*, 472 F.3d 1309 (citation omitted).

[43] *See id.*

[44] *See id.*

[45] *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013) (unpublished) (citation omitted); *see also United States v. Robinson*, No. 4:17-CR-052, 2017 WL 3262417, at *3 (S.D. Ga. July 14, 2017).

[46] *See id.* (citing *Howe v. Fields*, 565 U.S. 499, 509 (2012)).

[47] *See id.*

[48] *See id.*

[49] *See id.*

[50] *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (quoting *Thompson v. Keohane*, 516 U.S. 99 (1995)).

[51] *United States v. Freeman*, 61 F. Supp. 3d 534, 544 (E.D. Va. 2014).

[52] *United States v. Borostowski*, 775 F.3d 851, 860 (7th Cir. 2014).

[53] *See State v. Mangual*, 311 Conn. 182, 193 (Conn. 2014) (noting that "the United States Supreme Court has decline[d] to accord talismanic power to the freedom-of-movement inquiry[] and [has] instead asked the additional

have also evaluated the following additional list of non-exhaustive factors in making the custody determination: (1) whether the questioning was voluntary;[54] (2) whether the suspect was separated from others during the questioning;[55] (3) whether law enforcement had a search warrant for the person of the suspect;[56] (4) the number of law enforcement agents at the scene;[57] (5) the physical characteristics of the interview location;[58] and (6) the degree to which law enforcement's questioning focused on the suspect as a prime suspect.[59]

### C.    Application of The Custodial Factors Dictate That Winner Was "In Custody" and Therefore Entitled to *Miranda* Warnings.

Again, determining whether a suspect was in custody is based on the "totality of the circumstances,"[60] and no single factor should "sway the analysis."[61]   When one considers the totality of the circumstances here by examining the factors outlined above, it is clear that Winner's statements were taken without supplying her the constitutionally-required *Miranda* warnings.   The Court should, therefore, suppress her statements, as well as any evidence obtained from those statements.

---

question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*" (citations omitted)).

[54] *See, e.g., Borostowski*, 775 F.3d at 861–62 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004); *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *United States v. Ambrose*, 668 F.2d 943, 956 (7th Cir. 2012)).

[55] *See Borostowski*, 775 F.3d at 860, 862; *United States v. Hashime*, 734 F.3d 278, 284 (4th Cir. 2013); *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012); *United States v. Craighead*, 539 F.3d 1073, 1086–87 (9th Cir. 2008) (citing *Miranda*, 384 U.S. at 445–46, 448); *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007).

[56] *See People v. Wilson*, 268 Cal. App. 2d 581, 586 (Cal. Ct. App. 1968) (noting that search warrant authorized search of suspect as factor in custody analysis); *see also People v. Farris*, 120 Cal. App. 3d 51, 56 (Cal. Ct. App. 1981) (same).

[57] *See, e.g., Craighead*, 539 F.3d at 1078, 1085; *Cavazos*, 668 F.3d at 194; *United States v. Mahmood*, 415 F. Supp. 2d 13, 17–18 (D. Mass. 2006); *Mangual*, 311 Conn. at 201 (citing *Craighead*, 539 F.3d at 1085; *Revels*, 510 F.3d at 1270, 1277; *United States v. Mittel-Carey*, 493 F.3d 36, 39–40 (1st Cir. 2007)).

[58] *See Craighead*, 539 F.3d at 1088–89.

[59] *See Stansbury v. California*, 511 U.S. 318, 325 (1994) (noting that an officer's beliefs concerning suspect's culpability may be one of many factors in the custodial interrogation analysis if those words were manifested to the suspect and would effect a reasonable person's views on his or her freedom to leave); *United States v. Mittel-Carey*, 456 F. Supp. 2d 296, 308 (D. Mass. 2006) (citing *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990)).

[60] *Brown*, 441 F.3d at 1347 (quotation omitted)

[61] *United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (reversing district court's judgment that defendant was not in custody because the district court was swayed by the single factor that law enforcement told the suspect he was not under arrest and did not arrest the suspect for two years).

- **Winner Was Never Advised That She Was "Free to Leave."** As the Eleventh Circuit has emphasized, a *"powerful factor"* is whether law enforcement "unambiguously advis[ed] . . . that [the suspect was] free to leave and [was] not in custody."[62]  Plainly, where law enforcement makes such a disclosure, it will "generally lead to the conclusion that the defendant is *not* in custody."[63]

  Here, Winner was not advised she was free to leave.[64]  To the contrary, the agents directed her movements prior to and during the execution of the search warrant, leading any reasonable person to believe she was not free to leave.  Put differently, Winner was restricted in her freedom of movement.  This factor, therefore, counsels in favor of a finding of custody.[65]

- **Winner Was Never Advised She Was "Not Under Arrest."** Courts, including those within the Eleventh Circuit, have looked closely at whether the suspect was advised she was *not* under arrest.[66]  Indeed, the tactic of law enforcement to keep a detained suspect "in the dark" about his or her arrest status is far more likely to yield the pressures *Miranda* warns of and hence, render the situation custodial.[67]  This is because where a suspect is confused or unclear of her custodial status, "she may feel compelled to submit to police questioning for fear that her refusal to cooperate will reduce her chances for release or other favorable treatment."[68]

  Here, Winner was never told that she was not under arrest.  Instead, when she expressly asked, "Am I going to jail tonight?" agents told her, "I don't know the answer to that *yet*."[69]  The importance of this answer cannot be overstated.  "Where a suspect has been [] advised [an arrest will not be made], custody has frequently been found not to exist."[70]  Indeed, the Eleventh Circuit has termed this factor so *"powerful"* and *"substantial"* that, where present, it requires the government to "establish 'extensive' evidence" to overcome a finding" that the interview was not custodial.[71]  Winner was not advised that she was not under arrest.  This factor therefore strongly cuts in favor of a finding of custody.

---

[62] *Matcovich*, 522 F. App'x at 851 (quoting *Brown*, 441 F.3dat 1348 ); *see Craighead*, 539 F.3d at 1087–88; *Mittel-Carey*, 456 F. Supp. 2d at 307.

[63] *Matcovich*, 522 F. App'x at 851 (citation omitted).

[64] (Winner Decl. ¶ 5.)

[65] (*See, e.g.*, Winner Decl. ¶¶ 7, 20.).  While Winner was advised she did not have to answer the agents' questions, such a directive is materially different than being advised of the ultimately inquiry—whether she was free to leave.  Indeed, "[t]he broader setting makes clear why a few isolated statements by law enforcement" in the course of a bigger operation "cannot erase its custodial nature."  *Hashime*, 734 F.3d at 284.  *See also, e.g., Griffin*, 922 F.2d at 1354 (finding in-home interrogation custodial where, among other things, suspect was accompanied by officer to retrieve cigarettes and was told to remain in view of agents at all times); *Mittel-Carey*, 456 F. Supp. 2d at 307 (finding in-home interrogation custodial where, among other things, suspect was directed where to sit and was never told he was free to leave).

[66] *See, e.g., Brown*, 441 F.3d at 1346–48.

[67] *See Mangual*, 311 Conn. at 204-05.

[68] *Mangual*, 311 Conn. at 205 (citing *Illinois v. Perkins*, 496 U.S. 292, 296–97 (1990)).

[69] (Winner Decl. ¶ 18.)

[70] *Griffin*, 922 F.2d at 1350 (citing *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)).

[71] *Brown*, 441 F.3d at 1346–49.

- **From The Moment The Agents Encountered Winner, Through The Time She Was Formally Arrested, Winner Was Never Free To Leave.** An arrest after a suspect's questioning has frequently been held as objective evidence that tends to support the reasonableness of a defendant's position that she was in custody during pre-arrest interrogation.[72] Here, after her interrogation, and after being directed and instructed on where to go, Winner was arrested.[73] This factor therefore militates in favor of a finding that Winner was in custody during her questioning.[74]

- **Law Enforcement Agents Were There To Search Not Only Her House And Her Car, But Her Person.** Law enforcement specifically advised Winner that they had a search warrant for her person. This fact is significant. "It goes without saying that defendant was not free to leave the area while officers were conducting the search of the room. Had that search proved fruitless, defendant herself was a potential subject for search. To accomplish such a search, the officers were authorized to detain her and call in a female officer. [] Only one conclusion may be drawn from the evidence: From the time officers entered, defendant was deprived of her freedom of action in a significant way."[75]

  Likewise, it is monumentally reasonable for a suspect to believe she is detained when law enforcement *expressly* advise her that they have a search warrant for her person, at least until that search is conducted. Here, all law enforcement agents on the scene—during the search and interrogation—were *men*, and any reasonable person, especially a female, would not feel free to leave until a female agent arrived to conduct the search.[76] Indeed, it was not until female officers were called that law enforcement arrested Winner and transported her to jail.[77] And even the female officers did not search her until they transported her to jail. Under the circumstances, under the direction and control of law enforcement, any reasonable person would not have felt free to leave *unless and until* law enforcement executed the search warrants,[78] which here did not happen until her arrest and arrival at the jail. This factor therefore cuts in favor of a finding of custody.

- **Winner's Home Was a Police-Dominated Atmosphere.** While courts have generally been less likely to find that an interrogation in a suspect's home was custodial, many courts, including from the Eleventh Circuit, hold that an in-home interrogation may nonetheless be custodial in nature where a "police-dominated atmosphere" exists.[79] This

---

[72] *See Griffin*, 922 F.2d at 1356 ("Griffin's arrest at the conclusion of the interview is objective evidence which tends to support the reasonableness of Griffin's subjective belief that he was in custody from the inception of the encounter and that his arrest was imminent."); *Borostowski*, 775 F.3d at 862 (noting that suspect was not released at the end of interview, counseling in favor of finding of custody).

[73] (Winner Decl. ¶¶ 20–21.). To be sure, her movement in the immediate aftermath were subject to directives given by law enforcement—advising her to "wait" in the front yard, then the fenced yard—but thereafter, she was arrested by law enforcement. (*Id.* ¶¶ 20, 21.)

[74] *See Griffin*, 922 F.2d at 1356; *Borostowski*, 775 F.3d at 862.

[75] *Wilson*, 268 Cal. App. 2d at 586; *see State v. Farris*, 120 Cal. App. 3d at 56.

[76] (*See* Winner Decl. ¶¶ 3, 4, 8, 21.)

[77] (*Id.* ¶ 21.)

[78] *See Farris*, 120 Cal. App. 3d at 56; *Wilson*, 268 Cal. App. 2d at 586.

[79] *See, e.g., Matovich*, 522 F. App'x at 852 (noting that even in-home interrogations can become "police-dominated" atmospheres); *Craighead*, 539 F.3d at 1083–84; *Revels*, 510 F.3d at 1275; *Mittel-Carey*, 493 F.3d at 40;

is especially so when the interrogating scene is coupled with teams of agents rummaging through the suspect's home pursuant to a search warrant. The rationale for this finding of custody is as persuasive as it is simple: "a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search."[80] In such a scenario, the homeowner-suspect "may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search."[81] In other words, when law enforcement enters a suspect's residence, "that residence is no longer a bastion of privacy and security; rather, it has been transformed, albeit lawfully, into a hub of law enforcement activity directed against the suspect. Consequently, 'it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence.'"[82]

Here, Winner arrived at her home, only to be confronted with ten armed male law enforcement agents who executed their search warrant, which authorized a search of her person.[83] Winner had a "strong motive" to remain in place, given that it was her home,[84] and the scene quickly became one that was dominated by law enforcement agents. As a result, Winner's home contained the inherent pressures that, by their very nature, undermine an individual's ability to make a free and voluntary decision about whether to speak or remain silent—concerns which directly implicate *Miranda* and are highly relevant to the custody issue.[85] Accordingly, because Winner's home was a "police-dominated atmosphere," the location of the interrogation counsels in favor of a finding that Winner was in custody.[86]

---

*Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996); *Griffin*, 922 F.2d at 1354–55; *see also Orozco v. Texas*, 394 U.S. 324, 325–26 (1969) (in-home interrogation was custodial).

[80] *Craighead*, 539 F.3d at 1083.

[81] *Id.* Indeed, as the Ninth Circuit mused in *Craighead*, "[i]f a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth." *Id.*

[82] *Mangual*, 311 Conn. at 646 (quoting *Griffin*, 922 F.2d at 1355 n.15).

[83] (Winner Decl. ¶ 3.)

[84] *State v. Kelly*, 435 N.W.2d 807 (Minn. 1989) (in-home interrogation was custodial for purposes of *Miranda*); *see Craighead*, 539 F.3d at 1089 (noting that suspect testified he did not want to leave his home while it was being searched because he "did not want to leave the officers alone with his belongings and did not want to leave his dog unattended").

[85] *Mangual*, 311 Conn. at 196 (in-home interrogation was custodial for purposes of *Miranda*); *see Craighead*, 539 F.3d 1083–84 (citing cases).

[86] *See, e.g., Hashime*, 734 F.3d at 284–85 (in-home interrogation was custodial for purposes of *Miranda* where over a dozen law enforcement agents entered and searched home, exercising physical control over the defendant and his family); *Craighead*, 539 F.3d 1083–84 (finding that eight law enforcement agents from three different agencies, some armed, executing a search warrant rendered the defendant's home being dominated by law enforcement agents and thus, his in-home interrogation was "custodial" for purposes of *Miranda*); *Griffin*, 922 F.2d at 1354–55 (in-home interrogation was custodial under *Miranda* where environment was dominated by law enforcement who asserted control); *Sprosty*, 79 F.3d at 641–42 (in-home interrogation was custodial under *Miranda* where officers searched home, rendering environment dominated by law enforcement); *United States v. Tummins*, No. 3:10-CR-00009, 2011 WL 3420618, at *12–16 (M.D. Tenn. Aug. 4, 2011) (in-home interrogation was custodial for purposes of *Miranda* where search warrant executed at suspect's home); *Mahmood*, 415 F. Supp. 2d at 16–19 (in-home interrogation was custodial for purposes of *Miranda* where law enforcement search rendered premises dominated by

- **Law Enforcement Conducted The Interview Where Winner Advised She Did Not Want To.**  Law enforcement agents directed Winner to be interviewed in a very small (no more than 7' by 9') back room of Winner's house, a room that she specifically voiced her desire to avoid because she thought it was "creepy," and that was unfurnished.[87]  Law enforcement agents closed the door nearly in its entirety[88] and stood in front of Winner, whose back was against a wall.  Winner could not have exited the room without physically moving *both* law enforcement agents.[89]  Courts have found similar settings (*e.g.*, small interview rooms, coupled with agents situated in a way that made it difficult for the suspect to leave) custodial in nature.[90]  This factor, therefore, cuts in favor of finding Winner was in custody.

- **Winner Was Isolated During The Questioning.**  Authorities hold that "the law enforcement technique of isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation."[91]  Simply put, custodial interrogation is more likely where a suspect is isolated from others at the location of the interview.[92]

  While Winner lived alone (and therefore could not by physically separated from her friends or family), she was nonetheless separated from the substantial activity—eight armed male law enforcement agents rummaging through her possessions—ongoing in her house.  This factor therefore counsels in favor of a finding that Winner was in custody.

- **Law Enforcement Initiated The Contact With Winner.**  As courts have noted, "where suspects take the initiative to offer statements or voluntarily arrange for the questioning," custody is frequently lacking.[93]  "Conversely, when the confrontation between the

---

law enforcement); *Mittel-Carey*, 456 F. Supp. 2d at 306–307 (in-home interrogation was custodial for purposes of *Miranda* where defendant's house was searched by eight law enforcement agents and environment became "police-dominated"); *see also Cavazos*, 668 F.3d at 194–95 (in-home interrogation was custodial where, *inter alia*, law enforcement exercised physical dominion over defendant and more than a dozen officers searched suspect's home); *Revels*, 510 F.3d at 1275 (in-home interrogation was custodial for purposes of *Miranda* where environment was dominated by police).

[87] (Winner Decl. ¶ 6.)

[88] (*Id.* ¶ 7.)

[89] (*Id.*)

[90] *See, e.g.*, *Borostowski*, 775 F.3d at 860 (custodial interrogation took place in "small, crowded bedroom" with armed agent blocking the door, which counseled in favor of finding of custody); *Craighead*, 539 F.3d at 1086, 1088–89 (noting that custodial interrogation took place in unfurnished "back storage room," with a closed door, and agents situated so as to block the suspect's exit from the room, which counseled in favor of finding no freedom of movement); *Mahmood*, 415 F. Supp. 2d at 16–19 (custodial interrogation where interview took place in small room with agents); *Commonwealth v. Coleman*, 49 Mass. App. Ct. 150, 154 (Mass. Ct. App. 2000) (custodial interrogation where place of interview was small room with closed door shadowed by questioner).

[91] *Craighead*, 539 F.3d at 1087 (citing *Miranda*, 384 U.S. at 445–46, 448–50).

[92] *See, e.g.*, *Borostowski*, 775 F.3d at 860, 862–63 (custodial interrogation where, among other things, suspect was isolated from family members); *Hashime*, 734 F.3d at 284 (custodial interrogation where, among other things, suspect was isolated during interrogation); *Cavazos*, 668 F.3d at 194 (same); *Revels*, 510 F.3d at 1275 (same); *Mahmood*, 415 F. Supp. 2d at 17 (finding custodial interrogation where defendant, who was by himself when agents arrived at his house, remained isolated during the encounter).

[93] *Griffin*, 922 F.2d at 1351 (citations omitted).

suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist."[94]

Here, it is undisputed that law enforcement initiated contact, surprising Winner at her residence armed with search warrants for her home, car, and person. After presenting these warrants, the interview at issue began. This factor thus militates in favor of a finding that Winner was in custody.

- **Ten Male Law Enforcement Agents Were Present.** Winner arrived home from the grocery store to find a handful of law enforcement agents, to be followed, within minutes, by a total of ten male law enforcement agents who appeared to execute their search warrant of her house, car, and person.[95] Ten agents are in excess of the number of agents present in many cases where courts have found suspects were in custody and entitled to *Miranda* warnings.[96] This factor, therefore, also cuts in favor of a custody finding for Winner.

- **All Agents Were Armed.** While the agents here did not unholster their weapons, all *ten* male law enforcement agents were nonetheless armed—a fact Winner took notice of.[97] Because courts have held that the armed nature of every law enforcement agent counsels in favor of finding the suspect was in custody, this factor too counsels in favor of finding Winner was in custody.[98]

- **While Not In Handcuffs, Winner Was Nonetheless Restrained.** While Winner was not physically restrained (by handcuffs or otherwise), courts have held that a suspect may nonetheless be restrained based on the dominion or control exercised by law enforcement over the situation and the defendant.[99] Thus, for example, a suspect placed "under guard

---

[94] *Id.* (citations omitted); *see Borostowski*, 775 F.3d 861–62 (citing cases holding that custody may be found where suspect did not voluntarily seek out law enforcement) (citations omitted); *Mangual*, 311 Conn. at 199 (noting that "[a] wholly unexpected and highly intrusive law enforcement initiative of this sort is likely to be especially alarming when, as in the present case, the suspect is confronted by a large contingent of armed officers").

[95] (Winner Decl. ¶¶ 3, 4, 8.)

[96] *See, e.g., United States v. Medearis*, 775 F. Supp. 2d 1110, 1127 (D.S.D. 2011) (four officers interrogating suspect in his kitchen, in a police-dominated environment, constituted custodial interrogation); *Craighead*, 539 F.3d at 1085–86 (eight armed law enforcement agents covering three different agencies entering home to search residence and interrogate suspect was custodial); *Mahmood*, 415 F. Supp. 2d at 14–15, 17 (D. Mass. 2006) (finding custodial interrogation in suspect's interview at home where three armed agents were present for questioning in small area); *Mangual*, 311 Conn. at 201 (seven law enforcement officers participating in the search of defendant's residence counseled in favor of custodial interrogation).

[97] (Winner Decl. ¶¶ 3, 4.)

[98] *See, e.g., United States v. Musgrave*, 726 F. Supp. 1027, 1029–30, 1033 (W.D.N.C. 1989) (finding in-home interrogation custodial where, among other things, agents were visibly armed).

[99] *See, e.g., Craighead*, 539 F.3d at 1085–86; *Griffin*, 922 F.2d at 1350–51 (citing *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989); *South Dakota v. Long*, 465 F.2d 65, 68 (8th Cir. 1972)); *United States v. Goodman*, 945 F. Supp. 359, 365–66 (D. Mass. 1996); *Mangual*, 311 Conn. at 647 (although not handcuffed, suspect nonetheless restrained given the "highly coercive atmosphere and intimidating police presence, the severe limitation placed on the defendant's freedom of movement, and the failure of the police to explain the temporary nature of her detention"); *see also Mahmood*, 415 F. Supp. at 18.

14

during questioning" or "told to remain in the sight of interrogating officials" may associate those restrains with a formal arrest.[100]

That is precisely the case here. To begin with, as noted above, in the back room where agents chose to question Winner, they placed themselves in such a way as to prevent her exit from the questioning.[101] Further, after her interrogation, Winner was instructed by the agents on where to go (first the front yard, then the fenced yard) and then, finally, she was placed under arrest.[102] As courts have held under similar circumstances, such facts counsel in favor of finding Winner was in custody.[103]

- **Law Enforcement Agents Made It Clear That Winner Was The Only Suspect.** While the subjective beliefs of the participants are irrelevant, "[c]ustody determinations ought to consider how the officer's behavior and interactions with the suspect would affect an individual's perception of the situation" and the fact that an individual has become the focus of an investigation is relevant "to the extent that the suspect is aware of the evidence against him and this awareness contributes to the suspect's sense of custody."[104]

Here, this factor militates in favor of a finding of custody. While law enforcement almost certainly believed Winner was the prime suspect of their investigation *prior* to arriving at her home, those beliefs became manifested in the agents' interactions with Winner during the interview. Among other things, law enforcement began the interview by advising they were at Winner's house to discuss the "possible mishandling of classified information" and wanted to get "[her] side" of the story.[105] As the interview wore on, law enforcement began hinting at what they believed all along: that Winner was their prime suspect.[106] As these beliefs were aired to her, along with the evidence, Winner began to understand that she was the culprit whom they had decided had committed a crime, further demonstrating the reasonableness of Winner's belief that she was in custody and was not free to leave.[107]

---

[100] *See Craighead*, 539 F.3d at 1085–86 (suspect escorted to back room, interrogated with door closed, by agents blocking exit make it objectively reasonable for the suspect to believe he was under guard even though he was not handcuffed or physically restrained); *Griffin*, 922 F.2d at 1350–51; *Goodman*, 945 F. Supp.at 365–66 (although not handcuffed, suspect was nonetheless restrained where at least two officers were present at all times during his questioning with as many as four officers outside his home); *Mangual*, 311 Conn. at 647 (although not handcuffed, suspect was nonetheless restrained given the "highly coercive atmosphere and intimidating police presence, the severe limitation placed on the defendant's freedom of movement, and the failure of the police to explain the temporary nature of her detention"); *see also Mahmood*, 415 F. Supp. 2d at 18 (while not physically restrained, suspect's freedom was restrained where agents blocked access to telephone and suspect was required to remain in view of officers).

[101] (Winner Decl. ¶ 7.)

[102] (*Id.* ¶ 20.)

[103] *See, e.g., Craighead*, 539 F.3d at 1085–86; *Griffin*, 922 F.2d at 1350–51; *Goodman*, 945 F. Supp. at 365–66; *Mangual*, 311 Conn. at 647; *see also Mahmood*, 415 F. Supp. 2d at 18.

[104] *Mittel-Carey*, 456 F. Supp. 2d at 308 (quoting *Griffin*, 922 F.2d at 1348).

[105] (Winner Decl. ¶ 10.)

[106] (*See id.* ¶¶ 11–17.)

[107] *See Mittel-Carey*, 456 F. Supp. 2d at 308 (where suspect was made aware of the evidence against him and was given the impression that he would be going to prison, this factor counseled in favor of finding a custodial interrogation).

In sum, application of the non-exclusive list of factors courts analyze to determine custody strongly counsels in favor of finding custody in this case: Winner was not free to leave, law enforcement agents never told Winner that she was free to leave, and Winner's movements were entirely restricted and dictated by law enforcement up until her arrest.   No reasonable person would have felt free to leave and terminate the interrogation, especially when (among many other things) that person knew law enforcement had a warrant to search her person and had not effectuated that search.

### D.   Precedent Dictates That Winner Was "In Custody" and Therefore Entitled to *Miranda* Warnings.

In a very similar case, *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the Ninth Circuit determined the suspect was in custody for purposes of *Miranda*.   This Court should find the same here because the facts even more strongly support a finding of custody than they did in *Craighead*.

In *Craighead*, eight law enforcement officers went to the residence of a child pornography suspect to execute a search warrant.[108]   Two agents asked to speak with the suspect and advised him that he was "not under arrest," that any statement he might make would be "voluntary," that he would "not be arrested that day regardless of what information he provided," and that he was "free to leave."[109]   They then escorted the suspect to a "storage room at the back of his house," which appeared to be unfurnished and cluttered with boxes.[110]   In that back room, the agents, who were armed, stood in such a way as to block the exit door to the room, which

---

[108] *Craighead*, 539 F.3d at 1078.
[109] *Id.*
[110] *Id.*

was closed.[111]   The interview of the suspect lasted a mere twenty to thirty minutes, and the suspect made many incriminating statements.[112]   After applying many of the above-listed factors, the Ninth Circuit found the suspect's interrogation to be custodial, holding that the atmosphere was a police-dominated one, with a large number of armed law enforcement officers, which would have placed a reasonable person under the belief that he was not free to leave.[113]

The facts in *Craighead* are similar—and in many respects, identical—to those in this case.   Like Winner, the suspect in *Craighead* had his home raided by law enforcement agents from multiple agencies.   Like Winner, the suspect in *Craighead* was not handcuffed.[114]   Like Winner, the suspect in *Craighead* was interrogated in a "back room," with law enforcement situated in a way so as to block the suspect's exit.[115]   And like Winner, the interrogation in *Craighead* was relatively brief.[116]

Importantly, however, facts present in *Craighead* that counseled *against* a finding of custody are not present here.   In particular, the agents in *Craighead* advised the suspect that he was "free to leave" and that he would not be arrested that day.   By contrast, here, Winner was never advised she was free to leave and was kept in the dark about her arrest status.   Even more, law enforcement had a search warrant for Winner's person, which apparently was not the case in *Craighead*.[117]

---

[111] *See id.*
[112] *See id.*
[113] *See id.* at 1082–89.
[114] (*See id.* ¶¶ 1–24.)
[115] (*Id.* ¶ 7.)
[116] (*Id.* ¶ 19.)   While the interrogation was relatively brief, it took approximately two hours from the time the two male agents arrived until the time the two female officers arrived on the scene.  (*Id.* ¶ 21.)
[117] The Ninth Circuit also noted that one the law enforcement officers was the military superior to the suspect, who was a military technician. *See Craighead*, 539 F.3d at 1077–78, 1085.   A similar indicia of intimidation was present in this case with Winner, a single female, who had her house searched by eight male law enforcement officers and was interrogated by two male law enforcement officers. (*See* Winner Decl. ¶¶ 3–7.)

17

While there does not seem to be any Eleventh Circuit case as close to this case as *Craighead*, cases within Eleventh Circuit jurisprudence in which courts have found a suspect was not in custody stand in stark contrast to this case.

For example, in *United States v. Matcovich*, 522 F. App'x 850 (11th Cir. 2013), the Eleventh Circuit found an in-home interrogation to be non-custodial, but several factors existed in *Matcovich* that are not present here. The suspect in *Matcovich* was unambiguously told that he "was free to leave, could begin to answer questions and then stop, and could answer only the questions he wished."[118] But here, no such comforting options were given to Winner. Also in *Matcovich*, while law enforcement utilized handcuffs, law enforcement advised those in the house that "they were not under arrest," and that the handcuffs were just for officer safety.[119] Winner was never advised that she was not under arrest, and when she specifically inquired, the agents were ambiguous—"I don't know the answer to that yet"[120]—a response that would make any reasonable person feel "in the dark" and compelled to stay and continue to follow law enforcement's directives.[121] Furthermore, at the conclusion of the interview in *Matcovich*, the suspect left voluntarily (with an FBI polygrapher) and was not arrested until later.[122] Once again, by contrast, after her interrogation, law enforcement directed Winner on her movements (first the front yard, then the fenced yard) and then, after they arrived on the scene, female

---

[118] *Matcovich*, 522 F. App'x at 852.
[119] *Id.*
[120] (Winner Decl. ¶ 18.)
[121] *Mangual*, 311 Conn. at 204–05.
[122] *See Matcovich*, 522 F. App'x at 852.

officers arrested Winner.[123]   Significantly, unlike this case, law enforcement did not appear to have a search warrant for the person of the suspect in *Matcovich*. These "powerful"[124] factors are alone enough to distinguish the non-custodial interview in *Matcovich* (and other cases from this district and circuit)[125] from this case.

Likewise, in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit found a suspect's interview non-custodial where he was told "no less than *three* times by two different officers that he was not under arrest, not in custody, and was free to go at any time."[126] The Eleventh Circuit termed this factor as one "of substantial importance,"[127] which is "a powerful factor in the mix"[128] and requires a suspect to "establish 'extensive' restraints in order to overcome a finding that under the[] circumstances a reasonable person would have understood he was free to leave or terminate the interview at any time."[129]   Winner was never provided these "powerful" and "substantial" admonitions.   Moreover, unlike Winner's scenario, in *Brown*, the suspect "was never ordered to stay in any particular location,"[130] the questioning law enforcement agent in *Brown* was not armed,[131] and law enforcement did not appear to have a search warrant for the defendant's person.[132]

---

[123] (Winner Decl. ¶¶ 20–21.)

[124] *Matcovich*, 522 F. App'x at 851.

[125] *Cf. United States v. Robinson*, No. 4:17-CR-052, 2017 WL 3262417, at *3 (S.D. Ga. July 14, 2014) (finding in-home interrogation to not be custodial where, among other things, officers informed defendant he was not under arrest, free to leave, and pointed to unobstructed access to open back door adjacent to location of interview); *see also United States v. Maldonado*, 526 F. App'x 859, 861–62 (11th Cir. 2014) (finding interrogation non-custodial where suspect was told she was free to leave and was not in custody, signed *Garrity* forms advising that the interview was voluntary and that she could stop answering questions at any time, and left the interview at its conclusion and was not arrested until weeks later).

[126] *Brown*, 441 F.3d at 1347.

[127] *Id.*

[128] *Id.*

[129] *Id.* at 1348.

[130] *Id.* at 1346.

[131] *Id.*

[132] (*Cf.* Winner Decl. ¶ 3.)

Other cases from the Eleventh Circuit where the suspect was found not to be in custody are similarly distinguishable or inapposite. In *United States v. Lazarus*, 552 F. App'x 892 (11th Cir. 2014), for example, the suspect at issue was interrogated at her place of business but selected the date and time of the interview, and scheduled it in advance with law enforcement[133]—a far cry from this case. Likewise, in *United States v. Muegge*, 225 F.3d 1267 (11th Cir. 2000), the Eleventh Circuit reversed a district court's judgment finding a law enforcement interview as custodial.[134]  In that case, however, the defendant was asked by his military supervisor to report to a law enforcement interview, "came and left on his own," and was not arrested until eight months later.[135]  Unlike here, there was no search warrant in *Muegge*.

### E.     Winner Was Interrogated.

Under the second prong of the "custodial interrogation" inquiry, the Court must determine whether the suspect was "interrogated."  Under *Miranda*, the term "interrogation" refers not only to express questioning, but also to any words or actions on the part of the police (other so-called "booking" questions) that the police should know are reasonably likely to elicit an incriminating response from the suspect.[136]

Here, there can be no question that Winner was interrogated.  Among many other factors, for the approximately twenty-five minutes law enforcement questioned her, she was asked about her work for her employer; her access to various documents relevant to this case; her use of those

---

[133] *See* 552 F. App'x at 894.
[134] *See* 225 F.3d 1267, 1268–71.
[135] *See id.*
[136] *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

very documents; and specifically about the document the Government alleges she unlawfully disclosed.[137] Under these circumstances, for purposes of *Miranda*, Winner was interrogated.

## IV.    CONCLUSION

The circumstances of this particular interrogation counsel in favor of a finding that Winner was in custody during her encounter with law enforcement.  Winner's house was invaded with law enforcement officers who swarmed her residence.  Winner was then taken to a back room, which was unfurnished and which she described as a "creepy" and isolated place, with her back against the wall, and interviewed by two agents who blocked her exit from the room, which was nearly closed off from the rest of the house.  The law enforcement at the scene were *all men*, were *all armed*, and, significantly, never advised her she was "free to leave."  To the contrary, prior to and during the search, Winner was *directed* where to go by law enforcement at all times.  Also, Winner was never told that she was not under arrest, and law enforcement unambiguously advised that her arrest was a determination yet to be made—a further factor bearing a reasonable person's belief that she would not be free to leave.  Even more, Winner was advised that law enforcement had a search warrant for her person.  Any reasonable person would understand this fact to mean that she was not free to leave until such the personal search had been completed, which in this case, did not happen until female law enforcement arrived, arrested her, and then transported her to jail—long after the decision to arrest her had been made.

In view of all of the relevant factors, and applicable authorities, it is quite clear Winner was subjected to a custodial interrogation that required law enforcement to advise her of her *Miranda* rights, which they indisputably did not.   Accordingly, her statements to law enforcement, and any evidence obtained as a result of those statements, must be suppressed.

---

[137] (*See* Winner Decl. ¶¶ 11–17.)

WHEREFORE, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, defendant Reality Leigh Winner respectfully requests that the Court grant an evidentiary hearing in connection with the instant Motion to Suppress; that the Court grant the Motion to Suppress; that the Court suppress any statements made by Winner taken in violation of *Miranda*; that the Court suppress any evidence obtained as a result of those statements; and that the Court grant such additional relief as may be warranted.

Respectfully submitted,

BY:     */s/ John C. Bell Jr.*
         John C. Bell, Jr. (Bar No. 048600)
         Titus T. Nichols (Bar No. 870662)
         **BELL & BRINGHAM**
         PO Box 1547
         Augusta, GA 30903-1547
         (706) 722-2014
         John@bellbrigham.com
         Titus@bellbrigham.com

         Joe D. Whitley (Bar No. 756150)
         Admitted *Pro Hac Vice*
         Brett A. Switzer (Bar No. 554141)
         **BAKER, DONELSON, BEARMAN,**
         **CALDWELL & BERKOWITZ, P.C.**
         3414 Peachtree Rd., NE Suite 1600
         Atlanta, GA 30326
         (404) 577-6000
         JWhitley@bakerdonelson.com
         BSwitzer@bakerdonelson.com

         Matthew S. Chester (La. Bar No. 36411)
         Admitted *Pro Hac Vice*
         **BAKER, DONELSON, BEARMAN,**
         **CALDWELL & BERKOWITZ, P.C.**
         201 St. Charles Ave., Suite 3600
         New Orleans, LA 70170
         (504) 566-5200
         MChester@bakerdonelson.com

Jill E. McCook (Tn. Bar No. 033813)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
265 Brookview Centre Way, Suite 600
Knoxville, TN  37919
(865) 549-7129
JMCook@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 27488)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com

**ATTORNEYS FOR DEFENDANT
REALITY LEIGH WINNER**

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

*/s/ John C. Bell, Jr.*
JOHN C. BELL, JR.

COUNSEL FOR DEFENDANT