IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA


UNITED STATES OF AMERICA,     )
                             )
               Plaintiff,    )
                             )
                vs.        )    1:17CR34
                             )
REALITY LEIGH WINNER,     )
                             )
              Defendant.    )
_____)


DETENTION HEARING
BEFORE THE HONORABLE BRIAN K. EPPS
FRIDAY, SEPTEMBER 29, 2017; 10:01 A.M.
AUGUSTA, GEORGIA


FOR THE GOVERNMENT:

    Jennifer G. Solari, Esquire
    U.S. Attorney's Office
    Post Office Box 8970
    Savannah, Georgia 31412
    (912)201-2561

    Julie Ann Edelstein, Esquire
    U.S. Department of Justice
    600 E Street NW, 10th Floor
    Washington, DC 20002
    (202)233-2260

    David C. Aaron, Esquire
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530
    (202)307-5190

**FOR THE DEFENDANT:**

        John C. Bell, Jr., Esquire
        Titus T. Nichols, Esquire
        Bell & Brigham
        457 Greene Street
        Augusta, Georgia 30901
        (706)722-2014

        Joe D. Whitley, Esquire
        Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
        3414 Peachtree Road, NE, Suite 1600
        Atlanta, Georgia 30326
        (404)223-2209

        Jill E. McCook, Esquire
        Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
        265 Brookview Centre Way, Suite 600
        Knoxville, Tennessee 37919
        (865)549-7129

        Matthew S. Chester, Esquire
        Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
        201 St. Charles Avenue, Suite 3600
        New Orleans, Louisiana 70170
        (504)566-5231

**OFFICIAL COURT REPORTER:**

        Lisa H. Davenport, RPR, FCRR
        Post Office Box 5485
        Aiken, South Carolina 29804
        (706)823-6468

1                               **INDEX**

2    **WITNESS**                    **DIRECT CROSS REDIRECT RECROSS**

3    Justin C. Garrick,
          By Mrs. Solari            14              86
4         By Mr. Bell                     54                    91

5    Brittany M. Winner,
          By Mr. Nichols          94
6         By Mrs. Solari                105

7    Billie Winner-Davis,
          By Mr. Nichols          120            127
8         By Mrs. Solari               123

9

10                        **GOVERNMENT'S EXHIBITS**

11   **NO.**       **IDENTIFICATION**                **ID   ADMITTED**

12   1          Employment docs.                          14
     2          Photograph of text messages               14
13   3          Interview transcript 6/3/17               14
     4          Screenshot of "securedrop" sites          14
14   5          (OMITTED)
     6-A        DVD of two telephone calls                14
15   6-B        Transcript of telephone call              14
     6-C        Transcript of telephone call              14
16   7          Photographs of notes                      14
     8          Web history excerpts                      14
17   9          Instant message 2/9/17                    14
     10         Instant message 2/14/17                   14
18   11         Instant message 2/25/17                   14
     12         Instant message 3/7/17                    14
19   13         USAF Exit Questionnaire                   14
     14         Letters written by defendant              14

20

21

22

23

24

25

```
 1                (Call to Order at 10:01 a.m.)
 2               THE CLERK:  The Court calls case number 1:17CR34.
 3  The United States of America v Reality Leigh Winner.  Jennifer
 4  Solari, Julie Edelstein, and David Aaron for the government.
 5  John Bell, Joe Whitley, Matthew Chester, Jill McCook, and Titus
 6  Nichols for the defendant.  Here for a detention hearing.
 7               THE COURT:  Good morning, everybody.
 8               MRS. SOLARI:  Good morning, Your Honor.  The
 9  government is ready.
10               THE COURT:  Mrs. Solari, will you be lead counsel
11  today for the government?
12               MRS. SOLARI:  Yes, Your Honor.  I may defer to my
13  colleagues for a couple of matters, but I am lead today.
14               THE COURT:  Okay.  Mr. Bell, are you lead counsel
15  today for the defense?
16               MR. BELL:  Your Honor, I'll be doing some,
17  Mr. Whitley some, and Titus will be doing some portions.  I'll
18  be glad to start.
19               THE COURT:  Okay.  Well, if you two will maybe take a
20  seat for just a minute, I want to say a couple of things and
21  then we'll begin with the substance of the hearing.  First of
22  all, I know I owe you an amended scheduling order.  I have that
23  ready, but I'm waiting on -- I wanted to get some information
24  about security clearances from Mr. Whitley and Mr. Chester
25  because, obviously, nothing really kicks off until that occurs
```

1   and I wanted a better idea of a timeline for that so that I can

2   kind of map out where I think we're going to be in terms of

3   date-certain deadlines and how that coordinates with the

4   holidays and how much time we've got to do all of the

5   preliminary matters before we have the trial itself making sure

6   I give as much time as I can for everybody to do the things

7   that they need to do in the case.  So I am going to be getting

8   that to you shortly either today or Monday.

9        Is there anything else in that vein that we all need to

10  talk about today, Mr. Bell, from your perspective?

11            MR. BELL:  No, Your Honor.

12            THE COURT:  Mrs. Solari, from the government's

13  perspective?

14            MRS. SOLARI:  No, sir, Your Honor.

15            THE COURT:  Okay.  In terms of the number of

16  witnesses, how many will the government calling?

17            MRS. SOLARI:  The government expects to call one

18  witness, Your Honor.

19            THE COURT:  Okay.  And as to the defense?

20            MR. BELL:  Two witnesses, Your Honor.

21            THE COURT:  Okay.  Are any of those witnesses in the

22  courtroom right now, Mr. Bell?

23            MR. BELL:  They're out there in one of the conference

24  rooms.

25            THE COURT:  Okay.

1          MR. BELL:  They were there when I last saw them.  I

2   just wanted to make sure they hadn't come in.

3          THE COURT:  Okay.

4          MR. BELL:  We're keeping them there until called.

5          THE COURT:  All right.

6          MRS. SOLARI:  And, Your Honor, for the record the

7   government's witness is its case agent, Special Agent Garrick.

8   We would ask -- as part of the government trial team, we would

9   ask that he remain in the courtroom.

10          THE COURT:  Okay.  Well, that's certainly customary.

11   He's allowed to do that.  I imagine he is going to testify

12   first; is that correct?

13          MRS. SOLARI:  Well, Your Honor, I don't know.  I

14   assume that since the defendants moved to reopen this hearing

15   to present what they claim is new and material evidence, I

16   assumed that the movant would go first.  Of course, Your Honor

17   controls the court; so if you want the government to go first,

18   we can do that.

19          THE COURT:  That's how we typically proceed,

20   particularly since it's the government's burden with respect to

21   the detention hearing.  So that's how I would like to proceed

22   today.

23          MRS. SOLARI:  All right.

24          THE COURT:  Would you like to make any opening

25   statements or proffers before we begin with the first witness?

1        MR. BELL:  Your Honor, if I might, there is one

2   issue.  This refers to documents and not testimony, but there's

3   some documents that we wish to introduce that need to be done

4   in the secure environment and whether we do that first or last

5   or whenever the Court wants to do it, we can; though, I don't

6   think it is going to take long and it may make more sense to do

7   that first.  The government is aware of what we're putting in

8   the court and all that.  It's not like we're going to quote

9   from any of them.

10        THE COURT:  Right.

11        MR. BELL:  Obviously, not.

12        THE COURT:  I just think for the pure sake for the

13   fact we're already in here, we'll just start with what we have

14   unless there is a reason to do the other first.  I don't know

15   if you have a particular preference in that regard that we need

16   to consider the classified evidence before we begin here

17   because it sets the proper context for things, Mr. Bell.  Is

18   that true?

19        MR. BELL:  I think it may make the context more

20   meaningful, but we can -- it's not crippling by any means.

21        THE COURT:  Okay.  All right.  Well, let's just go

22   ahead and proceed then in what I think might be the more

23   efficient manner of beginning here and then taking it upstairs

24   after we're done.

25        So, Mrs. Solari, with that, if you have any -- you said no

1    opening remarks from you?

2              MRS. SOLARI:  Not really, Your Honor.  I think the

3    Court got the decision right the last time based on the facts

4    that were presented.  The government intends to present facts

5    today that weigh even more heavily in favor of the continued

6    detention of the defendant and I would ask that the Court grant

7    us a little bit of leniency with the witness on a couple of

8    occasions.  It's something a bit unusual.

9        In response to, I think, two of my questions Special Agent

10   Garrick actually has literally a scripted response because it's

11   been very carefully vetted and approved by the U.S. government

12   agencies that have equities in that information; so I would ask

13   the Court's leniency in allowing Special Agent Garrick to read

14   from a prepared statement in response to two of my questions.

15             THE COURT:  Right.  And, of course, that means to the

16   extent that he brings any materials with him to the witness

17   stand, the defense ---

18             MRS. SOLARI:  I'll have the defense to look at it.

19             THE COURT:  Right.  Okay.

20             MRS. SOLARI:  Yes, sir.

21             THE COURT:  Mr. Bell, anything that the defense would

22   like to say before we begin with the first witness?

23             MR. BELL:  Yes.  If I could present Mr. Whitley for

24   an opening statement.

25             THE COURT:  Sure.  Good morning, Mr. Whitley.  Come

1    on up.

2              MR. WHITLEY:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. WHITLEY:  It is a pleasure to be here in Augusta

5    and I want to compliment the court security personnel here in

6    Augusta for the courtesy they've afforded me and the entire

7    defense team.  It's been nothing short of remarkable.  They're

8    a great group of men and women; so the Court knows this, but

9    sometimes when you receive courtesy from a court and the court

10   family, it should be duly noted.  So thank you for the courtesy

11   Augusta and the personnel here at the courthouse have shown us.

12             THE COURT:  Well, I certainly echo that sentiment.

13   The CSOs we have here are very proud of what they do.  They are

14   an integral part of the court and they certainly adhere to the

15   same standard of excellence that's expected in federal court.

16   So we're proud of what they do and I appreciate you mentioning

17   it.

18             MR. WHITLEY:  Thank you, Your Honor.  We sincerely

19   appreciate the opportunity to be here this morning.  I am

20   confident the Court is thoroughly familiar with the briefs

21   filed by the government and filed by the defendant in this

22   case.  We only ask the Court to look at this new evidence --

23   the information that we're going to be presenting -- with a

24   view toward the terms and conditions that are set forth in the

25   Bail Reform Act under 18, United States Code, Section 3142(f)

1    and we believe there are considerations that should be taken

2    into account that really have a lot of bearing to do with how

3    this case unfolded, and I think the Court will hear about those

4    in the proceedings that come next.

5         Certainly, upon her arrest and then later detention

6    hearing which took place in just a matter of days later, the

7    defense counsel in this case really did not have sufficient

8    time to pull together information that we now have in our

9    possession that we think may be relevant to the Court.

10   Certainly, the Court will be making that decision and we defer

11   to the Court's decision in that regard.  However, these

12   numerous pieces of information we think would be useful for the

13   Court to hear about and that will be happening next.

14        We also think that the facts developed in the first few

15   days of this case and going forward should not move us away

16   from a presumption of innocence.  This is, after all, where we

17   start in all these analyses and the Court appreciates that,

18   but, also, her continued confinement, we believe, is manifestly

19   unjust and should not continue.  We'll be making that

20   presentation to you.

21        And as the Court will note -- and we'll be making a

22   presentation on this at some point in the proceeding -- in

23   almost every other situation involving the Espionage Act, some

24   of these cases much more severe in terms of the number of times

25   that an individual shared a Top Secret information -- in some

1   cases with a foreign power or other individuals, multiple

2   episodes of sharing this information, including a former

3   National Security Director at the White House, Sandy Berger;

4   including a four-star general -- shared information

5   substantially akin to what was shared in this situation or if

6   the government's assertions were to be proved correct and the

7   Court, certainly, has to consider that as it thinks about this

8   particular proceeding.

9       So I won't go on longer because I know that time is

10  precious.  The Court's obligation and the objective of this

11  proceeding this morning is to provide you with information that

12  helps you serve in that obligation that you've been invested

13  with and we respect that.  We believe there are conditions of

14  release that the Court could consider that would reasonably

15  assure Ms. Winner's appearance and the safety of the community

16  here in Augusta.

17      Moreover, and I guess I'll mention almost every other case

18  of espionage the defendants have been granted pretrial release.

19  We say in this regard as compared to those cases in terms of

20  the information being shared we're talking about one piece of

21  information, one information news source that was shared with

22  arguably, and on one occasion.  So this is what we have here

23  which is -- although, depending on where a person sits in a

24  case, a case is highly complex.  There is lots of complexity

25  with this case and, of course, familiar with that in terms of

1    CIPA we are not going to be able to try this case as we all

2    anticipated in the fall of this year but many months from now,

3    perhaps as early as March, and our objective will be to be

4    compliant with the Court's wishes so the case can be tried at

5    that time, but there are many hurdles to overcome.  During that

6    period of time this defendant will continue to be confined if

7    she's not permitted to be released on pretrial release subject

8    to your conditions.  Thank you, Your Honor.  I appreciate the

9    opportunity.

10             THE COURT:  Thank you, Mr. Whitley.

11        And I would ask the deputy marshal to maybe remove that

12   from the TV stand.  I've got the copy of all those cases and

13   it's kind of distracting as we go through the evidentiary part

14   of this to focus on the legal stuff.

15        All right.  Mrs. Solari?

16             MRS. SOLARI:  Thank you, Your Honor.  The government

17   calls Special Agent Justin Garrick.

18             **(JUSTIN C. GARRICK is duly sworn.)**

19             THE COURT:  Mrs. Solari, before we begin for,

20   perhaps, efficiency's sake and ease of administration, have you

21   provided the notebook of exhibits to defense counsel?

22             MRS. SOLARI:  Yes, Your Honor, I have.  I asked

23   defense counsel to please take a look at our proposed exhibits

24   this morning and in the interest of expediency let me know if

25   they have any objection to me simply moving to admit the bulk

1    of them at the outset of the hearing and they were very kind in

2    taking the time to look at my exhibits and indicating that they

3    had no objections to my moving to admit them.  There is one

4    exhibit, however, I'd like to withhold because, although the

5    exhibit itself is not classified, I would not like to discuss

6    its details in an unclassified forum.

7         So at this time, Your Honor, I believe without objection

8    from the defense the government would move to admit into

9    evidence Government's Exhibits 1 through 4 and 6 through 14.

10              THE COURT:  And that's 6A, 6B, 6C --

11              MRS. SOLARI:  Yes, sir.

12              THE COURT:  -- 7 through 14, excluding only

13   Exhibit 5?

14              MRS. SOLARI:  Yes, sir, Your Honor.

15              THE COURT:  Mr. Bell --

16              MR. BELL:  No objection, Your Honor.

17              THE COURT:  -- y'all stipulate to the

18   admissibility --

19              MR. BELL:  Yes.

20              THE COURT:  -- of these --

21              MR. BELL:  Yes.

22              THE COURT:  -- exhibits she just referenced?

23              MR. BELL:  Yes.  Not to the probative value on this

24   issue --

25              THE COURT:  Right.

(Justin C. Garrick-Direct by Mrs. Solari)

14

1        MR. BELL:  -- but to the admissibility, we have no

2    objection.

3        THE COURT:  All right.  All those exhibits except for

4    5 have been admitted into evidence.

5        (Government's Exhibit Nos. 1-4, 6A-14 are admitted.)

6        MRS. SOLARI:  Thank you, Your Honor, and I have just

7    shown Mr. Bell the somewhat scripted response we have for

8    Special Agent Garrick that's been cleared for an unclassified

9    presentation.

10       THE COURT:  Okay.

11       MRS. SOLARI:  May I approach the witness, Your Honor?

12       THE COURT:  You may.

13                      **DIRECT EXAMINATION**

14   BY MRS. SOLARI:

15   Q    Special Agent Garrick, I am going to leave with you the

16   items that have now been admitted into evidence as Government's

17   Exhibits 1 through 4 and 6 through 14.  I'll also leave with

18   you this single piece of paper.

19       I might have been distracted at the outset.  Have you

20   already stated your name for the record and told everybody

21   where you work?

22   A    I have not.

23   Q    Okay.  Please introduce yourself to the Court and spell

24   your last name.

25   A    My name is Justin Garrick; G-A-R-R-I-C-K.  I am a special

(Justin C. Garrick-Direct by Mrs. Solari)

15

1   agent with the FBI in the Augusta Resident Agency of the

2   Atlanta Field Office.

3   Q    And in what capacity do you serve as a special agent?

4   What is your assignment?

5   A    My assignment is counterintelligence investigation.

6   Q    And how long have you been doing that in the Augusta area?

7   A    In the Augusta area since May of 2013.

8   Q    Were you stationed somewhere else with the FBI prior to

9   2013?

10  A    Yes, I was.

11  Q    Where was that?

12  A    I was in Philadelphia from 2009 to 2013.

13  Q    What was the nature of your assignment there?

14  A    Counterintelligence investigations.

15  Q    Do you have previous experience in the intelligence or

16  counterintelligence field prior to becoming a special agent

17  with the FBI?

18  A    I was an intelligence analyst in the counterterrorism

19  division with the FBI from 2005 to 2008.

20  Q    And did you work at all in the intelligence field prior to

21  joining the FBI as an analyst?

22  A    Yes.  I worked in intelligence analysis and emergency

23  response with the World Bank Group in DC from 2002 to 2004.

24  Q    And are you the case agent who has handled the

25  investigation of this defendant, Reality Winner?

(Justin C. Garrick-Direct by Mrs. Solari)

1    A    Yes, I am.

2    Q    When did you first hear the name Reality Winner?

3    A    It was on June 1, 2017.

4    Q    In what context?

5    A    I was being given a briefing by a government agency --

6    intelligence agency -- regarding potential release of

7    classified information.

8    Q    And at the time you were contacted on 1 June, had that

9    government agency determined that, in fact, their classified

10   information had been compromised?

11   A    Yes.

12   Q    Was it a document that had been compromised?

13   A    Yes, it was.

14   Q    What was the level of classification of that document?

15   A    It was a Top Secret/SCI document.

16   Q    And did it have additional handling restrictions as well?

17   A    Yes, it did.

18   Q    How many pieces were there to the compromised document at

19   issue?

20   A    It was the Intelligence Report and an attachment.

21   Q    So according to the government agency that briefed you,

22   did the information that had been compromised pertain to the

23   national defense of the United States?

24   A    Yes, it did.

25   Q    How did the agency determine that its information had been

(Justin C. Garrick-Direct by Mrs. Solari)

17

1   compromised?

2   A    The agency was sent a message electronically by an online

3   news media outlet with photographs of the document and

4   requested verification.

5   Q    And the photos that were sent to the government agency,

6   did they include depictions of both the intelligence reporting

7   and the attachment that you said was also a piece of the item

8   at issue?

9   A    Yes.

10  Q    Did the government agency examine the photos that were

11  sent to them and determine that, in fact, the reporting sent

12  was authentic?

13  A    Yes.

14  Q    That it was truly a Top Secret/SCI document?

15  A    Yes, it was.

16  Q    In possession of a news media outlet?

17  A    Correct.

18  Q    And is it your understanding that that news media outlet

19  has any authority whatsoever to possess that classified

20  information?

21  A    They do not.

22  Q    How was the defendant employed at that time -- May,

23  June -- of this year?

24  A    The defendant was employed as a linguist with Pluribus

25  International.

(Justin C. Garrick-Direct by Mrs. Solari)

18

1   Q     And Pluribus International is a contractor?

2   A     Yes.

3   Q     So pursuant to the contract, where did they assign the

4   defendant to work as a linguist?

5   A     At the National Security Agency.

6   Q     When did she start with Pluribus International?

7   A     On or about February 9, 2017.

8   Q     What was her level of security clearance?

9   A     She had a Top Secret/SCI clearance.

10   Q     Did she receive any training either from Pluribus or from

11   NSA about how to properly safeguard classified information?

12   A     Yes.  Yes, she did.

13            MR. BELL:  I object.  This would be pure hearsay on

14   his part.

15            THE COURT:  Which is allowed in the context of this

16   hearing.

17            MR. BELL:  Okay.  That will be fine.

18   Q     So, Special Agent, have you reviewed some of the

19   defendant's training records?

20   A     Yes, I have.

21   Q     Did you find that, for instance, on the 16th of February

22   of this year she was trained in elements of classification and

23   marking?

24   A     Yes, she was.

25   Q     What does that pertain to?

 1  A      It, basically, is training to differentiate between a

 2  Secret document, Top Secret document, and the different

 3  handling caveats and how you handle those.

 4  Q      What difference does it make, really, whether something is

 5  Confidential, Secret, Top Secret?

 6  A      It directly relates to the amount of damage that it would

 7  cause to the U.S. Government if it had been released.

 8  Q      So Top Secret being that information that could reasonably

 9  be expected to cause exceptionally great damage to national

10  security if compromised?

11  A      Correct.

12  Q      Was the defendant also trained on the 17th of February of

13  this year in CI, OPSEC, and unauthorized disclosure?

14  A      Yes.

15  Q      What does that CI stand for?

16  A      Counterintelligence.

17  Q      What is OPSEC?

18  A      Operational Security.

19  Q      What does that mean?

20  A      It is, basically, how to go about securing items, how to

21  be cognizant, be aware of any potential security issues.

22  Q      Special Agent, did this defendant enter into any written

23  agreements with the government or with her contract employer to

24  safeguard classified information?

25  A      Yes, she did.

(Justin C. Garrick-Direct by Mrs. Solari)

20

1    Q    If you could please turn your attention to Exhibit 1 in

2    the box in front of you.  What are those documents?

3    A    They are acknowledgment of training documents, security

4    agreements, nondisclosures acknowledgments.

5    Q    So not to belabor each and every page -- we'll move

6    through them quickly -- but does the first page indicate that

7    on the 9th of February 2017 the defendant went through her

8    Pluribus new hire security briefing?

9    A    Yes.

10   Q    And does that security briefing, once again, include

11   instruction on how to properly handle and safeguard classified

12   information?

13   A    Yes.

14   Q    The next document in here, is that entitled "National

15   Security Agency Contractor Security Agreement"?

16   A    It is.

17   Q    And is this, essentially, the defendant's agreement to

18   properly handle and safeguard classified information so it is

19   not at risk of compromise?

20   A    It is.

21   Q    On what date did she execute the document?

22   A    On 13 February 2017.

23   Q    And could you please read paragraph 14 of this document?

24   A    "I make this agreement without any mental reservation or

25   purpose of evasion."

1    Q    Thank you.  Now there's a document in here called "Policy

2    Acknowledgment Status Report".  Does this document summon the

3    defendant's additional training?

4    A    Yes, it does.

5    Q    And on or about the 13th of February does it appear that

6    the defendant went through insider threat awareness training?

7    A    Yes.

8    Q    What is an insider threat?

9    A    An insider threat is an individual who is cleared who was

10   within the agency employed and is attempting to or revealing

11   classified information to an external party.

12   Q    So like a Trojan Horse of sorts, fifth column, I guess?

13   A    Yes.

14   Q    Okay.  The remaining documents in here -- are they

15   additional nondisclosure agreements the defendant executed --

16   agreements between herself and the United States?

17   A    They are.

18   Q    Another one being dated 15 February of this year?

19   A    Correct.

20   Q    And, finally, there is a document dated 15 February of

21   this year dealing with a counseling acknowledgment.  Can you

22   explain what that relates to?

23   A    This is a counseling statement in which she was counseled

24   because the defendant mishandled classified information.

25   Q    So she was found to have mishandled classified and her

(Justin C. Garrick-Direct by Mrs. Solari)

22

1   employer, once again, reminded her of the proper way to handle

2   and safeguard sensitive and classified documents?

3   A     Yes.

4   Q     Thank you, Special Agent.   You can set Exhibit 1 aside.

5   Now I would like to go back to talking about the intelligence

6   reporting that you were notified had been compromised by the

7   government agency.   According to the defendant's employer did

8   that intelligence reporting have anything to do with her job

9   duties or assignment?

10  A     It did not.

11  Q     But given her level of security clearance would she have

12  had access to it?

13  A     She would.

14  Q     How, if at all, did the government agency that briefed you

15  identify the defendant as a potential suspect in the

16  compromise?

17  A     The photographs of the document suggested that they had

18  been folded in half.   There was a crease suggesting that it had

19  been printed out and physically taken out of the facility.   An

20  internal audit by the agency revealed that at that time that

21  six individuals had printed out the document.   Of those six

22  only the defendant had had contact on an unclassified

23  government computer with the online news media outlet.

24  Subsequent investigation revealed that it was that only two

25  individuals had printed out both the Intelligence Report and

(Justin C. Garrick-Direct by Mrs. Solari)

23

1   the attachment.

2   Q    Was one of those two people who had printed the

3   Intelligence Report and the attachment the defendant?

4   A    Yes.

5   Q    And, again, was she the only one of those two people who

6   appeared to have had any communication with the news media

7   outlet in possession of the report?

8   A    Yes.

9   Q    On what date was the defendant found to have printed the

10  report at issue?

11  A    On May 9th of 2017.

12  Q    In addition to the information provided to you on June 1st

13  did the FBI receive any additional information suggesting the

14  defendant might be responsible for the leak?

15  A    Yes, we did.

16  Q    What was that?

17  A    We interviewed a witness in Tampa, Florida who had contact

18  with the online news media outlet during conversations with the

19  online news media outlet.

20  Q    Okay.  So was there a text message exchange back and forth

21  between the news reporter and a witness in Tampa?

22  A    Yes.

23  Q    If you could please take a look at Government's Exhibit 2.

24  What is that?

25  A    This is a photograph of a cellphone -- of the witness'

(Justin C. Garrick-Direct by Mrs. Solari)

24

1    cellphone and it's a conversation between the witness and the

2    news media outlet.

3    Q    Is the text at the bottom of this, I guess, screen

4    capture, was that sent by the representative of the news media

5    outlet?

6    A    It was.

7    Q    And can you read the last sentence of that text message,

8    please?

9    A    I can.  "Well, no.  If real, different convo.  Was mailed

10   May 10 from Augusta, Georgia."

11   Q    "May 10 from Augusta, Georgia."  And, again, what date did

12   the defendant print the report?

13   A    May 9th.

14   Q    Where was the defendant living in May of 2017?

15   A    Augusta, Georgia.

16   Q    Based on the information you just described, did you

17   obtain a search warrant for the defendant's residence, her

18   vehicle, and her person on June 3rd of this year?

19   A    I did.

20   Q    Did you and other agents execute the warrant the same day?

21   A    Yes.

22   Q    During the execution of the warrant, did you meet the

23   defendant?

24   A    Yes.

25   Q    And while other agents were searching, did the defendant

(Justin C. Garrick-Direct by Mrs. Solari)

25

 1   agree to talk with you about whether she may have mishandled

 2   classified information?

 3   A     Yes, she did.

 4   Q     How did you document that conversation?

 5   A     The document was audio recorded and a 302 was written.

 6   Q     Would you take a look at Exhibit 3, please, and tell us

 7   what that is?

 8   A     This is a verbatim transcription of the interview.

 9   Q     Now have you reviewed the entire audio recording of the

10   interview in its entirety?

11   A     Yes.

12   Q     Have you compared it with this transcript?

13   A     I have.

14   Q     And in your comparison do you believe this is a true and

15   accurate representation of the conversation that you and others

16   had with the defendant on June 3rd?

17   A     It is.

18   Q     Thank you.  You can set that aside, Special Agent.  We're

19   not going to belabor all of the various quotes in that 80-page

20   document.  I would like to talk to you about some other

21   evidence that the agents gathered in this case.  At the outset

22   of the search on June 3rd, did agents collect the defendant's

23   cellphone or at least one of them?

24   A     Yes.

25   Q     And have you reviewed its contents pursuant to the

(Justin C. Garrick-Direct by Mrs. Solari)

26

1   warrant?

2   A    I have.

3   Q    I'd like to direct your attention to Exhibit 4 now if you

4   would take a look at that and please tell us what it is.

5   A    This is a screen shot of a Tweet from a non-press.

6   Q    And where was it recovered?

7   A    From the defendant's cellphone.

8   Q    And on what date does it appear the user of the

9   defendant's cellphone captured this image?

10  A    On February 7th of 2017.

11  Q    What is depicted in the image?

12  A    It is entitled, "If you see abuse, leak it."  It has a

13  list of eight media outlets and ways to anonymously submit

14  information.

15  Q    And you said this was February 7th; so that would be,

16  what, two days before the defendant started in her cleared

17  position with Pluribus International and NSA?

18  A    Correct.

19  Q    I'd like to also talk to you about the defendant's

20  internet activity on the 9th through the 22nd of May.  Have you

21  reviewed that as well?

22  A    I have.

23  Q    We're not going to offer or refer to that exhibit at this

24  time, but can you please describe at an unclassified level what

25  you observed in the defendant's internet history on those

(Justin C. Garrick-Direct by Mrs. Solari)

27

1    dates?

2    A    On the 9th of May we see the defendant researching on web

3    searches on how to anonymously submit information to two news

4    media outlets.  After that date we see several searches for

5    those news media outlets and information related to potential

6    leaks of classified information.

7    Q    So did it appear -- now when you say on May 9th -- so the

8    defendant actually, I guess, obtained or could have obtained

9    from the web pages she viewed ways to submit anonymously

10   information by mail, for instance?

11   A    Correct.

12   Q    By internet?

13   A    Yes.

14   Q    And through other sorts of secure forms of communication?

15   A    Yes.

16   Q    And then in the subsequent days it appeared she was doing

17   internet searches to see if leaked information had been

18   published by those particular media outlets?

19   A    Correct.

20   Q    Special Agent, at some point following the search that we

21   discussed and the defendant's arrest did you or another agent

22   obtain recorded phonecalls the defendant made from the Lincoln

23   County Jail?

24   A    Another agent did, yes.

25   Q    If you would look at Exhibit 6, please.  I believe first

1    there is a CD or DVD in there marked 6A.

2    A    Yes.

3    Q    Does that contain two audio files that were recorded

4    phonecalls made by the defendant?

5    A    It does.

6    Q    And do those audio files -- can you review them?

7    A    I have.

8    Q    Do they appear to contain the conversations in their

9    entirety?

10   A    Yes.

11   Q    And 6B and C, are those transcripts of the two audio files

12   on the disc 6A?

13   A    They are.

14   Q    Have you compared them with the original audio recordings?

15   A    I have.

16   Q    And are you satisfied that those are true and accurate

17   versions of the conversations in Exhibit 6A?

18   A    I am.

19            MR. WHITLEY:  Your Honor, may I comment?  I'm sorry.

20            THE COURT:  You may.

21            MR. WHITLEY:  I understand that this information will

22   be presented ultimately at a trial of this case, but I don't

23   know what this information might have to do with the concerns

24   we might have about the flight risk of this individual

25   defendant or any danger she may pose to the community.  It is

(Justin C. Garrick-Direct by Mrs. Solari)

29

1   information that we can't -- we are going to respond to,

2   certainly, in cross and try to get more information from the

3   agent who is ably testifying, but I just wanted to bring that

4   to the attention of the Court just for my purposes.  I thought

5   it was relevant.  Thank you.

6           THE COURT:  So, Mr. Whitley, are you making an

7   objection that it's irrelevant?

8           MR. WHITLEY:  Absolutely, Your Honor.  I don't know

9   if this goes to the core issues that are before the court.

10          THE COURT:  Okay.  I mean, looking through the briefs

11  it appeared that these jail conversations were going to be

12  highlighted because of statements that, perhaps, could be

13  interpreted as being admissions on the part of the defendant.

14  If that's the purpose of presenting these, would you agree that

15  goes to the issue of the weight of the evidence for detention

16  purposes?

17          MR. WHITLEY:  It does, Your Honor.  It does have some

18  bearing on that, certainly.  However, the Court will note and

19  duly appreciate that the government and my learned counsel --

20  we're not in a position, really, to rebut or defend much of

21  this because there are certain aspects of CIPA that'll prevent

22  us from access to certain discovery until we are all cleared to

23  have that opportunity to make our request for discovery.  So

24  this is kind of in a posture in the case where we don't have

25  that information.

(Justin C. Garrick-Direct by Mrs. Solari)

30

1        THE COURT:  Well, as to the conversation itself that

2   was had between the defendant and her sister and mother that

3   was recorded, certainly, you have the ability to call those

4   people -- the people who participated in that telephone

5   conversation.  Is that correct?

6        MR. WHITLEY:  Thank you, Your Honor.  We do.

7        THE COURT:  Okay.  And nothing in CIPA would prevent

8   you then from fully presenting to the court any information

9   concerning the accuracy of these conversations?

10       MR. WHITLEY:  No, it would not, Your Honor.

11       THE COURT:  Okay.  Thank you.

12       MR. WHITLEY:  Thank you very much.  Thank you.

13       MRS. SOLARI:  Your Honor, and I won't belabor them.

14   In particular, 6B goes to the weight of evidence against the

15   defendant, and I will say 6C I included because there was some

16   dispute about the actual content of the conversation that was

17   represented at the first hearing and to the extent I may have

18   misrepresented or misconstrued any of that call, I sincerely

19   apologize to the Court, to counsel, and to Ms. Winner.  It was

20   never my intent to do so.  So I won't belabor 6C.  I simply

21   wanted the Court to have the full transcript of that

22   conversation so the Court can see for itself how the

23   conversation went.

24       THE COURT:  Okay.  Well, I guess, formally, I need to

25   overrule the objection and allow 6B and C into evidence.

 1            MRS. SOLARI:  Thank you, Your Honor.

 2        Special Agent, I'd like to direct your attention to 6B

 3   which is a transcript of one of the two phonecalls.  This is a

 4   conversation between the defendant and whom?

 5   A    Britty Winner, her sister.

 6   Q    And in some portion of the conversation does the

 7   defendant's sister Britty ask the defendant to some extent what

 8   this is all about -- her arrest and the whole event?

 9   A    Yes.

10   Q    And does she ask whether it's because the defendant put a

11   wrong birthday for someone on a security background form?

12   A    She does.

13   Q    And how does the defendant respond?

14   A    "No.  I leaked a document and they were able to trace it

15   back to me and it's kind of an important one."

16   Q    Thanks, Special Agent.

17        And, Your Honor, again, we're not going to belabor 6C

18   which is a transcript of another phonecall.  I just wanted the

19   Court to have it.

20            THE COURT:  Okay.

21   Q    Again, back to the search, Special Agent -- the search of

22   the residence -- did agents find notebooks and writings that

23   belonged to the defendant?

24   A    Yes.

25   Q    And have you been able to review the contents of those

1    notebooks and other writings?

2    A    Yes, I have.

3    Q    I am going to be talking to you right now about Exhibit 7,

4    if you would retrieve that, please.  That first document in

5    order -- what is that?

6    A    This looks to be handwritten notes taken during --

7    handwritten notes regarding employment position.

8    Q    And does it refer to education cost, possible dental,

9    employments -- it looks like the name of Pluribus

10   International, an employee portal link?  Like you said,

11   job-related, appointment-related things?

12   A    Correct.

13   Q    But in reviewing this particular page did you come across

14   any handwritten notations that were of concern?

15   A    Yes.

16   Q    What was that?

17   A    It was handwritten notes:  "I want to burn the White House

18   down.  Find somewhere in Kurdistan to live or Napal.  Ha, ha,

19   maybe."

20   Q    All right.  Well, perhaps that was, you know, said in jest

21   or off the cuff.  I'd like to direct your attention to the next

22   item in order.  What does the note on that page pertain to?

23   A    These are notes on how to unlock your cellphone and switch

24   out the SIM card.

25   Q    And if one were to follow these instructions and do that

(Justin C. Garrick-Direct by Mrs. Solari)

33

1   successfully, what would be the practical effect?

2   A    The practical effect is that you remove yourself from your

3   network.   You can get on either another network, a prepaid

4   account.

5   Q    So if you were to do that, for instance -- remove the SIM

6   card from your phone and insert another one you bought at, say,

7   Dollar General -- if I were to subpoena your subscriber records

8   would I be able to see what phonecalls you had made or received

9   during the time your original SIM card was missing?

10  A    No.

11  Q    Or who had sent you text messages or who you had sent

12  messages to?

13  A    No.

14  Q    Now to be sure, Special Agent, there have to be, you know,

15  some innocent reasons why people do this -- unlock their

16  phones; right?

17  A    Sure.

18  Q    What are some of those reasons?

19  A    If someone doesn't like their cell carrier and they want

20  to switch but they like their phone, that's a way to move on to

21  a carrier that you prefer or if you travel overseas and you

22  want to keep your phone, that way overseas you can get on their

23  network and use it.

24  Q    Okay.   Fair enough.   Let's look at the next page.   What

25  are the notations you see there?

(Justin C. Garrick-Direct by Mrs. Solari)

34

1   A     These are instructions on how to download and to set up

2   the preferences for the Tor network.

3   Q     And are these how to set the preferences at the most

4   secure security setting?

5   A     Yes.

6   Q     What is Tor?  What is the Tor network?

7   A     Tor network is a method in which someone can access the

8   internet -- not only the internet, but also the deeper, dark

9   web on a completely anonymous level.

10  Q     Were agents able to examine the computers that were

11  recovered from the defendant's residence?

12  A     Yes.

13  Q     Did any of them have Tor software installed?

14  A     Yes.

15  Q     And how many computers?

16  A     One.

17  Q     When was the Tor software installed on that computer?

18  A     On February 1st of 2017.

19  Q     What effect does Tor have on whether agents are able to

20  see someone's internet history, email history, or other

21  activity on their computer during the time they ran the

22  software?

23  A     While they're running the software we cannot see any

24  activity.

25  Q     So you wouldn't know if I sent or received emails?

(Justin C. Garrick-Direct by Mrs. Solari)

1    A    No.

2    Q    Or went to particular websites either on the regular

3    internet or the dark web?

4    A    No.

5    Q    Made any purchases, banking transactions, anything like

6    that?

7    A    No.

8    Q    We can see nothing.

9    A    No.

10   Q    Would you look at the next page, please?  What do those

11   notes pertain to?

12   A    These are -- it's a text string for a Slippery.email

13   account.

14   Q    What is Slippery.email?

15   A    Slippery.email is -- it's a -- as per the website, it's a

16   one-way burner email that allows you to receive email

17   anonymously that's not linked to your -- it's not linked to you

18   or to any of your other email accounts.

19   Q    So what would an address look like if I wanted to send an

20   email to someone who had a Slippery.com inbox?

21   A    It is an alphanumeric followed by @slippery.net or there's

22   a couple of different endings to it, but it's a completely

23   anonymous email address.

24   Q    Were you able to tell in analyzing the notations on this

25   page whether the defendant created or at least had access to a

(Justin C. Garrick-Direct by Mrs. Solari)

36

1   Slippery.com inbox?

2   A    It appears so, yes.

3   Q    How long do those inboxes last?

4   A    Eight days.

5   Q    And at the end of eight days, do they, essentially,

6   self-destruct?

7   A    They do.

8   Q    And obliterate all the information contained therein?

9   A    Correct.

10  Q    Special Agent Garrick, as someone with about 13 years

11  experience in the field of intelligence and

12  counterintelligence, did you have any concerns when you viewed

13  in their entirety these notes about switching the SIM cards,

14  installing Tor at its high security setting, and establishing a

15  self-destructing, anonymous inbox at Slippery.email?

16  A    Yes, I did.

17  Q    What concerns did you have?

18  A    When taken into its totality, it appears as though it's a

19  covert communications package or could be one.

20  Q    A covert communications package being what, essentially?

21  A    That is a way in which an individual can communicate

22  anonymously with another.

23  Q    Next page in order, please.  Is this another page of

24  handwritten notes?

25  A    Yes, it is.

(Justin C. Garrick-Direct by Mrs. Solari)

37

1   Q     In general, what are these about?

2   A     These appears to be musings regarding the Taliban.

3   Q     And does the defendant make reference to a couple of

4   different Taliban leaders both, I think, alive and believed to

5   be deceased?

6   A     Yes.

7   Q     And in reference to Mullah Omar and Akhtar Mansour does

8   she state, "They both understood the need for peace, yet were

9   pushed too far by western demand for unconditional surrender"?

10  A     Yes.

11  Q     Again, she's referring to Taliban military leaders?

12  A     Yes.

13  Q     Does she also state that "Perhaps Bin Laden was the Judas

14  to Omar's Christlike vision of a fundamental Islamic nation"?

15  A     Yes, she does.

16  Q     Thank you, Special Agent.  Now did you find anything in

17  the defendant's internet search history pertaining to an

18  apparent interest in the Taliban?

19  A     Yes.

20  Q     If would you take a look at Exhibit 8, please.  Have you

21  previously reviewed that exhibit?

22  A     I have.

23  Q     And are these excerpts of the defendant's web search

24  history in October, November, and December of 2016?

25  A     Yes.

(Justin C. Garrick-Direct by Mrs. Solari)

1   Q    And do you find in there, among other searches, searches

2   for the Taliban media website?

3   A    Yes.

4   Q    Taliban media network?

5   A    Yes.

6   Q    I don't know if I am pronouncing this correctly; so

7   forgive me.  This Zabiullah Mujahid --

8   A    Yes.

9   Q    -- who is that or what is that?

10  A    He is a Taliban spokesperson.

11  Q    Did you find searches for the Taliban office in Qatar?

12  A    Yes.

13  Q    Did you find the defendant searching for the Twitter

14  account of that Taliban spokesperson we've just mentioned?

15  A    Yes.

16  Q    As well as his Facebook?

17  A    Yes.

18  Q    As well as the Taliban's YouTube channel?

19  A    Yes.

20  Q    And I'd like to talk to you, Special Agent, about one

21  other item that was recovered from the defendant's residence

22  during the search on June 3rd, but before we talk about it, I'd

23  like you to sort of revisit that piece of paper on which you

24  found the Slippery.email address.  You've already described the

25  content, but describe the actual piece of paper on which those

(Justin C. Garrick-Direct by Mrs. Solari)

1   notes were written.

2   A    It was a small piece of paper torn out with the months

3   printed at the top and across almost like a calendar.

4   Q    So was it an unusual size?

5   A    Yes.

6   Q    Kind of tiny?

7   A    Yes.

8   Q    Okay.  Did you find any other pieces of paper just like

9   that in the home?

10  A    Yes.

11  Q    How many?

12  A    One other.

13  Q    Where did you find it?

14  A    I found it with that other piece of -- that other piece of

15  paper.

16  Q    So you found a piece of paper with the Slippery.email

17  address and then the second piece of paper we're about to talk

18  about?

19  A    Yes.

20  Q    Did the second piece of paper contain handwritten notes as

21  well?

22  A    Yes, it did.

23  Q    Now I understand that some of the information is

24  classified in the context of this case and I think you've been

25  presented with a cleared statement that we can present in an

1   unclassified setting.  If you would refer to the single piece

2   of paper I gave you.  Again, to the extent that you can

3   describe it unclassified, please describe what you found on

4   that second piece of notebook paper that was accompanied by

5   these Slippery.email notes.

6   A     "The defendant's notes contained specific identifying

7   information related to foreign intelligence targets associated

8   with terrorism activity being followed by the U.S. Government

9   as part of its national security mission.  The information

10  which the defendant obtained by virtue of her access to

11  government systems has no logical bearing on or connection to

12  the duties that were assigned to the defendant and should not

13  have been taken outside of U.S. Government control."

14  Q     Thank you, Special Agent.  Set that aside.  Now back to

15  Exhibit 8 for a moment, the defendant's internet search

16  history, to what places did it appear the defendant was

17  interested in traveling, working, or living based on her

18  research during that time?

19  A     Kurdistan, Iraq, Afghanistan, Jordan, Palestinian

20  territories.

21  Q     The defendant actually researched flights to Kurdistan and

22  to Erbil?

23  A     Yes, she did.

24  Q     Did the defendant research buying homes in Jordan?

25  A     Yes.

(Justin C. Garrick-Direct by Mrs. Solari)
41

1   Q     Did she query whether she could move to Palestine?

2   A     Yes.

3   Q     Among the other searches that you mentioned.  Did the

4   defendant appear, based on your review of her internet usage,

5   her communications -- did she appear to have researched or

6   taken any affirmative steps to establish a relationship with

7   Kurdistan?

8   A     Yes.

9   Q     What were those?

10  A     Based off of Facebook messages she told her sister that

11  she was looking to apply for a visa and then she told another

12  individual that she had a visa.

13  Q     To work in Kurdistan?

14  A     To visit Kurdistan.

15  Q     Okay.  Is that an exceptionally difficult thing to do to

16  obtain a visa to visit Kurdistan?

17  A     Based off of internet searches, it appears as though you

18  can actually apply for one when you land at the airport in

19  Erbil.

20  Q     And on or about December 10, 2016, again, based on the

21  defendant's internet search history, did you find she also

22  researched how to obtain a work visa in Afghanistan?

23  A     Yes.

24  Q     Now moving away from the defendant's internet usage for a

25  minute, I'd like to take you back to the defendant's security

(Justin C. Garrick-Direct by Mrs. Solari)

42

1    training with Pluribus International which I think you

2    testified began on February 9, 2017.  Did you notice in

3    reviewing the defendant's communications any comments the

4    defendant made about that training?

5    A    Yes.  She did.

6    Q    If you could look at Exhibit 9, please.

7              THE COURT:  Actually, I think at least in my notebook

8    Exhibit 9 was the internet searches that we just covered.

9              MRS. SOLARI:  I'm sorry, Your Honor.  I goofed in

10   your notebook.  That should be 8 and then 9 should be an

11   extraction report that contains a single --

12             THE COURT:  All right.

13             MRS. SOLARI:  -- message.  I will fix that for Your

14   Honor.

15             THE COURT:  No.  That's okay.  I am fine.

16   Q    Okay.  So Exhibit 9 in the box you have -- I may have it

17   in different folders and I'm sorry about that.  What is that?

18   A    It is an Extraction Report from the defendant's cellphone

19   and it's a Facebook message.

20   Q    And what was the date the defendant sent this message?

21   A    On February 9th of 2017.

22   Q    And did she send it to her sister Britty Winner?

23   A    Yes.

24   Q    Could you read it aloud, please?

25   A    "I just had my security training and the security officer

(Justin C. Garrick-Direct by Mrs. Solari)

43

1   was talking about threats and how the insider threat is

2   actually the largest and it was hard not to laugh when he was

3   like, 'Yeah, so, we have guys like Edward Snowden who thought

4   they were doing the right thing, but, you know, they weren't;

5   so, we have to keep an eye out for that insider threat,

6   especially with contractors.'"

7   Q    And the defendant was, in fact, a contractor at that time?

8   A    Yes.

9   Q    But she said it was hard not to laugh when she was

10  actually counseled in her security training about that insider

11  threat?

12  A    Yes.

13  Q    If you could look at Exhibit 10.  Actually, let's skip

14  Exhibit 10; although, I still wish for it to be admitted, but

15  in the interest of time let's go to Exhibit 11.  Before we

16  address that one, just to give it some context, Special Agent,

17  was the defendant required to take polygraph examinations to

18  maintain her clearance with Pluribus?

19  A    Yes.

20  Q    Had she done that as of May 9, 2017?

21  A    No, not yet.

22  Q    Was she granted some sort of conditional clearance and

23  access?

24  A    Yes.

25  Q    Did you see in the defendant's cellphone history any

 1  conversation about her upcoming polygraph exam?

 2  A    Yes.

 3  Q    Now, again, referring you to Exhibit 11.  Skipping that

 4  first message, I'd like to talk about the chain following the

 5  first message.  What is the date of this chain -- the

 6  conversation chain?

 7  A    This is February 25, 2017.

 8  Q    So just, I guess, a couple of weeks after the defendant

 9  started work?

10  A    Yes.

11  Q    And, again, is this a conversation with her sister Britty?

12  A    Yes.

13  Q    If you could read what the defendant wrote in this

14  conversation, I will read the other responses.

15  A    "I have to take a polygraph where they're going to ask if

16  I've ever plotted against the government. #gonnafail".

17  Q    "LOL.  Just convince yourself you are writing a novel."

18  A    "Look, I only say I hate America like three times a day.

19  I'm no radical.  It's mostly just about Americans' obsession

20  with air conditioning."

21  Q    "But you don't actually hate America; right?"

22  A    "I mean, yeah, I do.  It's literally the worst thing to

23  happen to the planet.  We invented capitalism, the downfall of

24  the environment."

25  Q    Thank you, Agent.  You can set that aside.

(Justin C. Garrick-Direct by Mrs. Solari)

45

1    MR. BELL:  Excuse me.  Which exhibit is that?

2    MRS. SOLARI:  Eleven, unless I've ---

3    MR. BELL:  I was on 12.  Okay.

4    MRS. SOLARI:  Eleven.  It starts there.

5    MR. BELL:  Okay.

6   Q    Have you ever heard of something called "Vault 7"?

7   A    Yes.

8   Q    Is that WikiLeaks alleged compromise of classified

9   government information?

10  A    Yes, it is.

11  Q    Did you see anything in the defendant's chats about Vault

12  7?

13  A    Yes, I did.

14  Q    Let's look at Exhibit 12, please.  Is this another

15  conversation between the defendant and her sister?

16  A    Yes, it is.

17  Q    On March 7th of this year?

18  A    Correct.

19  Q    And if you could read the portions written by the

20  defendant.

21  A    "Vault 7."

22  Q    "OMG.  That Vault 7 stuff is scary, too."

23  A    "It's so awesome though.  They just crippled the program."

24  Q    "So you're on Assange's side?"

25  A    "Yes.  And Snowden."

1    Q    Now we established that this conversation happened on the

2    7th of March 2017.  Did you see in the defendant's internet

3    search history any searches of note on that same date?

4    A    Yes.

5    Q    What was that?

6    A    Tor email.

7    Q    Thank you.  Now let's go back just a little bit further --

8    I think we're nearly done here -- and talk about the

9    defendant's employment prior to her time with Pluribus

10   International and the NSA.  How was the defendant previously

11   employed?

12   A    She served in the U.S. Air Force.

13   Q    And her rank was that of a Senior Airman?

14   A    Correct.

15   Q    What was her general nature of her military assignment?

16   A    She was a linguist.

17   Q    And did she maintain a security clearance in that

18   capacity?

19   A    Yes.

20   Q    At what level?

21   A    Top Secret/SCI.

22   Q    Essentially, the same clearance that she maintained when

23   she worked for Pluribus and the NSA?

24   A    Yes.

25   Q    If you could turn your attention to Exhibit 13, please.

(Justin C. Garrick-Direct by Mrs. Solari)

47

1    Are the beginning documents in this series the defendant's

2    email in which she submits her active duty member exit

3    questionnaire?

4    A    Yes.

5    Q    And what was the date she submitted her questionnaire

6    according to the email?

7    A    Thursday, August 25, 2016.

8    Q    And according to her exit questionnaire at that time how

9    many years of total service had the defendant had in the Air

10   Force?

11   A    Total years, six.

12   Q    And when was she planning to begin her terminal leave?

13   A    November 18, 2016.

14   Q    And just for people who may not have had a government or

15   military job, is terminal leave, essentially, when someone's

16   period of active duty obligation has not run out but they

17   simply leave before that date because they have so much stored

18   leave they are just going to go ahead and go --

19   A    Yes.

20   Q    -- probably not to return?

21   A    Yes.

22   Q    Okay.  In this exit questionnaire according to the

23   defendant what were her career plans following active duty?

24   A    Fitness instructor.

25   Q    I'd like you to turn to the next document in order which

(Justin C. Garrick-Direct by Mrs. Solari)

48

1    is captioned "National Security Agency Access Termination

2    Statement".  Just in general, what is this?

3    A    It's, basically, you're being what we call read out of

4    your accesses and you still agree that you have to abide by the

5    nondisclosure agreements that you previously signed.

6    Q    So even if you never returned to government service or

7    never have a security clearance again, you promise that you'll

8    never ever disclose that classified information you learned

9    while you did that?

10   A    Correct.

11   Q    All right.  But at some point when each of us leaves our

12   cleared position, our access to classified has to be cut off;

13   right?

14   A    Correct.

15   Q    Okay.  So based on the date of this document, when was the

16   defendant read out of her classified access?

17   A    15 November 2016.

18   Q    Now in the course of your investigation have you

19   discovered any workplace activity by the defendant in the days

20   prior to November 16th -- I'm sorry; November 15, 2016 -- that

21   seemed to be any cause for concern?

22   A    Yes.

23   Q    What was that?

24   A    On or about November 9th of 2016 on a Top Secret computer

25   the defendant Googled something to the effect of "Does a top

1   secret computer detect a thumb drive?"  At that point she

2   inserted a thumb drive into the computer for approximately two

3   minutes.

4   Q    Has the government's review of system logs determined

5   conclusively whether the defendant was able to move any data

6   onto that thumb drive?

7   A    No.

8   Q    Did the government ever recover the thumb drive?

9   A    No.

10  Q    Are you aware of something in particular the defendant did

11  right after she removed the thumb drive from the Top Secret

12  computer?  And I believe you have a scripted answer to that

13  one.

14  A    Yes.  It's a scripted answer provided.

15  Q    Cleared for unclassified use?

16  A    Correct.

17  Q    What is that?

18  A    "Winner printed an Intelligence Report that was classified

19  at the Top Secret level.  The classified intel reporting was

20  not associated in any way with the defendant's

21  duties/assignments and we do not know what she did with it."

22  Q    Thank you, Special Agent.  Now back for just a moment to

23  that October, November, December timeframe reflected in the

24  defendant's web history which should be Exhibit 8.  Now you

25  just testified the defendant stated in Exhibit 13 she was

(Justin C. Garrick-Direct by Mrs. Solari)
50

 1    planning to be a fitness instructor when she left the Air

 2    Force.  Did there come a time, though, judging from her online

 3    activity she seemed to turn her attention in earnest to jobs

 4    involving access to classified information?

 5    A    Yes.

 6    Q    Would that have been about mid-November of 2016?

 7    A    In earnest in mid-November.

 8    Q    Okay.  And during that time and after into December was

 9    she searching for positions requiring clearances such as

10    linguists, intel analysts, signals intelligence specialist,

11    counterintelligence support specialist, and lots of jobs listed

12    on Clearancejobs.com and similar sites?

13    A    Yes.

14    Q    And were those positions listed both in the U.S. and

15    overseas?

16    A    Yes.

17    Q    Was that during the same time the defendant was

18    researching Taliban social media and how to follow Taliban

19    spokespersons online?

20    A    Yes.

21    Q    Did you also find amidst all these searches for cleared

22    jobs, particularly on or about November 28, 2016, the defendant

23    entered a search strain to her browser "How to support

24    Anonymous"?

25    A    Yes.

(Justin C. Garrick-Direct by Mrs. Solari)

51

1   Q     Did she then view a page called, "How to join Anonymous"?

2   A     Yes.

3   Q     What is Anonymous?

4   A     Anonymous is a list affiliation of hackers.

5   Q     Based on your experience as an investigator, are they

6   known to be generally friendly to the U.S. or its intelligence

7   community?

8   A     No.

9   Q     Now, finally, Special Agent, the defendant's motion

10  mentioned some, I guess, deterioration of her physical

11  condition because of the quality of her diet at the Lincoln

12  County Jail.  I think we understand she is vegan and maintains

13  a kosher diet.  Have you personally spoken with anyone at the

14  jail about how they are attempting to accommodate that?

15  A     Yes, I have.

16  Q     And what did they tell you?

17  A     They said that they're making special trips to the grocery

18  store for additional food.

19  Q     So are they buying her things like fresh fruit, things

20  like that?

21  A     Fruit cups, various items.

22  Q     And did you have occasion recently to physically review

23  some of the defendant's outgoing mail from the jail?

24  A     Yes.

25  Q     And, particularly, if you look at Exhibit 14, were these

(Justin C. Garrick-Direct by Mrs. Solari)

52

1   letters dated 11 September and 18 September of this year?

2   A    Yes.

3   Q    And in some of the letters -- the first one, for instance,

4   does the defendant say "Dinner was pretty dope.  Lots of peas,

5   corn, and canned fruit.  I am grateful to be able to maintain

6   my spirituality in here with regards to my diet"?

7   A    Yes.

8   Q    In another letter does the defendant tell a fellow inmate

9   that the women get double patties, twice the cake; she gets

10   canned tropical fruit twice a day, leftover grits from

11   breakfast with peanut butter for lunch?

12   A    Yes.

13   Q    Now she mentions she still can't digest bread.  Do you

14   know what the jail has done to accommodate that?

15   A    For the bread, one of the things was the giving her grits

16   from breakfast for lunch.

17   Q    Okay.  So instead of bread now she gets grits.  So do the

18   folks at the jail, based on your conversations with them,

19   appear to be, basically, going above and beyond to satisfy the

20   defendant's dietary needs and preferences?

21   A    Yes.

22   Q    And based on these letters would you say that the

23   defendant appears to be quite pleased with the results?

24   A    Yes.

25   Q    And do you know whether the defendant is also able to

1   complete her workout regimen?  You know, she's a CrossFit fan.

2   She practices yoga, all that stuff.

3   A    Yes.  She is able to work out.

4   Q    Okay.  So there is no, I guess, infringement on her

5   ability to do any of that either?

6   A    Not that I'm aware of.

7   Q    All right.  Thank you, Special Agent.

8        If I may have a brief moment, Your Honor.

9            THE COURT:  You may.  Take your time.

10           MRS. SOLARI:  Thank you, Your Honor.  That's all the

11  government has for Special Agent Garrick at this time.

12           THE COURT:  All right.  Mr. Bell?

13           MR. BELL:  Your Honor, I don't know what -- if the

14  Court intends a break, but it might be a good time to take a

15  break because we've covered an awful lot in this short time.

16           THE COURT:  Right.

17           MR. BELL:  If we could have a few minutes, we'd

18  appreciate it.

19           THE COURT:  Sure.  If you need some time to prepare

20  for cross examination, then I'll give you that.  It would be

21  nice if we could not take more than 15 minutes, but just let

22  Mrs. Widener know when you're ready and we'll reconvene.

23           MR. BELL:  Okay.  That should be fine.  Thank you.

24      (A break is taken.)

25           THE COURT:  Mr. Bell?

(Justin C. Garrick-Cross by Mr. Bell)
54

1              MR. BELL:  Yes.  Thank you, Your Honor.

2                        **CROSS-EXAMINATION**

3    BY MR. BELL:

4    Q    Agent Garrick, you take your job quite seriously, don't

5    you -- FBI agent?

6    A    Yes, sir.

7    Q    And, certainly, in something such as counterintelligence,

8    that's a very important area of FBI work today, is it not?

9    A    Yes, sir, it is.

10   Q    And you, certainly -- when you do report, you want to get

11   the whole story and not just pick and choose little bits that

12   might give a very inaccurate picture.  You agree, don't you?

13   A    Yes, sir.

14   Q    You're not here as an advocate.  You're here as a

15   truth-teller, are you not?

16   A    Correct, sir.

17   Q    And I bet you've even heard that famous old Ben Franklin

18   phrase that half a truth can be a whole lie.  Is that correct?

19   A    I think I've heard that before, sir, yes.

20   Q    You agree with that, don't you?

21   A    Yes, sir.

22   Q    In fact, sometimes you have to interview people at great

23   length before you get the whole truth and not just little

24   snippets that might lead to a very different conclusion;

25   correct?

1   A    Yes, sir.

2   Q    Now you talked about Reality being in the Air Force;

3   correct?

4   A    Yes, sir.

5   Q    Six years?

6   A    Yes, sir.

7   Q    Did not mention that she got an honorable discharge, did

8   you?

9   A    I did not say her discharge.

10  Q    Okay.  Did you tell us about any commendations she got for

11  her work in the Air Force?

12  A    I did not.

13  Q    Okay.  Could you tell us about them?

14  A    I believe she received a commendation, yes.

15  Q    Okay.  She freely left; correct?

16  A    Yes.

17  Q    Okay.  Are you aware from looking at the various documents

18  that she -- and her mail and everything else in her house --

19  that she has expressed interest in, perhaps, going into the

20  Peace Corps at some time?

21  A    Yes, yes.

22  Q    But did not mention that?

23  A    No.

24  Q    And you don't think it's anything questionable for a

25  person -- American citizen or veteran honorably discharged

(Justin C. Garrick-Cross by Mr. Bell)

56

1   serving their country -- to want to go work for the Peace Corps
2   and perhaps help the less fortunate in a foreign land -- the
3   American Peace Corps?
4   A    Correct.
5   Q    And you didn't mention that, did you?
6   A    No, I did not.
7   Q    Okay.  Are you aware that -- do you know what an
8   organization named Médecins Sans Frontières is?
9   A    That is Doctors Without Borders.
10  Q    That is correct.  It is a French-based organization.  We
11  normally use the English one here.  Are you aware that Reality
12  has expressed interest in going to work with Doctors Without
13  Borders -- Médecins Sans Frontières?
14  A    I don't remember any specifics about it.
15  Q    Okay.  And tell me what do you understand that
16  organization to be?
17  A    It's -- as I understand Doctors Without Borders is a
18  non-governmental non-profit that goes to areas with either war
19  zones or the like or famine to do medical work.
20  Q    It's certainly not a terrorist organization, is it?
21  A    No.
22  Q    Though the people who work with that may well be putting
23  their own lives in danger to help those in great need; correct?
24  A    Correct.
25  Q    And could be the same way with the Peace Corps; correct?

(Justin C. Garrick-Cross by Mr. Bell)

57

```
1    A    Correct.

2    Q    Do you -- are you aware that some of these

3    non-governmental and I think maybe even the Peace Corps -- if

4    you're coming out of the service for some reason they would

5    generally not take you for about a year after you're discharged

6    from the service?

7    A    I wasn't aware of that.

8    Q    Okay.  But you were aware that Reality had an interest in

9    these do-gooder, foreign organizations in the dangerous and,

10   perhaps, most needy part of the world?

11   A    Yes.

12   Q    Okay.  Now Reality doesn't have any criminal record before

13   this, does she?

14   A    Correct.

15   Q    And when she was indicted y'all had seized all of her

16   computers, all of her old cellphones, and had gone through her

17   house tip to top; correct?

18   A    Correct.

19   Q    And, yet, I think the day after that or two days after she

20   was indicted; is that correct?  Maybe three or four days?

21   A    I don't remember the exact date of the indictment but --

22   Q    Okay.

23   A    -- in the days and a couple weeks following.

24   Q    She was indicted before you had gone through all of these

25   computers and cellphones in her house; is that correct?
```

(Justin C. Garrick-Cross by Mr. Bell)

58

1    A     Correct.

2    Q     And she was -- in fact, the prior pretrial release hearing

3    occurred before you had been able to go through and analyze

4    every computer and every cellphone and every scrap of paper in

5    her house; correct?

6    A     Correct.

7    Q     And she has now been reindicted, hasn't she?

8    A     Correct.

9    Q     And it's the exact same charge for which she was indicted

10   the first time; correct?

11   A     Correct.

12   Q     Now we've talked a lot -- we heard a lot about these SIM

13   cards in cellular telephones and her having instructions how to

14   take one out and put one back in; is that correct?

15   A     Correct.

16   Q     How many times have you taken a SIM card out of one of

17   your cellphones?

18   A     I don't think I ever have.  I am trying to think.  I have

19   never swapped a SIM card out on a phone.

20   Q     You haven't?

21   A     No, sir.

22   Q     The last time my cellphone broke they sent me a new one

23   and with instructions on how to take the SIM card out of that

24   and put it in a new one.  Was I doing something sinister or

25   some evidence of future illegal activity when I put the old

(Justin C. Garrick-Cross by Mr. Bell)

59

1   card in the new phone?

2   A    No, sir.

3   Q    Okay.  My son works for NBC News.  He has several

4   cellphones and often he travels the world.  He'll get different

5   cards in different countries and put them in.  Is he doing

6   anything sinister or wrong?

7   A    No, sir.

8   Q    Should there be any inference that an American who changes

9   a cellphone card or perhaps even has instructions how to take

10  the card out of one phone and put it in another or just change

11  cards is doing something -- is likely to flee the United States

12  and hide from prosecution?

13  A    When just -- when just the SIM card is taken into

14  consideration, that is not in and of itself alarming.

15  Q    Okay.  Now do you have any concern about data breaches of

16  your -- things that are on your computer?

17  A    Yes.

18  Q    You have concerns about data breaches of, perhaps, your

19  banking relations and your financial things?

20  A    Sure.

21  Q    Okay.  Do you have concerns that perhaps every time you do

22  Google somebody is recording where you are and what you're

23  looking at and selling that information to others who might

24  have some use of it?

25  A    I'm not overly concerned, but there's --

1    Q    Uh-huh.

2    A    -- always a possibility.

3    Q    Okay.  Does it comfort you that if you look up something,

4    whether it's a car or a mattress, on your computer for weeks

5    thereafter you keep getting popped, you know, ads for that

6    particular mattress or that particular type of car on your

7    computer when you just go to Google?

8    A    I guess it's the way that Google works.

9    Q    Okay.  They're selling -- they're telling you what you're

10   looking at, what you're doing, where you are all the time.

11   Right?

12   A    They do have software.  I don't know the ins and outs of

13   their software.

14   Q    Now if I found that offensive that not big brother the

15   government, but big brother Google is watching everything I do

16   and everything I look at on the internet and I don't like it --

17   is that evidence that I intend to commit a felony in the

18   future?

19   A    No.

20   Q    Is it evidence that I intend to flee the United States and

21   not show up for a court appearance such as I was required to

22   show up for this court hearing today?

23   A    No.

24   Q    Okay.  Is it evidence of guilt of any kind?

25   A    No.

(Justin C. Garrick-Cross by Mr. Bell)

61

1    Q     Now we've heard Tor and dark web both at the first hearing

2    and at this one.  Tell me what you know about Tor.

3    A     Tor is a very strong anonymizer that allows you to go on

4    the web and act completely anonymously.

5    Q     In other words, it doesn't produce the data of where you

6    are, what time it is, and what you're looking at on your

7    computer the way Google and Yahoo do?

8    A     Correct.

9    Q     Do you know how many American citizens have used the

10   privacy they can get from using Tor?

11   A     I do not have that number.

12   Q     Isn't it true that it's in the millions?

13   A     I don't know that number either way.

14   Q     Now is there any evidence of intent to commit espionage if

15   somebody wants to be able to get on their computer without big

16   brother Google knowing everything they're looking at?

17   A     No.  That alone is not the indicator.

18   Q     And did you, before you testified and before you told us

19   about the evils of Tor website, do any research into how many

20   legitimate uses there are for that?

21   A     I did not research legitimate uses of Tor.  No.

22   Q     Okay.  And you didn't research how many just ordinary

23   American citizens use it because they want a little privacy?

24   A     No, I did not.

25   Q     And do you have blinds or curtains at your home?

(Justin C. Garrick-Cross by Mr. Bell)

62

1    A    Yes.

2    Q    And do you close those when you don't want folks looking

3    in your window?

4    A    Yes.

5    Q    It's nice to have some privacy, isn't it?

6    A    Yes.

7    Q    And you aren't doing anything evil or sinister and nothing

8    like that should be drawn because you want some privacy, do

9    you?

10   A    Correct.

11   Q    And the fact if Reality may do what an awful lot of young

12   people do today who are far more computer literate than am I

13   and most folks my age of wanting to be able to simply get on

14   the computer without big brother spying on everything you're

15   doing -- is that anything wrong?

16   A    Could you phrase the question again?  I'm sorry.

17   Q    Well, let me just ask you this:  Do you know what Snapchat

18   is?

19   A    Yes.

20   Q    You got children?

21   A    Too young for Snapchat.

22   Q    Okay.  Well, tell us what Snapchat is.

23   A    As I understand it, it is a messaging service where you

24   can send photos to one another temporary fashion.

25   Q    Okay.  An awful lot of young people -- people my kids' age

(Justin C. Garrick-Cross by Mr. Bell)

63

1    and younger than that -- they use Snapchat, do they not?

2    A     I believe so.

3    Q     Many of them far prefer it to Facebook, do they not?

4    A     If you say so.

5    Q     And isn't that because you can send somebody something and

6    after a certain short period of time it disappears so that

7    you're not ending up with these Facebook pages that just where

8    the whole world has access to everything you did and every

9    silly picture and perhaps things you -- silly things and old

10   boyfriends and old girlfriends and everything else.  Is that

11   anything wrong if somebody uses Snapchat?

12   A     No.

13   Q     And going back to Tor, if somebody wants to use a browser

14   where the whole world doesn't get your information and then

15   sells it to everybody like Google and Yahoo and these others

16   are doing -- Bing -- is that any evidence of criminal conduct?

17   A     Taken in a specific instance, no.

18   Q     Okay.  Now how many years is this that you've been in

19   counterintelligence?

20   A     I have been in counterintelligence 2008/2009 to the

21   present.

22   Q     Okay.  And how many separate cases of espionage have you

23   been involved in in that period of time?

24   A     It's been a significant number.  I couldn't give you the

25   exact number.

(Justin C. Garrick-Cross by Mr. Bell)
64

1   Q    Well, try to take a moment and think because I want to

2   know whether it's 5, 3, or 500.  I think it would be helpful to

3   us.  As accurate as you can feel comfortable with.

4   A    You're referring to overall counterintelligence

5   investigations?

6   Q    I'm talking about espionage.

7   A    Okay.  To include other cases that I've worked on and

8   assisted with, probably 10 to 12.

9   Q    Okay.  And how many of those resulted in an indictment for

10  espionage?

11  A    For espionage, just one.

12  Q    Okay.  Is that Reality's?

13  A    Correct.

14  Q    Okay.  So you don't know of anybody that you've been in

15  contact who is a first offender, American citizen,

16  honorably-discharged veteran with commendations who was denied

17  pretrial release on an espionage charge?

18  A    That is correct.

19  Q    Okay.  Now tell me what do you understand the word

20  "espionage" to mean?

21          MRS. SOLARI:  Objection, Your Honor.  That's a legal

22  question.

23          THE COURT:  Sustained.

24          MR. BELL:  Your Honor, I think he's given all this

25  testimony about guilt.  If he doesn't know what espionage is, I

(Justin C. Garrick-Cross by Mr. Bell)

1    think it goes to his competency on these other issues.

2              THE COURT:  It is sustained.

3              MR. BELL:  I understand.

4    Q    Do you understand that Reality has been indicted under the

5    Espionage Act of 1917?

6    A    Correct.  Yes.

7    Q    Now do you have any information about Reality ever having

8    been involved in a violent altercation?

9    A    No.

10   Q    Have you any information of Reality ever as much as

11   pointing a firearm to another -- at another human being?

12   A    No.

13   Q    Do you have any information that would cause you to fear

14   that Reality would hold up a liquor store if on pretrial

15   release?

16   A    No.

17   Q    Do you have any information that would lead you to think

18   that she might rob, burglarize someone else's house?

19   A    No.

20   Q    And you have absolutely no suspicion that she would be

21   engaged in drug deals or anything like that if released on

22   pretrial -- if given pretrial release?

23   A    No.

24   Q    You've talked -- have you talked with her mother?

25   A    On a couple of occasions, yes.

(Justin C. Garrick-Cross by Mr. Bell)

66

1   Q    Have you any reason to believe that she -- Reality -- does

2   not have strong ties to her mother?

3   A    I believe she does.

4   Q    Okay.  And have you ever any reason to suspect at all that

5   her mother has ever engaged in any illegal or criminal

6   activity?

7   A    I don't know her criminal history.

8   Q    Okay.  Have you any reason -- we hear about evidence of

9   someone being dangerous or not.  Any evidence to think that

10  anyone in Reality's family is engaging in illegal criminal

11  conduct such as drug dealing or something?

12  A    I'm not aware of any.

13  Q    Okay.  And do you know her sister?

14  A    I've never personally met her, but I'm aware of her

15  sister.

16  Q    Okay.  Are you aware her sister has a PhD in pharmacology?

17  A    I didn't know it was pharmacology.  I know it was a PhD.

18  Q    And are you aware that Reality has strong ties with her

19  sister?

20  A    Yes.

21  Q    And, likewise, do you know what her stepfather did, who

22  really raised her?

23  A    I do believe I remember his employment based off of a

24  previous hearing.

25  Q    Tell us what that was.

(Justin C. Garrick-Cross by Mr. Bell)

67

1   A     I believe it was substance abuse counseling.

2   Q     Okay.  He's trying to help folks who need help; right?

3   A     I believe so.

4   Q     Okay.  And are you aware whether or not Reality has strong

5   ties to him?

6   A     I believe so.  Yes.

7   Q     Okay.  And you certainly don't have any reason to suspect

8   him of any criminal or illegal activity on an ongoing basis?

9   A     No.

10  Q     Okay.  Now have you any information about Reality ever

11  leaving the United States illegally?

12  A     No.

13  Q     Do you have any information about her ever entering the

14  United States illegally?

15  A     No.

16  Q     You mentioned that she inquired about travel to Jordan?

17  A     Yes.

18  Q     Okay.  Are you aware of her having an interest in,

19  perhaps, in the future working in the Peace Corps in Jordan or

20  some other area of the Middle East?

21  A     I know the Peace Corps.  I don't know any information

22  either way on what location she wanted.

23  Q     You are aware that she speaks and reads and writes several

24  mid-Eastern languages, do you not?

25  A     Yes.

(Justin C. Garrick-Cross by Mr. Bell)

68

1    Q    If she were in the Peace Corps, wouldn't it be logical to

2    expect the Peace Corps would strongly consider assigning her to

3    places where she can use her unique language skills?

4    A    You'd have to ask the Peace Corps how they decide where

5    they send people.

6    Q    But that would make sense, wouldn't it?

7    A    It might seem logical.

8    Q    Okay.  Now you've been in counterintelligence for a long

9    time, have you not?

10   A    Yes, sir.

11   Q    Do you have any interest in knowing what it is that the

12   bad guys are doing?

13   A    Yes.

14   Q    I bet you've spent hours and hours reading books, studies,

15   maybe even online reading about the entities that might be

16   posing a threat to the United States, have you not?

17   A    I have.  I was on my work computer.

18   Q    Okay.  Never at home?

19   A    No.

20   Q    Would it be anything wrong if you did it at home?

21   A    It may not be the best idea, but it's not illegal.

22   Q    Okay.  And, certainly, there is no evidence that you,

23   Mr. Garrick, are about to commit a future crime or fail to show

24   up for court because you want to know about these entities that

25   you're working against in your work, is it?

(Justin C. Garrick-Cross by Mr. Bell)

1    A     Correct.

2    Q     Now are you aware of the presence -- now we heard the word

3    "Taliban" a lot; correct?

4    A     Correct.

5    Q     Tell us, who is the Taliban?

6    A     Taliban is a designated terrorist organization that's

7    based in Afghanistan and was in control of Afghanistan prior to

8    the 2001 -- the attacks of September 11th.

9    Q     Okay.  Have you ever read the book, "Charlie Wilson's

10   War"?

11   A     About half of it.

12   Q     Did you see the movie?

13   A     I did.

14   Q     Do you know Charlie Wilson was a real congressman from

15   Texas?

16   A     Yes.

17   Q     Did you know that he was a close friend of Doug Barnard

18   who used to be the congressman from Augusta, Georgia?

19   A     I was not aware of that.

20   Q     Okay.  And, certainly, would be aware that Doug Barnard

21   said Charlie Wilson could strut sitting in a chair.  Now do you

22   know what the United States Government was doing in Charlie

23   Wilson's War?

24   A     Yes.

25   Q     They were funding millions of dollars ---

(Justin C. Garrick-Cross by Mr. Bell)

70

1          MRS. SOLARI:  Your Honor, I am not sure of the

2    relevance of this line of inquiry to the defendant's flight

3    risk or risk of danger to the community.

4          THE COURT:  Mr. Bell?

5          MR. BELL:  Your Honor, they have made their case on

6    the Taliban and I think there are two sides to the story and

7    I'd like to bring it out.  We've had half the story.

8          THE COURT:  Well, certainly, we want to explore the

9    full story today, but I am not sure how Ms. Winner's story

10   relates to Charlie Wilson's story.

11         MR. BELL:  I am worrying about Mr. Garrick's story

12   that anybody who has interest in the Taliban must be a threat

13   of future criminal acts or flight and that's what they put it

14   up on and I want to explore it.  That's why I'm exploring it.

15         THE COURT:  Well, let's focus on this case and his

16   testimony and not so much Charlie Wilson's War and the book and

17   movie.

18         MR. BELL:  Whatever -- let me make a one-sentence

19   proffer.

20         THE COURT:  I guess just get to the point.  Ask him a

21   question that you're trying to get to --

22         MR. BELL:  Okay.

23         THE COURT:  -- instead of going around the bend --

24         MR. BELL:  Okay.

25         THE COURT:  -- and talking about Hollywood.

(Justin C. Garrick-Cross by Mr. Bell)

71

1   Q    Isn't it true that the United States Government financed

2   the Taliban in their efforts to throw the Russians out of

3   control in Afghanistan?

4            MRS. SOLARI:  Your Honor, again, I object.  I am

5   really not sure whether this witness has any firsthand

6   knowledge of that.  To the extent that he might, it may, in

7   fact, be classified.  I would rather not get into that.

8            MR. BELL:  I read the book and movie.

9            THE COURT:  Right.  I am not worried about the

10  classified part.  I am worried about the relevance.

11           MR. BELL:  Okay.  Well, I mean, the inference is if

12  you look on a website about the Taliban you must be a flight

13  risk or something, and I think there is a much richer story

14  there.

15           THE COURT:  Well, I think it is best to maybe ask him

16  direct questions that relate more to the case and then if you

17  want to argue that in closing, you're welcome to do that.

18           MR. BELL:  Okay.  If I could get one more question.

19           THE COURT:  Sure.

20  Q    Are you aware that the export of opium from Afghanistan

21  has skyrocketed since the United States has wrested control of

22  Afghanistan from the Taliban?

23           MRS. SOLARI:  Your Honor, I can't understand the

24  relevance of that.

25           THE COURT:  Sustained.

(Justin C. Garrick-Cross by Mr. Bell)

72

1    Q    Okay.  Would you agree with me that somebody showing

2    interest and wanting to learn more about the Taliban, good and

3    bad, and that complex land of Afghanistan is absolutely no

4    evidence that they're going to commit a future crime in the

5    United States?

6    A    Correct.

7    Q    And you would agree with me that the fact that someone,

8    particularly, whose work involves it and they speak the

9    languages, might have a lot of interest in learning about

10   things going on in that complex land of Afghanistan including

11   the Taliban is no evidence that they intend to flee the United

12   States?

13   A    Sure.

14   Q    Now have you -- have you ever heard from any public

15   sources -- not drawn from any confidential ---

16         MRS. SOLARI:  Your Honor, may I ask for a quick

17   timeout, Your Honor?  I think there is an exhibit about to be

18   addressed here and I just want to make sure it's okay for this

19   forum.

20         THE COURT:  You may.

21       And while she's doing that, Mr. Whitley slipped you a

22   note.  I don't know if you saw that or not.  I think you may

23   have covered it up.

24         MR. BELL:  You're right, Your Honor.  Thank you.

25         THE COURT:  You were so focused on cross you didn't

(Justin C. Garrick-Cross by Mr. Bell)

73

1    see him do it.

2              MR. BELL:  Okay.

3              MRS. SOLARI:  I think we may be about to go into

4    matters that would require a classified forum, Your Honor.

5              THE COURT:  Okay.  Well, I think that's enough in

6    terms of that issue.  We can certainly reconvene his testimony

7    upstairs --

8              MR. BELL:  Okay.  We'll do that.

9              THE COURT:  -- to handle anything that might.

10             MR. BELL:  I'll move past that.

11             THE COURT:  Okay.

12             MR. BELL:  I'll represent I do not believe so because

13   she hasn't heard what questions I would ask.

14             THE COURT:  Well, look, I'd rather ---

15             MR. BELL:  Okay.  That's fine.

16             THE COURT:  When we're dealing with classified

17   information --

18             MR. BELL:  We're good.

19             THE COURT:  -- I'd rather act out of an abundance of

20   caution and, certainly, we'll give you in that classified

21   setting the opportunity to ask him anything you want to about

22   those documents and issues, but for this purpose, let me

23   exercise caution.

24   Q    Mr. Garrick, have you ever traveled abroad?

25   A    Yes.

(Justin C. Garrick-Cross by Mr. Bell)

74

1    Q    Do you like traveling abroad?

2    A    I do.

3    Q    Do you hope to do a lot more in the future if you can?

4    A    One day.

5    Q    Okay.  Where all -- would you like to see the whole world?

6    A    A good portion of it.

7    Q    Okay.  And have you ever traveled to the Middle East?

8    A    For work, yes.

9    Q    Okay.  And is there anything wrong about wanting to travel

10   the world to see the world and perhaps even the Middle East?

11   A    No.

12   Q    And that, certainly, is not evidence that someone intends

13   to engage in espionage, is it?

14   A    Correct.

15   Q    And it's certainly not evidence that they intend to flee

16   the United States and never return?

17   A    No.

18   Q    Okay.  Certainly, not evidence they wouldn't show up for a

19   court hearing, is it?

20   A    I don't see how the two are related, but, okay.

21   Q    Now we live in a country with a lot of different political

22   views, do we not?

23   A    We do.

24   Q    Do you know what the term "tree hugger" means?

25   A    Yes.

(Justin C. Garrick-Cross by Mr. Bell)

1    Q    And what does that mean to you?

2    A    An environmentalist.

3    Q    Okay.  And there are some people who care about the

4    environment and for some people, that is, they care deeply, do

5    they not?

6    A    Correct.

7    Q    With very strong feelings, do they not?

8    A    Yes.

9    Q    Many feel, correctly or incorrectly, that the United

10   States as the largest industrial country, not only in the world

11   but that the world has ever known, is contributing excessively

12   to climate damage, are they not?

13   A    They are.

14   Q    Okay.  Now regardless of whether or not you agree with me,

15   you agree with me there are a lot of people who believe that

16   sincerely, do you not?

17   A    Sure.

18   Q    Now the fact that someone is a deeply-committed

19   environmentalist, is that any evidence that they intend to flee

20   the United States?

21   A    No.

22   Q    And the fact that someone is a deeply-committed

23   environmentalist, is that any evidence that they are unwilling

24   to show up for court?

25   A    No.

(Justin C. Garrick-Cross by Mr. Bell)
76

1   Q    And is the fact that someone is a deeply-committed
2   environmentalist evidence that they're going to -- if on
3   pretrial release commit some crime -- sell drugs, burglarize,
4   steal -- is it?
5   A    No.
6   Q    And you will agree with me that Reality no longer has
7   access to confidential information, does she?
8   A    She does not have access to current U.S. Government
9   facilities.
10  Q    Period.  Confidential or no confidential?
11  A    She doesn't have access to classified facilities.
12  Q    Now and you've gone through all of her computers, have you
13  not?
14  A    Yes, we have.
15  Q    And you've gone through all of her cellphones, have you
16  not?
17  A    Correct.
18  Q    And you've gone through every scrap of paper you could
19  find out of her home, have you not?
20  A    Correct.
21  Q    Now how many computers have you in your home, whether you
22  are using them or not?
23  A    Two.
24  Q    You use both of them?
25  A    No.

(Justin C. Garrick-Cross by Mr. Bell)

1  Q    Okay.  Does the fact that you have more than one computer

2  create suspicion that you're about to do something illegal?

3  A    No.

4  Q    How many cellphones have you in your house, if you know?

5            MRS. SOLARI:  Your Honor, I don't think we need to do

6  this.  The government agrees that someone's possession of more

7  than one cellphone doesn't indicate necessarily that they're

8  dangerous or won't show up for a court appearance.

9            MR. BELL:  Thank you very much.  It's a welcome

10 change.

11     Now what that -- how much time did you spend with Reality

12 the day y'all came out with the search warrants?

13            THE WITNESS:  All in all I would say a few hours.

14 Q    Okay.  Did she attempt to flee?

15 A    No.

16 Q    What would you have done had she attempted to flee?

17 A    She was free to go.  She could have left.

18 Q    Did you ever tell her she was free to go?

19 A    I told her that her interaction with us was voluntary.

20 Q    Did you tell her she was free to go, sir?

21 A    No, I did not.

22 Q    Okay.  And are you telling us that if she had taken off

23 running you would not have pursued her?

24 A    After the execution of the initial warrant -- search

25 warrant -- letting her know why we were there, if she didn't

(Justin C. Garrick-Cross by Mr. Bell)

78

 1    want to be there, then, no.

 2    Q     Now the warrant included a search of her person; correct?

 3    A     Correct.

 4    Q     And you can't -- tell us what search of a person means

 5    when it's directed towards a female person.

 6    A     A search of her person was put in there just in case there

 7    was a cellphone -- if she didn't want to hand over the

 8    cellphone.

 9    Q     Tell me what -- I didn't ask why.  What all can the

10    government do when they have a search warrant to search

11    someone's person?

12          MRS. SOLARI:  Your Honor, I object to the relevance

13    of this and to the extent it requires a Fourth Amendment primer

14    I don't know that we need that here.

15          THE COURT:  What is the relevance to detention?

16          MR. BELL:  Your Honor, I think she's got -- they've

17    got an unexecuted search warrant of a person and I think it --

18    well, let me just keep going and I'll come back to it.  They've

19    gone into all of this stuff, the res gestae, and we're going

20    into the same thing they're going into, but I am trying to get

21    the whole story instead of just the tidbits brought out.

22          THE COURT:  I am trying to understand how this

23    execution of the search warrant relates to the detention issues

24    we're addressing today, and, certainly, Mrs. Solari spent a lot

25    of time with the agent, but every single question I remember

(Justin C. Garrick-Cross by Mr. Bell)

```
 1    them asking pertained to the issue of detention specifically

 2    whether she's a flight risk, danger to the community, et

 3    cetera.  This seems to be outside of the scope of that.

 4    Q    Well, let me ask you, did she attempt to flee while you

 5    were there?

 6    A    No.

 7    Q    Did she show any desire to flee?

 8    A    No.

 9    Q    Were you ever fearful that she was going the flee?

10    A    She made no attempts.  I wasn't fearful one way or the

11    other.

12    Q    Were you fearful for your life that she was some dangerous

13    person?

14    A    No.

15    Q    Have you any reason to think that Reality Winner is a

16    dangerous person?

17    A    Physical danger, no.

18    Q    Now you referred to a Slippery.com computer thing?

19    A    Slippery.email.

20    Q    Excuse me.  Slippery.email.  Now do you know how many

21    people use that?

22    A    I do not.

23    Q    And it allows you to get emails without creating a

24    permanent record; right?

25    A    Correct.
```

(Justin C. Garrick-Cross by Mr. Bell)

80

1    Q     And when you receive a phonecall and talk to somebody you

2    don't keep a recording device on your telephone, do you?

3    A     No.

4    Q     Okay.  And you don't keep a permanent record verbatim of

5    every telephone call conversation you have, do you?

6    A     No, I don't.

7    Q     In fact, you don't do any, do you?

8    A     No.

9    Q     Okay.  And what's wrong with not keeping a written

10   permanent record every time you use an email or receive an

11   email?

12   A     Can you restate the question?  I'm sorry.

13   Q     What is it about not wanting to keep a permanent record of

14   every email that leads one to think somebody is going to engage

15   in criminal activity if released on pretrial release?

16   A     The issue was taken in totality of the information.

17   Q     I'm talking about each of the pieces of your puzzle, sir.

18   A     Okay.

19   Q     Okay?  What is it about having an email thing that keeps

20   you from having a permanent record of email -- junk emails,

21   everything you get -- if you don't want to keep permanent

22   records of those emails?

23   A     In and of itself, nothing.

24   Q     Certainly, not evidence of intent to, you know, engage in

25   future criminal activity while on pretrial release, is it?

(Justin C. Garrick-Cross by Mr. Bell)

81

1   A     In and of itself, no.

2   Q     And, certainly, not evidence that someone is going to move

3   to a foreign land and not come back to court, is it?

4   A     In and of itself, no.

5   Q     And that's the same as not having a recording of every

6   telephone conversation or even face-to-face conversation you

7   have with anybody?

8   A     I could see the similarity.

9   Q     Now you said she inquired about a visa.  Now when you do a

10  visa, you have to have a passport, do you not?

11  A     Correct.

12  Q     And y'all have taken her passport, have you not?

13  A     Correct.

14  Q     She can't travel or get visas now, can she?

15  A     She would have to apply for a new passport.

16  Q     Okay.  Now you indicated that she had career plans to be a

17  fitness instructor when she left the Air Force?

18  A     Yes.

19  Q     Anything suspicious about that?

20  A     No.

21  Q     Any indication of future criminal conduct or flight to a

22  foreign land?

23  A     No.

24  Q     Do you know how much fitness instructors make?

25  A     No idea.

(Justin C. Garrick-Cross by Mr. Bell)

1    Q    They don't make much, do they?

2    A    I don't know what their salary is.

3    Q    Do you realize she was working both as a linguist and as a

4    fitness instructor?

5    A    She was.

6    Q    You asked -- you saw something about how to join what you

7    called the "association of hackers".  What's the name of it or

8    is that your colloquial name?

9    A    No.  The name is -- of the group, the association -- is

10   Anonymous.

11   Q    Did she join that group?

12   A    I have no information either way on that.

13   Q    So you don't have any information she did that?

14   A    No, I don't.

15   Q    If you are kind of a computer nerd and want to know about

16   all the different programs out there, anything wrong with that?

17   A    You have to talk to a computer guy.

18   Q    Okay.  Are you a computer guy?

19   A    Not really.

20   Q    Now we had P-4 you went through which is a screen shot:

21   "If you see abuse, leak it."  Do you know what a whistleblower

22   is?

23   A    I do.

24   Q    Is it something dishonorable for a government employee to

25   be a whistleblower when they see inappropriate conduct?

(Justin C. Garrick-Cross by Mr. Bell)

83

1    A     Whistleblowers are -- it is a legal protection.

2    Q     Okay.  Now we have here these websites that are on that

3    P-4.  One of them is to the New York Times.  Do you ever read

4    the New York Times?

5    A     I do.

6    Q     Okay.  Do you view that as a respectable publication?

7    A     I do.

8    Q     The Washington Post.  Do you ever read The Washington

9    Post?

10   A     I do.

11   Q     Do you view that as a respectable publication?

12   A     I do.

13   Q     Do you have strong support for the ---

14         MRS. SOLARI:  Your Honor, I've got to object.  I

15   don't think that Special Agent Garrick's opinions about

16   particular news agencies bear relevance.

17         MR. BELL:  They presented P-4 as evidence of future

18   criminal conduct, danger, and flight, and it's innocuous, Your

19   Honor, and I'm going into it.  If they didn't think it was

20   relevant, they shouldn't have tendered it into evidence.

21         THE COURT:  I'll allow you a little leeway.

22   Q     Do you know what The Guardian is -- that English newspaper

23   now active in the United States?

24   A     Yes.

25   Q     Respectable publication?

(Justin C. Garrick-Cross by Mr. Bell)

1   A    It has good articles.

2   Q    Okay.  And amongst them, The Intercept.  Do you review

3   that as respectable?

4   A    No, I do not.

5   Q    Okay.  Now are you aware of -- now The Intercept doesn't

6   have a security clearance, does it?

7   A    No, it does not.

8   Q    And so ---

9           MRS. SOLARI:  Your Honor, if I may.

10          (A bench Conference is held off the record.)

11  Q    You've got the exhibits, do you not?

12  A    I do, sir.

13  Q    If you could look at No. 7.

14  A    Yes, sir.

15  Q    If you could look at No. 7.  If you could go to the last

16  page of 7.

17  A    Yes, sir.

18  Q    And you mentioned several of the things on this page, did

19  you not?

20  A    Yes.

21  Q    You didn't mention anything in that first four lines, did

22  you?

23  A    No.

24  Q    So we get the full story, could you, please, Investigator

25  Garrick, read for all of us the first four lines which I think

(Justin C. Garrick-Cross by Mr. Bell)

85

1   is itself a paragraph of that page -- last page of P-7?

2   A    Sure.

3   Q    Thank you.

4   A    "If Christ were to be on planet Earth today, where would

5   he be?  Who would he be?  What would he say or do?  Would

6   people like him?  When would he reveal himself?"  Pardon me.

7   "To whom would he reveal himself?"  My apologies.

8   Q    Okay.  Thank you.  Do you ever wonder what Christ would

9   think if he came again today?

10         MRS. SOLARI:  Objection, Your Honor.  Relevance.

11         THE COURT:  Overruled.  I mean, sustained.

12   Q    Do you find those four words to be evidence of intent to

13   commit future crimes?

14   A    No.

15   Q    Do you find those words to be evidence that Reality

16   wouldn't show up for court?

17   A    That paragraph, no.

18         MR. BELL:  Your Honor, I think, given the Court's

19   ruling, we'd like to adjourn this until we're in the secure

20   room.

21         THE COURT:  Okay.  And just for the sake of everyone

22   here, there is a portion of this Mr. Bell wants to pursue -- he

23   discussed at sidebar -- that is classified and we'll discuss it

24   when we convene upstairs.

25         Mrs. Solari you also had that document that you had

(Justin C. Garrick-Redirect by Mrs. Solari)

86

1    concern about in discussing in open court.  Could I see that

2    before I make a final determination we need to move upstairs to

3    discuss it?

4         MRS. SOLARI:  Your Honor, may I approach at sidebar?

5         THE COURT:  You may.

6    (A bench conference is held off the record.)

7         THE COURT:  Mr. Bell, does that conclude your

8    unclassified questions for this witness?

9         MR. BELL:  Yes, it is, and I think Mr. Nichols has

10   got -- wait a minute.  The government hadn't finished yet

11   unless they ---

12        MRS. SOLARI:  I have some unclassified redirect.  I

13   don't know if the Court would prefer to get that out of the

14   way.

15        THE COURT:  Yeah, anything we can do in open court, I

16   absolutely want to do here and I only want to restrict the

17   closed portion to items that are -- and questions -- that are

18   truly classified in nature, and so I want everybody to get

19   those unclassified questions on the record in open court before

20   we go upstairs.

21        MRS. SOLARI:  Absolutely, Your Honor, and I won't be

22   very long.

23                    **REDIRECT EXAMINATION**

24   BY MRS. SOLARI:

25   Q    Special Agent Garrick, I believe Mr. Bell talked with you

1   about the fact that people might use anonymizing software

2   because they don't want Google or their search browsers to

3   figure out what they're doing or what they're buying or

4   searching for.  In your examination of the defendant's computer

5   and her cellphones, did you find that Google Chrome appeared to

6   be her preferred internet browser?

7   A    Yes, I did.

8   Q    Did she appear to use that browser extensively?

9   A    Yes.

10  Q    With regard to the Tor browser, have you ever used a Tor

11  browser?

12  A    Not outside of work purposes, no.

13  Q    So for work, though, you physically use Tor in your

14  capacity as an agent for official purposes?

15  A    Correct.

16  Q    Does Tor have any effect on the way that one's computer

17  runs when you're actually using the software?

18  A    My experience is it's very slow.

19  Q    Okay.  Did you talk to the defendant on June 3rd about

20  whether she had Tor software installed on her computer?

21  A    Yes.

22  Q    Did she actually volunteer to you the fact she did?

23  A    Yes.

24  Q    And why did she tell you she had installed it?

25  A    She said she installed it so that she could visit and look

1    at WikiLeaks.

2    Q    When did she tell you she had installed it?

3    A    After leaving the Air Force.

4    Q    Just after leaving the Air Force?

5    A    Yes.

6    Q    And I think earlier you testified that she left the Air

7    Force in about mid-November is when she began her terminal

8    leave?

9    A    Yes.

10   Q    However, I think you also testified that the actual date

11   that the Tor software was installed on her computer was the

12   first of February?

13   A    Correct.

14   Q    Which would actually have been several months after her

15   departure from the Air Force?

16   A    Yes.

17   Q    And eight days before she started work at Pluribus?

18   A    Yes.

19   Q    Okay.  With regard to the defendant's sister, you don't

20   know her; right?

21   A    No.

22   Q    You know of her; she appears to be very smart, very

23   capable person?

24   A    Yes.

25   Q    But isn't she also the person to whom the defendant told

1    she expected to fail her intelligence polygraph?

2    A    Correct.

3    Q    "#gonnafail"?

4    A    Yes.

5    Q    And whom she told, whether it was hyperbole or not, that,

6    "Yes, I really do hate America"?

7    A    Yes.

8    Q    And as far as you know is the defendant's family aware or

9    maybe not of the minutiae of what she does but that she held at

10   that time a cleared position?

11   A    Yes.

12   Q    And dealt with classified information?

13   A    Yes.

14   Q    To the best of your knowledge did Brittany Winner ever

15   report that to anyone that her sister thought she might fail a

16   polygraph when asked if she ever plotted against the U.S.

17   Government?

18   A    No.

19   Q    Or that her sister had expressed in any form hatred for

20   the United States?

21   A    No.

22   Q    Do you remember an internet search the defendant performed

23   that contained words to the effect of "military what happens

24   when you leave the country without permission"?

25   A    Yes.

(Justin C. Garrick-Redirect by Mrs. Solari)
90

1    Q     And would that have been in the fall of 2016 sometime?

2    A     Yes.

3    Q     And with regard to the defendant's access to classified,

4    since we've talked about movies, have you seen Men in Black?

5    A     Yes.

6    Q     Do you know the little memory-erasing device where they

7    just flash the flashlight in your face and you forget

8    everything?

9    A     Right.

10   Q     I doubt -- as far as I know, anyway, the government hasn't

11   created that technology, have they?

12   A     Not that I'm aware of.

13   Q     Okay.  And the defendant spent, what, over six years with

14   access to Top Secret and SCI information?

15   A     In that neighborhood.

16   Q     Okay.  Is it safe to assume then that she knows things in

17   her head that if disclosed could cause exceptionally great

18   damage to national security?

19   A     Yes.

20   Q     And I believe you talked about a handwritten note you

21   found right next to the note with the Slippery.email inbox?

22   A     Yes.

23   Q     That information -- has the equity holder, the owner of

24   that information, told you that information is actually

25   classified in the context of this case?

1   A    Yes.

2   Q    So, Special Agent Garrick, does this investigation remain

3   ongoing?

4   A    Yes, it does.

5   Q    Are you 100 percent certain that the defendant does not

6   have any further access to classified information?

7   A    No, I'm not.

8            MRS. SOLARI:  Thank you.  That's my redirect, Your

9   Honor.

10            THE COURT:  Mr. Bell?

11            MR. BELL:  Just very briefly.

12                      **RECROSS EXAMINATION**

13  BY MR. BELL:

14  Q    Do you have any information that she does?  You said you

15  don't have any information she doesn't.  That's a negative.

16  A    I have no information that she does.

17  Q    Thank you.  That's a positive thing.  Now you have Tor

18  yourself; correct?

19  A    No, I don't.

20  Q    But you use Tor?

21  A    At one time for work purposes.

22  Q    Okay.  And do you think that's indicative of you being

23  someone who is hiding access to the internet in a dark web,

24  illegal sense?

25  A    It was an authorized use by my agency.

1   Q    Okay.  And so your agency uses Tor?

2   A    It was -- I can't go into the details of that, but I don't

3   use Tor, never have on a personal basis.

4   Q    Okay.  But you didn't tell us that when you were talking

5   about it's there for the dark web, did you?

6   A    What was your question?  I'm sorry?

7   Q    When you were testifying on direct that the purpose of Tor

8   is to access the dark web in your words, you didn't tell us but

9   the FBI uses -- I use it in my business with the FBI, did you?

10  A    No, I did not.

11  Q    And you don't know how many millions of Americans use it

12  simply because they don't want Google and everybody else

13  knowing all their business?

14  A    I don't know the number who use it.  No.

15  Q    And you didn't think you were doing anything sinister when

16  you used Tor, did you?

17  A    No.  I was doing it in furtherance of my position.

18  Q    Okay.  Thank you.  Now you also mentioned that Reality may

19  know things in her head; correct?

20  A    Yes.

21  Q    You know a lot of things in your head, don't you?

22  A    Sure.

23  Q    Lots of people -- do you know how many NSA agents work out

24  at Fort Gordon?

25  A    I don't know the exact number.

(Justin C. Garrick-Recross by Mr. Bell)

1   Q    It's thousands, is it not?

2   A    That sounds about right.

3   Q    Would it be fair to say they all have things in their

4   heads?

5   A    Yes.

6   Q    Do you propose all of them be locked up in the Lincoln

7   County Jail because they might still have things in their head?

8   A    No.

9   Q    Then you would agree with me that General Petraeus had a

10  lot of things in his head when he was ---

11         MRS. SOLARI:  Objection, Your Honor.  I don't think

12  we need to ask -- did you work on the General Petraeus case?

13      I don't think this witness has any firsthand knowledge.

14         MR. BELL:  That's not -- she's testifying.

15         MRS. SOLARI:  I just don't think this witness has any

16  firsthand knowledge of the investigation pertaining to General

17  Petraeus and the outcome.

18         MR. BELL:  I'll withdraw the question.

19         THE COURT:  All right.  Mrs. Solari, any follow up to

20  that?

21         MRS. SOLARI:  No, Your Honor.  I don't want to get

22  into anything that might be potentially classified; so not in

23  this forum.

24         THE COURT:  All right.  Thank you very much for your

25  time and testimony.  Agent, you may step down.

1      Does the government have any further witnesses it would

2  like to call?

3           MRS. SOLARI:  No, Your Honor.

4           THE COURT:  At least in this public setting?

5           MRS. SOLARI:  No, sir.

6           THE COURT:  All right.  Mr. Bell?

7           MR. BELL:  Your Honor, we have a couple of witnesses,

8  and if Mr. Nichols can do that, I'd appreciate it.

9           THE COURT:  Okay.  Sure.

10           MR. NICHOLS:  Your Honor, at this time we ask that

11  Brittany Michele Winner be called to the courtroom.

12           THE COURT:  Good morning, Mr. Nichols.

13           MR. NICHOLS:  Good morning, Your Honor.

14           **(BRITTANY M. WINNER is duly sworn.)**

15           THE CLERK:  Please state your name for the record.

16           THE WITNESS:  Sure.  Do I need to spell it, too?

17           THE CLERK:  Please.

18           THE WITNESS:  Brittany, B-R-I-T-T-A-N-Y; Michele,

19  M-I-C-H-E-L-E; Winner, W-I-N-N-E-R.

20           THE CLERK:  Thank you.

21                    <u>**DIRECT EXAMINATION**</u>

22  BY MR. NICHOLS:

23  Q    Good morning, Ms. Winner.

24  A    Morning.

25  Q    Where do you currently resides?

(Brittany M. Winner-Direct by Mr. Nichols)

95

1   A     I live in Okemos, Michigan.

2   Q     And what do you do for a living?

3   A     I just received my PhD in pharmacology and toxicology.

4   Q     And we understand that you're related to Reality.   How

5   long did you all live in the same home?

6   A     Until I went to college.   That was when I was 17 years

7   old.

8   Q     And who is the oldest sibling?   You or her?

9   A     I am older.

10  Q     By how many?

11  A     About 15 months.

12  Q     I see you have the number down specifically.

13  A     Yes.

14  Q     Let's talk about your relationship with Reality.   How

15  would you describe her personality?

16  A     She's very creative, super smart.   She has kind of an

17  interesting sense of humor and so do I.   So we're always making

18  jokes and we watched a lot of the same TV.   So we talked about

19  that kind of stuff, but also very caring, very loving.   Yes,

20  she's a really special person.

21  Q     Have you ever known her to act out of violence?

22  A     No, definitely not.

23  Q     Have you ever seen her commit an act of violence?

24  A     No.

25  Q     What about her temperament?   Does she hold grudges?

(Brittany M. Winner-Direct by Mr. Nichols)
96

1   A    No.  I mean, she's always emphasized forgiveness, not

2  holding grudges, and she's helped me actually in my life try to

3  forgive people.

4   Q    How long -- are you aware of her service in the military?

5   A    Yes.

6   Q    Do you know why she joined the military?

7   A    She wanted to serve our country.  A lot of her peers went

8  to college and that kind of seemed like the obvious thing to do

9  once you get out of high school, but she decided that she

10  wanted to join the Air Force so she could make a difference.

11   Q    Had anyone in your family pressured her to join the

12  military or was it voluntary?

13   A    No.  It was voluntary.

14   Q    Do you know how long she served in the military?

15   A    She served for six years.

16   Q    And do you know if she had ever been reprimanded or

17  punished for any type of behavior in the military?

18   A    No, she was not.

19   Q    Do you know if she ever had gone AWOL or away without

20  leave in the military?

21   A    No, she did not.

22   Q    How long -- do you know when she left the military?

23   A    I can't remember the year off the top of my head.

24   Q    And was it a voluntary separation or involuntary?

25   A    It was voluntary.

(Brittany M. Winner-Direct by Mr. Nichols)

1   Q    Do you know if she ever received a commendation to her

2   service in the military?

3   A    She did, yeah.  She gave my mom a plaque and my mom was

4   really excited about that.

5   Q    What was the commendation for, if you know?

6   A    I can't remember off the top of my head.  I'm sorry.

7   Q    Not a problem.  When she was in the military, what were

8   her -- was there a specific part of the world that she was

9   trained in regards to?

10  A    Yes.  She was, like, a translator for the Air Force and

11  the first language that she was cleared to do was Farsi.

12  Q    Now the government has described her knowledge as a

13  fascination with Middle East and terrorism.  When she was in

14  the military, did she ever go to any schools in regard to the

15  Middle East?

16  A    What do you mean by schools?

17  Q    Like, did the military train her on anything regarding

18  Middle Eastern culture and language?

19  A    I believe that the Defense Language Academy Institute -- I

20  know that she learned the language, but as far as anything

21  else, I am not really sure.

22  Q    As a linguist, what part of the world was she focused on

23  in the military?

24  A    Sure.  She was focused on the Middle East -- so, Iran,

25  Afghanistan.

(Brittany M. Winner-Direct by Mr. Nichols)

1  Q    Do you know if she had studied other languages before

2  going into the military?

3  A    I don't recall other than Spanish.  We were raised, you

4  know, south Texas and a lot of us -- we learned Spanish in

5  school.

6  Q    Did Reality have any views in regards to humanitarian

7  work?

8  A    Oh, definitely.

9  Q    What do you know about her desire to do humanitarian work?

10 A    Well, she was -- I think that she thought one of her

11 life's missions and it became one of her life's goals to go to

12 Afghanistan and help, you know, with humanitarian aid.  Now

13 that she knew the languages, that she felt that she was in a

14 unique position to help people there and that was something

15 that she really wanted to do.

16 Q    Now when she said help in Afghanistan, did you interpret

17 that as to help the terrorists or to help the people?

18 A    Helping people.

19 Q    How often would she talk to you about her desire to do the

20 humanitarian work in Afghanistan?

21 A    Quite often.  I know that she was trying to go through,

22 like, different charities and trying to figure out how she

23 could get, you know, clearance that allowed being allowed over

24 in Afghanistan to do that.  We talked about it pretty

25 frequently.  It was something that she really, really wanted to

(Brittany M. Winner-Direct by Mr. Nichols)

1   do.

2   Q    Do you know if she ran into any difficulties in joining

3   the charities to go work in Afghanistan?

4   A    I believe for one of them -- and I can't remember which

5   one -- there was a language thing.  She had to know French to

6   go to Switzerland to get trained.  I can't remember what --

7   which one that is, but, yes, so she faced some difficulties in

8   trying to do that, but I don't think she really gave up.

9   Q    There's also been discussion about Reality writing in her

10  notebook about members of the Taliban or Islam.  Do you know

11  what Reality's view on Islam was?

12  A    Yeah.  So my sister liked to study religion, just kind of

13  like in general.  So we were raised Christian; so she knew

14  about, like, the Bible.  She also read the Torah.  She was

15  interested in Judaism.  She was interested in Buddhism.  So

16  she's kind of a yoga fanatic; so she's really into sort of the

17  sayings, the philosophies, sort of the ethics of things, and

18  then, of course, because of her connection to, you know, the

19  language that she learned for her job, part of some of her

20  training and the people that she interacted with were Moslems

21  and so she was introduced to the religion, the culture.  I know

22  that she had read the parts of the Koran.  So she was very

23  knowledgeable about Islam, but also about other major world

24  religions.  So I am not sure that she was fixated on Islam, but

25  she definitely knew a lot about it.

(Brittany M. Winner-Direct by Mr. Nichols)

1    Q    Did she have any opinions in regards to the Taliban and

2    Al-Qaida?

3    A    Definitely -- she was definitely against the kind of

4    destructive things that Al-Qaida was doing.  The thing about

5    the Taliban is that they're, basically, just religious leaders

6    in the Middle East and most of them haven't committed any act

7    of terrorism.  It is the rogue people.  It is the terrorists

8    within a normally-peaceable organization who are committing

9    these acts and so I don't think she viewed the Taliban as a bad

10   entity by itself.  I mean, they're religious leaders within

11   Islam.

12   Q    Did she ever -- from your conversations with her, did she

13   ever express any type of enjoyment whenever she heard about a

14   terrorist attack against the United States?

15   A    Of course not.  The only thing that they're doing -- I

16   mean, they're making Islam look bad and I think that she was

17   really frustrated that people were equating Moslems with

18   terrorists and that's something that we talked about a lot and

19   sort of the religious intolerance, you know, the Islamophobia.

20   It's something that we both -- we both shared beliefs that that

21   was so wrong.

22   Q    Did Reality have any political views on environmental

23   issues?

24   A    Oh, definitely.  Yes.

25   Q    Would you all talk about them from time to time?

(Brittany M. Winner-Direct by Mr. Nichols)

101

1    A    We did.  Both of us have tremendous respect for the earth,

2    for animals, and so since it's a philosophy that we shared, we

3    would discuss that quite often.

4    Q    How did she view America's handling of enviromental

5    issues?

6    A    Well, as a very large sort of industrialized capitalist

7    nation, I think that -- well, both of us agreed that there are

8    times when we don't use our resources wisely -- that sort of

9    the, like, not taking care of the earth -- this is the only

10   earth we have.  This is our home.  You have to honor it,

11   respect it, and I think that what we saw is that America was

12   just -- it was not putting the environment first where it

13   should be; so making decisions about people's quality of life

14   over kind of using the resources correctly and respecting the

15   earth, I think that -- yeah, we just really -- we talked about

16   it and we really didn't like that.

17   Q    Did Reality ever talk about committing acts of terrorism

18   because she had political views on the environment?

19   A    Of course not.

20   Q    Do you know if Reality ever tried to speak to her elected

21   officials about her views on the environment?

22   A    She did.  She had a meeting with Senator Perdue and they

23   discussed climate change and issues related to that.  So, I

24   mean, she tried to -- she wanted to make a difference in a good

25   way -- in a way where she could talk to somebody who could, you

1    know, vote to promote sort of environmentalism, and that was

2    the kind of way that she wanted to do that.

3    Q    How would you describe Reality's sense of humor?

4    A    Well, it's kind of like mine.  We're kind of weird in our

5    -- we have a lot of inside jokes, a lot of things that, you

6    know, we would say to each other that would look really strange

7    to somebody kind of outside of our relationship.  We -- it kind

8    of borders on sort of like not appropriate sometimes, but, I

9    mean, you know, we're sisters.  We're very close.  It becomes

10   -- so we just -- we're odd.  How about that?

11   Q    You said "not appropriate".  So in your knowing Reality,

12   does she frequently make inappropriate jokes?

13   A    Sure.  I do, too.  I mean, there is a time and a place for

14   them with, you know, your family members.  It was never

15   anything, you know, really horrible in my opinion.  It was just

16   nobody else would really understand our humor.

17   Q    Now the government has made mention of writings she made

18   where she said "burn the White House down" and flee to

19   "Kurdistan".  Did you believe that she was actually going to

20   burn or wanted to burn the White House down?

21   A    Of course not.

22   Q    Is there anything in your relationship with Reality that

23   made you think that she would ever commit an act of arson?

24   A    Never.

25   Q    Anything that would make you think that she would actually

1  flee the country to go to Kurdistan?

2  A    No.

3  Q    When she went to go see Senator Perdue do you know if she

4  said, "Well, I don't agree with his political views; I am going

5  to burn his office down"?

6  A    No.

7  Q    Did she ever say that she was going to be hostile or

8  disrespectful to Senator Perdue because she didn't agree with

9  him?

10 A    Of course not.

11 Q    Do you have any reason to believe that if granted bond

12 Reality would not come back to court?

13 A    I have no believe that she would not come back to court.

14 Q    Do you know if Reality owns property outside of Georgia?

15 A    No, she does not.

16 Q    Does she own property outside of this country?

17 A    No, she does not.

18 Q    Do you know if she has any personal contact with anyone in

19 Afghanistan or Kurdistan?

20 A    No, she does not.

21 Q    The government made mention of a prior online conversation

22 you and Reality had regarding a polygraph test.  Did you

23 believe that Reality actually hated America because of that

24 conversation?

25 A    No.

1    Q    Why did you not think she hated America?

2    A    Oftentimes when we would talk to each other, kind of joke

3    with each other, we assumed it was, you know, a safe place to

4    kind of talk about, you know, our views and things.  We used a

5    lot of hyperbole.  So, I mean, you have a bad day; you say,

6    "Man, you know, I want to quit my job" or "I want to" -- you

7    know, stuff that we would never do, stuff that we didn't really

8    think was true and I think that she was just being really

9    dramatic in that particular exchange.

10   Q    Well, based on that exchange and others, did you feel that

11   you had a need to alert the authorities as to what Reality

12   said?

13   A    Of course not.

14   Q    There is another conversation the government refers to

15   involving Vault 7 and Eric Snowden.  Reality agreed with

16   Mr. Snowden and Julian Assange, did she not?

17   A    Yes.

18   Q    Do you know if she ever had personal contact with him?

19   A    No.

20   Q    Do you know if she's ever had any personal contact with

21   any of the representatives?

22   A    No.

23   Q    Do you know if they provided her with any type of

24   financial or substantial support since this has taken place?

25   A    No.

(Brittany M. Winner-Cross by Mrs. Solari)

105

1          MR. NICHOLS:  And, Your Honor, those are all the

2   questions I have for Ms. Winner at this time.

3          THE COURT:  Okay.  Any cross?

4          MRS. SOLARI:  Thank you, Your Honor.

5                   **CROSS-EXAMINATION**

6   BY MRS. SOLARI:

7   Q    Hey.

8   A    Good morning.

9   Q    My name is Jenna.  I appreciate your being here today.  I

10  just want to ask you a few questions that pertain to this case.

11  Your name is Brittany.  Do you go by Britty?

12  A    On Facebook and -- yeah, like, that's kind of my nickname.

13  Q    So, like, just with your sister?

14  A    Yeah.

15  Q    What should I call you?

16  A    Brittany is fine.

17  Q    Brittany.  Okay.  Great.  So I'm sure you probably

18  remember the couple or few or however many conversations you've

19  had with your sister since she's been incarcerated?

20  A    Right.

21  Q    Okay.  And there was one in particular and I think you

22  were very wisely trying to be cautious about talking with your

23  sister about whatever it was she may have done to cause her to

24  be arrested.  Do you remember that conversation?

25  A    Yes.

(Brittany M. Winner-Cross by Mrs. Solari)

106

1    Q    And you were a little confused, obviously, because I don't

2    think really anybody in your family knew exactly what had

3    happened at that point; right?

4    A    Right.

5    Q    Okay.  You just knew that she had been arrested; it was

6    sort of a big deal; and you would find out later -- that the

7    FBI would call and give you more information, that sort of

8    stuff?

9    A    Right.

10   Q    Okay.  And I think you thought at first maybe that this

11   might have been something that had to do with her background

12   security questionnaire?

13   A    Yeah.

14   Q    That she might have -- I don't know -- put a wrong

15   birthday for someone or something?

16   A    Yes.

17   Q    Okay.  But in that conversation your sister actually

18   clarified for you with some detail what she had done?

19   A    What I was trying to do when I asked her about that was

20   also lighten her mood.  I realized she wouldn't have gotten

21   arrested for doing that.  Like, she got his birthday wrong

22   because she forgot the day in December of my husband.

23   Q    Oh, sure.  No, I am certainly not trying to suggest that,

24   you know, your sister was trying to commit espionage or

25   something because she got somebody's birthday wrong -- not at

(Brittany M. Winner-Cross by Mrs. Solari)

107

1   all, but I think you asked her in the conversation, "It's not

2   because you put the wrong birthday for Chris?"  And, in fact,

3   she answered you, "No, I leaked a document and they were able

4   to trace it back to me and it's kind of an important one."  Do

5   you remember her responding that way to you or words to that

6   effect in that phonecall?

7   A    Yes.

8   Q    So do you understand that to you -- and I understand you

9   may not know what she's admitted to anybody else, but to you

10  she, essentially, admitted committing the offense with which

11  she's charged?

12              MR. BELL:  Your Honor ---

13              MR. NICHOLS:  Your Honor ---

14              MR. BELL:  Your Honor, we -- I object to that.

15              MRS. SOLARI:  I'll rephrase it.

16              MR. BELL:  She's talking about a legal opinion.

17              MRS. SOLARI:  I'll rephrase it.

18              THE COURT:  Sustained.  It is sustained.

19  Q    She admitted to you she leaked a document.  I can show you

20  the transcript if you'd like.  I don't know if you remember it.

21  A    I've seen it.

22  Q    Okay.  So she admitted to you, "I leaked a document"?

23  A    That was her explanation for what was happening.

24  Q    And that they were able to trace it back to her?

25  A    That's what she said.

(Brittany M. Winner-Cross by Mrs. Solari)

108

1   Q     And that it was kind of an important one?

2   A     That's what the transcript says.

3   Q     Is that, in fact, what she said to you?

4   A     Yes.

5   Q     Okay.  Later on in the call -- and I know you were trying

6   to cheer her up, and, certainly, of course, I appreciate that

7   as I'm sure she did being her sister and trying to keep her in

8   good spirits -- it seemed like she was kind of down in that

9   conversation.  Did she at some point tell you "Like I don't

10  want a rest of my life if it's not what I have"?  Was she

11  concerned about what would come after she was released from

12  confinement one day?

13  A     I don't recall her specifically saying that.  Is that a

14  direct quote?

15  Q     It is.  I can show you the transcript.  I don't want to

16  put the words in anybody's mouth.

17  A     Oh, can you rephrase the question?

18  Q     I am just trying to confirm that you were talking with her

19  about, you know, keeping her chin up.  She said to you, "I

20  don't know what I am getting through this for."  You said,

21  "What do you mean?"  She said, "What's going to be on the other

22  side?"  And you very rightly said, "The rest of your life",

23  right, because your sister will get through this one way or the

24  other and then she responded to you ---

25              MR. WHITLEY:  Your Honor, I don't know why we have --

(Brittany M. Winner-Cross by Mrs. Solari)

109

1    the transcript should speak for itself, and we have the

2    counselor or the government is asking her questions about the

3    transcript.  If the Court wants the witness to look at the

4    transcript and say that's, in fact, what she said, that would

5    be fine, but it seems to me that we have double testimony here

6    going on regarding the transcript.

7                THE COURT:  If your concern is that she ought to have

8    a copy of it in front of her --

9                MR. WHITLEY:  Yes.

10               THE COURT:  -- certainly we can allow her to have

11   that copy.  But I do think that going through that conversation

12   on record here today to the extent that it relates to the

13   detention issues is certainly within the realm of what both

14   sides would be allowed to do.

15               MR. WHITLEY:  Right.  But I do think her having the

16   transcript would be quite useful.

17               THE COURT:  Sure.

18               MR. WHITLEY:  Thank you.

19               MRS. SOLARI:  I have no problem with that, Your

20   Honor.  I do think that's fair.  May I approach the witness?

21               THE COURT:  You may.

22   Q    Brittany, I am going to hand you what's admitted as

23   Government's Exhibit 6B on the bottom there and it is

24   paginated -- I think it is a 7-page document.  So I was talking

25   about the conversation that starts on the bottom of page 5 with

(Brittany M. Winner-Cross by Mrs. Solari)

110

1    your sister saying "I don't -- this sounds really dumb, but I

2    don't know what I am getting through this for."  Have you found

3    that place in the transcript?

4    A    I did.

5    Q    Was your sister sort of -- I don't know -- musing what

6    would be on the other side of this and then saying to you on

7    the next page, page 6, "Like I don't want a rest of my life if

8    it's not what I have."

9               THE COURT:  Ms. Winner, have you ever seen this

10   transcript before today?

11              THE WITNESS:  No, sir.

12              THE COURT:  Do you want some time to look at it

13   before you continue the questions?

14              THE WITNESS:  Well, maybe like a minute.

15              THE COURT:  We can take a break and give you ten

16   minutes if you want that.

17              THE WITNESS:  Yes, please.

18              THE COURT:  Okay.  Let's do that.  Let's take a break

19   and after you're done looking at that and you're ready to

20   proceed, just let Mrs. Widener know and we'll start again.  I

21   want to give you the time you need to look through it.

22              THE WITNESS:  Thank you.  Am I staying here?

23              THE COURT:  Well, if you need a private setting, we

24   got a jury room right there.  You can look at it in there.

25        (A break is taken.)

(Brittany M. Winner-Cross by Mrs. Solari)

111

1     THE COURT:  All right.  Dr. Winner, have you had a

2  chance to review that transcript in full now?

3     THE WITNESS:  Yes, I have, sir.

4     THE COURT:  All right.  Mrs. Solari, you may proceed.

5  Q    All right.  Again, so referring to the top of page 6 of 7,

6  is this generally a conversation where you're trying to give

7  your sister some words of encouragement?

8  A    Of course.  She's my baby sister.

9  Q    Sure.  And so you're trying to tell her, again, that which

10 is true -- I agree, you agree -- however this turns out, she'll

11 come through on the other side.  There is life after this;

12 right?

13 A    That's right.

14 Q    But she's expressed some concerns like saying "Like I

15 don't want the rest of my life if it's not what I have."  Was

16 that a concern that she expressed to you?

17 A    She did say that.

18 Q    But then, of course, you know, quickly acknowledges that

19 there are certainly a lot of other people in the world that

20 have things a lot worse than she did?

21 A    Yeah and she was very aware because she definitely

22 sympathized with those people -- Syrian refugees.

23 Q    Sure.  I've seen that in her history.  I know she's very

24 interested in humanitarian work and all those sorts of things

25 and I don't take any of that away from her.  I totally

(Brittany M. Winner-Cross by Mrs. Solari)

112

1    understand that.  Slightly after that conversation maybe a

2    quarter of the way down the page, did your sister tell you,

3    "Yeah, I keep telling myself to act more like I think I did

4    something wrong" with sort of a laugh?

5    A    Yes, I see that.

6    Q    And you asked her, "What?"  And she said, "Like pretend

7    like I really feel in my heart regret what I did and that I did

8    something wrong.  Not because I'm in jail right now because

9    what I did was inherently wrong."  Did she say that to you?

10   A    Yes.

11   Q    Did that sort of suggest to you that your sister was

12   struggling to really feel any regret or any contrition for what

13   she told you she had done?

14   A    I didn't really know how to interpret that at the time.

15   Q    All right.  Fair enough.  We can get past that.  I put in

16   front of you -- you can set Exhibit 6B aside.  I put in front

17   of you Exhibits 11 and 12 and, certainly, you can take your

18   time looking at those.  I think they're relatively brief.

19        So I'd like to talk to you about Exhibit 11 and I think

20   Mr. Nichols already discussed this one with you.  This was a

21   Facebook chat in which you and your sister discussed her

22   chances of passing the polygraph exam as part of her security

23   clearance.  Do you remember that one?

24   A    Yes.

25   Q    And she figured she was "#gonnafail"?

(Brittany M. Winner-Cross by Mrs. Solari)

113

1    A     That's what it says.

2    Q     Okay.  And then you had kind of an "LOL" because, like you

3    said, you guys sort of had our own sisterly sense of humor

4    going on?

5    A     Yes.

6    Q     Now she said -- and, again, perhaps this was hyperbole or

7    joking -- "You know, I only say I hate America like three times

8    a day.  I am no radical.  Mostly because Americans are obsessed

9    with air conditioning."  But then you asked her, didn't you,

10   "But you don't actually hate America; right?"

11   A     That's right.

12   Q     I mean, because this was your safe place and you guys

13   joked sometimes and say things like "I am going to quit my job"

14   or "I am going to kill that guy", but you actually asked her to

15   clarify that one, didn't you?

16   A     What I was trying to do was be conceding like, okay, well,

17   you know, you're talking about this, but, like, you don't

18   actually, you know, hate America.

19   Q     Right.  Because a lot of people say things like that and

20   they don't, but what she same back with was, "I mean, yeah, I

21   do.  It's literally the worst thing to happen to the planet.

22   We invented capitalism, the downfall of the environment."  When

23   your sister expressed to you some degree of actual -- I don't

24   want to say hatred, but those were her words -- after she

25   expressed that to you, did you have any concern about her as a

(Brittany M. Winner-Cross by Mrs. Solari)

114

1    security risk to or did you report her as such to anybody?

2    A    I didn't interpret her statement to mean that she actually

3    hated America.  Even though I clarified -- even though I said,

4    "You don't actually hate America", she was making a joke.  She

5    said, "I mean, yeah, I do.  It's literally the worst thing to

6    happen to the planet."  It's something that if we were in

7    person, she would be rolling her eyes.  She'd be saying, you

8    know, "Wow, you know, I really hate how the planet is being

9    abused."

10   Q    Okay.  So understanding at the time that she worked in a

11   cleared position because you understood that; right?

12   A    Yes.

13   Q    You just wrote that off as a joke -- didn't feel the need

14   to report it to anybody?

15   A    Of course not.

16   Q    All right.  Take a look at Exhibit 12 then.  This is

17   another Facebook Instant Message chat between you and your

18   sister.  Do you remember when she called your attention to

19   something called Vault 7?

20   A    Yes.

21   Q    And did you look at all on the internet after she pointed

22   it out to you to see, like, what is that because it is kind of

23   a random name?

24   A    I looked it up, but I didn't -- I was mainly relying on

25   her for some information because it's -- you know, security is

(Brittany M. Winner-Cross by Mrs. Solari)

115

1   something that she cared about and it was something that, you

2   know, she dealt with on a daily basis and so one of the ways --

3   one of the things that we used to talk about would be, you

4   know, current events, stuff like that.  So I was relying on her

5   for information about that.

6   Q     Okay.  And this was a current event because I think

7   WikiLeaks published what they called Vault 7 on this same day

8   on March 7th?

9   A     Right.

10  Q     Does that sound right?  And you told her, I guess, after

11  you got some information about it, "That's scary stuff"; right?

12  A     Right.

13  Q     Okay.  And your sister for some reason came back with

14  "It's so awesome, though.  They just crippled the program."

15  Did you interpret that to be your sister sort of championing

16  someone from WikiLeaks who claimed that they had damaged U.S.

17  intelligence programs?

18  A     I think that's part of her sense of humor.  She might have

19  meant awesome just in terms of a catastrophic sort of breach;

20  right?  So, oh, that's awesome that it was something that -- I

21  mean, if you think about the word "awesome", right, inspiring

22  awe, I don't think that she meant that it was necessarily --

23  she wasn't championing it.  She wasn't saying this was a great

24  thing.  She was just saying -- she was just making a comment

25  about the scope.

1   Q    I can see where perhaps you thought that and I think maybe

2   you do because you wrote back to her, once again, with some

3   incredulity like you did in the last chat: "So you're on

4   Assange's side?"  And rather than your sister responding to

5   you, "Well, no, of course, I am not," or, "No, this was a

6   really serious thing," or "It sounds terrible", her response

7   was, "Yes and Snowden".  Correct?

8   A    That's correct.

9   Q    So, once again, you tried to clarify saying, like, you

10  can't possibly mean what you're saying, and for the second time

11  your sister came back and told you, yes, absolutely, I do.  I

12  am on the signed of WikiLeaks and I am on the side of Edward

13  Snowden.

14  A    Yes.  Can I clarify something?

15  Q    Sure.

16  A    My tone is not incredulous.  It is hard to tell tone over

17  Instant Messages.

18  Q    Sure.

19  A    So what Reality and I would talk about often would be our

20  political opinions, our views on things, and so when you have

21  people who have leaked information or like Snowden or Assange,

22  it is a common thing -- it's a common debate.  I mean, there

23  are lots of people in America who think that what they did was

24  correct and there are a lot that think that what they did was

25  incorrect and so we're having a conversation --

(Brittany M. Winner-Cross by Mrs. Solari)

117

1   Q     Sure.

2   A     -- about that -- about our opinions.

3   Q     Right.  And I think that matters to some extent here.  So

4   was your sister of the opinion that these folks who leaked or

5   were alleged to have leaked damaging classified information

6   that that was the right thing to do?

7   A     What I wanted to know was her opinion.  Being in a

8   position of, you know, where she has security clearance she's

9   handling, you know, information.  I wanted to see her side of

10  things because I don't really deal with that kind of stuff in

11  my daily life.  I am a scientist.  So I got my news from her

12  and I wanted to know her opinion on that.

13  Q     And she gave you her opinion when you asked her, "So

14  you're on Assange's side?" and she said, "Yes, and Snowden".

15  A     Right.  That was something that I was interested in

16  learning more about her opinions, how she viewed things because

17  she had a really unique perspective on that.

18  Q     How did you typically communicate with your sister?

19  A     Mostly Instant Messaging.

20  Q     Did you guys email at all?

21  A     No.  We did not.

22  Q     Didn't use any email.  Okay.  So no Gmail, no Hotmail,

23  nothing like that?

24  A     I believe she emailed me.  I can't remember what it was.

25  It was a link that was more easily accessible with a computer;

(Brittany M. Winner-Cross by Mrs. Solari)

118

1    so she did email it to me, but I can't remember what that was.

2    Q      But it sounds like it was really rare that you guys would

3    communicate over emails?

4    A      That's right.

5    Q      Did you guys ever communicate using any sort of

6    self-destructing type thing like untraceable email accounts or

7    self-destructing inboxes, Tor email, or anything like that?

8    A      No.

9    Q      Okay.  You mentioned your sister doesn't own any property

10   outside of the state of Georgia.  She doesn't own any property

11   inside of the state of Georgia either, does she?

12   A      She rents a home.

13   Q      Right.  But she doesn't own anything here?

14   A      Right.

15   Q      She has some kind of lease on a small house here in

16   Augusta?

17   A      Oh, sorry.  Does a car count as property in this state?

18   Q      Not exactly.  I guess I am talking about real estate.

19   A      Got it.

20   Q      Doesn't have any real estate here; right?

21   A      Right.

22   Q      And I don't think any other member of your family owns any

23   real estate here?

24   A      No.

25   Q      Okay.  And your sister was previously employed here in

(Brittany M. Winner-Cross by Mrs. Solari)

119

1    Augusta; correct?

2    A    That's right.

3    Q    But due to the circumstances you're aware that she's

4    previously not employed by anybody in the State of Georgia; is

5    that right?

6    A    Since when?  Can you give me some dates?

7    Q    Since the date of her arrest?

8    A    That's right.

9         MRS. SOLARI:  Okay.  One moment, Your Honor.  That's

10   all I have, Your Honor.

11        THE COURT:  All right.  Any redirect?

12        MR. NICHOLS:  One moment, Your Honor.  Your Honor, we

13   have no further questions.

14        THE COURT:  Okay.  Dr. Winner, thank you very much

15   for your love of your sister and taking time out of your busy

16   schedule to be here today.

17        THE WITNESS:  Thank you.

18        THE COURT:  Any further witnesses from the defense?

19        MR. NICHOLS:  Yes, Your Honor.  We would call Billie

20   Winner-Davis to the stand.

21        THE COURT:  Is this your final witness, Mr. Nichols?

22        MR. NICHOLS:  Yes, Your Honor.

23        **(BILLIE W. DAVIS is duly sworn.)**

24        THE COURT:  You may be seated.

25        THE CLERK:  Please state your name for the record.

(Billie Winner-Davis - Direct by Mr. Nichols)

120

1             THE WITNESS:  Billie Winner-Davis.

2                  **DIRECT EXAMINATION**

3    BY MR. NICHOLS:

4    Q    Good morning, Mrs. Davis.

5    A    Good morning.

6    Q    You previously testified at the original hearing that we

7    had in June; correct?

8    A    Yes, I did.

9    Q    Okay.  I don't want to belabor any points that we

10   previously went over; so I'll try to focus on different areas.

11   There has since -- since the pretrial hearing the government

12   has clarified previous statements they made in regards to your

13   conversation with Reality.  Are you aware of that?

14   A    Yes.  I read it on Facebook and on the news.

15   Q    Let's talk about one of the issues -- the $30,000.  When

16   Reality was first placed in confinement did you have a

17   conversation with her about $30,000?

18   A    It actually wasn't with her.  It was with another cell

19   mate, I believe, the way that I am remembering it, and Reality

20   was right next to this woman and this woman called and she was

21   frantic saying that Reality needs for you to transfer the money

22   out of her account as soon as possible.

23   Q    What was the reason for Reality wanting to transfer the

24   money out of her account?

25   A    I -- she said that because Reality had been told that the

1   government was going to freeze all of her accounts and she

2   needed money to pay her bills and she was afraid that they

3   would freeze her accounts.  She would have no way to pay her

4   bills.

5   Q    Did you interpret it as Reality trying to scam the

6   government to get a free lawyer?

7   A    No.  Absolutely not, no.

8   Q    Did Reality tell you that she wanted you to take out the

9   money so she could get a free lawyer?

10  A    No.

11  Q    Once the money was transferred -- when she said "pay

12  bills", what type of bills did Reality expect to be paying

13  while she was in confinement?

14  A    Well, her house and her regular bills.  She has a credit

15  card that she was very concerned about paying for; so...

16  Q    And did you actually make that transfer?

17  A    Yes, I did.

18  Q    And has that money been used to pay those bills?

19  A    Yes.

20  Q    Where are you currently staying now?

21  A    I am staying at her home here in Augusta.

22  Q    When did you come to Augusta?

23  A    On Saturday.  I arrived on Saturday afternoon.

24  Q    Why did you come to Augusta from your home in Texas?

25  A    I am going to be temporarily living here as long as I need

1    to.

2    Q    And what about your employment?  Were you previously

3    employed in Texas?

4    A    Yes, I was.

5    Q    And why would you leave your employment to come to

6    Augusta?

7    A    Because I need to be here for my daughter.

8    Q    And you're staying in her home.  Do you have modes of

9    transportation?

10   A    I have her vehicle here at this point and if at some time

11   I need another vehicle my husband will drive my vehicle up and

12   then fly home.

13   Q    Since she was placed in confinement, who has made payments

14   on her home?

15   A    I have.

16   Q    And is there any risk that home -- that she's going to be

17   evicted from that home in the near future?

18   A    No, none whatsoever.  I put my name on the lease.

19   Q    What is the value of your property in Texas?

20   A    It's about 130 to $150,000 from what I understand.

21   Q    Would you be willing to put up that property in lieu for

22   Reality to receive a bond?

23   A    Yes, I would.

24   Q    Do you have any fears that if you put up that property

25   Reality would flee?

1    A    No, absolutely not.

2    Q    Do you have any fears that Reality would commit some type

3    of act of violence if released?

4    A    No, she would not.

5    Q    In your conversations with Reality has Reality discussed

6    her dietary issues?

7    A    Yes, she has.

8    Q    Would you say she's happy with the food she received?

9    A    No, she's -- and I am very concerned about her nutrition.

10   Q    Are you concerned about any medical issues she may have

11   inside of confinement?

12   A    Yeah.  She's had a skin condition as well and she told me

13   that she hates taking the medication and having to be on

14   medication for digestive issues.

15   Q    And what digestive issues is she experiencing?

16   A    She's not regular.

17            MR. NICHOLS:  And just, Your Honor, one moment.  The

18   Court's indulgence.  Your Honor, I have no further questions

19   for this witness at this time.

20            THE COURT:  Mrs. Solari?

21            MRS. SOLARI:  Briefly, if I may, Your Honor.

22                        **CROSS-EXAMINATION**

23   BY MRS. SOLARI:

24   Q    Good morning, Mrs. Winner-Davis.  How are you?

25   A    Not very good.

(Billie Winner-Davis - Cross by Mrs. Solari)

124

1   Q    Under the circumstances, to be expected.  I'm sorry about

2   that.  And I guess I can't say I know because we haven't spoken

3   directly, but I certainly get the impression and understand

4   that to the extent I may have misrepresented anything about the

5   conversation between you and your daughter at the initial

6   hearing, I apologize to you for that.  That was certainly not

7   my intent.  My only job here is to present the facts as they

8   are and I never want to do otherwise.  So, again, I want to

9   apologize to you.

10       In talking about the $30,000, I am not here to argue with

11  you about where it was moved or why it was moved or anything

12  like that, but where did Reality get $30,000?

13  A    She's very good with money.  She lives on minimal.  So she

14  saved and she worked.  I mean, she's worked.

15  Q    I understand, but did she -- did she come into a large sum

16  of money, say, after about February of this year?

17  A    Not to my knowledge, no.

18  Q    Okay.  So did she have any sort of inheritance or any sort

19  of sign-on bonus with Pluribus or anything else that would have

20  granted her, let's say, a payment in excess of $10,000?

21  A    I don't know.  I wouldn't have knowledge to that.

22  Q    And with regards to this ongoing case, obviously, you

23  support your daughter and I would want my mom to do that as

24  well and so I commend you for that.  Have you been involved in

25  some fundraising efforts for, I guess, yourself, your family,

(Billie Winner-Davis - Cross by Mrs. Solari)

125

1    your daughter, legal defense?

2    A    No.

3              MR. NICHOLS:   Your Honor, I am going to object as to

4    any question that goes into any fundraising efforts that may

5    have anything to do with legal defense.

6              THE COURT:   What's the relevance, Mrs. Solari?

7              MRS. SOLARI:   Your Honor, I think Your Honor needs to

8    know if Your Honor is going to consider any sort of bond

9    whatsoever what assets are available to the family and whether

10   they are, in fact, secured by the family's own assets or if

11   these are donations by other contributors.   I think the source

12   of anything that would be posted is relevant.

13             MR. NICHOLS:   And, Your Honor ---

14             MRS. SOLARI:   I don't want to get into who is paying

15   for the legal defense.

16             THE COURT:   We'll get into those issues if the bond

17   is ordered in the case.   Right now I don't think it's relevant.

18   So it is sustained.

19             MRS. SOLARI:   Understood.   I will forego that, Your

20   Honor.

21        As part of your other efforts to support your daughter,

22   have you aligned yourself with organizations such as "Stand

23   with Reality" and I think there is another one called maybe

24   "Resist" or what are some of the other ones?   I can't remember.

25   I see them online.

(Billie Winner-Davis - Cross by Mrs. Solari)

126

1   A     The "Courage to Resist Foundation" is -- they took on

2   Reality's case.

3   Q     Okay.

4   A     I am not really aligned with them, but I did give them

5   permission to go ahead and they do have a StandWithReality.org

6   campaign.  I have that on my Facebook.  I put it out there.  I

7   have an event in Kingsville to raise awareness.

8   Q     Okay.  Nothing wrong with that.

9   A     No fundraising.

10  Q     Okay.  And I guess I've seen some comments that you've

11  made or reposted or whatever in connection with the case and I

12  guess I'll ask you have you accepted the fact or do you believe

13  the fact that your daughter leaked a classified document to the

14  media?

15  A     No.  I don't know that to be a fact.

16  Q     I'm a little confused then by your online postings.

17  Haven't you expressed the opinion that what your daughter did

18  was quite heroic and patriotic because whatever she disclosed

19  was information America needed to know?

20  A     No.  I have not done that.

21  Q     Okay.  Thank you very much.  That's all I have for you.

22          THE COURT:  Any redirect?

23          MR. NICHOLS:  Briefly, Your Honor.

24          THE COURT:  All right.

25                    **REDIRECT EXAMINATION**

1    Q    Mrs. Davis, the government spoke about the $30,000 that

2    Reality had in her account.  How long did Reality serve in the

3    military?

4    A    Six years.

5    Q    Do you know what she had been paid in the military?

6    A    I do not, but I know that she had a sizable lump sum for

7    her language.

8    Q    Do you know if Reality had excess credit card debt?

9    A    No.

10   Q    Did Reality have student loans?

11   A    No.

12   Q    Did Reality have a high-interest car note she had to pay?

13   A    No, she had already paid it off.

14   Q    What about when she moved to Georgia?  Did she have -- is

15   her rent particularly high?

16   A    No, it's not.

17   Q    Does she have any children?

18   A    No.

19   Q    Well, having raised a family, do you believe that you

20   would be able to save $30,000 if you didn't have to pay for

21   children?

22   A    Absolutely, yes.

23   Q    And do you have any reason to believe that Reality had

24   $30,000 in her bank account because somebody gave her a large

25   sum of money at one time?

(Billie Winner-Davis - Redirect by Mr. Nichols)

128

```
 1   A     No, I do not.

 2   Q     Thank you.  No further questions.

 3              THE COURT:  Any follow up to that, Mrs. Solari?

 4              MRS. SOLARI:  No, sir, Your Honor.

 5              THE COURT:  Mrs. Davis, I think I said this last time

 6   that you were here with your husband, but I think it bears

 7   repeating again that, certainly, the love you have for your

 8   child is exceptional and I think that's a great example for

 9   other people of what you do when a parent is in a situation

10   like that.  Early retirement and moving here to be with her is

11   impressive.  So I thank you very much for your dedication to

12   her and your being here today to testify on her behalf.

13              THE WITNESS:  Thank you.  I appreciate that.

14              THE COURT:  You may step down and be seated.

15              MR. NICHOLS:  Your Honor, we have no further

16   witnesses to call at this time.

17              THE COURT:  Okay.  Any factual proffers from the

18   defense?

19              MR. BELL:  There will be, but I think it all ought to

20   be done ---

21              THE COURT:  Okay.

22              MR. BELL:  In an abundance of caution, I think we'll

23   do it all in there and sift it out rather than ---

24              THE COURT:  Okay.  Mrs. Solari?

25              MRS. SOLARI:  The government has one proffer as well,
```

1   but it's only suitable for a classified forum.

2          THE COURT:  Okay.  So is there any further business

3   that we can conduct in open court, Mrs. Solari?

4          MRS. SOLARI:  I don't believe so at this time, Your

5   Honor.

6          THE COURT:  Mr. Bell?

7          MR. BELL:  Only if the Court wants -- and I assume

8   brief summations after we have the other portion.

9          THE COURT:  Right.  That's probably appropriate.  So

10  we'll convene upstairs to have the classified portion.  Then

11  we'll reconvene here for any closing remarks the lawyers want

12  to make and then a ruling in the case.

13         MR. BELL:  Thank you, Your Honor.

14         MRS. SOLARI:  Thank you, Your Honor.

15         THE COURT:  All right.  So let's take a 15-minute

16  break and I'll see you all upstairs.

17     (The hearing is adjourned.  A closed hearing is held and

18        this hearing then resumes as follows:)

19         THE COURT:  Mrs. Solari, do you want to begin with

20  your closing remarks?

21         MRS. SOLARI:  Yes, Your Honor.  Thank you.  Your

22  Honor, as I briefly noted at the outset, the Court's findings

23  with regard to this defendant's risk of flight and her

24  potential for dangerousness to the community were correct in

25  the first instance, were founded in the evidence presented, and

1  have been even better supported today by evidence further

2  presented by the government and should not be disturbed.

3      This defendant with regard to the nature and the

4  seriousness of the crime purposely and with forethought

5  betrayed our nation's trust by stealing classified national

6  defense information and sending it to a news outlet.  She did

7  that with the stated intent that our most closely-held secrets

8  would be published for the entire world to see and she did it

9  knowing that she could compromise U.S. intelligence sources and

10 methods and she did it knowing as anyone with the proper

11 training would simply looking at the marking on the document

12 that the disclosure of that document or any compromise of that

13 information could reasonably be expected to cause exceptionally

14 grave damage to U.S. national security.

15     So the defendant violated and it certainly appears had

16 planned to violate -- every oath she swore was taken, just as

17 the oaths that Your Honor and I have taken, without any mental

18 reservation for purpose of evasion.  It seems that even at the

19 time she took that oath she knew that it was false and that she

20 always intended to violate that oath.  So the defendant was

21 then and is now somebody other than both the government at the

22 time it hired her and her family have believed her to be.

23     The defendant relies somewhat on her time in the military

24 to show the Court the content of her character, but in so many

25 of her words and her actions, Your Honor, she's shown nothing

1  but contempt for our country and its security.  She mocks her

2  security training.  She celebrates people and organizations

3  whose aim is to harm us.  She captions her inability to pass a

4  polygraph exam "#gonnafail" and told her sister even after her

5  sister asked her, "You don't really hate America, do you?" and

6  she responded, "Well, yeah, I do.  America is literally the

7  worst thing to happen on the planet."  Your Honor, even if that

8  is, to some degree, hyperbole, it is certainly a disconcerting

9  statement from someone who is believed at that time to be a

10  valued and trusted member of our intelligence community who

11  held our most precious secrets.

12       So the Court was right in the first instance, Your Honor,

13  to wonder who this defendant really is, and, certainly, her

14  parents who I think, and her sister as well, are lovely people

15  and they have seen the best parts of her.  They have seen her

16  altruistic nature, her curiosity about other cultures and

17  religions, the fun side of her, the kind side of her, and,

18  certainly, hardly anybody in this world is all bad, and the

19  government is not trying to say that this defendant is all bad,

20  inherently evil, or anything like that, but the evidence in

21  this case exposes quite literally, and not to be too pun'y

22  about it, an alternate Reality.

23       The Reality that we can see through the evidence had a Tor

24  browser installed eight days before she undertook her

25  classified assignment at Pluribus.  She had a self-destructing

1    email inbox.  She had phone anonymizing instructions, a list of

2    eight media outlets seeking leaked information, and she had the

3    details of sensitive U.S. counterterrorism targets stored in

4    her home with that information.  The person we can see was

5    searching for classified positions that would have given her

6    access to classified information at the same time she was

7    running queries about how to help Anonymous and wondering

8    whether WikiLeaks had been compromised.

9        The defendant we see lied to the FBI.  She lied first

10   about her commissioning offense, then about when she installed

11   her Tor browser, and then about the circumstances of her

12   inserting a thumb drive into a classified computer, and perhaps

13   has even lied about the number of media outlets to which she

14   has disclosed classified information.  So, Your Honor, there is

15   just a clear duality here that can't be explained away as just

16   a series of bizarre coincidences.  There is something much more

17   at play here.

18       We do know also that the defendant researched quite a bit

19   about travel, employment, and residence overseas which I agree

20   with Mr. Bell is not, per se, illegal, but she researched and

21   had a strong interest in going to, living in, gaining

22   employment in countries that would not be eager to hand her

23   back to us.  Given her language skills and her cultural

24   knowledge and the extremely sensitive information she would

25   have to trade, there is little doubt that she would be welcomed

1    with open arms by a number of our adversaries, and, Your Honor,

2    just a single disclosure of the sensitive information that the

3    defendant knows could potentially be catastrophic to our

4    national security.

5        The strength of the evidence in this case is overwhelming.

6    The defendant, despite how the defense would like to

7    characterize it, confessed to the FBI in a recorded,

8    non-custodial, voluntary interview.  She admitted her conduct

9    to her sister in another recorded conversation, and

10   notwithstanding those two items, Your Honor, the forensic

11   evidence alone establishes that the defendant was the culprit

12   in this case.  So the likelihood of the defendant's conviction

13   and the severity of her potential sentence really leave her no

14   reason to hang around the Southern District of Georgia,

15   especially where her only contacts here are a rented home in

16   which her mother moved four or five days ago.

17       This supposed new and material information authored by the

18   defense, Your Honor, I would respectfully submit is neither

19   really new nor material and it just doesn't do anything to tip

20   the scales at all in favor of granting this defendant a bond,

21   and, again, we have even more information now to justify

22   detention.  So, Your Honor, I, again, respectfully submit the

23   Court simply can't trust this defendant to abide by any promise

24   that she could make to the Court regarding bond.  She's already

25   shown a willingness to place her own judgment before that of

1   the U.S. Government, place her own judgment ahead of the

2   security of our country, and cause damage to the national

3   security at the risk of her own liberty.

4       Your Honor, the government put its trust in this defendant

5   once already and has paid a price for it and I submit that

6   under the circumstances and based on what we know of the

7   defendant, we simply can't risk it again.  So, Your Honor, I

8   respectfully ask that the Court, once again, order the

9   defendant be detained based on the fact that she is by a

10  preponderance of the evidence a risk of flight and by clear and

11  convincing evidence a continuing danger to the community.

12         THE COURT:  Thank you, Mrs. Solari.

13      Mr. Bell?

14         MR. BELL:  Your Honor, I'll try to be brief.  The

15  Court has been quite patient with us today.  It's not just

16  argument.  When we had the previous hearing we heard

17  "documents" instead of "document".  We heard about all sorts of

18  computers and phones and all -- phones and computers that may

19  have recordings of contacts with foreign and enemy countries or

20  organizations.  We didn't know a lot.  And I think the Court

21  out of caution ruled as it did rule.

22      The Reality Winner that her folks know and her sister

23  describes and the others describe is the real Reality.  She's a

24  dedicated environmentalist.  She cares deeply about other

25  people.  She is somebody who would like to travel to distant

1  and, perhaps, dangerous places to aid those in great need.  She

2  has some sense of adventure.

3      She's been active in the welfare thing and as we heard

4  before she even goes to the Church of the Good Shepherd where

5  my family goes and I go.  I can't imagine anyone who would feel

6  endangered knowing that Reality Winner was living down the

7  street or in their neighborhood.  Those -- we heard a lot

8  today.  We heard information about curiosity as to things going

9  on in other parts of the world -- parts of the world that

10  involved her daily work.  Who wouldn't have that?

11      I'm a news junkie.  I wish I knew -- I read a lot of

12  books.  I like reading books about things and even people I may

13  not like, but I learn a lot.  There is nothing wrong with not

14  -- with having -- particularly, when it's your work, wanting to

15  know about the different parties and what's going on in

16  Afghanistan or Kazakhstan or France or England.

17      What we've heard is innuendo, suspicion, and what the

18  court requires to deny someone their constitutional right to

19  bail -- a right that they're presumed to have and they're

20  presumed innocent until proven guilty -- is not speculation and

21  innuendo, much of which turned out to be unsubstantiated.  The

22  issue that, well, maybe she might do something but then she

23  might not, that's not clear and convincing evidence.  That's

24  not evidence by a preponderance of the evidence.

25      Using a computer browser that's used by the FBI and used

1    by millions of people is not clear and convincing evidence.  It
2    takes a vivid imagination to find that that is even evidence at
3    all.  Using whether it's Snapchat or whatever else that doesn't
4    create a permanent record of everything you put on your
5    cellphone is not clear and convincing evidence of anything.
6    Wanting privacy from Google and Amazon and all those they sell
7    their stuff to is not clear and convincing evidence of
8    anything.

9        What is clear and convincing evidence is no criminal
10   record, an honorable discharge, medals, a clear record, no
11   priors or anything, a family -- good family ties.  That's
12   compelling evidence.  Her family is here with her and they'll
13   be with her 'til the end.  We got a tree hugger here, not a,
14   you know -- regardless of her politics or what you agree or
15   disagree with, in this land we honor it.  We don't draw
16   suspicions based on what book someone reads or what world --
17   parts of the world affairs one has interest in.

18       Dropping left and right the word "Taliban".  This isn't an
19   examination, but let's explain something.  If you go watch
20   Charlie Wilson's War, our hero and alibi -- ally -- in that
21   were the Mujahideen and the Taliban.  America financed their
22   overthrow of the government of Afghanistan that was appointed
23   by the Russians.  They were our allies then and who knows what
24   people there were.  Now we consider them maybe an enemy or
25   maybe a party to a peace accord in Afghanistan.  Hopefully,

1    that happens.

2         There are parts of the country they control and there are

3    parts others do, but what happened when America did invade

4    with -- and with -- to help the Afghanis throw them of control?

5    Opium production skyrocketed because the Taliban -- maybe

6    they're too strict in their religion.  Maybe there are things

7    about some of them we don't like, but opium production in

8    Afghanistan, the heartland for poppy fields, and the opium

9    that's such an epidemic in America came from Afghanistan.  The

10   world's principal source -- it has dried up and with our

11   efforts to crush the Taliban, our former ally, opium production

12   went up.

13        Now this case is not about that, but when you start

14   dropping names like Taliban, instantly -- if somebody says

15   something or maybe doesn't say something evil about them

16   instantly, they must be someone who is about to commit another

17   felony during pretrial release.  That's not evidence.  It's

18   suspicion.  It is innuendo.  It's not clear and convincing

19   evidence, and it certainly is not a preponderance of the

20   evidence.

21        Now much of what was the basis for the suspicion at the

22   first has turned out unfulfilled.  As the Court is aware, it's

23   very few people who don't show up for trial on pretrial

24   release.  As the Court is aware, those who don't show up are

25   often at the bottom of our community.  I remember the late

1   Judge Curry explaining to me who didn't show up and who did

2   show up and it was amazing.   If the defendant was close to

3   their mama, they always showed up because they aren't breaking

4   the family ties and we have here strong family ties.

5          That is clear and convincing evidence.   It's not innuendo

6   and suspicion and broad-brush maligning of an American citizen

7   who, for whatever she might have done here, has done a lot of

8   good for our country, too -- has received commendations.

9          No reason to hang around?   No reason to hang around the

10  Southern District?   It's a crime to run and if you run, you get

11  caught, and who wouldn't want to spend their whole life on

12  that?

13         Overwhelming guilt?   Your Honor, without going into the

14  details with these elements, we do not think that the

15  government will be able to prove the elements of the charge

16  that they have brought against her or that the evidence will be

17  so weak on certain elements that there's a strong likelihood of

18  jury acquittal.   We think this is one of those cases where

19  they're trying to put a left foot into a shoe made for the

20  right foot.

21         The Espionage Act of 1917 and as the Supreme Court said of

22  military secrets -- the movements of the Army and Navy.   It

23  read it narrowly.   Now I've got a book here.   It's called

24  "Whistleblowers".   I got it at the last American Association of

25  Justice meeting.   It is produced by a very fine law firm about

1    the heroes of people who find wrongdoing -- what they perceive.

2    Now it shouldn't involve classified information and I am not

3    suggesting it, but there's statutes protecting it.

4        We're not here about guilt or innocence, but given the

5    presumption of innocence, given the fact that she has a

6    presumed right to bail, a right ensconced in the Bill of Rights

7    of the United States Constitution, and given the rights that it

8    is routine in these types of cases we've not found a single

9    example of anything closely analogous and the government in

10   responding to our briefs had the perfect opportunity to say

11   so -- why somebody who's used a computer, they are suspicious;

12   somebody who uses sites, suspicious.

13       They haven't presented a single case where someone charged

14   with similar conduct has been denied their constitutional right

15   for pretrial defense, and I would suggest without actually

16   knowing those but seeing what was described in the brief

17   describes these folks in greater detail, these would be people

18   with far greater resources should they wish to leave the

19   country.  Many of these were charged with multiple counts and

20   related things.  Many of them such as a CIA agent probably, I

21   suspect, knew far greater secrets than we have here and

22   probably was far more agile and had foreign contacts and had he

23   wished to run would have far more opportunity.

24       Reality doesn't have a passport, and, yet, the people I

25   have known of like Robert Vesco from back in the 70's and 80's

1    and that man Rich back in the 2000's who did not -- and the

2    movie producer who never has come back to stand trial for

3    improper sex with a minor under the age of 14 -- these are

4    people with resources, money, foreign contacts -- none of which

5    we have here.  None of which.  And, yet, those people were

6    granted bail.

7         We're not looking at a rich and powerful defendant.

8    Compared to these others, she may well bear the title "the

9    least of these".  Whether one agrees or disagrees with her

10   politics and without trying to condone what she did if she did

11   what they suggest she's done, we don't see the sign of a

12   dangerous person -- do see somebody who spent the last few

13   months in jail and my experience and it's backed up by the

14   textbooks of criminology, often it's the first weeks or months

15   of incarceration that have the most powerful and deterrent

16   effects.  I know even a night in a jail -- something I have

17   never had the chance to experience -- would scare the fool out

18   of me.  People who have never been to jail before don't want to

19   go back again, and I am sure that Reality, a very intelligent

20   woman, won't want to go back again, will not violate any

21   condition of pretrial release, will not risk her whole life

22   with additional charges for the opportunity to live on the lam

23   until caught because caught she will be if she didn't come

24   back.

25        The efforts of the government to find foreign contacts

1   have been to no avail, but they say, "Oh, it could happen."

2   When did "could happen" become clear and convincing evidence?

3   When did "could happen" become evidence bearing the weight the

4   probative value of a feather?  And that's what we have here.

5        I know not what will happen in this case, but she's not a

6   murderer and I've seen many murderers released on pretrial

7   release -- those charged with murder -- on pretrial release who

8   showed up for trial.  I represented them.  I've seen many

9   charged with crimes and I've seen them in this court bearing

10  much longer potential sentences than this and perhaps a few

11  past convictions who were released and came for trial.  Some

12  came for trial and then began a rather lengthy sentence.

13       This is the great exception and there's no exception

14  warranted by this very peaceful, non-violent woman -- educated

15  and wanting more education with a strong family, no record,

16  honorable military record, things that the government in its

17  effort to paint a fair picture chooses not to mention, and I

18  think the failure of the government to present evidence of the

19  good of Reality Winner along with whatever innuendo they want

20  to bring from owning a computer -- the Court doesn't let me

21  bring my cellphone in, but I've changed chips.  My kids change

22  chips all the time on cellphones.  That's reason to deny

23  pretrial release?  Wanting privacy with your email so that you

24  don't get bombarded with your private information being sold

25  for others -- grounds for denial of pretrial release?  The

1    constitutional right.

2        You don't have any problems with Reality.  It will save

3    the government money.  It will facilitate preparation for trial

4    having the client in Augusta close at hand rather than Lincoln

5    County requiring days of arrangements just to be able to get

6    her here or half a day of traveling back and forth for the

7    lawyers to get up there.  Justice will be served by pretrial

8    release, and in due course justice will be served again, but

9    her further retention does not benefit society.  It does not

10   protect society, and it is not warranted under the facts of

11   this case, the law, or the customs as shown by our government.

12   There is no good reason showing for an exception to the norm

13   and to the Constitutionally-mandated right.  Thank you very

14   much.

15             THE COURT:  Thank you, Mr. Bell.

16       All right.  Normally, it is my strong preference to rule

17   at the conclusion of the detention hearing such as this one

18   immediately.  There are, however, some arguments made by the

19   parties that are going to require some further reflection by me

20   and some legal research, and so I am going to reserve the issue

21   and will issue a written order on the issue of detention next

22   week.

23       Just to make sure that everybody in attendance -- those

24   who aren't familiar with detention issues -- understands the

25   standard and the thing that I will be determining is whether

1    the government has satisfied its burden on two fronts:  One,

2    with respect to a flight risk is whether the government has

3    proved by a preponderance of the evidence that no condition or

4    combination of conditions will reasonably assure the appearance

5    of the defendant as required for the case.  In terms of the

6    government's burden on the issue of danger to the community is

7    whether the government has shown by clear and convincing

8    evidence that no condition or combination of conditions will

9    reasonably assure the safety of other persons and the

10   community.

11        Certainly, here I don't think anybody is worried about her

12   holding up a liquor store or causing anyone physical harm or

13   committing a burglary somewhere in Augusta.  I think on both

14   fronts it is more of a macro look at our country in general.

15   Does she pose a risk of flight?  Not that she's going to flee

16   to southern Florida, but will she flee overseas?  And then on

17   the issue of danger to the community, whether she poses a

18   danger more to our national security than anybody that lives

19   next door to her or in the community.  And the standard, as I

20   just referenced, refers really to whether there is a reasonable

21   assurance of appearance and a reasonable assurance of safety.

22        So those are the only things I wanted to point out here

23   today in terms of what the standards are and we'll issue a

24   formal legal ruling as soon as possible.

25        Are there any other matters we need to take up today from

1    the defense's perspective, Mr. Bell?

2              MR. BELL:  No, Your Honor.  We have covered many

3    things and appreciate your attention to this matter.

4              THE COURT:  Okay.  All right.  Mrs. Solari, anything

5    further from the government?

6              MRS. SOLARI:  Nothing from the government, Your

7    Honor.

8              THE COURT:  All right.  Thank you.  We're adjourned.

9         (End of transcript of record.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5        I, Lisa H. Davenport, Federal Official Court Reporter, in

6   and for the United States District Court for the Southern

7   District of Georgia, do hereby certify that pursuant to Section

8   753, Title 28, United States Code that the foregoing is a true

9   and correct transcript of the stenographically-reported

10  proceedings held in the above-entitled matter and that the

11  transcript page format is in conformance with the regulations

12  of the Judicial Conference of the United States.

13

14                    _____

15                    Lisa H. Davenport, RPR, FCRR
                       Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25