UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | CR 1:17-34 |
| | * | |
| **Reality Leigh Winner** | * | |
| | * | |
| **Defendant** | * | |
| | ************ | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S APPEAL OF THE MAGISTRATE JUDGE'S DETENTION ORDER AND REQUEST FOR A HEARING

The United States, by and through the undersigned counsel, respectfully asks this Court to affirm rulings by Magistrate Judge Brian K. Epps that Defendant Reality Winner should be detained pending trial.

Judge Epps has conducted two detention hearings, and after each hearing has ordered the Defendant detained. Most recently, on October 5, 2017, following consideration of legal briefs, testimony, and extensive oral argument at a second detention hearing held on September 29, 2017, Judge Epps entered a well-reasoned Order denying the Defendant's motion for release from custody. Judge Epps found the government had shown: (1) "by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community"; and (2) "by a preponderance of evidence that no condition or combination of conditions will reasonably assure the appearance of Defendant as required." (Dkt. No. 115) (hereinafter, "the Epps Order"). Two weeks later, the Defendant appealed the Epps Order,

1

requesting a hearing "at the earliest practicable time" (Dkt. No. 128).  Now, the Defendant is again seeking release pending trial.  *Id.*

Neither the record nor the Defendant's brief provides any basis to overturn the Epps Order.  The Defendant minimizes her serious conduct, the exceptionally grave damage she has already caused to the United States, and her expressed desire and clear ability to cause further exceptionally grave damage to the United States.  The Defendant claims that Judge Epps failed to consider certain evidence and arguments.  Contrary to the Defendant's claims, however, the record supports Judge Epps's findings, as he carefully reviewed such evidence and arguments and rejected them as unpersuasive.

Moreover, the conditions of release proposed by the Defendant are insufficient to assure the safety of the community or the Defendant's appearance.  Considering the evidence presented at both detention hearings and the arguments made by the government in writing and orally, and in accordance with the reasoning of the Epps Order, this Court should deny the Defendant's appeal and issue an Order requiring that the Defendant remain detained pending trial.[1]

## I. PROCEDURAL BACKGROUND

The government summarized the Defendant's arrest, charges, the arguments put forth at the first detention hearing, and Judge Epps's first decision to detain the Defendant pending trial in its Response to Motion to Reopen Detention Hearing.  *See* Dkt. No. 99 at 2-4.  Subsequently,

---

[1] The government hereby incorporates by reference the Government's Response to Motion to Reopen Detention Hearing Pursuant to 18 U.S.C. § 3142(f) and Impose Conditions of Release (Dkt No. 99).

on September 29, 2017, the Court held the second detention hearing in this case.  *See* Transcript of Detention Hearing, 1:17-cr-34, at Dkt. No. 120 (Sept. 29, 2017) (hereinafter, "Tr.").[2]  On October 5, the Epps Order issued, again ordering the Defendant detained pending trial.

The Epps Order correctly recounts the government's burden with respect to detention and how the government met that burden.  *See* Dkt. No. 115 at 1-2.  The Court's decision to detain the Defendant specifically relied on the factors set forth in the Bail Reform Act, 18 U.S.C. § 3142.  First, regarding the nature of the offense, the Court opined that the Defendant poses an "ongoing risk to national security" because of her "alleged criminal disclosure and the potential for additional disclosures given her access to a wealth of classified information during her service in the Air Force and with the NSA."  Dkt. No. 115 at 2.  Not only are "many of the cases touted by the Defendant materially distinguishable," but a detention analysis "does not lend itself to easy comparisons across cases because of its intense focus on the unique facts of each case and the unique characteristics of each defendant."  *Id.* at 3.

Next, concerning the weight of the evidence, "[f]or purposes of this detention analysis only," the Court found that "at this early stage of the case that the evidence against the Defendant is strong."  *Id.* at 4.  The Defendant admitted to the Federal Bureau of Investigation (FBI) that she made an unauthorized disclosure of classified information and made "damning admissions regarding the same" in recorded jail telephone calls.  Circumstantial evidence also corroborates her admissions.  *Id.* at 4.

---

[2] Citations to "Gov. Ex." are to the exhibits admitted at the September 29, 2017 detention hearing.

3

Turning to the Defendant's character, the Court found that the "Defendant's state of mind, short length of time residing in the community, few community ties, and past conduct" support detention. *Id.* at 5. The evidence supporting this finding included the Defendant's own statements about hating the United States, misuse of a Top Secret computer during her Air Force career, her statements of admiration for Edward Snowden and Julian Assange, and, of particular note, evidence indicating that she "began preparations to leak classified information from the very outset of her work as an NSA subcontractor." *Id.*

The Court then characterized the nature and seriousness of danger to the community the Defendant poses as "high." *Id.* at 7. In short, "[b]y her own words and actions, Defendant has painted a disturbing self-portrait of an American with years of national service and access to classified information who hates the United States and desires to damage national security on the same scale as Julian Assange and Edward Snowden." *Id*.

Finally, regarding risk of flight, the Court noted that the Defendant has "few ties" to Augusta, Georgia, and the desire she already had to live abroad is now compounded by the felony charges against her that carry a maximum penalty of ten years in prison. *Id.* Importantly, the Court found that the Defendant has the financial means to flee and the surrender of her passport is not a condition that could assurance her appearance in court; "[w]hile Defendant has surrendered her passport and cannot obtain another one in her own name, this obstacle provides little assurance given her self-described desire to 'burn the White house down' and '[f]ind somewhere in Kurdistan to live . . . or Nepal.'" *Id.* at 8 (quoting Gov. Ex. 7).

4

## II.     LEGAL STANDARDS

In ruling on a motion for pretrial detention, the Court must determine whether any condition or combination of conditions will reasonably assure the appearance of the defendant as required, and the safety of any other person and the community. 18 U.S.C. § 3142(f). The standards of proof differ with respect to the "risk of flight" and "dangerousness" prongs of the statute. A defendant may be detained if her risk of flight is established by a preponderance of the evidence. *United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985). A defendant may be detained if the government demonstrates by clear and convincing evidence that she presents a danger to the community. 18 U.S.C. § 3142(f).

In making these determinations, the Court must evaluate several enumerated factors to determine "whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(g). These factors include:

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including: the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

5

*Id.* The Court must balance these factors in determining whether a defendant should be detained pending trial.

A district court's review of a magistrate judge's detention order is *de novo*, but the district judge need not conduct a new evidentiary hearing. Rather, "the district court may determine that the magistrate's factual findings are supported and that the magistrate's legal conclusions are correct," and "may then explicitly adopt the magistrate's pretrial detention order." *United States v. King*, 849 F.2d 485, 489-90 (11th Cir. 1988). "Adoption of the order obviates the need for the district court to prepare its own written findings of fact and statement of reasons supporting pretrial detention." *Id.* at 490; *see also United States v. Gaviria,* 828 F.2d 667, 670 (11th Cir. 1987).

### III.   ARGUMENT

Following the Defendant's initial detention hearing and the second detention hearing, Judge Epps correctly found that the government had established by a preponderance of the evidence that the Defendant presents a risk of flight, and by clear and convincing evidence that she presents a danger to the community.

#### A. The Defendant's Arguments that the Epps Order Is "Flawed" Are Meritless

The Defendant offers four arguments in support of her position that the Epps Order is "flawed." All of these arguments lack merit.

##### 1. Judge Epps Properly Considered the Evidence and Made Well-Supported Findings

First, the Defendant claims that Judge Epps, in relying on the Defendant's insertion of a USB drive into a Top Secret computer—after the Defendant had researched whether she could

6

insert it into a classified computer without being detected—failed "entirely" to address the government's statement that it has not been able to determine conclusively whether the Defendant was able to transfer any data to that USB drive. Dkt. No. 128 at 8. To the contrary, Judge Epps specifically stated that "[t]he government has been unable to determine why Defendant inserted the thumb drive, whether she saved anything to the thumb drive, or where the thumb drive is located today." Dkt. No. 115 at 5-6. As Judge Epps correctly found, regardless of whether the Defendant was able to successfully transfer anything to the thumb drive, her "misuse[]" of the Top Secret computer is relevant when considering the history and characteristics of the Defendant. *See id.*

Second, the Defendant claims that Judge Epps improperly assessed the Defendant's financial means in determining that she is a risk of flight. In attempting to rebut what Judge Epps actually found—that the Defendant has the means to flee the country—the Defendant notes that her means are insufficient to "live on for the rest of her life." Dkt. No. 128 at 8. This statement is irrelevant to the Court's finding, since there is no basis for the Defendant's claim that financial resources are only to be considered if sufficient to sustain her for the rest of her life. Indeed, as the Defendant herself stated, "[b]ecause she speaks Farsi, Dari, and Pashto (languages spoken in the Middle East), she had a particular interest in working in that part of the world." *Id.* at 4-5. These same skills would enable the Defendant to earn gainful employment in foreign countries, such that she would require only financial resources sufficient to leave the country, funds which she in fact possesses. *See* Dkt. No. 115 at 8 (referencing recent trip to

7

Belize).  And, as the government has also noted, the Defendant is an attractive candidate for recruitment by a foreign intelligence service.  *See* Dkt. No. 99 at 2.

Third, the Defendant calls Judge Epps's finding that the Defendant "admittedly 'hates' America" "incorrect, concerning, and without evidentiary support."  Dkt. No. 128 at 8-9.  The Defendant then minimizes her conduct, claiming that if she did hate America, she would have engaged in worse conduct than what she is charged with doing, *id.* at 9:  disclosing to a news outlet a document—marked as containing Top Secret//SCI information—with the desire that the document be published for the world to see.  The evidence that the government submitted at the detention hearings, including the following facts, clearly supports Judge Epps's findings regarding the Defendant's contempt for America:

- The Defendant researched opportunities to access classified information (multiple searches for jobs requiring a security clearance on ClearanceJobs.com) at the same time in November 2016 that she searched for information about anti-secrecy organizations such as Anonymous and Wikileaks.

- On or about February 9, 2017, immediately after undergoing her initial security training with Pluribus International and swearing an oath promising to keep secret the classified information she learned, the Defendant sent a message to her sister, via Facebook, in which she said at her security training "*it was hard not to laugh*" when the security officer said, "'yeah so uh we have guys like Edward Snowden who uhh thought they were doing the right thing, but you know, they weren't so uh we uh have to keep an eye out for that insider threat, especially with contractors'" (emphasis added).

- On or about February 25, 2017, the Defendant messaged her sister, "I have to take a polygraph where they're going to ask if I've ever plotted against the gov't. #gonnafail."  She then said, "Look, I only say I hate America like 3 times a day."  When the Defendant's sister sought to clarify, "But you don't actually hate America, right?", the Defendant responded affirmatively, "I mean yeah I do it's

8

      literally the worst thing to happen on the planet.  We invented capitalism the downfall of the environment."

- On or about March 7, 2017, the Defendant searched for online information about Vault 7, Wikileaks's alleged compromise of classified government information. Later on March 7, 2017, the Defendant engaged in a Facebook chat with her sister in which she expressed her delight at the impact of the alleged compromise reported by Wikileaks.  The Defendant told her sister that Vault 7 was "so awesome" and that it had "crippled the program."  When her sister asked, "So you're on Assange's side," the Defendant responded affirmatively, "Yes.  And Snowden."

The Defendant asks this Court to dismiss the Defendant's statements as mere "hyperbole."  Dkt. No. 128 at 9.  That position, however, is belied by the Defendant's own conduct:  in the months subsequent to making these statements, the Defendant searched for classified information—which she knew, based on her extensive security training, could cause exceptionally grave damage to the United States if disclosed—and disclosed it to a news outlet.

Finally, the Defendant incorrectly claims that Judge Epps ignored testimony of Special Agent Garrick that certain steps that the Defendant undertook, on their own, could be innocent. *Id.* at 9-10.  The Defendant selectively quotes from the Epps Order, omitting Judge Epps's full statement that "*Viewed in totality*, SA Garrick described [the Defendant's] activities as preparation of a 'covert communications package.'"  Dkt. No. 115 at 6 (emphasis added).  The Defendant's activities included searching for "tor email"; writing notes describing how to download and install Tor on its most secure setting; researching how to swap SIM cards; researching burner email accounts ("slippery.email"); writing down the URL for a burner email account, which grants the user access to the account; and possessing, on a piece of paper that accompanied the notes about the burner email account, highly sensitive information relating to

9

foreign intelligence targets associated with terrorist activity. As indicated by his phrasing, Judge Epps considered that, as Special Agent Garrick testified, although certain of the Defendant's actions could standing alone be innocent (e.g., replacing a SIM card in a cellular phone), the Defendant's actions, when viewed in their totality, supported a different inference. *See* Tr. at 32-40.

### 2. Judge Epps Properly Considered Case Law in Rendering His Decision

Second, the Defendant argues that Judge Epps did not properly consider cases in which defendants have been released pending trial, even criticizing Judge Epps for not mentioning by name all of the (inapposite) cases cited by the Defendant.[3] This criticism wholly overlooks Judge Epps's explanation that a detention analysis "does not lend itself to easy comparisons across cases because of its intense focus on the unique facts of each case and the unique characteristics of each defendant." Dkt. No. 115 at 3. Similarly, as the government previously stated:

> detention decisions must be considered on a case-by-case basis, and none of the defendants in any case cited by the defense presents the unique circumstances presented here: a defendant who has shown repeated contempt for her country; devised and executed a plan to harm her country; has conducted herself in a manner since arrest that shows she still harbors that contempt and intends to further harm our country, as evidenced by her lack of remorse in recorded

---

[3] The Defendant even claims that for cases that Judge Epps did distinguish, like the *Petraeus* case, "the analysis was incomplete." Dkt. No. 128 at 11. Putting aside that Petraeus was not charged with disclosing national defense information to a news outlet, it should be readily apparent that, for a detention analysis, a misdemeanor charge punishable by imprisonment for "not more than *one year*," 18 U.S.C. § 1924 (emphasis added), is not comparable to a felony charge punishable by imprisonment for "not more than *ten years*," 18 U.S.C. § 793 (emphasis added).

10

telephone comments and threat to "go nuclear in the press" unless this Court releases her; and a demonstrated desire to live abroad and the resources and skills necessary to do so. The weight of the evidence against the Defendant is overwhelming, and unlike many of the defendants identified by the defense, so is the sentence the Defendant is facing.

Dkt. No. 99 at 10.[4]

### 3. Judge Epps Considered, and Rejected, Releasing the Defendant Pursuant to Conditions

The Defendant's contention that Judge Epps did not consider whether certain conditions would reasonably assure the Defendant's appearance and the safety of the community is incorrect. None of the cases cited by the Defendant requires the Court to address separately why each condition proposed by the Defendant is inadequate. *Cf. United States v. Gerkin*, 570 F. App'x 819, 822-23 (10th Cir. 2014) (finding the record inadequate where the magistrate judge made *no* oral or written findings on the dispositive issues and the district judge merely summarized the magistrate judge's decision in a two-sentence order). Judge Epps determined that "no condition or combination of conditions" would be sufficient and issued detailed findings in support. For example, the Court explained that the Defendant surrendering her passport was not sufficient to assure her appearance, given the Defendant's "self-described desire to 'burn the White house down' and '[f]ind somewhere in Kurdistan to live . . . or Nepal.'" Dkt. No. 115 at 8 (quoting Gov. Ex. 7). In addition, the Court should dismiss the Defendant's argument that Judge

---

[4] The government also distinguished the cases cited by the Defendant and provided an example of a case, *United States v. Harold Martin III*, No. 1:17-cr-00069-MJG (D. Md.), where the defendant has been charged under 18 U.S.C. § 793(e) with the unlawful retention of national defense information, and is detained pending trial. *See* Dkt. No. 99 at 9-10.

11

Epps should have specifically addressed the Defendant's declaration offering to abide by any condition imposed. The Defendant violated one of the most important oaths a person can make to protect the United States, and as Judge Epps noted, she appears to have taken that oath with the express intent to violate it. *See id.* at 5 (finding that the Defendant "began preparations to leak classified information from the very outset of her work"). There is no reason to believe she will have any greater respect for potential conditions of release imposed by this Court, or that she would enter any promise to the Court without purpose of evasion.

### 4. Judge Epps Fairly Considered the Relevant Factors and Evidence

Fourth, the Defendant argues that Judge Epps did not make enough "favorable" statements about the Defendant, which show "imbalanced treatment" of the Defendant. Dkt. No. 128 at 14; *see also id.* at 13-14. This claim, too, is no reason to vacate the Epps Order. The Defendant's examples of "imbalanced treatment" do not withstand scrutiny. For example, the Defendant accuses Judge Epps of making statements "reflecting a lack of perspective" because he cited comments *made by the Defendant* about Julian Assange and Edward Snowden. The Defendant also argues that Judge Epps should have acknowledged the Defendant's self-serving comment in which she expressed uncertainty about the effect of her disclosure. Dkt. No. 128 at 13. Her comment is not relevant to any element of the crime and therefore is not relevant to the weight of the evidence. In addition, as the government explained in a classified setting at the detention hearing, with the Defendant present, exceptionally grave harm did result from the Defendant's crime. Finally, Judge Epps duly credited the Defendant's military service, lack of criminal record, and "loving and committed parents," Dkt. No. 115 at 5, before deciding that

those qualities did not overcome the factors in favor of detention.  The Defendant's suggestion that Judge Epps did not consider the relevant factors in deciding to detain the Defendant is without merit and should be rejected by this Court.

### B. The Factors Under the Bail Reform Act Weigh in Favor of Detention

As explained previously by the government, and as Judge Epps found, the four factors in the detention analysis clearly weigh in favor of detention.  Those factors are:  (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the Defendant's history and characteristics; and (4) the danger the Defendant presents to the community.  Rather than restate its arguments, the government refers the Court to its prior filing.  *See* Dkt. No. 99.  The government here responds only to the arguments raised by the Defendant in her latest brief.  *See* Dkt. No. 128.

#### 1. Nature and Circumstances of the Offense

The Defendant's only argument concerning the nature and the circumstances of the offense is that Congress did not include 18 U.S.C. § 793(e) in its list of crimes for which there is a rebuttable presumption in favor of detention.  Dkt. No. 128 at 15-16.  This point is without significance because Judge Epps did not rely upon such a presumption; he made detailed findings specific to the Defendant rather than the charge.

#### 2. Weight of the Evidence

At the outset, the Defendant notes that the parties disagree as to the elements of the crime.  The Defendant then claims because the Defendant's iteration of the elements is "more stringent," it should control.  *See* Dkt. No. 128 at 16-17.  Under this theory, the Defendant could

(as she has) invent elements of the crime that do not exist, and require the government to provide evidence on any such invented element to support detention. The Court should disregard that baseless argument, and rely instead on the government's well-supported brief articulating the actual elements of the crime. *See* Dkt. No. 122. In any event, the dispute between the parties is irrelevant for purposes of detention, as the government's case would be strong even considering the elements the Defendant proposes to add to the charged crime.

In finding that the "evidence against Defendant is strong," the Court relied on the Defendant's admissions to law enforcement, which are corroborated by both her recorded jail calls and circumstantial evidence. Dkt. No. 115 at 4. The Defendant in no way challenges the compelling circumstantial evidence of her guilt and says nothing of relevance regarding her admissions. The circumstantial evidence, which is uncontested by the Defendant, includes, but is not limited to, the following: (1) records from the Defendant's workplace show only two individuals who printed the reporting and the attachment (both documents were transmitted to the online news outlet by mail shortly thereafter); (2) records further show that of these two individuals, only the Defendant was in contact with the news outlet; (3) the envelope in which the intelligence reporting was sent was postmarked, "May 10, Augusta GA" (the day after the Defendant printed the reporting, from the city where she resided); and (4) the Defendant's online searches regarding how to leak documents, and subsequent searches to see whether the document she leaked had been published. *See* Dkt. No. 99 at 13-16.[5]

---

[5] Although it is not material to Judge Epps's analysis, the government notes that Special Agent Garrick did not testify that the Defendant was one of only six individuals who accessed the

14

Moreover, instead of addressing her clear admissions regarding her conduct, the Defendant cites to irrelevant testimony of her sister trying to explain away those admissions. Dkt. No. 128 at 17. The Defendant's admissions speak for themselves, *see, e.g.*, Dkt. No. 99 at 14; Gov. Ex. 6B ("I leaked a document. And they were able to trace it back to me. And it's kind of an important one."), and summarize precisely why the Defendant is facing criminal charges.

The Defendant's other arguments regarding her admissions are equally meritless. The Defendant relies on a motion to suppress not yet briefed fully to the Court, as the government's response is not due until December 4, 2017. *See* Dkt. No. 128 at 17. After again misstating the elements of the crime, the Defendant makes a blanket unsupported statement that the government has produced little if any evidence related to *mens rea*. *See id.* at 18. As the government has explained, however, it must show only that the Defendant committed the charged conduct knowing that her actions were unlawful. *See* Dkt. No. 122 at 9. Given the Defendant's employment and security clearance history, with the attendant extensive security training she received, this is a low hurdle for the government. *See id.* Finally, probably realizing the overwhelming nature of the weight of the evidence against the Defendant, the Defendant argues that the "weight of the evidence" factor is not significant. Dkt. No. 128 at 18. However, "weight of the evidence" is one of the four primary factors for this Court to consider, and therefore an

---

report. A greater number of individuals accessed it. Rather, Special Agent Garrick testified that an internal audit by the agency initially indicated that six individuals had printed the intelligence reporting, but subsequent investigation revealed that only two individuals had in fact printed the reporting and attachment (both of which were transmitted to the online news outlet). *See* Tr. at 22-23.

15

important one. *See United States v. English*, 629 F.3d 311, 317 (2d Cir. 2011) ("The weight of the evidence against the defendant is a factor that is to be taken into consideration. Defense counsel suggested it is not an important factor. As far as this Court is concerned, it is one of the most important factors to consider." (quoting district court opinion)).

### 3. History and Characteristics of the Defendant

In arguing that the history and characteristics of the Defendant weigh in favor of pretrial release, the Defendant states that she has no criminal history and served her country honorably. Dkt. No. 128 at 19. As noted above, Judge Epps gave the Defendant the credit she is due in that regard. Balanced against those positive factors, however, the Court discussed the countervailing, overwhelming evidence related to the "Defendant's state of mind, short length of time residing in the community, few family ties, and past conduct" in ordering her detained. Dkt. No. 115 at 5.[6] The Defendant cannot refute Judge Epps's findings. She offers no explanation as to why she misused a Top Secret computer or developed a covert communications package. As explained above, the Defendant's troubling writings concerning her hatred of America, desire to burn down the White House, and admiration for other leakers cannot simply be dismissed because of her purported "interesting sense of humor." Dkt. No. 128 at 20. The Defendant's actions, as Judge Epps said, "strongly suggest[] Defendant was planning to leak classified information from the outset of her NSA employment, while all the while swearing allegiance to the United States and

---

[6] The Defendant makes much of her mother's willingness to live with her in Augusta, yet admits that her mother and step-father "reside in Texas." Dkt. No. 128 at 5.

16

promising to safeguard its national secrets." Dkt. No. 115 at 6. Such history and characteristics counsel strongly against pretrial release.

### 4. Nature and Seriousness of Danger Posed by Release

Despite the Defendant's dismissing "as absurd" the government's concern about recruitment by a foreign intelligence service, that concern is real. As the government explained previously, the Defendant possesses knowledge of highly classified U.S. Government information and is unemployable in her most marketable fields of expertise. *See* Dkt. No. 99 at 21. The Defendant has also expressed contempt for the United States and has acted in accordance with this contempt by harming it. Or, as Judge Epps concluded, "[b]y her own words and actions, Defendant has painted a disturbing self-portrait of an American with years of national service and access to classified information who hates the United States and desires to damage national security on the same scale as Julian Assange and Edward Snowden." Dkt. No. 115 at 7. Nothing in the Defendant's brief undermines that statement.

On the other hand, the Defendant's complete lack of contrition shows that she is likely to inflict further damage on the United States if given the opportunity. *See, e.g.*, Tr. at 112 (Winner's sister acknowledging that Winner said, "Yeah, I keep telling myself to act more like I think I did something wrong" with sort of a laugh); *id.* (Winner's sister acknowledging that Winner said, "Like pretend like I really feel in my heart regret what I did and that I did something wrong. Not because I'm in jail right now because what I did was inherently wrong."); Gov. Ex. 6B. This lack of contrition, combined with the Defendant's knowledge of highly

17

classified U.S. Government information, clearly indicates that her release would pose a serious danger to the community.

### C. No Conditions Can Reasonably Assure the Defendant's Appearance or the Safety of the Community

In weighing the above factors, it is evident that no conditions of release, including those proposed by the Defendant, will reasonably assure the Defendant's appearance or the safety of the community. First, as Judge Epps recognized, no conditions would adequately protect against flight. The Defendant has a strong desire to relocate abroad, the added incentive to do so given the charges she is facing, the ability to flee, and has exhibited duplicity throughout the commission of the crime and a lack of remorse in its aftermath. *See* Dkt. No. 115 at 7-8. No conditions—including appointing a third-party custodian, travel restrictions, regular contact with a pretrial officer, a monitoring bracelet, surrender of passport, or bond—are sufficient to overcome the substantial risk of flight she poses. Second, no conditions of release can adequately protect against further unauthorized disclosures by the Defendant. Specifically, the Defendant's communications can be adequately monitored only if she is imprisoned. *See* Dkt. No. 99 at 21 (explaining why only imprisonment ensures the certainty of restrictions and why the Defendant's assurances are not persuasive). The Defendant's surrender of electronic devices and empty promise that she will not contact the media are insufficient.[7] Accordingly, the Defendant should remain detained pending trial.

---

[7] At the same time that the Defendant filed a brief professing her willingness to forego contact with the media, the Defendant put a member of the media on her jail visitor list. On October 14, 2017, that member of the media came to visit the Defendant. The member of the media met with

18

## IV.    CONCLUSION

For all of the reasons stated in the Epps Order, the government's prior detention brief, the evidence presented at both detention hearings, and other reasons stated above, there are simply no conditions of release that will reasonably assurance the Defendant's appearance or the safety of the community.  This Court, like Judge Epps, should order the Defendant detained pending trial.

           Respectfully submitted,

           R. BRIAN TANNER
           UNITED STATES ATTORNEY

           *//s// Jennifer G. Solari*

           Jennifer G. Solari
           Assistant United States Attorney


           *//s// David C. Aaron*

           David C. Aaron
           Trial Attorney
           U. S. Department of Justice
           National Security Division

           *//s// Julie Edelstein*

           Julie A. Edelstein
           Trial Attorney
           U. S. Department of Justice
           National Security Division

---

the Defendant, but jail personnel discovered that the visitor was a member of the media and terminated her visit.

## **CERTIFICATE OF SERVICE**

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 26th day of October, 2017.

                                           R. BRIAN TANNER
                                           UNITED STATES ATTORNEY

                                           **//s// *Julie A. Edelstein***

                                           Julie A. Edelstein
                                           Trial Attorney

600 E Street, N.W.
Washington, D.C. 20004
(202) 233-2260