IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| vs. | * | CR 117-034 |
| | * | |
| REALITY LEIGH WINNER | * | |

**O R D E R**

Pursuant to 18 U.S.C. § 3145(b), Defendant Reality Leigh Winner has filed an appeal from the United States Magistrate Judge's Detention Order of October 5, 2017.[1] After an independent and *de novo* review of the detention proceedings before the Magistrate Judge, the arguments of counsel in brief, and the relevant law, the Court finds that detention is appropriate and therefore affirms the Detention Order.

**I. LEGAL STANDARD**

When the Government seeks to detain a defendant pending trial under the Bail Reform Act, the Court must determine whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and

---

[1] Section 3145(b) contemplates that the detained defendant will file a motion to revoke the detention order rather than an "appeal." Because there is no substantive difference, the Court will use the term chosen by Defendant.

the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). A hearing for that purpose will be conducted upon motion of the Government in a case that involves "a serious risk that such person will flee."[2] 18 U.S.C. § 3142(f)(2)(A). The Government bears the burden of demonstrating a serious risk of flight by a preponderance of the evidence. United States v. Medina, 775 F.2d 1398, 1402 (11th Cir. 1985).

This Court's review of the Magistrate Judge's decision is *de novo*. United States v. Hurtado, 779 F.2d 1467, 1481 (11th Cir. 1985) (stating that the district court "is not constrained to look for abuse of discretion or to defer to the judgment of the prior judicial officer" when reviewing detention decisions). In assessing the Government's proof, the Court shall consider the following relevant factors: (1) the nature and circumstances of the offense charged; (2) the

---

[2] The Government cannot move for detention on the basis that Defendant poses a danger to the community under 18 U.S.C. § 3142(f)(1) because she does not meet any of the criteria set forth therein. United States v. Giordano, 370 F. Supp. 2d 1256, 1258-62 (S.D. Fla. 2005); accord United States v. Twine, 344 F.3d 987 (9th Cir. 2003); United States v. Byrd, 969 F.2d 106, 110 (5th Cir. 1992); United States v. Friedman, 837 F.2d 48 (2d Cir. 1988); United States v. Himler, 797 F.2d 156 (3d Cir. 1986). Importantly, the "dangerousness" of this Defendant is still a factor to be considered under 18 U.S.C. § 3142(g)(4). Giordano, 370 F. Supp. 2d at 1261 n.1. Moreover, the "dangerousness" of Defendant as a factor also "emanates" from § 3142(e)(1)'s requirement that the Court consider whether any condition(s) may reasonably assure the safety of the community. See King, 849 F.2d at 487.

weight of the evidence against Defendant; (3) the history and characteristics of Defendant, including character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release. 18 U.S.C. § 3142(g). In conducting the review, this Court may rely entirely on the pleadings and evidence developed during the Magistrate Judge's detention proceedings, or it may conclude that additional evidence is necessary and conduct its own evidentiary hearing. United States v. King, 849 F.2d 485, 490 (11th Cir. 1988). Here, the Court has determined that another hearing would not aid in this decision, particularly because the Court had the benefit of the transcripts of two prior detention hearings and the thorough and reasoned briefs of counsel. Further, no additional evidence is required, and there are no relevant factual disputes that require further evidence. Thus, Defendant's request for a hearing on this matter is denied.

3

## II. ANALYSIS

On appeal, Defendant argues that the Magistrate Judge ignored certain favorable evidence, made findings that are unsupported by the evidence, and as a whole, improperly balanced the evidence. Consequently, the Magistrate Judge erred in finding that Defendant is a serious risk of flight. Defendant also argues that the Magistrate Judge failed to consider factors and conditions that would reasonably assure the safety of the community and her appearance at trial.

After conducting a *de novo* review of the entire record, including the transcripts of the two detention hearings, the Court finds that the Order of Detention accurately and thoroughly sets forth both the facts and the law. Despite Defendant's contentions, the Magistrate Judge properly considered the factors giving rise to detention and properly concluded that no condition or combinations of conditions would reasonably assure the safety of the community and Defendant's appearance at trial. This Court will now examine the factors set forth in the Bail Reform Act, 18 U.S.C. § 3142(g), all of which weigh against Defendant, while addressing Defendant's assertions of error on appeal.

    A.   <u>Nature and Circumstances of the Offense Charged</u>

Defendant is charged with a violation of 18 U.S.C. § 793(e), which provides in relevant part:

> Whoever having unauthorized possession of, access to, or control over any document . . . related to the national defense, willfully communicates, delivers, transmits, or causes to be communicated, delivered or transmitted . . . to any person not entitled to receive it . . . shall be fined . . . or imprisoned.

The Magistrate Judge concluded that the "nature and circumstances of the offense weigh in favor of detention because of the ongoing risk to national security posed by releasing Defendant . . . ." (Detention Order, at 2.) While a violation of 18 U.S.C. § 793(e) does not create a rebuttable presumption in favor of detention,[3] the superseding indictment nevertheless charges that Defendant willfully transmitted a classified, top-secret[4] document without authority to an online news outlet, which was not entitled to receive it. (See generally Superseding Indict., Doc. 72.) A plain reading of the indictment demonstrates the serious nature of the offense. Coupled with evidence that Defendant had access to classified information during her service in the Air Force and with the NSA, particularly in light of the "covert

---

[3] Contrary to Defendant's emphasis on this point, the fact that the offense charged does not create a rebuttable presumption of detention is not determinative of this particular factor; if it was, there would be no reason to list this factor as an independent relevant consideration.

[4] A document is classified "TOP SECRET if the unauthorized disclosure of that information could be expected to cause ***exceptionally grave damage to the national security***." (Superseding Indict., ¶ 3 (emphasis added).)

5

communications package" (discussed <u>infra</u>) that she had created around the time of taking the NSA position and her apparent antipathy toward the United States of America, the gravity of Defendant's alleged crime is unassailable. The fact that Defendant has been charged with one count-related to one transmission of one document-does not mitigate the serious nature of the offense, especially given that the matter may affect national security.[5]

B. <u>Weight of the Evidence</u>

At the time of the execution of the search warrant of her home, Defendant admitted to FBI Special Agent Justin Garrick that she willfully secreted the classified document out of the NSA and mailed it to the online news outlet, which did not have authority to receive it.[6] (Tr. of

---

[5] Defendant harps on the fact that she has only been charged with the disclosure of "one document, one time, to one recipient, with no allegations of financial gain." (E.g., Def.'s Appeal Br., Doc. 128, at 13.) The Court finds this fact to be of little importance because it may reasonably be said that the Government caught this Defendant before any more damage could be done. Indeed, Defendant had only recently begun her employment with the NSA contractor, Pluribus International, and had only recently researched how to disclose information to news outlets anonymously. Also, financial gain is not the only reason a person may disclose classified information to a news outlet. These other takes on the "only once" argument are reasonable given the evidence discussed <u>infra</u> regarding Defendant's development of a "covert communications package," her antipathy toward America, and her research into living and working abroad.

[6] In fact, Defendant initially denied taking any document out of the NSA building. (Tr. of Interview, at 08145-

6

Interview, Doc. 100, Ex. A, at 08161-62.) While Defendant has disputed the specific elements of this crime, particularly whether the classified document was related to the national defense[7] and whether she possessed the requisite *mens rea* to be found guilty, at this point in the proceeding, her admission to these relevant facts appear to hit upon all the elements of the crime.

Defendant complains that the Magistrate Judge did not consider that the initial statements to the FBI during the execution of the search warrant are subject to a pending motion to suppress. The motion to suppress, however, has not been fully vetted and is certainly not resolved; thus, at this point it is immaterial. Besides, in addition to the admissions to the Special Agent, Defendant has also made statements to her sister that she "screwed up" and that she "leaked a document." (Detention Hr'g Tr., Sept. 29, 2017, Doc. 109, Ex. 6.) The use of the word "leaked" indicates a

---

46.) And, when she admitted that she had printed a classified document, she initially claimed to have placed it in the burn bag and denied taking it out of the building or mailing it to anyone. (<u>Id.</u> at 08152-08158.) This suggests a certain level of deception.

[7] As pointed out by the Magistrate Judge, Defendant admitted that she knew the document contained information regarding sources and methods of collecting classified information that would be valuable to adversaries of the United States. (Detention Order, at 4; Tr. of Interview, at 08172.)

7

certain consciousness of wrongdoing because lawful possession and transmission would not be called a "leak." Moreover, as expressed by the Magistrate Judge (Detention Order, at 3), the investigatory facts which led the FBI to the independent conclusion that Defendant was the source of the leaked document will be compelling evidence against her.[8]

    C.   History and Characteristics of Defendant

The Court first notes that Defendant believes the Magistrate Judge overlooked the positive characteristics and history of Defendant, such as her honorable service to the country, her humanitarian aspirations, her strong family ties, and her lack of a criminal history. In point of fact, the Magistrate Judge opened his discussion of this factor noting: "Characteristics weighing in favor of Defendant's pretrial release are her service in the Air Force, clean criminal

---

[8] At the detention hearing on September 29, 2017, Special Agent Garrick testified that of the six individuals that printed the subject document, only two had printed both the Intelligence Report and the attachment, both of which ended up in the possession of the online news outlet. Of the two, the investigation revealed that the document was printed by Defendant on May 9, 2017, that the document was mailed from Augusta, Georgia on May 10, 2017, and that Defendant had contacted the recipient news media outlet. (Detention Hr'g Tr., Sept. 29, 2017, at 22-24.) The investigation also revealed that on the day the classified document was printed, Defendant had researched online how to anonymously submit information to two news outlets. (Id. at 27.) After that date, Defendant performed several searches for those news outlets and information related to the potential leak of classified information to see "if leaked information had been published by those particular media outlets." (Id.)

8

history, and loving and committed parents." (Detention Order, at 5.) The Magistrate Judge then went on to find that negative factors outweighed the positive, pointing to her state of mind, few community ties, and past relevant conduct. Specifically, the Magistrate Judge found compelling evidence to support this finding: "Defendant admittedly 'hates' America, misused a top-secret computer during her Air Force career, admires Edward Snowden and Julian Assange, and began preparations to leak classified information from the very outset of her work as an NSA subcontractor." (Id.) Defendant takes particular umbrage at the characterization that she "hates" America and that she "admires" Edward Snowden and Julian Assange.

Upon a *de novo* review of the evidence submitted at the detention hearing of September 29, 2017, particularly the testimony of Special Agent Garrick, this Court similarly concludes that the negative implications from the evidence pertaining to Defendant's character, her mental state, her conduct in the months before her arrest, and her lack of community ties significantly outweigh the positive aspects of her family ties, commendable service in the Air Force, care for environmental issues and animals, humanitarianism, and lack of criminal record.

The Court will now recount the evidence that supports this finding:

9

- On November 9, 2016, while in the waning days of her service in the Air Force, Defendant researched whether a top secret computer will detect a thumb drive. On this same day, Defendant inserted a thumb drive into a top secret computer for approximately two minutes. (Detention Hr'g Tr., Sept. 29, 2017, at 48-49.) The Government has not located the thumb drive.

- Immediately after removing the thumb drive, Defendant printed a top secret intelligence report which was "not associated in any way with [her] duties/assignments." The Government does not know what Defendant did with the document. (Id. at 49.)

- Defendant performed multiple searches for jobs requiring a security clearance in November 2016 at the same time that she researched for information pertaining to the Taliban and for information about an organization called Anonymous, an affiliation of hackers. (Id. at 50-51.)

- In handwritten notes apparently regarding employment opportunities, Defendant writes "I want to burn the whitehouse down. Find somewhere in Kurdistan to live . . . or Nepal haha maybe." (Id. at 32, Ex. 7.)

- Included in Defendant's handwritten notes are references to Taliban military leaders. (Id. at 37, Ex. 7.) Defendant also performed internet searches in October, November, and December of 2016 for the Taliban media website, the Taliban office in Qatar, and the Taliban YouTube channel. (Id. at 37-38, Ex. 8.)

- Other internet searches involve traveling, working and living in Kuridstan, Iraq, Afghanistan, Jordan and Palestinian territories, to include information pertaining to flights to Kurdistan and Erbil, moving to Palestine, and obtaining visas for Kurdistan and Afghanistan. (Id. at 40-42, Ex. 8.)

- On February 7, 2017, two days prior to her first day of employment with the NSA contractor, Pluribus International, Defendant captured a screenshot of how to securely drop information to eight different news outlets. The image is titled, "If you see abuse. Leak it." (Id. at 26, Ex. 4.)

10

- On February 9, 2017, immediately after undergoing her initial security training with the NSA, Defendant sent a message to her sister, in which she said of her security training "it was hard not to laugh" when the security officer said "'yeah so uh we have guys like Edward Snowden who uhh thought they were doing the right thing, but you know, they weren't so us we uh have to keep an eye out for that insider threat, especially with contractors.'" (Id. at 42-43, Ex. 9.)

- On February 25, 2017, Defendant messaged her sister, "I have to take a polygraph where they're going to ask if I've ever plotted against the gov't. #gonnafail." She then said, "Look, I only say I hate America like 3 times a day." When Defendant's sister asked, "But you don't actually hate America, right?", Defendant responded: "I mean yeah I do it's literally the worst thing to happen on the planet. We invented capitalism the downfall of the environment." (Id. 44, Ex. 11.)

- On March 7, 2017, Defendant messaged her sister that Vault 7[9] was "so awesome" and that it had "crippled the program." When her sister asked, "So you're on Assange's side," Defendant responded, "Yes. And Snowden." (Id. at 45, Ex. 12.)

- Defendant wrote notes describing how to download and install Tor[10] on its most secure setting; researched how to swap SIM cards on her phone; researched burner email accounts (e.g., slippery.email); and wrote down the URL for a burner email account. (Id. at 32-36.)

---

[9] Vault 7 is Wikileak's alleged compromise of classified government information. (Detention Hr'g Tr., Sept. 29, 2017, at 45.)

[10] The Tor network "is a method in which someone can access the internet -- not only the internet, but also the deeper, dark web on a completely anonymous level." (Detention Hr'g Tr., Sept. 29, 2017, at 34.) The Tor network was installed on a computer in Defendant's home on February 1, 2017, several days after Defendant was hired by Pluribus International and ten days prior to her start date. (Id. at 34; Tr. of Interview, at 08144.)

11

- On the note about the burner email account, there is "specific identifying information related to foreign intelligence targets associated with terrorism activity being followed by the U.S. Government as part of its national security mission." (Id. at 39-40.)

The first point to take from this evidence is that the use of the word "hate" by the Magistrate Judge was not of his choosing, but was the word that Defendant herself used in her message to her sister. "Hate" is also an apt word to describe a person's emotion that noted she would like to burn the White House down. And while Defendant, through the testimony of her sister, would pass this off as "hyperbole" (Detention Hr'g Tr., Sept. 29, 2017, at 104), the conclusion that Defendant hates America is justifiable. Also, while Defendant offered other non-nefarious reasons that a person may research TOR, burner email accounts, and SIM cards, Special Agent Garrick testified that "taken into its totality, it appears as though it's a covert communications package or could be one. . . . [It] is a way in which an individual can communicate anonymously with another." (Id. at 36.) The credit that the Magistrate Judge and this Court give to the agent's testimony, over Defendant's proffer that there are benign reasons for each of these acts taken alone, is reasonable, especially in light of evidence that Defendant researched ways to send information to news outlets anonymously and accessed classified information outside of her job duties. In short,

12

Defendant attacks the Magistrate Judge's reasonable conclusions from the evidence as "sweeping" and "unsupported" (Def.'s Appeal Br. at 9), yet taking all the evidence in its totality, the Court finds the Magistrate Judge's Detention Order to be sustainable and indeed, correct in its ultimate ruling.[11]

In conclusion, the aforementioned evidence shows a person who sought out employment in a classified position with the intent to anonymously share information with news outlets and to cover her tracks while doing so. Defendant argues that she had a legitimate interest in the Middle East and religion, given her background and education. She also has strong humanitarian and environmental bents, as well as an interesting sense of humor, that can explain some of her comments. But Defendant's gloss on the evidence, painted primarily through the testimony of her sister, is but one view of the story. Certainly, the Magistrate Judge and now this Court are free to reject Defendant's gloss-the minimalization of her admitted behavior-and accept the reasonable inference

---

[11] While Defendant quibbles with the Magistrate Judge's characterization of Defendant as an admirer of Snowden and Assange, her comments to her sister endorse the conduct of these men. No matter the word choice, the point to be taken from the evidence is that Defendant condoned divulging classified information as she was "on their side." What the Magistrate Judge did not do in his Detention Order, contrary to Defendant's assertion, was equate Defendant's conduct to the "extreme conduct" of Snowden and Assange. (See Def.'s Appeal Br., at 2.)

13

from the evidence that Defendant's past conduct and state of mind are of serious concern.

    D.    <u>Nature and Seriousness of Danger Posed by Release</u>

Having found that Defendant may have accepted a position with the NSA with intentions to leak information to news outlets, it is not a leap to find Defendant's potential release troubling.  The classified document she printed and the thumb drive she inserted while in the employ of the Air Force are unaccounted for.  Further, while the Government has not been able to conclude that Defendant has or had in her possession other classified documents, it has not concluded that she has not had further access to classified information.  (Detention Hr'g Tr., Sept. 29, 2017, at 91.)  Given the uncertainty with respect to Defendant's level of knowledge or possession of classified information, together with evidence that she planned to anonymously release information to online news outlets and that she has antipathy toward the United States, the Court finds that releasing Defendant prior to trial would pose a danger to the community, particularly to the national security.

As discussed, the statutory factors for consideration each weigh in favor of the Government.  Additionally, the Government has presented other significant evidence relative to Defendant's risk of flight.  As mentioned, Defendant has few ties to this community, she has shown a strong intent to

live and work abroad, and she has demonstrated an interest in matters of the Taliban. She even researched airline flights to Kurdistan and Erbil and work visas in Afghanistan. This desire to live abroad is no doubt quickened by facing a felony charge brought by United States of America. Further, the Court finds that Defendant's fluency in Farsi, Dari, and Pashto would enable her to live and sustain herself in many Middle Eastern countries, and the $30,000 in her bank account will provide her with a start. Finally, just prior to her arrest, Defendant demonstrated her propensity for travel with a three-day solo trip to Belize. This evidence takes the chances of Defendant fleeing the jurisdiction of this Court beyond the mere theoretical and into the realm of probable. Indeed, the Court finds by a preponderance of the evidence that Defendant is a serious flight risk.

Defendant complains that the Magistrate Judge did not discuss, and therefore did not consider, whether the proposed conditions on her release would reasonably assure her appearance. The Court, however, need not enunciate every consideration in its Order. It suffices that this Court has considered the proposed conditions (for instance, the surrender of her passport, the posting of a property bond, and her agreement to wear a monitoring bracelet) and reasonably concludes that, based upon evidence that Defendant does not wish to be in America, may even wish to cause harm to national

15

security, and has the means to live abroad, Defendant will flee despite these conditions and assurances. Moreover, Defendant's promises to remain in the county, wear a monitoring bracelet, and refrain from internet usage and contact with the media[12] do not adequately protect against potential further unauthorized disclosures. Classified information cannot be retrieved or un-disclosed once it is released, so the potential of harm to national security is too great a risk to place upon the promises of this Defendant.[13]

### III. CONCLUSION

Upon a *de novo* review of the record, the Court concludes that the Magistrate Judge did not err in ordering Defendant Reality Leigh Winner detained pending trial. While Defendant urges this Court to adopt its view of the evidence, indeed painting a very different picture of Defendant, the Court cannot ignore another reasonable and supported picture of

---

[12] The Government states in a footnote that Defendant had put a member of the media on her jail visitor list and that this visitor came to see Defendant in jail on October 14, 2017. While the jail terminated the visit, this encounter took place just a few days prior to Defendant filing her appeal. (Gov't Br. in Opp'n, Doc. 131, at 18 n.7.)

[13] See King, 849 F.2d at 487 n.2 (explaining that the Senate Judiciary Committee intended a broad construction of "danger to the community" to encompass the risk that the defendant may engage in criminal activity to the detriment of the community (quoting the Report of the Senate Committee on the Judiciary, S. Rep. No. 98-225, 98th Cong., 2d Sess. (1984))).

16

Defendant.  Through its considered view of the evidence, the Court finds by a preponderance of the evidence that Defendant is a serious flight risk and no condition or combination of conditions will reasonably assure the safety of the community (particularly national security) or the appearance of Defendant as required.  Accordingly, the Court **DENIES** Defendant's appeal (doc. 128) and **AFFIRMS** the Magistrate Judge's Detention Order of October 5, 2017.

**ORDER ENTERED** at Augusta, Georgia, this 27th day of November, 2017.

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　J. RANDAL HALL, CHIEF JUDGE
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　　　　　　　　　SOUTHERN DISTRICT OF GEORGIA