**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | ) |
| **v.** | ) |
| | )   **CR 117-34** |
| | ) |
| **REALITY LEIGH WINNER,** | ) |
| | ) |
| **Defendant.** | ) |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
DEFENDANT'S STATEMENTS (DKT. 63)**

NOW COMES the United States of America, by and through Bobby L. Christine, United States Attorney for the Southern District of Georgia, in response to Defendant Reality Leigh Winner's Motion to Suppress Defendant's Statements (Dkt. 63), and shows as follows:

**I.      PROCEDURAL HISTORY**

On June 3, 2017, the Defendant was arrested after federal agents executed a search warrant at her residence for evidence of, *inter alia*, violations of Title 18, United States Code, Section 793(e) (Willful Retention and Transmission of National Defense Information) (hereinafter, "Section 793(e)").  During the execution of the warrant, the Defendant admitted to committing that crime.  The Defendant was arrested and charged by criminal complaint on June 5, 2017, with one count of violating Section 793(e).  On June 7, 2017, a grand jury in the Southern District of Georgia returned a one-count indictment charging the Defendant with violating Section 793(e).  Dkt. 13.  On June 8, 2017, the Defendant entered a plea of not guilty to

1

the charge.[1]  Dkt. 26.  On August 29, 2017, the Defendant filed a Motion to Suppress Defendant's Statements and Request for Evidentiary Hearing, Dkt. 63, and the Government now responds.

## II.    STANDARDS AND BURDENS OF PROOF

Law enforcement officers interviewing a subject are not required to provide warnings pursuant to *Miranda* unless the subject is "in custody."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A defendant claiming to have been interrogated in a custodial setting bears the burden of proving, by a preponderance of the evidence, that she was under arrest or subjected to the functional equivalent thereof at the time the challenged statements were made.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977);[2] *United States v. Peck*, 17 F. Supp. 3d 1345, 1354 (N.D. Ga. 2014) (listing jurisdictions applying the burdens of proof set forth in *de la Fuente*); *United States v. Morris*, 491 F. Supp. 226, 229 (S.D. Ga. 1980).

Whether a defendant was in custody during an interview is a fact-specific determination based on the totality of the circumstances.  *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006).  This test is objective and examines the circumstances from the perspective of a "reasonable innocent person."  *Id.*; *see Florida v. Bostick*, 501 U.S. 429, 437-38 (1991); *Berkimer v. McCarty*, 468 U.S. 420, 422 (1984); *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010).

---

[1] The Defendant was subsequently charged with one count of violating Section 793(e) in a superseding indictment that did not differ substantively from the original indictment.

[2] *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting for the Eleventh Circuit as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981).

Courts apply a two-step analysis to determine whether a subject was "in custody" and therefore entitled to pre-interview warnings for the purposes of *Miranda*.  The "initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,'" a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (citations omitted; alteration in original).  Critically, however, the "freedom-of-movement" test is not dispositive.  Rather, courts ask the additional question "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Fields*, 565 U.S. at 509; *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("[T]he ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (internal quotations omitted)); *Luna–Encinas*, 603 F.3d at 881.

To evaluate whether a defendant was subjected to coercion or restraint equal to that of a formal arrest, courts in the Eleventh Circuit examine factors such as whether law enforcement officers "brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."[3]  *Street*, 472 F.3d at 1309 (citations omitted); *see United States v. Hill*, No. CR 114–028, 2014 WL 5410214, at *10 (S.D. Ga. Oct. 23, 2014). Other relevant factors include "the location of the interview, the existence of physical restraints such as handcuffs or drawn weapons, [and] whether the suspect asked to leave."  *United States v. Dix*, No. 3:12–cr–00007–TCB–RGV, 2013 WL 610219, at *3 (N.D. Ga. Jan. 29, 2013), *adopted by* 2013 WL 609458 (Feb. 19, 2013); *see also Fields*, 565 U.S. at  509 ("Relevant factors include

---

[3] Law enforcement officers do not create a "custodial" situation merely by interviewing an individual, even if the individual is aware of his or her status as a suspect.  *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013) (citing *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000)).

the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints, and the release of the interviewee at the end of the questioning." (citations omitted)); *Luna-Encinas*, 603 F.3d at 881 (including "location and length of the detention" as well); *Matcovich*, 522 F. App'x at 851.

The fact that a defendant is questioned in her own home weighs heavily against a finding of custody. *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006) ("[C]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." (emphasis in original; internal quotations marks and citations omitted)); *see also United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008) ("[C]ourts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature." (citations omitted)).

Notably, detention during the execution of a search warrant is "substantially less intrusive than an arrest" and does not, on its own, constitute custody for *Miranda* purposes. *Dix*, 2013 WL 610219, at *4 ("To hold that detention of a suspect while executing a lawful warrant . . . is the legal equivalent of custody for *Miranda* purposes would run contrary to the Eleventh Circuit's direction to consider the totality of the circumstances." (citation omitted)).  In that regard, even when a defendant's freedom of movement is lawfully curtailed, such as during a traffic stop or the execution of a search warrant, courts have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry.  *McCarty*, 468 U.S. at 437.  Rather, "the freedom-of-movement test identifies only a *necessary* and *not a sufficient* condition for *Miranda* custody."  *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (emphasis added).  During such detention, a defendant is not "in custody" for *Miranda* purposes as long as the environment does not present "the same inherently coercive pressures as the type of station house questioning at

issue in *Miranda*."  *Fields*, 565 U.S. at 509; *see also Luna–Encinas*, 603 F.3d at 881; *Bird*, No.

3:17-cr-1, Dkt. 74, at 36 ("[M]inor restraints on freedom of movement generally do not convert a

non-custodial setting to a custodial setting.").

**III.      ATTACHMENTS IN SUPPORT OF RESPONSE**

>   **A.**  Recorded Interview of Defendant, June 3, 2017 (redacted)
>
>   **B.**  Transcript of Interview of Defendant, June 3, 2017 (redacted)[4]
>
>   **C.**  Photographs taken during search on June 3, 2017
>
>   **D.**  Recorded Phone Calls of Defendant
>
>   **E.**  Partial Transcripts of Recorded Phone Calls of Defendant
>
>   **F.**  Sketch of Defendant's Residence Created June 3, 2017

**IV.      SUMMARY OF ARGUMENT**

The Defendant was not in custody during her interview with Federal Bureau of

Investigation ("FBI") agents at her home on June 3, 2017.  The Defendant, in response to the

agents' noncoercive invitation to speak, agreed and decided to speak with them in her own home.

The agents did not restrain the Defendant in any way or tell her where to go, did not brandish

weapons, yell, make pointed accusations, or use foul language.  They told the Defendant several

times that her participation in the interview was voluntary.  To be sure, agents possessed a search

warrant for the Defendant's person, but the purpose of that warrant was satisfied upon the

Defendant's surrender of her cellular phone.  The Defendant never asked agents about the status

of that search or whether she could depart the premises.  Moreover, the Defendant never asked to

terminate her interview, speak with an attorney, or otherwise remove herself from the agents'

---

[4] For the ease of use, the Government refers to Attachment B herein as "USAO-," followed by
the applicable page number in the Attachment's lower right corner.

presence.  The objective facts of the interview environment, as well as the Defendant's own conduct, establish that a reasonable person would have felt free to terminate the encounter.

Even assuming, *arguendo*, that a reasonable, innocent defendant would not have felt free to leave the premises or otherwise terminate her encounter with agents on June 3, 2017, the circumstances still did not present the same inherently coercive pressures as an arrest or the type of station house questioning at issue in *Miranda*.  The Defendant moved about her home letting her dog out, putting away her groceries, and putting a leash on her cat.  Agents brought the Defendant (and her dog) water and told her to let them know if she wanted to go to the restroom. The Defendant stood in a room with an open, unimpeded doorway and nearby access to the outside.  The entire conversation was conducted in a calm, cordial tone.  No one demanded the Defendant's compliance at any time – to the contrary, agents reminded the Defendant multiple times that her participation was voluntary and that no one would force her to do anything.

Under the totality of the circumstances, a reasonable, innocent person in the Defendant's position on June 3, 2017, would not have understood her freedom of action to have been curtailed to a degree associated with a formal arrest.  Thus, the Defendant was not in custody, *Miranda* warnings were not required, and the Defendant's motion to suppress should be denied.

## V.    FACTUAL BACKGROUND[5]

On June 3, 2017, based upon an application and sworn affidavit presented by FBI Special Agent (SA) Justin C. Garrick, this Court issued a search warrant for the Defendant's residence, her vehicle, and her person.  Dkt. 1, 2.  The warrant authorized agents to search for and seize, *inter alia*, classified and other U.S. Government-owned material, contacts with foreign agents or media outlets, travel and financial information, and any information regarding tradecraft or a motive to commit the alleged offense.  Dkt. 2-2.

At approximately 3:30 p.m. on June 3, 2017, an FBI surveillance team notified SA Garrick and FBI SA R. Wallace Taylor that the Defendant was headed home from a grocery store in her personal vehicle.  SAs Garrick and Taylor, who were stationed along a nearby road in an unmarked vehicle, watched the Defendant pull into her driveway from the main roadway and park.  The agents pulled into the Defendant's driveway from the access road, parked approximately five to ten yards in front of the Defendant's car without blocking it in, and began walking towards her vehicle.  SA Garrick activated a handheld recording device to memorialize his and other agents' interactions with the Defendant.

---

[5] The Defendant's motion describes the Defendant's interview with the FBI inaccurately in several important respects.  The first page alone of the Defendant's motion is replete with false statements and gross mischaracterizations.  For example, the Defendant claims to have been "confronted" by ten officers, Dkt. 63-1 at 1, when she was in fact so gently approached (by only two FBI agents) that she thought they were interested in renting her house.  She claims that she advised the agents that she would "rather not go into" the room in which she was interviewed, *id.*, but in fact, after the agents asked where they could speak privately, the Defendant suggested that room.  She appears to complain that the room was "unfurnished," *id.* at 2, but she herself not only suggested the room, but also joked that she was "not big on furniture."  Finally, she claims that her "two questioners" blocked her exit, *id.*, which is not true—her path to the exit was unobstructed during her interview.  Rather than providing a point-by-point refutation of all of the Defendant's misstatements of fact, the government respectfully submits that the interview transcript, audio recording, and photographs speak for themselves and demonstrate to the Court that the Defendant's dramatic, self-serving statements should not be credited.

SAs Garrick and Taylor, dressed in casual, short-sleeved shirts and khaki pants, approached the Defendant at a walking pace as she stepped out of her vehicle.  Neither agent wore a visible weapon or displayed a weapon to the Defendant.  Instead, both agents displayed their FBI credentials as they introduced themselves and asked the Defendant how her day was going.[6]  The agents told the Defendant the reason for their visit was a search warrant, which pertained to "possible mishandling of classified information."  USAO-08108.  SA Garrick offered to show the Defendant the warrant, and stated, "What I'd like to do is sit down, talk with you a—talk with you about it."  *Id.*  The Defendant responded, "Mm-hmm."  SA Garrick then stated, "Kind of go over what—what's going on.  Uh, talk to you, kind of get your—your side of it.  And, of course, you – completely voluntary to talk to me."  *Id.*  SA Garrick then told the Defendant that she could speak to the agents either at her home or at the FBI office, five minutes away.  *Id.*  The Defendant responded, "Okay."  USAO-08109.

SA Taylor then asked the Defendant if she had any pets.  The Defendant responded that she had two, and SA Garrick asked if they needed to be let out to go to the bathroom.  *Id.*  The Defendant asked if she could put her groceries in the refrigerator.[7]  *Id.*  The agents told her they

---

[6] The gentle nature of the agents' approach is underscored by the Defendant's statements during her interview.  For example, when asked by SA Garrick whether she was surprised to see agents that day, the Defendant replied, "Yeah.  Actually, I thought that [laughs], uh, you were people coming to ask about the house, because it's still for lease online. . . . and then FBI.  I was like, what is going on, you know?  And you showed me your badge right up, and, uhm, I submitted a security packet yesterday, uh, for my clearance on E-QIP.  So, uh, that's what I thought it was for.  I'm like, 'why are you guys going to question me for my own clearance?'"  USAO-08174.

[7] The transcript reflects that different voices were speaking over each other, and the Defendant then said "I do," before asking about the groceries.  The Defendant put her dog in the fenced yard, and agents later gave it water.

needed to check the house first to make sure it was safe, but that the Defendant could go in and get her dog if she chose.  USAO-08109-10.

The agents asked the Defendant for her house key and told her the search warrant also included her car.  USAO-08111.  They also asked the Defendant to provide her cellular phone, which she did.[8]  *Id.*  SA Taylor then reiterated, "but like he said, we're – we're completely voluntary, completely up to you on . . . but, you know, I think maybe it – it'd be worth your time to listen at least for a little bit."[9]  *Id.*  The Defendant replied, "[d]efinitely."  *Id.*

The agents went inside with the Defendant as she detailed where she kept her three firearms.  They asked her not to touch the firearms, but told her that, as she requested, she could put the dog in the backyard and then put her groceries in the refrigerator.  USAO-08112-13.  They informed her "we're probably going to have a few more people showing up here directly," to which the Defendant replied, "of course."  USAO-08113-14.

As the Defendant escorted her dog through the house to the front door, SA Garrick called to the dog, "Hey sweetie – hey sweetie."  USAO-08114.  The Defendant announced she also had a cat who was most likely under her bed.  She asked, "can I close the door for my cat?" to which SA Taylor replied, "yep."  USAO-08115.

The Defendant then removed her groceries from her car as other agents and FBI personnel began arriving at the residence.  USAO-08117.  SA Garrick explained that SA Taylor and another agent were going to walk through the house "just checking to make sure there's nobody else in there or nothing – surprise – surprise us or anything like that."  USAO-08117.

---

[8] At this point, the agents' "search" of the Defendant's person was complete.

[9] Inexplicably, in her declaration, the Defendant in the same paragraph both concedes that agents "advised meeting with [them] was voluntary" and claims that she was not told she could decline the interview.  Dkt. 64 at ¶ 5.

The Defendant stated, "I want to make this as easy for you guys as possible," *id.*, and SA Garrick replied, "Okay.  Likewise.  So, hopefully, explain things, get to, uh, figure this all out and, uh, wrap it up."  *Id.*

Each of the law enforcement personnel who arrived at the house was dressed in a short-sleeved shirt and casual pants.  None of the search participants, including SAs Garrick and Taylor, wore tactical gear, "FBI" raid jackets or hats, or anything else boldly announcing their law enforcement affiliation.  Only two of the ten law enforcement officers or agents who arrived at the home were visibly armed, carrying handguns holstered at their waists.[10]  None of the agents who were armed ever unholstered a weapon, or even touched a weapon, in the Defendant's presence.

For about 90 seconds, as additional search personnel arrived and entered the house, SA Garrick and the Defendant talked outside about their respective rescue dogs.  USAO-08117.  Once the agents confirmed that the Defendant's house was clear of additional persons or items of immediate concern, agents helped the Defendant put her groceries in the refrigerator.  When she finished, the agents asked her to step back outside so the search team could photograph the interior of the house.  USAO-08118.  SAs Garrick and Taylor briefed arriving agents, letting them know there was a cat and a dog on the premises, and SA Garrick asked the Defendant whether her dog needed some water.  The Defendant declined the offer.  USAO-08121.

---

[10] Nine of the ten agents who arrived at the scene carried weapons.  One agent and one additional person assisting the agents and officers, an FBI Intelligence Analyst, were unarmed.

As other agents began photographing the house prior to the search,[11] SA Garrick asked the Defendant whether she preferred to talk at the house or at the FBI office.  The Defendant replied, "let's go ahead and talk here."  USAO-08121.  When asked whether she had a room in the house that was private, the Defendant offered "a spare bedroom that I don't use that's empty."  USAO-08121.  She added, "I don't like to go in there."  *Id*.  SA Garrick asked, "you said you don't like to go in there.  What –" and the Defendant interrupted, "Oh, gosh, it's just creepy.  It's just weird.  It's like an addition to the house behind the kitchen and it's always dirty. . . " and she laughed.  USAO-08122.  SA Garrick said, "we can talk back there if you're fine going back there," to which the Defendant immediately responded, "Yeah, we can go back there."  *Id*.

Agents continued to document the exterior and interior of the house while the Defendant remained outside.  Search participants asked her for the keys to her car and the password for her phone, both of which she provided.  USAO-08123.  The Defendant engaged in lighthearted conversation with SA Garrick about her time in Augusta, her various job aspirations, her language skills, and her military background.  USAO-08124-27.  During their conversation, an agent approached the Defendant and asked again whether her dog was okay, and whether it needed anything.  The Defendant said the dog was "fine," to which SA Garrick remarked, "if you can tell, we're all dog people."[12]  USAO-08127.

---

[11] Notably, one of the first photos taken by the FBI at the search shows the Defendant leaning against the side of the house, by herself, unrestrained, with her feet casually crossed.  *See* Attachment C at 1.

[12] The agents' concern for the Defendant's pets was evident to the Defendant, as evinced by the Defendant's subsequent statement to her mother during a recorded phone call that "I had a bunch of FBI guys worrying about my dog.  Like they were freaking out about my dog."  Attachment D-1 at 1:43-3-36.  She told her sister in another recorded call that "[e]verybody was really

After more casual conversation about dogs, various places to live, and workout routines, USAO-08128-32, the Defendant asked whether the search "was going to be like an 'I-brought-my-phone-into-the-building'-type situation where I don't see that phone for three weeks, or," USAO-08133, as she said she was going to teach yoga the next day and had her music stored on the phone. *Id.* SA Garrick replied that the phone fell within the warrant, and that he would explain everything to her once they sat down. *Id.* The Defendant indicated that she could "make do" without the phone. *Id.* The Defendant laughed and said that they would probably have to sit on the floor, because she was "not big on furniture." *Id.*

As agents tried to find chairs to bring inside the house, the Defendant asked whether she could go into the bedroom and put a leash on her cat. USAO-08133-34. SAs Garrick and Taylor told her that was not a problem, so the Defendant went inside, walked into the bedroom, crawled under the bed, and tethered her cat to the bedpost. USAO-08136. She then accompanied SAs Garrick and Taylor to the rear bedroom, apologizing for it being "dirty," although the room contained nothing more than a folded dog crate leaning against a wall. *See* Attachment C at 2-5.

The Defendant and SAs Garrick and Taylor entered the rear bedroom, which measured approximately 10.5 feet long by 7 feet wide and had two large windows.[13] *See* Attachment C-3; *see also* Dkt. 64 ¶ 6. The window blinds were already down and closed. SA Garrick looked inside a small closet and closed the closet door. Without any direction from the agents, the Defendant chose to stand against the south wall of the room. SA Garrick stood opposite her on

---

worried about [my pets] when they searched my house. Bunch of dog people." Attachment D-2 at 7:53-8:38.

[13] These measurements were provided by counsel for the Defendant on October 27, 2017, after the Defendant's mother indicated, through counsel, that she would not allow the FBI into the residence to measure the room.

the north wall, and SA Taylor stood with his back against the west wall.  *See* Attachment F.  The door to the room, located on the east wall (adjacent to the Defendant), remained completely open,[14] and an exterior door leading to the back yard was approximately four feet away directly across from the doorway.  The exterior door contained a window with blinds that were partially raised.  *See* Attachment C at 2, 4-5.  The agents did not stand between the Defendant and the exterior door, and neither the bedroom door nor the exterior door was blocked at any time during the Defendant's conversation with the agents.  The Defendant was unrestrained, having never been handcuffed or even touched by any of the law enforcement personnel on the premises.

SA Garrick reintroduced himself (as "Justin") and SA Taylor (as "Wally"), and offered to show the Defendant a copy of the search warrant and explain it to her.  He added, "[n]ow, if you're willing to talk with me, like to go through just kind of how this started and, you know, get your side of it and figure out what's going on here.  Okay – does that sound good to you?" USAO-08137.  The Defendant replied "Okay. . . .  Yes."  *Id*.  While asking background questions about the Defendant's date of birth and Social Security number, SA Garrick asked if she was thirsty.  She said she was not, and SA Garrick told her "[i]f you need water, just shout it out."  *Id*.  He also told her "if you need to use the restroom, any of that, let me know.  It's not a big deal."  USAO-08138.  SA Garrick further told the Defendant "if you do feel like, you know, you want to sit or anything like that, we'll sit, okay?  You know, we can sit on the floor, I don't care.  Uhm, if you sit on the floor, I'll sit on the floor."  USAO-08139.  The Defendant laughed, and SA Garrick again offered to sit.  *Id*.

---

[14] This fact is corroborated by a considerable amount of background noise that can be heard on the recording as other law enforcement personnel in adjacent rooms speak to each other and move items.

SA Taylor then explained the components of the search warrant and told the Defendant that the Court had given the agents authority to search the premises, the Defendant's vehicle, and the Defendant.  USAO-08139-40.  The Defendant made a joke about her weight as listed in the warrant, and then said, "Sorry.  I have a sense of humor."  USAO-08140.  SA Taylor also explained the list of property agents were authorized to search for and seize, adding, "[n]ot saying all of that's here, but that's what we're authorized to search for. . . .  [a]nd seize."  *Id*.  SA Taylor provided the Defendant with a copy of the warrant and offered to answer any questions; the Defendant said she did not have any.  USAO-08141.

SA Garrick then stated, "this stems from a report that you had mishandled classified information, okay?  So, that's, uh, the broad scope of it . . . does that ring any bells to you whatsoever?"  *Id*.  The Defendant recounted, in detail, a security incident in February 2017 in which she accidentally removed classified information from the secure portion of her work building to a non-secure area of the same building.  USAO-08141-42.

For the next nine minutes, SA Garrick chatted casually with the Defendant about her job assignments, her neighborhood, and her travel.  USAO-01843-51.  During that conversation, SA Garrick asked gentle questions about whether the Defendant could recall ever accessing classified information beyond her "need to know" or sharing classified information with unauthorized persons.  USAO-08146-47, 08151.  The Defendant said she never searched for or printed information beyond her job assignments, other than helping fellow employees in Maryland, USAO-08146, did not send or otherwise remove classified information from her work building, *id*., and did not discuss classified or other work matters with anyone outside of work. USAO-08147.

14

When asked, "[s]o you're positive you've never printed anything out that was outside of your work role?" the Defendant recounted printing articles from NSA Pulse, a classified intelligence report storage system, which she claimed she used as "scratch paper" and reference material.  USAO-08151.  She maintained, however, that she always properly disposed of the reports in the burn bag and had never removed anything from the building.  *Id*.  The Defendant laughed, and joked that her use of so much paper was "probably fraud, waste and abuse right there."  *Id*.

The agents told the Defendant they were "not worried about fraud, waste and abuse."  *Id*. Instead, SA Garrick asked, "Reality, what if I told you I have information to suggest that you did print out stuff that was outside of that scope?"  USAO-08152.  The Defendant stated, "Okay.  I would have to try to remember."  *Id*.  Before the Defendant answered further, SA Taylor stated:

> Reality – uh – you know – we obviously know a lot more than – than what we're telling you at this point.  And I think you know a lot more than you're telling us at this point.  I don't want you to go down the wrong road.  I think you need to – to stop and think about what you're saying and what you're doing.  Uhm – you know – I – I think it's a – an opportunity to maybe tell the truth.  Because, uh, telling a – telling a lie to an FBI agent is not going to be the right thing.

*Id*.  The Defendant replied, "Mm-hmm."  SA Taylor added, "Okay?  Uhm, you know – and again – we're here voluntarily.  You're talking voluntarily.  I'm not asking you – forcing you to do anything."  *Id*.

The Defendant then admitted she had accessed and printed a particular report from the NSA Pulse system.  USAO-08152-53.  She described the general content of the report and initially said she printed it because it was hard for her to read the electronic download, and because "it looked like a piece of history."  USAO-08153.  She claimed to have read only half of it, kept it on her desk for a few days, and then disposed of it in the burn bag.  USAO-08154, 08156-57, 08159.  Eventually, the Defendant stated that before

15

she put the report in the burn bag, she "folded it in half."  USAO-08160.  The Defendant

then provided the following answers to the agents' questions:

| | |
|---|---|
| SA Garrick: | Okay.  What if I tell you that document, folded in half, made its way outside of NSA? |
| Defendant: | I don't – I don't know – that. |
| SA Garrick: | It made its way out in an envelope, post-marked Augusta, Georgia.  See, things are starting to get a little specific. |
| Defendant: | Okay. |
| SA Garrick: | It made its way to an online news source that you subscribe to.  Getting really specific.  I'm going to ask you again. |
| [Pause] | |
| SA Garrick: | What is very, very, very compelling, I'd like to know the reason, because I don't think – I don't think you make it a habit out of this at all.  At all, I really do.  I think you just messed up.  Now, I'm not quite sure why you did it, and I'd like to hear from you on that, but w-the what and the how is – would you agree, looks awfully bad? |
| Defendant: | It looks really bad. |
| SA Garrick: | If you're angry about what's going on, if there's something that – look, you've had a good career.  You have.  If there's something that just pushed you over the edge on this, now is the perfect time.  This is a podium. |
| SA Taylor: | You know, like he said, I – I don't think we're coming in here to say you're some big bad mastermind - |
| Defendant: | All right. |
| SA Taylor: | - prolific spy kind of thing.  I – I think what we both think is that maybe you made a mistake.  Maybe you weren't thinking for a minute.  Maybe you got angry, like he said.  I mean, that- that's – that's what I'm hoping.  If that's – that's the case, then that makes us feel a little better knowing that we don't have a – real serious problem here.  You know, uh – uh that's something that concerns us, too, |

16

> this isn't an ongoing problem.  But we need to figure it out.
> And if it was a mistake, let's deal with it.

[Pause]

SA Garrick:     So how did you get it out of the office?

Defendant:      Folded in half in my pantyhose.[15]

SA Garrick:     And what did you do with it?

Defendant:      Put it in an envelope and sent it to [NAME
                REDACTED].

USAO-08160-62.

Neither SA Garrick nor SA Taylor ever raised his voice above a quiet, conversational tone during this exchange.  Neither agent physically approached the Defendant, touched her, restrained her, brandished a weapon, or blocked her egress from the room.  Neither agent ever indicated to the Defendant at any point during the conversation that she was under arrest, would be arrested at any point, or was not free to terminate the encounter at will.  The Defendant never asked to end the conversation, leave the room, or leave the premises.

The Defendant spent the next five minutes discussing with SAs Garrick and Taylor the specific way in which she mailed the document to a news outlet, how she found a mailing address, the date she mailed the document, and the fact that the Defendant wanted the news outlet to publish the document.  USAO-08163-65.  The agents then brought the Defendant a glass of water and talked with her about her cat.  USAO-08166-68.  The Defendant joked about her cat's weight and eating habits.  USAO-08167-68.

After approximately five more minutes of conversation about other issues, SA Garrick asked, "Uhm, in regards to the document that you did put out, when you – did you realize that –

---

[15] The Defendant made this admission approximately 34 minutes after the start of the interview.

the technical capabilities in that article?"  USAO-08172.  The Defendant replied, "[s]ources and

methods."  *Id*.  SA Garrick inquired, "did you know that if that got out, that those sources and

methods could be compromised?"  *Id*.  The Defendant responded, "If they haven't been already,

then yes."  *Id*.

In wrapping up the conversation with the Defendant less than one hour after entering the

room, SA Garrick explained how the search team was going to finish their searches of the house

and the vehicle.  USAO-08176.  When asked if she had any questions for the agents, the

Defendant asked, "This – this sounds really bad.  Am I going to jail tonight?"[16]  USAO-08178.

SA Garrick truthfully responded, "I don't know the answer to that yet."[17]  *Id*.  The Defendant

then asked the agents about making some phone calls to arrange for care of her pets.  *Id*.  They

told her they were unsure whether that would be necessary (as they did not know whether she

would be arrested), but assured the Defendant they would help her take care of her pets if

needed.  USAO-08178-81.  SA Taylor reiterated that the agents "truly [didn't] know at this

point" whether the Defendant would be arrested, and said, "I don't really know that it's really

our decision at this point."  USAO-08181.  SA Garrick confirmed, "and it's not – it's not."

USAO-08182.

The agents told the Defendant they needed to make some calls, and the Defendant asked

to use the restroom.  *Id*.  After SA Garrick ensured the search team was "done, out of the

---

[16] This was the first indication that the Defendant even considered the possibility she would be
arrested.  Indeed, she had stated earlier belief that she would need her cellular phone to teach a
yoga class the next day, and she ultimately assessed that she could "make do" without it.
USAO-08133.

[17] Indeed, SA Garrick had arranged for an undercover surveillance team to wait nearby in
anticipation of the Defendant's departure from the premises.

bathroom, so we can give you privacy," *id*., the Defendant used the restroom alone, unsupervised, behind the closed door.  As she did so, SA Garrick ended the recording at 5:17 pm on June 3, 2017, one hour and twenty-eight minutes after his initial arrival on scene and first encounter with Defendant Winner.  Agents continued to search the house.  The Defendant stood in the front yard for a while, then asked a Task Force Officer who was searching her car if she (the Defendant) could sit with her dog in the backyard.  He told her, "sure, go ahead," or words to that effect.[18]

SA Garrick was instructed by telephone to arrest the Defendant.[19]  SA Garrick did so by informing the Defendant that she was being placed under arrest, but told her he was not going to handcuff her or search her.  SA Garrick explained that county deputies were going to transport the Defendant, and that they might search her before she was placed in their vehicle.  While waiting for the police transport, SA Taylor assisted the Defendant in making a call to her stepfather to let him know what was happening, and a call to an acquaintance who would care for her pets.

When deputies arrived to transport the Defendant to the Lincoln County Jail, SA Garrick asked the officers to handcuff the Defendant in front of her body so she would not be too uncomfortable during the approximately 40-minute ride.  None of the federal law enforcement personnel ever physically searched – or even touched – the Defendant, because the authorized "search" of the Defendant was complete once she provided her cellular telephone to the FBI.

---

[18] The Defendant confirmed this to her mother, whom she told, "They let me hug [the dog] while we were waiting. They were searching the house, and I just went in the backyard and sat with her." Attachment D-3 at 13:24-13:56.

[19] During this time, the Defendant continued to sit in the backyard with her dog.

## VI.   ARGUMENT AND CITATION TO AUTHORITY

As discussed in Section II above, a defendant seeking to suppress a statement to law enforcement officers based on the absence of *Miranda* warnings must prove by a preponderance of the evidence that she was in custody.  Even if a reasonable, innocent person in a defendant's position would not have felt free to terminate the interview or leave, not every detention or restriction on movement constitutes "custody" for *Miranda* purposes.  *See Fields*, 565 U.S. at 509; *Luna-Encinas*, 603 F.3d at 881; *Bird*, 3:17-cr-1, Dkt. 72, at 32.  Critically, when the Defendant argues that "custody" occurs when a reasonable, innocent person would not have felt free to leave, *see* Dkt. 63-1 at 7, the Defendant only cites the first step of a two-step inquiry.  The "ultimate inquiry," however, "is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) (citation omitted); *see Luna-Encinas*, 603 F.3d at 881; *Brown*, 441 F.3d at 1347; *United States v. Colon*, 579 F. App'x 791, 792 (11th Cir. 2014).

As the facts described above demonstrate, and as the audio recording of the interview further supports, a reasonable, innocent person in the Defendant's position would have felt free to terminate the interview and leave.  She was thus not "detained," and there is no reason for the Court to proceed beyond the "initial step" of determining whether a reasonable person would have felt free to terminate the encounter.  *Fields*, 565 U.S. at 509; *see Street*, 472 F.3d at 1310.  Even if the Defendant's freedom to leave or terminate the interview had been restricted, however, any limitation would not have risen to the level of "custody" because a reasonable, innocent person in the Defendant's position would not have perceived a restraint on her freedom of movement to the degree associated with a formal arrest.  *Beheler*, 463 U.S. at 1125; *Street*, 472 F.3d at 1310.

Although, as described above, courts generally refer to an "initial step" of determining whether a defendant was detained at all, and an "ultimate inquiry" as to whether that detention rose to the level of custody for *Miranda* purposes, both analyses objectively examine the totality of circumstances, and courts apply similar factors to both assessments.  *See, e.g.*, *United States v. Miller*, 2015 WL 8578649, *4-5 (S.D. Ga. Dec. 9, 2015).  Those factors, discussed below, establish that the Defendant in this case was not detained, let alone "in custody," when she spoke with the agents.  The Defendant's arguments to the contrary are unpersuasive.  As explained with respect to those factors, the extreme cases the Defendant cites are readily distinguishable and further illustrate the difference between custodial questioning and the FBI's interview of the Defendant.  Moreover, the Defendant's arguments do not appropriately consider the totality of the circumstances.

### A.  An Examination of Relevant Factors Shows That the Defendant Was Not Detained and Was Not in Custody

As described above, in the Eleventh Circuit, notable factors for a court to consider in determining whether a defendant is detained or in custody include:  (1) whether officers brandished weapons; (2) whether officers touched the defendant; (3) whether officers used language or tone indicating that they could compel compliance; (4) the location of the interview (with defendants' homes generally being considered non-custodial); (5) the use of handcuffs, drawn weapons, or other physical restraints; (6) requests by a defendant to leave; (7) the duration of questioning; (8) statements made during the interview; and (9) whether the defendant was released at the end of the interview.  *Luna-Encinas*, 603 F.3d at 881; *Street*, 472 F.3d at 1309; *Brown*, 441 F.3d at 1348; *Matcovich*, 522 F. App'x at 851; *Bird*, 3:17-cr-1, Dkt. 74, at 31-32; *Miller*, 2015 WL 8578649, at *4-5; *Hill*, 2014 WL 5410214, at *10; *Dix*, 2013 WL 610219, at *3; *see also Fields*, 565 U.S. at 509.  Each of these factors, independently and in combination,

demonstrates that the Defendant was not detained or in custody when she spoke with SAs Garrick and Taylor.

      *1.*    *The Officers Approached the Defendant Casually and Did Not Brandish Weapons*

As to the first factor, the FBI agents who interviewed the Defendant and executed the search warrant never brandished weapons.  To the contrary, their approach was informal and relaxed.  The Defendant's motion paints a wholly inaccurate picture of how the agents encountered and interviewed her when she arrived home from the grocery store on June 3, 2017.  Rather than coming home and being "confronted with ten armed male law enforcement agents," Dkt. 63 at 1; 63-1 at 3, 12, two agents clothed in khaki pants and short-sleeved shirts, whose weapons were not visible, approached the Defendant in a friendly manner.  The approach was apparently so low-key that the Defendant initially mistook the agents for "people coming to ask about the house, because it's still for lease online."  USAO-08174.  Even when the agents showed the Defendant their FBI credentials, the Defendant still assumed they had come to conduct a routine interview about her security clearance application.

This is hardly the approach encountered by defendants in the cases the Defendant cites.  In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), for example, eight armed agents and two non-agents representing three different agencies confronted the defendant at 8:40 a.m. in his base housing unit.  *Id.* at 1078.  All of the FBI agents were wearing flak jackets or "raid vests," and some of the armed agents unholstered their firearms in the defendant's presence during the search.  *Id.*  In *United States v. Colonna*, 511 F.3d 431 (4th Cir. 2007), the defendant was awakened in his home at gunpoint at approximately 6:30 a.m. after agents – some number of the 24 on the premises – kicked open his bedroom door.  *Id.* at 433.

In *United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013), 15-30 state and federal law enforcement agents equipped with a battering ram entered the defendant's house at 9:00 a.m., banging on the door and yelling, "Open the door." *Id.* at 280.  After finding the defendant naked and asleep in his bed, an officer pointed a gun at him, ordered the defendant to show his hands, led him by the arm from the house, and left him standing on the front lawn in only his boxer shorts. *Id.*  Similarly, in *United States v. Mittel-Carey*, 456 F. Supp. 2d 296 (D. Mass. 2006), eight FBI agents awoke the defendant at 6:25 a.m. with loud banging all around his house, after which they entered, drew weapons, pointed a flashlight in his face, and ordered him to put his hands in the air. *Id.* at 300.  .

The defendant in *United States v. Matcovich*, 522 F. App'x. 850 (11th Cir. 2013), saw the other residents of his halfway house handcuffed and corralled in a central location. *Id.* at 852. He was not permitted to enter his bedroom to retrieve his cigarettes, nor was he allowed to use the restroom without leaving the door partially open so agents could observe him. *Id.*  In *United States v. Borostowski*, 775 F.3d 851 (7th Cir. 2014), the defendant was sleeping when seven armed agents, one of whom carried a ballistic shield, entered his house at 6:05 a.m. *Id.* at 854. The agents shouted, "FBI, search warrant," ordered the defendant to place his hands on his head, and pulled him by his arm out of the house into the 40-degree weather. *Id.* at 854-55.  After being handcuffed, the defendant remained outside wearing sweatpants and a t-shirt for approximately 20-25 minutes.  An agent kept his hands on the defendant's handcuffs most of the time. *Id.* at 855.

Compared to the cases cited by the Defendant, her initial encounter with SAs Garrick and Taylor, as well as the others who arrived at the scene shortly thereafter, was exceedingly friendly and non-threatening.  No one brandished a weapon, carried a battering ram, yelled "FBI - search

warrant," woke the Defendant from a slumber, shined a flashlight in her face, ordered her to get on the ground or show her hands, touched her, or raced throughout her house rousing and handcuffing others.  The Defendant did encounter multiple agents throughout her time at the house, but she was not confronted by them simultaneously, and the majority of them carried no visible weapons.  The status of the law enforcement personnel eventually present on the premises was as follows:

- SA Garrick:          no visible weapon
- SA Taylor:           no visible weapon
- SSA Harrison:        no visible weapon
- SA McKee:            no visible weapon
- IA Butts:            unarmed
- SA Kirkland:         handgun holstered on hip
- TFO Bryngelson:      handgun holstered on hip
- SA Freyman:          no visible weapon
- SA Igo:              no visible weapon
- TFO Francois:        no visible weapon
- SA Meekins:          unarmed

None of the agents or officers wore police uniforms, raid gear, flak jackets, or FBI-emblazoned jackets or hats.  None of them carried a battering ram, a Halligan tool, a ballistic shield, or anything else suggesting a plan to force entry into the house.  This factor clearly weighs against a finding of custody.

### 2.    *No Law Enforcement Officer Ever Touched the Defendant*

This factor is simply addressed – no one touched the Defendant until she was taken into custody by Richmond County Deputy Sheriffs approximately one and one-half hours after the conclusion of her interview.  The FBI personnel at the scene did not frisk, search, grab, push, restrain, or otherwise touch the Defendant at any time.  They did not attempt to physically intimidate her by lording over her, crowding her, impeding her freedom of movement, or otherwise invading her personal space.  These facts counsel in favor of a finding that the

Defendant was not in custody for purposes of *Miranda*.  *Cf. United States v. Riquene*, 552 F. App'x 940, 942 (11th Cir. 2014) (finding defendant not in custody where he was interviewed in his living room, not handcuffed, and officers wore civilian clothes, did not display weapons, and did not use force).

> 3.      *Agents Spoke to the Defendant in Calm, Conversational Tones and Used Gentle, Non-Accusatory Language*

The audio recording of the agents' interview with the Defendant is telling.  The agents' speech never rose in pace or volume above a conversational level, nor did the Defendant's.  The agents never yelled, used foul language, or did anything else to suggest that compliance with their requests could or would be compelled.  To the contrary, agents spoke gently, permitted the Defendant to attend to her pets and groceries, answered truthfully all of her questions, and deferred to every preference she expressed.  They consistently reminded her that her participation in the interview was voluntary.

When speaking about the matter at hand, the agents did not harangue the Defendant, accuse her of espionage, or confront her angrily with incriminating evidence.  Rather, they gently urged the Defendant to "think carefully" and suggested she had "an opportunity to maybe tell the truth."  USAO-08152.  Although the Defendant lied to the agents multiple times during the interview, neither agent called her a liar or threatened her that "lying to a federal agent is a serious crime."  Rather, SA Taylor softly told the Defendant he did not want her to go down the wrong road, that she should "stop and think about what you're saying and what you're doing," and that "telling a lie to an FBI agent is not going to be the right thing."  USAO-08152.  He also reminded her that "we're here voluntarily.  You're talking voluntarily.  I'm not asking you – forcing you to do anything."  *Id.*

In reviewing, step-by-step, the evidence that led them to the Defendant's doorstep, SA Garrick told the Defendant, "[t]he most likely candidate, by far and away, is you," USAO-08158, that the evidence was "very, very, very compelling," and that he would "like to know the reason." USAO-08160. Rather than condemn or chastise the Defendant, both agents sympathized with her, offering that the Defendant "made a mistake" based upon "something that just pushed [her] over the edge." USAO-08161. The Defendant admitted that she had secreted a classified intelligence report from her work building and mailed it to a news agency that she knew had no authority to receive it.[20]

During the rest of the interview, both before and after the Defendant's admissions, the Defendant laughed and joked with SAs Garrick and Taylor. They chuckled about workouts, previous places they had lived, pets, learning foreign languages, the Defendant's lack of furniture, the weight reflected on the Defendant's driver's license, the Defendant's neighborhood, the monkeys the Defendant saw in Belize, the rudimentary way the Defendant found the intelligence report, and a picture of Anderson Cooper the Defendant kept on her desk at work.

This is not a case in which the Defendant sought to exercise her option of terminating the interview, only to meet resistance from the interviewers. Nor was it an exercise in police deception, in which the Defendant was led to believe she would be questioned about one incident, only to be ambushed with evidence of her guilt regarding a different one. To the

---

[20] Contrary to the Defendant's sworn assertion, it was she, not the agents, who first mentioned the name of the media publication to whom the Defendant mailed the report. *Compare* Dkt. 64 at ¶ 14 *with* USAO-08162.

contrary, the agents' tone, manner, and language were gentle, honest, and entirely non-coercive. This weighs in favor of a finding that the Defendant was not in custody.

> ### 4.   The Defendant Chose To Be Questioned in Her Own Home and Was Not Isolated from Others

SA Garrick asked the Defendant whether she would like to speak with him at the house or at the FBI office about five minutes away. The Defendant chose to speak inside the house.[21] When asked if there was a private place they could talk during the search, the Defendant suggested an unfurnished spare bedroom. The Defendant said she did not like to go in the room and did not use it much, so SA Garrick began to ask why. The Defendant said the room was "creepy" and "weird," and then laughed. USAO-08122. SA Garrick said "we can talk back there if you're fine going back there," *id*., to which the Defendant replied, "Yeah, we can go back there." *Id.*

When the Defendant and the agents entered the bedroom, SA Garrick looked inside a small closet and closed the closet door. He left the doorway to the bedroom completely open, so that both he and the defendant could see and hear the others in the house. Just beyond the bedroom doorway was an exterior door leading to the backyard, where the Defendant had placed her dog a few minutes earlier.

The Defendant declined the agents' offers to bring chairs inside the unfurnished room, and similarly declined their invitation to sit on the floor with them. Instead, the Defendant chose to stand against the west wall of the room, leaning back against her hands. SA Garrick stood against the opposite wall and mirrored the Defendant's posture; SA Taylor stood against the

---

[21] As can be gleaned from the interview, it was too hot outside that day to comfortably conduct an interview in the Defendant's yard. USAO-08122.

north wall.  No one blocked the doorway or the Defendant's path to it.  She could have walked unimpeded through the bedroom door, out the exterior door, and into the backyard.

While the fact that an interview occurred in a defendant's home does not conclusively establish that she was not in custody, it usually indicates the absence of the coercion, isolation, and restraint inherent in custodial interrogations.  *See Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976).  Indeed, the Eleventh Circuit recognizes that courts are "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *United States v. Gomes*, 279 F. App'x 861, 868 (11th Cir. 2008) (citing *Brown,* 441 F.3d at 1348).

In the instant case, the Defendant was in her own home during the encounter.  In response to the agents' request for a private place to speak, she suggested the particular room in which to meet with agents, chose her position and location in the room, saw and heard other people moving about through the open door, had unrestricted opportunities to use the restroom, and was expressly informed that her participation in the encounter was voluntary. *Cf. Peck*, 17 F. Supp. 3d at 1360 (finding no custody where, "[u]nlike in *Craighead*, the bedroom door . . . was not blocked by an agent, and the sound of other agents walking outside the room, and to a lesser extent, their voices, could be heard. . . so that Defendant was not in total isolation.  The evidence shows that Defendant chose to sit on the bed, as opposed to being directed to sit there.").  All of these facts—that the Defendant was interviewed in her own home, suggested a room when asked for a private space to speak, had an easy path out of the room, and could see and hear other people outside the room—are highly indicative of a noncustodial interview.

### 5.      The Defendant Was Not Restrained

As noted above, the Defendant was never handcuffed, frisked, or even touched by federal law enforcement personnel at her house on June 3, 2017.  Agents directed her movements during the search only to the extent necessary to ensure the safety of persons and the integrity of evidence at the scene.  Agents did not stop the Defendant from, for example, letting her dog outside, putting her groceries away, or placing a leash on her cat.  The Defendant not only agreed to speak with SAs Garrick and Taylor, but when they asked for a private location to speak to her, she also suggested the room, decided whether any furniture would be brought in, and chose where to stand.  The door to the room remained open, and neither interviewer blocked the Defendant's path of exit.  Even after the Defendant made damning admissions about releasing a classified document, agents permitted the Defendant to use the restroom alone and unsupervised, ensuring the search of the restroom was complete so the Defendant could have "privacy." USAO-08182.

These facts do not paint a picture of a suspect feeling the pressures of a formal arrest or its functional equivalent, and are entirely distinguishable from the case law cited by the Defendant.  The defendants in *Craighead* and *Hashime* were questioned in remote storage closets by agents who brandished weapons upon entry.[22]  539 F.3d at 1078; 734 F.3d at 281.  In

---

[22] The Defendant's claim that *Craighead* is "identical" to this case, Dkt. 63-1 at 17, ignores the totality-of-circumstances analysis that questions of custody require.  In *Craighead*, agents wore tactical law enforcement gear, directed the defendant, who was a member of the U.S. military, to a specific room, blocked the defendant's exit from that room, and unholstered their weapons during the execution of the search warrant.  539 F.3d at 1085-86.  Moreover, the defendant's superior military officer was present, which the court found to be inherently coercive.  *Id.* at 1085.  "Most importantly," officers of three law enforcement agencies were between the defendant and the exit, leading the defendant to believe that even his interviewers did not have the authority to permit him to leave.  *Id.* at 1088.  None of these facts, which led to the finding of custody in *Craighead*, were present here.

*Colonna*, the defendant sat in the agents' vehicle after being roused at gunpoint and slammed

into a door jamb.  511 F.3d at 433.  The defendant in *Mittel-Carey* was roused from sleep with a

flashlight in his face and told he was "looking at a lot of jail time."  456 F. Supp. 2d at 300-01.

The defendant in *Matcovich* (who was found not to be in custody) watched as his fellow

residents were rounded up and handcuffed, was not allowed to get his cigarettes from his

bedroom, and was monitored while using the restroom.  522 F. App'x. at 852.  In *Borostowski*,

the defendant was restrained for 25 minutes in the cold, confined in a small room for three hours

while an officer blocked the door, and then handcuffed and shackled for a trip to the FBI office.

775 F.2d at 861.  The Defendant's situation presented none of these facts.

> 6.   *The Defendant Never Asked To Leave*

This factor, too, weighs against a finding of detention and custody.  Simply put, the

Defendant never asked to leave or terminate the discussion, and never hesitated in continuing the

interview.

> 7.   *The Defendant's Interview Lasted Less Than One Hour*

As noted by the Defendant in her motion to suppress, her interview with agents was

"relatively brief," Dkt. 63-1, n.116; *see also* Dkt. 63-1 at 5; Dkt. 64 at ¶ 19, lasting less than one

hour.  This factor weighs in favor of a finding that the Defendant was not in custody, as the

---

Even the Defendant's attempt to liken *Craighead* to this case based on the fact that both
defendants were interviewed in "back rooms," Dkt. 63-1 at 17, omits a critical factual distinction.
In *Craighead*, the defendant was "directed" to "a storage room at the back of his house."  539
F.3d at 1078.  In this case, the Defendant, in response to the agents' request for a private location
to speak, suggested the room, and confirmed her decision even after SA Garrick noted that the
Defendant had indicated that she did not like to be in that room.  USAO-08121-22.  The
similarity—that both rooms were in the rear of a house—is inconsequential.  The distinction—
that the defendant in *Craighead* was directed to a specific room and that the Defendant in this
case suggested the room—is meaningful.

Eleventh Circuit has found interviews of greater duration to be noncustodial.  *See, e.g., Muegge*, 225 F.3d at 1269-71 (finding no custody where defendant was directed by supervisor to speak with investigators at a secure site in an interview room with the door closed, where he was interviewed for approximately two and one-half hours, and was not formally arrested until eight months later); *see also United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001) (holding that "there is no fixed limit to the length of questioning" and finding four-hour inquiry not to be a custodial interrogation).

> 8.   *The Agents' Statements Did Not Indicate Defendant Would Be Arrested and Were Not Coercive*

In the time leading up to and during her interview, the agents did not communicate in any way that the Defendant would be arrested.  SA Garrick implied the agents' time on the premises would be quick, stating the agents would "hopefully, explain things, get to, uh, figure this all out and, uh, wrap it up."  USAO-08117; *see also Berkemer v. McCarty*, 468 U.S. 420, 441-42 (1984) (considering, in support of finding no custody, that officer never informed defendant that his detention would not be temporary).  SA Taylor asked the Defendant if she planned to stay in her current house or look for another.  USAO-08147.  This plainly suggests an expectation that the Defendant would be free to do either.  The Defendant herself clearly perceived she would not be placed under arrest – she told SA Garrick she was "teaching yoga tomorrow," but that she could "make do" without her phone if need be.  USAO-08133; *see also Gomes*, 279 F. App'x at 869 (noting that defendant's comments indicated he did not believe he was in custody).  The Defendant also mentioned she was seeking a deployment opportunity and trying to increase her security clearance.  USAO-08148, 159.  It is also important to note that while the agents showed the Defendant a search warrant, they did not show her – nor did they possess – an arrest warrant.

Even if the agents began to change their minds about whether the Defendant would be arrested after she began making incriminating admissions, it is well established that "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time[.]" *McCarty*, 468 U.S. at 442.  The agents did nothing to broadcast to the Defendant that she would be arrested – to be sure, they did not know that.  The agents did not speak of jail, penalties, charges, sentencing guidelines, or the like.  Rather, they focused on helping the Defendant offer an explanation for what they called a "mistake."  USAO-08161.  As agents gave the Defendant no reason to believe her time with them would be indeterminate or even lengthy, this factor also weighs in favor of a finding that the Defendant was not in custody.

A reasonable innocent person viewing these factors objectively would clearly feel free to terminate the interview and leave. [23]  Accordingly, the circumstances in this case do not meet the "initial" threshold of detention, and the Court need not proceed to the "ultimate inquiry" of custody.  Moreover, even if the Court were to find that the Defendant at any point was not free to terminate the interview and leave, the totality of circumstances in this case does not remotely resemble the level of restraint on freedom associated with a formal arrest.  The Defendant was therefore not "in custody" for *Miranda* purposes.

---

[23] To be sure, as to the ninth factor referenced above, the Defendant was arrested after the agents finished the interview and received further instructions by telephone.  Although the fact that a defendant was arrested at the end of an interview is a factor that some courts consider, *see, e.g., Matcovich*, 522 F. App'x at 851, as explained in the text, whether a defendant was in custody remains an objective test considering the totality of the circumstances from the perspective of a reasonable, innocent person being interviewed under the same circumstances.

**B.      The Defendant's Arguments Do Not Consider the Totality of the Circumstances**

      *1.      There Is No Requirement for Agents To Expressly Inform a Defendant That She Is Free To Leave When There Is No Indication That Her Freedom Is Curtailed*

The Defendant argues repeatedly that her statements to the FBI should be suppressed because the FBI agents never expressly stated that she could leave her residence.  That fact is insufficient on its own to show that the Defendant was detained, let alone convert the Defendant's interview into a custodial interrogation.  *See Robinson*, 2017 WL 3262417, at *3-4 & n.3.  In any event, this point does not establish custody when considered in the totality of circumstances.  Of particular note are the agents' statements on at least three occasions that participating in the interview was voluntary.  *See* USAO-08108 ("completely voluntary to talk to me"); USAO-08111 ("we're – we're completely voluntary, completely up to you"); USAO-08152 ("[A]gain, we're here voluntarily.  You're talking voluntarily.  I'm not asking you—forcing you to do anything.").

Given the absence of any indication or statement by the agents suggesting that the Defendant's freedom was limited, a reasonable innocent person in the Defendant's situation would have understood the agents' repeated reassurances that the interview was voluntary to clearly signify that she could have terminated the encounter at any point.  *See United States v. Leese*, 176 F.3d 740, 742 (3d Cir. 1999) ("Where . . . the individual has not been openly arrested when the statements are made, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or allow the suspect to do so.'" (citations omitted)); *see also United States v. Barry*, 479 F. App'x 297, 299 (11th Cir. 2012) (finding defendant not in custody when reasonable innocent person would have felt free to leave or terminate the interview);

*Miller*, 2015 WL 8578649, at *1 (finding no custody when "a reasonable, innocent person would have felt he was free to terminate the interview or to leave").   Notwithstanding the Defendant's selective recitation of the facts underlying the cases cited in her motion, none of those cases resulted in the suppression of a defendant's statement based on this one fact.  Taken in totality with all of the other facts surrounding the FBI's interview of the Defendant—particularly the agents' repeated statements that the Defendant was not required to participate in the interview— this one data point is insignificant.

2.     *The Existence or Execution of a Search Warrant Does Not Convert a Consensual Interview into a Custodial Interrogation*

In the absence of any relevant or controlling case law, the Defendant also attempts to construct an argument that the existence of a warrant to search her person somehow transformed her voluntary interview into a custodial interrogation.[24]   This claim is baseless and belied by the facts.  No one at the scene ever told the Defendant that she could not leave or had to wait to be searched, or that any search of her person would occur beyond the seizure of her cellular telephone.  The idea that the warrant to search the Defendant's person prevented the Defendant from leaving certainly did not occur to the Defendant herself; she asked questions such as whether she could have her telephone back, and whether she could attend to groceries and pets (both of which which were permitted), but never asked whether she would be further searched, how such a search would occur, or whether she was required to remain and wait for the search of her person.  Moreover, the Defendant clearly did not believe she was in any type of custody

---

[24] The Defendant repeatedly presumes that female agents were required to perform any search of her person. Dkt. 63-1 at 2, 11.  This assumption is incorrect and is not founded upon any information provided to the Defendant prior to or during her interview.  Had the Defendant simply inquired about the search of her person (as she did about whether the agents would return her cellular telephone), she would have learned it was complete.

when she asked about using her telephone while teaching yoga the next day.[25]  Even after giving

her entire statement, which included confessing to stealing a classified document and mailing it

to a news outlet, the Defendant still did not feel detained, as evidenced by her – finally – asking

whether she was going to be arrested.  Particularly in light of all of the other circumstances

surrounding the Defendant's interview, the single fact that the FBI had a warrant to search the

Defendant, which the agents had already executed by seizing her cellular phone, does not support

a claim that the Defendant was detained, let alone in custody.

Similarly, the execution of a search warrant at a defendant's residence does not, on its

own, constitute "custody" for *Miranda* purposes, even when, unlike this case, the defendant is

detained during the search.  *United States v. Asher*, 2010 WL 4192883, at *8 (N.D. Ga. Feb. 25,

2010), *report and recommendation adopted,* 2010 WL 4237579 (Oct. 21, 2010) ("To hold that

detention of a suspect while executing a lawful warrant at his residence is the legal equivalent of

custody for *Miranda* purposes would run contrary to the Eleventh Circuit's direction to consider

the totality of the circumstances in analyzing the issue." (citing *Brown*, 441 F.3d at 1348-49)).

"[E]scorting a subject around [her] own home while it is searched does not create a custodial

situation."  *Asher*, 2010 WL 4192883, at *14.

Thus, even if a reasonable, innocent person in the Defendant's position could have

believed she was being detained for the duration of the search, then the circumstances still would

not establish custody for purposes of *Miranda*.  As described above, the agents casually

approached the Defendant outside of her house in the afternoon.  They never touched the

Defendant or brandished any weapons.  They never ordered her to do anything.  They allowed

---

[25] As noted above, the Court's inquiry is objective and does not rely on the Defendant's perception or state of mind.  The Defendant's conduct, however, demonstrates that she was not detained as a result of the search warrant.

her to move about her home as she wished within the bounds of safety.  The Defendant was never subjected to physical or implied restraint of any kind, and she never asked to leave.[26]  The agents did not use harsh or commanding language.  They assured the Defendant multiple times that her participation in the interview was entirely voluntary.  The Defendant chose to speak to the agents.  When the agents requested a private place to speak to her, the Defendant suggested the location.  She joked with the agents and engaged in conversation about pets and exercise.  No one blocked the Defendant's path to leave her house or otherwise restrained her.  She never asked to end the conversation, leave the room or the premises, or speak to an attorney.  There is simply no basis for the Court to conclude that the Defendant was subjected to the level of coercion and restraint associated with a formal arrest.

In sum, a reasonable innocent person being interviewed under the facts set forth above would feel free to terminate the encounter, and in any event, the totality of the circumstances of the interview did not approach the level of arrest.  The Defendant was therefore not in custody during the execution of the search warrant, and was not entitled to *Miranda* warnings.

## VII.   CONCLUSION

The Defendant's interview with agents on June 3, 2017, viewed in the totality of its circumstances, was noncustodial and did not require *Miranda* warnings.  Agents, dressed in casual civilian clothes and carrying no visible weapons, approached the Defendant outside her home.  She agreed to speak with the agents and, in response to their request for a private

---

[26] The Defendant avers that from the time she learned law enforcement had a search warrant for her person, she understood she was not free to leave. Dkt. 64 at ¶¶ 3, 4.  "The test," however, "is objective: the actual, subjective beliefs of the defendant. . . on whether the defendant was free to leave are irrelevant."  *Brown*, 441 F.3d at 1347 (citations and quotation marks omitted); *see also Peck*, 17 F. Supp. 3d at 1360 (defendant's subjective feelings of intimidation irrelevant to custody determination).

36

location, she suggested the room in which the interview occurred.  The interview was conducted in a room with an open door, and no one impeded or in any way attempted to prevent the Defendant's departure.  Agents reminded the Defendant numerous times that her participation was voluntary, and the Defendant expressed a desire to "definitely" speak with them.

The agents allowed the Defendant to move about her house and to attend to personal matters.  Even after she made incriminating admissions, agents told the Defendant that no one had decided to place her under arrest.  The Defendant never asked to end her interview, leave the premises, or speak to an attorney.  Had she asked about the search of her person, she would have learned it was complete when she relinquished her cellular phone.  Even if the Defendant felt compelled to remain on the premises, the agents did nothing during her voluntary interview to elevate their encounter to a formal arrest or its functional equivalent.  The Defendant's own statements regarding her plans for the next day and the fact that she never asked whether she was under arrest until the end of the interview reinforce the conclusion that, based on the totality of the circumstances, the Defendant was not detained when she spoke with the agents.  Even if any detention occurred, it did not approach the level of arrest, and *Miranda* warnings were therefore unnecessary.

For those reasons, the Court should find the Defendant was not in custody during her interview with SAs Garrick and Taylor on June 3, 2017, and the Defendant's Motion to Suppress, Dkt. 63, should be denied.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

*//s// **Jennifer G. Solari***
Assistant United States Attorney
Southern District of Georgia

*//s// **David C. Aaron***
David C. Aaron
Trial Attorney
U. S. Department of Justice
National Security Division

*//s// **Julie A. Edelstein***
Julie A. Edelstein
Trial Attorney
U. S. Department of Justice
National Security Division

P.O. Box 8970
Savannah, Ga.  31412
(912) 652-4422

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This 18th day of December, 2017.

Respectfully submitted,

BOBBY L. CHRISTINE
UNITED STATES ATTORNEY

*//s// Jennifer G. Solari*
Assistant United States Attorney

Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422