UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | NO. 1:17-CR-00034 |
| | * | |
| REALITY LEIGH WINNER | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

**REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO SUPPRESS
DEFENDANT'S STATEMENTS AND REQUEST FOR EVIDENTIARY HEARING**

**NOW INTO COURT**, through undersigned counsel, comes Defendant, Reality Leigh Winner ("Ms. Winner" or "Defendant"), who, in accordance with this Court's December 19, 2017 Order [Rec. Doc. No. 192], respectfully files this Reply Brief in further support of her Motion to Suppress Defendant's Statements and Request for Evidentiary Hearing (the "Motion") [Rec. Doc. No. 63] and in response to the Government's Response to said Motion (the "Response") [Rec. Doc. No. 189]. For the reasons set forth herein and for those set forth more fully in Defendant's original Memorandum in Support (the "Opening Brief") [Rec. Doc. No. 63-1], Defendant respectfully requests that, after holding the evidentiary hearing which this Court has scheduled for February 27, 2018,[1] this Court suppress the statements elicited by law enforcement from Defendant on June 3, 2017, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), as well as any evidence obtained as a result of such statements, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure.

---

[1]   *See* Rec. Doc. No. 201.

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Law enforcement's encounter with Ms. Winner on June 3, 2017 was unquestionably a custodial interrogation. In particular, law enforcement arrived with ten male agents carrying weapons, took Ms. Winner's car keys within minutes of entering her home, requested and directed her to an isolated room for her questioning, suggested during that questioning that she was the prime suspect, and informed her that they had a search warrant not only for her home, but also for her person, thereby communicating that she was not free to leave at least until they completed that search. The Government focuses throughout its Response on whether the agents advised Ms. Winner that it was voluntary for her to answer their questions, but that is not the relevant issue. Rather, the determination of whether Ms. Winner was "in custody" turns on whether a reasonable person in her position would have felt free to leave the house. Given the totality of the circumstances in this case, a reasonable person clearly would not have felt free to leave.

It is also fantastical to assert, as the Government does, that Ms. Winner "did not believe she was in any type of custody" simply because she made casual or colloquial comments to the agents "about using her telephone while teaching yoga the next day" and "whether she was going to be arrested."[2] Such a conclusion requires this Court to engage in the precarious act of reading Ms. Winner's mind, which it cannot do (even if her subjective beliefs are relevant, which, as noted in the Motion, they are not). And the opposite conclusion is just as — if not more — likely, especially when one considers portions of the interview transcript that were conveniently omitted from the Government's Response, such as Ms. Winner's questions about whether she would be arrested and go to jail, or Ms. Winner's logical questions about using the restroom

---

[2]   *See* Rec. Doc. No. 189, pp. 30–31, 34–35, 37.

("How is that going to work?"), which suggests she was not "unrestricted" and free to move about her home.[3]

Moreover, as the Government well knows, suspects are far more likely to cooperate with law enforcement's investigation when faced with the threat of incarceration. It is the surest way to buy freedom from restraint. Therefore, the fact that Ms. Winner never to asked end the interrogation or leave the premises has little bearing on whether Ms. Winner herself believed that she was not in custody. And, by that logic, the Government improperly seeks to flip the burden on Ms. Winner, imposing a requirement that a defendant make affirmative statements demanding her rights or actually depart the premises and, in the absence of these facts, no custodial interrogation can take place. That is simply not the law.

For these reasons, and for those set forth more fully below and in Ms. Winner's Opening Brief, this Court should grant Ms. Winner's Motion, suppress the statements elicited by law enforcement from Ms. Winner in violation of *Miranda*, and suppress any evidence obtained as a result of those statements.

## II.  THE GOVERNMENT'S RESPONSE DOES NOT COMPLY WITH LOCAL RULES.

As an initial matter, the Government makes a number of factual assertions in its Response that are not supported by the record or an accompanying affidavit, and therefore violate Local Rules 12.1.[4] Among other unsworn assertions, the Government states that (i) the agents did not brandish or leave their weapons visible;[5] (ii) the agents did not block the

---

[3]  USAO-08182.
[4]  *See* S.D. Ga. L. Cr. R. 12.1 ("Every factual assertion in a motion, **response**, or brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion. **Where allegations of fact are relied upon that are not supported by the existing record, supporting affidavits shall be submitted**." (emphasis added)).
[5]  *See* Rec. Doc. No. 189, p. 24.

defendant's path to the door in the private room they used to interrogate her;[6] and (iii) the search warrant for the defendant's person was complete when she handed over her cellular phone.[7] These "facts" are nothing more than unsworn statements made by counsel in the Government's Response; they are asserted without any evidentiary citations and without any supporting affidavits by persons with knowledge in violation of this Court's Local Rules.[8] This Court should therefore strike or disregard all portions of the Government's Response that are not properly supported by citations to the record or a supporting affidavit.[9]

## III.   DEFENDANT WAS SUBJECTED TO CUSTODIAL INTERROGATION BY LAW ENFORCEMENT.

### A.   Governing Law

Importantly, the Government does not deny that Ms. Winner was interrogated, or that law enforcement never advised Ms. Winner of her *Miranda* rights prior to questioning; thus, the only dispute is whether Ms. Winner was "in custody" at the time of her interrogation. As this Court has explained, for purposes of this inquiry:

> [T]he only relevant inquiry is how a reasonable person in the suspect's position would have understood the situation. In other words, the inquiry is whether a reasonable person in the suspect's position would feel a restraint on his freedom

---

[6]   *Id.* at 27–28.

[7]   *Id.* at 19, 34, 37, n.8 & n.24.

[8]   *See United States v. Mosby*, No. CR414–307, 2015 WL 128189, at *2 n.3 (S.D. Ga. Jan. 8, 2015); *see also United States v. Verch*, 307 F. App'x 327, 330 (11th Cir. 2007) ("Criminal Cases Rule 12.1 of the Southern District of Georgia [. . .] requires a [party] to support by citation to the record or by affidavit each factual Assertion."); *United States v. Carter*, 141 F. Supp. 3d 1381, 1382–83 (S.D. Ga. 2015) ("Suffice it to say that hearsay-based conclusions from *counsel*, rather than direct-knowledge factual attestations from the *defendant* or some other percipient witness, are not what the case law and Rule 12.1 demand." (emphasis in original)); *United States v. Fann*, 462 F. App'x 128 (2d Cir. 2012) (suppressing evidence where "the Government did not submit any affidavits or other evidence before the district court") (upholding this Court's denial of an evidentiary hearing for want of a L. Cr. R. 12.1 affidavit); *United States v. Mosby*, 2015 WL 128189 at * 2 n. 3 (S.D. Ga. Jan. 8, 2015) ("Any factual assertions in Mosby's brief that are not supported by the record have been disregarded.").

[9]   The Government also filed a Response that far exceeds the 26-page limit established by Local Rule 7.1(a) of this Court. The Government did not obtain the Court's permission before filing that Response, which is comprised of 39 pages, inclusive of the certificate of service, nor did it file a separate motion to exceed the page limitations or otherwise include any such request in the Response itself. Under those circumstances, the Government's Response is procedurally improper. As such, this Court should disregard pages 27 through 39 of the Government's Response in their entirety or, at a minimum, direct the Clerk to strike the Response and require the Government to re-file it in compliance with the page limitations and other requirements as set forth in the Local Rules.

of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave the scene. The determination of custody for *Miranda* purposes depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.[10]

The Government seeks to evade this legal standard in its Response. In particular, the Government repeatedly emphasizes that the agents informed Ms. Winner that it was voluntary for her to answer their questions,[11] but "the voluntariness inquiry and the *Miranda* custody inquiry are [...] not one and the same."[12] As the Supreme Court has long recognized, "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*" if the defendant was subject to custodial interrogation.[13] "[P]atently *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's case."[14] Here, application of the custodial factors dictate that Ms. Winner was in custody at the time she was interrogated, and therefore, she was entitled to *Miranda* warnings.

## B.     The Most Important Factors Favor A Finding Of Custodial Interrogation.

While spending pages and pages discussing the "casual" clothes of the officers and the "calm, conversational" and "gentle" tones used during the questioning of the defendant, the

---

[10] *United States v. Miller*, 2015 WL 13238641, at *3 (S.D. Ga. Oct. 30, 2015), *report and recommendation adopted*, 2015 WL 8578649 (S.D. Ga. Dec. 9, 2015).

In its Response, the Government suggests a two-part inquiry: (1) whether "a reasonable, innocent person in a defendant's position would [...] have felt free to terminate the interview or leave" (i.e., "whether a defendant was detained"); and (2) "whether there is a formal arrest or restraint on freedom of movement of the degree associate with a formal arrest" (i.e., "whether that detention rises to the level of custody for *Miranda* purposes") *See* Rec. Doc. No. 189, p. 20–21. The Government initially suggests that Ms. Winner ignored the second step of this two-party inquiry, but then acknowledges that "both analysis objectively examine the totality of circumstances, and courts apply similar factors to both assessments." *Id.* at 21 (citing *Miller*, 2015 WL 8578649 at *4–5). Contrary to the Government's assertion, Ms. Winner has adequately addressed all pertinent legal tests, and its application of both tests dictates a finding that Ms. Winner was both "detained" and "in custody."

[11] *See* Rec. Doc. No. 5, 189, pp. 6, 8, 9 , 15, 25. 28, 33.

[12] *United States v. Hashime*, 734 F.3d 278, 285 (4th Cir. 2013).

[13] *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).

[14] *Id.* (emphasis in original); *see also United States v. Craighead*, 539 F.3d 1073, 1087 (9th Cir. 2008) (*Miranda* warnings were required even though interrogation was in defendant's home and agent told the defendant "his statements were voluntary."); *United States v. McDow*, 206 F. Supp. 3d 829, 847 (S.D.N.Y. 2016).

Government's Response tellingly neglects to combat the most powerful factors in the "custodial interrogation" analysis. As set forth below, those important factors counsel in favor of a finding of "custodial interrogation" here.

        *1.*     *Defendant Was Never "Unambiguously Advised" That She Was Free To Leave And Not In Custody.*

As set forth in Ms. Winner's Opening Brief, she was never advised that she was "free to leave" and was "not in custody," nor was she ever advised that she was "not under arrest." The Government glosses over these facts and improperly seeks to flip the burden onto Ms. Winner, suggesting that she had an obligation to *affirmatively ask* to terminate the interrogation or to leave the premises. That is not the law.[15]

Indeed, the Eleventh Circuit has emphasized that it is a "powerful factor" whether law enforcement "unambiguously advis[ed] […] that [the suspect was] free to leave and [was] not in custody."[16]  Plainly, where law enforcement makes such a disclosure, it will "generally lead to the conclusion that the defendant is not in custody."[17] But where the Government makes no such statements, it keeps the suspect "in the dark" about his or her arrest status, rendering the suspect far more likely to yield the pressures about which *Miranda* warns.[18] This is because where a suspect is confused or unclear of her custodial status, she may "feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment."[19]

Here, the Government does not dispute that it never advised Ms. Winner that she was free to leave or that she was not in custody. To the contrary, the Government's actions would have led any reasonable person to believe that she was not free to leave. The Government swarmed

---

[15] *See, e.g.*, *Miller*, 2015 WL 8578649 at *4–5.
[16] *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013) (quoting *Brown*, 441 F.3d at 1348); *see also United States v. Craighead*, 593 F.3d 1073, 1087–88 (9th Cir. 2008).
[17] *Matcovich*, 522 F. App'x at 851 (citation omitted).
[18] *See State v. Mangual*, 311 Conn. 182, 204–05 (Conn. 2014).
[19] *Illinois v. Perkins*, 496 U.S. 292, 296–97 (1990).

Ms. Winner's home with ten agents. most of whom were armed, and took Ms. Winner's phone and car keys shortly after their arrival. Where was Ms. Winner supposed to go without her car or the ability to order alternative transportation from her phone? Even if there were locations to which Ms. Winner could wander on foot, would any reasonable person believe in these circumstances that she could just walk out the door? Of course not.

Moreover, while the Government erroneously suggests that "agents told [Ms. Winner] that no one had decided to place her under arrest," the record reveals otherwise.[20] Ms. Winner expressly asked the agents, "Am I going to jail tonight?," to which Special Agent Garrick responded, "I don't know the answer to that yet."[21] He then repeated this statement seconds later, in response to a question from Special Agent Thomas:

| | |
|---|---|
| Special Agent Thomas: | What was your question? Sorry. |
| Special Agent Garrick: | [OV] If she's going to jail tonight. |
| Special Agent Thomas: | Oh. |
| Special Agent Garrick: | Said I don't know the answer to that-[22] |

Shortly thereafter, Special Agent Thomas reiterated to Ms. Winner that "we truly don't know at this point. Uh-uh, you know, he's going to have to talk to some people. We're going to have to make some phone calls. […] And we'll go from there. Uh-uh, I don't know that it's really our decision at this point."[23] As is clear from a plain reading of the interview transcript, no one ever advised Ms. Winner that she was *not* under arrest or that an arrest would not be made, which strongly cuts in favor of a finding of custody.[24]

---

[20] *See* Rec. Doc. No. 189, p. 29.
[21] *See* Winner Decl., Rec. Doc. No. 64, ¶ 18. *See also* USAO-08178.
[22] *Id.*
[23] USAO-08181.
[24] *See, e.g.*, *United States v. Brown*, 441 F.3d 1330, 1346–49 (11th Cir. 2006).
   The Government also suggests that Ms. Winner "admitted to committing [the] crime" of Espionage under 18 U.S.C. § 793(e) during her interrogation on June 3, 2017. *See* Rec. Doc. No. 189, p. 1. This is simply not true, and in fact, the Government selectively omits an exculpatory statement made by Ms. Winner regarding the nature of the information she allegedly disclosed. *See id.* at 16–18. *See also* USAO-08172–73; Rec. Doc. No. 64, ¶ 17 ("I

2. *Defendant Was Advised That Law Enforcement Had A Search Warrant For Her Person And Believed It Had Not Been Executed.*

In the middle of Ms. Winner's interrogation, the agents informed Ms. Winner that they had a search warrant for "[t]he residence, the car, and *then you*."[25]  But the agents had not physically searched Ms. Winner to that point, nor did they so through the duration of the interrogation.  Thus, during the interrogation, Ms. Winner was under the impression the agents had a warrant to search her that they had not yet executed.[26] No reasonable person would have felt free to leave under these circumstances.

The Government's Response only highlights the dispositive nature of this fact.  Rather than argue that Ms. Winner was free to leave despite an unexecuted search warrant for her person, the Government contends, without any support, that the search warrant was already executed by the time Ms. Winner was told about it.  The Government claims that "the authorized 'search' of the Defendant was complete once she provided her cellular telephone to the FBI."[27]  This makes no sense given the sequence of events. Ms. Winner surrendered her cellular phone *before* the agents informed her they had a search warrant for her person.[28] When the agents subsequently told Ms. Winner they had a warrant to search her, they did *not* state that the warrant had already been executed by obtaining Ms. Winner's phone. Even if the agents on the scene actually believed that they had executed that warrant in full by obtaining the phone (which is highly doubtful),[29] a reasonable person in Ms. Winner's position certainly would not think that.

_____

specifically told law enforcement that, "whatever we were using had already been compromised, and that this report was just going to be like a one drop in the bucket.").

[25]  USAO-08140 (emphasis added).

[26]  *See* Winner Decl., Rec. Doc. No. 64,¶ 3.

[27]  *See* Rec. Doc. No. 189, p. 19; *see also id.* at 5 & n.8 (similar).

[28]  *See* USAO-08111.

[29]  It matters not that whether the agents had any intention of searching Ms. Winner's "person" beyond the seizure of her cell phone.  *See* Rec. Doc. No. 189, pp.  19, 34, 37, n.8, n.24. Nor does it matter that one of ten law enforcement agents asked Ms. Winner "if she planned to stay in her current house or look for another," which, according to the Government, "suggests an expectation that [Ms. Winner] would be free to do either" because law

No reasonable person would assume that, when federal agents say they have a warrant to search "you," that warrant was already moot because you handed over your phone a short time prior — and this is especially true where, as here, that phone was handed over *before* the agents even told you they had a warrant to search your *person*.

Rather, any reasonable person would believe, as Ms. Winner did, that the search warrant for her person would be executed when the agents conducted a physical pat down or frisk.[30] That had not occurred at the time of Ms. Winner's interrogation. In fact, all law enforcement agents on the scene during the interrogation were men, and reasonable woman would assume that the search would not occur until female agents were present. That is exactly what happened: Ms. Winner was not arrested until female officers arrived at the scene after the interrogation had ended, and those female officers then searched Ms. Winner after they transported her to jail.[31]

The Government also argues that it was incumbent upon Ms. Winner to affirmatively ask "whether she would be further searched, how such a search would occur, or whether she was required to remain and wait for the search of her person."[32] According to the Government, "[h]ad [Ms. Winner] simply inquired about the search of her person (as she did about whether the agents would return her cellular phone), she would have learned it was complete."[33] Again, the Government improperly seeks to flip the burden on Ms. Winner. That is not what the law requires.[34] This factor overwhelmingly supports a finding of custody in this case.[35]

---

enforcement had no plans to arrest her at that time. *Id.* at 31. The legal question in this case — whether the agents imposed a "restraint on [Ms. Winner's] freedom of movement of the degree associated with a formal arrest" — is an *objective*, not subjective, inquiry. *See United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) ("[T]he actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."). The agents' unspoken beliefs and plans, which they never shared with Ms. Winner either before or during the interrogation, cannot diminish the impact of the agents' actions.

[30] *See* Winner Decl., Rec. Doc. No. 64, ¶ 23.
[31] *Id.* ¶ 21.
[32] *See* Rec. Doc. No. 189, p. 34.
[33] *Id.* at 34, n.24.
[34] *See, e.g., Miller*, 2015 WL 8578649 at *4–5.

### 3.      *Defendant's Home Was A "Police-Dominated Atmosphere."*

There can be little dispute that Ms. Winner's home was turned into a police-dominated atmosphere.  Indeed, the Government does not even address this factor in its Response, and for good reason. Ten male agents swarmed Ms. Winner's home, with at least eight of those agents carrying weapons and at least two openly displaying their weapons.[36] The agents quickly demanded that Ms. Winner turn over her car keys and began searching throughout her home. From there, Ms. Winner's interaction with the agents became increasingly more restrictive as the agents escorted Ms. Winner inside her home and remained by her side at all times, including while she put up her groceries and secured her cat;[37] directed Ms. Winner to a small room that she specifically expressed a desire to avoid because she thought it was "creepy" and "weird;"[38] situated themselves in such a way that made it difficult for Ms. Winner to leave the room;[39] and then, after the interrogation was complete, instructed Ms. Winner on where to go (first the front yard, then the fenced yard).[40] Ms. Winner thus had a "strong motive" to remain in place, given that it was her home and that the scene quickly became one that was dominated by law enforcement agents.[41] As such, her home contained the inherent pressures that, by their very nature, undermine an individual's ability to make a free and voluntary decision about whether to

---

[35]   *See, e.g.*, *People v. Wilson*, 268 Cal. App. 2d 581, 586 (Cal. Ct. App. 1968) (noting that search warrant authorizing search of suspect as factor in custody analysis); *see also People v. Farris*, 120 Cal. App. 3d 51, 56 (Cal. Ct. App. 1981) (same).

[36]   *See* Rec. Doc. No. 189, p. 24.

[37]   *See* USAO-08109, 08116, 08118–19, 08134–36. Following her interrogation, Ms. Winner was escorted to the restroom by law enforcement, and, although law enforcement did not accompany her inside, the transcript reveals that they did wait for her outside the restroom. *See* USAO-08182–83.

[38]   USAO-08121–22. *See also* Winner Decl., Rec. Doc. No. 64, ¶ 6.

[38]   USAO-08122.

[39]   *See* Winner Decl., Rec. Doc. No. 64, ¶¶ 6–7.

[40]   *Id.* ¶ 20.

[41]   *State v. Kelly*, 435 N.W.2d 807 (Minn. 1989) (in-home interrogation was custodial for purposes of *Miranda*); *see also Craighead*, 539 F.3d at 1089 (noting that suspect testified he did not want to leave his home while it was being searched because he "did not want to leave officers alone with his belongings and did not want to leave his dog unattended).

speak or remain silent — concerns which directly implicate *Miranda* and are highly relevant to the custody issue.[42]

Rather than address whether the level of police-domination, the Government places great weigh on the fact that the interrogation occurred in Ms. Winner's home. But the fact that questioning took place in a defendant's home is not dispositive.  To the contrary, courts routinely find that a defendant's residence can be transformed into such a police-dominated atmosphere that the defendant is "in custody" for *Miranda* purposes. In addition to *United States v. Craighead*, 593 F.3d 1073 (9th Cir. 2008), discussed extensively in Ms. Winner's Opening Brief, the following courts all found that questioning in a suspect's home constituted custodial interrogation:

- In *Orozco v. Texas*, 394 U.S. 324, 325–26 (1969), the U.S. Supreme Court rejected the state's argument that Miranda did not apply because the defendant was "interrogated on his own bed, in familiar surroundings."

- In *United States v. Mittel-Carey*, 493 F.3d 36, 39-40 (1st Cir. 2007), the First Circuit found that the defendant was in custody where there were "eight officers in the home," the interrogation lasted 90 minutes to two hours, and, mostly importantly, the officers maintained "physical control" over the defendant by instructing him where to sit allowing him to move only by permission, including in order to use the bathroom.  And the court found that Miranda applied even though the officer had told the defendant that "he did not have to respond to the agents' questions."

- In *Sprosty v. Buchler*, 79 F.3d 635, 641-42 (7th Cir. 1996), the Seventh Circuit found Miranda triggered where the police "surrounded [the defendant's car], blocked the driveway from his car to the street, and escorted him inside."

- In *United States v. Griffin*, 922 F.2d 1343, 1346, 1354–55 (8th Cir. 1990), the Eighth Circuit held that Miranda applied to questioning in the defendant's home, even though "the agents did not draw their guns, handcuff [the defendant], or place him under formal arrest."

- In *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007), the Tenth Circuit found the defendant's *Miranda* rights violated where the "facts demonstrate[d] that the police

---

[42]  *Mangual*, 311 Conn. at 196 (in-home interrogation was custodial for purposes of *Miranda*); *see also Craighead*, F.3d at 1083–84 (citing cases).

were unequivocally in control of the circumstances both before and during [her] questioning. . . . That [the defendant] was in her own home at the time of the interview [did] nothing to alter [the] conclusion that this was a police-dominated environment." The Government's position here is out-of-step with these and other cases.

Apparently, under the Government's view, *Miranda* warnings would never be required in connection with an at-home interrogation absent the most extreme circumstances, including (i) a physical, forced entry into the suspect's home; (ii) the presence of numerous law enforcement personnel representing multiple agencies or departments; (iii) the brandishing of weapons, as well as yelling and cursing, by law enforcement towards the suspect; (iv) the use of handcuffs or other physical restraints; (v) the presence of family members or co-habitants; (vi) the forced separation of the suspect from those family members or co-habitants; and (vii) an interrogation of the suspect by law enforcement in an isolated room, with the door closed, for multiple hours, involving the use of strong-arm tactics to compel the suspect's cooperation.[43] While such an encounter would undoubtedly satisfy the "custody" inquiry, *Miranda* and its progeny — as set forth above — support a finding of custody in much less extreme circumstances and do not require, as a matter of course, that any or all of these circumstances be present to support a finding of custody.

4.   *The Location Of The Questioning Supports Custodial Interrogation Here.*

In its Response, the Government wrongly claims that Ms. Winner "suggested the room in which the interview occurred."[44] On the contrary, Special Agent Garrick specifically asked Ms. Winner how many rooms she had in her house and whether there was any place that they could sit that would be "private" and "away," to which she responded, "Away? Uhm, so there's one bedroom. I do have a spare bedroom that I don't use that's empty. I don't like to go in there. Uhm, I guess I-I don't have anything that's completely closed off though […] except for that

---

[43]   *See, e.g.*, Rec. Doc. No. 189, pp. 22–31.
[44]   *Id.* at 37. *See also* id. at 27, 29.

back room."[45] She then described the room as "an addition to the house behind that kitchen" that was "creepy," "weird," and "always dirty."[46]  However, despite her characterization, the *agents suggested* that they "talk back there," and Ms. Winner *acquiesced*.[47]

Moreover, upon entering the room, Ms. Winner stood with her back against a wall, while the two agents situated themselves in such a way that made it difficult for Ms. Winner to leave the room.[48] That Ms. Winner allegedly chose, as the Government suggests, to conduct the interrogation at her home, as opposed to the FBI office — the only other location offered by the agents — is of no moment.[49] Under the circumstances, either of those settings was custodial. Allowing her to choose her custodial setting did not render the settings any less custodial. This factor therefore militates in favor of a finding that Ms. Winner was in custody.

5.   <u>Defendant Was Separated From Others During The Interrogation.</u>

The Government places a great deal of emphasis on the fact that Ms. Winner was not in handcuffs at any point during the encounter with law enforcement on June 3, 2017. Courts have held, however, that a suspect may be restrained based on the dominion or control exercised by law enforcement even where the defendant was not handcuffed or physically restrained.[50] Thus, for example, a suspect placed "under guard during questioning" or "told to remain in the sight of

---

[45]  USAO-08121.

[46]  USAO-08122.

[47]  *Id.*

The Government also suggests that Ms. Winner "admitted to committing [the] crime" of Espionage under 18 U.S.C. § 793(e) during her interrogation on June 3, 2017. *See* Rec. Doc. No. 189, p. 1. This is simply not true, and in fact, the Government selectively omits an exculpatory statement made by Ms. Winner regarding the nature of the information she allegedly disclosed. *See id.* at 16–18. *See also* USAO-08172–73; Winner Decl., Rec. Doc. No. 64, ¶ 17 ("I specifically told law enforcement that, "whatever we were using had already been compromised, and that this report was just going to be like a one drop in the bucket.").

[48]  *See* Winner Decl., Rec. Doc. No. 64, ¶ 7.

[49]  *See* Rec. Doc. No. 189, p. 27.

[50]  *See, e.g.*, *Craighead*, 539 F.3d at 1085–86; *Griffin*, 922 F.2d at 1350–51 (citing *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989); *South Dakota v. Long*, 465 F.2d 65, 68 (8th Cir. 1972)); *United States v. Goodman*, 945 F. Supp. 359, 365–66 (D. Mass. 1996); *Mangual*, 311 Conn. at 647.

interrogating officials" may associate those restrains with a formal arrest.[51] That is precisely the case here.

At all times, Ms. Winner was directed where to go. While the Government is correct that law enforcement did allow Ms. Winner to take such actions as leashing her dog, unloading her groceries, and securing her cat, law enforcement remained in control and by her side at all times. And again, Ms. Winner's keys were taken from her at the beginning of the search, well before the interrogation began, so that agents could search her car.[52] It is difficult to understand — and case law does not support — how a reasonable person in Ms. Winner's position would feel free to leave and unrestrained in her movement when she had no effective means of transportation available to her.

Ms. Winner was also isolated during the questioning, which supports a finding of custody.[53] Specifically, law enforcement directed Ms. Winner to be interrogated in a very small (approximately 7' by 9') "dirty" and "unfurnished" back room of her house.[54] This room was secluded from the remainder of Ms. Winner's house, and kept her separated from both of her pets, as well as from the eight armed law enforcement agents who were rummaging through her possessions. Accordingly, this factor, as held by pertinent case law that went unaddressed by the Government in its Response, counsels in favor of a finding Ms. Winner was in custody.

6.   *Law Enforcement's Questioning Of Defendant Was Not Voluntary.*

While the Government contends that Ms. Winner voluntarily participated in the interrogation, that argument lacks merit. There is absolutely no suggestion by the Government, much less evidence, that Ms. Winner took "the initiative to offer statements or voluntarily

---

[51]   *Id.*
[52]   *See* Winner Decl., Rec. Doc. No. 64, ¶ 5.
[53]   *See Craighead*, 539 F.3d at 1087.
[54]   USAO-08121–22. *See also* Winner Decl., Rec. Doc. No. 64, ¶ 6.

arrange[d] for the questioning."[55] On the contrary, the encounter between Ms. Winner and the agents was initiated at the sole direction of the law enforcement authorities when they surprised Ms. Winner at her residence armed with search warrants for her home, car, and person. Although the agents told Ms. Winner when they first approached that it was "completely voluntary" for her to speak with them,[56] such admonitions were closely preceded or followed by statements that the agents were investigating the "possible mishandling of classified information;" that Ms. Winner could either speak to them at her home (where agents would be executing a search of not only her home, but also her car and person) or at the agent's office, which was "about five minutes away;" and that it would "be worth [Ms. Winner's] time to listen at least for a little bit."[57] Indeed, law enforcement made quite clear that Ms. Winner was the (only) focus of their investigation, another fact tending to support an objective belief that responses to such questions are not voluntary for purposes of *Miranda*.[58] In all events, as explained above, it is well-settled that the voluntariness of a defendant's statements is not dispositive in assessing whether the defendant was in custody for purposes of *Miranda*.

> 7.   *Defendant Was Not Released At The End Of Her Questioning.*

Finally, Ms. Winner was not released at the end of her questioning, consistent with the above-noted circumstances that she was never advised that she was not under arrest, nor advised that she was free to leave. In fact, Ms. Winner's interaction with law enforcement became more and more restrictive as time went on, culminating in her formal arrest. The day began with agents taking Ms. Winner's keys and cell phone and then directing her to remain outside while they

---

[55] *Griffin*, 922 F.2d at 1351 (citations omitted).
[56] USAO-08108.
[57] USAO-08108–09, 08111.
[58] *See Mittel-Carey*, 456 F. Supp. 2d at 308 (quoting *Griffin*, 922 F.2d at 1348).

15

entered her house,[59] continued with a personal guard of one or two agents who remained by Ms. Winner's side while she put up her groceries and secured her cat,[60] moved into a small room where agents situated themselves in such a way that made it difficult for Ms. Winner to leave,[61] proceeded with the agents directing and instructing Ms. Winner on where to go,[62] and ended with her arrest and transport to jail.[63] Ms. Winner's arrest at the conclusion of her interrogation "is objective evidence which tends to support the reasonableness" of her position that she was, in fact, in custody at the time of her interrogation.[64] This factor therefore supports a finding of custody.[65]

### C.   The Other Custodial Factors Do Not Sway The Analysis Here.

Instead of adequately addressing the custodial factors that the Eleventh Circuit and other courts have held are the most "powerful," the Government's Response spends pages discussing how the agents used "calm, conversational tones" and "gentle, non-accusatory language" when talking to the defendant.[66] Separate and apart from the fact that federal law enforcement is known to utilize this tactic in an effort to elicit incriminating responses, these "soft" factors do not convert an otherwise custodial interrogation into one that does not require *Miranda* warnings.

Moreover, in this case, these few factors are as likely to cut in Ms. Winner's favor as they are the Government's. For example, in *State v. McAdams*, 193 So. 3d 824 (Fla. 2016), a state supreme court in this Circuit found a suspect's interview to be custodial for purposes of *Miranda*, even though the questioning began as a voluntary interaction and "was conducted at all

---

[59] USAO-08109, 08116, 08118–19. *See also* Winner Decl., Rec. Doc. No. 64, ¶ 5.
[60] USAO-08118.
[61] *See* Winner Decl., Rec. Doc. No. 64, ¶¶ 6–7.
[62] *Id.* ¶ 20.
[63] *Id.* ¶ 21.
[64] *See, e.g.*, *Matcovich*, 522 F. App'x at 851.
[65] *See, e.g.*, *Matcovich*, 522 F. App'x at 851.
[66] *See* Rec. Doc. No. 189, pp. 5–11, 13–14, 19, 21–23, 25–27.

times in a conversational tone."[67] In so ruling, the court noted: "There is not necessarily a single specific comment, question, or circumstance that converts an encounter from noncustodial to custodial. A situation can commence as a voluntary interaction with police, but slowly intensify and become more pressured, pointed, and accusatory until it evolves into custodial status."[68]

Although *McAdams* is somewhat factually different than this matter,[69] several of the facts present in *McAdams* that counseled in favor of a finding of custody are also present in this case.[70] Like *McAdams*, Ms. Winner was placed in a small room that was located in a remote area for the duration of the interview.[71] Like *McAdams*, she was escorted to the restroom by law enforcement, and although law enforcement did not accompany her inside (as was the case in *McAdams*), they did remain outside the restroom and subsequently directed and instructed her on where to go.[72] Like *McAdams*, law enforcement also made accusatory statements to Ms. Winner that the evidence against her was "very, very, very compelling" and that she was "[t]he most likely candidate, by far and away,"[73] thereby "indicating to [Ms. Winner] that the police believed [she] was the prime suspect" with respect to the possible mishandling of classified information.[74] And like *McAdams*, when Ms. Winner expressly asked whether she would be "going to jail tonight," law enforcement kept her in the dark, telling her they did not "know the answer to that

---

[67] *See* 193 So.3d at 834 (Fla. 2016).

[68] *Id.* at 840.

[69] Among other things, although the suspect in *McAdams* was approached in his driveway like Ms. Winner was in this case, the interview in McAdams took place at the sheriff's office, after the suspect expressed a desire to help law enforcement, was specifically advised that he was not under arrest, and accepted a ride to the sheriff's office to voluntarily participate in the interview. *Id.* at 833–34.

[70] *See id.* at 839.

[71] *See* Winner Decl., Rec. Doc. No. 64, ¶¶ 6–7. By contrast, in *McAdams*, the suspect's access to the door of the interrogation room was not blocked, *see McAdams*, 193 So.3d at 834.whereas the agents in Ms. Winner's case were situated in such a way that made it difficult for Ms. Winner to exit the room. *See McAdams*, 193 So.3d at 839.

[72] USAO-08182–83. *See also* Winner Decl., Rec. Doc. No. 64, ¶ 20.

[73] USAO-08158–60.

[74] *See McAdams*, 193 So.3d at 839.

*yet*."[75] These circumstances are such that "would lead a reasonable person to conclude that he or she was not at liberty to terminate the encounter" and leave the premises.[76]

Finally, while the Government notes that agents told Ms. Winner "that her participation in the interview was voluntary," the Government completely fails to address the Ninth Circuit's insightful — and logical — observation that "an agent's statement that a suspect is free to leave [or to terminate the interview] may have [...] less resonance with the suspect [if] [s]he cannot leave the interrogation site and retreat to the safety of [her] home [because her] home is in fact the locus of police activity."[77] In view of all of the relevant factors, and applicable authorities, it is quite clear that Ms. Winner was in custody at the time of her interrogation.

### D.   The Government Erroneously Places the Burden on the Defendant.

The Government's Response, as a whole, takes the troubling position that it is the *defendant's burden* to raise questions and issues during the interrogation and/or search to demonstrate its custodial nature. As noted above, the Government chastises Ms. Winner for "never ask[ing] whether she would be further searched, how a such would occur, or whether she was required to remain and wait for the search of her person."[78] Such an argument is as dangerous as it is legally incorrect.[79] The pertinent legal inquiry is whether, under the totality of circumstances, a reasonable person in Ms. Winner's position would have felt a restraint on his or her freedom of movement, fairly characterized as that degree associated with a formal arrest, to such extent that he or she would not feel free to leave the scene.[80] And the relevant legal factors for that inquiry are whether *law enforcement* advised the defendant she was free to leave;

---

[75]   *See* Winner Decl., Rec. Doc. No. 64, ¶ 18. *See also* USAO-08178 (emphasis added).
[76]   *See McAdams*, 193 So.3d at 839.
[77]   *See Craighead*, 539 F.3d at 1088.
[78]   *See* Rec. Doc. No. 189, p. 34.
[79]   *See, e.g.*, *Street*, 472 F.3d at 1309 ("[T]he actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant.").
[80]   *See Miller*, 2015 WL 8578649 at *4–5.

whether *law enforcement* advised the defendant she was not under arrest; whether the actions of *law enforcement* rendered the defendant's home a "police-dominated atmosphere"; whether *law enforcement* isolated the defendant during her questioning; whether the behavior of *law enforcement* would affect an individual's perception of the situation; and whether *law enforcement* initiated contact with the defendant.[81] The inquiry thus focuses on the actions, words, and conduct of *law enforcement* — there is no requirement, as the Government dangerously suggests, that the defendant speak up to render an interrogation a non-custodial one.

## IV.   CONCLUSION

For the reasons stated above and in her original Motion, Defendant Reality Leigh Winner respectfully requests that this Court, after holding an evidentiary hearing, (a) grant her Motion to Suppress; (b) suppress any statements elicited from Defendant during the encounter with law enforcement at her home on June 3, 2017 in violation of *Miranda*; (c) suppress any evidence obtained as a result of those statements; and (d) award all such other relief as may be warranted.

Respectfully submitted,

*/s/Joe D. Whitley*
Joe D. Whitley

Joe D. Whitley (Bar No. 756150)                     John C. Bell, Jr. (Bar No. 048600)
Admitted *Pro Hac Vice*                               Titus T. Nichols (Bar No. 870662)
Brett A. Switzer (Bar No. 554141)                   **BELL & BRIGHAM**
**BAKER, DONELSON, BEARMAN,**                          PO Box 1547
**CALDWELL & BERKOWITZ, P.C.**                         Augusta, GA  30903-1547
3414 Peachtree Rd., NE Suite 1600                   (706) 722-2014
Atlanta, GA  30326                                  John@bellbrigham.com
(404) 577-6000                                      Titus@bellbrigham.com
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

---

[81]   *See* § II.B, *supra*.

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com

**COUNSEL FOR DEFENDANT
REALITY LEIGH WINNER**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

*/s/Joe D. Whitley*_____

Joe D. Whitley
