IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA


UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,        )
                               )
         vs.                    )      1:17CR34
                               )
REALITY LEIGH WINNER,          )
                               )
              Defendant.        )
_____)


SUPPRESSION HEARING
BEFORE THE HONORABLE BRIAN K. EPPS
TUESDAY, FEBRUARY 27, 2018; 10:05 A.M.
AUGUSTA, GEORGIA


FOR THE GOVERNMENT:

     Jennifer G. Solari, Esquire
     U.S. Attorney's Office
     Post Office Box 8970
     Savannah, Georgia 31412
     (912)201-2561

     David C. Aaron, Esquire
     U.S. Department of Justice
     950 Pennsylvania Avenue, NW
     Washington, DC 20530
     (202)307-5190

**FOR THE DEFENDANT:**

     John C. Bell, Jr., Esquire
     Titus T. Nichols, Esquire
     Bell & Brigham
     457 Greene Street
     Augusta, Georgia 30901
     (706)722-2014

     Matthew S. Chester, Esquire
     Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
     201 St. Charles Avenue, Suite 3600
     New Orleans, Louisiana 70170
     (504)566-5231

     Thomas H. Barnard, Esquire
     Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
     Legg Mason Building
     100 Light Street, 19th Floor
     Baltimore, MD 21202
     (410)862-1185

**OFFICIAL COURT REPORTER:**

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

3

1                              **INDEX**

2   **WITNESS**                  **DIRECT  CROSS  REDIRECT  RECROSS**

3   Justin Garrick,

4        By Mrs. Solari          25            152
         By Mr. Chester                 83

5   James T. Harrison,

6
         By Mrs. Solari         163

7        By Mr. Nichols                175

8

9

10

11                      **GOVERNMENT EXHIBITS**

12  **NO.**       **IDENTIFICATION**              **ID**   **EVD.**

13  1          Recording of Interview               11
    2          Transcript of Exh. 1                 11
14  3          Photographs                          11
    4          Sketch of Residence                  11
15  5          Recorded Telephone Calls             11
    5.1        Booking.wav                          11
16  5.2        Winner3.wav                          11
    5.3        Winner4.wav                          11
17  6          Transcripts of Exh. 6                11
    6.1        Partial Booking Transcript           11
18  6.1.1      Full Booking Transcript              11
    6.2        Partial Winner3 Transcript           11
19  6.2.1      Full Winner3 Transcript              11
    6.3        Partial Winner4 Transcript           11
20  6.3.1      Full Winner4 Transcript              11

21

22

23

24

25

1

2                          **DEFENDANT'S EXHIBITS**

3   | NO. | IDENTIFICATION | ID | EVD. |
    |-----|----------------|----|----|
4   | 1  | 6/2/17 Email            |   | 87  |
    | 2  | 6/2/17 Email            |   | 88  |
5   | 3  | Photo of Vehicle        |   | 93  |
    | 4  | Photo of Vehicle        |   | 99  |
6   | 5  | Photo of Vehicle        |   | 100 |
    | 6  | Photo of Vehicle        |   | 102 |
7   | 7  | Photo of Vehicle        |   | 103 |
    | 8  | Photo of Backyard       |   | 113 |
8   | 9  | Copy of Warrant         |   | 139 |
    | 10 | Copy of Criminal Complaint |  | 139 |
9   | 11 | Photo of Sketch of Room |   | 208 |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Call to Order at 10:05 a.m.)

2            THE CLERK:  The court calls case number 1:17CR34.

3    The United States v Reality Leigh Winner.  Jennifer Solari and

4    David Aaron for the government.  Matthew Chester, John Bell,

5    Titus Nichols, and Thomas Barnard for the defendant.  Here for

6    a suppression hearing.

7            THE COURT:  Good morning, everybody.  Before we take

8    up the suppression motion and take evidence on that motion, I

9    want to go through the list of motions that are referred to me

10   and make sure that I understand and we're in agreement as to

11   the status of those.  The first motion, obviously, is the

12   motion to suppress is Docket Number 63 that we're here for

13   today.

14       The second one is Docket Number 159 which is the first

15   ex-parte -- well, we'll talk about that later, but, obviously,

16   everybody knows here we've got the Rule 17 subpoena pending and

17   in that context I think we're waiting on a decision on the

18   discovery appeal before we address that.

19       Is that right, Mr. Chester?

20           MR. CHESTER:  That's my understanding, Your Honor.

21           THE COURT:  And so the Rule 17 subpoena as originally

22   formulated -- that request is going to be revised; is that

23   right?

24           MR. CHESTER:  Yes, Your Honor.  Depending on Judge

25   Hall's rulings, we'll revise accordingly.

1          THE COURT:  Okay.  The next is the motion to lift

2     restrictions on internet searches.  Certainly, we've discussed

3     that issue on many occasions here.

4        What is the current status of that, Mr. Chester?

5          MR. CHESTER:  Your Honor, I know there's been several

6     discussions back and forth.  I think as of now we've been able

7     to work out a protocol that has allowed us to get past that

8     hurdle with the promise to revisit any issues with the

9     governmental agency at issue if the further need arises.  So I

10    think as of the current status, we're okay on that -- on that

11    motion on those issues.

12         THE COURT:  Okay.  So I'll enter an order that

13    terminates that motion with the understanding, though, that

14    it's an issue of continuing concern and discussion and,

15    certainly, if there are any additional issues that need to be

16    discussed in court, if you'll just notify Mrs. Widener, I'll be

17    glad to schedule another hearing to check on the status and any

18    issues that may remain.

19         MR. CHESTER:  Thank you, Your Honor.

20         THE COURT:  Okay.  The next is the Motion for Bill of

21    Particulars.  If anybody has any argument they want to present

22    on that, certainly, we could include that today if you're

23    ready, but I think I can take that one up on briefs.

24        Mr. Chester, do you have any argument you want to make

25    orally regarding that motion?

1          MR. CHESTER:  I am not prepared to argue that today,

2     but I will say that I think Your Honor knows the issues and,

3     certainly, can handle it on the briefs.  We would be okay with

4     Your Honor handling it on the briefs if the government is okay.

5          THE COURT:  Okay.  Another one I see listed here as

6     pending but not included in the list of motions resolved by the

7     parties is the Government's Motion for Reciprocal Discovery.

8          What is the status of that?  Is it still an issue of

9     concern that the court needs to address?

10          MRS. SOLARI:  I don't know that the court needs to

11     address it, Your Honor.  It is a motion outstanding and we've

12     been in discussion with defense counsel about our request for

13     reciprocal discovery.  In particular, in our discussions about

14     trying to work out a joint proposed scheduling order, we've

15     tried to identify dates by which reciprocal discovery would be

16     produced in whole or in part.

17          THE COURT:  Okay.  The next is the Motion to Adopt

18     Redaction Procedures.  I am going to take that one up on the

19     briefs as well, and, really, I think all that leaves then is

20     the issue you just mentioned, Mrs. Solari, of the proposed

21     schedule moving forward once the appeal on the discovery issue

22     is decided.  I did note the parties' comment in an earlier

23     filing that you've been working together and you have a pretty

24     good draft which I very much appreciate you having that open

25     discussion and formulating that proposed schedule on your own.

1    I think the proposal was for you to submit a proposed

2    scheduling order within 14 days of the appeal being decided.

3         Would there be any concern with filing that within seven

4    days of the appeal being decided, Mr. Chester?

5              MR. CHESTER:  I don't think so, Your Honor.  I think

6    we'll be in a position to file that within seven days.

7              THE COURT:  Mrs. Solari?

8              MRS. SOLARI:  I agree, Your Honor.

9              THE COURT:  Okay.  I believe that takes care of all I

10   need to know about pending motions and moving on to the

11   substance of the hearing today in terms of the suppression

12   motion ---

13             MR. CHESTER:  I'm sorry.  I didn't mean to interrupt,

14   Your Honor.

15             THE COURT:  Sure.

16             MR. CHESTER:  The only thing I had on my list is the

17   404(b).  Is that still pending before Your Honor?  I know that

18   we've kind of suspended that indefinitely for the time being,

19   but I just wanted to make sure that didn't get overlooked.

20             THE COURT:  That has not been referred to me.

21             MR. CHESTER:  Oh, it hasn't?  Okay.  I apologize

22   then, Your Honor.  I just assumed it was.  I apologize.

23             THE COURT:  In terms of the suppression hearing

24   today, in reading the briefs one of the issues that I

25   researched and want to be sure about is the burden of proof and

1   my research state -- my conclusion after that research is that

2   the defendant has the burden of proof as to the issue of

3   custody and that the government has the burden of proof when it

4   comes to the issue of voluntariness.  Of course, here I don't

5   think voluntariness is an issue.

6       Is that right, Mr. Chester?

7           MR. CHESTER:  Yes, Your Honor.  That's correct.

8           THE COURT:  So at the hearing then today on the issue

9   of custody which is the sole issue in dispute it is the

10  defendant's burden and so we'll begin with any evidence and

11  arguments that the defense would like to make in that regard.

12      Before we do so, Mr. Chester, how many witnesses does the

13  defense plan on calling today?

14          MR. CHESTER:  Potentially two, Your Honor -- both law

15  enforcement agents.

16          THE COURT:  Okay.

17      What about the government?  How many witnesses does the

18  government plan to call?

19          MRS. SOLARI:  The government planned to call two

20  witnesses, Your Honor.  I am not sure whether they're the same

21  or different witnesses as defense counsel.

22          THE COURT:  Okay.  And is the defense going to seek

23  sequestration of those witnesses until their testimony?

24          MR. CHESTER:  Yes, Your Honor.

25          THE COURT:  Okay.  And so who are the two agents that

1     the defense intends to call?

2             MR. CHESTER:  Special Agent Garrick -- Justin

3     Garrick -- and Special Agent Wally Porter -- Wally Taylor.

4     Excuse me.

5             THE COURT:  And are those the same two that

6     government intends to call?

7             MRS. SOLARI:  The government intends to call Special

8     Agent Garrick.  The government also intends to call Special

9     Agent James Harrison.

10            THE COURT:  Okay.  In which order are you going to

11    take those up, Mr. Chester?

12            MR. CHESTER:  We can start with Special Agent

13    Garrick, Your Honor.

14            THE COURT:  Okay.  So Special Agents Taylor and

15    Harrison, are you in the courtroom?

16            MRS. SOLARI:  Your Honor, I believe they're waiting

17    in witness waiting room two.

18            THE COURT:  Okay.  An issue I always like to try to

19    take care of in the beginning if I can is the issue of

20    exhibits.  I have before me a set of exhibits from the trial

21    notebook of the government.

22            MRS. SOLARI:  Your Honor, may I address that?  We

23    weren't sure today -- defense counsel and I -- whether you

24    would want the government to proceed first or defense counsel.

25    I think magistrates in various divisions have different

1    practices on that.  Having assumed that the government might go

2    first, I prepared that trial notebook.  I believe defense

3    counsel will be using some of the exhibits the government

4    intended to introduce.  So if it please the Court, at this time

5    and if there is no objection from the defense, the government

6    would like to go ahead and offer into evidence Government's

7    Exhibit 1 through 6 and that would include within Exhibit 5

8    Exhibit 5.1, 5.2, and 5.3, and within Exhibit 6 Exhibit 6.1,

9    6.1.1, 6.2, 6.2.1, 6.3, and 6.3.1.

10        At this time, Your Honor, the government would reserve

11   offering Exhibits 7 and 8 and I will remove them from the

12   parties' trial notebooks if I don't ultimately offer them into

13   evidence.  So will the Court accept Government's Exhibits 1

14   through 6 at this time?

15            THE COURT:  Mr. Chester, do you have a copy of those

16   exhibits?  If so, do you have any objection to their admission?

17            MR. CHESTER:  Your Honor, I have a copy and no

18   objection.

19            THE COURT:  All right.  We'll admit Exhibits 1

20   through 6 and that includes 5.1 through 3 and 6.1 through

21   6.3.1.

22        (Government's Exhibit Nos. 1-6 are admitted.)

23            MRS. SOLARI:  Your Honor, at this time I'll provide

24   the original exhibits to Mrs. Widener.  For the ease of the

25   parties, and, again, if it please the Court, I believe the

 1   Court has the trial notebook.  Defense counsel has one as does

 2   the government, Mrs. Widener, and I've left one at the witness

 3   stand just for ease of use by the witness.  They're identical

 4   to the original exhibits.

 5            THE COURT:  All right.  And my notebook starts with

 6   Exhibit 2.

 7            MRS. SOLARI:  Yes, sir, Your Honor.  Exhibit 1 is an

 8   audio exhibit.  So Your Honor will only have the hard copy

 9   exhibits.  So, 1 is an audio recording; 5 is audio as well.

10            THE COURT:  Okay.

11            MRS. SOLARI:  Yes, Your Honor.  You have all of the

12   hard copy exhibits in that trial notebook.  The audio exhibits

13   have been uploaded to our trial presentation system.  Again, if

14   it please the Court, we have brought with us an employee of the

15   U.S. Attorney's Office, Ms. Natasha McKie, who can run the

16   system, play audio, and bring up exhibits for either party.  I

17   believe she's willing to do so for defense counsel as well if

18   that's their preference.

19            THE COURT:  Okay.  What about defense exhibits?  Will

20   there be any?

21            MR. CHESTER:  There will be, Judge.  I have several

22   boxes.  I don't know that I am going to be using all of those.

23   I don't anticipate, though, that there will be any issues with

24   us using them, but, of course, we'll give copies to the

25   government, you know, as we decide to use them.

1          THE COURT:  Okay.  So you don't have a composite set

2    to distribute?

3          MR. CHESTER:  I mean, I could give them a -- I could

4    give them a copy of every one that I might potentially use, but

5    I am not sure I am going to use every one.

6          THE COURT:  Okay.  We'll just take them up one at a

7    time then.  All right.  Would the lawyers like to make any

8    opening statements before we begin with the first witness?

9          MR. CHESTER:  Sure, Your Honor.

10          THE COURT:  Mr. Chester?

11          MR. CHESTER:  Would you like me to go first, Judge?

12          THE COURT:  Sure.  And, look, I always go with the

13    burden of proof.  Whoever has the burden of proof presents

14    their witnesses first.  If the lawyers, though, on both side

15    agree that we ought to take it up in a different order and have

16    the government go first, I'm fine with that.

17          MR. CHESTER:  Yeah, we're okay with that, Your Honor.

18    We're okay with the government going first.

19          THE COURT:  Mrs. Solari, is that your preference?

20          MRS. SOLARI:  I am happy to do so, Your Honor.

21          THE COURT:  Okay.  Well, let's flip the order of

22    things, and, Mrs. Solari, let's hear from you first in terms of

23    any opening statements you'd like to make.

24          MRS. SOLARI:  Thank you, Your Honor.  I think Your

25    Honor will find viewed in the totality of the circumstances

1    that the government and defense counsel will present today that

2    the defendant's interview with the FBI on the 3rd of June of

3    last year was non-custodial, and, therefore, required no

4    *Miranda* warnings.  Again, the parties will present evidence

5    today of the facts that the Eleventh Circuit typically looks at

6    to determine, again, based on the totality-of-the-circumstances

7    analysis whether an interview was custodial.

8           So, for instance, the brandishing of weapons.  Your Honor

9    will hear in this case that there was no such thing with regard

10   to the agents' interaction with the defendant.  Not only were

11   there no weapons brandished, there were none unholstered in her

12   presence, and most agents' weapons were not even visible.  In

13   fact, two of the participants weren't even armed.  So the

14   defendant's allegations that all of the agents at the scene

15   were armed is not only factually incorrect, but I believe it's

16   simply her supposition since she could not have seen their

17   concealed weapon.

18          No one at the scene ever touched the defendant -- not to

19   guide her in any particular direction, certainly not to

20   restrain her in any way, and, in fact, the search of her person

21   was either complete or moot in about two minutes into the

22   encounter when she handed over her cellphone.  So, certainly,

23   she wasn't frisked.  Her pockets weren't turned out.  Her

24   sneakers weren't taken off or anything of the like.

25          The agents never used any harsh language or tone

1   indicating that the defendant had any choice but to comply with
2   their wishes.  They never, certainly, used any foul language in
3   her presence.  No one ever raised a voice at the defendant or
4   used any sort of harsh language.  To the contrary, they told
5   her, I believe, it's four times they assured her that her
6   interaction with them was entirely up to her and entirely
7   voluntary.

8        The location of the interview was dictated by the
9   defendant.  Certainly, the agents were at her house to execute
10  a search warrant, but they asked her, first of all, whether she
11  would like to speak and if she would like to speak where she'd
12  like to do that, and the defendant on her own chose an ordinary
13  room within her own home, and as Your Honor will hear there was
14  nothing peculiar about the room except that it lacked furniture
15  as did much of the defendant's house.  It wasn't filthy.  It
16  didn't smell bad.  It wasn't unusually hot or cold.  It was
17  simply a spare bedroom that lacked a bed.  But, again, that was
18  the defendant's choice of the location of the interview.
19  Nobody ushered her back there or demanded that she go there.
20  That was where the defendant expressed her preference.

21       There was no use of restraints in this case.  The
22  defendant wasn't handcuffed, not even for a moment.  The
23  defendant never requested to leave the premises, to end the
24  conversation.  To the contrary, when the officers or when the
25  agents offered her opportunities to speak with them, the

1   defendant's responses included words like "absolutely" and

2   "definitely" indicating that she was actually eager to speak

3   with them at the premises.

4        The duration of the questioning certainly wasn't

5   overbearing in any way.  The conversation in total was probably

6   about an hour, and if Your Honor has already listened to the

7   interview or read the transcript, you'll see that most of that

8   was small talk.  It was about the defendant's experience in the

9   military, her love for dogs and animals, her travel inside and

10  outside the country.

11       The statements made during the interview are relevant as

12  well.  I think Your Honor will find that the best way to

13  describe the agents' treatment of the defendant in this case

14  was kind.  They were very kind to her.  They never referred to

15  her as a criminal or a liar.  They never threatened her with

16  jail or with prison.  Even when she told them things they knew

17  based on evidence they had seen were untrue, they never

18  threatened her with prosecution based on Section 1001 or said,

19  you know, lying to a federal agent is a very serious crime.

20  They simply empathized with the defendant, expressed their

21  belief that she had made a mistake, and encouraged her to share

22  with them the truth.

23       While the defendant was not released in the way that we're

24  used to at the end of her interview, she was not immediately

25  placed under arrest because as the agents expressed to her when

1    she finally asked, "Am I going to jail tonight?" they told her,

2    "We don't know.  We don't have the authority to make that

3    decision.  We have to make some phonecalls."  When the

4    defendant expressed some worry about her animals and she said,

5    "In the event I won't be here," they said, "Let's not put the

6    cart before the horse.  We don't know that that's going to

7    happen."  So the defendant hung out in the front yard, chatted

8    with Special Agent James Harrison, at some point asked to go

9    play with her dog in the backyard which she did for some period

10   of time, and just sort of continued about her business until,

11   ultimately, she was informed that she would, in fact, be placed

12   under arrest.

13        So this is a very fact-intensive inquiry as all Fourth

14   Amendment issues and I think Your Honor will find after having

15   heard the evidence that the cases relied upon heavily by the

16   defendant and the defendant's motion primarily from the Fourth,

17   Seventh, and Ninth Circuits are factually distinguishable in

18   very significant ways.  I won't go into all of those now, Your

19   Honor, but the government is eager to present its evidence and

20   believes the Court will find certainly by a preponderance that

21   under the totality of circumstances this was not a custodial

22   encounter.

23             THE COURT:  Thank you, Mrs. Solari.

24        Mr. Chester?

25             MR. CHESTER:  Judge, good morning.  As the Court has

1   already phrased it, there's one question that needs to be

2   answered here today and that is whether or not Ms. Winner's

3   statements in the afternoon and early evening of June 3, 2017,

4   to law enforcement should be suppressed.  It is no dispute she

5   was not read *Miranda*.  There is no dispute she was subjected to

6   interrogation as that term is defined under pertinent case law.

7   So the only issue is whether or not she was subjected to

8   custodial interrogation, and as the Court is well aware, that

9   doesn't just mean handcuffs.  It is a factor test.  As

10  Mrs. Solari said, totality of the circumstances has to be

11  viewed, importantly, from the perspective of a reasonable,

12  innocent person.  I am not going to go through all of the

13  factors, Judge, but I do want to touch on a couple.

14       The two most powerful and important and substantial

15  factors cut in favor of a finding of custody in this case.  The

16  Eleventh Circuit has said when law enforcement unambiguously

17  tells a suspect they are free to leave, custody will almost

18  never be found.  It is undisputed law enforcement did not tell

19  her that that day.  Law enforcement never told her she was free

20  to leave.  And, in fact, we know from the transcript of the

21  interview she never felt free to leave because she asked for

22  permission every time she needed to physically do something

23  that day:  "Can I use the restroom?  How is this going to work?

24  I can leash up my dog, but you guys can keep eyes on me the

25  whole time."

1   They had an agent standing by when she was outside in the

2   front.  They had an agent standing by when she was outside in

3   the back at the conclusion of the interview.  When she needed

4   to do anything physically that day, she asked for permission.

5   So no reasonable person would have felt free to leave and,

6   certainly, law enforcement did not unambiguously advise her of

7   that fact if it is true.

8       The second important substantial factor under the Eleventh

9   Circuit analysis is whether or not law enforcement

10  unambiguously told her she was not in custody.  They did not

11  tell her that either.  In fact, the only time it was brought up

12  it was brought up by my client when she said, "Am I going to be

13  arrested tonight?  Am I going to jail tonight?"  They never

14  gave her a straight answer.  They never said yes or no.  They

15  said, "Well, let's not get the cart before the horse.  Well, we

16  don't know the answer to that yet.  Well, let's cross that

17  bridge when we come to it."

18      What's a reasonable person supposed to think when they ask

19  that question of law enforcement and they don't get a straight

20  answer?  That they can run out and -- jump up and run out of

21  the house without anything happening to them?  That certainly

22  doesn't seem reasonable in my view and the Eleventh Circuit

23  says those are the two most important factors.  They cut in

24  favor of the finding of custody here.

25      Other factors, Judge, as Mrs. Solari mentioned, she was

1    not released at the end of this interview -- at the end of the

2    encounter with law enforcement.  She was arrested.  There are

3    factors here, Your Honor, that I think at first blush may

4    seemingly support the government's view that it was a

5    non-custodial setting, but given the unique and particular

6    circumstances here, they actually cut against the government's

7    view.

8         So was she interrogated in her home?  Absolutely.  And is

9    there case law that says that being interrogated in a familiar

10   surrounding generally leads to a conclusion of a non-custodial

11   interview?  The answer to that is yes, but even the Supreme

12   Court instructs in-home interrogations can, nonetheless, be

13   custodial when there are other factors present that make it a

14   police-dominated atmosphere.  That's precisely what we have

15   here.

16        First of all, her movements were controlled during law

17   enforcement's encounter with her.  At the beginning she was

18   told, "You need to stay outside.  You can't do anything here.

19   You can go in here, but you can't touch this.  Don't touch

20   that."  At the end of her interview she's told to go in the

21   front of her house.  There is an FBI agent guarding her.  After

22   that she goes to the back of her house.  There is an FBI agent

23   near by her at that point as well.  Her movements were

24   controlled, and as I mentioned, she relayed to law enforcement

25   that she felt like her movements were controlled.  That's why

1    she asked for permission to do anything physically that day.

2         The search warrant for her person is a unique fact in this

3    fact pattern that's not in many of these cases.  There's a

4    handful of cases that address it and we cited in our motion

5    that cuts in favor of a custodial interrogation in this case.

6    Law enforcement shows up the afternoon of June 3rd and says,

7    "We have a search warrant for your person."  She hands over her

8    cellphone within the first 120 seconds of meeting Special Agent

9    Garrick and Special Agent Taylor.  Twenty-eight minutes later

10   law enforcement reiterate "We have a search warrant for your

11   person.  We can search you."

12        The government's position is, well, that search warrant

13   was completely moot once she turned over her cellphone.  Why

14   did they bring it up 28 minutes later if it was moot?  When

15   they showed it to her 28 minutes later, even if it is just to

16   show it to her, why didn't they say, "Well, we do have a search

17   warrant for your person, but this has already been taken care

18   of; you gave us your cellphone"?

19        That search warrant, as Your Honor knows, gave law

20   enforcement the ability to search her, to search her legs, her

21   waist, her torso, her chest, her arms, her head, her hair, her

22   pockets.  It gave them the ability to search her.  Is a

23   reasonable, innocent person supposed to think after law

24   enforcement tells them twice "I can search you" and she's never

25   patted down that she can run out of there without law

1    enforcement stopping her?  That doesn't seem reasonable to me,

2    Your Honor.

3          There are other circumstances here that make this in-home

4    interrogation custodial.  She is a 5'5 female who lives alone

5    in an 800-square-foot house in not a great area of this town.

6    Eleven male agents show up, nine of whom were armed.  She parks

7    in front of her house.  Law enforcement vehicles are

8    surrounding her car within feet of her car.  She's taken to an

9    isolated, back room where law enforcement said, "We need to go

10   to a private room away from the activity."  She clearly was

11   their prime suspect.  In fact, I would venture to say she was

12   their only suspect.

13         Given all of these factors that she was their only

14   suspect; she was taken into a back room -- a small back room --

15   in her small house with two male agents when there are nine

16   other law enforcement agents, most of whom are armed, rummaging

17   through her house; her car is blocked in; she handed over the

18   keys in the first 120 seconds never to get them back; she's

19   told they have a search warrant for her person that allows law

20   enforcement to search her person -- is it reasonable that an

21   innocent person would think I can jump out of this room, run

22   out there, grab my keys from the agent who took them, hop into

23   my car, do a 15-point turn so I don't hit any of these law

24   enforcement vehicles, drive through my yard, try not to plow

25   through any other security perimeter surveillance team they set

1   up and nobody is going to lift a finger?  That doesn't seem

2   reasonable under these circumstances.  This is precisely the

3   type of case where the Supreme Court says an in-home

4   interrogation can be custodial.

5       Now, Your Honor, I can't deny that -- I've listened to

6   that audio, too.  The agents were nice to her.  The agents were

7   kind to her.  They didn't put a gun to her head.  They didn't

8   yell at her.  I think I have to concede those points, but I

9   would say two things in response to that.  First, certainly,

10  those factors don't change the analysis.  It doesn't suddenly

11  make a custodial interview a non-custodial interview just

12  because the agents are nice when the other factors, including

13  the two most important factors in the Eleventh Circuit, cut in

14  favor of a custodial finding here, but separately I would say

15  that's how the FBI is trained.

16      Flash-bangs and Flak jackets aren't going to work on an

17  intelligent, white-collar suspect like Ms. Winner.  So they do

18  it in the way that they can maximize the extraction of

19  information.  Nobody faults them for that.  That's their job,

20  but that doesn't change the fact that the setting in the

21  case -- the facts in this case under the analysis of the

22  Eleventh Circuit clearly point to the fact this was a custodial

23  interrogation.

24      Judge, I don't expect a Perry Mason moment in this

25  courtroom.  I am sure the FBI agents are going to testify that

1    it's their view she was free to leave at any time.  What I

2    would ask this Court to consider is to keep an open mind.

3    Given all of these circumstances -- the circumstances I just

4    went through, as well as others that I am going to go through

5    with these FBI agents, is that really credible?  Is it really

6    credible that somebody who is told they have a search warrant

7    for their person that is unexecuted and she's never patted down

8    until hours later when the first female officer shows up on the

9    scene -- is it really credible that a reasonable person would

10   feel like they can get up and run out of their 800-square-foot

11   and run out where there are eleven male, armed agents rummaging

12   through everything and the FBI wouldn't have stopped her?  We

13   submit the answer to that is no.  We submit she wasn't free to

14   leave, and, therefore, this motion should be granted and her

15   statement should be suppressed.

16              THE COURT:  Thank you, Mr. Chester.

17              MR. CHESTER:  Thank you, Your Honor.

18              THE COURT:  Mrs. Solari?

19              MRS. SOLARI:  Thank you, Your Honor.  The government

20   calls Special Agent Justin Garrick.

21        **(JUSTIN GARRICK is duly sworn.)**

22              THE CLERK:  Please state your name.

23              THE WITNESS:  Justin Garrick.

24              THE CLERK:  And which agency are you with?

25              THE WITNESS:  Federal Bureau of Investigation.

(Justin Garrick-Direct by Mrs. Solari)

1              THE CLERK:   Thank you.

2                      **DIRECT EXAMINATION**

3   BY MRS. SOLARI:

4   Q    With which office are you currently assigned?

5   A    The Augusta RA, Atlanta field office.

6   Q    And how long have you been with the FBI?

7   A    In total a little over 13 years.

8   Q    And what positions have you served with your agency?

9   A    Intelligence analysis analyst and then a special agent.

10  Q    How long have you been a special agent?

11  A    Special agent for about nine years.

12  Q    And what are the primary types of cases that you worked?

13  A    I've worked counterintelligence, primarily.

14  Q    Are you the case agent handling the investigation of this

15  defendant, Reality Winner?

16  A    Yes, I am.

17  Q    On what date did you first become aware of the violation

18  in this case and the defendant's potential involvement?

19  A    It was June 1 of 2017.

20  Q    On June 3 of 2017 did you obtain a federal search warrant

21  for the defendant's house, her personal vehicle, and her

22  person?

23  A    Yes, I did.

24  Q    Approximately, what time on June 3rd did you obtain that

25  warrant?

(Justin Garrick-Direct by Mrs. Solari)

1   A    Approximately about noon.

2   Q    Did you obtain an arrest warrant for the defendant on that

3   day as well?

4   A    No, I did not.

5   Q    Did you brief the team that would help you execute the

6   warrant at some point on that day?

7   A    Yes, I did.

8   Q    Where did that briefing take place?

9   A    I briefed the team at the parking lot of the Kroc Center

10  which is downtown Augusta and then also at a parking lot of a

11  school which is about a half a mile from the defendant's house.

12  Q    And this was on the 3rd of June?

13  A    Yes.

14  Q    What did you tell your team about whether the defendant

15  would be arrested on that day?

16  A    I told them that the defendant would not be arrested.

17          MR. CHESTER:  I'm sorry, Your Honor.  The subjective

18  intent and plan going in, since this is an objective test,

19  doesn't seem to me to be relevant in this case.

20          THE COURT:  So the objection is to relevance?

21          MR. CHESTER:  Yes.

22          THE COURT:  I will say at the beginning that this is

23  fundamentally different than a jury trial.  We're here today to

24  try to ascertain a wide scope, I think, of facts, and so I am

25  pretty liberal when it comes to relevance objections at a

(Justin Garrick-Direct by Mrs. Solari)

1    hearing of this type.  So I am going to overrule the objection.

2              MR. CHESTER:  Understood.  Thank you, Your Honor.

3    Q    Again, Special Agent, what did you tell your team during

4    those briefings about whether Ms. Winner would be arrested that

5    day?

6    A    I said that she would not be arrested.

7    Q    What personnel did you put in place in case the defendant

8    chose to leave the residence during the search?

9    A    We had a surveillance team set up around the residence.

10   Q    Were they overt?

11   A    No, they were not.

12   Q    Now did you personally participate in the execution of the

13   search warrant on the 3rd?

14   A    Yes, I did.

15   Q    And was that 1957 Battle Row in Augusta?

16   A    Yes.

17   Q    Was that the defendant's residence at the time?

18   A    Yes.

19   Q    Describe the general area in which that's located.

20   A    It's a residential area in the Harrisburg District of

21   Augusta.

22   Q    And where does the house sit relative to Battle Row?

23   A    It sits directly on Battle Row with an access road off to

24   the side.

25   Q    What's the traffic like in that area?

(Justin Garrick-Direct by Mrs. Solari)

1   A     It's a fairly steady traffic.

2   Q     About what time did you approach the residence on

3   June 3rd?

4   A     Approximately -- say, approximately 4 p.m.

5   Q     Was anyone with you?

6   A     Yes, Special Agent Taylor.

7   Q     What was your role during the execution of the warrant?

8   A     I interviewed the defendant.

9   Q     What was Special Agent Taylor's role?

10  A     To interview.

11  Q     Did you record your interactions with the defendant on

12  June 3rd?

13  A     Yes, I did.

14  Q     How did you do that?

15  A     With a digital audio recorder.

16  Q     Did someone on the search team take photographs of the

17  residence and the vehicle prior to, during, and after the

18  search?

19  A     Yes.

20  Q     Who was that?

21  A     That was Intelligence Analyst McCarthy Butts.

22  Q     Did someone on the search team create a rough sketch of

23  the layout of the premises?

24  A     Yes.

25  Q     Which agent did that?

(Justin Garrick-Direct by Mrs. Solari)

1    A    That was Special Agent Marcus Kirkland.

2    Q    If you could look at the binder in front of you, Special

3    Agent, I'd like to just you to confirm the nature of some of

4    those exhibits.  I know Exhibit 1 is not included in the

5    binder, but can you remind the Court what Exhibit 1 is?

6    A    Exhibit 1 is a recording of the defendant's interview.

7    Q    And last night did you review that recording in its

8    entirety?

9    A    Yes, I did.

10   Q    Did you assure yourself that that recording is as you made

11   it that day from start to finish?

12   A    Yes.

13   Q    No additions, modifications, or deletions other than

14   necessary redactions?

15   A    Just the redactions.

16   Q    And what is redacted from that recording is classified

17   information?

18   A    Correct.

19   Q    As well as some of the defendant's personally identifiable

20   information?

21   A    Correct.

22   Q    Other than that, is the recording as you made it?

23   A    Yes.

24   Q    Exhibit 2 -- what is that?

25   A    It says, "Transcript of Exhibit 1."

(Justin Garrick-Direct by Mrs. Solari)

30

1   Q    All right.  And Exhibit 3 -- is that the sketch of the

2   premises that was created on the 3rd?

3   A    Exhibit 3 are the photographs taken -- Exhibit 3, yes, is

4   the sketch.

5   Q    All right.  And Exhibit 4 -- are those a selection of the

6   photographs that were taken that day?

7   A    Yes.

8   Q    Thank you, Special Agent.  I'd like to take you back again

9   to your encounter with the defendant on June 3rd of last year.

10  Had you ever met her before?

11  A    No, I had not.

12  Q    In the 15 or 20 minutes of time leading up to your initial

13  encounter with her that day, describe where you and the other

14  members of the search team were located.

15  A    We were in the parking lot of a school.

16  Q    What were the outdoor conditions like that day?

17  A    It was sunny, very hot.

18  Q    What were you wearing?

19  A    I was wearing a blue polo shirt and a pair of Banana

20  Republic cargo pants.

21  Q    Did your Polo shirt have anything emblazoned on it to

22  indicate you were police, FBI, anything like that?

23  A    No.  It had a Master's emblem.

24  Q    Did you have any raid gear on, Flak jacket, FBI jacket, or

25  ball cap, anything like that?

(Justin Garrick-Direct by Mrs. Solari)
31

1   A     No, I did not.

2   Q     Were you wearing a ballistic vest?

3   A     No, I was not.

4   Q     Were you carrying any visible weapons?

5   A     No.

6   Q     How about the other members of the team?  How were they

7   dressed?

8   A     Similarly dressed.  Civilian clothes.

9   Q     Short-sleeved shirts, khaki pants?

10  A     Yes.

11  Q     Anybody at all have an FBI jacket or ball cap on?

12  A     No.

13  Q     Anybody to the best of your knowledge wearing a ballistic

14  vest?

15  A     No.  No one was wearing one.

16  Q     And let's talk about anybody carrying any visible weapons?

17  A     Two were carrying side arms on their waist.

18  Q     Which officers were those, if you recall?

19  A     That was Special Agent Kirkland and Task Force Officer

20  Mark Bryngelson.

21  Q     Now how do you know, if you know, that the remaining

22  members of the team were armed or unarmed?

23  A     Some I had to go and ask.  I wasn't sure.  Others weren't

24  agents; so I knew that they would not be armed.

25  Q     Would that be McCarthy Butts, for instance?

(Justin Garrick-Direct by Mrs. Solari)

32

1    A    Correct.

2    Q    Not a sworn agent, so not carrying a weapon?

3    A    Correct.

4    Q    And how about Agent Nick Meekins?

5    A    Correct.

6    Q    Was he armed?

7    A    No, he was not.

8    Q    All right.  As for the other agents aside from Special

9    Agent Kirkland and TFO Bryngelson, were you able to see any

10   weapons they were carrying?

11   A    No.

12   Q    What kind of vehicles were the team members driving?

13   A    Bureau-issued vehicles -- their standard bu cars.

14   Q    Bu cars.  So what would they look like to an ordinary

15   person?

16   A    They would look like normal vehicles.

17   Q    All right.  So they're not emblazoned with police emblems

18   or anything like that?

19   A    No.

20   Q    Do they have sort of light packages mounted on top or very

21   visibly in the front?

22   A    No.  They're inside of the compartment.

23   Q    So are they designed to be undercover vehicles?

24   A    Yes.

25   Q    To the extent that any of those cars had light and siren

1    packages, were any of them activated on any vehicle that day?

2    A    No.

3    Q    Was anybody who approached the residence carrying a

4    battering ram?

5    A    No.

6    Q    Or a Halligan tool to pull bars off?

7    A    No.

8    Q    Bullhorn?

9    A    No.

10   Q    Ballistic shield?

11   A    No.

12   Q    Anybody carry a raid helmet?

13   A    No.

14   Q    Did y'all bring with you any distractors like Flash-bangs?

15   A    No.

16   Q    Any other tactical equipment in hand as your team

17   approached the house?

18   A    No.

19   Q    All right.  I'd like to go back to the time where you said

20   you and Special Agent Taylor initially approached the

21   defendant.  Describe, please, how that happened.

22   A    The defendant was -- had pulled up into her residence and

23   was getting out of the vehicle.  We pulled up at, say, a

24   90-degree angle perpendicular to her vehicle several yards

25   back.

(Justin Garrick-Direct by Mrs. Solari)

34

1           MRS. SOLARI:  Tash, could you please bring up Exhibit

2     4-1?

3       All right.  For the record, we have on the screen Exhibit

4     4-1 which corresponds to the same page in everybody's trial

5     notebook.

6       Was that how the defendant's car was positioned in the

7     driveway when you approached?

8           THE WITNESS:  Yes.

9  Q   And describe if it can be seen on this photograph where

10    you and Special Agent Taylor parked.

11 A   Well, it can't be seen, but our vehicle would be off to

12    the right.

13 Q   I see.  So at that time were you actually blocking in the

14    defendant's vehicle or could she have had, I suppose, an exit

15    way from that driveway if she had chosen?

16 A   From the way our vehicle was positioned, she could have

17    reasonably backed up.

18          MRS. SOLARI:  Thank you, Tash.  You can take that

19    down.

20      You mentioned you recorded your interaction with the

21    defendant.  When did you begin the recording?

22          THE WITNESS:  I hit record on the recorder just

23    before exiting the vehicle.

24 Q   What kind of device did you use?

25 A   It's a Sony digital audio recorder.

(Justin Garrick-Direct by Mrs. Solari)

35

1   Q     And how and where did you hold it?

2   A     Both Special Agent Taylor and I held it just out in the

3   open on top of my notebook at various times just in my hand.

4   Q     So it wasn't concealed surreptitiously on your person

5   anywhere?

6   A     No.

7          MRS. SOLARI:   Tash, if we could please play Exhibit 1

8   starting at zero and we're going to go to 1 minute and 22

9   seconds.

10         For everyone, the transcript should correspond to pages

11  2-3 and 2-4 in the transcripts.

12         (The audio is played.)

13  Q   Special Agent, please describe how everyone's relative

14  positioning during that conversation.

15  A     We're standing a little bit more than arm's length away

16  from the defendant just presenting, you know, our credentials

17  and explaining why we're there.  She's outside of her --

18  standing outside of her vehicle.

19  Q     So in Exhibit 4-1 were y'all standing on that parking pad

20  we can see in the forefront of the photo?

21  A     Yes.

22  Q     After that initial introduction, did you obtain from the

23  defendant her house key?

24  A     Yes.

25  Q     The keys to her vehicle?

1    A    Yes.

2    Q    And did you or Special Agent Taylor ask if she had a

3    cellphone?

4    A    Special Agent Taylor did, yes.

5    Q    Did the defendant provide you her cellphone?

6    A    Yes.

7    Q    And I believe this appears on page 2-6 halfway down the

8    page.  Did you tell her or did Special Agent Taylor tell her at

9    that time, "But, like he said, we're completely voluntary,

10   completely up to you, but, you know, I think maybe it would be

11   worth your time to listen at least for a little bit"?

12   A    Yes.

13   Q    So Special Agent Taylor, we heard in the recording, had

14   expressed some concern about whether the defendant's dog needed

15   to be let out to go to the bathroom.  Did y'all make

16   arrangements to make that happen?

17   A    We did.

18   A    How did that work?

19   A    We asked if she should get the dog, and if the dog needed

20   to go outside, put the dog in the backyard.

21   Q    Did she get the dog from the house?

22   A    Yes.

23   A    Describe what that looked like.

24   A    She went in the house just in the front door, grabbed a

25   leash, leashed the dog, and put the dog in the back.

(Justin Garrick-Direct by Mrs. Solari)

1    Q    Okay.  And is that a fenced backyard sort of around the

2    side of the house?

3    A    It is.

4    Q    Okay.  Did you see the defendant's dog when she brought

5    her outside?

6    A    Yes, I did.

7    Q    So on page 9 of Exhibit 2 at about 3 minutes and 31

8    seconds on the recording you can be heard saying, "Hey,

9    sweetie.  Hey, sweetie."  Who were you talking to?

10   A    I was talking to the dog.

11   Q    After the defendant put her dog -- what was the dog's

12   name?

13   A    It was Mickey.

14   Q    All right.  After the defendant put Mickey in the

15   backyard, did she ask anything from you or Agent Taylor about

16   leaving her front door open or closed?

17   A    She asked that we close the door so the cat wouldn't get

18   out.

19   Q    Did you agree to do that?

20   A    Yes.

21   Q    Had anybody else arrived around that time?

22   A    Task Force Officer Joe Francois had -- was stationed

23   across the street and had moved forward a little bit.

24   Q    And was he one of the team members that you described

25   earlier?

(Justin Garrick-Direct by Mrs. Solari)

38

1   A      Yes.

2   Q      So was he dressed in some sort of polo shirt, khaki pants?

3   A      I believe it was a t-shirt or something.  Yes, civilian

4   clothes.

5   Q      After Task Force Officer Francois arrived, was there some

6   arrangement made for a walk-through of the residence?

7   A      Yes, there was.

8   Q      Who conducted that walk-through?

9   A      TFO Francois and Special Agent Taylor.

10  Q      And as that was occurring, did you explain to the

11  defendant that that's what they were doing inside the home?

12  A      Yes, I did.

13  Q      And where was the defendant during the time that

14  walk-through was taking place?

15  A      On the front porch.

16  Q      With whom?

17  A      With me.

18  Q      Did she have any questions or express any concerns to you

19  at that point?

20  A      She made a comment of just wanted to make this as easy as

21  possible.

22  Q      All right.  And I believe that appears on page 2-12 of the

23  transcripts.  And did you respond to her, "Okay.  Likewise.

24  So, hopefully, explain things, get to figure this all out, and

25  wrap it up"?

(Justin Garrick-Direct by Mrs. Solari)

1  A    Yes.

2  Q    So what did you and the defendant do after that while

3  Wally and Joe conducted the walk-through?

4  A    Engaged in small talk, spoke about her dogs -- her dog --

5  my dog, Crossfit, her time in the Air Force.

6  Q    So, finally, we see on page 13 of Exhibit 2 someone is

7  quoted as saying "The house is cleared."  What does that mean?

8  A    That means the house was visually cleared of any other

9  individuals or any, you know, threats to officer safety.

10 Q    Had any actual searching of the defendant's belongings

11 taken place at that time?

12 A    No.

13 Q    So once the house was cleared, did you all address the

14 defendant's earlier expressed concern about getting some of her

15 groceries into the fridge?

16 A    Yes.

17 Q    How did y'all make that happen?

18 A    The defendant and Special Agent Taylor and TFO Francois

19 took the groceries out of the car and into the house.  They

20 took a look at the groceries quickly and then put them in the

21 refrigerator.

22 Q    So that was a joint effort by the defendant and Special

23 Agent Taylor and TFO Francois?

24 A    Yes.

25 Q    All right.  Did anyone at any point restrain the defendant

1   or try to keep her from entering her home or her kitchen?

2   A    No.

3   Q    And what else started happening about that time with

4   regard to documenting the scene?

5   A    The search team arrived on scene and began setting up for

6   a search.  So taking pictures of the residence.

7   Q    Where did the pictures begin?

8   A    It's standard to start on the exterior of the home.

9         MRS. SOLARI:  Tash, could you please bring up Exhibit

10  4-2?

11       Well, I don't see that coming up.  If you would refer to

12  4-2 in the trial notebook that you have in front of you.

13         THE WITNESS:  Yes.

14  Q    And can you describe what we're looking at in that

15  photograph?

16  A    This is a picture of the defendant leaning up against her

17  house outside of the front door.

18  Q    And about when was that photo taken?

19  A    This was taken on -- this would be the entry photos for

20  the search.  So at the beginning.

21  Q    So that's shortly after y'all finished helping her put her

22  groceries in the refrigerator?

23  A    I believe so.

24  Q    Did anyone tell the defendant where to stand or what to do

25  as that photo was taken?

1    A    No.

2    Q    That's just where we found her at that particular point in

3    time?

4    A    Yes.

5    Q    Where are the other agents?  I don't see anybody else in

6    the frame of that photo.

7    A    They're getting ready -- backed up a little bit getting

8    ready for the search.

9    Q    And where were you since you were out there chatting with

10   her?

11   A    I am off frame on -- off towards, I guess, the right -- I

12   guess her left.

13   Q    How much space would you say you gave the defendant during

14   this conversation you had with her outside?

15   A    More than an arm's length.

16   Q    Is it more or less or the same as you typically give

17   someone in an ordinary conversation?

18   A    I gave her a little bit more.

19   Q    So did you speak with the defendant again at that point

20   about whether she might want to talk with you?

21   A    Yes, I did.

22        MRS. SOLARI:  Tash, if we could please play Exhibit 1

23   starting at 8 minutes, 25 seconds.

24        For those of you following in the transcript, this would

25   start on page 2-016.

(Justin Garrick-Direct by Mrs. Solari)

1          (The audio is played.)

2    Q    All right.  Special Agent, you gave the defendant a couple

3    of choices should she want to speak with you and that was here

4    meaning her home; correct?

5    A    Correct.

6    Q    Or the FBI office about five minutes away?

7    A    Correct.

8    Q    Why those two choices?  You seemed to think the defendant

9    wanted to speak with you.  Why was that?

10   A    She seemed -- after I asked if she wanted to speak with us

11   and sit down and go over everything, she seemed like she wanted

12   to do so.  So I gave her a couple of options.

13   Q    All right.  And you asked her if there was somewhere

14   private or away that you could speak.  Why?

15   A    It is a fairly small house.  So when the search began

16   there would be, you know, a lot of movement, walking around.

17   That way -- didn't want to have, you know, people walking

18   through our conversation providing a distraction.

19   Q    Had you been inside of the house yet?

20   A    I had not.

21   Q    So you weren't familiar with whatever back room she was

22   talking about?

23   A    I was not.

24   Q    Or any other room in the house, for that matter?

25   A    No.

1    Q    All right.   And you said that the other agents would have

2    to "do their thing and then we can go in."  What were you

3    referring to as far as "do their thing"?

4    A    As far as when a search warrant starts they have to do the

5    photographs and then the initial walk through which is when

6    they go in and they photograph the interior and so they would

7    need to complete that.  The search team would have to complete

8    that before we could go in.

9    Q    Okay.   And, again, how and where were you and the

10   defendant standing during that part of the conversation?

11   A    This would all have been on the front porch of the house.

12   Q    And now how did you continue to pass the time while

13   Investigator -- I'm sorry -- Intelligence Specialist Butts was

14   finishing the photos?

15   A    Additional small talk just about her time stationed --

16   where she was stationed during the Air Force, things like that.

17   Q    During the time you've discussed so far did anybody show

18   any concern for the defendant's dog that had been put in the

19   backyard -- Mickey?

20   A    Yes.

21   Q    What did they do for the dog?

22   A    Several people asked if the dog needed water or anything

23   like that and eventually one of the agents went and got water.

24   Q    And brought it to the dog?

25   A    Yes.

(Justin Garrick-Direct by Mrs. Solari)

44

1   Q    While you were still talking waiting to go inside as the

2   photos were being taken, did the defendant ask you about her

3   cellphone?

4   A    Yes, she did.

5            MRS. SOLARI:   Tash, can you please play Exhibit 1

6   starting at 20 minutes, 17 seconds?   This corresponds to the

7   transcript pages 2-27, -28.

8        (The audio is played.)

9   Q    So did you understand what the defendant meant when she

10  said, "One of those things where I brought my phone into the

11  building and I won't see it for three weeks"?

12  A    Yes, I was.

13  Q    What is she talking about?

14  A    So the building she worked at is a secure facility; so if

15  someone is caught with a cellphone, they confiscate the phone

16  and it can take several weeks to get it back, if at all.

17  Q    Defendant mentioned that she was teaching yoga the next

18  day.   Did you ever tell her, "No, you're not"?

19  A    No, I did not.

20  Q    Did you ever encourage her to cancel those plans?

21  A    No, I did not.

22  Q    That recording ended at minute 21 having started your

23  initial approach to the defendant.   Had anyone started

24  searching through the defendant's belongings inside the house

25  yet?

1    A    No.

2    Q    Just the walk-through and the initial scene photos were

3    ongoing?

4    A    I believe the initial walk through was still ongoing, yes.

5    Q    So 21 minutes after you've introduced yourself to the

6    defendant there is no general rummaging going on in the house?

7    A    No.

8    Q    Other than the conversation that we've heard so far

9    between the defendant and you and Special Agent Taylor, who

10   else had interacted with the defendant by this time?

11   A    I believe Special Agent Harrison had mentioned -- had

12   spoken with her just briefly.

13   Q    Was he the one that had concerns about her dog?

14   A    The dog and then comparing duty stations in the Air Force.

15   Q    He was stationed in, what, Minot, North Dakota?

16   A    Right.

17   Q    So that comment in the transcript belongs to Special Agent

18   Harrison?

19   A    Yes.

20   Q    And I believe she also -- you said she also interacted

21   with TFO Francois who helped her put her groceries away?

22   A    Yes.

23   Q    Any other significant interaction between the defendant

24   and any agent at the scene at this time?

25   A    No.

(Justin Garrick-Direct by Mrs. Solari)

46

1    Q    How were the agents, if at all, acting toward the

2    defendant as they arrived on scene and prepared to conduct the

3    search?

4    A    Agents were busy getting ready for the search; so they

5    pretty much ignored her.

6    Q    The defendant told you that all she kept in her spare

7    bedroom was a dog crate.  So did you do anything to try to make

8    that a more comfortable space in which to have a conversation?

9    A    The room is pretty much as we found it.

10   Q    Did you attempt to find anything on which y'all could sit

11   if that would make folks more comfortable?

12   A    We did ask if there were any chairs that she had in her

13   house -- any place that we could use to sit.  She said she

14   wasn't big on furniture.  I tried to see if we had any folding

15   chairs in the back of one of our trucks which we didn't.

16   Q    Let's talk about the amount of furniture in the

17   defendant's house.  You said she told you she just wasn't big

18   on furniture?

19   A    She did.

20   Q    Was there a lot of furniture in her house, generally?

21   A    There was not.

22   Q    How many things were there to comfortably sit on in the

23   house?

24   A    There was a futon in the living room and that was -- that

25   was about it.

1    Q    So was there a dining room table and chairs?

2    A    There weren't chairs.  There was a small table in that

3    room, as I recall.

4    Q    Was there a kitchen table and chairs?

5    A    No.

6    Q    Okay.  Any sort of benches, love seats, anything like that

7    in the house?

8    A    Just that futon type of couch.

9    Q    And were there more rooms other than that spare bedroom

10   you finally got to that appeared pretty sparsely furnished?

11   A    There was a living room, I guess what you consider a

12   dining room, other room, a kitchen, her bedroom, and then that

13   room.

14   Q    The dining room in particular -- you said there was a

15   small table in there?

16   A    I believe so.

17   Q    What else was in there, if you recall?

18   A    It was a rug.

19   Q    That was it?

20   A    As I recall, that was about it.

21   Q    All right.  So at some point right around then when you

22   were trying to find some chairs to figure out if there would be

23   anything to sit on, did the defendant express any desire to

24   tend to her cat?

25   A    She asked if she could leash her cat.

1    Q     Did she say why?

2    A     She didn't want the cat to run out.

3    Q     Okay.  Did you or any other agent have any issue with

4    that?

5    A     No.

6    Q     All right.  I am going to have you describe how that

7    happened.

8          Tash, are you able to bring up 4-3?

9          So this is one of the search photos that you authenticated

10   earlier.  Can you describe what we're looking at here in 4-3?

11   A     This is a photograph from the kitchen into her bedroom.

12   Q     So did you tell the defendant that she was able to go in

13   her bedroom to tend to the cat?

14   A     Yes.

15   Q     Where was it at that time, if you know?

16   A     The cat?

17   Q     Uh-huh.

18   A     Under the bed.

19   Q     All right.  So this is the photo approaching the bed.  Now

20   I see there is some clutter on the bed and things like that.

21   Is this the bedroom as y'all found it that day?

22   A     Yes.

23   Q     So the FBI hasn't, you know, dumped drawers out on the bed

24   or anything like that?

25   A     No.

1    Q     All right.

2          Can we go to the next photo, Tash -- 4-4?

3          What is this we're looking at?

4    A     This is the interior of the bedroom.

5    Q     All right.  What was going on in this bedroom as the

6    defendant entered it to tend to her cat?

7    A     I believe that there were one or two agents in there who

8    had just begun conducting the search.

9    Q     All right.  But, again, this stuff that we see kind of

10   strewn about the room -- had the agents done that?

11   A     No.

12   Q     This was an initial scene photo?

13   A     Yes.

14   Q     How did the defendant actually go about getting to her cat

15   and putting some sort of leash on it?

16   A     She got the leash.  I think she got the leash in the

17   living room as she walked in and she crawled under the bed and

18   leashed the cat.

19   Q     All right.  So were you or Agent Taylor or any other agent

20   sort of holding on to her or holding her by the elbow or

21   guiding her as she approached her bedroom?

22   A     No.

23   Q     Did she just walk in there freely?

24   A     Yes.

25   Q     Did you or any other agent go under the bed with her?

1    A    No.

2    Q    All right.  She was under there by herself trying to find

3    the cat?

4    A    Yes.

5    Q    All right.  I believe the other photos are just photos of

6    the bedroom.

7         Let's look at 5, Tash.

8         Again, another photo of the bed that had the cat

9    underneath?

10   A    Yes.

11             MRS. SOLARI:  And 6, Tash -- 4-6.

12        Now on the right-hand side of that photograph, because

13   this may become important later, what is that?

14             THE WITNESS:  That's a door to the bathroom.

15   Q    All right.  Is that door the one that has sort of a beige

16   towel hanging over it?

17   A    Yes.

18   Q    Were there other bathrooms in the house that you noticed?

19   A    No.  That's the only one.

20   Q    All right.

21        Thank you, Tash.

22        So was the defendant able to successfully leash her cat?

23   A    Yes.

24   Q    And then how did she secure it somehow in the room so it

25   didn't run out the door?

1    A    I want to say tied the other end around the bottom of the

2    bed post, but I am not sure.

3    Q    All right.  Did any of you tell her to do any of that?

4    A    No.

5    Q    That was something she asked to do?

6    A    Yes.

7    Q    All right.  What happened when the defendant was done

8    taking care of her cat?

9    A    When she was done with the cat, we walked into the spare

10   bedroom and started the interview.

11   Q    All right.  So I want you to describe for us how that

12   happened.  In other words, who led the way into that spare

13   bedroom?

14   A    She did.

15   Q    In fact, had you even figured out where it was quite yet?

16   A    No, I really didn't.

17   Q    All right.  So the defendant led the way.  Again, is

18   anybody sort of touching her at the elbow or guiding her at the

19   shoulder or touching her in any way whatsoever?

20   A    No.

21   Q    So she leads the way and who follows her?

22   A    I believe Special Agent Taylor and then myself.

23   Q    Describe for us, please, the spare bedroom as you entered

24   it.

25   A    It was, again, no furniture in the room, a collapsed dog

(Justin Garrick-Direct by Mrs. Solari)

52

1    crate off to the right as you enter.  It was maybe about seven

2    and a half feet by ten feet.  There was a closet in the room.

3    There are two windows with the blinds closed.  That was -- it

4    was about it.

5              MRS. SOLARI:  Tash, could you please bring up Exhibit

6    3?

7         Special Agent, can you tell us which room on this diagram

8    is the spare bedroom in which you interviewed the defendant?

9              THE WITNESS:  Room "E".

10   Q    Okay.  And we see on the left there something marked

11   "access road".  So how is this oriented with regard to Battle

12   Row?

13   A    So Battle Row would be on the south side; so that would be

14   on the right of the screen all the way.

15   Q    All right.  And that access road borders the house to the

16   left?

17   A    Yes.

18   Q    So let's talk a little bit more about -- oh, and by the

19   way, so we see a room "D" just above room "E" there?

20   A    Yes.

21   Q    All right.  We see indications there that look like

22   doorways, but describe for us please what we're looking at.

23   A    That's a hallway off the kitchen with an exterior door.

24   Q    That leads to the outside?

25   A    Yes.

1   Q    All right.  Let's look at some actual photographs then of

2   that room, please.

3        Tash, if you would bring up 4-7.

4        Please describe what we're looking at in photo 4-7.

5   A    That is the kitchen -- photo from the kitchen into that

6   hallway that's labeled as room "D".

7   Q    And what is the door that we see on the right-hand side?

8   A    That's an exterior door.

9   Q    And where does that lead to?  Back to the backyard

10  somewhere?

11  A    Yes.

12  Q    All right.  4-8, please.

13       Is this the photo as we continue to approach the spare

14  bedroom?

15  A    Yes, it is.

16  Q    And what is the doorway on the left?

17  A    The doorway on the left is the doorway to the spare

18  bedroom.

19  Q    4-9, please.

20       What do we see here?

21  A    That is the entryway for the spare bedroom.

22  Q    And is this how you found the room when the defendant led

23  you to it?

24  A    Yes.

25  Q    4-10.

(Justin Garrick-Direct by Mrs. Solari)
                                                              54

1          What is this?

2     A    Interior photo of the room from the opposite end.

3     Q    And can you identify where the closet is that you

4     mentioned in this photo?

5     A    The closet is on the right side of the photograph.

6     Q    All right.  And did you do anything with that closet door

7     when you first entered the room?

8     A    I did.  I opened it, and I looked in the closet.

9     Q    All right.  So I believe we hear the sound of a closing

10    door on the recording.  What is that?

11    A    That's me opening and closing the closet door.

12    Q    And 4-11, please, Tash.

13         Again, is that the closet we're talking about?

14    A    Yes.

15    Q    And the main door to the room?

16    A    Yes.

17    Q    And the exterior door can be seen in the background of

18    that photo?

19    A    Yes.

20    Q    And the blinds appear to be partially up on that exterior

21    door.  Is that how you found that door?

22    A    Yes.

23    Q    And is that how it remained as far as you know during the

24    entirety of your interview with the defendant?

25    A    Yes.

1            MRS. SOLARI:  Thank you, Tash.

2        Now, Special Agent, on page 31 of Exhibit 2 the defendant

3    is quoted as saying, "Oh, this room is dirty.  I am so sorry."

4    Was that room particularly dirty?

5    A    I didn't think so, no.

6    Q    Were there piles of dirt or debris in there?

7    A    No.

8    Q    Any garbage or old food?

9    A    No.

10   Q    Was it infested with bugs?

11   A    There was -- I noticed one dead cockroach.

12   Q    All right.  Did it smell particularly bad or funny?

13   A    No.

14   Q    Was it unusually dark?

15   A    No.

16   Q    Pretty easy to see in there?  Was it fairly well lit?

17   A    Yes.

18   Q    Was it unusually damp?

19   A    No.

20   Q    Was it unusually hot or cold?

21   A    No.

22   Q    Would you say, but for the lack of furniture, it was

23   pretty much the same as the other rooms in the house?

24   A    It was.

25   Q    Now tell me as far as everyone's relative position, where

(Justin Garrick-Direct by Mrs. Solari)
56

1    did y'all go when you entered that room?

2        And, Tash, could you bring up Exhibit 3, again?  If you

3    could zoom in so we could see room "E" a little bigger, please,

4    Tash.

5        All right.  So, again, is this the room in which your

6    interviewed occurred?

7    A    Yes.

8    Q    All right.  Please explain to us everyone's relative

9    position understanding, I think, north is to the left?

10   A    North is to the left.

11   Q    All right.

12   A    The sketch is not to scale, but the defendant was on the

13   south end -- was on the south wall.

14           MRS. SOLARI:  May I approach the drawing, Your Honor?

15           THE COURT:  You may.

16   Q    So please tell me, Special Agent, is this the south wall

17   you're describing?

18   A    Yes.

19   Q    Please tell me -- I am going to run my pen down the south

20   wall.  When we get to the spot where the defendant was

21   approximately located, please let me know.

22   A    Okay.  Stop.

23   Q    All right.

24   A    About there.

25   Q    Okay.  Now tell me where you were located.

(Justin Garrick-Direct by Mrs. Solari)
                                                                    57

1   A    I was on the -- leaned up against the closet wall on the

2   -- that would be the east end of the room.

3   Q    All right.  So --

4   A    Right there.

5   Q    -- this portion right here?  All right.  I am going to run

6   my pen along it from left to right and you tell me when to

7   stop.

8   A    Stop.

9   Q    All right.  And where was Special Agent Taylor?

10  A    Special Agent Taylor was on the west wall.

11  Q    That would be down at the bottom line here?

12  A    Yep, about midway between -- about halfway.

13  Q    About here?

14  A    Sounds about right.

15  Q    All right.  Was there anyone else in the room but the

16  three of you?

17  A    No.

18  Q    Okay.  Now you've positioned the defendant there on the --

19  that's the south wall?

20  A    Well, she walked there.

21  Q    Okay.  Yeah, I want to know more about that.  How did the

22  defendant come to be there?

23  A    She walked in the room and took up a position on that

24  wall.  She leaned up against that wall.

25  Q    So did you tell her verbally where to go when she entered

(Justin Garrick-Direct by Mrs. Solari)
58

1    the room?

2    A    No.

3    Q    Did you point or gesture in some way that she was to stand

4    in any particular place?

5    A    No.

6    Q    Did you tell her whether to sit or stand?

7    A    I told her that -- to sit or stand, whatever she

8    preferred.  If she sat I said then we would sit, too.  If she

9    sits, I would sit.

10   Q    Why was that important to you to sit if she sat?

11   A    I didn't want there -- I didn't want to create any

12   situation in which I was looming over, you know, her looking

13   down on her.  I wanted to make sure that we were on equal

14   footing.

15   Q    Did you tell her at any time what to do with her hands?

16   A    No.

17   Q    And what was she doing with them?

18   A    Sometimes she was -- she had her hands in front of her.

19   Other times she had them behind her back leaning up against the

20   wall.

21   Q    And did you leave the main door to room "E" open or

22   closed?

23   A    I don't remember the condition of the door.

24   Q    All right.  Let's listen to the beginning of that

25   conversation, please, in the spare bedroom.  I believe this

1    appears -- begins on page 32 of Exhibit 2 and is Exhibit 1

2    starting at 25:42.

3         (The audio is played.)

4              MRS. SOLARI:  This portion is redacted.

5         (The audio continues to be played.)

6    Q    So, Special Agent, you told the defendant if she needed to

7    go to the bathroom to just let you know; it was no big deal?

8    A    I did.

9    Q    If she needed water to shout it out?

10   A    Yes.

11   Q    Asked her if she wanted water right then and there?

12   A    Yes.

13   Q    And she indicated she was not thirsty at that time?

14   A    Correct.

15   Q    In the conversation that followed did you or Special Agent

16   Taylor ever tell the defendant that she was under arrest?

17   A    No.

18   Q    That she was going to be arrested?

19   A    No.

20   Q    That she had to speak with you or with anybody else at the

21   scene?

22   A    No.

23   Q    That she had to stay there in that spare bedroom?

24   A    No.

25   Q    That she had to stay in the house?

(Justin Garrick-Direct by Mrs. Solari)

1    A      No.

2    Q      Did you or Special Agent Taylor show the defendant the

3    search warrant and give her an opportunity to read it?

4    A      Yes.

5    Q      This appears on 2-34 and -35.

6           Tash, if you would please play Exhibit 1 starting at

7    28:30.

8           (The audio is played.)

9           MRS. SOLARI:   Thank you, Tash.

10          What was that joke about?   I heard laughter, but it was

11   difficult to hear on the recording.

12          THE WITNESS:   Can you remind me which page number?

13   Q      This is on transcript 2-34 and -35.

14   A      Okay.   She was commenting about the weight that was on the

15   -- that was on the warrant.

16   Q      Like most of us probably maybe underestimated her weight a

17   little bit on her driver's license?

18   A      Special Agent Taylor said "Don't we all?"

19   Q      Yeah.   Fair enough.   Did Special Agent Taylor give the

20   defendant a chance to ask questions about the search warrant?

21   A      Yes.

22          MRS. SOLARI:   Tash, could you please play Exhibit 1

23   at 31:15?   This is the transcript at 2-36.

24          (The audio is played.)

25   Q      I believe that ended with, "Does that ring any bells?"

(Justin Garrick-Direct by Mrs. Solari)
61

1    Right?

2    A    Correct.

3             MRS. SOLARI:   Okay.   Thanks, Tash.

4    So you and Special Agent Taylor both said you would leave

5    a copy of the search warrant with the defendant?

6             THE WITNESS:   Yes.

7    Q    Why did you tell her that?

8    A    So that she could -- after we were gone so that she could

9    read the warrant, have a copy of it, and it was hers to keep.

10   That's how it works.

11   Q    And you anticipated the defendant being there at the

12   residence to read the search warrant after you were gone?

13   A    Yes.

14   Q    So you started off the substance of the conversation

15   asking the defendant if mishandling classified information rang

16   any bells.   How did the interview go from there, generally?

17   A    She provided some information about an issue that occurred

18   right after she began -- an issue with the PKI document that

19   was classified, but then she denied any knowledge or

20   involvement of the document in question.

21   Q    Based on the investigation you had done so far, did you

22   have evidence to suggest that her statements to you at that

23   point were not truthful?

24   A    I did.

25   Q    So did you challenge that denial?

1    A    I did.

2    Q    Did you do so by yelling at her or raising voice at her?

3    A    No.

4    Q    Did Special Agent Taylor do either of those things?

5    A    No.

6    Q    Did either of you call her a liar?

7    A    No.

8    Q    Or tell her that she was lying?

9    A    No.

10   Q    Did you threaten her with prosecution for false statement

11   or tell her that was a very serious offense?

12   A    No.

13   Q    I'd like to know if either you or Agent Taylor at any time

14   moved from those positions you identified towards the defendant

15   in any sort of effort to make her feel stressed or

16   uncomfortable?

17   A    No.

18   Q    So you stayed in place?

19   A    I did.

20   Q    Anybody point a finger in her face or any other accusatory

21   body language?

22   A    No.

23   Q    So, instead, what did you do?

24   A    Presented her with one piece of evidence at a time and

25   gave her an opportunity to tell the truth.

(Justin Garrick-Direct by Mrs. Solari)

63

1   Q    Okay.  And as a matter of fact, for a bit -- I'm sorry.

2   After that initial denial, did y'all just kind of take a step

3   back, change the subject for a while?

4   A    We did that several times.

5   Q    Talk about travel, her neighborhood, things like that?

6   A    We did.

7   Q    But each time you eventually revisited the subject of the

8   classified information?

9   A    Yes.

10  Q    The second time you asked the defendant if she had

11  searched for, printed, or disclosed information outside of her

12  work world, how did that go?

13  A    The second time -- do you have that page number?

14  Q    Somewhere around 2-46 and -47.

15  A    She did say that she did -- or she would print off

16  documents for, among other reasons, to have scratch paper.

17  Q    Then on page 2-46 did she say nothing outside of her work

18  assignments -- anything else outside of that and never outside

19  of the building?

20  A    She did.

21  Q    And, again, based on the evidence that you had seen, did

22  you believe that that statement was untrue?

23  A    I did.

24  Q    Did you challenge that denial?

25  A    I did.

1       MRS. SOLARI:  Tash, if you would play Exhibit 1,

2  please, at 43:38.  I've skipped one.  Just go to 43:38.

3       (The audio is played.)

4       MRS. SOLARI:  This is redacted.

5       (The audio continues to be played.)

6  Q    So was that Special Agent Taylor talking towards the end?

7  A    It was.

8  Q    And he reminded the defendant while y'all were in that

9  spare bedroom, "We're here voluntarily"?

10  A    Yes.

11  Q    "You're talking voluntarily"?

12  A    Yes.

13  Q    "We're not forcing you to do anything"?

14  A    Correct.

15  Q    You just wanted her to think; correct?

16  A    Correct.

17  Q    So what did that produce from the defendant?

18  A    She then stated that she did have recollection of printing

19  out a document -- the document in question.

20  Q    What did she tell you she had done with it?

21  A    She stated that she read it and she left it on her desk

22  for a few days and then she said that she placed it in the burn

23  bag.

24  Q    Again, based on the evidence that you were privy to, did

25  you believe that to be true?

1   A     I did not.

2   Q     So did you challenge that denial or that misstatement?

3   A     I did.

4   Q     Again, did you yell at the defendant, point a finger in

5   her face, creep towards her, anything like that?

6   A     No.

7   Q     Did anybody touch her at that point?

8   A     No.

9   Q     Any foul or harsh language used towards her?

10  A     No.

11        MRS. SOLARI:  Tash, if you could please play

12  Exhibit 1 starting at 52:15.  This is on pages 2-53 and -54.

13        (The audio is played.)

14  Q     I paused it right there.  There seems to be a lot of sort

15  of background noise and speaking.  What is the noise we are

16  hearing in the background?

17  A     That would be the search team just doing their search.

18  Q     Okay.  Were they in areas just outside of the door?

19  A     They were.  They would be room "C", "D", and throughout

20  the house.

21        MRS. SOLARI:  All right.  I'm sorry.  Let's continue.

22  We're on page 53.

23        (The audio is played.)

24  Q     So, Special Agent, you told the defendant, "Why I'm here

25  and why I want to talk to you is figure out the why behind

(Justin Garrick-Direct by Mrs. Solari)

1   this."  Is that right?

2   A     That's right.

3   Q     And so when you asked the defendant, "I ask you, again,

4   did you take it out and send it?" that resulted in her stating,

5   "I didn't.  I put it in the burn bag."  Is that right?

6   A     That's right.

7   Q     Now, again, how were you and Special Agent Taylor

8   positioned relative to the defendant during that portion of the

9   conversation?

10  A     The same as we had been positioned throughout the whole

11  interview.

12  Q     So nobody moved spaces there.  Nobody got closer to the

13  defendant?

14  A     No.

15  Q     Did you touch her at any point during this conversation?

16  A     No.

17  Q     What, if anything, were you holding in your hands during

18  this conversation?

19  A     I had a notebook.

20  Q     What were you trying to do here?  Why not just come out

21  right in the beginning and say, "Reality, guess what?  I am an

22  FBI agent.  I have been investigating a case, and here is what

23  I know about you, dah, dah, dah, dah, dah, dah, dah, and here

24  is how I know that you took this document and you compromised

25  it"?

1   A    I thought it would be better to give one piece of evidence

2   at a time to give her the opportunity to tell the truth, to not

3   overwhelm her with a whole slew of evidence all at once.

4   Q    Had that been working up to this point?

5   A    No.

6   Q    So at some point did you decide to share with the

7   defendant some of the facts that you had gathered in your

8   investigation?

9   A    Yes.

10  Q    This is on pages 2-54 through -57.

11       Tash, if you could please play Exhibit 1 at 56:09.

12       (The audio is played.)

13  Q    So at the conclusion of that audio portion did the

14  defendant admit to you that she had secreted the document at

15  issue in pantyhose and removed it from her work space?

16  A    She did.

17  Q    And that she had put it in an envelope and mailed it

18  somewhere?

19  A    Yes.

20  Q    Those facts that you were sharing with the defendant about

21  the envelope postmarked Augusta, Georgia; that you believed it

22  was disclosed to an online news outlet that she subscribed

23  to -- based on your investigation, were those facts true?

24  A    Yes.

25  Q    Did you lie to the defendant at any portion of this

(Justin Garrick-Direct by Mrs. Solari)

1   interaction?

2   A     No.

3   Q     During the rest of the conversation did the defendant then

4   detail for you how she found the item at issue?

5   A     Yes.

6   Q     And exactly how she mailed it?

7   A     Yes.

8   Q     How she found the mailing address?

9   A     Yes.

10   Q     Whether she knew the report contained sensitive

11   information?

12   A     Yes.

13   Q     And what did she call that information?

14   A     Sources and methods.

15   Q     Did she admit to you she knew that the news outlet at

16   issue had no authority to receive that item?

17   A     Yes.

18   Q     Did she talk to you some -- volunteering, in fact, some

19   information about what you might find on her phone or on her

20   computer?

21   A     Yes.

22   Q     Did the defendant ever indicate that she wanted water or

23   anything else?

24   A     No, not until I asked her if she wanted some.

25   Q     Okay.  And did she indicate that she did want some water

1   at some point?

2   A    Yes.

3   Q    And how did you handle that?

4   A    I went and got her water.

5   Q    Did you call another agent somewhere nearby the room while

6   you did that?

7   A    I did.

8   Q    Who was that?

9   A    That was Special Agent Marcus Kirkland.

10  Q    Why did you do that?

11  A    Just to have that additional individual in the room so

12  we're not in -- so Special Agent Taylor isn't on a one-on-one

13  with the defendant.

14  Q    So is this more about Special Agent Taylor than it is the

15  defendant?

16  A    Yes.

17  Q    And to go back during that audio portion we just listened

18  to -- again, I'll ask you the same question I've been asking --

19  did you maintain your position in the room?

20  A    Yes.

21  Q    Special Agent Taylor -- did he stay in the same position?

22  A    He did.

23  Q    So no movement towards the defendant during this sort of

24  recitation of evidence?

25  A    No.

1    Q    Okay.   Any pointing, gesturing, menacing looks, anything

2    like that?

3    A    No.

4    Q    Did you -- as the substance of the interview was sort of

5    winding down, did you discuss with the defendant her initial

6    impressions when she first saw you that day?

7    A    I did.   Yes.

8    Q    In is on page 2-69.

9         Tash, if you'd play Exhibit 1 at 1:17:19 or thereabouts.

10        (The audio is played.)

11            MRS. SOLARI:   Thank you.

12        So the defendant told you initially she thought you and

13   Wally might have been there to ask about renting the house?

14            THE WITNESS:   Yes.

15   Q    And then when you showed her your FBI badge she thought

16   this had something to do with the e-QIP packet she had just

17   filled out?

18   A    Yes.

19   Q    What is that?

20   A    It is an online system that you first fill out and submit

21   all of your data through for purposes of getting a security

22   clearance.

23   Q    Does that usually initiate a background check sometimes

24   done by the FBI?

25   A    It does.

(Justin Garrick-Direct by Mrs. Solari)

71

1    Q    So what was -- I mean, we can hear it in the recording,

2    but as you perceived it, what was the defendant's general

3    affect and demeanor during the time you spent with her?

4    A    Very flat.  No -- not a whole lot of emotion, kind of

5    aloof to the whole process.

6    Q    As you were finishing up the interview, again, did you

7    take any time to explain to the defendant what else needed to

8    happen before the search team would be finished?

9    A    Yes, I did.

10   Q    This is on 2-71.

11        Tash, could you play Exhibit 1 at 1:19:50, please?

12        (The audio is played.)

13   Q    All right.  So you mentioned finishing up searches of the

14   vehicle and the house.  Why just those?

15   A    Those were the only searches that we needed to complete.

16   Q    Did you give the defendant an opportunity to ask you

17   whatever questions she had about what else was going to happen?

18   A    Yes.

19   Q    On page 2-73 -- Tash, if you would play Exhibit 1 at

20   1:21:46.

21        (The audio is played.)

22   Q    Why did you tell the defendant you didn't know whether she

23   was going to be going to jail that night?

24   A    Well, at the outset she was not going to be going to jail,

25   and then through the course of the interview she made a lot of

(Justin Garrick-Direct by Mrs. Solari)

1   statements that sounded pretty close to a confession to me.  So

2   I needed to go back and report in and get further instructions.

3   Q    And did you go through sort of another iteration of that

4   assuring the defendant that we didn't need to do anything just

5   yet -- that you were going to make some phonecalls to determine

6   what the outcome would be?

7   A    Yes.

8   Q    Did the defendant express any other needs at the end of

9   your interview?

10  A    She asked to use the restroom.

11  Q    Did you have any issues with that?

12  A    No.

13  Q    Okay.  What did you do for her to make sure that that

14  could happen without any interference?

15  A    I just wanted to make sure that the search team was out of

16  the bathroom so she could have privacy.

17  Q    And did you tell her that you were checking the bathroom

18  for that reason so she could have privacy?

19  A    Yes.

20          MRS. SOLARI:  Tash, could we see Exhibit 4-12,

21  please?

22      What's this, Special Agent?

23          THE WITNESS:  That would be the bathroom in her

24  residence.

25  Q    And that was the only one in the house?

1    A    Yes.

2    Q    So then that's the bathroom the defendant used at the

3    conclusion of her interview?

4    A    Yes.

5    Q    Was anybody in there with her?

6    A    No.

7    Q    Did she use the restroom with the door open or closed?

8    A    Closed.

9    Q    And where were you and the rest of the search team while

10   the defendant was using the restroom?

11   A    Well, the search team was still at the house.  Special

12   Agent Taylor and I were in the bedroom that was off of the

13   bathroom.

14   Q    All right.  Were you standing with your ear pressed up

15   against the door or anything like that?

16   A    No.

17   Q    Standing sort of a respectful few feet away from the door?

18   A    Yes.

19   Q    When the defendant was done, did you tell her at that

20   point she was under arrest?

21   A    No.

22   Q    Did you even know at that point whether she would be taken

23   into custody?

24   A    No.

25   Q    Did you give any -- her specific directions about where to

(Justin Garrick-Direct by Mrs. Solari)
                                                                74

1    go or what to do?

2    A    No.

3    Q    Where did she ultimately go?

4    A    She ended up going to the front of the house and hanging

5    out in the front porch area and I think in the backyard for a

6    while.

7    Q    Do you have any specific knowledge of what she did out

8    there?

9    A    No, not really.

10   Q    What did you do during that time?

11   A    I went to one of the bureau vehicles, got in, and started

12   making telephone calls.

13   Q    And when did you first learn the defendant would be taken

14   into custody that day?

15   A    About a little bit before 6 p.m.

16   Q    Did you find -- this may be embarrassing to the FBI; so I

17   am sorry to have to ask this, but did you find that the team

18   was well prepared to take her into custody?

19   A    We were not.

20   Q    What needed to happen in order to affect the arrest?

21   A    We had to find a place to take her.  We needed to call a

22   local sheriff's deputy for transport and we had to figure out

23   an arrangement of location that she could be housed.

24   Q    Was there a period of time which you had that conversation

25   with the defendant, again, to keep her apprised of what was

(Justin Garrick-Direct by Mrs. Solari)

1    happening?

2    A    I did.

3    Q    I'd like to switch gears slightly and finally address some

4    of the allegations in the defendant's sworn affidavit that was

5    submitted in support of her motion.  Special Agent, in

6    paragraph three of the defendant's affidavit she said she was

7    confronted by two armed male FBI agents after she came home

8    from the grocery store.  I believe we've covered this, but did

9    you or Agent Taylor ever display a weapon in the presence of

10   the defendant?

11   A    No.

12   Q    Did you ever tell her that you were armed?

13   A    No.

14   Q    Did you ever tell her that anyone else at the scene was

15   armed?

16   A    No.

17   Q    The defendant also said in paragraph three that she was

18   told at that time that you had a search warrant for her person.

19   Is that accurate?

20   A    No, it's not.

21   Q    In paragraph four of the defendant's affidavit she claims

22   that after a brief conversation eight more male, armed law

23   enforcement agents came through her front door and immediately

24   began rummaging through her house.  Would you say that's an

25   accurate characterization of how this search began?

1    A    No.

2    Q    Again, was there ever any discussion with the defendant

3    about whether anybody carrying concealed weapons was, in fact,

4    armed?

5    A    No.

6    Q    Did the entire search team show up right on the spot and

7    barge through the front door?

8    A    No.

9    Q    And I believe we discussed this earlier, but 21 minutes

10   into your interaction with the defendant still nobody was

11   rummaging through her house.  Isn't that true?

12   A    That's true.

13   Q    How does the FBI go about searching someone's house?  Is

14   there just a general rummaging through things or is there a

15   systematic way in which it's done?

16   A    No.  It's very methodical.  It starts with photographs --

17   exterior photograph -- and then walk-through, interior

18   photographs, room labeling, and then you pull out those team

19   lead briefs and then it is a methodical search inside.

20   Q    The defendant appears concerned in her affidavit about the

21   lack of a female agent or officer on the scene.  Did you ever

22   discuss with the defendant whether a female agent was necessary

23   to carry out any portion of the search warrant?

24   A    No.

25   Q    Did she ever ask?

1    A     No.

2    Q     In paragraph six of the defendant's affidavit she says you

3    asked to speak with her in a small, unfurnished bathroom in her

4    house.  Is that how that transpired?

5    A     No, it's not.

6    Q     And, again, when the subject came up of the spare room,

7    you had not ever been in the house?

8    A     I had not.

9    Q     And although the room, I suppose -- it depends on which

10   way you're facing the house -- it could be called sort of a

11   back room, is it any more secluded or far away than any other

12   room in the house?

13   A     Not really.  It's a small house.

14   Q     Paragraph seven in the affidavit has quite a few things I

15   want to ask you about.  The defendant claims that as the

16   questioning began in the back room she sat with her back

17   against the wall.  Is that true or false?

18   A     That is false.

19   Q     What was she doing?

20   A     She was standing.

21   Q     Did anybody tell her to do that?

22   A     No.

23   Q     The defendant says that at that time you and Special Agent

24   Taylor were standing in front of her.  Is that true or false?

25   A     That is false.

(Justin Garrick-Direct by Mrs. Solari)
78

1   Q    She says that you and Special Agent Taylor were physically

2   blocking the exit to the room.   True or false?

3   A    That's false.

4   Q    Could the defendant have walked out of the room without

5   ever physically encountering you or Special Agent Taylor?

6   A    Yes.

7   Q    Would it have required either of you to move at all for

8   the defendant to walk unimpeded out of the room?

9   A    No.

10  Q    Not that it's particularly relevant to a custody analysis,

11  but the defendant says in paragraph 14 of her affidavit that

12  you or Special Agent Taylor told her the name of a media

13  publication in which the leaked reporting publicly appeared.

14  True or false?

15  A    False.

16  Q    Did you ever offer her the name of the publication to

17  which you believed she had sent this report?

18  A    No.

19  Q    Was there ever any discussion of whether that reporting

20  had appeared in any publication?

21  A    No.

22  Q    In paragraph 20 of her affidavit the defendant says she

23  was told to go stand in the front yard after your conversation

24  ended.   Again, did you tell her where to go?

25  A    No.   I said, "Hang about, hang around."   I can't remember

(Justin Garrick-Direct by Mrs. Solari)

1   the exact phrase.

2   Q     Did you ever hear anyone else tell the defendant exactly

3   where to go?

4   A     No.

5   Q     And, finally, in paragraph 24 of the affidavit, the

6   defendant says she never felt free to terminate the

7   interrogation or to leave the home.  I don't know if you've

8   been through the transcript and counted, but if you know, how

9   many times do either you or Agent Taylor tell the defendant

10  that day that her interaction with you was voluntary?

11  A     About four times.

12  Q     Did you ever see any law enforcement personnel at the

13  scene of this search touch the defendant?

14  A     No.

15  Q     Raise a voice to the defendant?

16  A     No.

17  Q     Restrain her in any way?

18  A     No.

19  Q     Any handcuffs or frisks?

20  A     No.

21  Q     Ever see anyone unholster a weapon at this scene?

22  A     No.

23  Q     Did anyone openly display any other type of weapon like OC

24  spray or baton or a TASER?

25  A     No.

1    Q    Are you aware of any requests the defendant made during

2    this evolution that were denied?

3    A    No.

4    Q    Anything that she was asked for -- that she asked for that

5    she was told she couldn't have?

6    A    No.

7    Q    Anywhere she asked to go that she was told she couldn't?

8    A    No.

9    Q    Did you ever hear her to ask to either leave the room that

10   she was in with you or to leave the premises?

11   A    No.

12   Q    Ever heard her ask to speak to a lawyer?

13   A    No.

14   Q    Prior to her being informed that she would, in fact, be

15   taken into custody, did she ever ask to make a phonecall?

16   A    She only asked to make a phonecall after we had told her

17   that she was going to be taken into custody.

18   Q    All right.  Ever asked to end the conversation that you

19   were having with her?

20   A    No.

21   Q    Did she ever ask you if you had an arrest warrant?

22   A    No.

23   Q    But she did, ultimately, ask you if she would be going to

24   jail that night?

25   A    Yes.

1    Q    And that happened, essentially, at the conclusion of your

2    interview; correct?

3    A    Correct.

4    Q    Special Agent, have you participated in searches and

5    arrests prior to this case?

6    A    Yes.

7    Q    How, if at all, would this encounter have looked different

8    if you had gone in knowing the defendant would be arrested that

9    day?

10   A    We go in with displayed FBI garments, body armor, either

11   identifying clothing -- go in, handcuff the subject, and secure

12   the scene.

13   Q    And is there any manner of search that happens right away

14   after you handcuffed the subject as well?

15   A    Yes, a high-risk search.

16   Q    Which is what?

17   A    Searching for weapons, anything that could be an

18   officer-safety issue, handcuff keys, stuff like that around the

19   waistband and areas of taken access.

20   Q    All right.  You and Special Agent Taylor promised in the

21   recorded interview that you would help the defendant make

22   arrangements for her pets if that actually became necessary.

23   Did you follow through with that?

24   A    Yes.

25   Q    How was that done?

(Justin Garrick-Direct by Mrs. Solari)

1  A    Special Agent Taylor assisted her in making a telephone

2  call to an individual who could come and pick up the pets.  We

3  also made sure that both animals -- she stated she wanted the

4  animals to be locked inside of the residence.  So after asking

5  her a couple of times on that one, we just made sure that we

6  provided enough food and water for the animals.

7  Q    And was there a call made to somebody other than I think

8  her name was Kathy who would help take care of the pets?

9  A    Yes.

10 Q    And did y'all help the defendant make that happen?

11 A    Yes.  She called her stepfather.

12 Q    Did you notice anything that you thought was slightly out

13 of the ordinary about her conversation with her stepfather --

14 Mr. Davis?

15 A    She didn't provide a whole lot of information to him about

16 what was going on.

17 Q    So did you or Agent Taylor do anything to try to remedy

18 that?

19 A    Agent Taylor got on the phone and provided a little bit

20 more information, yes.

21            MRS. SOLARI:  All right.  May I have a moment, Your

22 Honor?

23            THE COURT:  You may.

24            MRS. SOLARI:  Thank you.  I have no further questions

25 at this time, Your Honor.  Thank you.

1                    THE COURT:  Thank you, Mrs. Solari.

2          Mr. Chester, how long do you believe that

3    cross-examination will take?

4                    MR. CHESTER:  An hour.

5                    THE COURT:  Okay.  All right.  It's probably best to

6    take a lunch break then at this time.  We'll reconvene at

7    1 o'clock.

8          (A lunch break is taken.)

9                    THE COURT:  Mr. Chester, are you ready for your

10   cross-examination?

11                   MR. CHESTER:  Yes, sir.

12                   THE COURT:  All right.  Agent Garrick, if you could

13   retake the stand.

14                        **CROSS-EXAMINATION**

15   BY MR. CHESTER:

16   Q    Afternoon, Special Agent Garrick.

17   A    Afternoon.

18   Q    Your first involvement in this investigation was on or

19   about June 1, 2017; right?

20   A    Correct.

21   Q    Okay.  And you received a report from a governmental

22   agency involving allegations relating to Ms. Winner relating to

23   the leaking -- alleged leaking of a classified document; right?

24   A    Correct.

25   Q    You applied for a search warrant two days later; correct?

1    A    Correct.

2    Q    Now you undertook some planning in those 48 hours; right?

3    A    Yes.

4    Q    Okay.  You met with members of the team?

5    A    With members of the team?

6    Q    Yeah.  Is that right?

7    A    Yes.

8    Q    Did you meet with just the members of the team or did you

9    meet with other folks?

10   A    I pretty much just met with members of the team at

11   that ---

12   Q    Okay.  Sorry.

13   A    Other than telephone calls and emails and just members of

14   the team.

15   Q    So you met with the 11 members of the search team that

16   were there that day and nobody else; is that right?

17   A    I wouldn't say nobody else.  I am just trying to think of

18   who else I might have met with.  As far as physical meeting, I

19   think I just met with the 11.

20   Q    Okay.  One meeting or two or more?

21   A    You mean preoperational meetings?

22   Q    Yes, sir.

23   A    Oh, there were two -- actually, a total of three.  So

24   there is a 10 a.m. briefing and then -- that was at the office

25   and then I had the briefing later at the first rally point

1    which is the Kroc Center and then the second rally point at the

2    school.

3    Q     That was all on June 3rd?

4    A     Yes.

5    Q     Is that right?

6    A     Yes.

7    Q     No meetings before June 3rd?

8    A     Maybe one or -- small meetings with like one or two people

9    just as a head's up, you know; there might be a search in the

10   next coming days.

11   Q     Who were those meetings with?

12   A     Those would be with members, ultimately, of the search

13   team.

14   Q     Now prior to showing up that day on June 3rd it was the

15   FBI's view that Ms. Winner would be arrested; is that right?

16   A     No.  No, it was not.

17   Q     It was not?  Okay.  Let's pull up page 8 of that .pdf.

18         Your Honor, if I could approach?

19              THE COURT:  You may.

20              MR. CHESTER:  I've shown this to the government in

21   advance, Your Honor.

22         Can you pull up page 8 of that .pdf?

23         Now who is Charles McKee, Special Agent Garrick?

24   A     He is a special agent in the Augusta RA.

25   Q     Okay.  He was a member of the search team?

(Justin Garrick-Cross by Mr. Chester)

86

1    A     Yes, he was.

2    Q     Who is Marcus Kirkland, Special Agent Garrick?

3    A     He is a special agent out of the Statesboro RA.

4    Q     Okay.  He was a member of the search team as well?

5    A     Yes.

6    Q     Who is McCarthy Butts, Special Agent Garrick?

7    A     He is an intelligence analyst with the Augusta RN.

8    Q     He was a member of the search team as well; correct?

9    A     Yes.

10   Q     So this email is dated Friday, June 2nd at 7:21 p.m.

11   That's the night before you executed the search warrant; right?

12   A     Correct.

13   Q     And in this email Special Agent McKee says, "We're meeting

14   at 10 a.m. rally time at the Augusta FBI office tomorrow.

15   Agents will effect the arrest and then our search team will

16   begin."  Is that what he says?

17   A     That's what it says, yes.

18            THE COURT:  Mr. Chester, are we going to mark this as

19   an exhibit --

20            MR. CHESTER:  I'm sorry, Your Honor.  Yes.  I

21   apologize.

22            THE COURT:   -- and move it into evidence?

23            MR. CHESTER:  I'm sorry.  I apologize.  Yes, I'd like

24   to mark that as Defense Exhibit 1 and I'd offer it into

25   evidence.

1           THE COURT:  Okay.  Did you fill out the tab for the

2    exhibit?

3           MR. CHESTER:  I did.  I did, but I do need to

4    write -- I apologize, Your Honor.  Thank you.

5           THE COURT:  That's all right.

6           MR. CHESTER:  I'd offer that into evidence, Your

7    Honor.

8           THE COURT:  Any objection?

9           MRS. SOLARI:  None, Your Honor.

10          THE COURT:  It is admitted.

11       (Defendant's Exhibit No. 1 is admitted.)

12   Q    The night before three FBI agents who were on the search

13   team talk about effecting the arrest and the search team will

14   begin; is that right?

15   A    It is two FBI agents and intelligence analyst.

16   Q    I apologize.  Three FBI employees; right?

17   A    Correct.

18          MR. CHESTER:  Holly, can we go to the June 2nd email

19   from Michael Homburg, please?

20       Your Honor, may I approach again?

21          THE COURT:  You may.

22          MR. CHESTER:  I'll mark this as Defense Exhibit 2,

23   Your Honor.  I've shown it to the government.  I'd offer this

24   into evidence as well, Your Honor.

25          MRS. SOLARI:  No objection, Your Honor.

1        THE COURT:  As Exhibit No. 2?

2        MR. CHESTER:  Yes, sir.

3        THE COURT:  It is admitted.

4     (Defendant's Exhibit No. 2 is admitted.)

5   Q    Special Agent Garrick, that same day -- that same evening,

6   Friday night, June 2nd at 7:16 p.m. there is an email between

7   Michael Homburg and is that Oliver Rich?

8   A    Yes, it is.

9   Q    Who is Michael Homberg?

10  A    Michael Homburg is an SSA at headquarters.

11  Q    SSA stands for Supervisory Special Agent; is that right?

12  A    Right.

13  Q    And headquarters -- that's the Washington office?

14  A    It is the Hoover building.  So headquarters as opposed to

15  WFO.

16  Q    Okay.  Who is Oliver Rich, Special Agent Garrick?

17  A    He is the SSA for my substantive squad in Atlanta.

18  Q    Okay.  And these other individuals that were copied,

19  Michael Varacalli and Paul Haertel -- do you see that?

20  A    Yes.

21  Q    Those are FBI agents as well?

22  A    I know Paul Haertel is an FBI agent.  I am not sure on

23  Michael Varacalli.

24  Q    Okay.  So at 7:16 in the evening the night before you were

25  to execute this search warrant somebody from FBI headquarters

1    in Washington says that -- in the second paragraph CES/USAO --

2    do you know what that stands for?

3    A    U.S. Attorney's Office.

4    Q    And CES -- do you understand that to be a division of the

5    Department of Justice?

6    A    Yes.

7    Q    "CES/USAO have indicated a PC arrest" -- that stands for

8    probable cause; right?

9    A    Correct.

10   Q    -- "Would be potentially authorized if the subject decides

11   to flee.  So please plan accordingly."  Do you see that?

12   A    Yes.

13   Q    And then it says, "to cover with fisur" -- F-I-S-U-R.

14   What is that, Special Agent Garrick?

15   A    That is physical surveillance.

16   Q    Okay.  "And for arrest, if authorized"; right?

17   A    Correct.

18   Q    So we've seen two emails the night before FBI has reviewed

19   that an arrest would be effectuated the next day; right?

20   A    One said -- one did say so.  The other one says

21   potentially authorized.

22   Q    If the subject decides to flee; right?

23   A    That's what it says, yes.

24   Q    So it was a tactical decision by law enforcement to not

25   seek an arrest warrant; isn't that right, Special Agent

1    Garrick?

2    A    No.  No.  We were advised by U.S. Attorney's Office on the

3    3rd via telephone that we would not be affecting an arrest.

4    Q    Okay.  So what changed from 7 o'clock at night to the 3rd

5    to change the mind from somebody at the FBI that an arrest

6    wouldn't be effectuated?

7    A    As far as these two emails, I have no idea.

8    Q    Okay.  But as of the night before the plan was to

9    effectuate an arrest.  That's the emails we saw; correct?

10   A    The plan as I was moving forward was to not arrest.

11   Q    Okay.  But the emails said what they said, right, Special

12   Agent Garrick?

13   A    Correct.

14   Q    Okay.  Did you set up a surveillance team, Special Agent

15   Garrick?

16   A    Yes.

17   Q    All right.  Was there a security perimeter as well?

18   A    A security perimeter at the?

19   Q    Around the scene of the warrant?

20   A    Yes.

21   Q    Okay.  And tell us what that involves.

22   A    That involves just agents watching making sure that nobody

23   enters into the search scene.

24   Q    Where were those agents physically located?

25   A    On the property.

1    Q    Is there caution tape put up around the search scene?

2    A    I believe there was one strip of caution tape.

3    Q    Now, Special Agent Garrick, am I right that it's your

4    position that Ms. Winner was free to go -- that's what you

5    previously testified to -- during any point in this encounter?

6    A    Yes.

7    Q    Okay.  So from the beginning to the end your position is

8    she was free to go.  That's your testimony?

9    A    Once she provided the cellphone to us which was two

10   minutes in, then she was free to go.

11   Q    Why was she not free to go prior to that?

12   A    We just needed to get the cellphone from her and the keys

13   for her house and her car.

14   Q    And that was so you could effectuate that search warrant

15   for her person and for the car keys; right?

16   A    Yes.

17   Q    And after those first 120 seconds your position is she was

18   free to go; right?

19   A    Yes.  If she left, it would have been fine.

20   Q    Okay.  Let's talk about your initial encounter with

21   Ms. Winner.  As I appreciate it, she came in approximately

22   4 o'clock that afternoon June 3, 2017; right?

23   A    Yes.

24   Q    And Battle Row is -- there is a 45-degree private asphalt

25   drive that is attached to Battle Row that leads to her house in

1    an alleyway behind her house; is that right?

2    A    Correct.

3    Q    Okay.  And she pulled into that drive and then she pulled

4    on a parking pad directly in front of her house; correct?

5    A    Correct.

6    Q    Okay.  Where were you when you saw her pull in?

7    A    We were actually -- when she was pulling in, we were

8    pulling up Battle Row.

9    Q    Okay.  And you followed her -- I'm sorry.  Go ahead.

10   A    Driving up Battle Row.

11   Q    Okay.  You followed her into that private drive; right?

12   A    Yes.

13   Q    Okay.  And she parked on the pad and you parked behind

14   her; right?

15   A    I did not park behind her.  No.  It was perpendicular to

16   her vehicle.

17   Q    Okay.  Perpendicular to her vehicle.  So she could have

18   backed up and would not have hit your car.  That's your

19   testimony?

20   A    Correct.

21          MR. CHESTER:  All right.  Can you pull up 196, Holly?

22      I'm sorry, Your Honor.  May I approach again?

23          THE COURT:  I'm sorry?

24          MR. CHESTER:  Can I approach, Your Honor?

25          THE COURT:  You may, yeah.

1          MR. CHESTER:  I mark this as Defense Exhibit 3.  I'd

2   offer Exhibit 3 into evidence, Your Honor.

3          MRS. SOLARI:  No objection.

4          THE COURT:  It's admitted.

5       (Defendant's Exhibit No. 3 is admitted.)

6   Q    Does this accurately depict the scene on the day in

7   question, Special Agent Garrick, of Ms. Winner's Nissan Cube?

8   A    This depicts the scene after the search team arrives.

9   Q    Okay.  Whose car is that directly behind hers?

10  A    That is either Special Agent Marcus Kirkland's or Special

11  Agent McKee's.

12  Q    And that is, what, 5 yards away from her car?  Is that

13  fair to say?  Less?

14  A    I would say so.  I don't know the exact measurement.

15  Q    Okay.  Is it fair to say this encounter was

16  law-enforcement initiated; right?

17  A    Yes.

18  Q    She didn't call you to set up a meeting; right?

19  A    Correct.

20  Q    You didn't send correspondence -- she didn't send

21  correspondence in advance inviting you over; right?

22  A    Correct.

23  Q    Right.  You followed in her driveway and you parked

24  perpendicular to her vehicle; correct?

25  A    Correct.

(Justin Garrick-Cross by Mr. Chester)

94

1   Q    And then more FBI agents showed up and parked behind her;

2   right?

3   A    It appears so, yes.

4   Q    It appears so or is that ---

5   A    That's what the picture shows, yes.

6   Q    Okay.  Now when you first encountered her, you spent some

7   time talking to her outside of the house; correct?

8   A    Correct.

9   Q    And you told her you were there with the FBI.  You told

10  her you had a search warrant and you were there to discuss a

11  report of possible mishandling of classified info; right?

12  A    Correct.

13  Q    All right.  Now there was some brief discussion that we're

14  going to get into in a little bit about the dog and about the

15  cat, but would you agree with me that during this initial

16  encounter you directed her movements?

17  A    Directed her movements just insofar as not to go into the

18  house.

19  Q    You controlled her movements, right, Special Agent

20  Garrick?

21  A    Again, just to not go into the residence.

22          MR. CHESTER:  Okay.  Can we go to the transcript at

23  8109?

24      Your Honor, this is a duplicate of Government's Exhibit 2.

25  So I don't think I need to -- it'll just be the same document.

1         Okay.  Special Agent Garrick, this is early on in your

2    encounter with her.

3         Scroll down a little bit, Holly.

4         Your partner, Special Agent Taylor, says, "We will keep

5    you out here until we do that" referencing a sweep of the

6    house; right?

7              THE WITNESS:  Correct.

8    Q    Okay.  So you were going to keep her outside.  She

9    couldn't go anywhere; right?

10   A    Go into the house, correct.

11   Q    Okay.  You were -- she could go anywhere but into the

12   house.  Is that your testimony?

13   A    If this is after she had the cellphone, then yes -- after

14   we had the cellphone, then yes.

15   Q    Well, was it or was it not?  Do you recall, Special Agent

16   Garrick?

17   A    I'd have to look at the transcript.

18             MR. CHESTER:  Okay.  Can we go to the next page,

19   Holly?

20             THE COURT:  Agent Garrick, can you read that from

21   where you're sitting?

22             THE WITNESS:  I can.

23             THE COURT:  We have plenty of copies.  We can also

24   have you reference the original if it's easier for you to read.

25             THE WITNESS:  If you don't mind, I'd like to ---

1    Q    Sure.  Page 8110 is this one, Special Agent Garrick.

2    A    Okay.

3    A    Special Agent Taylor at the initial encounter says, "What

4    we're going to do is let you is go in there with her, but

5    you're not to touch anything else."  Is that right?

6    A    That's correct.

7    Q    Okay.  And Ms. Winner says that she can move her straight

8    into the backyard; right?

9    A    Correct.

10   Q    And Special Agent Taylor says, "If we're going to have a

11   problem, we're not going to do that."  Right?

12   A    Correct.

13   Q    You controlled her movements, right, Special Agent

14   Garrick?

15   A    Into the house, yes.

16   Q    Okay.  Can we go to the next page, Holly?  The FBI then

17   asked if she had a cellphone; right?

18   A    Yes.

19   Q    And she said she did; correct?

20   A    Yes.

21   Q    She handed it over to you; right?

22   A    She did.

23   Q    And this happened within the first two minutes of your

24   encounter with her.  Is that fair to say?

25   A    Correct.

1    Q    All right.  And you asked her about her lawfully-owned

2    weapons inside of the house, did you not?

3    A    Yes.

4    Q    All right.  And you again directed her not to make any

5    movement towards the weapons; correct?

6    A    Correct.

7    Q    How did you know about her lawfully-owned guns, Special

8    Agent Garrick?

9    A    There was a -- well, two things.  One, that's the standard

10   question that we ask.  Also, there was a picture on her

11   Facebook of her shooting what appeared to be an AR15 rifle.

12   Q    Okay.  Had you done any sort of investigatory work to

13   determine her registration or ownership of those weapons?

14   A    No.

15   Q    Okay.  Now let's talk about this house, Special Agent

16   Garrick.  Small house; right?

17   A    Yes.

18   Q    Approximately, 800 square feet?

19   A    I don't know what the square footage was, but it was ---

20   Q    Do you have any reason to doubt that if I told you it was

21   836 square feet -- any reason to doubt that?

22   A    No.

23   Q    Seven rooms, two closets into those 800 square feet,

24   approximately?

25   A    That sounds right.

1    Q    Okay.  Now I heard you testify on direct that the FBI

2    agents who were there for the search team didn't show up until

3    about 20 minutes later to execute the search.  Do you recall

4    that testimony?

5    A    Yes.

6    Q    Okay.  Isn't it true that FBI agents started trickling in

7    within the first three minutes?

8    A    TFO Joe Francois was the first between other than Special

9    Agent Taylor and I.

10   Q    Okay.  So a third agent came within the first three

11   minutes of you encountering Ms. Winner; is that right?

12   A    Yes.

13   Q    Okay.  Where was TFO Francois before physically arriving

14   at the scene?

15   A    He was across the street and down the road a little bit.

16   Q    Okay.  And when these other FBI agents came, how many

17   vehicles did they come in, Special Agent Garrick?

18   A    I don't recall.

19   Q    Okay.  If I told you four or five, does that sound about

20   right?

21   A    That sounds -- that sounds reasonable.

22   Q    Okay.  Where did those folks park?

23   A    I believe on the access road on Battle Row itself.

24   Q    She was surrounded by law enforcement vehicles?  Her car

25   was surrounded by law enforcement vehicles.  Is that fair to

1    say, Special Agent Garrick?

2    A    They pulled up on the roads around it, yes.

3    Q    Okay.  So, yes, her car was surrounded by law enforcement

4    vehicles; right?

5    A    Yes.

6              MR. CHESTER:  In fact, let's go to 108, Holly.

7         Sorry.  Again, Your Honor, if I could approach?

8              THE COURT:  You may.

9              MR. CHESTER:  I'll mark this as Defense Exhibit 4 and

10   offer this into evidence, Your Honor.

11             THE COURT:  Mrs. Solari, any objection?

12             MRS. SOLARI:  No, sir, Your Honor.

13             THE COURT:  It is admitted.

14        (Defendant's Exhibit No. 4 is admitted.)

15   Q    Special Agent Garrick, that's a picture on the date of the

16   search of Ms. Winner's car?

17   A    Yes.

18   Q    And behind it are what?  At least two law enforcement

19   vehicles?

20   A    Yes.

21   Q    Okay.  Whose cars were those?  Do you know?

22   A    Other members of the search team.  I can't identify them

23   outright.

24   Q    I'm sorry?

25   A    I can't identify whose vehicle they would be, but they are

(Justin Garrick-Cross by Mr. Chester)

100

1    members of the search team.

2    Q    Okay.  Standard issue law enforcement black SUVs?

3    A    SUVs, yes.

4    Q    Okay.  How far is the front of that first black SUV from

5    her Nissan Cube, do you think?

6    A    I'm not sure.  15 feet?

7    Q    15 feet?  You think it's 15 feet away?

8    A    Again, I'm not sure.

9    Q    Okay.

10   A    I would have to measure it.

11        MR. CHESTER:  Okay.  Let's go to 107, Holly.

12        May I approach, Your Honor?

13        THE COURT:  You may.

14        MR. CHESTER:  I mark this as Defense Exhibit 5 and

15   ask that it be admitted into evidence, Your Honor.

16        MRS. SOLARI:  No objection.

17        THE COURT:  It's admitted.

18        (Defendant's Exhibit No. 5 is admitted.)

19   Q    Another picture from the scene, Special Agent Garrick?

20   A    Yes.

21   Q    Those two cars we just previously talked about are there;

22   is that right?

23   A    Yes.

24   Q    In fact, in this one I see another car pulled up right

25   next to the black SUV; right?

1    A     Yes.

2    Q     That's another law enforcement vehicle?

3    A     Yes.

4    Q     You still think that one is 15 feet away?

5    A     Again, without measuring I can't give you an exact

6    distance.

7    Q     I'm sorry.  This is the other law enforcement vehicle we

8    talked about before parked behind her; right?

9    A     Yes.

10          MR. CHESTER:  Okay.  Let me go to 195, Holly.

11       May I approach, Your Honor?

12          THE COURT:  You may.  Mr. Chester, for point of

13   clarity on the record, there are three vehicles behind this one

14   depicted in Exhibit 5.  When you asked him this most recent

15   question about 15 feet, were you asking for an estimation of

16   the car you can only see through the windows that's closest to

17   her vehicle or the SUV that's further back?

18          MR. CHESTER:  I appreciate that.  That's a good

19   point.  Let's ask for both.

20       Can we go back to that one, Holly?

21       So how about that first -- the law enforcement vehicle you

22   can only see through the windows.  How far is that from

23   Ms. Winner's car, approximately, Special Agent Garrick?

24          THE WITNESS:  Again, it's difficult for me to tell.

25   I would be guessing.

1    Q    Okay.  Less than 10 feet, fair to say?

2    A    Again, I'm not sure.

3    Q    You don't know?

4    A    I don't know.

5    Q    Okay.  And the other car which appears to be pretty close

6    aligned with the car that you can only see through the

7    windows -- about the same distance, Special Agent Garrick?  Is

8    that fair?

9    A    It's the same distance.

10         MR. CHESTER:  Okay.  May I approach, Your Honor?

11         THE COURT:  You may.

12         MR. CHESTER:  I mark this as Defense Exhibit 6.

13         MRS. SOLARI:  No objection to admission of Defense

14   Exhibit 6, Your Honor.

15         THE COURT:  All right.  It's admitted.

16   (Defendant's Exhibit No. 6 is admitted.)

17         MR. CHESTER:  195, Holly.

18      Another picture from the scene, Special Agent Garrick, of

19   her car; is that right?

20         THE WITNESS:  Yes.

21   Q    And directly in front of her car -- is her vehicle parked

22   on Battle Row Street -- Battle Row Road there?

23   A    Yes.  That's facing Battle Row.

24   Q    Okay.  And that's a law enforcement vehicle parked in

25   front of her car there?

1    A    I don't know if that is or not.

2    Q    You don't know that that is a law enforcement vehicle?

3    A    I don't.  It may be.

4    Q    Okay.  Is there a caution tape up around this scene as you

5    previously testified?

6    A    There is a caution tape up in front, yes.

7    Q    Okay.  One more.

8         Let me show 109, Holly.

9         May I approach, Your Honor?

10             THE COURT:  You may.

11             MR. CHESTER:  I'd offer Defense Exhibit 7 into

12   evidence.

13             MRS. SOLARI:  No objection.

14             THE COURT:  It's admitted.

15        (Defendant's Exhibit No. 7 is admitted.)

16   Q    Another picture of -- Defense Exhibit 7.  Here is another

17   picture from the search warrant scene, Special Agent Garrick?

18   A    Yes.

19   Q    Is that Ms. Winner's car?

20   A    Yes, it is.

21   Q    And directly in front of it on Battle Row do you see a

22   truck parked?

23   A    Yes.

24   Q    Whose truck is that?

25   A    I believe that -- I believe that might be the truck of TFO

1    Mark Bryngelson, but I am not positive.

2    Q    Okay.  And you see the caution tape up around the scene?

3    A    Yes, I do.

4    Q    Okay.  So she had cars parked behind her, parked

5    catty-cornered from her, and directly in front of her, right,

6    Special Agent Garrick, on the scene?

7    A    Yes.

8    Q    Let's talk about who was on the scene.

9         You can take it down, Holly.

10        Let's talk about who was there.  You were there as a

11   member of the search team, right, Special Agent Garrick?

12   A    I was there to conduct the interview.

13   Q    Okay.  Male FBI agent; right?

14   A    Yes.

15   Q    Were you armed?

16   A    Yes.

17   Q    Okay.  Special Agent Wally Taylor was there; right?

18   A    Correct.

19   Q    Male?

20   A    Yes.

21   Q    Armed?

22   A    Yes.

23   Q    Okay.  Special Agent James Harrison was on the scene as

24   well; correct?

25   A    Correct.

(Justin Garrick-Cross by Mr. Chester)

1    Q    Male?

2    A    Yes.

3    Q    FBI agent?

4    A    Yes.

5    Q    Supervisory agent; right?

6    A    Yes.

7    Q    Was he armed?

8    A    Yes.

9    Q    Okay.   Special Agent Charles McKee was on the scene as

10   well; correct?

11   A    Correct.

12   Q    Male?

13   A    Yes.

14   Q    Armed?

15   A    Yes.

16   Q    Special Agent Marcus Kirkland was also on the scene;

17   correct?

18   A    Correct.

19   Q    FBI agent?

20   A    Yes.

21   Q    Male?

22   A    Yes.

23   Q    Armed?

24   A    Yes.

25   Q    Special Agent David Freyman or Freeman was also on the

(Justin Garrick-Cross by Mr. Chester)

106

 1   scene; correct?

 2   A    Yes.

 3   Q    Male?

 4   A    Correct.

 5   Q    Armed?

 6   A    Yes.

 7   Q    Okay.  Special Agent Andrew Igo; is that right?

 8   A    Igo.

 9   Q    Igo.  Was he on the scene as well?

10   A    Yes.

11   Q    Male?

12   A    Yes.

13   Q    Armed?

14   A    Yes.

15   Q    Task Force Officer Mark Bryngelson?  I'm going to butcher

16   that.  I'm sorry.

17   A    Bryngelson.

18   Q    Bryngelson.  Okay.  Was he on the scene as well?

19   A    Yes.

20   Q    Male?

21   A    Yes.

22   Q    Armed?

23   A    Yes.

24   Q    Task Force Officer Joseph Francois was also on the scene;

25   correct?

1    A    Yes.

2    Q    FBI task force officer?

3    A    Yes.

4    Q    Male?

5    A    Yes.

6    Q    Armed?

7    A    Yes.

8    Q    You had an intelligence analyst from the FBI -- McCarthy

9    Butts; correct?

10   A    Correct.

11   Q    Male?

12   A    Yes.

13   Q    Okay.  He was unarmed; right?

14   A    Correct.

15   Q    Special Agent Larry Meekins was also on the scene;

16   correct?

17   A    Correct.

18   Q    Law enforcement officer?

19   A    I don't know if he is deputized.

20   Q    Okay.  Male?

21   A    Yes.

22   Q    He was one of the other two that was unarmed; right?

23   A    Correct.

24   Q    Eleven male law enforcement officers total; right?

25   A    Well, law enforcement officers ---

(Justin Garrick-Cross by Mr. Chester)

1   Q      Including Special Agent Meekins?

2   A      Yes.

3   Q      Okay.  Nine of them were armed; correct?

4   A      Correct.

5   Q      Okay.  The first female to show up on the scene was a

6   sheriff's deputy from Richmond County; isn't that right?

7   A      Correct.

8   Q      She didn't show up until at least two hours after your

9   initial encounter with Ms. Winner; correct?

10  A      Correct.

11  Q      One hour after you had gotten done questioning her; right?

12  A      Correct.

13  Q      Okay.  Now early on in the encounter, Special Agent

14  Garrick, you previously testified you took her car keys; right?

15  A      Yes.

16  Q      Okay.  And within the first 120 seconds?

17  A      Yes.

18  Q      Okay.  And who were those keys given to, Special Agent

19  Garrick?

20  A      Special Agent Taylor.

21  Q      All right.  What was done with those car keys?

22  A      They would have been handed over to the search team to

23  search the vehicle.

24  Q      Okay.  The vehicle was searched; right?

25  A      Yes.

(Justin Garrick-Cross by Mr. Chester)

1    Q    Keys were never handed back to her; correct?

2    A    I don't believe so.

3    Q    Okay.  You never handed the keys back; right?

4    A    I did not hand the keys back to her, no.

5    Q    Special Agent Taylor to your knowledge never handed the

6    keys back to her; correct?

7    A    I am not aware that he did either way.

8    Q    No one on the scene handed those keys back; isn't that

9    right, Special Agent Garrick?

10   A    I'm not sure.  I don't think so.

11   Q    You don't think so?  Okay.  You don't have any information

12   to suggest it was handed back to her; right?

13   A    No.

14   Q    Okay.  For the whole three hours; correct?

15   A    Correct.

16   Q    Can't drive a car without your keys, right, Special Agent

17   Garrick?

18   A    Correct.

19   Q    Now we've already discussed this a little bit.  You talked

20   about early on you did control her movements while you did the

21   initial sweep of the house; right?

22   A    Correct.

23   Q    After the interview was over -- I heard your testimony on

24   direct.  It is your testimony that Ms. Winner went to the front

25   yard; right?

(Justin Garrick-Cross by Mr. Chester)

1    A    Yes.

2    Q    Okay.  And I heard you on direct.  Your testimony was that

3    she just went there willingly; right?

4    A    I think she asked if -- I can't remember exactly how it

5    was phrased.  I think I said just hang around.

6    Q    You said to hang around?

7    A    I believe I might have, but I don't know that for certain.

8    Q    Okay.  So the FBI tells her to hang around and she goes to

9    the front yard; right?

10   A    Yes.

11   Q    And there is an FBI agent out in front, isn't there?  An

12   FBI agent goes out to the front with her; right?

13   A    There were agents kind of milling about across the

14   property.

15   Q    Special Agent Harrison was in the front while she was in

16   the front after the interview, Special Agent Garrick?

17   A    Yes, he was.

18   Q    Okay.  Was he with her the entire time she was in the

19   front to your knowledge?

20   A    I don't know.

21   Q    You don't know?  Was there always an FBI agent posted near

22   her while she was in the front of that house after the

23   interview?

24   A    Not for any -- no directive, no.

25   Q    Okay.  My question is was there an FBI agent with her

1    while she was standing in the front of the house after the

2    interview had concluded?

3    A    I don't know if there had been -- if an agent was there

4    with her the whole time.  I was in the vehicle.

5    Q    You don't know.  Well, and let's talk about that.  After

6    she goes to the front you go to your vehicle with Special Agent

7    Taylor; right?

8    A    Correct.

9    Q    Okay.  You go to the vehicle to make some phonecalls;

10   right?

11   A    Correct.

12   Q    And you're parked perpendicular to her car; correct?

13   A    Correct.

14   Q    She's within eye shot of you; right?

15   A    Well, the vehicle is in the way.

16   Q    Okay.  So you could -- you're telling me you couldn't see

17   her while you were sitting in your car making those phonecalls?

18   A    I was looking down sending emails and answering

19   phonecalls; so.

20   Q    So for the 45 minutes -- she was there approximately,

21   what, 30 or 45 minutes in the front?

22   A    That's sounds about right.

23   Q    Okay.  So for the 45 minutes she's sitting there in the

24   front, there is an FBI agent out front and you're in your car

25   with Special Agent Taylor also out in front of the house;

1    right?

2    A    Correct.

3    Q    Okay.  During this period of time the keys were still

4    taken; right?

5    A    The search hadn't been completed so the keys would have

6    still been in the possession of the search team, I believe.

7    Q    Okay.  So she didn't have her keys during this period of

8    time; right?

9    A    I don't believe so.

10   Q    Okay.  The agents were still searching the house; right?

11   A    Yes.

12   Q    Okay.  Her car was still surrounded by law enforcement

13   vehicles; right?

14   A    Yes.

15   Q    Right.  No phone in her possession; right?

16   A    Correct.

17   Q    Okay.  And after those 45 minutes she then goes in the

18   backyard; right?

19   A    I don't remember the time progression on that one.

20   Q    Okay.  What happens after she's done in the front yard?

21   Doesn't she go in the backyard?

22   A    I believe she did.

23   Q    Okay.  Didn't Special Agent Harrison go to the backyard

24   with her?

25   A    I'm not sure where Special Agent Harrison was standing.

1   Q    Okay.  Do you have any information to contradict the fact

2   that Special Agent Harrison was directly outside of the fence

3   while she was in the backyard with her dog?

4   A    No, I don't.

5             MR. CHESTER:  Okay.  Can we go to 136, Holly?

6        I'm sorry, Your Honor.  If I could have just one moment.

7             THE COURT:  Take your time.

8             MR. CHESTER:  Judge, I have a photo.  Unfortunately,

9   I thought I had an extra hard copy.  I don't seem to have one.

10  I could certainly get the Court one for the record unless we

11  can find it.  I'd offer -- I don't think they're going to have

12  any objection.  I can offer it in evidence and I can follow up

13  with the Court and give the Court a hard copy.

14            THE COURT:  You're going to publish it on the screen?

15            MR. CHESTER:  Yes, sir.

16            THE COURT:  Any objection to that, Mrs. Solari?

17            MRS. SOLARI:  No, Your Honor.

18            THE COURT:  You can just follow up with a hard copy

19  after the hearing.

20            MR. CHESTER:  Thank you, Your Honor.  I'll mark this

21  Defense Exhibit -- I believe we're on 8; right, Lisa?

22       (Defendant's Exhibit No. 8 is admitted.)

23  Q    Defense Exhibit 8 is a depiction of the fenced-in area

24  where she was with her dog.  Is that fair to say, Special Agent

25  Garrick?

1    A    Yes.

2    Q    Okay.  And so this was the area that my client went to

3    after she was in the front of the house where you told her to

4    go; right?

5    A    I believe that's where she went, yes.

6    Q    Okay.  And she went there with the dog after that period

7    of time; correct?

8    A    I believe so.  Yes.

9    Q    Okay.  And Special Agent Harrison was just outside of the

10   fence while she was inside of the fenced-in area; right?

11   A    I am not sure on his position.

12   Q    Okay.  But you don't have any -- you don't have any

13   information to contradict that.  If I told you that's what

14   happened, you don't have any information to contradict that;

15   right?

16   A    Correct.

17   Q    Okay.  During this period of time when she was in the back

18   do you know how long she was in the back for, Special Agent

19   Garrick?

20   A    No, I don't.

21   Q    Okay.  Well, if you started the interview encounter at

22   approximately 4 and your encounter with her plus your interview

23   lasted an hour and a half approximately?

24   A    Approximately, yes.

25   Q    Then she goes to the front for 30 to 45 minutes and now

(Justin Garrick-Cross by Mr. Chester)

1    we're looking at 6, 6:15.  Is that fair to say?

2    A    That would be fair to say.

3    Q    Okay.  So then she goes in the back and you didn't arrest

4    her until approximately 7 o'clock; right?

5    A    I believe so, yes.

6    Q    All right.  So you're there from 4 to 7 and she's in the

7    back from 6:15 approximately to 7 o'clock; right?

8    A    Yes.

9    Q    All right. so during -- I'm sorry?

10   A    I believe so.

11   Q    During those 45 minutes, again, keys still not in her

12   possession; right?

13   A    Correct.

14   Q    Agents still searching and finishing the search of the

15   house; right?

16   A    Correct.

17   Q    Car still surrounded by law enforcement vehicles; right?

18   A    Correct.

19   Q    No phone in her possession; correct?

20   A    Correct.

21   Q    All right.  And it was after this period of time that you

22   then went to her and said, "We're going to arrest you"; right?

23   A    I told her that she -- when I told her she was being

24   placed under arrest she was actually on the front porch.

25   Q    Okay.

1   A    So it might have been before she went back there.

2   Q    So you told her you were going to arrest her and then you

3   allowed her to go to the backyard for 45 minutes?

4   A    I did not place her into handcuffs.  I just notified her

5   that we would be arresting her.  I don't remember the timeframe

6   of exactly when that was, though.

7   Q    Okay.  So I want to make sure I get this chronology right.

8   So you believe you told her she was going to be arrested while

9   she was standing in the front after the conclusion of the

10  interview?

11  A    I know she was standing in the front.  I don't remember at

12  what point that was in regards to.  I know it had to have been

13  after, what, approximately 6 p.m. which is when I got notified.

14  So sometime after 6 p.m.  So I don't know if she maybe had gone

15  into the backyard after I told her that.  I don't remember that

16  part.

17  Q    Okay.  Would it be your normal practice to tell somebody

18  that they're under arrest and allow them to kind of mill about?

19  A    At that point it's typically you will take them into

20  custody, but at that point it was just a courtesy to let her

21  know what was going to be happening.  She was very compliant at

22  the time, and it was just a courtesy to tell her that.

23  Q    Okay.  All right.  We're going to come back to that

24  courtesy in a second.  Ms. Winner during your encounter made

25  statements to you indicating that she felt she needed

1    permission to make physical moves; right?

2    A    Inside the house she did ask.

3    Q    Right.  So early on when she's talking about leashing up

4    her dog she said, "I'll go leash up my dog and I can do it in

5    the backyard and you won't even have to take your eyes off me";

6    right?

7    A    She said that, yes.

8    Q    Okay.  And later on she was concerned about her cat

9    running out of the house.  You had previously testified to that

10   and so she said, "Listen, can you, basically, tell somebody to

11   make sure the front door is closed?  I don't want to be telling

12   the FBI what to do with its job, but I don't want my cat

13   leaving out of the house"; right?

14   A    Right.

15   Q    Okay.  She asked permission to use the bathroom; right?

16   A    She did.

17   Q    Did she offer to leave the door open or have somebody come

18   stand by the door while she did that?

19   A    I don't recall.  I'd have to review the transcript.

20   Q    Okay.  She didn't go do any of these things herself

21   without talking to you, right, Special Agent Garrick?

22   A    Correct.

23   Q    Okay.  She didn't go -- she didn't go leash up her dog

24   without making sure you were okay with it, right, Special Agent

25   Garrick?

(Justin Garrick-Cross by Mr. Chester)

1    A     Correct.

2    Q     She didn't go close the front door because she was

3    concerned about her cat until she had the FBI's permission or

4    told the FBI to do it; right?

5    A     She did ask us first, yes.

6    Q     Right.  She didn't go to the bathroom without clearing it

7    with the FBI first; correct?

8    A     She did ask to use the restroom, yes.

9    Q     And despite her movements being controlled and her

10   vocalizing to you that she felt controlled and needed your

11   permission, you never told her she was free to leave, right,

12   Special Agent Garrick?

13   A     I never used those words, no.

14   Q     Right.  You never dissuaded her of the notion that she

15   needed your permission before she could do anything in that

16   house, right, Special Agent Garrick?

17   A     Not in those words, no.

18   Q     Not in any words; right?

19   A     I told her our interaction was voluntary.  That was how I

20   phrased it.

21   Q     You never dissuaded her that she needed your permission to

22   do anything in that house; right, Special Agent Garrick?

23   A     I never said anything to the contrary.

24   Q     I'm sorry.  I don't know what that means.  What do you

25   mean you didn't say anything to the contrary?

1    A    I never said that she could move about freely, no.

2    Q    Now let's talk about the room that you interviewed her in,

3    Special Agent Garrick.  To begin with, you gave her two choices

4    for the interview, right?  The FBI or her house; correct?

5    A    I did.

6    Q    Okay.  You didn't offer any place else other than the FBI

7    or her house; right?

8    A    Those were two logical locations; so, yes.

9    Q    And you were looking for a place to interview once you

10   went in the house; right?

11   A    Once I went -- I never went in the house before we

12   actually were doing the interview.

13   Q    You wanted to interview her in a private place.  Didn't

14   you say that, Special Agent Garrick?

15   A    Yes.  That it was someplace away.

16   Q    Right.  You said, "I want to interview you in a private

17   place that's away."  Right?

18   A    I think I asked if she had one, yes.

19   Q    Those were your words, right -- "private" and "away" --

20   right, Special Agent Garrick?

21   A    Yes.

22   Q    Okay.  She mentioned after you said you wanted a private

23   room that was away from everything that she had a spare

24   bedroom, did she not?

25   A    Yes.

(Justin Garrick-Cross by Mr. Chester)

1   Q    Okay.  But she specifically told you she didn't want to go

2   there, didn't she?

3   A    Can I review the transcript?

4   Q    Of course.  We can pull it up.

5        It is 8121, Holly.

6   A    Her exact words were "I don't like to go in there."

7            MR. CHESTER:  Scroll down a little bit, Holly.

8        So here at the transcript page 8121 you say, "I'm trying

9   to think if we have a place that's private.  Is there anything

10  in your house that we can kind of sit that's away?"  Right?

11  That's what you testified to earlier; correct?

12           THE WITNESS:  Yes.

13  Q    And, again, she mentioned there is a spare bedroom but she

14  doesn't like to go in there; right?

15  A    Yes.

16  Q    She told you it was creepy; right?  That's on page 8122.

17  A    Yes.

18  Q    She told you it was weird; right?

19  A    Yes.

20  Q    Okay.  But despite her telling you she didn't want to go

21  in there, you said, "We can talk back there if you're going to

22  be fine back there"; right?

23  A    "If you're fine going back there."

24  Q    Right.  I'm sorry.  "If you're fine going back there."

25  Those were your words?

(Justin Garrick-Cross by Mr. Chester)

1    A     Yes.

2    Q     She didn't say, "I want to go back there"; right?

3    A     The next line is she said, "Yeah, we can go back there."

4    Q     After you said "We can talk back there"; right?

5    A     "If you're fine going back there."  Yes.

6    Q     So she didn't volunteer "I've got this spare bedroom; I

7    want to go back there"; correct?

8    A     She volunteered a location.

9    Q     After you asked for a private room that was away; right?

10   A     Yes.

11   Q     Okay.  She volunteered that the only room like that she

12   had was a spare bedroom and she didn't want to go there; right?

13   A     She said that she didn't like going back there and then

14   that's why I asked if she was fine going back there.

15   Q     Is that a question or is that a declarative statement?

16   "We can talk back there."  Those were your words, right,

17   Special Agent Garrick?

18   A     "We can talk back there if you're fine going back there."

19   Q     So she acquiesced to you wanting to go to that back room;

20   right?

21   A     I am not sure what was in her mindset at the time, but she

22   said that we can go back there.

23   Q     Okay.  Your partner then says -- your partner then comes

24   up and you say, "There's a back room that she'd like to talk

25   in."  Do you see that?

1    A    Yes.

2    Q    She never said she'd like to go talk in that back room,

3    did she, Special Agent Garrick?

4    A    Again, it's -- she said what was in the transcript.

5    Q    Right.  What she said was she didn't want to go back

6    there.

7    A    She said that "I don't like to go in there."  That was --

8    that was the phrase that she used.

9    Q    And you guys went in that back room.  She went in first.

10   You followed her in; right?

11   A    Yes.

12   Q    All right.  Now let's talk about this room.  Fairly small

13   room, right, Special Agent Garrick?

14   A    Yes, about 7 1/2 by 10, something like that.

15   Q    Okay.  Approximately, 70 square feet.  Does that sound

16   about right?

17   A    Yes, sir.

18            MR. CHESTER:  Okay.  One moment, Your Honor.  Your

19   Honor, can we toggle back and forth?  I am going to use a

20   government exhibit.  We're going to have to toggle with the

21   government's IT person if that's okay with the Court.

22            THE COURT:  Sure.  We can pull up another chair over

23   there if we need to.

24   Q    This is Government's Exhibit 3 -- the diagram of the

25   house.

(Justin Garrick-Cross by Mr. Chester)

123

1   A    Yes.

2   Q    Do you remember talking about this on direct?

3   A    Yes.

4   Q    You testified it wasn't drawn to scale; right?

5   A    Correct.

6   Q    Okay.  Room E is where you interviewed Ms. Winner;

7   correct?

8   A    Correct.

9        MR. CHESTER:  Okay.  Your Honor, may I approach the

10  white board?

11       THE COURT:  You may.

12       MR. CHESTER:  Thank you.

13       What I'd like to do is do my best to try to draw it to

14  scale.  Okay?  So if this room is 7 by 10, what isn't to scale

15  on that diagram to the best of your recollection, Special Agent

16  Garrick?

17  A    Well, the whole drawing is not to scale.

18  Q    Okay.  You agree with me that that closet is substantially

19  bigger than is depicted in Government's Exhibit 3?

20  A    Yes.

21  Q    Okay.  It takes up about a third of that wall?

22  A    I am not sure what the --

23  Q    Okay.

24  A    -- dimensions are.

25  Q    The door is right there in the front?

1    A      Uh-huh.

2    Q      Okay.  And I heard you on direct.  You testified that

3    Ms. Winner was back here in the corner; is that right?

4    A      No.

5    Q      I'm sorry.  Where was she?

6    A      She was in the middle of the wall to your right.

7    Q      Right here?

8    A      Right.

9    Q      Okay.  You were standing -- leaning on the closet;

10   correct?

11   A      Correct.

12   Q      Right here or right here, Special Agent Garrick?

13   A      I was on the -- basically, just on the inside of that

14   corner.

15   Q      Okay.  Right there?

16   A      Yes.

17   Q      Okay.  And Special Agent Taylor, your partner, was on this

18   wall opposite?

19   A      He was on the lower wall.

20   Q      The lower wall.  So he was here?

21   A      Yes.

22   Q      Is that a more accurate depiction of what it was like when

23   you were interviewing her in that small room she said she

24   didn't want to go to, Special Agent Garrick?

25   A      Well, that's -- those are the positions that we were

(Justin Garrick-Cross by Mr. Chester)

1    standing, yes.

2    Q    Okay.  So for her to get to the door, Special Agent

3    Garrick, she was going to have to go around you and in between

4    you and Taylor around the closet to get to the front door;

5    right?

6    A    She would have to walk between Special Agent Taylor and

7    myself.

8    Q    She wouldn't have to walk around you?

9    A    Not really.  I had my back up against the wall.

10   Q    Okay.  You and Special Agent Taylor were essentially

11   sandwiched in between her; right?

12   A    No.  We were standing in a triangle pattern.

13   Q    In a triangle pattern, right, with her being the bottom

14   and you being the two arms; right?

15   A    We were in that position.

16   Q    Now, Special Agent Garrick, I heard you testify on direct

17   about the condition of the door during your interview with

18   Ms. Winner.  Do you recall that?

19   A    Yes.

20   Q    You don't remember the condition of the door, right?

21   A    I don't.

22   Q    Okay.  And you've listened to the audio transcription;

23   correct?

24   A    Yes.

25   Q    Okay.  And it picks up some background noise, does it not?

1   A     It does.

2   Q     But not a whole lot.  You can't really clearly hear what

3   people are saying, right, in that square foot -- in that

4   800-square foot house; right?

5   A     At times you can.  You have to put on headphones, but,

6   yeah, you can hear specific phrases and words being said.

7   Q     That door was partially closed, was it not, Special Agent

8   Garrick?

9   A     I don't remember the condition of the door.

10  Q     Okay.  So you don't have any information to offer one way

11  or the other; right?

12  A     I don't.

13  Q     Okay.  Now, Special Agent Garrick, I may have already

14  asked this question.  Again, you never told her she was free to

15  leave; right?

16  A     Correct.

17  Q     Special Agent Taylor never told her she was free to leave;

18  right?

19  A     Correct.

20  Q     Neither of you used the word "free" in the entirety of

21  your questioning of her; right?

22  A     I'd have to go back and see the transcript.

23  Q     Do you recall -- do you have a specific recollection of

24  using that word?

25  A     No.

(Justin Garrick-Cross by Mr. Chester)

127

1    Q    Okay.  All other eight men who were there on the scene --

2    none of them told her she was free to leave to your knowledge;

3    right?

4    A    Not to my knowledge, no.

5    Q    Okay.  No one for the whole three hours told her she was

6    free to leave; correct?

7    A    I can tell you what I know.  I am not sure what other

8    people have said, but I don't know that.

9    Q    Okay.  You don't have any information that any other FBI

10   agents told her she was free to go; right?

11   A    Correct.

12   Q    Okay.  You never told her she was not in custody either;

13   right?

14   A    No.

15   Q    Okay.  Did Special Agent Taylor say, "Hey, you're not in

16   custody"?  He never said that; correct?

17   A    Correct.

18   Q    Right?  None of the other eight law enforcement officers

19   who were there said that; correct?

20   A    Not to my knowledge, but I am not sure what they -- what

21   they said.

22   Q    Okay.  The same question then -- you don't have any

23   specific knowledge of anybody else telling her she's not in

24   custody; right?

25   A    Correct.

(Justin Garrick-Cross by Mr. Chester)

128

1    Q    Okay.  And, of course, you never gave her her *Miranda*

2    warnings; right?

3    A    Correct.

4    Q    Now I heard you talk about you telling her three or four

5    times that you were there or that the scene was there and

6    everybody was there voluntarily; right?  That was a word you

7    used when you interviewed Ms. Winner; correct?

8    A    I said speaking to me was voluntary, yes.

9    Q    You said speaking to you was voluntary.  Okay.  Didn't you

10   say, "We're here voluntarily"?

11   A    Special Agent Taylor did.

12   Q    And Special Agent Taylor or you also said, "You're here

13   voluntarily"; right?

14   A    I believe Special Agent Taylor did.

15   Q    Okay.  Did Ms. Winner ever say, "I know I am here

16   voluntarily"?  Did she ever use the word "voluntarily", Special

17   Agent Garrick?

18   A    I don't believe so.  No.

19   Q    To your knowledge was this my client's only encounter with

20   FBI law enforcement agents?

21   A    I didn't have any information otherwise.

22   Q    Okay.  You ran a criminal history on her, I'm sure?

23   A    I did.

24   Q    Does she have any prior criminal history?

25   A    Traffic violations.  That's it.

 1    Q    Okay.  Besides traffic violations, no prior criminal
 2    history?
 3    A    No.
 4    Q    Okay.  No -- I'm sure you ran in your 302 database had she
 5    ever been interviewed by an FBI before?
 6    A    She had not.
 7    Q    Okay.  So to your knowledge this was her only encounter
 8    with the FBI; right?
 9    A    Correct.
10    Q    Okay.  Was this her only encounter to your knowledge with
11    the search warrant?
12    A    Yes, to my knowledge.
13    Q    Okay.  Fair to say that during this interview she advised
14    you and Special Agent Taylor she was confused?
15    A    I don't recall that.  Could you ---
16    Q    Yeah.
17         Let's go to page 8141, Holly.  I'm sorry.  Now we're going
18    to have to toggle back.  Thank you, Tash.  8141.  I think it's
19    at the top.
20         Special Agent Taylor says as you were interviewing her,
21    "It's probably still a little confusing to you."  Do you see
22    that?
23              THE WITNESS:  Yes.
24    Q    And she says "Mm-hmm" acknowledging that; right?
25    A    She was acknowledging the statement.  Yes.

(Justin Garrick-Cross by Mr. Chester)

1    Q    That she was confused; right?

2    A    I didn't get the impression that that was -- that she was

3    confused.  It was more a minimal encouragement "Mm-hmm" like --

4    Q    Okay.

5    A    -- following what she's -- what he's saying.

6    Q    That's your impression of what she felt; right?

7    A    That's my impression of her response.

8    Q    Right.  But she acknowledged when Special Agent Taylor

9    said, "You're probably confused," she said, yes, right, or

10   mm-hmm; right?

11   A    She said, "Mm-hmm".

12   Q    Okay.  Now you received a search warrant for her person,

13   did you not, Special Agent Garrick?

14   A    Yes.

15   Q    And on the attachment for that search warrant you told the

16   court that you were planning to search the person of Ms. Winner

17   and described her physical appearance; right?

18   A    Correct.

19   Q    Okay.  Now that search warrant, as you well know, gives

20   you authority to search her body, her person; correct?

21   A    Correct.

22   Q    You could give her a pat-down; right?

23   A    Correct.

24   Q    You could search her legs?

25   A    Correct.

(Justin Garrick-Cross by Mr. Chester)

131

1    Q    You could search her waist?

2    A    Correct.

3    Q    You could search her torso?

4    A    Correct.

5    Q    Her arms, her head, her hair; right?

6    A    Right.

7    Q    Okay.  You can search her pockets?

8    A    Correct.

9    Q    Okay.  And to get that search warrant, you swore out an

10   affidavit for the court indicating that you believed there

11   would be instrumentalities of a crime on her person, did you

12   not?

13   A    Correct.

14   Q    Okay.  Now as I understand -- and as I understand your

15   position now, your position is that search warrant for her

16   person was only to get her cellphone.  Is that what your

17   testimony is?

18   A    Yes.

19   Q    Okay.  Nothing else?

20   A    That was -- the cellphone is what we needed to get.

21   Q    I'm sorry.  She gave you the cellphone the first 120

22   seconds; correct?

23   A    Correct.

24   Q    You never told her, though, that that search warrant for

25   her person was only for that cellphone.  Am I right?

(Justin Garrick-Cross by Mr. Chester)

132

1    A     Correct.

2    Q     Okay.  And your partner never said, "The search warrant

3    for your person is only for your cellphone"; right?

4    A     Correct.

5    Q     None of the other eight male law enforcement agents said

6    that; correct?

7    A     Not to my knowledge.

8    Q     All right.  For the whole three hours nobody advised her

9    that that search warrant for her person was only for that

10   cellphone; right?

11   A     Not to my knowledge.

12   Q     Okay.  Now this position, Special Agent Garrick, that

13   can't possibly be true, right, because you advised her 28

14   minutes later that you had a search warrant for her person even

15   after she handed over her cellphone, did you not?

16   A     Special Agent Taylor did.

17   Q     Okay.  So I want to make sure I get this chronology right.

18   At the outset you have a search warrant for her person; right?

19   A     Yes.

20   Q     That authorizes you to search her body, does it not?

21   A     Yes.

22   Q     And in your view this search warrant was only so you could

23   get the cellphone; correct?

24   A     Correct.

25   Q     And you got that in the first 120 seconds you met with

1    her; right?

2    A    Correct.

3    Q    And 28 minutes later the FBI said, "By the way, we have a

4    search warrant for her person -- for your person that

5    authorizes us to search you", did you not?

6    A    Special Agent Taylor did, yes.

7    Q    Were you -- I mean, you and he are partners; right?  You

8    didn't correct the record and say, "Well, this search warrant

9    is over.  We've already gotten the cellphone."  You didn't say

10   that, did you?

11   A    No, I did not.

12   Q    Okay.  So you told her even after you got the cellphone

13   that you had a search warrant for her person and that that

14   search warrant authorized a search of her, did you not?

15   A    Special Agent Taylor told her that there was also a search

16   warrant for her person.

17   Q    And she was never patted down until three hours later when

18   the first female sheriff's deputy arrived on the scene;

19   correct?

20   A    Correct.

21   Q    Special Agent Garrick, the search warrant that was brought

22   before the court that was applied for on June 3, 2017 -- you

23   were the affiant for it; right?

24   A    Yes.

25   Q    And I am not going to go through all of the allegations in

1    that search warrant, but, again, you swore out an affidavit

2    that led you to believe that there was probable cause of

3    evidence in her house, in her car, on her person -- that there

4    would be evidence of a crime there; correct?

5    A    Correct.

6    Q    All right.  And you specifically talked about your first

7    communication with the government agency about this case;

8    right?

9    A    Correct.

10   Q    All right.  And you talked about the fact that you had

11   been given information that a classified document had been

12   leaked and made it out into the public; correct?

13   A    It had been leaked, yes.

14   Q    Okay.  And you had talked about in that affidavit that

15   analysis on that document indicated it had been creased;

16   correct?

17   A    Correct.

18   Q    And as I understand it, you were advised that an audit was

19   conducted that indicated that Ms. Winner was one of only six

20   people who had printed the document; right?

21   A    Correct.

22   Q    Okay.  And your affidavit swears that Ms. Winner, my

23   client, is the only one who had contact with the media outlet

24   in question; correct?

25   A    Correct.

1    Q    As part of your affidavit you told the court that my

2    client had conducted searches to lead her to the document at

3    issue; isn't that right?

4    A    Correct.

5    Q    All right.  And you did some investigatory work of your

6    own before you executed the search warrant; correct?  You did

7    some surveillance work on Ms. Winner to figure out what car she

8    drove; right?

9    A    Correct.

10   Q    You confirmed who her cellphone provider was; right?

11   A    Correct.

12   Q    You believed you had probable cause for this search

13   warrant; right?

14   A    Correct.

15   Q    Okay.  And the court agreed with you; right?  You got that

16   search warrant; right?

17   A    Correct.

18   Q    Fair to say Ms. Winner was your prime suspect, Special

19   Agent Garrick?

20   A    She was, yes.

21   Q    She was your only suspect; right?

22   A    She was my only suspect.  Yes.

23   Q    Okay.  You didn't do any other investigation on anybody

24   else; right?

25   A    No, I did not.

(Justin Garrick-Cross by Mr. Chester)

136

1    Q    And, in fact, you told her during your interview that she

2    was your prime suspect; right?

3    A    I believe I used different words.

4    Q    You told her that far and away she was the most likely

5    candidate to have leaked the document at issue, did you not?

6    A    Yes, I did.

7    Q    Okay.  And you believed that then, did you not?

8    A    I did.

9    Q    And you believe it now; right, Special Agent Garrick?

10   A    Yes.

11   Q    And so with all of this probable cause, with the evidence

12   you got from the government agency, with the evidence that you

13   told this court, with your preliminary investigation, with your

14   surveillance work, your testimony is you were going to

15   interview her, but if she jumped up and ran out of there, no

16   harm no foul; you weren't going to lift a finger; right?

17   A    I was not going to arrest her, no.

18   Q    Okay.  Now, Special Agent Garrick, you didn't get an

19   arrest warrant at the time you applied for the search warrant;

20   right?

21   A    Correct.

22   Q    You applied for an arrest warrant two days later on

23   June 5, 2017; right?

24   A    Correct.

25   Q    You had probable cause for an arrest warrant on June 3,

1   though, did you not?

2   A    I was in consultation with the U.S. Attorney's Office and

3   DOJ as far as probable cause.

4   Q    Did you believe you had probable cause on June 3rd to get

5   an arrest warrant?

6   A    Before the interview?

7   Q    At the time you were executing -- getting the search

8   warrant, did you believe you had probable cause to get an

9   arrest warrant?

10  A    At the time of the consultation from AUSA and DOJ I

11  thought no.

12  Q    You thought no?

13  A    I did -- I wasn't sure.  I said, "Do we -- are we feeling

14  -- do we have enough for a search warrant or for an arrest?"

15  and they said, "No, you're not going to be arresting."  I said,

16  "Okay."

17  Q    Okay.  So I understand communications from prosecutors

18  about logistical reasons or whatever about whether you

19  effectuate an arrest.  I am asking your personal opinion.  Did

20  you have probable cause in your mind to get an arrest warrant

21  on June 3rd?

22  A    I wasn't sure.

23  Q    Okay.  You weren't sure.

24       Can I have a moment, Your Honor?

25            THE COURT:  Sure.

(Justin Garrick-Cross by Mr. Chester)

138

1          MR. CHESTER:  May I approach, Your Honor?

2          THE COURT:  You may.

3          MR. CHESTER:  I will mark these as Defense Exhibit, I

4     think, 8 and 9.

5          THE CLERK:  9.

6          MR. CHESTER:  9 and 10?  9 is the next one?  Okay.

7       And I apologize.  This one we don't have electronically.

8     So I am going to give you a hard copy, Special Agent Garrick.

9     May I approach again, Your Honor?

10         THE COURT:  You may.

11       Mrs. Solari, do you have any objection to these two

12    exhibits?  Have you seen them?

13         MRS. SOLARI:  I don't.  I think I have an objection

14    to much more of the line of questioning to the extent that

15    Special Agent Garrick's unarticulated opinions about probable

16    cause or its relevant degrees I don't think are relevant to

17    whether custody existed in this case, but I have no objection

18    to those exhibits.

19         THE COURT:  Okay.  Well, as to the relevancy, I'll

20    overrule the objection consistent with my statement earlier in

21    the case that I do allow a great amount of latitude in these

22    settings.

23         MRS. SOLARI:  Understood.  Thank you, sir.

24         MR. CHESTER:  Thank you, Your Honor.

25

 1            (Defendant's Exhibit Nos. 9 & 10 are admitted.)

 2    Q    Special Agent Garrick, Defense Exhibit 9 and 10 which I'll

 3    offer for the record and introduce into evidence -- no

 4    objection?  I'm sorry.

 5              MRS. SOLARI:  No objection.

 6              MR. CHESTER:  Okay.  Are they admitted, Your Honor?

 7              THE COURT:  They are.

 8              MR. CHESTER:  Thank you.

 9       Defense Exhibits 9 and 10 -- one is the search and seizure

10    warrant which includes your affidavit attached to it and the

11    other is the criminal complaint which also includes an

12    affidavit from you seeking the arrest of Ms. Winner or

13    justifying the arrest of Ms. Winner.  Do you see those

14    documents in front of you?

15              THE WITNESS:  Yes.

16    Q    Have you had an opportunity to compare these two

17    documents, sir?

18    A    I haven't read these in a while.

19    Q    Okay.  Well, feel free to take a look at them.  I am not

20    going to ask you about everything, but would it surprise you

21    that the probable cause section in both of these are nearly

22    identical, Special Agent Garrick?  Let me know when you're

23    ready.

24              THE COURT:  Agent Garrick, do you need some time to

25    look through those?  You got a whole room full of people

(Justin Garrick-Cross by Mr. Chester)

1    watching you do this.  If you do, I'm sure some people would

2    probably like to break anyway; so let's give you 10 minutes.

3    Take your time.  In fact, let's not even say 10.  You let

4    Mrs. Widener know when you're ready to proceed, and we'll

5    resume for questioning -- additional questioning at that time.

6            THE WITNESS:  Yes, Your Honor.

7        (A break is taken.)

8            THE COURT:  Mr. Chester, before you begin again and

9    before I forget about it, the record is not going to be

10   entirely complete if we don't have some type of reproduction of

11   what you've drawn on that and what he's testified about.  I

12   think looking at the record you wouldn't be able to piece

13   together exactly the answers to his questions.  So my proposal

14   would be for you and Mrs. Solari to get together after we

15   complete this today and someone snap a photo of that so we can

16   put it in the record and make it an exhibit and maybe make it

17   the last exhibit of your set.

18       Would you have any objection to that, Mrs. Solari?

19           MRS. SOLARI:  No, sir, Your Honor.

20           THE COURT:  Okay.

21           MR. CHESTER:  Thank you, Your Honor.

22           THE COURT:  You're welcome.

23           MR. CHESTER:  May I proceed?

24           THE COURT:  You may.

25   Q    Special Agent Garrick, we were on Defense Exhibits 9 and

1    10 -- the arrest warrant -- the criminal complaint and the

2    search warrant affidavit.  Fair to say some substantial overlap

3    between these two; right?

4    A    I'd say the affidavit for the arrest includes her

5    statements from the June 3rd interview.

6    Q    Okay.  Let's briefly go through this here.  The search

7    warrant affidavit, Special Agent Garrick, paragraph six is the

8    same as paragraph five in your arrest warrant affidavit; right?

9    A    Which paragraphs again?  I'm sorry.

10   Q    Paragraph six of the search warrant affidavit and five of

11   the criminal complaint.

12   A    What do the paragraphs begin with?  I'm sorry.

13   Q    Under 18 U.S.C. § 793.

14   A    Yes.

15   Q    Okay.  Paragraph seven of the search warrant affidavit is

16   identical to paragraph six in the arrest warrant affidavit;

17   right?

18   A    Yes.

19   Q    Paragraph eight in the search warrant affidavit is

20   identical to paragraph seven in the arrest warrant affidavit;

21   right?

22   A    Yes.

23   Q    Paragraph nine in the search warrant affidavit is

24   identical to paragraph eight in the arrest warrant affidavit;

25   correct?

1    A     Yes.

2    Q     Paragraph 10 in the search warrant affidavit is identical

3    to paragraph nine in the arrest warrant affidavit; right?

4    A     Yes.

5    Q     Paragraph 11 in the search warrant affidavit is identical

6    to paragraph 10 in the arrest warrant affidavit; right?

7    A     Yes.

8    Q     Paragraph 12 in the search warrant affidavit is identical

9    to paragraph 11 in the arrest warrant affidavit; right?

10   A     There are some differences.

11   Q     Okay.  Are there any substantive differences between those

12   two, Special Agent Garrick?

13   A     No.

14   Q     Okay.  Paragraph 13 in the search warrant affidavit is

15   similar to paragraph 12 in the arrest warrant affidavit; right?

16   A     Yes.

17   Q     Paragraph 14 in the search warrant affidavit is similar to

18   paragraph 13 in the arrest warrant affidavit; correct?

19   A     Yes.

20   Q     Paragraph 15 in the search warrant affidavit is similar to

21   paragraph 14 in the arrest warrant affidavit; correct?

22   A     Yes.

23   Q     The only thing that's new is paragraph 15 in the arrest

24   warrant affidavit; right?

25   A     Correct.

1   Q     So you had ten nearly identical paragraphs constituting

2   your probable cause for both the search warrant affidavit on

3   June 3rd and the arrest warrant affidavit two days later;

4   right?

5   A     Yes.

6   Q     Okay.  But your position is you didn't have probable cause

7   until after she talked to you; right?

8   A     I defer to the U.S. Attorney's Office and the DOJ for

9   probable cause on the arrest.

10  Q     So you swore under oath.  You don't have an opinion as to

11  whether you had probable cause, but, yet, you were the affiant

12  on these affidavits, Special Agent Garrick?

13  A     In this one for a search warrant, yes.  This is the

14  affidavit for the arrest has her statements.

15  Q     Right.  So that singular paragraph -- that's the only

16  thing in the mix that changed it.  You didn't have probable

17  cause until she talked to you; right?  That's your position?

18  A     My position is that of the U.S. Attorney's Office and

19  DOJ -- what they stated.

20  Q     So you didn't have a personal opinion on it?

21  A     No.

22  Q     Okay.  Now you've been present at some of the hearings

23  we've held in this case, have you not, Special Agent Garrick?

24  A     Yes.

25  Q     You've been present at the detention hearings in this

(Justin Garrick-Cross by Mr. Chester)

144

1    matter?

2    A    Yes.

3    Q    You're familiar with the government's view that Ms. Winner

4    presents a significant flight risk, are you not?

5    A    Yes.

6    Q    The government has repeatedly said that she has a desire

7    to travel to the Middle East and live in places like Kurdistan

8    and Iraq and Jordan and Afghanistan; right?

9    A    Yes.

10   Q    Okay.  And the government has made the point that because

11   of her linguistic skills she could actually make this happen --

12   that it would be easy for her to blend in, have they not?

13   A    I believe so, yes.

14   Q    That she could gain employment in these countries were she

15   to flee; correct?

16   A    Yes.

17   Q    Okay.  The government has stated that she had $30,000 in

18   her bank account and with these linguistic skills she was a

19   significant risk of flight.  Have they not made that position?

20   A    Yes.

21   Q    And that's a position you agree with; right, Special Agent

22   Garrick?

23   A    Yes.

24   Q    In fact, you testified that she was interested in

25   traveling and working and living abroad; right?

1    A    Yes.

2    Q    You testified that she researched living in these

3    countries that I just talked about; right?

4    A    Yes.

5    Q    The government has also taken the position that in

6    addition to being a substantial risk of flight, she's a

7    significant danger to community, have they not?

8    A    Yes.

9    Q    They've repeatedly made the point that the only way to

10   ensure there are no further disclosures of classified

11   information is to keep her detained pretrial; right?

12   A    Yes.

13   Q    Okay.  That the prosecution has gone so far as to suggest

14   that she might be if she's released a target of foreign

15   intelligence agencies; right?

16   A    Yes.

17   Q    Okay.  And, in fact, the prosecution has said and you've

18   testified about the fact that she might be welcomed by our

19   adversaries given all the information in her head; right?

20   A    Yes.

21   Q    Okay.  And, again, that's a position you agree with;

22   correct?

23   A    Yes.

24   Q    That she needs to be detained because she might go

25   disclosing all the stuff in her head; right?

1    A    Yes.

2    Q    And that risk of flight and that substantial danger --

3    that was something you knew about even before you went into her

4    house and executed that search warrant; correct?

5    A    There was a lot of additional information that we became

6    aware of when exploiting the -- and analyzing the materials

7    that were got -- seized in the search warrant.

8    Q    You specifically noted that she traveled to Belize when

9    you were applying for the search warrant, did you not?

10   A    Yes.

11   Q    And that was a point that was brought up at the detention

12   hearing that she traveled to Belize and nobody knows what she

13   did in Belize; right?

14   A    Correct.

15   Q    And that that presents a significant risk of flight;

16   right?

17   A    Correct.

18   Q    Okay.  And that's a position you agree with; correct?

19             MRS. SOLARI:  Your Honor, forgive my interruption.

20   It just sounds like we're relitigating the detention issue here

21   rather than going to issues that have to do with custody.

22             THE COURT:  I see the connection.  So, overruled.

23             MR. CHESTER:  Thank you, Your Honor.

24        So that position that she is a substantial risk of flight,

25   that she could travel to the Middle East and blend in with her

(Justin Garrick-Cross by Mr. Chester)

1    linguistic skills and the $30,000 in her bank account --

2    despite knowing all of that before you walked in there, you

3    were going get up and let her walk out.  That's your testimony?

4              THE WITNESS:  Yes.

5    Q    And the fact that she's a substantial danger to this

6    community, that she has all this classified information in her

7    head, that she needs to be detained pretrial because she'll go

8    about disclosing classified information, your position is you

9    were going to let her get up and walk out of there; right?

10   That's your testimony?

11   A    Again, we have additional information that we learned from

12   the search warrant and the interview.

13   Q    My question to you is were you going to let her get up and

14   walk out knowing she was a substantial danger to this

15   community, Special Agent Garrick?

16   A    Provided that we had the surveillance team able to track

17   her.

18   Q    And so the surveillance team was there so you could track

19   her, right, and you could effectuate an arrest; right?

20   A    The surveillance team was there to monitor her activities.

21   Q    Right.  But you were going to let her get out -- as a

22   sworn law enforcement officer you were going to let her get up

23   and walk out of there if that's what she chose despite knowing

24   she was this substantial danger to the national security of the

25   United States of America; right?

(Justin Garrick-Cross by Mr. Chester)

1   A    My orders were to not effect an arrest.

2   Q    So you were going to let her leave; right?

3   A    Yes.

4   Q    Okay.  Now speaking of arrest, she's -- we've talked about

5   your ability to get an arrest warrant and she brought up that

6   prospect several times during your encounter with her, did she

7   not?

8   A    She brought it up at the conclusion.

9   Q    Okay.  She asked you specifically about whether she would

10  be arrested; right?

11  A    Yes.

12  Q    Okay.  And you didn't give her a yes or no answer, did you

13  not?

14  A    I did not.

15  Q    Okay.  You told her you don't know the answer to that yet;

16  right?

17  A    Correct.

18  Q    You didn't tell her she was free to go; right?

19  A    Correct.

20  Q    You didn't tell her that she was not in custody; right?

21  A    Correct.

22  Q    You just said, "I don't know the answer to that"; right?

23  A    Correct.

24  Q    She later then brought it up and in concern of her pets

25  was talking about who is going to be taking care of her pets --

1    "I don't know if I am going to be here" -- again, bringing up

2    the issue of whether she would be detained; right?

3    A    Correct.

4    Q    Okay.  And in response your partner, Special Agent Taylor,

5    said, "Let's not get the cart before the horse"; right?

6    A    Correct.

7    Q    He didn't say, "You're free to go, Ms. Winner.  I don't

8    know why you're bringing this up.  You're free to go."  He

9    didn't say that; right?

10   A    Correct.

11   Q    He didn't say, "You're not in custody"; right?

12   A    Correct.

13   Q    Okay.  And then she brought it up a third time, and you

14   said that, "We'll cross the bridge when we get to it"; right,

15   Special Agent Garrick?

16   A    Correct.

17   Q    Again, you didn't tell her she was free to go?

18   A    Correct.

19   Q    You didn't tell her she was not in custody?

20   A    Correct.

21   Q    And the fact is hours later she was arrested by a female

22   when you had a female deputy come to the scene; right?

23   A    She was placed under arrest a couple of hours later, yes.

24   Q    And she was patted down at that time; right?

25   A    I believe she was.  I didn't watch a pat-down.  So it's up

(Justin Garrick-Cross by Mr. Chester)

1    to the department and their procedure.

2    Q    You had a female law enforcement officer pat her down when

3    the arrest was effectuated; correct?

4    A    I believe she patted her down.  Again, I did not watch it.

5    Q    You didn't pat her down?

6    A    No.

7    Q    Special Agent Taylor didn't pat her down?

8    A    No.

9    Q    None of the other eight males law enforcement officers

10   patted her down; right?

11   A    Correct.

12   Q    Special Agent Garrick, we've talked about what you did.

13   Let's focus on a couple of facts you didn't do.  Okay?  You

14   didn't tell her that the search warrant for her person was

15   completed when she handed over that cellphone; right?

16   A    Correct.

17   Q    In fact, 28 minutes later you reiterated -- the FBI

18   reiterated they had a search warrant for her person that

19   authorized a search of her; right?

20   A    Special Agent Taylor said that, yes.

21   Q    Okay.  Again, you didn't tell her at that point she was

22   not in custody; correct?

23   A    Correct.

24   Q    Okay.  The FBI never gave her her car keys back during the

25   entire three-hour account; right?

(Justin Garrick-Cross by Mr. Chester)

1   A    The search was still ongoing; so, no.

2   Q    You kept them the whole three hours; right?

3   A    I believe so, yes.

4   Q    You never gave them back; right?

5   A    I believe so.

6   Q    You never told her she was free to leave at any point

7 during these three hours; right, Special Agent Garrick?

8   A    Correct.

9   Q    But your testimony was she was free to leave.  That's your

10 testimony now?

11   A    Correct.

12   Q    Despite her being a substantial danger?

13   A    Correct.

14   Q    Despite her being the severe flight risk?

15   A    Again, with a surveillance team in tow.

16   Q    So she was free to go --

17   A    Yes.

18   Q    -- in your opinion.  Okay.  And despite her being a target

19 for recruitment by foreign intelligence services, she was free

20 to go?

21   A    Yes.

22          MR. CHESTER:  One moment, Your Honor?

23          THE COURT:  Sure.  Take your time.

24          MR. CHESTER:  Thank you, Your Honor.  I'm finished.

25          THE COURT:  All right.  Any redirect?

(Justin Garrick-Redirect by Mrs. Solari)

152

1        MRS. SOLARI:  Yes, Your Honor.

2                    **REDIRECT EXAMINATION**

3    BY MRS. SOLARI:

4    Q    Special Agent, I'd like to talk with you about what you

5    knew during your encounter with the defendant on the 3rd of

6    June.  My esteemed colleague, Mr. Chester, has asked you a lot

7    of questions about the defendant being released despite being a

8    danger and a flight risk, all of that sort of thing.  To be

9    sure you knew at the time you met the defendant that day that,

10   for instance, she had traveled to Belize on one occasion; is

11   that right?

12   A    Yes.

13   Q    You knew through your initial conversation with her that

14   she speaks three languages other than English; is that right?

15   A    Yes.

16   Q    And you knew that she had been employed within the

17   intelligence community for some period of time?

18   A    Yes.

19   Q    Did you know on that date the information that was

20   discovered in her journal?

21   A    No.

22   Q    Was that something that was collected as part of the

23   search that was executed that day?

24   A    Yes.

25   Q    So in your decision, I guess, about whether the defendant

1    would be free to leave the premises, were you aware of the

2    information in her journal regarding what I think you called at

3    the detention hearing a "covert communications package"?

4    A    I was not aware.

5    Q    So you were not aware of the instructions about how to

6    change SIM cards?

7    A    No.

8    Q    About how to install the Tor browser at its highest

9    setting on one's computer?

10   A    No.

11   Q    About the one-way burner email account that the defendant

12   appeared to have set up?

13   A    No.  I was not aware.

14   Q    Were you aware before the conclusion of the search of the

15   highly sensitive information found in the defendant's home that

16   appeared to have been taken from her work place without

17   authorization?

18   A    No.

19   Q    You said that you had not had time yet, obviously, to do a

20   full forensic examination of the defendant's phone prior to

21   conclusion of the search; is that right?

22   A    Correct.

23   Q    So did you know at that time whether the defendant had

24   apparently engaged in any prior planning to take and to release

25   classified information?

(Justin Garrick-Redirect by Mrs. Solari)

154

1  A    No.

2  Q    Were you aware of the multiple computer searches that she

3  had conducted for ways to travel, live, and work overseas?

4  A    No.

5  Q    Were you aware of the searches she conducted about how to

6  follow extremists and members of the Taliban on social media?

7  A    No.

8  Q    Were you aware, for instance, of the internet search she

9  conducted "How to make friends among the Taliban"?

10  A    No.

11  Q    Were you aware at that time that she had $30,000 in the

12  bank account?

13  A    No.

14  Q    And at the end of the day, Special Agent, based on your

15  conversations as you said with the U.S. Attorney's Office and

16  with the folks at Main Justice, did you believe it to be your

17  call whether to allow the defendant to leave the premises?

18  A    No.

19  Q    Was it your understanding that she was to be allowed to

20  leave absent further instruction?

21  A    Yes.

22  Q    In that regard defense counsel showed you, I think, a

23  couple of emails that have been entered into evidence as

24  Defense Exhibits 1 and 2.  I believe Exhibit 1 was an email

25  from Special Agent Chuck McKee.  Do you remember that one?

1    A     Yes.

2    Q     I believe the recipients were Marcus Kirkland and McCarthy

3    Butts.  You were not on that email, were you?

4    A     I was not.

5    Q     When is the first time you ever saw that email or became

6    aware of the information in it?

7    A     Yesterday morning.

8    Q     Was that in preparing to disclose to defense counsel once

9    we realized it existed?

10   A     Yes.

11   Q     And the headquarters emails, I think, between Mike Homburg

12   and some other folks -- were you a recipient of that email or

13   any of the information therein?

14   A     No.

15   Q     Defense pointed out that there was a piece of caution tape

16   up at the scene at the defendant's residence and there were

17   some perimeter agents.  What's the purpose of that?

18   A     It's to keep onlookers from entering into the premises,

19   people wandering into a search scene.

20   Q     Did you have any onlookers that day, curious neighbors,

21   anything like that?

22   A     Yes.

23   Q     We talked a lot about the defendant's car being

24   surrounded, but you testified you had the defendant's car keys

25   at that point; right?

(Justin Garrick-Redirect by Mrs. Solari)

1   A     Yes.

2   Q     And at some point the search of her vehicle was going to

3   take place; correct?

4   A     Yes.

5   Q     So given that you had a search warrant for the vehicle,

6   would you have allowed the defendant to move that car no matter

7   how many other vehicles were around it?

8   A     No.

9   Q     Did the defendant, though, ever ask you if she could

10  depart the premises by any other means?

11  A     No.

12  Q     Did she ask for assistance in calling for a ride or an

13  Uber or a family member or something like that?

14  A     No.

15  Q     Did she ask to walk to a neighbor's house?

16  A     No.

17  Q     Are you familiar enough with that area to know if there is

18  a convenience store or something like that nearby?

19  A     There is.

20  Q     Is it within walking distance?

21  A     Yes.

22  Q     Did the defendant ever ask to just walk down to the

23  convenience store and spend time there?

24  A     No.

25  Q     So it was possible for her to leave then -- just not in

1    that particular vehicle?

2    A    Correct.

3    Q    And did she ever attempt to leave?

4    A    No.

5    Q    As far as the defendant requesting permission to do

6    things, did you ever instruct her to do that?

7    A    No.

8    Q    I think she apologized maybe for not having chairs in the

9    house at some point.  Wasn't your response kind of laughingly,

10   "Hey, don't apologize; it's your house"?

11   A    Yes.

12   Q    The defense I think made some hay about the fact that you

13   did not tell the defendant she could move about freely within

14   the residence.  When you and your team are executing a search

15   warrant, do you typically allow people to move about freely in

16   the house?

17   A    No, we don't.

18   Q    Why not?

19   A    For two reasons -- one is officer safety and the other one

20   is possible destruction of evidence.

21   Q    So have you conducted search warrants before where there

22   were other people in the premises?

23   A    Yes.

24   Q    Did you call them outside or otherwise tell them to remain

25   in some particular location?

(Justin Garrick-Redirect by Mrs. Solari)

158

1   A    Yes.

2   Q    Did you end up arresting those people?

3   A    No.

4   Q    The defendant referred to that spare bedroom I think as

5   both creepy and weird.  Do you remember that?

6   A    Yes.

7   Q    Was it creepy?

8   A    No.

9   Q    Was it weird?

10  A    I didn't think so.

11  Q    Was there really anything remarkable about it other than

12  the absence of furniture in that particular room?

13  A    No.

14  Q    Let's talk about the drawing.  I understand that will be

15  the last defense exhibit in evidence and I agree we do have to

16  preserve that.  Is that drawing to scale?

17  A    No, it's not.

18  Q    All right.  So let's talk about it this way.  As you stood

19  speaking to the defendant if you had just reached out your arm

20  could you have touched her?

21  A    No.

22  Q    Could Special Agent Taylor have reached out and touched

23  her during the conversation?

24  A    No.

25  Q    Mr. Chester made -- I guess had some conversation with you

(Justin Garrick-Redirect by Mrs. Solari)

1   about whether the defendant ever stated to you or Agent Taylor

2   that she was confused, and this is on page 2-36 of Government

3   Exhibit 2.  Isn't it the case that Special Agent Taylor

4   followed that up by saying, "I think some of it will become

5   more clear.  But just if anything sticks out, is there any

6   questions you have about that?"  How did the defendant answer?

7   A    She answered, "No."

8   Q    Did you give her multiple opportunities to ask you

9   questions about what was happening, what was going on with the

10  premises, what would happen in the future?

11  A    Yes.

12  Q    And when she asked you any of those questions, did you

13  answer them to the best of your ability?

14  A    I did.

15  Q    Did you answer them honestly?

16  A    Yes.

17  Q    Again, did the defendant ever ask you questions about the

18  search of her person?

19  A    No.

20  Q    Whether it had already happened, whether it would happen?

21  A    No questions.

22  Q    Any concerns about whether it needed to be conducted by a

23  female officer or agent?

24  A    No.

25  Q    And did the defendant, except for this somewhat ambiguous

1    "Mm-hmm", ever express to you that she was confused about what

2    was happening or that she didn't understand some part of this

3    process?

4    A    No.

5    Q    Did she ever express to you any lack of understanding when

6    you told her that her interaction with you and Agent Taylor was

7    entirely voluntary?

8    A    No.

9            MRS. SOLARI:   One moment, Your Honor, if I may.

10   Thank you, Your Honor.   That's all I have.

11           THE COURT:   Okay.   Mr. Chester, do you have any

12   follow-up to that?

13           MR. CHESTER:   No.

14           THE COURT:   I do have a couple of questions that I'd

15   like to ask.   First of all, in your training with the FBI were

16   you given any instructions as to when you should mirandize a

17   person in context of a search of their home and, also, any

18   instruction regarding when you should convey to someone in that

19   context -- the same search warrant context -- that they're free

20   to leave?

21           THE WITNESS:   The training involved if you have an

22   indictment or an arrest and questioning that once the

23   indictment kicks or a formal arrest and questioning, then you

24   have to mirandize.

25           THE COURT:   Okay.   But in the context of executing a

(Justin Garrick-Redirect by Mrs. Solari)

161

1    search warrant at a person's home who is a target of an

2    investigation, under any circumstances were you trained that

3    you should mirandize the target in that setting or tell the

4    person that they are free to leave despite the fact the search

5    warrant is being executed at their home?

6              THE WITNESS:  No, Your Honor.

7              THE COURT:  Okay.  Did you consider mirandizing this

8    defendant at any point during the search warrant prior to her

9    arrest?

10             THE WITNESS:  No, I did not.  I had asked if we were

11   going to be -- if what was going to occur with the defendant

12   and they said, "You will not be arresting."  So, no arrest, no

13   *Miranda*.

14             THE COURT:  Okay.  And the same question with respect

15   to this often repeated phrase "free to leave" -- did you at any

16   point during the interview of this defendant at her home

17   consider telling her that she was free to leave?

18             THE WITNESS:  No.

19             THE COURT:  Okay.  And then at the end of the

20   interview -- you testified earlier and I am not sure that the

21   record is exactly clear on this and I want to make sure

22   understand it.  After the interview you're on the front porch

23   and I think you testified you told her to hang around in

24   response to some question or statement she had directed to you.

25   Can you give me more detail about the timing of that and the

(Justin Garrick-Redirect by Mrs. Solari)

1    exchange that you had with her?

2              THE WITNESS:  That would have been after she got out

3    of the bathroom and in response to, you know, what's going to

4    happen.  "I've got to make some phonecalls.  I've got to figure

5    out, but if you want to hang around, I'll get the answers to

6    those."

7              THE COURT:  Okay.  So it wasn't a directive to her to

8    remain -- to remain at the premises?

9              THE WITNESS:  No, sir.  No, Your Honor.

10             THE COURT:  It was, instead, a thought that you were

11   trying to get further instruction and that if she wanted to

12   know what instruction you were given, she should remain on the

13   premises?

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  Okay.  When was the search of the car

16   completed?

17             THE WITNESS:  I'm not sure, Your Honor.  I'd have to

18   -- I believe the entire search was done around 6 p.m., but I

19   may not be 100 percent accurate on that time.

20             THE COURT:  So when you say the entire search, you

21   mean the search of the car and the house?

22             THE WITNESS:  Correct.

23             THE COURT:  Do you know whether the search of the car

24   was completed before the search of the house?

25             THE WITNESS:  I don't, Your Honor.

(James T. Harrison-Direct by Mrs. Solari)

163

1          THE COURT:  Okay.  That's all the questions I have.

2       Any follow-up to that, Mrs. Solari?

3          MRS. SOLARI:  No, sir, Your Honor.

4          THE COURT:  Mr. Chester?

5          MR. CHESTER:  No, Your Honor.  Thank you.

6          THE COURT:  Okay.  You've been a model of patience.

7    You've answered a ton of questions and never lost your

8    composure or showed any signs of irritation with anyone.  I

9    very much appreciate that and you may be seated at counsel

10   table.

11         THE WITNESS:  Thank you, Your Honor.

12         MRS. SOLARI:  Your Honor, if it please the Court to

13   move forward at this time, the government calls Special Agent

14   James Harrison.

15      **(JAMES T. HARRISON is duly sworn.)**

16         THE CLERK:  Please state your name.

17         THE WITNESS:  James T. Harrison.

18         THE CLERK:  And which agency are you with?

19         THE WITNESS:  Federal Bureau of Investigation.

20         THE CLERK:  Thank you.

21                    **DIRECT EXAMINATION**

22   BY MRS. SOLARI:

23   Q    To which duty station are you assigned?

24   A    I'm assigned to the Augusta Resident Agency.

25   Q    How long have you been with the FBI?

(James T. Harrison-Direct by Mrs. Solari)

164

1    A    Twenty years and six months.

2    Q    And what positions have you served?

3    A    I have been a special agent throughout, but most recently

4    I was the supervisory senior resident agent of the Augusta RA.

5    Q    Is that the position that you occupied in June of 2017?

6    A    Yes, ma'am.

7    Q    Did you participate in the execution of a search warrant

8    on June 3rd of 2017?

9    A    I did.

10   Q    Was that at 1957 Battle Row in Augusta?

11   A    Yes.

12   Q    At about what point did you arrive at that scene?

13   A    I arrived shortly after the execution of the search

14   warrant.

15   Q    Okay.

16   A    Within several minutes of the execution of the search

17   warrant.

18   Q    So sort of as the search team members were arriving were

19   you in one of those vehicles?

20   A    Correct.

21   Q    What was your role during the search that day?

22   A    Again, I was the senior agent on scene.  My role was to

23   serve as a supervisor just to make sure that everything was

24   running smoothly and support my agents as needed.

25   Q    So did you just sort of float on the premises as you were

1    there just kind of checking things out?

2    A    Yes, I did.

3    Q    How were you dressed that day?

4    A    I can't remember exactly, but, typically, I would wear

5    like a tropical-weight hiking pants and fishing shirt just to

6    cover my gear -- duty gear.

7    Q    So when you say cover your "duty gear", were you visibly

8    armed that day?

9    A    No.

10   Q    How were the other members of the search team dressed?

11   A    It was a mix.  There were law enforcement officers.  So

12   some were visibly armed, but most were not.  Most wore either

13   ankle holsters or shoulder bags.

14   Q    And were they dressed in casual clothing as well?

15   A    Yes.

16   Q    Was anybody carrying any tactical gear like battering

17   rams, ballistic shields, anything like that?

18   A    Not that I recall.

19   Q    And the teams' vehicles -- were they just unmarked cars?

20   A    Yes.

21   Q    Anybody activate lights or sirens at any time?

22   A    Not that I recall.

23   Q    Did you personally interact with the defendant while you

24   were on the premises that day?

25   A    I did.

(James T. Harrison-Direct by Mrs. Solari)

1    Q    Describe what interaction you had with her before the

2    search started.  Where were you guys and what did you talk

3    about?

4    A    We were sitting on the front porch.  It was small talk at

5    that point.  I was -- I remember having a conversation with her

6    about the Air Force.

7    Q    Were you stationed at one point in Minot, North Dakota?

8    A    I was.

9    Q    All right.  So that's you in the transcript mentioning

10   Minot?

11   A    Yes, it is.

12   Q    All right.  Who else was around?

13   A    At that time pre-search it was myself, Special Agent Wally

14   Taylor, and Special Agent Justin Garrick.

15   Q    And how was everybody standing or sitting?

16   A    As though we were having a casual conversation.  Everybody

17   was standing around on the front porch waiting for the initial

18   search team to be completed.

19   Q    Anybody touching the defendant or instructing her where to

20   stand or what to do?

21   A    No.

22   Q    What was the defendant's demeanor during that time?

23   A    Casual.

24   Q    Besides you and Special Agent Garrick, Special Agent

25   Taylor, did you see any other agents have any significant

(James T. Harrison-Direct by Mrs. Solari)

1    contact with her that day?

2    A    No.

3    Q    I'd like to move your attention to what was going on once

4    the search began and you said during that time you were kind of

5    floating?

6    A    I was.

7    Q    Did you do anything to tend to the defendant's dog?

8    A    I did.  We all made sure that the dog was taken care of.

9    I remember we gave the dog water.  We made sure the dog had

10   food.  We let it out into a fenced-in area on the side of her

11   property.

12   Q    Okay.  Was the defendant the one that actually sort of

13   ushered the dog back there?

14   A    I believe so, yes.

15   Q    At some point were you aware of Special Agents Garrick and

16   Taylor talking with the defendant in a spare bedroom?

17   A    Yes.

18   Q    What opportunities, if any, did you have to hear or see

19   what was going on in that room?

20   A    Again, it was my job to make sure everything was running

21   smooth.  So I periodically would walk back and observe them

22   during the course of their interview.

23   Q    Did you have any impediments to your observation?  Were

24   you able to both see and hear into the room?

25   A    I could see and hear, yes.

(James T. Harrison-Direct by Mrs. Solari)

168

1   Q    So was there any closed door in your way?

2   A    No.

3   Q    And you could overhear what was being said?

4   A    I could.

5   Q    Describe everybody's posture in the room.  Were they

6   sitting, standing?

7   A    Again, it was casual.  They were standing and it was

8   pretty much as though we were having a conversation in

9   Starbucks -- or they were having a conversation in Starbucks,

10  from what I could see.

11  Q    That's what you'd think if you're just sort of a casual

12  observer of this conversation?

13  A    Yes.

14  Q    And so approximate distances from each other would be --

15  are you able to estimate?

16  A    Two or three feet conversation.  There was no invasion of

17  personal space and no one was being overbearing that I

18  observed.

19  Q    All right.  Now you said you were observing portions of

20  the interview through that open doorway.  Was anybody blocking

21  the doorway?

22  A    No.

23  Q    Was anybody at any time that you saw in this interview

24  standing in front of the defendant?

25  A    No.  Not from my vantage point, no.

(James T. Harrison-Direct by Mrs. Solari)

169

1    Q    Did you ever hear any raised voices in there?

2    A    No.

3    Q    Did you ever see -- I think you just said this, but did

4    you ever see anyone sort of crowding the defendant in something

5    that would be less than personal space?

6    A    No.

7    Q    Ever see anybody get sort of within an arm's reach of her?

8    A    No.

9    Q    Ever see anybody pointing any fingers in her face or

10   making any menacing gestures towards her?

11   A    No.

12   Q    How did you perceive the defendant's demeanor during the

13   conversation itself?

14   A    Again, casual, cooperative, willing to engage in the

15   conversation.

16   Q    Did you interact with the defendant at all when that

17   interview was complete?

18   A    When it was complete, yes.

19   Q    And where was that?

20   A    Again, on the front porch and then for a period of time in

21   the fenced-in area on the side of the house.

22        MRS. SOLARI:  Tash, can you bring up 4.1, please?

23        All right.  What is this area right here?

24        THE WITNESS:  It's the driveway and the porch that I

25   was referencing.  That's where we were engaging in conversation

(James T. Harrison-Direct by Mrs. Solari)

1    pre-interview and post-interview.

2    Q    All right.  So let's talk about post-interview.  If you

3    can describe within this photo, where were you and the

4    defendant located?

5    A    I just kind of walked around on that porch and the

6    defendant did the same.  For a period of time she was sitting

7    down with her back leaning up against that type -- I believe it

8    is a brick structure.  I don't have my glasses, but it's sort

9    of a pillar there and her feet were propped up.

10   Q    So she had her feet kicked up on the pillar?

11   A    Yes, ma'am.

12   Q    Did you tell her to do that?

13   A    No.

14   Q    Did you tell her whether to stand or sit at any particular

15   time?

16   A    No.

17   Q    Did you restrict her movements to the porch or tell her

18   anything else about where she could or couldn't go during that

19   time?

20   A    No.

21   Q    So you said y'all talked.  Did you talk about case-related

22   things?

23   A    No, small talk.  Talked about the Air Force, talked about

24   her dog a lot.  She told me that she wore different color

25   socks.  I can't remember the reason why, but it was all small

1   talk.

2   Q    All right.  Did the defendant ever try to reenter the

3   house?

4   A    No.

5   Q    Ever ask any questions about her case or whether she was

6   going to be arrested?

7   A    No.

8   Q    What was her demeanor like during that time?

9   A    Calm, casual, conversational.

10  Q    Was she sort of smiling and laughing at times?

11  A    She was.

12  Q    Did she ever seem fearful in any way?

13  A    No.

14  Q    Did she ever seem confused about anything?

15  A    No.

16  Q    At some point did she talk with you about whether she

17  could go in the backyard and play with her dog?

18  A    She did.

19  Q    Did you instruct her to go in the backyard?

20  A    I did not.

21  Q    Did you hear any other agent instruct her to do that?

22  A    No.

23  Q    So how did it come to be that she went back there?

24  A    She asked if it was okay and I said, "Of course".  She

25  walked over there and petted her dog for a period of time.

(James T. Harrison-Direct by Mrs. Solari)

172

1    Q    Okay.  And what did you do while she was in the backyard

2    playing with her dog?

3    A    I walked over in that direction with her.  I stood on the

4    other side of the fence.  I was on my phone for a little bit as

5    well just to key an eye on her.

6    Q    All right.  So were you right at her elbow or anything

7    like that?

8    A    No.

9    Q    You were on the totally opposite side of the fence but

10   still in the parking pad area?

11   A    Correct.  I was on the driveway side of the fence.

12   Q    Got it.

13        Tash, if you could bring up 4-13, please.

14        Is this the backyard that you're talking about?

15   A    Yes, ma'am.

16        MRS. SOLARI:  All right.  4-14.

17        Just another vantage point of the backyard?

18        THE WITNESS:  Correct.

19        MRS. SOLARI:  And 4-15.

20        Again, I believe this stretches sort of from that rear

21   exterior door around the side and part of the back of the

22   house?

23        THE WITNESS:  Correct.  And we never made it back

24   that far.  We were close to the gate.

25   Q    Okay.  Was anybody else in the backyard with the

1   defendant?

2   A    No.

3   Q    Anybody ever tell her she had to stay there or couldn't

4   stay there?

5   A    No.

6   Q    Do you remember about how long she spent back there with

7   the dog?

8   A    Ten minutes, fifteen minutes.  Not much more than that.

9   Q    What did she do after that?

10  A    We went back to the porch.

11  Q    Did she do that based on anyone's instruction?

12  A    No.  She just appeared to be done petting her dog.

13  Q    And just came on back out front?

14  A    Right.

15  Q    At any point during the time the defendant spent in your

16  presence did she ever ask to leave the premises?

17  A    No.

18  Q    Ask for help making a phonecall?

19  A    No.

20  Q    Ask about talking to an attorney?

21  A    No.

22  Q    Did she ever tell you anyone on the team had treated her

23  badly or made her do anything she didn't want to do?

24  A    No.

25  Q    Tell you that anyone on the team had scared or threatened

(James T. Harrison-Direct by Mrs. Solari)

174

1    her in any way?

2    A    No.

3    Q    During any part of your time on the premises prior to the

4    defendant's formal arrest, did you ever see or hear anybody

5    touch the defendant?

6    A    Not at all.

7    Q    Restrain her in any way?

8    A    No.

9    Q    Raise a voice to her?

10   A    No.

11   Q    Use foul or otherwise inappropriate language?

12   A    Not at all.

13   Q    Suggest to her that she couldn't leave the premises?

14   A    No.

15   Q    Suggest to her that she was going to be arrested or taken

16   into custody?

17   A    No.

18   Q    At what point did you learn the defendant was going to be

19   arrested that day?

20   A    After we had been on the porch for a while, I had a

21   conversation with Agent Garrick and Agent Taylor and they

22   communicated with headquarters and headquarters advised that we

23   would be taking her into custody.

24   Q    Had the team planned for that?

25   A    Not at all.

1   Q    What steps did you have to take then to effect that

2   arrest?

3   A    I picked up my phone and I called the Marshal's Service to

4   figure the best way to handle this on a Saturday afternoon, and

5   they advised accordingly -- put me in touch with Lincoln County

6   and it went from there.

7   Q    All right.  Thank you, Special Agent.

8        That's all I have right now, Your Honor.

9             THE COURT:  All right.  Mr. Nichols.

10                      **CROSS-EXAMINATION**

11  BY MR. NICHOLS:

12  Q    Good afternoon.

13  A    Good afternoon.

14  Q    You previously stated that you have been with the FBI for

15  over 20 years?

16  A    I have.

17  Q    And during that time you have learned the various

18  different ways to interview an individual that you're

19  interested in in a case; correct?

20  A    Correct.

21  Q    And you stated that when you showed up on the day of the

22  interview you were dressed in -- how did you describe the

23  clothes you were wearing?

24  A    Tropical hiking pants and an untucked fishing shirt.

25  Q    And you chose to wear that versus being in tactical gear

1   because you wanted to put Ms. Winner at ease when you performed

2   the search and spoke with her; correct?

3   A    No, sir, because it was about 90 degrees outside.

4   Q    And but in your experience if several FBI agents show up

5   in tactical gear the individual is going to be less likely to

6   speak to you; correct?

7   A    Sometimes.

8   Q    And Mrs. Solari asked if you were visually armed.  Were

9   you armed, period?

10  A    I was.

11  Q    And where was the weapon that you had?

12  A    For a period of time it was on my hip underneath my

13  untucked shirt and for a period of time it was in a shoulder

14  bag that I carry.

15  Q    And during the interview between Special Agent Taylor and

16  Special Agent Garrick where were you standing?

17  A    Outside for the most part, but I would periodically enter

18  the house, walk through the kitchen, and stick my head around

19  the corner of the door to observe and listen.

20  Q    During the course of the interview, how long would you say

21  you were outside the house?

22  A    The majority of it.

23  Q    And how long were you -- would you say you were in the

24  kitchen but not inside of the room?

25  A    I wasn't inside the room at all.  I was in the kitchen and

(James T. Harrison-Cross by Mr. Nichols)

1  I -- there's a small hallway in between the kitchen and room

2  where I was standing listening to the threshold.

3  Q    And you said that you had a clear view of the inside of

4  that room?

5  A    I did.

6  Q    So then you're aware that there is a closet inside the

7  room that blocked the view of Ms. Winner; correct?

8  A    No.

9  Q    What I am showing you here is a diagram of the room.  From

10 what you saw, is this an accurate depiction of the room?

11 A    To the best of my recollection, yes.

12 Q    And do you recall there being a closet on the side of the

13 room?

14 A    I don't.

15 Q    Is there anything else about the room you don't recall?

16 A    Not that I know of.

17 Q    How many vehicles were present at the scene?

18 A    Maybe ten.

19 Q    Ten vehicles.  Where were those ten vehicles parked?

20 A    Maybe one in the driveway and the rest were scattered

21 along the street in the front of her house.

22 Q    Were there any vehicles that were within 15 feet of her

23 vehicle?

24 A    I believe there were, yes.

25 Q    And was -- would it be possible for her to just drive off

(James T. Harrison-Cross by Mr. Nichols)

1    the parking spot or parking area of her home with all of those

2    vehicles present?

3    A    Not without us moving them.

4    Q    The keys -- do you know who took her car keys?

5    A    I don't know that.

6    Q    Do you know if she ever got her car keys?

7    A    I don't know that.

8    Q    During the course of the interview would you say she was

9    free to leave?

10   A    I would.

11   Q    Do you know -- did you ever tell her that she was free to

12   leave?

13   A    I didn't have that conversation with her, no.

14   Q    During your small chat with her, did you inform her that

15   you were a senior agent on the scene?

16   A    I believe I did, yes.

17   Q    And did you inform her that if she wanted to she could

18   just walk away?

19   A    No, I did not.

20   Q    Did you inform her that she could ask for her car keys

21   back if she wanted them?

22   A    No, I did not.

23   Q    You stated that you also went into the backyard with

24   Ms. Winner; correct?

25   A    Correct.

(James T. Harrison-Cross by Mr. Nichols)

1  Q     Why did you go there with her?

2  A     Well, it was my job at that point to keep an eye on her

3  for a couple of different reasons:  One, I had a team in the

4  process of conducting a search and I have to be concerned about

5  officer safety, and, two, to make sure that there was no

6  destruction or tampering of any evidence.  So my job is just to

7  follow her around and make sure nothing was going on.

8  Q     You knew she didn't have any weapons on her; correct?

9  A     I did at that point.

10 Q     And you didn't see any other agents in the backyard;

11 correct?

12 A     Correct.

13 Q     So then why would your agents be in danger if she went to

14 the backyard by herself?

15 A     It's an abundance of caution on my part.  It is my job to

16 make sure that my agents are safe throughout the entire search

17 until we depart that area.

18 Q     But she was free to go as she pleased; correct?

19 A     She could have.

20 Q     And so if she wanted to walk out of that fence, she would

21 have to go through you; correct?

22 A     No, because I was standing to the side of the fence.

23 Q     So you were not standing near -- the photo we had -- you

24 were not standing on the opposite side of the fence door?

25 A     I was standing on the opposite side of the fence to the

1    right as you face into the backyard of that gate.

2    Q    And how long did you stand back there with her?

3    A    For the duration of her time.  So probably 10 or 15

4    minutes.

5    Q    And when you were in the back with her, where was Agent

6    Garrick and Agent Taylor?

7    A    I believe they were in the vehicle on the telephone.

8    Q    And so you said that it wasn't until after they came out

9    of the vehicle they informed you that she was under arrest?

10   A    Correct.

11   Q    So she was not under arrest when you were standing back

12   there with her in the backyard?

13   A    Correct.

14   Q    And when you were standing with her on the front porch she

15   still was not under arrest but you were still right next to

16   her?

17   A    Correct.

18            MR. NICHOLS:  Your Honor, I have no further questions

19   for this witness.

20            THE COURT:  All right.

21            MRS. SOLARI:  No redirect, Your Honor.

22            THE COURT:  All right.  Special Agent Harrison, thank

23   you for your time and testimony.  You're excused.  You may

24   remain in the courtroom if you'd like.

25            Any further witnesses from the government?

1          MRS. SOLARI:  No, sir.  None from the government.

2          THE COURT:  Any witnesses from the defense?

3          MR. CHESTER:  We'll rest on cross-examination.

4          THE COURT:  All right.  At this time let's turn to

5   any closing remarks that the parties would like to make

6   beginning with any that the defense would like to offer.

7          MR. CHESTER:  I'm sorry.  One moment, Your Honor.

8          THE COURT:  Do you need a break first, Mr. Chester,

9   before you make any closing remarks?

10          MR. CHESTER:  Yes, I just assumed -- I'm sorry.  I

11   was taken aback.  I assumed that the government would be giving

12   closing remarks first.  Since they went first on opening, I

13   assumed I was going to be going second.

14          THE COURT:  We can handle it whichever way y'all

15   prefer.  Technically, I think the defense has the burden on

16   custody; so that's why I turned to you, again, out of more

17   habit than anything.  How long do you need to prepare for

18   closing?

19          MR. CHESTER:  I don't think it will be very long,

20   Your Honor.

21          THE COURT:  Let's take a 15-minute break.

22      (A break is taken.)

23          THE COURT:  Before we begin with the closing remarks,

24   I understood initially that there would be a need to reconvene

25   in a classified setting.

1           Mr. Chester, is there any need for that today?

2                 MR. CHESTER:  No, I don't think there is any need for

3       that, Your Honor.

4                 THE COURT:  Mrs. Solari?

5                 MRS. SOLARI:  No.  No, Your Honor.

6                 THE COURT:  Okay.  All right.  Let's move into the

7       closing remarks.  Y'all have an agreement about who is going to

8       go first?

9                 MR. CHESTER:  It doesn't matter to me.

10                 THE COURT:  All right.

11                 MR. CHESTER:  Judge, I will end where I began.  This

12      is one issue that we're here to decide:  Was she subjected to

13      custodial interrogation on June 3, 2017, when she made those

14      statements?  And as my colleague, John Bell, would say, actions

15      speak leader than words.  The government can say, yes, we told

16      her it was voluntary; yes, we're here voluntary; you're here

17      voluntarily; but actions speak louder than words.

18           If I may approach to the board, Your Honor?

19                 THE COURT:  You may.

20                 MR. CHESTER:  What we heard today are all sorts of

21      actions that are unquestionably under the law demonstrate

22      custodial interrogation from both special agents.  First, we

23      heard that her movements were controlled at various points in

24      time throughout this encounter.  We heard that -- and it's in

25      the transcript -- that she felt controlled and she verbalized

1    that.  She asked for permission every time she needed to

2    physically do something:  Use the restroom, leash up her dog,

3    close the front door so her cat doesn't go out.  They never

4    said, "You don't need to ask for permission."

5        We heard they never told her she was free to leave.

6    Excuse my penmanship, Your Honor.  In fact, we heard Special

7    Agent Garrick say that he never even considered telling her

8    that.  We heard that they never told her she was not in

9    custody.  When she brought it up, the FBI didn't give her a

10   straight answer despite the day before people in headquarters

11   talking about effectuating an arrest and having a probable

12   cause arrest if she were to flee.  We heard that she was

13   confused.  She acknowledged she was confused.  We also heard --

14   and, again, this is what I started with earlier -- that they

15   had a search warrant for her person, but she was never patted

16   down for hours.

17       I was only able to find a handful of cases that addressed

18   this, and we cited them to you in our brief.  They are state

19   court cases applying the same law: *Wilson* and *Ferris*.  Both of

20   those cases made the point that a reasonable, innocent person

21   when you're told you have a search warrant for your person

22   would interpret that as I need to be patted down which makes

23   all the sense in the world which is why she then asks for

24   permission to do things because she doesn't think she can do

25   anything without law enforcement's okay.

1    We heard her car keys were taken -- never given back for

2    the whole three hours she was there.  We heard her car was

3    surrounded -- surrounded by law enforcement vehicles and

4    Special Agent Harrison testified that she couldn't leave

5    without them moving it which is exactly what the picture

6    showed.

7    What else was at the scene?  There was caution tape.

8    There was a surveillance team, a security perimeter.  What else

9    did we hear today?  Eleven male agents, nine armed.  First

10   female didn't show up until hours later when she was finally

11   patted down.  She was isolated in that private room.  Those

12   were Special Agent Garrick's words:  "Do you have a private

13   room somewhere that's away from this?"  She said, "I do.  I

14   don't want to go in there."  He said, "We can go in there if

15   you'll be okay in there," and she then acquiesces.  Again, it's

16   consistent with the pattern of she needs law enforcement's

17   approval, law enforcement's permission to do anything, and she

18   will acquiesce to their request because of the police-dominated

19   atmosphere that pervaded that house that day.

20   We talked about -- Your Honor asked some of these

21   questions.  Special Agent Harrison said -- I'm sorry, Special

22   Agent Garrick said he told her to hang around afterwards.  So

23   the interview ends and she is still told, "Hang around."

24   Special Agent Harrison said, "I was there to keep an eye on

25   her."  What was there to keep an eye on?  If she was there --

1   if it was a voluntary thing and she could walk out, why did

2   they need to keep an eye on her?

3       We talked about the heavy probable cause that the FBI had

4   going in that day.  We talked about the same probable cause

5   that they had for the search warrant two days later -- or for

6   the arrest warrant, excuse me, two days later.  Nearly

7   identical probable cause.  We talked about her being the only

8   suspect.  Their prime suspect.  We talked about the fact that

9   the government's view, the FBI agent's view, is that she's a

10  substantial danger to the community.  We talked about her being

11  a substantial flight risk.

12      And Your Honor asked a poignant question when you asked

13  Special Agent Garrick what sort of training he receives to give

14  somebody *Miranda* warnings even in the absence of an arrest.

15  His answer was, "No arrest, no *Miranda*."  That's not the law.

16  We know the law is you can be in custody even without being

17  under arrest.  That's what these cases that we've cited stand

18  for.

19      So at the end of the day here are just 20 things that I

20  jotted down in the 15 minutes we had to reflect this was

21  clearly a custodial interrogation.  One of these things, two of

22  these things, but in totality -- the totality of the

23  circumstances test -- a reasonable, innocent person who's not

24  told she's free to leave, first encounter with the FBI, whose

25  car keys are taken, whose cellphone is confiscated, who is told

1    they have a search warrant for her person -- by the way, the

2    FBI knows she's a substantial danger to the community, a

3    substantial flight risk, and their testimony is we were going

4    to let her walk out of there?  That's just simply not credible.

5        It's just simply not credible, and no reasonable person --

6    I keep going back to the search warrant for her person.  No

7    reasonable person would ever feel like in this back room that I

8    didn't want to go to in my small, 800-square foot house with

9    two FBI agents right next to me, with the security perimeter,

10   with my car keys taken, with my cellphone taken, with my car

11   surrounded, never being told she's free to leave, never being

12   told she's not in custody, with her movements being controlled,

13   with her expressing that she's confused, with caution tape

14   around the scene -- no reasonable person would have felt like,

15   you know what I am going to do?  I am going to jump up out of

16   this room.  I am going to run to the FBI agent who has my keys.

17   I am going to grab my keys.  I am going to get in my car.  I am

18   going to do an 18-point turn so I can get out of there so I

19   don't hit one of these law enforcement vehicles.  I am going to

20   plow through my yard, plow through the caution tape, hope not

21   to hit the law enforcement vehicles parked on Battle Row.  And

22   they wouldn't have done anything?  That's not credible, Your

23   Honor.

24       These are clearly custodial circumstances.  All the agents

25   had to do is take six seconds out of their time and read her

1   her *Miranda* rights as she was entitled.  They didn't do that.

2   And they didn't do that, as we all know, for a very good

3   reason.  Everybody knows that when you read somebody your

4   *Miranda* rights, they're not going to talk.  Despite emails the

5   night before talking about effectuating an arrest and arresting

6   her if she flees.  They didn't want to get that arrest.

7   Despite two days later coming to Your Honor to get an arrest

8   warrant based on the exact same probable cause that they'd had

9   before they even walked in her house.

10          It was clear it was a tactical decision.  We don't need to

11  read her *Miranda* rights.  We can employ all the factors we need

12  to employ here to keep her controlled and, hopefully, she'll

13  talk to us, and, lo and behold, that's exactly what happened,

14  but the law says you don't get to do that.

15          The factors in the Eleventh Circuit cited by the Supreme

16  Court, most of them cut in favor of custody here including the

17  most powerful factors cut in favor of custody.  Your Honor,

18  we'd submit the motion should be granted and her statement

19  should be suppressed.

20                THE COURT:  Thank you.  I appreciate it.

21      Mrs. Solari?

22                MRS. SOLARI:  Thank you, Your Honor.  I think we

23  spent a lot of time here focusing on things that are either not

24  relevant or, perhaps more importantly, relevant but not

25  dispositive.  So may I approach the white board, Your Honor?

1           THE COURT:  You may.

2           MRS. SOLARI:   And I mean no disrespect, but if I may,

3   I'd like to sort of start off by erasing the things here that

4   we already know from the Eleventh Circuit case law are not

5   relevant at all to this inquiry.  So, first of all, we'll start

6   with subjective feelings of either the agents or the target --

7   the suspect.  And that would be, let's see, that the defendant

8   according to the defense felt controlled.  There wasn't really

9   any articulation of that to the agents that the defendant asked

10  permission.  It was more of a subjective thing.  She simply

11  elected to do that and the agents never forbid her to do

12  anything that she asked to do.  It would seem kind of weird to

13  tell someone to stop asking you if they could do something and

14  I think the agents, essentially, had every right to control the

15  defendant's movements.  We know from the case law that simply

16  controlling movements of people during the scene of a search

17  warrant does not make people in custody.  It is simply

18  something one would be expected to do to preserve the integrity

19  of the evidence and to ensure the safety of everybody at the

20  scene.

21     So, let's get rid of how the defendant felt because that's

22  not relevant.  The defendant felt confused I think, certainly,

23  is not what the evidence portrayed, but, again, that would be

24  something subjective that would not be relevant in a

25  determination of what a reasonable, innocent person would have

1   concluded or could have concluded under these circumstances.

2        Let's see.  That there was a surveillance team or

3   security.  Well, there is no evidence that was ever known to

4   the defendant.  So to the extent that was unarticulated to her,

5   that's not part of what a reasonable, innocent person would

6   consider in determining whether they felt they were in custody.

7   There were, to be sure, eleven male agents at the scene, but

8   there is certainly no evidence that the defendant did anything

9   but suppose that any of them were armed.  I think two were

10  visibly armed and the rest Special Agent Garrick said he

11  couldn't even see their weapons.  He had to ask them whether

12  they were armed.  So this was not something that could

13  reasonably have been known by the defendant, but she must have

14  simply guessed and hoped that was accurate.  In fact, I think

15  she got that wrong in her sworn affidavit when she concluded

16  everybody at the scene was armed.  Certainly, we know now that

17  was not true.

18       I think things that happened after the defendant's

19  interview are of no consequence in determining whether she was

20  in custody during her conversation with Special Agents Garrick

21  and Taylor in that room in her house -- that spare bedroom.

22  So that she was told to hang around really doesn't matter to

23  what she would have concluded during the interview itself.

24  That anybody kept an eye on her after that interview is

25  irrelevant.

1    Certainly, the degree of probable cause that the agents

2    could have had for her arrest is of no moment.  They could have

3    shown up with an arrest warrant in their back pocket, but,

4    again, to the extent that was not conveyed to the defendant and

5    it certainly was not conveyed to her here that she would be

6    arrested with or without a warrant, those are not relevant to

7    this inquiry.

8        We know from case law that the fact that someone is a

9    suspect and even the fact that that is conveyed to the

10   defendant is certainly not even really relevant to the inquiry

11   and certainly not dispositive.  The agents definitely never

12   conveyed to the defendant during this interaction that they

13   felt in any way that she was a danger to the community or a

14   flight risk.  So that's not something a reasonable person would

15   have been thinking about in trying to conclude whether they

16   were under arrest, and Special Agent Garrick's belief or

17   training about mirandizing the defendant, again, to the extent

18   none of that was conveyed to her is not relevant to what a

19   reasonable, innocent person would conclude about whether he or

20   she is in custody.

21       So what we're left with is the degree to which the agents

22   may have controlled the defendant's movements, and, again, we

23   know from case law that that's something that's quite expected

24   at the scene of a search warrant and, certainly, doesn't

25   elevate an encounter to a full-blown arrest.

1       That she was not told she was free to leave and not told

2  she was not in custody.  Certainly, that would have been

3  helpful if she were told that.  It would have erased any

4  arguable ambiguity, but I think Special Agents Garrick and

5  Taylor having told her unambiguously four different times "This

6  is entirely voluntary; this is entirely up to you" -- I think

7  their conclusion was they had adequately conveyed that to the

8  defendant; although, they didn't use these words, but, again,

9  we know from case law that these particular words have no

10  particular talismanic effect.  They are but one fact to be

11  considered under the totality of the circumstances.  In fact,

12  we've seen many cases where subjects have been told multiple

13  times "You're free to leave and you're not in custody" but, in

14  fact, they were because the agents -- as Mr. Chester said, the

15  actions speak louder than words.  The actions belied the

16  assurance that the subject was not in custody.

17       So I think the reverse happened here.  While these magic

18  words, so to speak, weren't said, the actions of the agents

19  certainly would have led a reasonable, innocent person to

20  conclude that they were not in custody during that

21  conversation.

22       Now that there was a search warrant for the defendant's --

23  well, that her car keys were taken -- again, of no moment

24  because we all know the car wasn't going anywhere.  They had a

25  search warrant for the car.  Again, the defendant never asked

1    to depart the premises any other way -- call for a cab, an

2    Uber, or walk to a neighbor's house, spend all of her time in

3    the backyard, again, knowing full well having been told

4    repeatedly her interaction with these agents was entirely

5    voluntary, totally up to you.  Rather than sort of hem and haw

6    and think that over, you'll find in the recording and the

7    transcript the defendant answers with responses like,

8    "absolutely, definitely."  She actually seems quite eager to

9    interact with and talk with these agents.  So that her car is

10   surrounded is of no moment.  The government concedes she's not

11   going anywhere in that car, but that doesn't mean she can't go

12   anywhere.

13        We have no evidence she was aware of the caution tape, but

14   I really don't know what that means in terms of anybody being

15   under arrest.  It certainly seems insignificant.

16        As for the male agents, I have to say -- and this is

17   probably, you know, not terribly relevant -- I find it a bit

18   offensive that we should assume somehow that as a matter of law

19   there must be a female officer or agent on the scene to effect

20   a search warrant of a female's person.  That's never been the

21   law.  That's not a requirement, and, certainly, it's not one

22   that was ever discussed with the defendant in any way.  So to

23   the extent she subjectively supposed that must the case, that's

24   something else that's of absolutely no relevance here.

25        And the isolated room -- certainly, it's not, Your Honor.

1    As a matter of fact, I'll call to the Court's attention a case

2    -- I believe it's *Peck* out of the Northern District of

3    Georgia -- that points out that as opposed to Craig head which

4    is the case on which the defense likes to rely -- a Ninth

5    Circuit case -- the room in which the defendant in *Peck* was

6    interviewed was a room that was somewhat away from the

7    commotion of the search warrant, but the door was wide open and

8    the defendant and the agents could hear the other agents moving

9    and going about their business outside the room.  This is

10   hardly isolated.  It was a smallish house, but as I asked

11   Special Agent Garrick, "Was this any more isolated or any

12   different from any other room in the house?" and the answer

13   was, "No."

14        The most important part of this, though, Your Honor, is

15   the defendant chose this room.  It wasn't as though Special

16   Agent Garrick did some sort of reconnaissance of the home and

17   determined that this, you know, creepy, weird room would be the

18   best place in which to intimidate the defendant.  She

19   identified it.  To the extent she subjectively may have

20   believed it was weird, we heard testimony that it wasn't.

21        It was maybe odd in that it lacked furniture, but the

22   defendant herself said, "I am not big on furniture."  And

23   that's borne out as the agents go through her house and see

24   that she really isn't big on furniture.  She doesn't have much.

25   So this was an ordinary room with the door wide open.  About

1   4 feet beyond that wide-open door is another exterior door
2   leading to the outside.
3       The defendant is never impeded in any way from walking out
4   of the room should she have chose, and Special Agent Taylor
5   specifically told her, "We're here voluntarily.  You're here
6   voluntarily.  We're not forcing you to do anything."  So,
7   certainly, the room was not isolated.  It was just a room in
8   which three people were having a conversation.  Again, I don't
9   know what the caution tape means.
10      So here's, I think, what we have left to deal with and
11  here's where I want to talk about the law.  The argument that
12  defense seems to be making is that based on all these facts and
13  circumstances a reasonable person in the defendant's position
14  would have concluded she was not free to leave the premises and
15  I think they base that largely on, and, understandably, the
16  fact that this defendant was told, "We have a search warrant
17  for your person" and I concede that it was not conveyed to the
18  defendant that that search warrant according to, you know, as
19  far as the agents were concerned had either been executed or
20  was moot in any event by the time they got her cellphone, but,
21  again, they communicated to her at least four different times
22  that any further interaction with them was entirely voluntary
23  -- "It's up to you; you're here voluntarily."  The defendant
24  says, "Definitely, absolutely", never asks to leave, so on and
25  so forth, but let's skip ahead because whether the defendant is

1  free to leave is, again, just the starting point in the custody

2  analysis, and I know Your Honor is more than familiar with this

3  case law.

4      Whether the defendant is free to leave is interesting but

5  far from determinative.  So, again, I'll refer the Court to a

6  case called *Asher*.  That's 2010 Westlaw 4192883 at page eight.

7  It is a Northern District of Georgia case stating that "To hold

8  that detention of the suspect while executing a lawful warrant

9  at his or her residence is legal equivalent of custody would

10 run contrary to Eleventh Circuit direction to consider the

11 totality of the circumstances."

12     So, again, we understand that even assuming arguendo that

13 a reasonable person in the defendant's shoes would have

14 concluded that she had to remain on the premises so that her

15 person could be searched or for some other reason, that doesn't

16 mean that she was in custody.  The question we have to ask is

17 whether under the totality of the circumstances her interaction

18 with Special Agents Garrick and Taylor in that room resembled a

19 formal arrest -- whether it looked to every reasonable person

20 to be the functional equivalent of a formal arrest.  Special

21 Agent Harrison probably said it best when he said, "If I had

22 just seen this conversation somewhere, I would just thought,

23 you know, it was just three people kind of chatting at a

24 Starbucks or something."  There was nothing exceptional looking

25 about it.

1        In U.S. versus Luna-Encinas which is an Eleventh Circuit

2   case from 2010, again, we're reminded that although a

3   reasonable person in the defendant's position may feel

4   constrained not to leave the scene of a police encounter at a

5   particular moment and thus may be deemed to have been seized by

6   law enforcement, he will not necessarily be considered in

7   custody for Fifth Amendment purposes.  Rather, a free to leave

8   inquiry revealed only whether the person in question was

9   seized, and while seizure is a necessary perquisite to *Miranda*,

10  a court must also ask whether a reasonable person would have

11  understood his freedom of action to have been curtailed to a

12  degree associated with a formal arrest."

13       Your Honor, when we think about formal arrest, we think

14  about those things that were not present at this scene.  We

15  think about ballistic vests.  We think about raid jackets.  We

16  think about weapons drawn.  Talk about controlling movement --

17  telling the defendant, "Reach outside and get the leash and

18  just get your dog and come out" is lot different from "Get on

19  the ground; get on the ground; show me your hands", pulling

20  people out of rooms outside.  None of that happened to this

21  defendant.

22       Again, in Luna-Encinas the court considers the totality of

23  the circumstances including whether officers brandished

24  weapons -- nothing like that happened here -- touched the

25  suspect -- never happened -- or used language or tone that

1    indicated compliance with the officers to be compelling.  Your

2    Honor can hear the tone of the voice throughout that

3    interaction with the defendant, and, again, the tones are

4    nothing but empathetic and kind.  There is a lot of laughing.

5    There's friendliness.  Is some of that rapport building?

6    Absolutely.  Does that weigh in favor of a finding of custody?

7    Absolutely not.

8         The location and length of detention.  Again, the

9    defendant was interviewed in the comfort of her own home in a

10   room of her choosing that was not unusual except that there was

11   no furniture.  She was invited to sit, stand, or do whatever

12   else she wanted to do, and the agents purposely made sure that

13   if the defendant were to sit, they would have done so, too, and

14   they let her know that because they didn't want to lord over

15   her in some way that might have seemed imposing.

16        She wasn't threatened or intimidated verbally or

17   physically, no weapons pointed at her.  As a matter of fact, we

18   have a bunch of statements in the record in the transcript that

19   suggests to the defendant that like any other detention, if

20   that's what this was, this would be finite; right?  So we have

21   Special Agent Garrick telling the defendant, "Hopefully, we'll,

22   you know, have a talk about this, figure out what's going on,

23   and wrap it up"; conversation about whether she's going to stay

24   in this house or look for another one; the defendant's

25   expression to the agents that she was going to teach yoga the

1   next day; and, certainly, nobody said to her, "I don't think

2   you're going to be doing that."  So that was the defendant's

3   understanding.  Someone mentioned -- I believe Special Agent

4   Garrick mentioned to the defendant that her dog probably wasn't

5   going to be happy being put out in the yard for a few hours.

6   Again, that suggests they will be there for a few hours, and

7   then she and her dog will be back in the house and they'll be

8   on their way.

9        So everything suggested to the defendant that this

10  interaction with the agents would be finite just like any other

11  seizure or detention.  We all know it only ends one of two

12  ways: either the person ends up in custody or they end up

13  walking away.  The best evidence that this could never have

14  been anything more than a detention, if that's even what it

15  was, is the conversation that happens after the interview where

16  the defendant asks for the first time, "This sounds really bad,

17  but am I going to jail tonight?"  And the agents answer her

18  honestly, "We don't know.  That's not up to us.  Don't put the

19  cart before the horse.  Don't get all worried about that yet.

20  It might not be happening.  We got to figure that out."

21       I mean, Your Honor, think about any ordinary *Terry* stop or

22  detention; right?  Isn't that exactly what's going on?  The

23  agent -- when the guy says, "Well, you know, are you going to

24  arrest me?"  "Well, we don't know that yet.  We're

25  investigating things.  We got to figure out what's going on,

1    make some phonecalls, and we'll let you know what's going to

2    happen."  That's the furthest thing in the world from a

3    reasonable, innocent person saying or thinking, "Oh, gosh.

4    Well, then that means I'm definitely going to jail."  Nothing

5    of the sort was broadcast to the defendant.  As a matter of

6    fact, quite the contrary.

7         The cases cited by the defendant are factually

8    distinguishable and quite significantly so from the case at

9    hand.  Again, they like to rely on *Craighead* in which eight,

10   apparently, obviously-armed agents and two unarmed agents from

11   three different agencies swarmed the defendant's base housing

12   unit at 8:40 a.m.  It's worth noting in *Craighead*, I believe,

13   the defendant was an active duty member of the Air Force which

14   changes the calculus significantly.  They wore raid vests.

15   Some of them unholstered their weapons, and then they led the

16   defendant to an unfinished basement storage closet, would not

17   allow the defendant's supervisor to attend the interview, was

18   unclear to the defendant who, if anyone, had authority to allow

19   him to leave, and the court there found the presence of the

20   defendant's military superior there inherently coercive.  So

21   that is a case in and of itself because it has a military

22   involvement that certainly doesn't resemble this case in any

23   way.

24        *Colonna* from the Fourth Circuit -- at 6:30 a.m. the

25   defendant was awoken at gunpoint by some 24 agents who kicked

open his bedroom door, slammed him into a doorjamb as they pulled him outside, placed him in a car with agents sort of boxing him in in the passenger seat in the backseat, kept him in there for close to three hours, and told him twice that lying to a law enforcement officer was a federal offense.

*Hasheem* from the Fourth Circuit -- 15 to 30 state and federal agents entered the defendant's home equipped with a battering ram at 9 a.m. after banging on the door and yelling "Open the door", roused the defendant naked from bed at gunpoint, ordered him to show his hands, led him by the arm onto his front lawn in his boxer shorts where he was forced to remain for some time, and then questioned him in what was described as a remote storage closet where he was taken by officers -- not where he elected to go.  The officers, for whatever reason, lied about recording the defendant and then the court found it important that the officers made statements to the effect of "We don't care if you're afraid or don't want to answer.  We need to know the truth."

And, finally, *Borostowski*, relied upon by the defense, Seventh Circuit case -- seven armed agents, one with a ballistic shield, entered the defendant's house at 6:05 in the morning shouting "FBI search warrant", ordered the defendant to put his hands over his head, put him outside in 40-degree weather in handcuffs with the defendant holding on to his handcuffs most of the time, and then, ultimately, interviewed

1    him as he was confined in a small room for three hours while an

2    officer blocked the doorway to the room so the defendant could

3    not exit.

4         Those cases do not at all resemble this one.  Again, this

5    was, as Special Agent Harrison testified, what looked like a

6    friendly, low-key conversation between three people who were

7    standing in a normal conversational distance from each other.

8    I think it's been established through the evidence provided by

9    the government that the defendant's sworn affidavit is, let's

10   kindly say, mistaken in many respects, and that is certainly

11   she was not led to this room by these agents.  This was not a

12   room of their choosing.  In fact, they didn't know it existed

13   when she suggested it.

14        I thought it was nice of Special Agent Garrick to try to

15   address the defendant's concerns about when you said you don't

16   like to go back there, and she laughed and said, "Well, it's

17   just creepy."  "We can go back there if you're fine."  "Sure,

18   that's fine."  I don't know what more Special Agent Garrick was

19   supposed to do.  Again, there is nothing unusual about the

20   room.  Rather than the defendant sitting against a wall with

21   the agents standing in front of her, we learned that she chose

22   her own space to stand against a wall and the agents stood on

23   walls sort of to the side of her, again, at a reasonable

24   conversational distance.

25        The door, as Special Agent Harrison said, was wide open

1  such that he could poke his head in numerous times and not only

2  see but overhear what was going on in there -- no raised

3  voices, no menacing body language, nothing like that.  The

4  defendant also alleges that the agents blocked her exit from

5  the room.  We know that that isn't true.

6      Again, all this talk about male armed agents, I think,

7  that they're male is, frankly, a bit offensive, but, certainly,

8  of no consequence and that they were armed can't be anything

9  more than a supposition made by the defendant but for the two

10  agents who wore handguns on their hips and who never

11  unholstered them at the scene for any reason and, in fact, had

12  little or no interaction with the defendant as we know from the

13  witness' testimony.

14      So, again, Your Honor, I think even should the Court find

15  despite this defendant being told multiple times that her

16  interaction with the agents was voluntary -- because, remember,

17  we asked whether the defendant was free to terminate the

18  encounter or leave -- certainly, she was free to terminate this

19  encounter and, certainly, she was told so multiple times.  She

20  expressed no confusion about that, but instead she expressed an

21  eagerness: "I am here to comply; I just want to make this as

22  easy for you guys as possible."

23      So that was her interaction with them, but should the

24  Court find despite that this defendant or a reasonable person

25  in her shoes could reasonably have concluded that they were

1  detained -- that they were not free to leave the premises --

2  again, Your Honor, I rely on the Eleventh Circuit case law that

3  clearly says detention during the execution of a search warrant

4  is not tantamount to custody and to find that would be in

5  contravention of the totality of the circumstances test

6  prescribed by the Eleventh Circuit, and I think every

7  circumstance set forth by the Eleventh Circuit in that totality

8  inquiry weighs in favor of a finding this defendant was having

9  voluntary, casual, friendly, non-coercive conversation with

10  these agents; that she was not in custody or anything

11  resembling a formal arrest or its functional equivalent; and,

12  therefore, certainly, while agents could have given her *Miranda*

13  warnings -- I sort of resent the implication that there was

14  some nefarious plan to not do that -- they didn't do that and

15  it's simply because she was not in custody, and, therefore,

16  under the law not entitled to *Miranda* warnings.  Thank you,

17  Your Honor.

18            THE COURT:  Thank you, Mrs. Solari.

19        Mr. Chester?

20            MR. CHESTER:  Very brief, Your Honor.  So let's talk

21  about factually distinguishable cases that Mrs. Solari brought

22  up.  I went through every one of the cases they cited.  *United*

23  *States versus Asher*, the suspect was told he was not under

24  arrest three times.  *United States versus Brown*, the suspect

25  was told he was free to leave three times.  He was not under

1  arrest three times.  He was never ordered to stay at a

2  particular location.  Law enforcement was not armed.

3       *United States versus Robinson* was told free to leave, was

4  told not in custody, pointed to the door and told the suspect,

5  "You can walk out."

6       *United States versus Peck*, was told free to leave, was not

7  arrested at the end of the interview.

8       *United States versus Muegge* -- M-U-E-G-G-E -- was told

9  free to leave, was not arrested afterwards.  Defendant came and

10 went as he pleased.

11      Those are factually distinguishable cases.  Now, look, no

12 case is 100 percent duplicative of this as Your Honor well

13 knows.  These are fact -- you know, these are specific facts

14 given the specific interrogation setting that was had here, but

15 let's address a couple of points that Mrs. Solari made.

16      She said the door was wide open.  That's not what Special

17 Agent Garrick testified to.  He had no recollection of the door

18 positioning.  In fact, when you talk about Ms. Winner's

19 affidavit being mistaken or Ms. Winner's affidavit having

20 misstatements in it, guess what else had misstatements?  The

21 government's response.  The government's response said the door

22 was open.  Special Agent Garrick said he had no recollection of

23 the positioning of the door.  The government's response, by the

24 way, situated the room who was standing on which wall -- that

25 was contradicted by Special Agent Garrick.

1    So, look, people have different interpretation of what

2    happened, and, obviously, Ms. Winner who is detained was going

3    off her recollection as to what happened months prior, but the

4    simple fact remains that the overarching issue was she didn't

5    feel free to leave; her movements were controlled -- all the

6    stuff we talked about in my first closing we went through

7    today.

8        Your Honor, Mrs. Solari spent time talking about how

9    friendly they were.  Again, I'll go back to the fact that this

10   is certainly part of their training.  They do it to extract as

11   much information as possible.  That's how they're trained.

12   That certainly doesn't change the custodial analysis.  Yeah, I

13   can't argue with the fact that they didn't come in with guns to

14   her head or Flash-bangs or Flak jackets.  You know why?

15   Because that wouldn't have worked with Ms. Winner.  She would

16   have gotten scared off and they knew that.  That's why they

17   approached her in the manner that they did.  Does that factor

18   cut in their favor?  Maybe, but it certainly doesn't outweigh

19   the most substantial, most important factors in the Eleventh

20   Circuit and that is was she told she was free to leave?  She

21   never was.  Was she told she was not in custody?  She never

22   was.  She was specifically kept in the dark.  That's

23   problematic.  She's asking her captors, "What's going to happen

24   to me?" and she's specifically left in the dark on that, Your

25   Honor.  What's a reasonable person supposed to think under

1    those scenarios?

2         I find it ironic Mrs. Solari spent some time in her close

3    talking about the post-interview statements as the best

4    evidence that this was a non-custodial interview.  Earlier in

5    her close she said post-interview statements aren't relevant.

6    So I am not sure which one it is, but the best evidence in my

7    mind that this was a custodial interrogation is the admissions

8    by the FBI agents that they never told her she was free to

9    leave.  They never told her she was not in custody and they

10   never dissuaded her from her very reasonable belief that she

11   needed the FBI's permission to do anything that day.

12        They never said, "You don't need to ask permission for

13   this.  You don't need to ask me to do this.  And, oh, by the

14   way, that search warrant for your person, I know I just brought

15   it up, but it's moot."  They never said that either.  And that

16   was done and a reasonable person would interpret that to mean I

17   can't go anywhere without their permission.  I can't do

18   anything without their acquiescence.

19        That's why the motion should be granted.  The most

20   important factors support custody in this case, and, Your

21   Honor, as a result we think her statements should be

22   suppressed.  Thank you.

23             THE COURT:  Thank you, Mr. Chester.  All right.  Is

24   there anything further we need to discuss today regarding the

25   suppression issue or any other topic in this case, Mr. Chester?

1      MR. CHESTER:  Your Honor, I would do this at my own

2  peril.  Obviously, to ---

3      THE COURT:  Maybe you shouldn't do it then.

4      MR. CHESTER:  Whatever the Court pleases.  I don't

5  know if the Court wants any further briefing after today's

6  evidence.  If the Court is going to make its mind up and issue

7  an order after receiving this or if you don't want anything

8  from the parties, I would certainly offer to brief something

9  further given the evidence that we've received today.

10      THE COURT:  Certainly, if you feel a need.  I always

11  like more information than less when I am trying to make a

12  decision.  How much time do you need after the transcript is

13  prepared?

14      MR. CHESTER:  I think no more than 14 days.

15      THE COURT:  Mrs. Solari, what about from the

16  government?

17      MRS. SOLARI:  I guess if we could have 7 days to

18  respond to the defense's briefing or ---

19      THE COURT:  Okay.  Mrs. Solari, anything further from

20  the government regarding any topic?

21      MRS. SOLARI:  No, Your Honor.

22      THE COURT:  Well, I do want to compliment everyone

23  today.  The lawyers did an outstanding job preparing their

24  witnesses and making excellent arguments.  Certainly, everyone

25  here was very well prepared.  The witnesses were knowledgeable

1    and patient, and I think it's just a fine example of how the

2    adversarial process is supposed to work, and I am very proud of

3    that process and the people who endeavor to make it function as

4    well as the lawyers and witnesses here today have.  So I

5    appreciate that.  I look forward to receiving the supplemental

6    briefs, and, with that, we're adjourned.

7              (Defendant's Exhibit No. 11 is admitted.)

8              (End of transcript of record.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5       I, Lisa H. Davenport, Federal Official Court Reporter, in

6  and for the United States District Court for the Southern

7  District of Georgia, do hereby certify that pursuant to Section

8  753, Title 28, United States Code that the foregoing is a true

9  and correct transcript of the stenographically-reported

10 proceedings held in the above-entitled matter and that the

11 transcript page format is in conformance with the regulations

12 of the Judicial Conference of the United States.

13

14                    _____

15                    Lisa H. Davenport, RPR, FCRR
                     Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25