**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **1:17-CR-0034 (BKE)** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * | * | |

**POST-HEARING BRIEF IN SUPPORT**
**OF DEFENDANT'S MOTION TO SUPPRESS**

The February 27, 2018 hearing on the Defendant's Motion to Suppress [Doc. No. 63] (the "Motion") confirmed the central issues presented by the Motion: that no reasonable person in Reality Winner's position ("Ms. Winner" or the "Defendant") would conceivably have felt free to leave her residence on June 3, 2017, when a team of eleven FBI agents arrived to question her and search her home, that the FBI was never going to actually let Ms. Winner leave, and that the authorities created an entirely police-dominated atmosphere both before and during Ms. Winner's interrogation. *Nearly every* fact revealed at the evidentiary hearing on February 27, 2018 supports the view that law enforcement had Ms. Winner in custody during her encounter with the FBI on June 3rd (as they had previously planned) and, because it is uncontested that Ms. Winner was never read her *Miranda* rights at any point during her interrogation,[1] any statements elicited by law enforcement from Ms. Winner during the encounter must be suppressed, as should any evidence obtained as a result of those statements. The Defendant's Motion to Suppress should therefore be granted.

---

[1] *See* Tr. of Proceedings, Feb. 27, 2018, at 128:1-3.

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT

The thrust of Ms. Winner's Motion to Suppress boils down to one core issue: whether a reasonable person would have felt free to leave during Ms. Winner's encounter with law enforcement on June 3, 2017.  The suppression hearing only confirmed that no reasonable person in Ms. Winner's position possibly would have felt free to leave, and it is not even a close call. Among many other facts elicited at the hearing that make this clear:

- The FBI blocked in Ms. Winner's car and demanded that Ms. Winner turn over her car keys within minutes of initiating the encounter, and never returned those keys over the many hours of the search and interrogation;

- After obtaining Ms. Winner's car keys and initiating the search of her home, the FBI informed Ms. Winner that it had a search warrant for her person, but she was not patted down until *hours later*, when an arrest was effectuated by law enforcement.  The explanation provided by FBI Special Agent Garrick at the hearing -- that the FBI had already completed the search warrant for her person by obtaining her cell phone -- did not withstand scrutiny on cross-examination, and is irrelevant in any event since that was never communicated to Ms. Winner at the time.  Every prior case undersigned counsel located to have addressed such circumstances unanimously holds that the advisement of a search warrant for a suspect's person would lead any reasonable person to believe they could not leave the scene until they were physically searched which, again, did not happen until *after* the FBI ended the interrogation.

- It is uncontested that the FBI never advised Ms. Winner she was "free to leave" nor advised her she was "not under arrest" -- the two most powerful factors under Eleventh Circuit precedent for determining whether a suspect has been subjected to custodial interrogation.  Indeed, at the evidentiary hearing, the FBI agent testified that he ***never even considered*** advising Ms. Winner she was free to leave -- a telling confession that manifested itself in all the circumstances present on June 3rd.

- Consistent with never advising Ms. Winner she was free to leave, the FBI agents testified at the February 27th hearing that they controlled her movements both prior to, during, and after Ms. Winner's interrogation.  For example, after the interview, law enforcement advised Ms. Winner to "hang around" and, for good measure, posted an FBI agent to shadow her movements -- all for the purpose of "keep[ing] an eye on her" -- both in front of the house and when she moved to the back of it.  Here again, a reasonable person would have thought they were not free to leave when their every move is shadowed by an FBI agent and when they are told to "hang around" by law enforcement at the police-dominated scene.

- Law enforcement's tactics that day to keep Ms. Winner in check are confirmed by the words spoken and actions taken by the Defendant herself, who advised the FBI that she was confused and repeatedly asked for permission to do *anything* that afternoon -- an indication that she, herself, did not feel free to leave.

- The broader scene at Ms. Winner's residence on June 3rd yielded the sort of "stationhouse" coercive pressures that *Miranda* warns of: eleven male law enforcements agents, nine of them armed; approximately ten law enforcement vehicles, parked around her car prohibiting her exit; a surveillance team on standby to monitor the Defendant in the event of flight; a security perimeter and caution tape affixed to the premises to prevent exit and entry; an interrogation in a tiny room with two large, male, armed law enforcement agents questioning the Defendant, who (according to the FBI) was its only suspect and a substantial flight risk and danger to the community.

Moreover, the notion that the FBI would have in fact let Ms. Winner stroll out of the door had she tried is fanciful, and Special Agent Garrick's testimony to the contrary strains credulity. FBI emails from the night before the interrogation show that at least some agents had planned an arrest, and by Special Agent Garrick's own account at this hearing and at the prior detention hearings, he claimed to already have forensic evidence that Ms. Winner allegedly leaked the document at issue before he ever arrived at Ms. Winner's home.  What new information emerged, then, during the interrogation that Special Agent Garrick did not already know, so as to trigger an arrest that (purportedly) was not planned?  Special Agent Garrick never said.

Given these facts (and the many others previously briefed), under applicable precedent, *Miranda* warnings were required, but not given.  And, it is unsurprising that law enforcement did not advise Ms. Winner of her constitutional rights because, as the lead FBI agent testified, he had *never received training* for giving *Miranda* warnings in the absence of a formal arrest and advised that it was his (erroneous) belief that *Miranda* is not required unless a formal arrest is consummated.[2]  This belief and lack of training is as stunning as it is telling.

For these reasons, and for the reasons set forth more fully below and in Ms. Winner's prior briefing, Ms. Winner's Motion to Suppress should be granted, and any statements elicited

---

[2] *See id.* at 160:14-161:13.

by law enforcement from Ms. Winner during the encounter on June 3rd should be suppressed, as should any evidence obtained as a result of those statements.

## II.     THE DEFENDANT WAS SUBJECTED TO "CUSTODIAL INTERROGATION"

### A.     Governing Law

Ms. Winner hereby reincorporates by reference her prior briefing setting forth the governing law and custodial factors that courts look to in determining whether a particular suspect has been subjected to custodial interrogation.[3]  As demonstrated in that prior briefing, the question of custodial interrogation asks whether, under the "totality of the circumstances," a reasonable person would have felt a restraint on her freedom of movement to such an extent that she would not feel free to leave.[4]  Courts review a broad range of factors, including, but not limited to, whether law enforcement "unambiguously advis[ed]" the suspect was free to leave; whether law enforcement "unambiguously advis[ed]" the suspect was not in custody; the location of the questioning; whether the officers brandished weapons; whether law enforcement touched the suspect; whether law enforcement used a tone or language that indicated that compliance could be compelled; whether the questioning was voluntary; whether the suspect was separated from others during the questioning; whether law enforcement had a search warrant for the person of the suspect; the number of law enforcement agents at the scene; the physical characteristics of the interview location; and the degree to which law enforcement's questioning focused on the suspect as a prime suspect.[5]

---

[3] Doc. No. 63-1 at pp. 6-9 (Parts III.A, III.B).
[4] *See United States v. Brown*, 441 F.3d 1330, 1337 (11th Cir. 2006) (quotation omitted).
[5] Doc. No. 63-1 at pp. 8-9 (Part III.B).

**B.      Application Of Custodial Factors Dictate That The Defendant Was Subjected To Custodial Interrogation.**

The facts adduced at the February 27th hearing confirm that application of the custodial factors here dictate that Ms. Winner was "in custody" and therefore entitled to *Miranda* warnings, which were never given, thus mandating the suppression of her statements.

**1.      The Two Most "Powerful" Factors Counsel In Favor Of A Finding Of Custody.**

The two most "powerful" factors in the custodial interrogation analysis in the Eleventh Circuit are whether or not law enforcement advised Ms. Winner whether she was "free to leave" and whether or not law enforcement advised Ms. Winner that she was "not under arrest."[6] In this case, law enforcement did neither.   Special Agent Garrick conceded that, during law enforcement's three-hour encounter with Ms. Winner, he never advised her she was free to leave.[7] Special Agent Garrick also testified that his partner, FBI Special Agent Wally Porter, never told Ms. Winner she was free to leave, nor did any of the nine other male law enforcement agents at the scene.[8] Tellingly, Special Agent Garrick admitted that ***he never even considered telling Ms. Winner she was free to leave***.[9]

Likewise, Special Agent Garrick confessed to never telling Ms. Winner that she was "not under arrest,"[10] the other "powerful" factor in the Eleventh Circuit's analysis.[11] Special Agent Garrick also advised that his partner, Special Agent Porter, never advised Ms. Winner that she was not in custody, nor did any of the nine other male law enforcement officers on June 3rd.[12]

---

[6] *United States v. Matcovich*, 522 Fed. Appx. 850, 851 (11th Cir. 2013) (citing *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006)).
[7] Tr. of Proceedings, Feb. 27, 2018, at 126:14-16.
[8] *Id.* at 126:17-19, 127:1-4.
[9] *Id.* at 161:10-18.
[10] *Id.* at 127:12-14.
[11] *Matcovich*, 522 Fed. Appx. at 851 (citing *Brown*, 441 F.3d at 1348).
[12] Tr. of Proceedings, Feb. 27, 2018, at 127:15-17, 22-25.

Contrast this case with *United States v. Robinson*, No. 4:17-CR-052, 2017 WL 3262417 (S.D. Ga. July 14, 2017), for example, a case cited by the Government in its briefing.[13]   In *Robinson*, an in-home interrogation was determined to be non-custodial where, among other things, law enforcement explained that the suspect was "not required to be present during the execution of th[e] [search] warrant," that "he was free to leave the premises," and where one of the agents "pointed out that [the defendant] had unobstructed access to the open back door of the apartment and that he could simply walk out if he so desired."[14]   In *Robinson*, these dispositive facts -- not present here -- yielded a finding of no custody.

Another stark contrast is presented by *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), another case cited by the Government in its briefing.[15]   In *Brown*, the Eleventh Circuit upheld the denial of a motion to suppress asserted by a murder defendant, holding that the suspect was not "in custody" during an in-home interrogation.[16]   However, in *Brown*, the suspect was "told not less than *three* times by two different officers that he was not under arrest, not in custody, and was free to go at any time" -- facts that are "of substantial importance in determining whether a reasonable person would have felt free to leave."[17]

By contrast, *none* of this was told to Ms. Winner by any of the *eleven* male law enforcement agents on June 3, 2017; *Brown*, *Robinson*, and the other cases cited by the Government[18] are light years away from this case.   In fact, *even the prosecution* had to concede at the February 27th hearing that "it would have been helpful" if law enforcement had advised Ms. Winner that she was "free to go" or "not under arrest," as that would have addressed the

---

[13] *See* Doc. No. 189 at p. 33 (citing *United States v. Robinson*, 2017 WL 3262417, at *3-4 (S.D. Ga. July 14, 2017)).
[14] *United States v. Robinson*, No. 4:17-CR-52, 2017 WL 3262417, at *1 (S.D. Ga. July 14, 2017).
[15] Doc. No. 189 at p. 4 (citing *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006)).
[16] *See Brown*, 441 F.3d at 1344-49.
[17] *Id.* at 1347 (emphasis added).
[18] *See infra*, Part II.C.

"ambiguity" that day.[19]   The Eleventh Circuit's "most powerful" factors counsel in favor of a finding of custody here.[20]

>    **2.    To Keep Her In Check, Law Enforcement Advised The Defendant That She Was Subject To Be Physically Searched, But Never Executed Such A Search Until After Interrogating Her.**

Consistent with failing to advise Ms. Winner that she was free to leave, law enforcement told her that it had a search warrant for her person, which would convey to any reasonable person that she was not free to go until that search warrant -- i.e., a physical pat-down -- had been executed.   Law enforcement arrived at Ms. Winner's residence on June 3rd armed with three search warrants: one for the house, one of her car, and one for her person.   As Special Agent Garrick testified, the search warrant for Ms. Winner's person allowed the FBI to search the entirety of Ms. Winner's body -- legs, waist, torso, arms, head, hair, pockets, and the like.[21]   As courts have held, any reasonable person would understand a search warrant for their person to mean that they, themselves, would be "a potential subject for search."[22]   And that is what Ms. Winner believed here.[23]   And yet, though law enforcement told Ms. Winner twenty-eight minutes into the encounter that it had a search warrant for her person,[24] that physical search of the Defendant did not happen until *hours* later -- *hours* after her interrogation, when law enforcement finally called a female officer to search Ms. Winner.[25]

The Government seeks to elude this fact by concocting an explanation that the search warrant for Ms. Winner's person was *only* so that law enforcement could secure her cell phone.[26] Special Agent Garrick's explanation, however, is nonsensical because law enforcement obtained

---

[19] *See* Tr. of Proceedings, Feb. 27, 2018, at 191:1-3.
[20] *See* Doc. No. 63-1 at p. 10 (citing cases).
[21] *See* Tr. of Proceedings, Feb. 27, 2018 at 130:15-131:8.
[22] *People v. Wilson*, 268 Cal. App. 2d 581, 586 (Cal. Ct. App. 1968).
[23] *See* Doc. No. 64 (Ms. Winner's Declaration) at ¶¶10, 23, 24.
[24] *See* Tr. of Proceedings, Feb. 27, 2018, at 132:12-16.
[25] *See id.* at 108:5-12, 149:21-150:1.
[26] *Id.* at 131:14-20.

Ms. Winner's cell phone within the first *two minutes* of its encounter with her.[27]   Thus, after the first two minutes, there would be *no reason* -- other than to keep her "in pocket," as the FBI had planned[28] -- to advise Ms. Winner of that search warrant (since it had purportedly already been executed).   And yet, that is precisely what the FBI did, telling the Defendant twenty-eight minutes into the encounter (and twenty-six minutes after obtaining her cell phone) that it had a search warrant for her person.[29]   When confronted, Special Agent Garrick sought to cast blame on his colleague, saying that Special Agent Porter (mistakenly) told Ms. Winner about this search warrant when it had (purportedly) already been executed.[30]   When asked why he did not correct the record, however, Special Agent Garrick could provide no answer.[31]   And in any event, this explanation is irrelevant to the analysis because, from Ms. Winner's perspective, all she knew at the time was that FBI agents told her that they had a warrant to search her personally, which they had not executed.

Every case undersigned counsel could locate to address this issue has found it monumentally important in the custodial interrogation analysis.   In *United States v. Brunn*, No. 06-CR-198, 2008 WL 441486 (D. Haw. Feb. 19, 2008), a federal district court partially suppressed statements made by a defendant who was being questioned contemporaneously with the execution of a search warrant for his person.[32]   In *Brunn*, one of the defendants, a male, was questioned by law enforcement contemporaneously with the execution of a physical search of his person without *Miranda* warnings.[33]   In suppressing those statements, the district court held:

---

[27] *See id.* at 91:7-19.
[28] Doc. No. 235 at p. 14 (Defendant's Ex. 1) (June 2, 2017 7:37 p.m. Email from FBI SA James Harrison).
[29] *See* Tr. of Proceedings, Feb. 27, 2018, at 132:12-16.
[30] *See id.* at 132:12-133:16.
[31] *Id.* at 133:7-11.
[32] *United States v. Brunn*, No. 06-CR-198, 2008 WL 441486 (D. Haw. Feb. 19, 2008).
[33] *See id.* at *4, *9.   Notably, one of the defendants who was subject to being frisked pursuant to the search warrant for her person was a female and, in that case, the FBI agents testified that the female suspect was not frisked at the scene "because they did not have any female agents present[.]"   *Id.* at *5.

> "a reasonable person in [the defendants'] position would have felt that he or she could not leave before being searched.  The search warrants expressly allowed the agents to seize and search [the defendants].  [The defendants] had no choice in the matter, and it cannot be said that either voluntarily presented himself or herself to law enforcement officials for questioning.  ***Certainly, no objectively reasonable person would think that, in light of the search warrants allowing searches of their person, the agents would simply allow [the defendants] to leave the premises without first being searched.***"[34]

Importantly, the district court did *not* suppress statements made by the defendants in that case *after* the search of their persons was complete, holding that the defendants were only "in custody" while the search of their persons was being completed.[35]  Thereafter, according to the district court in *Brunn*, the defendants would have known that the custodial search of their person had ended.[36]

The same suppression result was reached in *People v. Wilson*, 268 Cal. App. 2d 581 (Cal. Ct. App. 1968) and *People v. Farris*, 120 Cal. App. 3d 51 (Cal. Ct. App. 1981).  In both *Wilson* and *Farris*, California state appellate courts reversed convictions due to *Miranda* violations.[37]  In both cases, a significant fact at play was that law enforcement had search warrants that authorized the searches of the respective defendants, which the appellate courts rightly concluded deprived the defendants' freedom of action in a significant way.[38]  In *Wilson*, the court explained that the search warrants

> "authorized the search not only of the premises, but specifically authorized the search of her person as well.  It goes without saying that defendant was not free to leave the area while officers were conducting the search of the room.  Had that searched proved fruitless, defendant herself was a potential subject for search.  To

---

[34] *Id.* at *9 (emphasis added).  The district court did note that its decision was buttressed by law enforcement's testimony that they would not have allowed the defendants to leave before they finished the searches of their person. *See id.* at *10.  However, as the district court in *Brunn* noted, the subjective view of the agents was not dispositive, given that the custodial interrogation test was an objective one.  *See id.*

[35] *See id.*

[36] *Id.*  It is noteworthy that in *Brunn*, the defendants were told they did not have to stay on the premises and were told they would not be arrested.  *See id.* at *4, *10.

[37] *People v. Farris*, 120 Cal. App. 3d 51 (Cal. Ct. App. 1981); *People v. Wilson*, 268 Cal. App. 2d 581 (Cal. Ct. App. 1968).

[38] *Farris*, 120 Cal. App. 3d at 56; *Wilson*, 268 Cal. App. 2d at 586.

accomplish such a search, the officers were authorized to detain her and call in a female officer… Only one conclusion may be drawn from the evidence: [f]rom the time the officers entered, defendant was deprived of her freedom of action in a significant way."[39]

Here, Ms. Winner was advised that law enforcement had a search warrant for her person -- which, as these courts have held, would lead a reasonable person to think they "could not leave before being searched"[40] -- but she was not patted down until *hours* later.  It is of no moment that the search warrant was purportedly for her cell phone; certainly, that was a fact that was never relayed to Ms. Winner, nor was it something that a reasonable person would have understood, especially considering that the FBI advised of this search warrant ***after*** it had already obtained Ms. Winner's cell phone.  As every case located to address the issue has held,[41] and as Ms. Winner herself believed,[42] the inescapable conclusion from these facts is that Ms. Winner was "in custody" and would not have been free to terminate the questioning until that search was completed.  *Miranda* warnings were thus required and, in the absence of these warnings, Ms. Winner's constitutional rights were violated.

### 3. The Defendant's Movements Were Controlled And Directed By Law Enforcement Throughout Her Three-Hour Encounter With The FBI.

Law enforcement further exercised its control and dominance over Ms. Winner by directly controlling her physical actions on June 3rd.[43]  For example, at the outset of the encounter, before law enforcement undertook a protective sweep of the residence, Ms. Winner was allowed to go into her house, get her dog, and bring it outside -- but only following the precise instructions law enforcement gave her.[44]  Indeed, in taking care of her dog, Ms. Winner

---

[39] *Wilson*, 268 Cal. App. 2d at 586.
[40] *Brunn*, 2008 WL 441486, at *9.
[41] *Id.* at *9-10; *Farris*, 120 Cal. App. 3d at 56; *Wilson*, 268 Cal. App. 2d at 586.
[42] *See* Doc. No. 64 (Ms. Winner's Declaration) at ¶¶10, 23, 24.
[43] *See* Doc. No. 63-1 at pp. 14-15.
[44] *See* Tr. of Proceedings, Feb. 27, 2018, at 94:17-96:15.

acknowledged that the FBI agents would not even have to take their "eyes off" her as the agents expressly advised her that she was "not to touch anything else" and if she did, that would be a "problem."[45]   Later on, at the beginning of the interrogation, Ms. Winner was concerned about her cat running out of the house because the FBI left open the front door of the residence as they were rummaging through the house.[46]   In that context, again recognizing -- as any reasonable person would – that she could not do anything without law enforcement's permission (including getting up and closing her own front door), Ms. Winner asked permission to leash her cat because she did not want to be "telling someone in the FBI to keep my front door closed."[47] Further on in the interrogation, Ms. Winner asked permission to use the restroom and, recognizing law enforcement's dominance, inquired: "[h]ow is that going to work?"[48]

        The FBI's control over the situation did not end with the interrogation, either.  After the interrogation, as Special Agent Garrick testified, he told Ms. Winner to "hang around"[49] and another FBI agent, Special Agent James Harrison, physically stood watch in the front of the house (where Ms. Winner went after the interrogation) to "keep an eye on her[.]"[50]   Special Agent Garrick and his partner, Special Agent Porter, likewise moved to the front of the house (to their vehicles) to place calls, all with Ms. Winner mere feet away.[51]   This monitoring and guarding continued throughout the remainder of the afternoon and early evening, first with Special Agent Harrison watching her in the front yard and then moving to the back yard with her[52] -- all so (according to the FBI) he could "follow her around" and "make sure nothing was

---

[45] *See id.*
[46] *See id.* at 117:8-14, 118:2-5.
[47] Doc. No. 234 at p. 30 (USAO-08134) (Government's Ex. 2, Interrogation Transcript); *see* Tr. of Proceedings, Feb. 27, 2018, at 47:21-48:2.
[48] Doc. No. 234 at p. 78 (USAO-08182) (Govt. Ex. 2, Interrogation Transcript).
[49] Tr. of Proceedings, Feb. 27, 2018, at 78:22-79:1.
[50] *Id.* at 179:1-7.
[51] *Id.* at 111:5-112:2.
[52] *See id.* at 170:2-173:8.

going on."[53]   In sum, at no point in time -- other than a brief moment in the bathroom after the FBI gave its permission[54] -- was Ms. Winner left alone or was she allowed to move about freely.[55]   And, of course, law enforcement never sought to dissuade Ms. Winner from the notion that she needed the FBI's permission to move freely.[56]

Law enforcement's actions, in controlling Ms. Winner's movements on June 3rd, are in line with courts that have granted motions to suppress.[57]   For example, as previously briefed, where suspects (like Ms. Winner here) are placed "under guard during questioning" or "told to remain in the sight of interrogating officials," such actions constitute restraint, even without a formal arrest.[58]   The rationale for such holdings is as simple as it is persuasive: "the likely effect on a suspect of being placed under guard during questioning, or told to remain in sight of interrogating officials, is to associate these restraints with a formal arrest," necessitating *Miranda* warnings.[59]

### 4.     The Defendant Was Interrogated In A Police-Dominated Atmosphere Involving Circumstances Requiring *Miranda* Warnings.

The broader scene on June 3rd confirms that the inherently coercive pressures *Miranda* warns of were present that day.   Indeed, as courts have held, where there is an overwhelming presence of law enforcement, even a residential search can very quickly turn into a police-

---

[53] *Id.*

[54] *See id.* at 72:8-73:8.

[55] Tr. of Proceedings, Feb. 27, 2018, at 119:1 (Special Agent Garrick acknowledging that he never told Ms. Winner she could move about freely), 157:12-20 (FBI does not typically allow people to move about freely).

[56] *See id.* at 118:9-119:1.

[57] Doc. No. 63-1 (citing *United States v. Craighead*, 539 F.3d 1073, 1085-86 (9th Cir. 2008); *United States v. Griffin*, 922 F.2d 1343, 1350-51 (8th Cir. 1990); *United States v. Goodman*, 945 F. Supp. 359, 365-66 (D. Mass. 1996); *State v. Mangual*, 311 Conn. 182, 201-02 (Conn. 2014); *United States v. Mahmood*, 415 F. Supp. 2d 13, 18 (D. Mass. 2006)).

[58] *See id.*

[59] *Griffith*, 922 F.2d at 1350-51 (citing *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (custody where suspect told "just stay here"); *South Dakota v. Long*, 465 F.2d 65, 68 (8th Cir. 1972) (custody where suspect continually chaperoned)).

dominated atmosphere -- rendering what might be considered a non-custodial setting into a custodial one.[60]  And that is precisely what happened here.

To begin with, as was demonstrated at the February 27th suppression hearing, the encounter was initiated by law enforcement[61] at Ms. Winner's tiny house,[62] which was crawling with approximately eleven law enforcement agents, all of whom were male, and nearly all of whom were armed.[63]  After turning over her cell phone and keys within the first two minutes of her encounter,[64] leaving her little option for seeking or getting outside contact, Ms. Winner was isolated[65] and questioned in an even smaller room[66] by two FBI agents who were substantially bigger than her and would -- even construing the scene most favorably to the Government -- have presented a substantial, physical roadblock to any flight Ms. Winner might have contemplated.[67]  Importantly, the agents *knew* Ms. Winner did not want be interrogated in that room, but that is where they went, anyway.[68]

Other facts further serve to confirm the police-dominated atmosphere that day.  Law enforcement parked their vehicles -- by one FBI agent's estimation, a total of *ten* vehicles[69] -- mere feet from Ms. Winner's car on the access road adjacent to her house, leaving her no place

---

[60] Doc. No. 63-1 at pp. 11-13; Doc. No. 215 at pp. 10-12.

[61] Tr. of Proceedings, Feb. 27, 2018, at 93:15-17.

[62] *See id.* at 97:20-25 (house, which consisted of seven rooms and two closets, was approximately 836 square feet).

[63] *See id.* at 104:10-108:4.

[64] *See id.* at 91:7-19 (testifying that cellphone and keys were handed over within first 120 seconds of encounter).

[65] As demonstrated at the February 27, 2018 hearing, the choice to isolate Ms. Winner was law enforcement's, not the Defendant's.  *See id.* at 119:13-21.

[66] *See id.* at 122:15-123:20 (interrogation room of 70 square feet, including a closet).

[67] *See* Doc. No. 235 at p. 62 (Defendant's Ex. 11) (drawing of interrogation room reflecting presence of FBI agents in front of Ms. Winner).

[68] *See* Doc. No. 234 at p. 18 (Government's Ex. 2, Interrogation Transcript) (USAO-08122).  The Government makes much of the fact that Ms. Winner purportedly agreed to be interrogated in that room, but at best, such an assertion is misleading and is of no moment.  As the transcript demonstrates, Ms. Winner *expressly* advised law enforcement that she did not want to be interviewed in that room; the FBI agents acknowledged this fact; but nonetheless suggested that the parties go back into that room.  *See id.*  Indeed, the fact that Ms. Winner *acquiesced* to the FBI's request actually demonstrates the coercive pressures encountering her that day and her total and complete capitulation to law enforcement's tactics -- again, the very reason that *Miranda* warnings are required.

[69] Tr. of Proceedings, Feb. 27, 2018, at 177:17-18.

to go (even if she did have her keys, which she did not).[70]   Likewise, law enforcement cars were parked around her house, including on Battle Row drive, further preventing any fleeing from the scene.[71]   A surveillance team was standing by to monitor Ms. Winner's movements in the event she attempted to run,[72] and a security perimeter was set up to block exit and entrance to the premises.[73]   Caution tape was also placed around her house, another effort by law enforcement to prevent ingress or egress by anyone on the scene, including Ms. Winner.[74]   Despite the Government's self-serving references to the word "voluntary," implying that the encounter was somehow the product of deliberate, free, and independent choice,[75] the circumstances that day presented the opposite scene: an obligatory encounter with the FBI by a scared twenty-five-year-old woman who reasonably felt, under all the circumstances, that she had no choice but to comply with law enforcement's directives.[76]

>    **5.    The Subjective Beliefs Of Law Enforcement Confirm The Custodial Nature Of The Defendant's Interrogation.**

To the extent it is relevant,[77] all the actions taken by the FBI on June 3rd in relation to Ms. Winner confirm law enforcement's subjective beliefs that Ms. Winner would not be allowed

---

[70] *See id.* at 98:24-99:5 (Defendant's car surrounded by law enforcement vehicles), 177:25-178:3 (would not have been possible for Defendant to leave without law enforcement moving its vehicles); *see also* Doc. No. 235 at pp. 20-29 (Defendant's Exs. 3-7) (pictures reflecting law enforcement vehicles blocking in premises).

[71] *See* Tr. of Proceedings, Feb. 27, 2018, at 103:16-104:1 (law enforcement vehicle parked on Battle Row Rd.).

[72] *See id.* at 90:14-16, 147:16-20 (surveillance team in place to "monitor [Ms. Winner's] activities.").

[73] *Id.* at 90:17-25.

[74] *See id.* at 91:1-2.

[75] There are two problems with the Government's argument that the interrogation was "voluntary" because the agents declared so.   First, the agents' testimony did *not* indicate that Ms. Winner voluntarily agreed to the interrogation; rather, as was made clear at the February 27th hearing, the agents *told* Ms. Winner that *they* were there voluntarily, which is materially different than a suspect voluntarily agreeing to be interrogated by law enforcement.   *See id.* at 128:4-18 (acknowledging that FBI declared to her that she was there voluntarily and that Defendant never used that word).   Moreover, and in all events, such self-serving statements are insufficient to change the analysis in light of all the facts presented because "an agent's statement that a suspect is free to leave [or to terminate the interview] may have […] less resonance with the suspect [if] [s]he cannot leave the interrogation site and retreat to the safety of [her] home [because her] home is in fact the locus of police activity."   *Craighead*, 539 F.2d at 1088 (alterations not in original).

[76] Doc. No. 63-1 at pp. 11-13 (citing cases); Doc. No. 215 at pp. 10-12 (citing cases).

[77] As the Court is aware, the custodial interrogation test is an objective one; the actual, subjective beliefs of Ms. Winner and law enforcement are irrelevant.   *See, e.g.*, *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006).

to leave the premises on that day.  To begin with, in the lead up to the execution of the warrants, the FBI's own internal emails confirm (at least some of) its agents' plan and desire to arrest Ms. Winner:

- At 7:21 p.m. on the evening of June 2, 2017, the day before the execution of the warrants, FBI Special Agent Charles McKee, an Augusta FBI agent,[78] advised of a 10:00 a.m. "rally time" at the Augusta FBI office with a plan that "**[a]gents will affect the arrest [of Ms. Winner]** and then our search team will begin."[79]

- At or around the same time, FBI Special Agent Michael Homburg, a Supervisory Special Agent from the Washington Headquarters of the FBI,[80] advised that budgetary issues with "the deployment of surveillance assets for this matter" would be covered and, significantly, that federal prosecutors "have indicated **a [probable cause] arrest would be potentially authorized if the subject decides to flee**…"[81]

- Just minutes later, FBI Special Agent James Harrison, the Supervisory Senior Resident Agent at the Augusta FBI,[82] emailed FBI team members, including lead agent Garrick, that law enforcement will be "set up on [the] subject house before 0700" and that "[o]nce we have [the] subj[ect] in pocket […] we'll execute [the] [search warrant]."[83]

The search and interrogation of Ms. Winner was a law enforcement-coordinated and controlled event designed to achieve the pressures that actually took place, as evidenced by emails from government lawyers literally the minute that the FBI confronted Ms. Winner.[84]

Consistent with law enforcement's plan to "affect the arrest" of the Defendant,[85] Ms. Winner was the prime suspect in connection with the investigation; there was no other suspect,

---

At the February 27th hearing, however, the Government sought to inject these subjective beliefs on direct examination, which the Court permitted.  *See* Tr. of Proceedings, Feb. 27, 2018, at 26:17-27:1.  Accordingly, Ms. Winner sets forth the evidence reflecting that law enforcement's subjective beliefs undermine the Government's claim that the Defendant was not in custody.

[78] *Id.* at 85:23-24.

[79] Doc. No. 235 at p. 8 (Defendant's Ex. 1) (June 2, 2017 7:21 p.m. Email from FBI SA Charles McKee) (emphasis added and alterations not in original).

[80] Tr. of Proceedings, Feb. 27, 2018, at 88:9-15.

[81] Doc. No. 235 at p. 19 (Defendant's Ex. 2) (June 2, 2017 7:16 p.m. Email from FBI SA Michael Homburg) (emphasis added and alternations not in original).

[82] *See* Tr. of Proceedings, Feb. 27, 2018, at 163:23-164:4.

[83] Doc. No. 235 at p. 14 (Defendant's Ex. 1) (June 2, 2017 7:37 pm. Email from FBI SSA James T. Harrison) (alterations not in original).

[84] *See id.* at pp. 15-17 (Defendant's Ex. 1) (emails between FBI agents and government lawyers).

[85] *Id.* at p. 8 (Defendant's Ex. 1) (June 2, 2017 7:21 p.m. Email from FBI SA Charles McKee).

as Special Agent Garrick testified.[86]  Even prior to showing up on June 3rd, it was the FBI's

belief that Ms. Winner had committed this crime.[87]  As Special Agent Garrick made clear during

his interrogation of Ms. Winner, and in his testimony during the detention hearings in this case,

the FBI believed that it already had forensic evidence purportedly implicating Ms. Winner even

before the interrogation occurred.[88]  Special Agent Garrick pointed to no material evidence that

he did not already know that emerged during the interrogation, which would cause him to

suddenly arrest Ms. Winner even though it was (purportedly) not already planned.  There was

none.  Indeed, as Special Agent Garrick conceded, nearly the exact same probable cause used to

justify the search warrant was used to justify the arrest warrant just days later.[89]  This point

completely belies the Government's view that the scene on June 3rd was non-custodial.  Before

being confronted with the nearly identical affidavits, Special Agent Garrick testified that he did

not think he had probable cause for an arrest prior to June 3rd, then later testified that he "wasn't

sure" whether he had probable cause for an arrest on June 3rd prior to the interrogation.[90]  When

confronted with these similarities, however, he retreated and claimed that he deferred to the

prosecutors on whether he had adequate probable cause and that he, personally, as a sworn law

enforcement officer and the affiant on these search warrants, had no personal opinion as to the

level of probable cause the FBI had during this time period.[91]  Once again, law enforcement's

plan becomes clear: the FBI did not want to have to *Mirandize* Ms. Winner (as it knows that

chills suspects from speaking with it) so, instead, the FBI *intentionally* did not seek arrest

---

[86] Tr. of Proceedings, Feb. 27, 2018, at 135:18-25.
[87] *See id.* at 136:4-10.
[88] *See id.* at 133:21-135:25 (noting evidence obtained by FBI prior to interrogation).
[89] *See id.* at 140:25-143:5 (comparing search warrant affidavit and arrest warrant affidavit and noting the presence of ten identical paragraphs).
[90] *See id.* at 136:25-137:22.
[91] *See id.* at 143:6-21.

authority on June 3rd, despite having nearly *identical* probable cause.  Such tactics should not be sanctioned by this Court.

Separate and apart from whether Ms. Winner was law enforcement's prime suspect, Special Agent Garrick made plain his view that, even *before* executing the search warrant, Ms. Winner was a significant danger to the community and a substantial risk of flight, further undermining the Government's position that Ms. Winner was not in custody.[92]  For example, even before initiating the encounter with Ms. Winner, the FBI knew about an innocuous trip that Ms. Winner took to Belize weeks earlier; indeed, that trip was included in the search warrant affidavit.[93]  As Special Agent Garrick testified, that trip, among other information, which was known to law enforcement *before* interrogating Ms. Winner, presented her as a significant risk of flight in law enforcement's view.[94]  It is simply inconceivable, then, that the FBI, who had its prime suspect cornered, who had planned to arrest Ms. Winner even prior to June 3rd, and who believed that she was a flight risk and a danger to society even *before* speaking with her, would allow her to walk away at any point during her encounter -- despite its hollow protestations to the contrary.  And, lest there be any doubt, the Washington Headquarters of the FBI -- the entity "calling the shots" in the operation[95] -- advised that prosecutors had authorized an arrest if Ms. Winner attempted to flee.[96]  Law enforcement not only failed to unambiguously advise Ms. Winner she was free to leave, but, as the facts make clear, that incredible assertion also was not a belief actually held by the agents at her house that day.

---

[92] *See id.* at 144:3-146:17.
[93] *See* Doc. No. 235 at p. 44 (¶ 20) (Defendant's Ex. 9).
[94] *See* Tr. of Proceedings, Feb. 27, 2018, at 146:8-17.
[95] Doc. No. 235 at p. 2 (June 2, 2017 11:50 a.m. Email from SA Charles McKee).
[96] *Id.* at p. 19 (Defendant's Ex. 2) (June 2, 2017 7:16 p.m. Email from FBI SA Michael Homburg).

**C.**     **Precedent Dictates That The Defendant Was "In Custody" And Therefore Entitled To *Miranda* Warnings.**

As the parties indicated at the February 27th hearing, there is no case that is directly on point to the facts here.   However, many of the Government's previously-cited cases are materially distinguishable because, as noted above, law enforcement unambiguously advised the suspects in those cases that they were free to leave and/or were not in custody.  For example:

- In *United States v. Asher*, 2010 WL 4237579 (N.D. Ga. Feb. 25, 2010), cited by the Government on page 35 of its Opposition to the Motion [Doc. No. 189], the suspect was told three times he was not under arrest.[97]

- In *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), cited by the Government on page 4 of its Opposition to the Motion, the suspect was told he was free to leave three times and told he was not under arrest three times.[98]

- In *United States v. Robinson*, 2017 WL 3262417 (S.D. Ga. July 14, 1017), cited by the Government on page 33 of its Opposition to the Motion, the suspect was told he was free to leave, was not in custody, and law enforcement pointed to the door and advised that he could walk out.[99]

- In *United States v. Muegge*, 225 F.3d 1267 (11th Cir. 2000), cited by the Government on page 31 of its Opposition to the Motion, the suspect was told he was free to leave and was not arrested afterwards.[100]  In that case, the suspect came and went as he pleased.[101]

- In *United States v. Miller*, 2:15-CR-14, 2015 WL 8578649 (S.D. Ga. Dec. 9, 2015), cited by the Government on page 34 of its Opposition to the Motion, the suspect was told he was not under arrest by law enforcement.[102]

- In *United States v. Leese*, 176 F.3d 740 (3d Cir. 1999), cited by the Government on page 33 of its Opposition to the Motion, the suspect was told she was not under arrest and would not be arrested at the conclusion of the interview.[103]

- In *United States v. Matcovich*, 522 Fed. Appx. 850 (11th Cir. 2013), cited by the Government on page 21 of its Opposition to the Motion, the suspect was told he was free to leave and could answer questions as he wished.[104]

---

[97] *See* 2010 WL 4237579, at *6.
[98] *See* 441 F.3d at 1347.
[99] *See* 2017 WL 3262417, at *1-3.
[100] *See* 225 F.3d at 1269-71.
[101] *See id.* at 1271.
[102] *See* 2015 WL 8578649, at *1-2 (upholding factual finding that agent told suspect he was not under arrest).
[103] *See* 176 F.3d at 744.

By contrast, in the numerous cases cited in Ms. Winner's opening brief where suppression was granted, law enforcement failed to advise the suspect that she was free to leave or that she was not under arrest -- exactly the scenario presented here.[105]

On top of these two "powerful" factors is the unique facet presented here -- that law enforcement advised Ms. Winner it had a search warrant for her person but did not execute a physical search until hours later.  As noted above, every case undersigned counsel could locate to address this issue has unanimously found this fact warranted suppression because the advisement and existence of a search warrant for one's person would lead any reasonable person to feel restrained in their freedom of movement, at least until that physical search was completed -- which did not happen here until hours after the interrogation.[106]

While no one case is dispositive or identical, and given that many of the Government's cases are materially distinguishable, Ms. Winner has relied on, among others, *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008).  As noted in the Motion, *Craighead* had many of the same factors present here, including (a) an in-home interrogation, with (b) eight law enforcement officers from multiple agencies present to execute a search warrant, (c) a brief interrogation in a tiny, unfurnished back room, conducted by two law enforcement officers, and with (d) a defendant who was not handcuffed.[107]  *Craighead* also had certain facts that actually favored a finding of no custody that are *not* present here.  For example, in *Craighead*, the suspect was advised he was free to leave and that he would not be arrested -- which did not happen here.[108] *Craighead* also did not involve the inherently coercive pressures that accompanied law

---

[104] *See* 522 Fed. Appx. at 852.
[105] *See* Doc. No. 63-1 at pp. 10 (citing cases).
[106] *See id.* (citing *Brunn*, 2008 WL 441486 (D. Haw. Feb. 19, 2008); *Farris*, 120 Cal. App. 3d 51 (Cal. Ct. App. 1981); *Wilson*, 268 Cal. App. 2d 581 (Cal. Ct. App. 1968)).
[107] *See* Doc. No. 63-1 at pp. 16-17.
[108] *See Craighead*, 539 F.3d at 1078-79; *supra*, Part II.B.1.

enforcement's advisement of a search warrant for Ms. Winner's person, which also cuts against the Government in this case.[109]  Though no one case is directly on point, the vast majority of the custodial interrogation factors (including the most "powerful" factors), and the weight of the case law, favors a finding of custody, requiring the suppression of Ms. Winner's statements to law enforcement.

## III.    CONCLUSION

For the reasons stated in the Defendant's original Motion to Suppress [Doc. No. 63], as well as those stated in her Reply Brief in Support of the Motion to Suppress [Doc. No. 215], and in light of the evidence received by the Court at the February 27, 2018 suppression hearing, Ms. Winner respectfully requests that the Court: (a) grant her Motion to Suppress; (b) suppress any statements elicited from the Defendant during the encounter with law enforcement at her home on June 3, 2017; (c) suppress any evidence obtained as a result of those statements; and (d) award all such other relief as may be warranted.

Respectfully submitted,

/s/ Joe. D. Whitley
_____

Joe D. Whitley (Bar No. 756150)
Admitted *Pro Hac Vice*
Brett A. Switzer (Bar No. 554141)
**BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Rd., NE Suite 1600
Atlanta, GA  30326
(404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

John C. Bell, Jr. (Bar No. 048600)
Titus T. Nichols (Bar No. 870662)
**BELL & BRIGHAM**
PO Box 1547
Augusta, GA  30903-1547
(706) 722-2014
John@bellbrigham.com
Titus@bellbrigham.com

---

[109] *See supra*, Part II.B.2.

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
  **CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
  **CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com

**COUNSEL FOR DEFENDANT**
**REALITY LEIGH WINNER**

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

*/s/ Joe D. Whitley*
Joe. D. Whitley, Esq.