**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **1:17-CR-0034 (BKE)** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * | * | |

### DEFENDANT'S SENTENCING MEMORANDUM

NOW INTO COURT, through undersigned counsel, comes Defendant Reality Leigh Winner ("Ms. Winner," "Reality," or the "Defendant"), who respectfully submits this Sentencing Memorandum and requests that the Court accept the stipulated sentence, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, agreed upon by the parties after lengthy and extensive negotiations.  As set forth in more detail below, the stipulated sentence agreed upon by the parties is a sufficient, but not greater than necessary, sentence to achieve the ends of justice and all the goals of sentencing.  Indeed, the agreed upon sentence is on the higher end of prior Espionage Act cases prosecuted by the United States and, given Ms. Winner's characteristics as an honorably discharged veteran, a first-time offender, and someone who is unlikely to ever commit another crime again, represents a reasonable disposition to this case.

## I.    INTRODUCTION & SUMMARY OF ARGUMENT

This matter is now before the Court at sentencing pursuant to a Rule 11(c)(1)(C) plea agreement negotiated by the parties.  As detailed below, the plea agreement and its stipulated sentence should be accepted by the Court in light of all the pertinent sentencing factors

applicable to this case.  To begin with, Rule 11(c)(1)(C) plea agreements are commonplace in the context of "leak" prosecutions.  This case was charged under the Espionage Act, a law passed over 100 years ago that was intended to apply to the offense for which it was named.  The plea agreement reached by the parties is particularly appropriate to remedy what would otherwise be overly-severe penalties imposed by the Act and the sentencing guideline recommendations that were drafted with actual espionage -- selling government secrets to foreign adversaries, usually for monetary gain -- in mind.  It is for this precise reason that the vast majority of "leak" prosecutions, as demonstrated below, are resolved like this one, through a Rule 11(c)(1)(C) plea agreement.

Additionally, the conduct at issue supports the stipulated agreement reached by the parties.  While the charged conduct is no doubt serious, there is no allegation or evidence of actual spying or treason on the part of Reality Winner; instead, she has acknowledged leaking a single document that contained national defense information, a single time, to a single news outlet.  This was not a WikiLeaks-like "dump" of massive amounts of sensitive data, nor was it a disclosure of military secrets to a foreign intelligence service.  It was, as Reality has admitted, a naive attempt to "change things," in which she abused her security clearance and ran afoul of federal law -- an act which she acknowledges was criminally wrong.  Despite her singular criminal act, as set forth below, the stipulated sentence of 63 months is in *excess* of many prior Espionage Act cases where the Government has prosecuted "leakers" of national defense information, including cases where the factual conduct, and information leaked, was arguably worse.

Finally, the personal history and circumstances of Reality justifies the stipulated sentence agreed to by the parties.  As discussed below, and as demonstrated in the presentence

investigation report dated August 7, 2018, Reality is far from the monster she has been portrayed to be; she is a loving and caring daughter, step-daughter, and sibling; a veteran who honorably served her country for 6 years; and an extremely bright human being with a strong spirit of service. With the good, Reality also suffered through the bad -- parents who divorced when she was very young, a biological father who was jobless and an addict, and mental and emotional health issues that ensued, which Reality has struggled with for years. Despite difficulties, and notwithstanding this single offense, Reality has led a life of public service. Reality is not in need of deterrence, nor does the general public have any reason to fear Reality as a recidivist. After putting this chapter behind her, Reality will likely return to the successful, selfless life she previously enjoyed. The plea agreement negotiated by the parties, and its accompanying stipulated sentence, should be accepted by this Court.

## II.    PROCEDURAL HISTORY

On June 7, 2017, Ms. Winner was indicted for leaking a singular report, classified at the Top Secret / SCI level, that contained national defense information, to a news outlet, in violation of 18 U.S.C. § 793(e).[1]  A superseding indictment, alleging the same factual conduct and legal violation, was returned on September 6, 2017.[2]  Reality was detained before trial[3] and, nine months after the return of the superseding indictment, she pled guilty to the single count charged against her.[4]  The final presentence investigation report ("PSR") was completed on August 7, 2018,[5] and sentencing is set for August 23, 2018 at 10:00 a.m.[6]

---

[1] *See* Rec. Doc. No. 13.
[2] *See* Rec. Doc. No. 72.
[3] *See* Rec. Doc. Nos. 27, 115, 163.
[4] *See* Rec. Doc. Nos. 315, 316.
[5] *See* Final Presentence Investigation Report, dated Aug. 7, 2018 (confidentially submitted to the parties).
[6] *See* Rec. Doc. No. 319.

### III.    MS. WINNER'S PERSONAL HISTORY AND CHARACTERISTICS[7]

Reality was born to Billie and Ronald Winner on December 4, 1991 in Alice, Texas, but grew up in Kingsville, Texas, a town 100 miles north of the Mexican border.  Reality's mother, Billie, worked for Texas Child Protective Services; her father, Ronald, was intellectually engaging (having received at least three separate academic degrees in psychology, sociology, and theology), but was never consistently employed.  Reality was particularly close to both her parents, as well as her older, biological sister, Brittany.

In or around 1998, when Reality was approximately 6 years old, her parents separated and the following year, divorced.  Despite the split, Reality remained close to both her mother, who remarried Gary Davis in 2000, as well as her father, who moved to Harlingen, Texas, approximately 95 miles away from the home where Reality lived with Billie and Gary Davis. Reality stayed with the Davis' because, although she loved her biological father, he was regularly addicted to and often under the influence of prescription drugs, placing a significant burden on his ability to effectively parent his two daughters.

In high school, Reality succeeded academically and developed strong humanitarian characteristics.  In regards to the latter, as a teenager, Reality spent hours of her time doing volunteer work.  Among other things, she regularly volunteered for the Kleberg County Child Welfare Board, participating in community events for child abuse prevention.     Every Thanksgiving, through a church program, Reality distributed food baskets to needy families. Reality spent hours fixing up homes and yards of elderly citizens of her small town through a program that is akin to a local chapter of Habitat for Humanity.  In the aftermath of Hurricane Katrina, with the onslaught of displaced individuals from the Gulf South seeking homes in South Texas, she donated hours setting up and maintaining shelters for refugees.

---

[7] Many of the factual statements made in this section come directly from the PSR at pages 13-19 (Part C).

In 2010, Reality earned her high school diploma, graduating in the top ten of her class. Later that year, Reality turned down a full engineering scholarship at Texas A&M-Kingsville to enlist in the military.  The events of September 11, 2001, had an enormous impact on Reality who, driven by her mother's own humanitarianism, sought to make a difference in the world.

Based on Reality's test scores, and in light of her interest of Arabic history and culture, which she began studying at age 17 outside of school given world events and her father's encouragement of understanding and appreciating different cultures, the U.S. Air Force selected Reality to be a cryptologist and linguist where she spent the next two years becoming fluent in Dari and Farsi, and another year in intelligence training.  After her three years of military training and education, Reality was sent to Maryland's Fort Meade, and was admitted to a third language program in which she would eventually become fluent in Pashto.

Despite exhausting, stressful, and long 12-hour work days translating foreign communications, including conversations by suspected terrorists thousands of miles away, Reality made time for hobbies and volunteer work during her time in Maryland.  Reality spent hours volunteering at a local animal shelter.  She also participated in the non-profit "Soccer Without Borders" program in which she spent time working with inner-city youths in Baltimore. Reality has been and is an avid runner, and she enjoyed giving of her time to push wheelchair-bound children through half-marathons with an organization called Athletes Serving Athletes. Reality also donated what little money she had to "White Helmets," a volunteer organization performing search-and-rescue missions in Syria, as well as to the Red Cross.  Every Christmas, she helped prepare and distribute shoe boxes of toys to needy families around the world through the Christian International Relief organization "Samaritan's Purse".  Reality also participated in

"adopting" low-income families in Maryland at the holidays each year, helping provide them with gifts and food. And the list goes on.

Despite her amazing dedication to volunteer work and placing a smile on other people's faces, it was during this time period and continuing through to the present, that Reality has suffered with, among other things, depression, anxiety, and discontent. According to Dr. Adrienne Davis, a psychologist Reality has been seeing regularly for the past few months since her detention, these underlying emotions have manifested themselves in numerous ways, some of which have been severely detrimental to Reality's health. For example, Reality has been diagnosed with a serious eating disorder, Bulimia, which negatively impacts her both physically and cognitively, leading to impaired judgment and decision-making, as evidenced by significant decisions Reality has made in her young life as detailed in the PSR. All the while, on the surface, Reality's six-year military career was nothing short of successful.

In each of Reality's six years in the U.S. Air Force, she received the highest evaluation score possible. As late as October 2016, Reality received a commendation from the military for, among other things, removing hundreds of enemies from the battlefield and aiding in the capture of hundreds more enemies. Reality was honorably discharged from the Service in November 2016 and thereafter sought work in her field of expertise, ultimately being hired by Pluribus International Corporation, a government contractor, in Augusta, Georgia, a location she was familiar with and where she felt at home.

Reality kept up with her humanitarian efforts in Augusta while working at Pluribus. She exercised regularly, taught yoga at a local studio, participated in armed forces fundraising events, and again, volunteered her time for various causes, including working at the local animal shelter. Reality also kept up her engagement with political issues, which would have been encouraged by

her biological father who was a strong advocate of political awareness. She arranged, for example, a 30-minute meeting with the staff of U.S. Senator Purdue to discuss climate change and the Dakota Access Pipeline. Reality traveled to Belize, a place where her biological father had always wanted to go, to see the ruins. Although her political and philosophical views, her travel to Belize, and her interest in the affairs in the Middle East (which was, after all, part of her job) have been negatively portrayed throughout this case in connection with her sustained pretrial detention, it is the intellectual engagement of these topics that maintained her and even sustained her during the difficult months she spent translating thousands of conversations half a world away by suspected terrorists for the Government she willingly and voluntarily chose to serve.

During the months of November and December 2016, two significant events occurred that had a profound impact on Reality, coupled with her ongoing health struggles. First, like many other Americans, Reality was swept up by the political fervor surrounding the 2016 presidential election, including persistent public pronouncements by the President on matters of national security that were arguably inaccurate -- which frustrated her so much so that it, in part, led to her ill-conceived, woefully amateurish act that resulted in the offense at issue. The following month, on December 21, 2016, Reality's biological father, Ronald Winner, died, a loss that affected her deeply. The loss of her father was particularly relevant to this case because he was an intellectually-engaging parent with whom Reality spent many hours discussing geopolitical events. Without her father's proverbial sounding board of reason, Reality did not have the customary checks and balances that her father had provided to her down through the years.

At the time of the offense, Reality was an impetuous twenty-five year old, in her first full-time "real" job since being honorably discharged from the military.  She acknowledges responsibility for her singular and serious act, recognizes the severity of it, and is prepared to accept her punishment.  But, Reality is not a terrorist.  Despite the rhetoric that has flowed freely throughout this case, she is not a hater of her country or its people -- she is quite the opposite.  At the conclusion of this chapter of her life, Reality hopes to seek employment with humanitarian organizations, where she can put her language skills to good use, benefitting long-suffering foreign individuals.

This single offense has had an enormous impact on Reality and her family.  Putting aside the substantial amount of prison time she will serve (which, as set forth below, is extraordinarily high relative to other Espionage Act prosecutions), Reality is well aware that, as a federal felon, it will be difficult, if not impossible, to achieve long-lasting gainful employment or live the successful life to the fullest extent she had hoped.  Reality understands that a federal conviction comes with collateral consequences that will significantly impair her rights as a U.S. citizen.  And, perhaps saddest of all, Reality knows that her family has suffered greatly, and will continue to suffer with her because of her singular act of passion.  Her family has spent thousands of dollars traveling back-and-forth to support Reality during her detention.  They have suffered serious health consequences of their own as a result of the stress associated with the offense.  And perhaps worst of all, is the emotional toll this offense has wrought -- given Reality's pretrial detention.  She has been able to hug or even touch and console her mother, stepfather, or sister in over a year.

The plea negotiated between the parties should be accepted by this Court as a sufficient, but not greater than necessary.  Importantly, and in accordance with the work done by Joel

Sickler, Defendant's prison facilities expert, Reality requests that this Court make a recommendation to the Federal Bureau of Prisons for placement at FMC Carswell, a medical security facility, located near Fort Worth, Texas, so that she may be able to see her family regularly, receive the adequate medical care she needs, and in an effort to further her humanitarian objectives be in a position to provide assistance to other inmates with debilitating illnesses.[8]

## IV.   GOVERNING LAW

The sentence imposed on the defendant should be driven by the "overarching" command of 18 U.S.C. § 3553(a), which instructs district courts to "'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."[9]   As the Court knows, the U.S. Sentencing Guidelines are merely advisory[10] and, while they generally provide the starting point for sentencing,[11] a sentencing court may not presume that a within-guidelines sentence is reasonable, or that only "extraordinary circumstances… justify a sentence outside the Guidelines range."[12]   In every sentencing, the court "must make an individualized assessment based on the facts presented."[13]   This individualized assessment is undertaken pursuant to the long-standing principle that "the punishment should fit the offender and not merely the crime."[14]   As the Supreme Court has explained, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and

---

[8] *See* Declaration of Joel A. Sicker (attached as Exhibit A).
[9] *Kimbrough v. United States*, 552 U.S. 85, 89 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 56 (2007)).
[10] *See United States v. Booker*, 542 U.S. 220 (2005).
[11] *Kimbrough*, 552 U.S. at 109 (citation omitted).
[12] *Gall v. United States*, 552 U.S. 38, 47, 50 (2007).
[13] *Gall*, 552 U.S. at 50.
[14] *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

the punishment to ensue."[15]   Indeed, it is the district court that is uniquely situated to have greater familiarity with the individual defendant and individual case than the U.S. Sentencing Commission.[16]

Accordingly, after calculating the applicable guideline range, the sentencing court should then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether the requested sentence is "sufficient, but not greater than necessary"[17] to accomplish the goals of sentencing or whether a variance is warranted.[18]   The factors to be considered under 18 U.S.C. § 3553(a) are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed to promote the goals of sentencing, including to (a) reflect the seriousness of the offense, (b) promote respect for the law, (c) provide just punishment for the offense, (d) afford adequate deterrence; (e) protect the public from further crimes; and (f) provide the defendant with needed training, medical care, or other treatment;
> (3) the kinds of sentences available;
> (4) the Sentencing Guidelines range;
> (5) the pertinent policy statements of the Sentencing Commission;
> (6) the need to avoid unwarranted disparities; and
> (7) the need to provide restitution to victims.[19]

As set forth below, the agreed-upon sentence of 63 months of imprisonment and 3 years of supervised release is *more than sufficient* to satisfy the goals of sentencing, including all of the factors set forth in 18 U.S.C. § 3553(a).

---

[15] *Pepper*, 562 U.S. at 487 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).
[16] *Kimbrough*, 552 U.S. at 574.
[17] 18 U.S.C. § 3553(a).
[18] *See Gall*, 552 U.S. at 50.
[19] 18 U.S.C. § 3553(a)(1)-(7).

## V.   THE PARTIES' STIPULATED SENTENCE OF 63 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, IN THIS CASE.

### A.   The Sentencing Guidelines Calculation

The PSR prepared by the U.S. Probation Officer mirrors the guideline calculations undertaken by the parties in the Rule 11(c)(1)(C) plea agreement applicable to this matter:[20]

| Enhancement | Sentencing Guidelines Provision | Points |
|---|---|---|
| Transmitting National Defense Information (Base Offense Level) | U.S.S.G. § 2M3.3(a) (Top Secret information) | +29 |
| Abuse of Trust | U.S.S.G. § 3B1.3 | +2 |
| Acceptance of Responsibility | U.S.S.G. § 3E1.1 | (-2)[21] |
| TOTAL OFFENSE LEVEL | --- | 29 (87-108 months imprisonment w/ Criminal History Category I) |

### B.   A Downward Variance Is Appropriate.

Though the guidelines calculation calls for a term of imprisonment for 87-108 months, this case warrants the reduction the parties have agreed, particularly in view of the 18 U.S.C. § 3553(a) factors.

#### 1.   Nature and Circumstances of the Offense

While the offense at issue was no doubt serious, there are several characteristics that distinguish it from much more severe offenses, justifying the sentence reached by the parties.

---

[20] *See* Plea Agreement at pp. 7-8; PSR at p. 12.

[21] Ms. Winner submits that she is entitled to an additional reduction of one point under Section 3E1.1(b) of the U.S. Sentencing Guidelines because she "timely notif[ied] authorities of [her] intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently…"  U.S.S.G. § 3E1.1(b).  Ms. Winner recognizes that the additional one-point reduction requires government consent (which the government here has advised it will not do), but believes she should qualify for this reduction, having pled guilty four months prior to trial and only weeks after receiving, for the first time, the Government's expert reports on the specific information in the disclosed document that it believes qualifies as "national defense information" under 18 U.S.C. § 793(e).  In other words, upon receiving the most material of discovery four months prior to trial, Ms. Winner was finally able to properly evaluate the case and made the decision to plead guilty -- in plenty of time to conserve government resources that she should qualify for the third point reduction under Section 3E1.1(b) of the U.S. Sentencing Guidelines.  With the inclusion of this additional point, her guidelines calculation would be reduced to a total offense level of 28, which yields a range of 78-97 months imprisonment.  *See* U.S.S.G. § 5A.

First, to be sure, despite the title of the statute, Ms. Winner did not engage in *actual* espionage as that phrase is commonly understood -- the true reason the Espionage Act, a statute passed in 1917, was enacted into law.[22]  Instead, Reality leaked a single document, a single time, to a single news outlet (not a foreign adversary), that contained within it some national defense information,[23] the disclosure of which could have harmed national security.[24]  This case is thus far from other Espionage Act prosecutions, where defendants engaged in actual espionage.[25]

Second, the offense here involved the disclosure of one document to one news outlet, done on one occasion.  The offense did not involve the disclosure of a massive amount of information, *i.e.* it was not the result of a Wikileaks-like "dump" of thousands of pages of

---

[22] *See* Harold Edgar & Benno C. Schmidt, Jr., *The Espionage Statutes and Publication of Defense Information*, 73 Colum. L. Rev. 929, 936-42 (1973).

[23] While the Government claims Reality's disclosure was the "calculated culmination of a series of acts," such an assertion is simply its creative interpretation on the facts.  *See* Rec. Doc. No. 320 at p. 5.  While Ms. Winner does not dispute some of the factual episodes listed by the Government in its sentencing memorandum (*see* Rec. Doc. No. 320 at pp. 5-7), many of those factual episodes, as previously briefed and argued, have innocent explanations and/or are taken out of context.  *See, e.g.* Rec. Doc. No. 96-1 at pp. 7 (addressing allegations regarding thumb drive insertion), 13 (same); Rec. Doc. No. 111 at p. 2 (addressing TOR browser, thumb drive insertion); Rec. Doc. No. 128 at pp. 7-8 (addressing thumb drive insertion), pp. 9-10.  Reality's unlawful conduct, as agreed to by the parties, involved the physical printing and mailing of a single document to a single news outlet.  *See* Plea Agreement pp. 2-4; PSR at p. 6 (¶ 17).

[24] *See* Plea Agreement at pp. 2-4.  While the Government asserts that the disclosure of the information in the document at issue *did* cause damage to the national security of the United States, *see* PSR at p. 7 (¶ 22), Reality is able only to acknowledge that the disclosure would be *potentially* damaging to national security.  *See* Plea Agreement at p. 4.  The Government has not produced evidence, nor does the defense have independent access to evidence, to confirm or deny the Government's assertion regarding actual harm.  This lack of evidence is the case with a number of assertions made by the Government described in the classified and unclassified conduct summaries.  The defense submits that these few factual disputes are immaterial to sentencing and therefore, do not need to be resolved by this Court.  *See* FED. R. CRIM. PROC. 32(i)(3)(B) (stating that a sentencing court may determine that any factual disputes between the parties may not require a ruling if the matter will not affect sentencing).

[25] *See, e.g. United States v. Hoffman*, No. 2:12-CR-184 (E.D. Va. 2012) (prosecution of former naval officer for passing information to purported foreign intelligence members); *United States v. Abu-Jihaad*, No. 3:07-CR-57 (D. Conn. 2009) (prosecution of former naval signalman for transmitting classified information concerning the movement of naval ships destined for the Persian Gulf to unauthorized persons supportive of *jihad*); *United States v. Regan*, No. 01-CR-405 (E.D. Va. 2002) (prosecution of former Air Force sergeant for attempting to sell classified information to Iran, Iraq, Libya, and China).

sensitive materials.  As with prior Espionage Act prosecutions, the fact that the volume of materials disclosed is less counsels in favor of the stipulated sentence agreed to by the parties.[26]

Third, Reality did not profit or obtain any gain from the offense at issue.  She did not sell the information to a reporter or foreign adversary for money, nor did she seek out the fame and fortune as a result of the offense.  As she states in her personal statement accepting responsibility for her single offense, she willfully undertook this act to try and "change things."[27]  While such an action is misguided, it was not motivated by greed or personal gain.

Fourth, unlike other Espionage Act cases, Reality did not disclose the names of covert agents, putting lives, particularly American lives, in danger.[28]  Instead, as admitted during the re-arraignment, Reality leaked a single document that could have potentially caused harm to the United States.

None of the above facts are intended to minimize Reality's offense.  As Reality has acknowledged, it was, indeed, serious.  Rather, the defense sets forth the above to point out that this case falls outside of the "heartland" of classic Espionage Act cases and to explain why a Rule 11(c)(1)(C) plea and its stipulated sentence is appropriate here.  The Statement of Offense contained in the plea agreement confirms that Reality was not a spy leaking information to a foreign intelligence service nor was she a mercenary leaking information for personal gain or financial wealth.  Instead, Reality was a dedicated public servant and veteran who made a poor decision on this one occasion and she has taken full responsibility for that unfortunate decision. But this case bears little resemblance to classic espionage cases and, for the above reasons (as

---

[26] *See, e.g. United States v. Kim*, No. 10-CR-225 (D.D.C. 2010) (defendant who discussed singular report containing national defense information on one occasion sentenced to thirteen months' imprisonment pursuant to Rule 11(c)(1)(C) plea agreement).
[27] PSR at p. 10.
[28] *See United States v. John Kiriakou*, No. 1:12-CR-127 (E.D. Va. 2012) (prosecution of former CIA intelligence officer who disclosed, among other things, identities of covert agents).

well as those set forth below), the stipulated sentence reached by the parties should be accepted by the Court.

### 2. History and Characteristics of the Defendant

As set forth above, Reality is not the monster she has been portrayed to be by the Government during the course of this case; she is quite the contrary. She is a caring sister, a loving daughter and stepdaughter, a veteran who served her country for six years, and Reality is an extraordinarily bright human being who will be an asset to others in the long life she has ahead of her. Reality is a first-time offender who is highly unlikely to ever appear in a criminal court again. Indeed, the evidence is overwhelming that offenders who are Criminal History Category I, like Reality, are unlikely to be recidivists.[29] In particular, defendants with *zero* criminal history categories points have a re-arrest rate of just 30.2 percent, the lowest of all offenders surveyed by the U.S. Sentencing Commission.[30] Even more, offenders who qualify as Criminal History Category I, but have had no prior contact with the criminal justice system -- as is the case with Reality -- are 11.7% less likely to be recidivists.[31] It is no stretch to say that, after this case is resolved, Reality will almost certainly never be in a court for a criminal matter again.

And what has Reality lost as a result of this offense? Reality Leigh Winner has lost a good bit of her life. Reality will spend the remainder of her 20's -- a time in life when many of us are coming of age, determining what to do with the rest of our life, getting married, having children, etc. -- incarcerated. Reality will now be a felon, which will have a substantial impact on her ability to obtain future employment, and she will suffer from innumerable collateral

---

[29] *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, U.S. Sentencing Commission, March 2017 at pp. 6-9.
[30] *See id.*
[31] *See id.*

consequences as a result of her felony conviction.[32]  Reality will lose her security clearance, and her career in the military or as a contractor for our government is now over.  Reality's health has likewise deteriorated.   As detailed in the PSR, her bulimia has significantly worsened.[33]  Likewise, Reality's family has suffered from the offense.  Her mother, Billie, retired as a state worker for Child Protective Services so she could focus full-time on supporting her daughter.  The family has spent what little money they have traveling back-and-forth to visit and support their incarcerated daughter, who has been locked up since her arrest over 1 year and 2 months ago in June of 2017.  And, Reality is not the only individual who has suffered health problems from the offense.  Members of her family have suffered substantial health problems during the pendency of this case, no doubt the result of the stress of dealing with the offense.

In sum, the history and circumstances of the defendant counsel in favor of the substantial penalty negotiated by the parties here.  There is simply no need for a harsher sentence.

### 3.    Need for Sentence Imposed to Satisfy Sentencing Goals (Reflect Seriousness of Offense, Promote Respect for the Law, Provide Just Punishment, Afford Deterrence, Protect Public)

The sentencing goals contained in 18 U.S.C. § 3553(a)(2) -- the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, and protect the public -- are also satisfied by the plea resolution worked out by the parties.  Specific deterrence of Ms. Winner is certainly unnecessary in this case.  The offense conduct was situation-specific and extremely narrow in scope and, with her conviction, Reality will no longer possess a security clearance, nor will she be employed by the federal government

---

[32] *See United States v. Nesbeth*, No. 15-CR-18 (E.D.N.Y. May 25, 2016) (ECF No. 43) (sentencing opinion discussing, at length, severe collateral consequences associated with federal convictions, and stating that such consequences rise to the level of a "civil death" in our society); Nat'l Assoc. of Criminal Defense Lawyers, *Collateral Damage: America's Failure to Forgive or Forget in the War on Crime* (May 2014), available at https://www.nacdl.org/restoration/roadmapreport/ (last visited July 13, 2018).
[33] *See* PSR at pp. 15-16.

to provide her access to sensitive materials. The crime at issue was "particularly adapted to [her] chosen career" and "[t]hat career is over."[34]   Likewise, Reality's well-publicized arrest, indictment, and conviction, coupled with any incarceration, completely satisfies general deterrent interests. Those in sensitive positions within our government are certainly on notice that engaging in the offense conduct may subject them to criminal process and prison.[35]   In terms of incarceration, there is no evidence that the term of imprisonment called for by the guidelines will have any greater deterrent effect than the agreed-upon sentence of 63 months.[36]   Indeed, the 63-month term of imprisonment agreed to by both parties is in *excess* of many prior Espionage Act prosecutions, including those with arguably *worse* conduct -- providing the necessary deterrence.[37]   Finally, as a first-time offender, Reality is unlikely to ever commit another crime again, and there is simply no need to protect the public from her. Reality's singular offense was an unfortunate act in an otherwise commendable life of service.

### 4.   Need to Avoid Unwarranted Sentencing Disparities and Promote Consistency in Sentencing

One of the most persuasive reasons for approving the agreed-upon sentence of 63 months is the need for consistency in sentencing. The 63-month sentence agreed to by the parties appears to be in excess of the average sentence for charges under the Espionage Act (including so-called "leak" prosecutions), and is one of the higher sentences undersigned counsel could

---

[34] *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (finding no chance of recidivism because defendant's career was over) (alterations not in original).

[35] Separate and apart from the multitudes of prior prosecutions for leaking sensitive information, *see, e.g. infra* Part V.B.4, leak prosecutions have engendered substantial news coverage. *See, e.g. Trump Administration Escalates War on Leakers*, NBC News, Aug. 4, 2017, available at https://www.nbcnews.com/nightly-news/video/trump-administration-escalates-war-on-leakers-1017778755654 (last visited July 5, 2018); *Ex-Senate Aide Charged in Leak Case Where Times Reporter's Records Were Seized*, The New York Times, June 7, 2018, available at https://www.nytimes.com/2018/06/07/us/politics/times-reporter-phone-records-seized.html (last visited July 5, 2018).

[36] *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders") (citations omitted).

[37] *See infra*, Part V.B.4.

locate for defendants convicted of similar conduct.  For example, all of the following cases, prosecuted by the United States, resulted in *lesser* sentences despite the conduct in some of these matters arguably being *worse*:

- *United States v. David Petraeus*, No. 3:15-CR-47 (W.D.N.C. 2015): Four-star general prosecuted for providing eight notebooks of classified materials (including code word materials, identities of covert officers, information about war strategy, and deliberative discussions with National Security Council) to his paramour reporter.  *See Petraeus*, No. 3:15-CR-47 (W.D.N.C. 2015) (ECF Nos. 1, 3).  General Petraeus ultimately pled guilty to misdemeanor violation of mishandling of classified information and was sentenced to two years' probation and $100,000 fine.  *See id.* (ECF Nos. 2, 24).

- *United States v. Thomas Drake*, No. 1:10-CR-181 (D. Md. 2010): NSA employee originally charged with Espionage Act violations for improperly retaining and disclosing classified information subsequently pled guilty to exceeding authorized access to NSA computer and providing NSA information to someone not authorized to receive it.  *See Drake*, 1:10-CR-181 (D. Md. 2010) (ECF No. 1 at pp. 1-14; ECF No. 158 at pp. 7-9).  Drake was sentenced to 1 year of probation plus 240 hours of community service on misdemeanor count.  *See id.* (ECF No. 169).

- *United States v. Stephen Jin-Woo Kim*, No. 1:10-CR-225 (D.D.C. 2010): Senior Advisor and Assistant Secretary of State leaked contents of an intelligence report to a news organization relating to military capabilities and preparedness of North Korea.  *See Kim*, No. 1:10-CR-225 (D.D.C. 2010) (ECF Nos. 1, 273).  Kim pled guilty to felony count of Unauthorized Disclosure of National Defense Information and was sentenced, pursuant to Rule 11(c)(1)(C) plea agreement with Government, to a term of imprisonment of 13 months and 1 year of supervised release.  *See id.* (ECF Nos. 274, 291).

- *United States v. Shamai Leibowitz*, No. 8:09-CR-632 (D. Md. 2009): FBI contract linguist acknowledged improperly transmitting five documents classified at the "Secret" level to a media member/blogger.  *See Leibowitz*, No. 8:09-CR-632 (D. Md. 2009) (ECF No. 1; ECF Nos. 6, 6-1).  Leibowitz was sentenced, pursuant to Rule 11(c)(1)(C) plea agreement, to 20 months in prison and 3 years of supervised release.  *See id.* (ECF Nos. 6 at p. 5; ECF No. 25 at pp. 2-3).

- *United States v. John Kiriakou*, No. 1:12-CR-127 (E.D. Va. 2012): CIA Intelligence Officer leaked information concerning the identity of covert agents and classified techniques in connection with counterterrorism operations to a reporter.  *See Kiriakou*, No. 1:12-CR-127 (E.D. Va. 2012) (ECF Nos. 22, 115).  Kiriakou pled guilty to unlawful disclosure of identity of CIA agent and was sentenced, pursuant to Rule 11(c)(1)(C) plea agreement with Government, to 30 months in jail and 3 years of supervised release.  *See id.* (ECF No. 114, 128).

Other Espionage Act cases, where sentences were *higher* than the stipulated 63 months, generally had distinguishable conduct or characteristics.[38]

The Eleventh Circuit has found this factor particularly persuasive and has even reversed sentences where the need to prevent disparities across similarly situated defendants was not adequately taken into account by the sentencing court.  As an illustration, in *United States v. Killeen*, No. 15-15001, 2018 WL 1560050 (11th Cir. Mar. 29, 2018) (unpublished), the Eleventh Circuit reversed a 139-year prison sentence against a defendant charged with possession, production, and distribution of child pornography in large measure because other defendants, charged with similar (or arguably worse) conduct, were treated much less harshly.[39]  Here, Reality is subjected to a severe punishment of 63 months, a significant upward departure from prior negotiated pleas by the Department of Justice in similar "leak" cases.  The need for consistency in sentencing counsels in favor of acceptance of the plea agreement.

### 5.      Other Sentencing Factors

The U.S. Sentencing Guidelines calculation applicable to this case, another sentencing factor listed in 18 U.S.C. § 3553(a), is addressed above.[40]  While the guidelines provide for a higher sentence than what the parties have agreed to, as previously stated, that is the circumstance with nearly every case charged under the Espionage Act.  For example, in *United States v. Kim*, No. 10-CR-225 (D.D.C. 2010), the Sentencing Guidelines called for a term of imprisonment of approximately 121-151 months, but the parties there agreed to a term of

---

[38] For example, in *United States v. Christopher Glenn*, No. 14-CR-80031 (S.D. Fla. 2014),the defendant received a ten-year sentence for Espionage Act charges but that sentence ran concurrent to charges in a related case against this same defendant for child pornography and sex trafficking, for which Mr. Glenn received life imprisonment.  *See United States v. Glenn*, No. 14-CR-80031 (S.D. Fla. 2014) (ECF No. 142 - Judgment); *United States v. Glenn*, No. 1:15-CR-20632 (S.D. Fla. 2015) (ECF No. 424 - Judgment).

[39] *See United States v. Killeen*, No. 15-15001, 2018 WL 1560050, at *10-11 (11th Cir. Mar. 29, 2018) (unpublished).

[40] *See supra*, Part V.A.

imprisonment of 13 months pursuant to Rule 11(c)(1)(C).[41]   In *United States v. Donald Sachtleben,* No. 13-CR-200 (S.D. Ind. 2013), a defendant, a former FBI agent, was charged with two separate groups of criminal charges: child pornography charges and national security charges, more particularly, unauthorized disclosure of national defense information and unauthorized possession of the same.[42]   As to the national security counts, with a three-level reduction for pleading guilty, the defendant in *Sachtleben* faced a guideline range of 87-108 months for the unauthorized disclosure count,[43] notably the same range faced by Ms. Winner. Notwithstanding this guideline range, the Government and the defendant agreed in that case to a Rule 11(c)(1)(C) plea agreement to 43 months imprisonment.[44]   The same disparity is present in *United States v. Shamai Leibowitz*, No. 8:09-CR-632 (D. Md. 2009).   In that case, the defendant was convicted with disclosure of classified information in violation of 18 U.S.C. § 798(a), and faced a guideline range of 46-57 months imprisonment.[45]   Despite the guidelines calculation, the defendant and the Government agreed to a sentence of twenty months imprisonment, pursuant to Rule 11(c)(1)(C).[46]

There are no victims in need of restitution, another sentencing factor,[47] and all pertinent policy statements associated with the U.S. Sentencing Guidelines are addressed below in the context of a potential departure.[48]   No other sentencing factors appear applicable to this matter.

---

[41] *See Kim*, No. 10-CR-225 (D.D.C. 2010) (ECF No. 285) (Government's Sentencing Memorandum at pp. 1, 6-8).
[42] *See United States v. Sachtleben*, No. 13-CR-200 (S.D. Ind. 2013) (ECF No. 20 - Government's Sentencing Memorandum at pp. 4-17).
[43] *See id.* at p. 18 (reflecting total offense level for disclosure of national defense information charge of 32).
[44] *See id.* at pp. 19-20.   The 43-month term of imprisonment agreed to by the Government and the defendant was consecutive to the defendant's more severe punishment for the child pornography charges.   *See id.* at pp. 18-20.
[45] *See United States v. Leibowitz*, No. 8:09-CR-632 (D.Md. 2009) (ECF No. 6 - Plea Agreement at pp. 1, 4).
[46] *See id.* at p. 5.
[47] 18 U.S.C. § 3553(a)(7).
[48] 18 U.S.C. § 3553(a)(5).

### C.     A Downward Departure Is Also Warranted.

Separate from a variance under 18 U.S.C. § 3553(a), a sentencing court may *depart* from the guidelines calculation where, like here, "a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm…"[49]   As set forth above, Reality's service to her country, in combination with her youth, employment record, and lack of criminal history, justifies a downward departure.[50]   The conduct at issue here is a far cry from traditional espionage (the original intent behind the Espionage Act), and involved a single disclosure, a single time, to a single news outlet.[51]   Reality, a veteran who has spent almost all her life in service to others,[52] has accepted responsibility and has been (and will be) punished severely.   A departure to the stipulated sentence -- which is still in excess of many similar cases prosecuted by the Government against so-called "leakers"[53] -- is thus warranted under pertinent guideline policy statements.[54]

### D.     The PSR's Identified Ground For An Upward Departure Should Be Rejected.

The PSR identified a singular ground as potentially applicable for an upward departure -- "Public Welfare," as set forth in Section 5K2.14 of the U.S. Sentencing Guidelines,[55] which allows the court to depart "[i]f national security, public health, or safety was significantly endangered…"[56]   However, as set forth below, that departure ground should not apply here

---

[49] U.S.S.G. Ch. 1, Pt. A § 4(b).

[50] *See* U.S.S.G. §§ 5H1.1 ("Age (including youth) may be relevant in determining whether a departure is warranted…"); 5H1.3 ("Mental and emotional conditions may be relevant in determining whether a departure is warranted…"); 5H1.11 ("Military service may be relevant in determining whether a departure is warranted…").

[51] *See supra*, Part V.B.1.

[52] *See supra*, Part V.B.2.

[53] *See supra*, Part V.B.4.

[54] *See* U.S.S.G. §§ 5H1.1 (Age may be one factor for a sentencing departure); 5H1.3 (mental and emotional conditions may be relevant for a departure); 5H1.11 (military service may be relevant in determine whether a departure is warranted).

[55] *See* PSR at p. 22 (¶ 81).

[56] U.S.S.G. § 5K2.14.

because it would constitute impermissible "double-counting," as the offense conduct, its applicable sentencing guideline, and the charged statute already takes into account any harm or potential harm caused to the national security.[57]   As it relates to the charged statute, potential harm to the national security of the United States is *an element* of the offense[58] and therefore, including it as a ground for departure would be impermissible double-counting.   The guideline provision at issue, U.S.S.G. § 2M3.3, also takes into account the creation of risk of harm and thus, the enhancement's inclusion constitutes impermissible double-counting.[59]   In *United States v. Todd*, 909 F.2d 395 (9th Cir. 1990), a defendant who pled guilty to possession of document-making implements in connection with fake armed forces identification cards (among other things) was sentenced to 48 months imprisonment, which represented a significant upward departure from the applicable guideline range.[60]   In upwardly departing, the sentencing court held that the activity at issue in that case posed a grave danger to the national security of the United States.[61]   On appeal, the Ninth Circuit affirmed the applicability of the enhancement, stating that the offense conduct at issue there (illegally possessing document-making implements) did *not* take into account the potential danger to national defense, which is the purpose of Section 5K2.14 of the Guidelines.[62]   Importantly, however, the Ninth Circuit distinguished the conduct in *Todd* from traditional national security offenses like the one charged in this case:

---

[57] *See United States v. Kapordelis*, 569 F.3d 1291, 1315 (11th Cir. 2009) (defining impermissible double-counting); PSR at pp. 4-7 (¶¶ 5-22); *see also* U.S.S.G. § 1B1.3 (upward departure may be warranted if "the creation of risk is not adequately taken into account by the applicable offense guideline.").

[58] *See United States v. Rosen*, 445 F. Supp. 2d 602, 622 (E.D. Va. 2006); *accord United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988).

[59] *See* U.S.S.G. § 2M3.3, Application Note 1 & U.S.S.G. § 2M3.1, Application Note 2.

[60] *See United States v. Todd*, 909 F.2d 395, 396-98 (9th Cir. 1990).

[61] *See id.* at 397-98.

[62] *See id.*

Offenses which involve national security have a much higher offense levels.  *See, e.g.* 18 U.S.C. § 793(e) [].  That section recognizes the potential harm of having documents in the unauthorized possession of a person who has reason to believe such documents could be used to the injury of the United States and to the advantage of a foreign nation.[63]

Here, Reality has been charged with 18 U.S.C. § 793(e);[64] as set forth in *Todd*, that statute and the guideline provision applicable to that offense already does take into account harm to the national security.[65]   As a result, applying this enhancement even as a potential ground for a departure would be impermissible "double-counting."[66]

## VI.    CONCLUSION

The 63-month sentence stipulated by the parties is "sufficient, but not greater than necessary" to accomplish all pertinent sentencing goals.  For the reasons set forth above, Ms. Winner respectfully requests that this Court accept the plea agreement negotiated between the parties and sentence her in accordance with the terms contained therein, and grant such additional relief as is warranted.

---

[63] *Id.* at 398 n.5 (alternation not in original).
[64] *See* PSR at p. 4 (¶¶ 2-3).
[65] *See Todd*, 909 F.2d at 397-98.
[66] *See Kapordelis*, 569 F.3d at 1315.

Respectfully submitted,

*/s/* Joe. D. Whitley

Joe D. Whitley (Bar No. 756150)
Admitted *Pro Hac Vice*
Brett A. Switzer (Bar No. 554141)
**BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Rd., NE Suite 1600
Atlanta, GA  30326
(404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

John C. Bell, Jr. (Bar No. 048600)
Titus T. Nichols (Bar No. 870662)
**BELL & BRIGHAM**
PO Box 1547
Augusta, GA  30903-1547
(706) 722-2014
John@bellbrigham.com
Titus@bellbrigham.com

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com

**COUNSEL FOR DEFENDANT
REALITY LEIGH WINNER**

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2018, I electronically filed the foregoing with the

Clerk of the Court using the ECF system, which sent notification of such filing to counsel of

record for all parties.

/s/ Joe D. Whitley
Joe D. Whitley (Bar No. 756150)
Admitted *Pro Hac Vice*

**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Rd., NE Suite 1600
Atlanta, GA  30326
(404) 577-6000
jwhitley@bakerdonelson.com