# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> ) 1:17-CR-0034 (BKE) <br> v. ) <br> ) <br> REALITY LEIGH WINNER ) <br> ) **DECLARATION OF** <br> ) **JOEL A. SICKLER** <br> ) | |

STATE OF VIRGINIA

COUNTY OF FAIRFAX

NOW COMES, Joel A. Sickler, who, under penalty of perjury and from his own personal knowledge, states:

### Scope and Opinion

1. I have been asked by counsel in this matter to assess conditions of confinement considering the security classification of Defendant Reality Winner (the "Defendant" or "Ms. Winner") within the federal Bureau of Prisons ("BOP"). As set forth below, it is my estimation that Ms. Winner will be classified at either "low" or "medium" security and will not likely be housed at a "minimum-security" camp facility. In my opinion, Ms. Winner will face significant challenges should she be classified medium-security; she will be far safer, and the goals of sentencing would be adequately met, were she classified low-security by the BOP, particularly if she is designated (assigned) to a facility in Texas near her immediate family.

### Background and Qualifications

2. I have worked in the field of sentencing and corrections for more than 35 years and currently head the Justice Advocacy Group, LLC, a consortium of criminal justice professionals based in Alexandria, Virginia. I have worked consistently since 1980 on federal sentencing and federal prison-related matters and have experience as a correctional counselor in the District of

Columbia's Department of Corrections and with prior tenure as the Director of Client Services at the National Center on Institutions & Alternatives in Washington, D.C.

3. I have visited 51 federal prisons and have advised clients with inmate matters in 86 of the BOP's 122 institutions. Before the abolishment of parole, I represented hundreds of federal inmates before the U.S. Parole Commission. I currently advocate for and communicate with approximately 100 federal prisoners and have assisted thousands over the years. Based on more than three decades of experience assisting clients who have been committed to the care and custody of the BOP, I have extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, institutions, and standard practices.

4. I am also thoroughly familiar with the inmate classification process utilized by the BOP. For example, I am well-versed in the Program Statement ("PS") of the BOP: *Inmate Security Designation & Custody Classification* (PS 5100.08, September 12, 2006), which is used to determine the security classification of incoming inmates as well as the custody classification of existing inmates. I have also spoken and interacted on numerous occasions with personnel at the BOP's Designation and Sentence Computation Center ("DSCC"),[1] as well as with officials at the BOP's regional and central offices in correctional programs administration regarding specific inmate policies and/or program statements.

5. Finally, in this case, I have additionally conferred with defense counsel about Ms. Winner and reviewed materials regarding the defendant's case, including her medical records. I also met with and interviewed Ms. Winner at the Lincoln County Jail in the presence of counsel.

### Inmate Classification Process

6. After the imposition of sentence of imprisonment, a defendant with Ms. Winner's offense (non-violent), who has no history of violence or escapes, no prior criminal record, no outstanding detainers, and is relatively healthy, would be eligible to be designated by the BOP to a minimum-security prison "camp."

---

[1] The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas. All facility designations or assignments and inter-facility transfers are processed and made by the DSCC. *See* Federal Bureau of Prisons, *Sentence Computations*, available at https://www.bop.gov/inmates/custody_and_care/sentence_computations.jsp (last visited August 2, 2018).

2

7. In my opinion, utilizing BOP's scoring calculations, Ms. Winner's BOP security level will total approximately eleven (11) points. That figure is likely to be calculated as follows: she will not be allowed to surrender voluntarily (0 pts.); her offense severity (Espionage) will likely be rated "Greatest" (7 pts.); she has no prior criminal history (0 pts.); no history of prior violence; no history of escape (0 pts.); no outstanding detainers (0 pts.); she is 26-years old (4 pts.); she has graduated high school (0 pts.); and she has no history of substance abuse within the last five years (0 pt.). Therefore, her security designation points totals *eleven* (11), yielding a security level of "**Minimum**."[2]

8. However, in accordance with BOP rules, the BOP designators may apply a "Greater Security" Management Variable[3] ("MGTV").[4] The MGTV is applied when there are security concerns which are not considered adequately in the BOP's numeric classification system. The application of this MGTV indicates that the inmate represents a greater security risk than his/her scored security points. It is my belief, based on my years of experience, that the BOP will apply this MGTV given that Ms. Winner's offense involved the removing and transmitting of a "Top Secret" document to an unauthorized party.

9. This MGTV specifies that the security classification must be *at least* one level greater than the scored security level based upon the Security Point Total (in this case, 11 points) and other considered Public Safety Factors (none of which apply in this case)[5] – in Ms. Winner's case that equates to *at least* "low-security" (as opposed to "minimum").

10. Low-security prisons generally have security protocols and living conditions far different than what exists at the minimum-security, camp level. In my experience, there are four main differences between a minimum-security camp versus a low-security prison, including the following:.

---

[2] Security Point Totals of 0-11 equate to an Inmate Security Level of Minimum. *See* BOP: *Inmate Security Designation & Custody Classification* (PS 5100.08, September 12, 2006) at Table 5-2.

[3] *See* BOP: *Inmate Security Designation & Custody Classification* (PS 5100.08, September 12, 2006) at Ch. 5, page 5, MGTV "V".

[4] This Management Variable requires up to a 24-month expiration date. *See id.* In my opinion, this MGTV will continue to be applied throughout her incarceration and Ms. Winner will never be eligible for a camp assignment.

[5] Public Safety Factors (PFSs) are additional classification management tools used by BOP similar to MGTVs. *See* BOP: *Inmate Security Designation & Custody Classification* (PS 5100.08, September 12, 2006) at Ch. 5, page 7.

3

a. The first difference is the institution's size, mindset and crowding: Federal Correctional Institutions ("FCIs") are five to ten times larger than camps. As a rule, the bigger the institution, the more stressful it is on the general population of the prison. Large FCIs have open-bay housing quarters where 90-120 inmates sleep in double-tiered bunk beds. These inmates compete for use of the dozen or so showers, sinks and toilets. Most BOP facilities house more inmates than they are designed for; however, the camps are far less crowded than the low-security FCIs.

b. The second difference is the perimeter security and other forms of heightened security. Federal Prison Camps ("FPCs") are fenceless compounds that have the appearance and feel of an austere college campus. Camps have invisible boundary lines and any inmate could walk away (escape) from the facility if they chose to (very few do). An FCI, on the other hand, is surrounded by barriers to prevent escape; walls, fencing with concertina wire, secured and defensible main gates, armed guard towers, security lighting, motion sensors, dogs and roving patrols. Remotely controlled doors, CCTV monitoring, alarms, cages, restraints, nonlethal and lethal weapons, riot-control gear and physical segregation of units are used within the facility. Inmate movement throughout the facility is highly controlled, with access from one location to the other allowed only for 10 minutes at the top of each hour. Camps do not have "controlled movements." Mass body checks where groups of inmates are strip searched so officers can inspect their bodies for bruises or lacerations indicating violence, or fresh tattoos indicating gang involvement, are routinely conducted. Such assembly searches are not done at the camp level. Housing units are searched ("tossed") far more frequently than at the camp level.

> (1) Overcrowding in FCIs results in some facilities placing mattresses on the floor in "overflow units". Sleep disturbances (resulting from sleeping on thin mattresses, snoring, constant light, and movement) are common. Noise is incessant in a secure correctional facility, and in some (those that have cubicles, for example), there is little to absorb or otherwise block nighttime noise. Inmates may be awakened repeatedly for late night head counts.

    (2) Other problems exist in the more crowded FCIs. For instance, there are longer lines to use the telephone, long wait times to see a member of your unit team, and longer waiting periods for medications and checkups or to use the library. During mealtime, the busy, noisy cafeteria serves institutional food, pre-packaged, pre-made, sometimes days before it is served. Inmates eat in shifts (each housing unit is called in an ever-changing rotation) and if your unit is called last, most of the fresh, edible food is gone. Naturally, there are also long lines to use toilets, sinks and showers. Cramped, crowded conditions result in such prisons being unsanitary, even rodent-infected.

c. The third difference between an FPC and an FCI is the type of inmate. The camps house generally younger offenders principally caught up in the "War on Drugs" whom are serving short sentences (less than 10 years) and have often cooperated with the government. The inmates generally are first-time offenders who have committed nonviolent crimes, have minor to no criminal history and pose no public safety or flight risk. They tend to generally behave well out of fear they will end up in a higher security institution (infractions can penalize a camp inmate with a transfer to a low-security facility). Otherwise, camps house "white-collar" property offenders. Inmates at the FCIs (which also house poor minority drug offenders, but those of the more serious kind), are serving sentences greater than 10 years, likely have a prior record involving a gun or violent offenses, may be gang-affiliated, or are otherwise poor security or flight risks. FCIs also house all deportable aliens, members of organized crime, drug cartel leaders and all serious sexual offenders. Statistically, there is a 143% greater chance of being assaulted at an FCI as opposed to a camp.[6]

---

[6] This percentage is based on the average rate per month (per 5,000 inmates) of "inmate on inmate" assault (serious and less serious) from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

5

Furthermore, the rate of "serious assault"[7] is 553% higher in low-security institutions than minimum-security camps.[8]

    d.    Lastly, and in my opinion, the most important difference between a low security facility and a camp regards visitation. At a camp, an inmate's family can drive up to the compound, park in a lot next to the visiting hall, walk in unescorted, show identification and then visit their incarcerated loved one. At an FCI, visitors must proceed to a guarded gate to access the facilities parking area. They are observed by officers on patrol in the parking lot. Once inside the prison, they pass through metal detectors, are subjected to random pat down searches (with vehicles on the property also subject to inspection), their hands are tested for drug use, they are escorted through several check points and wait interminably for a friend or family member to be brought to the visiting room (a crowded indoor environment) all while the average camp has an outdoor picnic area for visitation during warm months, which means a great deal to the family of an inmate.

11. The unfortunate result is that someone who may otherwise be designated to a minimum-security camp based on the categorization of their offense as "Greatest Severity" will instead now be housed in a significantly harsher institution, next door or in a bed adjacent to someone with a much more serious criminal background. Prison is hard enough for even the toughest of souls. Ms. Winner is 26 years old. She has no prior criminal history. She will be imprisoned in a crowded, noisy facility indifferent to her needs in an institution that employs security measures far beyond what is required for her care and custody.

12. There is also the chance that the BOP could decide to classify Ms. Winner at "medium-security" due to the accompanying current political climate and the broad publicity of this case. The BOP designates medium-security FCIs as having strengthened perimeters (often double fences with electronic detection systems), cell-type housing, and greater internal controls.

---

[7] "Serious assault" is defined in the BOP's *Inmate Discipline Program* (PS 5270.09, August 1, 2011) at page 44, Table 1 (CODE 101 - Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished)).

[8] This percentage is based on the average rate per month (per 5,000 inmates) of serious "inmate on inmate" assault from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

6

13. If the BOP classifies Ms. Winner at medium-security, she will likely be designated to Secure Female Facility (SFF) at Hazelton, West Virginia. There are very few facilities that house female inmates, and even fewer that house medium-security female inmates.[9] SFF Hazelton is a secure facility designed to house inmates who have committed very serious violent offenses. It is, in no uncertain terms, a dangerous facility. Statistics on the rate of "inmate on inmate" violence reveals that an inmate is 340% more likely to be the subject of a "serious" assault in a medium-security facility than a low-security facility (low-security facilities have a rate of about 2 serious assaults per month; medium-security facilities have a rate of almost 9 serious assaults per month).[10]

### Ms. Winner's Likely BOP Classification

14. Notwithstanding the severity of leaking top-secret information to a media outlet, Ms. Winner's offense involved a single act. She did not (a) engage in actual espionage; (b) dump massive amounts of sensitive materials like WikiLeaks; (c) obtain a monetary reward for her offense; or (d) put lives in danger, but instead leaked a single document, a single time, to a single news outlet. Ms. Winner is a first-time non-violent offender; she is a veteran of the U.S. Air Force who has been involved with community affairs and public service for years. In my opinion, Ms. Winner has a low likelihood of recidivism.

15. Given these specifics regarding the offense and Ms. Winner's background, it would appear that Ms. Winner should be classified at low-security. This Defendant is not in need of the heightened security of a medium-security correctional institution.

16. In Ms. Winner's *Sentencing Statement* to the Court (as contained in the August 7, 2018 Revised Presentence Investigation Report), she indicated that she will be relocating upon her release to

---

[9] According to the BOPs Website, 7% of federal inmates are female. *See* Inmate Gender, Federal Bureau of Prisons, available at https://www.bop.gov/about/statistics/statistics_inmate_gender.jsp (last visited August 13, 2018). Of the approximately 108 federal institutions, there are five dedicated to the housing of low-security female inmates, and only one (SF Hazelton) dedicated to housing medium-security female inmates. *See* Our Locations, Federal Bureau of Prisons, available at https://www.bop.gov/locations/list.jsp (last visited August 13, 2018).

[10] This percentage is based on the average rate per month (per 5,000 inmates) of serious "inmate on inmate" assault from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).

live with her family in Kingsville, Texas.[11] In my opinion, it would be extremely helpful for Ms. Winner if she were designated to a facility close to her family in Texas, as it would assist with her adjustment to the conditions of confinement, and later, it would be beneficial as she transitions to pre-release at a halfway house.[12] The Federal Medical Center (FMC) in Carswell, Texas is the closest facility to her family in Kingsville which houses low-security females (though it is almost a seven hour drive).

17. Ms. Winner also mentioned in her *Sentencing Statement* the desire to be designated to FMC Carswell where she can work as an Inmate Helper.[13] The Psychological Evaluation prepared by Dr. Adrienne Davis (referenced in the August 7, 2018 Revised Presentence Investigation Report), along with the sentencing memorandum prepared by the defense, notes Ms. Winner's substantial history of volunteering to work with others in need (e.g. Habitat for Humanity, providing home repairs for the elderly; "White Helmets," providing aid to unarmed first responders in war ravaged countries, "Operation Christmas Child," which involved adopting needy families around the holidays; "Soccer Without Borders," donating time to assist inner-city youths in Baltimore; "Athletes Serving Athletes," pushing wheelchair-bound kids in half-marathons, etc.).[14] Working as an Inmate Helper would allow Ms. Winner to help others and begin to pay her debt to society for her actions.

18. FMC Carswell was opened in 1995 to help serve the female population in the BOP with specialized medical and mental health issues. Designation to FMC Carswell would also serve as an excellent location where Ms. Winner can receive help addressing her significant issues with Bulimia.

19. Given what has been presented herein, it is my opinion that the lowest possible security level

---

[11] *See Revised Presentence Investigation Report* prepared by Christopher R. Ingalls, Sentencing Guidelines Specialist in the Southern District of Georgia on August 7, 2018, p.10-11.
[12] Even low-security inmates are transitioned back into the community via placement in a Residential Reentry Center (halfway house) at the tail end of their sentence. Ms. Winner's RRC would be in Corpus Christi, Texas.
[13] Inmate Helpers are assigned to assist elderly and/or infirm inmates with activities of daily living such as brushing their hair and teeth, bathing, medication reminders, transportation to the cafeteria, commissary, church, etc. *See FMC Carswell Admission & Orientation Handbook* (October 2016), Job Assignments, Medical Department.
[14] Psychological Evaluation of Reality Leigh Winner by Adrienne C. Davis, Ph.D., ABPP dated July 1, 2018, p. 5.

(***low-security***) would both give deference to the need to protect the public from incarcerated offenders and provide Ms. Winner with the least harmful correctional environment. It is our hope that the Court will (1) provide a judicial recommendation in support of the lowest possible security classification for Ms. Winner; and (2) specifically recommend assignment to the Federal Medical Center (FMC) in Carswell, Texas, so that she may be located close to her family, attend to her condition of Bulimia, and allow her to grow in her desire to be of service to others as an Inmate Helper.

_____
Joel A. Sickler, Criminologist
*Justice Advocacy Group, LLC*

Dated: August 14, 2018