IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA


UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
              vs.              )      1:17CR34
                               )
REALITY LEIGH WINNER,          )
                               )
              Defendant.       )
_____)


SENTENCING HEARING
BEFORE THE HONORABLE J. RANDAL HALL
THURSDAY, AUGUST 23, 2018; 10:00 A.M.
AUGUSTA, GEORGIA


FOR THE GOVERNMENT:

    Bobby L. Christine, Esquire
    United States Attorney
    Post Office Box 8970
    Savannah, Georgia 31412
    (912)652-4422

    Jennifer G. Solari, Esquire
    U.S. Attorney's Office
    Post Office Box 8970
    Savannah, Georgia 31412
    (912)201-2561

    Julie Ann Edelstein, Esquire
    U.S. Department of Justice
    600 E Street NW, 10th Floor
    Washington, DC 20002
    (202)233-2260

    David C. Aaron, Esquire
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530
    (202)307-5190

**FOR THE DEFENDANT:**

     John C. Bell, Jr., Esquire
     Titus T. Nichols, Esquire
     Bell & Brigham
     457 Greene Street
     Augusta, Georgia 30901
     (706)722-2014

     Joe D. Whitley, Esquire
     Brett A. Switzer, Esquire
     Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
     3414 Peachtree Road, NE, Suite 1600
     Atlanta, Georgia 30326
     (404)223-2209

     Matthew S. Chester, Esquire
     Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
     201 St. Charles Avenue, Suite 3600
     New Orleans, Louisiana 70170
     (504)566-5231

     Thomas H. Barnard, Esquire
     Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
     Legg Mason Building
     100 Light Street, 19th Floor
     Baltimore, Maryland 21202
     (410)862-1185

**OFFICIAL COURT REPORTER:**

     Lisa H. Davenport, RPR, FCRR
     Post Office Box 5485
     Aiken, South Carolina 29804
     (706)823-6468

```
 1                  (Call to Order at 10:00 a.m.)

 2            THE CLERK:  The court calls case number 1:17CR34.

 3    United States of America v Reality Leigh Winner.  Bobby

 4    Christine, Jennifer Solari, Julie Edelstein, David Aaron for

 5    the Government.  Joe Whitley, Matthew Chester, John Bell, Titus

 6    Nichols, Brett Switzer and Thomas Barnard for the Defendant.

 7    Here for sentencing.

 8            THE COURT:  Good morning.

 9         (Group responds simultaneously.)

10            THE COURT:  Is the Government ready to proceed with

11    sentencing?

12            MR. CHRISTINE:  The Government is ready, Your Honor.

13            THE COURT:  Is the Defense ready?

14          MR. WHITLEY:  Yes, sir, Your Honor.

15            THE COURT:  Realty Leigh Winner appeared before this

16    Court on June 26, 2018, accompanied by several of her attorneys

17    for a Rule 11 proceeding.  Pursuant to a Plea Agreement

18    Ms. Winner plead guilty and was adjudged guilty of count one of

19    the Indictment charging her with willful retention and

20    transmission of national defense information in violation of

21    18, United States Code, Section 793(e).  Upon completion of

22    that Rule 11 proceeding and this Court's acceptance of her

23    guilty plea, the Court then directed the probation office to

24    prepare a Presentence Report and to disclose the report to the

25    Government and to the Defendant.
```

1          Has the Government seen the report and had an opportunity

2    to read it and do you have any objections to its contents?

3               MS. EDELSTEIN:  Yes, Your Honor.  The Government has

4    no objections.

5               THE COURT:  Thank you.

6           Now the Defense -- have you gone through the report with

7    Ms. Winner?

8               MR. WHITLEY:  Yes, sir, Your Honor.  We have.

9               THE COURT:  And I note that you have a single

10   objection to paragraph 81 which is a potential ground for

11   departure under Guideline Section 5K2.14.  Reviewing your

12   Sentencing Memorandum and the addendum to the agreement it

13   appears that that is still an outstanding objection that needs

14   to be addressed; is that correct?

15              MR. WHITLEY:  Your Honor, we would like to make a

16   statement as to that objection, if I might.

17              THE COURT:  Sure.  Go right ahead.

18              MR. WHITLEY:  Your Honor, we believe that it's within

19   the Court's discretion to sentence this defendant under Rule 32

20   without addressing that issue.  We believe that we've

21   adequately addressed it, we hope, for the Court's benefit in

22   our pleadings that we filed with the court.  We read the

23   Presentencing Report and there is something -- some authority

24   in the Circuit that would support saying this would be double

25   counting in this particular situation.  However, we believe

1   we've adequately addressed it and we would defer further

2   discussion of it and we would rest with the Court's decision on

3   acceptance of the 11(c)(1)(C) plea in the situation as opposed

4   to going into an extended presentation with the Court this

5   morning.

6           THE COURT:  Any thoughts from the Government on that

7   objection?

8           MS. EDELSTEIN:  Your Honor, the Government agrees

9   with the Defense that the objection need not be resolved in

10  this case.  The Government thinks that this is a

11  potentially-applicable policy statement in the sentencing

12  guidelines.  However, the Government is not in this case

13  seeking an upward departure or a sentence above the sentencing

14  guidelines; therefore, the Government agrees with the Defense

15  that this objection need not be addressed.

16          THE COURT:  Very well.  With the parties consenting,

17  I'll move forward then.

18          MR. WHITLEY:  Yes, sir.

19          THE COURT:  All right.  The Court will adopt the

20  factual statements in the advisory guidelines that are

21  contained in the report and in doing so the Court will now

22  announce that the applicable advisory guidelines for purposes

23  of this morning's sentencing are total offense level 29,

24  criminal history category I, 87 to 108 months of imprisonment,

25  one to three years of supervised release, $30,000 to $250,000

1    fine, and a $100 special assessment.

2        All right.  With that, obviously, we all recognize we have

3    an 11(c)(1)(C) Plea Agreement here which is really our focus

4    this morning, but I'll be glad to hear from -- Mr. Whitley,

5    from you or whoever else you'd like to address any information

6    in mitigation or more likely, I guess, in support of the Plea

7    Agreement.

8        Ms. Winner, as with every defendant in a sentencing

9    hearing, the law gives you the right to make a personal

10   statement to the Court.  If that is a right that you wish to

11   exercise and make a statement, I'll be glad to hear from you,

12   but I'll leave that up to you and your counsel.

13       So, Mr. Whitley, the floor is yours, sir.

14           MR. WHITLEY:  Yes, sir, Your Honor.  Thank you for

15   that.  I would defer to my co-counsel, John Bell, to speak

16   first --

17           THE COURT:  All right.

18           MR. WHITLEY:  -- and then I'll speak second, Your

19   Honor.

20           THE COURT:  Very well.

21           MR. WHITLEY:  And then after that, Your Honor, our

22   client will make an allocution to the Court.  Is that

23   acceptable, Your Honor?

24           THE COURT:  Yes, sir.

25           MR. WHITLEY:  Thank you.

1          THE COURT:  Mr. Bell?

2          MR. BELL:  Yes, Your Honor, and I will try not to

3  speak at length and I am not here to reargue the underlying

4  facts.  They are set up.  I think the Court is quite familiar

5  with the legal issues and the factual basis.  What I do want to

6  state -- and I take seriously anything I say in a court and I

7  try to take seriously what I say outside of a court for I

8  believe the candor -- not just honesty, but candor of a lawyer

9  is essential to the functioning of our system of justice.

10         Over a little more than a year I spent a good bit of time

11  with this young lady.  I am the father of four very interesting

12  daughters and each very different in their own way.  I have

13  been very extremely impressed with her as a person and I'm

14  quite familiar with the imperfectibility of mankind for we have

15  all seen folks including lawyers and bank presidents and

16  politicians and even judges do things that they have to have

17  known that they should not have done, and in some cases it

18  reflects an evil and defective heart and sometimes it's just

19  the imperfectibility of mankind.

20         She's a really good person.  I never -- I have not heard

21  any expressions of meanness, anger.  I had talked with her at

22  length independently on this Plea Agreement -- I didn't want

23  anybody else around -- to make sure this is really what she

24  wants to do and fully accepts that and she does.  I believe

25  that her acceptance of responsibility, including responsibility

1    that necessarily even under the Plea Agreement involves the

2    loss of her freedom for a good portion of her life,

3    particularly in her youth years when people are getting on with

4    life, it's real, but she's never told me anything that I had

5    reason to doubt as being truthful.

6        She's never expressed anything to me that would reflect

7    disloyalty to the United States outside of how one might view

8    what she's charged with.  She is an honorably-discharged

9    veteran.  She is a person coming before this Court with no

10   criminal history.  She is a person who did amazingly well in

11   school, received honors from the Air Force, who has shown a lot

12   of humanity and interest in -- not in gaining wealth, but in

13   serving others, trying to get jobs with non-profits and such.

14       We are here asking the Court to go with the plea bargain,

15   but I say these words because the person before you is a very

16   good person who has done something that she should not have

17   done and she knew she shouldn't have done it and it is

18   something that our federal laws do not concur, but she is not

19   an evil person.  I have no doubt that she will never again see

20   the inside of a courtroom in a similar position and I give you

21   those assurances from the bottom of my heart.

22            THE COURT:  Thank you, Mr. Bell.

23            MR. WHITLEY:  Your Honor, I'll say a few words.

24   There is an expression -- maybe Benjamin Franklin said it -- "I

25   would have written you a shorter letter but I didn't have

1    time."  You may have heard it and today what I want to do is

2    keep brief and succinct in my remarks.

3         We have spent a good bit of time in this case over many,

4    many months and I really thank the Court for the opportunity

5    this morning to say a few words.  It is part of our system and

6    it's what makes our country exceptional and I have been working

7    with exceptionally-great lawyers here in Augusta for many

8    months -- John Bell and Titus Nichols -- two great lawyers here

9    in this city.

10        I want to thank you again for the opportunity to speak on

11   behalf of Reality.  On behalf of her entire family, her defense

12   team, I want to thank the Court, the prosecutors who sit back

13   to my left here, the investigators who are back there -- there

14   are people here from the intelligence community -- for the

15   courtesy they've shown our client in this matter.  There is

16   something to be said for our adversarial system under our

17   Constitution and Bill of Rights that protects a defendant's

18   rights even if those to which she committed wrongful conduct

19   that was controversial and arguably provocative.  I believe our

20   client is deeply remorseful as John said and apologetic for her

21   actions and any harm that she may have caused the United States

22   and the intelligence community.

23        The Court has earlier indicated that it will support a

24   recommendation for a BOP facility requested by Ms. Winner which

25   is FMC Carswell facility in Fort Worth, Texas.  We thank the

1    Government also for not opposing this request.  To that end for

2    the reasons set forth in the declaration of Joel Sickler, an

3    expert in correctional facilities, Mr. Sickler believes that

4    FMC Carswell is the best facility for our client based on, Your

5    Honor, three things:  Location, safety, and available programs.

6    And I won't go into all the details.

7         Now what is this case about?  Not to minimize it, but this

8    is a case that's unique in that every case is unique, but it is

9    about one single document, Your Honor, on one single occasion

10   that was shared with one media outlet sent by what is called

11   "snail mail" today, but old fashioned mail.  There were no --

12   fortunately, there were no foreign governments involved.

13        Reality Winner in this case acted alone, Your Honor, on

14   naive political impulse.  This was a poorly-considered act of

15   political passion and protest with no financial benefit

16   received by her.  This was not a cyber crime that involved the

17   use of cyber-related resources, Your Honor, or advanced

18   technology of any kind.  As to harm, Reality has admitted that

19   she knew that the release of the information could potentially

20   harm the United States.  However, at the time I believe Reality

21   never intended, Your Honor, to harm the United States.

22        There are a few key facts about Reality, the person, and

23   John has touched on those.  Reality is just 26 years old, Your

24   Honor.  She has had no prior criminal history.  Again, as John

25   suggested, her background is, indeed, exceptional.  She was an

accomplished scholar in high school.  She was offered a
scholarship, Your Honor, to attend college at Texas A&M, but
she turned that down to serve her country in the United States
Air Force.

Reality excelled, Your Honor, in the Air Force.  Colonel
Ricky Mills, her commanding officer, said in 2016 in a
commendation letter that Reality was selected over 60 of her
peers to serve as a subject matter expert.  Colonel Mills cited
that she facilitated 816 intelligence missions, 3236
time-sensitive reports, and removed 100 enemies from the
battlefield as well as aided in 650 enemy captures and 600
enemies killed in action.

There are some other personal circumstances worthy of
consideration.  Despite her laudable military service, Reality
has faced personal family adversity all recounted quite well in
Officer Chris Ingall's PSR.  Specifically, there was a loss of
her father in December of 2016 just months before her arrest.
Dr. Adrian Davis, a clinical psychologist, has noted that
Reality suffers from longstanding depression and she suffers
and struggles with an eating disorder called bulimia. Dr. Davis
said in the months leading up to the offense it was a time in
Reality's life when she was "both depressed and suffering from
bulimia."  This contributed to her poor decision making in this
situation when the situation required really clear thinking and
sound judgment.

1    I want to briefly touch on the letters of support because

2    we're not calling any witnesses, Your Honor, this morning to

3    talk about Reality Winner.  I believe the Court probably has

4    had the opportunity to read those letters written by friends

5    and family members.  I wanted to highlight a few points about

6    those letters.  Really, it deals with the types of people who

7    wrote those letters and they range from neighbors, people who

8    served with her in the military, a friend in dog rescue, a

9    fitness instructor, her aunt, her mother, stepfather, sister,

10   adults in the small rural Texas town she grew up in.  They're

11   all supportive of the Reality Winner -- the Reality Winner that

12   they know.  These letters suggest that Reality has a high

13   potential for rehabilitation and reentry into society.

14   Taken together with Reality's personal statement which you

15   have heard or read in the materials and her allocution in a few

16   moments, I believe it will suggest that Reality will in the

17   next few years return to her freedom as a law-abiding citizen.

18   During the last year of her confinement in Lincoln County

19   Reality has acknowledged in my conversations with her

20   repeatedly the mistakes she made and the regrets that she

21   feels.

22   In summing up, I would remind the Court of a few points.

23   The charged offense in this case is non-violent.  There was no

24   profit received and it was not cyber related.  Reality is a

25   first-time offender who has a strong potential for

1    rehabilitation, Your Honor.  Accordingly, we respectfully ask

2    the Court to accept the 63-month plea deal and endorse our

3    request that she be designated to FMC Carswell in Fort Worth,

4    Texas and be offered the opportunity to participate in the

5    prison's inmate helper program for other inmates.

6         This institution is also proximate to her family's home in

7    Texas.  It is a suitable location for her health to be

8    monitored, Your Honor, and, in particular, we would ask if

9    she's not designated to that facility that she be designated to

10   a low-security facility if not FMC Carswell.

11        I want to conclude by saying that this has been a real

12   long journey for all of us working on this case.  For most of

13   us the journey is ending, but for Reality Winner her journey

14   will continue and we hope that it continues on with the Court's

15   acceptance of this Plea Agreement.  We thank Your Honor for

16   your attention to our request and that's all I have this

17   morning to share with you.  Thank you very much.

18             THE COURT:  Thank you, Mr. Whitley.

19        Ms. Winner, would you like to speak?

20             THE DEFENDANT:  Yes, sir, Your Honor.

21             THE COURT:  Very well.  You may proceed.

22             THE DEFENDANT:  I would like to begin by expressing

23   my gratitude toward this Court, the Department of Justice, the

24   FBI, and our Government, and sincerely apologize and take full

25   responsibility for my action.  You have all treated me with the

most professionalism during my arduous time in my life which I
greatly appreciate.  I will spare the Court the details of my
childhood and youth, save a few key details that shaped me into
the person I am today.

I grew up with my mother, father, and sister in Ricardo,
Texas -- a small town approximately 3 miles south of
Kingsville, Texas.  In 1997 my father moved about 80 miles
south to Harlingen.  To say my father was unique would be an
understatement.  Bless his heart and rest his soul.  A
psychology and theology major, he expected us to engage in
intellectual discourse by the time we were out of diapers.

Despite his obvious intelligence, he never quite found a
sense of belonging anywhere much as I have experienced in my
own life.  While he had some trouble in his life with the law,
opioids, and questionable philosophies, he taught me some of
the most profound and influential insights into our world that
undeniably led me to my chosen career.

His chosen education had especially impacted the nature of
our discussions in the years following the tragedy of
September 11, 2001.  Like many Americans, this event greatly
changed us.  However, part of our change was the intellectual
pursuit of answers through research and discussion of the
event, the cultures, and the languages of the people in
countries involved as the global war on terror remained in the
headlines.  Language became a topic of sincere interest to me.

1   In school my favorite subject happened to be Latin -- in

2   essence, the very structure of language itself.

3        An additional positive influence in my life came in the

4   blessing of my stepdad.  He was everything a dad should be:

5   Discipline, structure, fun, my first soccer coach.  The rock of

6   our family, he redefined our family as normal for the first

7   time and also expanded the small immediate family of my mother,

8   sister, and me by more than double with my three additional

9   step-siblings.  A staunch conversative, I couldn't help but

10  notice his pride when my oldest stepbrother joined the U.S. Air

11  Force and it was then when I first learned about the military

12  language programs.

13       By the time I became old enough to enlist my heart was set

14  in joining the military in my stepbrother's footsteps and

15  pursue a career as a linguist eventually learning Farsi, Dari,

16  and Pashto within my six-year enlistment in the U.S. Air Force.

17  By the end of my first year at my first assignment in Fort

18  Meade I was a cryptological language analyst, the dream I had

19  -- the career I had dreamed of.  Pardon me, Your Honor.

20       By the final year of my enlistment our country was well

21  into its second decade of the war in Afghanistan.  Aside from

22  my military career I had always participated in supporting

23  various charities, most notably the Samaritan's Purse Operation

24  Christmas Child in which shoe boxes are distributed across the

25  world to refugee children or those afflicted by abject poverty

and famine.  More than anything I dreamt of the day where
linguistic meets compassion, strategy, and peace.

As my time in the military came to an end I decided that I
intended to establish a life centered on obtaining the
experience and education I would need to vie for a position
within an organization like the UNHCR, USAID or UNICEF.  To
help that transition I decided to find a job where I could rely
on and improve the language skills I developed in the Air Force
and took a job as a contractor in Augusta.  Aside from the
potential job, I chose Augusta because I love this city.

It is not to be understated my understanding of the
gravity of my circumstance; however, I implore the chance to
share a few personal interests of mine that stand as the
justification of my request for the Southern District of
Georgia Augusta Division's judiciary recommendation and the
Bureau of Prisons' amenity to our request that I serve my
sentence at the Federal Medical Center, Carswell, in Fort
Worth, Texas.

On the surface it is the BOP federal facility nearest to
my family home in Kingsville, Texas.  It will be nearly a full
day's drive for my parents on visitation occasions, but it will
be less of a strain than the airfare, lodging, and
transportation logistics should I be placed out of my home
state.  Furthermore, I do intend to resettle in Texas and so
the transition from incarceration to halfway house to

supervised release will benefit me more greatly if it all were
to occur within the state of Texas.

On a personal note, one of my goals over the following
years of my life, incarcerated or otherwise free, is to seek
extensive treatment for bulimia, a condition that has been an
inescapable part of my life for over 12 years now.  I pray that
FMC Carswell would provide the adequate mental healthcare level
to allow me the opportunity to begin a lasting rehabilitation
and relief.  The disorder is a constant struggle for me and
even now is the most pressing internal challenge in my
day-to-day survival.  My greatest fear would be assignment to a
facility in which the mental health services are lacking and
that conditions will provoke my bulimia to not only grow worse
but also serve as my only coping mechanism of incarceration.

Lastly, as I am able to recover and strengthen my own self
I understand that FMC Carswell is a unique facility in which
inmates may progress to caretaking positions to serve fellow
inmates.  For both my health needs and vocational education
interests as well as proximity to my home of record, FMC
Carswell is a suitable facility in my opinion, and I humbly
request that the Court and the BOP to consider my placement in
Carswell.

Losing nearly everything has taught me that nothing is
worth the time spent away from loved ones.  Time removed from
such dearness has allowed me to reflect thus far on what an

1  undeniable mistake I made in committing such a severe crime

2  against the government of the United States.  I would like to

3  apologize profusely for my actions which have resulted in the

4  damages caused and resources expended by the Government and

5  this Court, and, in particular, I want to apologize to my

6  family.

7       My actions were a crucial betrayal of my nation's trust

8  placed in me, one for which I will spend my life in service of

9  our communities as atonement.  Nothing will be more greatly

10 prized than the most simple pleasures of serving others, my

11 family's love, or being out in the sunlight of another day,

12 and, therefore, nothing would ever be done by me to jeopardize

13 my lasting commitment to the government or to my own liberty

14 ever again.  I would, again, like to thank this Honorable Court

15 and its servants for their time and fair consideration in this

16 matter.

17          THE COURT:  Thank you, Ms. Winner.

18          MR. WHITLEY:  Thank you, Your Honor.  We would ask a

19 bit of housekeeping.  We have Dr. Adrian Davis' report.  We'd

20 like to move that to be part of the record, Your Honor, if

21 that's acceptable, and I don't believe -- I don't know what the

22 Government's position is, but I believe there's -- is there any

23 objection?

24          MS. EDELSTEIN:  There is no objection, Your Honor.

25          THE COURT:  I think what I'll order is that the

1    report be provided to the BOP but not incorporated as an

2    attachment --

3              MR. WHITLEY:  Okay.

4              THE COURT:  -- into the PSR, but I will order that it

5    be provided.

6              MR. WHITLEY:  Yes, sir.  Thank you.  Thank you, Your

7    Honor.  That's preferential.

8              THE COURT:  Anything further, then?

9              MR. WHITLEY:  No, sir, Your Honor.  We thank you for

10   your courtesy this morning.  Thank you.

11             THE COURT:  All right.  Does the Government want to

12   make its comments from the lecturn or from the table?

13             MS. EDELSTEIN:  Whatever is easier for Your Honor.

14             THE COURT:  Are they long remarks or no?

15             MS. EDELSTEIN:  I can keep them very short.

16             THE COURT:  Okay.  You can stay right here.  My

17   normal practice is to let the counsel and defendant remain at

18   the lecturn.  If you'd like to stay right where --

19             MR. WHITLEY:  Yes, sir.

20             THE COURT:  -- you are, that will keep you from

21   having to get up and down.

22             MR. WHITLEY:  Thank you.

23             MS. EDELSTEIN:  Your Honor, the Government's position

24   is fully set forth in our Sentencing Memorandum as to why the

25   disposition of this case that was agreed to by the parties is

1    an appropriate disposition -- 63 months of imprisonment and

2    three years of supervised release.  There are a few points I'd

3    like to briefly highlight.

4        In terms of the seriousness of the Defendant's offense, it

5    cannot be understated.  The Defendant when she began work as a

6    contractor with Pluribus in February of 2017 and signed

7    paperwork -- important paperwork -- showing that she was

8    agreeing to keep our secrets secret and that she was doing so

9    without any mental reservation or purpose of evasion at the

10   same time was taking actions that were clearly contrary to what

11   she was swearing to.

12       The Defendant also was not a newcomer to handling our

13   nation's secrets.  She had had a security clearance for a good

14   part of her six years that she was in the Air Force and knew

15   the importance of protecting our national security information

16   and the damages that unauthorized disclosure can cause.

17   Nonetheless, just two days before starting work with Pluribus

18   the Defendant at the same time was just looking on her phone

19   and captured an image of a web page that listed a number of

20   sites that were seeking leaked classified information.

21       On May 5th an intelligence community agency published a

22   report internally on classified databases that was classified

23   at the Top Secret Special Compartmented Information level.  The

24   Top Secret designation shows that the disclosure of this report

25   had potential to cause exceptionally grave damage to our

1    national security and what we call the "SCI" designation showed

2    that it was even more protected than other Top Secret

3    information, in part because it concerned our nation's sources

4    and methods.

5        Nonetheless, on May 9th the Defendant purposefully

6    searched for, identified, and printed this intelligence report.

7    Instead of handling it in the proper procedures, she removed it

8    from the secure facility where she worked.  She put it in an

9    envelope and she addressed that envelope to a news outlet.  As

10   she admitted to the Federal Bureau of Investigation she did so

11   with intent that the news agency publish the content of that

12   report, and as the Defendant admitted when she pleaded guilty,

13   this act was not an accident; it was not a mistake; and it was

14   not done for any innocent reason.  Rather, the Defendant acted

15   willfully.  She knew what she was doing was against the law.

16   In so doing she knowingly and intentionally jeopardized the

17   national security.

18       I gave you previously the definition of Top Secret

19   information that it has potential to cause exceptionally grave

20   damage, and in this instance the U.S. subject matter experts

21   have assessed that the Defendant's disclosure did exactly that.

22   It caused exceptionally grave damage to our national security.

23       The Defendant has now accepted responsibility for this

24   crime and the parties agree that 63 months is an appropriate

25   sentence.  It reflects the seriousness of this crime.  It is a

1    long prison sentence.  The Defendant understood the harm that

2    her disclosure could cause and she blatantly violated the trust

3    that was placed in her.

4        In addition, the sentence confers significant benefit to

5    the Government.  It avoids the complex issues that would have

6    been posed by a Classified Information Procedures Act

7    proceeding both before this Court and on a potential appeal and

8    it avoids the potential dangers of discussing a case which has

9    at its core classified information in front of a jury which

10   inevitably leads to the disclosure of more classified

11   information.

12       Given the balance that we must strike in all of those

13   cases as the Government between the needs to prosecute an

14   individual and the damage that further disclosure of classified

15   information can cause, this is a good result for the

16   Government.  The prosecutors have confirmed both with the

17   Federal Bureau of Investigation and the members of the

18   intelligence community who are affected by the Defendant's

19   disclosure, and all agree.  We also think that this sentence

20   will avoid unwarranted sentencing disparities in light of other

21   cases that have been prosecuted under 783 for unauthorized

22   disclosure of classified information.

23       Unless the Court has any questions, Your Honor, that's all

24   the Government has.  Thank you.

25             THE COURT:  All right.  Thank you.  The Court is now

1    ready to impose the sentence in this case.  I have listened to

2    the Defendant and her counsel.  I have carefully reviewed the

3    Presentence Report prepared by the United States Probation

4    Office.  I have also considered letters of support filed by the

5    Defense in this case and I have carefully considered the

6    Sentencing Memorandums filed by both the Government and the

7    Defense and, finally, have listened to argument of counsel in

8    open court this morning.

9        In arriving at the Court's decision, I have carefully

10   considered the 18 U.S.C. § 3553(a) sentencing factors.  Based

11   upon this the Court hereby approves the Plea Agreement under

12   Rule 11(c)(1)(C) and will now sentence accordingly.  Pursuant

13   to the Sentencing Reform Act of 1984 then it is the judgment of

14   this Court that the Defendant, Reality Leigh Winner, is hereby

15   committed to the custody of the Bureau of Prisons to be

16   imprisoned for a term of 63 months.

17       Now imposing -- in imposing this sentence this morning

18   this Court has conducted a variance from the advisory guideline

19   range pursuant to Rule 11(c)(1)(C) and the Plea Agreement in

20   this case again and including the relevant 18 U.S.C. § 3553(a)

21   factors.  In particular, in approving this agreement and the

22   sentence that the Court has imposed, I have carefully

23   considered the very serious nature and circumstances of the

24   offense committed by this defendant and I have considered very

25   carefully her history and characteristics.

1            This sentence by the Court reflects the seriousness of

2    this espionage offense.  It is designed to provide just

3    punishment for this offense, and, very importantly, to promote

4    respect for the law and, also, very importantly, to avoid

5    adequate deterrence to future criminal conduct.  While the

6    Court doesn't have any -- has no sense, rather, that there is a

7    need to protect the public from any further crimes of this

8    defendant, the Court does believe that the public deterrence

9    factor is very important in the Court's decision to approve

10   this 11(c)(1)(C) agreement and to impose the sentence called

11   for by that agreement.  For all of these reasons this Court now

12   finds that the sentence -- that a sentence outside of the

13   advisory guideline range is appropriate and has imposed such a

14   sentence.

15           It is recommended that Ms. Winner be evaluated by BOP

16   officials to establish her participation in an appropriate

17   program of mental health treatment and counseling during her

18   term of incarceration.  In addition, the Court orders that the

19   psychological examination prepared by Dr. Adrian C. Davis dated

20   July 1, 2018, shall be provided to the Bureau of Prisons as

21   part of the record in this case but shall not be incorporated

22   into the Presentence Report.

23           After considering the Sentencing Guideline 5E1.2D factors

24   and in light of paragraph four of the Plea Agreement, the Court

25   has -- will not impose a fine today upon Ms. Winner.  I do,

1   however, order that she shall pay to the United States a $100

2   special assessment which is due immediately.

3        Pursuant to the approval of the Plea Agreement Ms. Winner

4   shall forfeit her interest in the items mentioned in paragraph

5   12 of that agreement.

6        Upon release from imprisonment Ms. Winner shall be placed

7   on supervised release for three years.  While on supervised

8   release she shall comply with the standard conditions of

9   supervision adopted by this court and the mandatory conditions

10  required by 18 U.S.C. § 3583 which will include, but not be

11  limited to, urine testing, a prohibition against possession of

12  any firearm or other dangerous weapon, and a prohibition

13  against the violation of any law.  Further, she shall cooperate

14  in the collection of a DNA sample as directed by the probation

15  officer pursuant to 18 U.S.C. § 3583.

16       While on supervised release Ms. Winner shall comply with

17  certain special conditions imposed by this court.  The Court

18  has considered various factors set forth in 18 U.S.C. § 3553

19  and 3583 along with relevant policy statements issued by the

20  United States Sentencing Commission and has determined that

21  these special conditions involve no greater deprivation of

22  liberty than is reasonably necessary to achieve the purposes of

23  sentencing; therefore, the following special conditions are

24  imposed on her term of supervised release.

25       She must participate in a mental health treatment program

1    and follow the rules and regulations of that program.  The

2    probation officer, in consultation with her treatment provider

3    or providers, will supervise her participation in such a

4    program.  She must pay the cost of treatment in an amount to be

5    determined by the probation officer based on her ability to pay

6    or the availability of third-party payment.  She must take all

7    mental health medications that are prescribed by her treating

8    physician.  She must pay the cost of such medication in an

9    amount to be determined by her probation officer based on her

10   ability to pay or the availability of third-party payment.

11        She must provide the probation officer with access to any

12   requested financial information and authorize the release of

13   any financial information.  The probation office may share

14   financial information with the United States Attorney's office.

15   She shall not maintain more than one financial institution

16   account or be a signer on any financial institution account

17   without the prior approval of the probation officer.

18        She must complete 100 hours of community service within 12

19   months of her supervised release.  The probation officer will

20   supervise her participation in the program by approving the

21   program and verifying the completed hours.

22        She must submit her person, property, house, residence,

23   office, vehicle, papers, computers, other

24   electronic-communications or data-storage devices or media to a

25   search conducted by a United States Probation Officer.  Failure

1   to submit to a search may be grounds for revocation of her

2   supervised release.  Failure -- rather, she must warn any other

3   occupants that the premises may be subject to searches pursuant

4   to this condition.  The probation officer may conduct a search

5   under this condition only when reasonable suspicion exists that

6   she has violated a term or condition of her supervision and

7   that areas to be searched contain evidence of the violation.

8   Any search must be conducted at a reasonable time and in a

9   reasonable manner.

10       A curfew will apply during the term of supervised release.

11  She must comply with the conditions of a curfew from 10 p.m. to

12  6 a.m. daily.  During the curfew time she will remain at her

13  place of residence and shall not leave except when the leave is

14  approved in advance by her probation officer.

15       She shall not collaborate on or consult about or otherwise

16  assist or be involved in any communication of information

17  related to classified subject areas to which she was exposed

18  while working as an employee of or contractor for the United

19  States Government with any other person or entity without first

20  obtaining the express written permission of all relevant

21  agencies or components of the United States Government.

22       She shall not circumvent her assignment to the United

23  States of any compensation, profits, proceeds, fee, honorarium,

24  money, or payments of any kind which she may otherwise be

25  entitled to receive in connection with any publication or

1    dissemination of information related to her work as an employee

2    of or contractor for the United States Government and the facts

3    and circumstances of the investigation of her activities or her

4    prosecution, sentencing, or incarceration in this matter by

5    assigning the rights to her story to an associate or to a

6    current, former, or future member of her family or to any other

7    person or entity who would provide some financial benefit to

8    her, to her associates, or to a current, former, or future

9    member of her family.  Moreover, she shall not circumvent this

10   assignment by communicating with an associate or family member

11   for the purpose of assisting or facilitating their profiting

12   from a public or private dissemination whether or not such

13   associate or other family member is personally or directly

14   involved in such dissemination.

15        The probation officer is now directed to provide

16   Ms. Winner with a written statement setting forth all of the

17   conditions to which her term of supervised release is subject.

18   The Court has accepted this Rule 11(c)(1)(C) sentencing

19   agreement that departs from the applicable guideline range

20   because the Court is satisfied that there are justifiable

21   reasons for accepting this agreement that I have previously set

22   forth in this sentencing statement.

23        Consistent with the Court's judgment then it is ordered

24   that Ms. Winner is remanded to the custody of the United States

25   Marshal.  This Court will recommend to the Bureau of Prisons

1    that she be assigned to FMC Carswell, Texas to serve her

2    incarceration -- term of incarceration.  As a backup, the Court

3    would recommend her assignment to another facility of the same

4    risk level and with the same programs and other facilities that

5    Carswell offers.

6         Pursuant to the Plea Agreement, with limited exceptions,

7    Ms. Winner has waived all rights conferred by 18 U.S.C. § 3742

8    to appeal this sentence.  She has also waived the right to

9    appeal this sentence on any other ground and has waived the

10   right to attack the sentence in any post-conviction proceeding.

11        The sentence in this case has now been pronounced by this

12   Court.  Other than any objections which may have previously

13   been stated for the record, does anyone now have any objections

14   to the Court's findings of fact, its conclusions of law, or to

15   the manner in which the sentence was pronounced by this Court?

16        Government?

17             MS. EDELSTEIN:  No, Your Honor.  Thank you, Your

18   Honor.

19             MR. WHITLEY:  No, Your Honor.

20             THE COURT:  Very well.  With that, the sentencing

21   hearing is now concluded.

22        (The hearing is concluded.)

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

1
2
3
4
5       I, Lisa H. Davenport, Federal Official Court Reporter, in
6  and for the United States District Court for the Southern
7  District of Georgia, do hereby certify that pursuant to Section
8  753, Title 28, United States Code that the foregoing is a true
9  and correct transcript of the stenographically-reported
10 proceedings held in the above-entitled matter and that the
11 transcript page format is in conformance with the regulations
12 of the Judicial Conference of the United States.

13
14             _____
15             Lisa H. Davenport, RPR, FCRR
               Federal Official Court Reporter
16
17
18
19
20
21
22
23
24
25