**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **NO. 1:17-CR-00034** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## BRIEF IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582

Defendant Reality Leigh Winner ("Reality" or the "Defendant") respectfully moves this Court for an order releasing her based on the "extraordinary and compelling reasons" discussed below, pursuant to the recently amended 18 U.S.C. § 3582(c)(1)(A)(i).  Due to the exigent nature of this Motion and the various observations and limitations explained by this Honorable Court in its recent Standing Orders (MC 120-4 and MC 120-5) issued by Chief Judge Randall Hall, Reality also respectfully requests that this Court address the instant Motion on an expedited basis and, if needed, counsel is available to participate in video or telephonic oral argument on this Motion after a reasonable opportunity for the United States of America to by heard.

## INTRODUCTION

We are in the middle an unprecedented pandemic. American life as we know it has slowed to a near-halt, and COVID-19 has largely shut down the entire world.  On March 13, 2020, President Trump declared a National Emergency concerning the novel COVID-19 disease outbreak,[1] and on the same day, Governor Abbott declared a State of Disaster in Texas – where

---

[1] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020), at

Reality is incarcerated -- due to COVID-19.[2] It is unclear when we will be able to return to any sort of normalcy.  And we have been told the worst is yet to come. The disease could potentially infect and kill anywhere from 200,000 to 1.7 million Americans, depending on the intervention and precautions each municipality and individual takes.[3] As members of the general public, we are instructed to keep a minimum six-foot distance from any other human being and practice social isolation to prevent the spread of a highly contagious disease for which there is no approved cure, treatment, or vaccine to prevent.  This is difficult for those of us who enjoy general freedoms; but for those incarcerated, like Reality, it is near impossible, as COVID-19 infections, as acknowledged by the Department of Justice, continue to run rampant in federal prison facilities where the conditions are not conducive to the type of "social distancing," mask wearing, or isolation that has been mandated by the White House, the Centers for Disease Control, or other governmental authorities.[4]   In the end, Reality signed up to serve her sentence under the care, custody, and safety of the Bureau of Prisons – she did not agree (nor did this Court require her) to be confined to an institution that was caught unprepared for this virus (having, among other things,

---

https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[2] *Governor Abbott Declares State of Disaster In Texas Due To COVID-19*, Office of the Texas Governor (Mar. 13, 2020), at https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19.

[3] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, The N.Y. Times (Mar. 18, 2020),  at  https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html; *see also* Bobby Allyn, *Fauci Estimates That 100,000 To 200,000 Americans Could Die From The Coronavirus*, National Public Radio (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus, for the original proposition that the death toll from COVID-19 would be much higher than initially anticipated.

[4] Richard Harris, *White House Announces New Social Distancing Guidelines Around Coronavirus*, National Public Radio (Mar. 16, 2020), at https://www.npr.org/2020/03/16/816658125/white-house-announces-new-social-distancing-guidelines-around-coronavirus; *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, Centers for Disease Control and Prevention (last reviewed Apr. 3, 2020), at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

run out of hand sanitizer), placed in close quarters with other inmates in a facility that has already been infested by this deadly and contagious disease, literally putting her health and life in danger.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 7, 2017, Reality was indicted for leaking a singular report, classified at the Top Secret / SCI level, and containing national defense information to a news outlet in violation of 18 U.S.C. § 793(e), a section of the "Espionage Act."[5]  The Government returned a superseding indictment alleging the same factual conduct and legal violation on September 6, 2017.[6]  Unlike almost every Espionage Act defendant before her, Reality was detained before trial,[7] and nine months after the return of the superseding indictment, she pleaded guilty to the single count charged against her.[8]  To be clear, the Government presented neither an allegation of nor a shred of evidence of actual spying or treason committed by Reality.

This Honorable Court sentenced Reality on August 23, 2018.[9]  Accepting the parties' Rule 11(c)(1)(C) plea agreement, this Honorable Court approved a sixty-three (63) month term of imprisonment, as set forth in the proposed plea agreement.[10]  Under 18 U.S.C. § 3624(b), she will serve approximately 85% of her 63-month sentence – i.e., approximately fifty four (54) months – assuming she receives full credit for "good time" from BOP.  She was 26 years old when she was sentenced, and at that time, COVID-19 did not exist.

At sentencing, Reality acknowledged and took responsibility for leaking a single document that contained national defense information, a single time, to a single news outlet.[11]  As the Court

---

[5] *See* ECF No. 13.
[6] *See* ECF No. 72.
[7] *See* ECF Nos. 27, 115, 163.
[8] *See* ECF Nos. 315, 316.
[9] *See* ECF No. 323.
[10] *Id.*
[11] *See* ECF No. 328 at pp.13-14.

is aware, this was not a Wikileaks-like "dump" of massive amounts of sensitive data, nor was it a disclosure of military secrets to a foreign intelligence service.[12]  It was, as Reality has admitted, a naive attempt to "change things," in which she abused her security clearance and ran afoul of federal law -- an act which she acknowledges was criminally wrong.[13]  For her mistake, the Court sentenced Reality to the stipulated sentence of sixty-three (63) months.[14]

As of today's date, Reality has served over thirty-four (34) months of her sentence as of the filing of this motion.  Under 18 U.S.C. § 3624(b), she calculates approximately twenty (20) months remain on her term.  By filing this Motion, Reality respectfully requests she receive relief from the extraordinary circumstances COVID-19 presents under the recent amendments to 18 U.S.C. § 3582(c)(1)(A)(i) via the First Step Act.[15]

On or about April 8, 2020, Reality submitted a written request to the Warden of FMC Carswell in Ft. Worth, Texas, asking that he Petition the Bureau of Prisons ("BOP") for a reduction of her sentence under 18 U.S.C. § 3582(c)(1)(A)(i). As of the date of this filing, to Reality's knowledge, the Warden has not filed a Petition with the BOP on Reality's behalf nor has he responded to Reality's request.

Because of the recent amendments to Section 3582(c)(1)(A)(i), the Court has jurisdiction to consider this request and may reduce Reality's sentence, and indeed, modify it by releasing her and permitting her to finish her sentence on home confinement, for the reasons set forth below.[16]  Now, by and through counsel, Reality asks this Court to commute her sentence to home confinement so that she may carry out the balance of her term under the care of her family, and

---

[12] *See id.* at p.10.
[13] *Id.* at p.13-14.
[14] *See* ECF No. 327.
[15] First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018).
[16] *See* P.L. 115-391, 132 Stat. 5194 § 603 (Dec. 21, 2018).

avoid the fate of so many others currently incarcerated in federal prison facilities – including FMC

Carswell – that have contracted this contagious and deadly virus.

## ARGUMENT

### A. This Court has Jurisdiction to Decide Whether Extraordinary and Compelling Reasons Exist to Grant Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18

U.S.C. § 3852(c). Substantively, under § 3852(c)(1)(A)(i), a court may reduce a prisoner's

sentence "if it finds that (1) "extraordinary and compelling reasons warrant such a reduction" and

(2) the reduction is "consistent with applicable policy statements issued by the Sentencing

Commission."

Procedurally, prior to 2018, only the Director of the BOP could file these kinds of

"compassionate-release motions."[17] The First Step Act amended § 3852(c)(1)(A) to allow

prisoners to directly petition courts for compassionate release, removing the BOP's exclusive

"gatekeeper" role.[18] The amendment to § 3852(c)(1)(A) provided prisoners with two direct routes

to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not

to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt . . . of such a

request" by the warden of the defendant's facility, "whichever is earlier." 18 U.S.C. §

3852(c)(1)(A). These changes gave the "district judge . . . the ability to grant a prisoner's motion

for compassionate release even in the face of BOP opposition or its failure to respond to the

---

[17] *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).

[18] S*ee also United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.").

prisoner's compassionate release request in a timely manner."[19]   The substantive criteria of §
3582(c)(1)(A)(i) remained the same.

As set forth in detail below, and as other district courts across the country have done, this
Court may consider the circumstances of the instant request under the "extraordinary and
compelling" rubric set forth in the applicable statute (rather than the explicitly-enumerated grounds
set forth in the statute), and may further consider Reality's direct request for release (as opposed
to requiring that the motion be filed by the Bureau of Prisons).

### a. The Term "Extraordinary and Compelling" Is Not Limited by Those Explicitly-Listed Reasons Set Forth in the Sentencing Commission's Policy Statement.

Congress never defined the term "extraordinary and compelling reasons" in Section
3852(c), except to state that "[r]ehabilitation . . . alone" does not suffice. 18 U.S.C. § 994(t).[20]
Rather, Congress directed the Sentencing Commission to define the term.[21] The Commission did
so prior to the passage of the First Step Act, but it has not since updated the policy statement.[22]

Presently, the Commission is unable to update the Sentencing Guidelines because it
currently lacks enough appointed commissioners to take this action.[23]   However, while the
application notes cite to health, age, and familial reasons as "extraordinary and compelling"
grounds justifying release, the Commission also made clear that it is impossible to package all

---

[19] *United States v. Young*, No. 2:00-cr-00002-1, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 3, 2020).

[20] "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 18 U.S.C. § 994(t).

[21] *Id.*

[22] *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D).

[23] *See, e.g.*, *United States v. Maumau*, No. 08-cr-00785, 2020 WL 806121, at *1 n.3 (Feb. 18, 2020).

"extraordinary and compelling" circumstances into neat categories and thus created a non-exclusive catchall that recognized that other "compelling reasons" could exist.[24]

While a small number of courts (including this one) have concluded that the Sentencing Commission's policy statement prevents district courts from considering any "extraordinary and compelling reasons" outside of those expressly listed the policy statement,[25] most district courts have concluded the opposite.[26]  Indeed, the cases which this Court previously relied on "rest upon a faulty premise that the First Step Act somehow rendered the Sentencing Commission's policy statement an inappropriate expression of policy" and thus, this Court's prior view is clearly out of step with the majority of recently-issued American First Step Act jurisprudence.[27] Therefore, while the policy statement may provide "helpful guidance," it does not limit the Court's independent assessment of whether "extraordinary and compelling reasons" exist under § 3582(c)(1)(A)(i).[28] And, as courts have recently held from across the country, and as further detailed below, the global

---

[24] *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

[25] *See, e.g., United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. Lynn,* No. 89-0072-WS, 2019 WL 3805349, at *2-*5 (S.D. Ala. Aug. 12, 2019).

[26] *United States v. Beck*, --- F. Supp. 3d ---- , No. 13-cr-186-6, 2019 WL 2716505 (M.D.N.C. June 28, 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019); *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086 (D. Me. July 11, 2019); *United States v. Redd*, No. 1:97-cr-00006-AJT, 2020 WL 1248493 (E.D. Va. Mar. 16, 2020); *United States v. Young*, No. 2:00-cr-00002-1, 2020 WL 1047815 (M.D. Tenn. Mar. 4, 2020); *United States v. Maumau*, No. 08-cr-00785, 2020 WL 806121 (Feb. 18, 2020).

[27] *See Willingham*, 2019 WL 6733028, at *2.

[28] *See Beck*, 2019 WL 2716505, at *6; *Fox*, 2019 WL 3046086, at *3 ("I agree with the courts that have said that the Commission's existing policy statement provides helpful guidance . . . [but] is not ultimately conclusive given the statutory change.").

7

pandemic of COVID-19 facing the world clearly constitutes a "extraordinary and compelling" reason to grant release.[29]

### b. This Court Can Consider This Request From Reality Under the Sentencing Commission's Policy Statement in Light of the First Step Act.

In earlier times, a motion for compassionate release could only reach the court through a motion made by the BOP. Indeed, the minority cases previously followed by this Court specifically require that the BOP (and not the inmate) file the request.[30] The First Step Act, however, significantly altered the landscape of compassionate-release motions and, consistent with more recent jurisprudence, permits the Court to consider inmate-filed compassionate release motions.

The rationale for this shift in jurisprudence is easy to understand, is consistent with the legislative intent and purpose of the First Step Act, and comports with fundamental fairness.  In providing the catchall provision, the Commission recognized it may be impossible to predict what reasons may qualify as "extraordinary and compelling." Rather than attempt to make a definitive prediction, the Commission covered its bases by ensuring that *every motion* to reach the court would have an opportunity to be assessed under the flexible catchall provision. At the time the Commission wrote the catchall provision's BOP-focused language,[31] it accomplished that task, because prior thereto (i.e., pre-Amendment), every motion to reach the court necessarily had to be filed and approved by the BOP.

The First Step Act explicitly allows inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for relief. Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where

---

[29] *See infra*, Part C.
[30] *Willingham*, 2019 WL 6733028, at *2.
[31] *See* U.S.S.G. §1B1.13 cmt. n.1(D) (providing for relief if, "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).").

8

nobody in the BOP *ever decided* whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions. It would be a strange remedy if Congress intended that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard.

Under the minority view previously accepted by this Court, that is exactly what would happen: prisoners in this situation would never have the chance for the BOP to assess their claim under the catchall provision and would never get the chance for this kind of flexible review in this district court, since under the minority view this Court would be constrained to the specific criteria in subsections (A)-(C) of the policy statement.[32] This would have the perverse effect of *penalizing* prisoners who take advantage of the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay, which is precisely what the Act sought to alleviate. Indeed, it would discriminate against prisoners like Reality who happen to be young, single, and childless (in other words, those moving under the "catchall provision"), but nonetheless, face extraordinary and compelling circumstances warranting compassionate release. For reference, the COVID-19 virus does not stop to inquire as to Reality's age, relationship status, or desire for children before invading her body; it does not discriminate on any grounds at all.

The minority view, of course, would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to

---

[32] The minority bases this view on the BOP-focused language of the policy statement's catchall provision. *See* U.S.S.G. §1B1.13 cmt. n.1(D) (asking only the BOP Director to determine if other extraordinary and compelling circumstances exist).

decide.[33]  Under the minority view, Congress would have created a two-tiered system that poses a "catch-22" to prisoners with unresponsive wardens: (1) opt for quicker relief at the cost of a disadvantageous standard with no catchall; or (2) endure delay—and, possibly, complete inaction—to retain a more flexible standard. Congress sought to help, not hinder, these sorts of prisoners, and clearly did not intend to create this outcome. Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.

Continuing to subscribe to the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and unintended definition of the term "extraordinary and compelling."  Because the Sentencing Commission has not yet been able to issue a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach.  Moreover, there remains a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill.  Importantly, nothing in § 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these. Rather, the statute's text directly instructs courts to "find that" extraordinary circumstances exist.

Of course, the Sentencing Commission's policy statement remains informative.[34] However, it should not constrain the Court.  In fact, courts have held that, in view of the Sentencing

---

[33] *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.").

[34] *See, e.g.*, *Fox*, 2019 WL 3046086, at *3 ("[T]he Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive . . . ."); *Beck*, 2019 WL 2716505, at *7 ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment . . . ."); *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020) ("[T]he Court may independently evaluate whether [defendant] has raised an extraordinary and compelling

Commission's inaction in the face of the First Step Act, district courts <u>are not</u> limited to the express grounds contained in the old policy statements previously promulgated:

> There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. By its terms, the old policy statement applies to motions filed by the [BOP] Director and makes no mention of motions filed by defendants. . . . The Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, nor has it adopted a new policy statement applicable to motions filed by defendants.[35]

The introductory sentence of §1B1.13, "*[u]pon motion of the Director of the [BOP . . . the court may reduce a term of imprisonment*," limits the policy statement's scope to a procedural scheme exclusively involving the BOP that does not exist anymore.  And comment 4 of §1B1.13's Application Note expressly states that "[a] reduction *under this policy statement may be granted only upon motion by the Director of the [BOP]*."

Accordingly, by its own terms, the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions.  In other words, for prisoner-filed motions, there is a gap left open that no "applicable" policy statement has addressed.  Because Congress intended for this Court to be able to determine whether extraordinary and compelling circumstances exist to reduce Reality's sentence, this Court may consider her direct request (as opposed to a request from the BOP).

**B. Reality is Not Required to Exhaust Her Administrative Remedies Before Bringing this Motion Under 18 U.S.C. § 3582(c).**

**a.  The Statutory Language of 18 U.S.C. § 3582(c) Does Not Mandate Exhaustion.**

The Supreme Court has held that a court's power to create exceptions to a statutory exhaustion requirement depends on the language of the statute.[36]  "[A] statutory exhaustion

---

reason for compassionate release . . . [but §1B1.13's policy statement] remain[s] as helpful guidance to courts . . . .").

[35] *Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *5 (citations omitted).

[36] *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).

provision stands on a different footing [from a judicially created one]. There, Congress sets the rules — and courts have a role in creating exceptions only if Congress wants them to."[37] In the context of cases under the Prison Litigation Reform Act of 1995 ("PLRA"), for example, such as *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court ruled that courts do not have the power to create emergency exceptions to the exhaustion requirement where Congress expressly created a mandatory requirement.[38]

The Court reached this conclusion because the PLRA used mandatory language in setting out the administrative remedies exhaustion standard: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such* administrative remedies as are available are exhausted."[39] The "no action shall be brought . . . until" language in the PLRA motivated the Court's ruling in Ross.  "Statutory interpretation, as we always say, begins with the text."[40]

"[T]he PLRA's text suggests no limits on an inmate's obligation to exhaust — irrespective of any 'special circumstances.'"[41] Given this mandatory language, the Court concluded "mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account."[42] In contrast, the 18 U.S.C. 3582(c)(1)(A) language has nothing akin to the type of mandatory language found by the *Ross* court to be controlling. In fact, the text of the statute simply allows for the passing of time of 30 days, regardless of progress on administrative procedures, before this Court may modify a term of imprisonment.  Reality acknowledges 30-days

---

[37] *Id.*
[38] *Id.* at 1856.
[39] *Ross*, 136 S. Ct. at 1856; 42 U.S.C. §1997e(a) (emphasis added).
[40] *Ross*, 136 S. Ct. at 1856 (internal citation omitted).
[41] *Id.*; *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (proper exhaustion of administrative remedies is necessary).
[42] *Id.*

have not passed since she submitted her request to the Warden under 18 U.S.C. § 3582(c)(1)(A).

But, based on the statutory language, this passage of time is not a mandatory pre-requisite for

bringing this motion.  Also, notably, 30 days *have* passed since the COVID-19 outbreak giving

rise to this motion, including 30 days since the World Health Organization declared the novel

coronavirus outbreak a global pandemic.[43]   Therefore, whether viewed through the prism that

administrative exhaustion is not required under the applicable statute, or whether that requirement

has been satisfied in light of the passage of 30 days since the declaration of the COVID-19

pandemic, this Motion is timely.

### b.  This District Court has the Discretion to Excuse Exhaustion.

Even still, "[d]istrict courts have discretion to excuse exhaustion…"[44] "Exhaustion may be

excused if a litigant can show: (1) that requiring exhaustion will result in irreparable harm; (2) that

the administrative remedy is wholly inadequate; or (3) that the administrative body is biased,

making recourse to the agency futile."[45]

All three of these exceptions apply here. Requiring exhausting will result in irreparable

harm as exigent circumstances exist.  Positive cases of COVID-19 have been reported in FMC

Carswell and given the extremely contagious nature of the disease, it is only a matter of time before

Reality is exposed to it.  An administrative remedy would be wholly inadequate because Reality

would never receive it in time.  Finally, Congress's enactment of the First Step Act and decision

---

[43] *See* WHO Director-General's Opening Remarks at the Media Briefing on COVID-19, Mar. 11, 2020, available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Apr. 10, 2020).

[44] *Georgia by & through Georgia Vocational Rehab. Agency v. United States by & through Shanahan*, 398 F. Supp. 3d 1330, 1343 (S.D. Ga. 2019) (internal citation omitted) (allowing plaintiff to bring claim even though plaintiff failed to exhaust administrative remedies under federal statute).

[45] *Id.* (internal citation omitted); *see also McCarthy v. Madigan*, 503 U.S. 140, 146–47 (1992) (But [even] where Congress has not clearly required exhaustion," a court may still impose it as an act of "sound judicial discretion.).

to give prisoners the ability to petition Courts directly is evidence that a remedy from the BOP is frequently inadequate and futile.[46]

The provision allowing prisoners to bring motions under § 3582(c) was added by the First Step Act in order to "increas[e] the use and transparency of compassionate release."[47] Requiring exhaustion generally furthers that purpose, because the BOP is best situated to understand an inmate's health and circumstances relative to the rest of the prison population and identify "extraordinary and compelling reasons" for release.[48] In Reality's case, however, administrative exhaustion would defeat, not further, the policies underlying § 3582(c).

Here, delaying release amounts to denying relief altogether. Pursuing the administrative process would be a futile endeavor; Reality is unlikely to receive a final decision from the BOP, and certainly will not see 30 days lapse before COVID-19 becomes, if it has already not become, rampant in her facility. Remaining incarcerated for even a few weeks increases the risk that the other underlying conditions from which she suffers, discussed *infra*, will be aggravated and cause her greater harm.  Requiring exhaustion, therefore, would be directly contrary to the purpose of identifying and releasing individuals whose circumstances are "extraordinary and compelling." Accordingly, this Court should hold that Reality's underlying health issues, combined with the high risk of contracting COVID-19, justifies waiver of the exhaustion requirement.

---

[46] *See also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").

[47] 132 Stat. 5239.

[48] 18 U.S.C. § 3582(c)(1)(A)(i).

### C.  Extraordinary and Compelling Circumstances Warrant a Reduction to Reality's Sentence.

Reality's circumstances—particularly the outbreak of COVID-19 and her history of respiratory illnesses as well as eating disorders place her at a high risk should she contract the disease—present "extraordinary and compelling reasons" to reduce her sentence. Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common."[49] It defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." [50]

Reality has shown extraordinary and compelling reasons to reduce her sentence. First, as referenced in the materials previously provided to the Court at sentencing, she suffers from bulimia nervosa and a propensity for respiratory illnesses that render her especially vulnerable to COVID-19. Second, prison – a population dense petri dish already infested with this disease – is a particularly dangerous place for Reality at this moment. Neither of these reasons alone is extraordinary and compelling. Taken together, however, they constitute reasons for reducing her sentence "[b]eyond what is usual, customary, regular, or common," and reasons "so great that irreparable harm or injustice would result if [the relief] is not [granted]."[51]

### a.  Reality's Health Conditions Make Her Especially Vulnerable to COVID-19.

On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[52] Reality suffers from depression and bulimia nervosa.[53]  She copes with stress and

---

[49] Extraordinary, Black's Law Dictionary (11th ed. 2019).
[50] Compelling Need, Black's Law Dictionary (11th ed. 2019).
[51] Extraordinary, Black's Law Dictionary (11th ed. 2019); Compelling Need, Black's Law Dictionary (11th ed. 2019).
[52] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020), at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[53] Taylor Barnes, Reality Winner Battles an Eating Disorder Behind Bars, (Nov 24, 2018), at https://theintercept.com/2018/11/24/reality-winner-prison-eating-disorder/.

uncertainty, such as incarceration and the invasion of a novel disease, by binge eating, regurgitation, excessive exercise, or any combination thereof.  For example, Reality will push herself to participate in "push up challenges" or run laps barefoot around a prison yard.[54]

> People with eating disorders have a high risk of relapsing or worsening the severity of their disorder, due to infection fears and the effect of the quarantine … Infection fears tend to increase the feeling of not being in control that, in people with eating disorders, is often managed with an increase of dietary restrictions or other extreme weight control behaviors or with binge-eating episodes.[55]

Reality's routines allow her to cope and hold the things she is unable to control together, which is monumental to her survival in an environment where she controls nothing, like prison. The COVID-19 outbreak only adds another element of her life she cannot control and threatens her overall health.[56]

Moreover, ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████[57]  Indeed, "many people with eating disorders are immunocompromised, putting them squarely in the group of people for whom COVID-19, the disease caused by the coronavirus, could be most dangerous."[58] When paired with an unknown

---

[54] *Id.*

[55] Riccardo Dalle Grave M.D., *Coronavirus Disease 2019 and Eating Disorders*, (Mar. 21, 2020), at      https://www.psychologytoday.com/us/blog/eating-disorders-the-facts/202003/coronavirus-disease-2019-and-eating-disorders.

[56] *See, e.g.*, Addy Baird, The Coronavirus Outbreak Is "Like A Nightmare" For People With Eating Disorders, (Mar. 20, 2020), at https://www.buzzfeednews.com/article/addybaird/coronavirus-quarantines-eating-disorders-recovery.

[57] *See* Psychological Evaluation of Reality Winner by Adrienne Davis, dated July 1, 2018, attached hereto as **Exhibit 1**.

[58] *See* Fn. 56, *supra.*

virus, Reality's illness could spiral from a daily struggle that merely makes it difficult to get out of bed in the morning to a fully compromising situation from which she may never recover.

Furthermore, the federal prison system is currently under a "modified lockdown."[59] Inmates are currently locked in their cells or quarters with their movement and group gatherings "significantly decrease[d.]"[60]  Normally, it is these times outside of her cell when Reality can engage in the ████████████████████████████████████████

████████[61] Without these routines, Reality's health is in peril. Reality has stated: ████████

████████████████████[62] ████████████████████████████████

████████████████████████████████[63]  Indeed, the people who know Reality the best attest to the importance of exercise for her self-worth and validation.[64]  Reality's depleted mental and physical states -- with no way to exercise any coping mechanism for the stress of her own underlying conditions and now the added stress of battling a novel virus present in her facility -- make her particularly susceptible to COVID-19.

### b.  Reality Cannot Adequately Protect Herself Against Infection in Prison.

Given Reality's vulnerability to COVID-19, prison is a particularly dangerous place for her. Inmates are confined in close quarters, eat meals in large dining halls, and use communal showers and recreational facilities. These inmates are overseen by BOP employees who travel

---

[59] Courtney Buble, *Federal Prison System Goes Into 'Modified Lockdown'*, *Government Executive*, (Apr. 1, 2020), at https://www.govexec.com/management/2020/04/federal-prison-system-goes-modified-lockdown/164286/.

[60] *Id.*

[61] *See* **Ex. 1**.

[62] *Id.*

[63] *Id.*

[64] *See* Letter of Support from Brittany Winner, dated July 31, 2018, attached hereto as **Exhibit 2** ("[H]er behavior is an attempt to exert control in her life where she has none."); *see also* Letter of Support from Billie Davis-Winner, dated July 29, 2018, attached hereto as **Exhibit 3** (Reality also suffers from depression, anxiety, and an eating disorder…I worry about her mental health daily, and am concerned about the stress she is under….").

back and forth between the facility and the community, potentially bringing the coronavirus inside the prison.  BOP facilities also continue to transfer inmates in and out, increasing the chances for exposure.[65] As a result, experts and BOP employees regard the federal prisons as ripe breeding ground for coronavirus.[66] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[67] Indeed, in the past week, at least one inmate has texted positive at Reality's facility,[68] and, separate from concerns over the amount of food available for inmates when most stores are rapidly running out of sustenance, she reports FMC Carswell has recently run out of hand sanitizer, a basic need in times of rapidly-spreading infectious diseases. A prison inmate like Reality cannot "shelter-in-place" and avoid contact with others.  Instead, she is stuck in a densely populated breeding ground for disease.

As of April 9, 2020, there are 283 federal inmates and 125 BOP staff who have confirmed positive test results for COVID-19 nationwide.  Only 14 inmates and 7 staff have recovered.  There have been 8 federal inmate deaths attributed to COVID-19 disease. FCI Oakdale, where five inmates have already died from the coronavirus, is a case study in the disease's rapid spread.[69] Now that the virus is at FMC Carswell, it is only a matter of time before the virus infiltrates the

---

[65] *See* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, *Vice News* (Mar. 24, 2020) at https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

[66] *Id.* ("Federal prison guards warn that a coronavirus outbreak is looming and could be catastrophic, causing 'mass chaos' in a correctional system responsible for more than 175,000 inmates across the United States.").

[67] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, Business Insider* (Feb. 21, 2020) at https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

[68] *See* Federal Bureau of Prisons, COVID-19 Cases,  https://www.bop.gov/coronavirus/ (last accessed on April 8, 2020).

[69] Sadie Gurman, Zusha Elinson, Deanna Paul, *Coronavirus Puts a Prison Under Siege*, https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030 (updated April 6, 2020) (last accessed on April 8, 2020).

prison population like it has done at FCI Butner (44 inmates, 16 staff positive), FCI Danbury (36 inmates, 15 staff positive), FCI Oakdale (36 inmates, 14 staff positive, 5 dead), etc.[70]  These are just the confirmed case numbers reported on the BOP website. Notably, and logically, they are increasing each day as additional test results come in on a delay.

The best chance that Reality has to weather this pandemic is to be released and be permitted to live with her family in rural Texas, where she can appropriately "shelter in place" and avoid interacting with others.  Congress and the Department of Justice are increasingly recognizing the danger of COVID-19 outbreaks in prisons and encouraging steps to release some inmates where appropriate. Indeed, Attorney General William Barr has directly addressed the extreme vulnerability of the men and women in the federal prison system by issuing his March 26, 2020 Memorandum to the Bureau of Prisons, which specifically encourages the Bureau of Prisons to transfer inmates to home confinement, where appropriate.  A true and correct copy of Attorney General William Barr's Memorandum, dated March 26, 2020, is attached hereto as **Exhibit 4**. And on April 6, 2020, he issued a Memorandum to Heads of Department Components and All United States Attorneys, mandating that while resolving pre-trial detention issues, all prosecutors must consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic. A true and correct copy of Attorney General William Barr's Memorandum, dated April 6, 2020, is attached hereto as **Exhibit 5**.  The Court can infer from these Memorandums that a deference should be given to home confinement, when possible and when appropriate, as it is here.

---

[70] *See* Federal Bureau of Prisons, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last accessed on April 9, 2020).

### c. Courts are Releasing Prisoners into Home Confinement on Similar Requests.

This is a rapidly developing phenomenon. The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation.  It presents a clear and present danger to society for reasons that need no elaboration.  It presents a heightened risk for incarcerated defendants like Ms. Winner who suffer from underlying conditions and compromised immune systems.

Federal district courts around the country are releasing prisoners like Reality into home confinement on similar requests.  Attached hereto as **Composite Exhibit 6** are orders entered in a handful of similar cases within the past ten (10) days, including the cases of Daniel Hernandez (a rapper with gang ties known as Tekashi69), *United States v. Hernandez*, No. 1:18-cr-00834-PAE, ECF No. 451 (S.D.N.Y. Apr. 2, 2020), Jeremy Rodriguez (a drug offender serving a 20-year sentence), *United States v. Rodriguez*, No. 2:03-cr-00271-AB, ECF No. 135 (E.D. Pa. Apr. 1, 2020), Wilson Perez (a conspirator to kidnapping), *United States v. Wilson Perez*, No. 1:17-cr-513-AT, ECF No. 98 (S.D.N.Y. Apr. 1, 2020), and Teresa Gonzalez (a conspirator to wire and mail fraud), *United States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155 (E.D. Wash. Mar. 31, 2020).

Federal courts across the Country are being asked to intervene because the BOP response is insufficient, and the Sentencing Commission's policy statement and corresponding commentary give the courts this power – i.e., a court may reduce a "sentence for 'extraordinary and compelling reasons,' including where the defendant is 'suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."[71]  Like

---

[71] *Hernandez*, No. 1:18-cr-00834-PAE, ECF No. 451, at p.4 (*citing* 1 U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A)); *see also Rodriguez*, No. 2:03-cr-00271-AB, ECF No. 135 (E.D. Pa. Apr. 1, 2020) (granting compassionate release); *Perez*, No. 1:17-cr-513-AT, ECF No. 98 (same); *Gonzalez*, 2020 WL 1536155 (same); *United States v. Campagna*, No. 16 Cr. 78-01 (LGS), 2020 WL 1489829

the many other defendants who have been released in the face of this global health care crisis, release is appropriate here for Reality.

### D.       Reality is Not a Danger to Others or the Community.

The Commission's policy statement, which provides helpful guidance, provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

Section 3142(g) sets out the factors courts must consider in deciding whether to release a defendant pending trial. These factors weigh both the defendant's possible danger to the community and the defendant's likelihood to appear at trial. Only the former is relevant here. The factors that weigh danger to the community include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."[72]

Reality has briefed the Court at length regarding the various reasons she is not a danger to the community in the context of her pre-trial detention.[73] Years removed from that briefing, having

---

(S.D.N.Y. Mar. 27, 2020) (same); *United States v. Williams*, No. 3:04-cr-00095-MCR-CJK, ECF No. 91 (N.D. Fl. Apr. 1, 2020) (same); *United States v. Garcia*, No. 2:95-cr-00142-JPS, ECF No. 196 (E.D. Wi. Mar. 27, 2020) (same); *United States v. Edwards*, No. 6:17-cv-3-NKM, ECF No. 134 (W.D. Va. Apr. 2, 2020) (same); *United States v. West*, No. 1:17-cr-00390-AT; ECF No. 53 (N.D. Ga. Mar. 30, 2020) (same); *United States v. Powell*, No. 1:94-cr-00316-ESH (D.D.C. Mar. 28, 2020) (same); *United States v. Copeland*, No. 2:05-cr-00135-DCN, ECF No. 662 (D.S.C. Mar. 24, 2020) (same); *United States v. Huneeus*, No. 1:19-cr-10117-IT, ECF No. 642 (D. Ma. Mar 17, 2020) (same); *United States v. Resnick*, No. 1:12-cr-00152-CM, ECF No. 461 (S.D.N.Y. Apr. 2, 2020) (same); *United States v. Hernandez*, No. 1:16-cr-20091-KMW, ECF No. 561 (S.D. Fl. Apr. 3, 2020) (same); *United States v. Barkman*, No. 3:19-cr-00052-RCJ-WGC, ECF No. 21 (D. Nv. Mar. 17, 2020) (same).

[72] 18 U.S.C. § 3142(g).

[73] *See* ECF No. 128, 156, 176, *et al.*

accepted responsibility for her conduct, and having served nearly three (3) years of her sentence, any risk to the community that may have existed previously no longer exists.

Importantly, Reality has been evaluated by several physicians, who have all concluded that Reality is not a danger to herself or others.[74]  Notes from every single visit/evaluation received by counsel confirm that Reality's physicians have never been concerned about danger to herself or the community.[75]  Indeed, this is consistent with the comprehensive psychological evaluation and report of Dr. Adrienne Davis.[76]

Moreover, in both the pre-trial detention context and at sentencing, people close to Reality have reiterated these points to the Court and that Reality will have incredible support upon her release.  For example, below are excerpts taken from letters of support submitted to this Honorable Court:

> **Brittany Winner (Reality's Sister):**
> "She calls me almost every day and we write to each other often.  I am a huge part of her support system, and she is a huge part of mine. I will continue to support her during the transition to this new chapter of her life, and I am wholeheartedly prepared to take on a much larger role if necessary in the future."
>
> **Billie Davis Winner (Reality's Mother):**
> "Those who know her know that she is not a danger in any way to anyone….We have rearranged everything in our lives to support her and we will continue to do so.  My husband and I have already begun planning to build or move a small home unto a section of our property here in Texas, for her to live upon release.  Our family and friends continue to be very supportive and will always assist Reality in any way possible."

---

[74] *See e.g.*, true and correct copies of ███████████████████ ████, attached hereto as **Exhibit 7** ██████████████
[75] *Id.*
[76] *See* **Ex. 1** ███████

**Indira Garcia:**
"Reality is a good person with a strong sense of doing what is right.  She has a strong support system from her family and friends.  Her parents have been positive role models and have the proper support.  I cannot say enough positive things about Billie and Gary and their dedication and commitment to their children.  Reality is their life and they do anything to guide and support her."

**Shani Messerschmidt**
"As family, Reality will always have our support, whether that means providing her continued emotional support through continuous contact or a place to stay upon her release."[77]

Notably, the Letters of Support also emphasize the importance of a healthy diet, a stringent exercise routine, and access to medical treatment for Reality's overall well-being.[78]  Of course, these are all things that are currently being deprived under the current COVID-19 lock down protocols, which increases her susceptibility to the deadly disease, discussed *supra*.

**E.  The Sentence Reduction is Consistent with the Section 3553(a) Factors.**

Finally, the Court must "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."[79] The applicable sentencing factors warrant a sentence reduction for Reality. Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here. The applicable factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

---

[77] *See* **Exs. 2, 3**; *see also* Letter of Support of Indira Garcia, undated, attached hereto as **Exhibit 8**; *see also* Letter of Support of Shani Messerschmidt, dated July 20, 2018, attached hereto as **Exhibit 9**.
[78] *See id.*
[79] 18 U.S.C. § 3582(c)(1)(A).

. . . [and]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.][80]

The statute also mandates: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)."[81]

Reality's Sentencing Memorandum, ECF No. 321, addressed Section 3553's factors at length. For sake of brevity, she will summarize the application of those factors here. But, she attaches the complete discussion from her Sentencing Memorandum hereto as **Exhibit 10**, should the Court wish to revisit that analysis in full.

The first factor is "the nature and circumstances of the offense and the history and characteristics of the defendant."[82] As stated above, Reality's singular offense was an unfortunate act in an otherwise commendable life of service. While her offense did involve a matter of national security, it was non-violent and involved a single document of classified material, not a disclosure analogous in size to the Pentagon Papers or Wiki Leaks. She has shown good conduct over the course of serving her sentence and while in service to her country. Those nearest her vouch for her character.

The second factor is the need for the sentence imposed to serve the enumerated purposes of punishment.[83] The court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes."[84] Reality has served nearly three years of her five years sentence, most of the original sentence imposed. Three years is a long time—long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of Reality. Indeed, a three

---

[80] 18 U.S.C. § 3553(a).
[81] *Id.*
[82] *Id.* § 3553(a)(1).
[83] *Id.* at § 3553(a)(2).
[84] *Id.* at § 3553(a).

year term is longer than every or almost every other case cited in her Sentencing Memorandum.[85]  Her continued incarceration during the COVID-19 pandemic may induce irreparable harm to her health. To prolong her incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

The final relevant factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[86]  Reality has served the majority of her mandatory sentence and is approximately two years away from release. Granting this Motion would resolve the sentence disparities between her and similarly situated defendants because her prison term was more than many prior Espionage Act prosecutions from the start – including those with arguably *worse* conduct.[87]  A reduction in sentence and commuting her sentence to home confinement would correct – not create -- any disparity.[88]

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant Reality Compassionate Release under 18 U.S.C. § 3583(c)(1)(A) and allow her to serve the remainder of her sentence at home with her family in light of the COVID-19 pandemic.

Respectfully submitted,

BY:     */s/ Joe D. Whitley*
        Joe D. Whitley (Bar No. 756150)
        Admitted *Pro Hac Vice*
        Brett A. Switzer (Bar No. 554141)
        **BAKER, DONELSON, BEARMAN,**
        **CALDWELL & BERKOWITZ, P.C.**
        3414 Peachtree Rd., NE Suite 1600

---

[85] *See* ECF No. 321 at Section V(B)(4).

[86] 18 U.S.C. § 3553(a)(6).

[87] *See* ECF No. 321 at pp. 16-17.

[88] *See, e.g.*, Reality Winner, Former N.S.A. Translator, Gets More Than 5 Years in Leak of Russian Hacking Report, N.Y. Times (Aug. 23, 2018), at https://www.nytimes.com/2018/08/23/us/reality-winner-nsa-sentence.html.  (confirming Reality received the harshest sentence in the history of the Espionage Act at the time for a journalist leak).

Atlanta, GA  30326
(404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com

**ATTORNEYS FOR DEFENDANT**
**REALITY LEIGH WINNER**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

/s/ Joe D. Whitley
Joe D. Whitley