# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

DANIEL HERNANDEZ,

Defendant.

---

18 Cr. 834-04 (PAE)

ORDER

PAUL A. ENGELMAYER, District Judge:

WHEREAS on December 18, 2019, the Court imposed sentence on the defendant as set forth in a Judgment, dated December 20, 2019 (ECF No. 398);

WHEREAS on March 22, 2020, the defendant moved this Court for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 437);

WHEREAS on March 25, 2020, the Court denied the defendant's motion for failure to exhaust the administrative remedies set forth in 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 440);

WHEREAS on March 31, 2020, now having exhausted his administrative remedies, the defendant renewed his motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF No. 445);

NOW THEREFORE IT IS HEREBY ORDERED that, for the reasons set forth in an accompanying Opinion and Order, the Court grants the defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i);

IT IS FURTHER ORDERED that pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), the Court hereby reduces the defendant's term of incarceration such that he is released from the custody of the Bureau of Prisons effective immediately;

IT IS FURTHER ORDERED that the defendant is hereby placed on supervised release and the Court re-imposes the terms and conditions of supervised release as set forth in the December 20, 2019 Judgment (ECF No. 398) with the following amendments:

1. The defendant shall serve the first four months of supervised release on home incarceration, to be enforced by GPS monitoring, at an address approved by the defendant's probation officer;

2. In light of the COVID-19 pandemic, the defendant must remain at his residence except to seek any necessary medical treatment or to visit his attorney, in each instance with prior notice and approval by the Probation Department; and

3. In the event the Probation Department is unable to implement GPS monitoring upon the defendant's release, the defendant is ordered to have daily contact with the defendant's probation officer through videoconferencing technology until GPS monitoring is implemented.

IT IS FURTHER ORDERED that the Court grants the Government's request that the docketing of this Order be delayed, such that this Order and the Court's accompanying Opinion and Order are not to be docketed until 4 p.m. on April 2, 2020.

SO ORDERED.

_Paul A. Engelmayer_
_____
PAUL A. ENGELMAYER
United States District Judge

Dated: April 1, 2020
       New York, New York

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>JEREMY RODRIGUEZ | Criminal Action<br>No. 2:03-cr-00271-AB-1 |

## MEMORANDUM

We are in the midst of an unprecedented pandemic.  COVID-19 has paralyzed the entire world.  The disease has spread exponentially, shutting down schools, jobs, professional sports seasons, and life as we know it.  It may kill 200,000 Americans and infect millions more.[1]  At this point, there is no approved cure, treatment, or vaccine to prevent it.[2]  People with pre-existing medical conditions—like petitioner Jeremy Rodriguez—face a particularly high risk of dying or suffering severe health effects should they contract the disease.

Mr. Rodriguez is an inmate at the federal detention center in Elkton, Ohio.  He is in year seventeen of a twenty-year, mandatory-minimum sentence for drug distribution and unlawful firearm possession, and is one year away from becoming eligible for home confinement.  Mr. Rodriguez has diabetes, high blood pressure, and liver abnormalities. He has shown significant rehabilitation in prison, earning his GED and bettering himself with numerous classes. He moves for a reduction of his prison sentence and immediate release under the "compassionate release"

---

[1] Bobby Allyn, *Fauci Estimates That 100,000 To 200,000 Americans Could Die From The Coronavirus*, National Public Radio (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus.

[2] *See* Pien Huang, *How the Novel Coronavirus and the Flu Are Alike . . . And Different*, National Public Radio (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.

statute, 18 U.S.C. § 3582(c)(1)(A). He argues that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. §3582(c)(1)(A)(i).

For Mr. Rodriguez, nothing could be more extraordinary and compelling than this pandemic. Early research shows that diabetes patients, like Mr. Rodriguez, have mortality rates that are more than twice as high as overall mortality rates.[3] One recent report revealed: "Among 784 patients with diabetes, half were hospitalized, including 148 (18.8%) in intensive care. That compares with 2.2% of those with no underlying conditions needing ICU treatment."[4]

These statistics—which focus on the non-prison population—become even more concerning when considered in the prison context. Prisons are tinderboxes for infectious disease. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities. Two inmates have already tested positive for COVID-19 in the federal detention center in Elton—the place of Rodriguez's incarceration.[5] After examining the law, holding oral argument, and evaluating all the evidence that has been presented, I reach the inescapable conclusion that Mr. Rodriguez must be granted "compassionate release."

## I. DISCUSSION

18 U.S.C. § 3852(c)(1)(A)(i) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction

---

[3] *See Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[4] Tom Avril, *How much diabetes, smoking, and other risk factors worsen your coronavirus odds*, Phialdelphia Inquirer (Mar. 31, 2020), https://www.inquirer.com/health/coronavirus/coronavirus-underlying-conditions-heart-lung-kidney-cdc-20200331.html.

[5] *COVID-19 Tested Positive Cases*, Federal Bureau of Prisons (accessed Mar. 31, 2020), https://www.bop.gov/coronavirus/index.jsp.

would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.[6] Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term. The policy statement lists three specific examples of "extraordinary and compelling reasons," none of which apply to Mr. Rodriguez. U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). It also provides a fourth "catchall" provision if the Director of the Bureau of Prisons determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." *Id.* § 1B1.13, cmt. n.1(D). Mr. Rodriguez argues that, in light of the First Step Act, the Court is no longer bound by the policy statement. Therefore, he argues, the Court can and should exercise its discretion to determine that "extraordinary and compelling reasons" exist for his release. The government argues that Rodriguez does not meet any of the enumerated criteria in the policy statement, and that the Court cannot independently assess whether other extraordinary and compelling reasons exist that warrant a sentence reduction.

I conclude that (1) the Court may independently assess whether "extraordinary and compelling reasons" exist; (2) the COVID-19 pandemic—in combination with Mr. Rodriguez's underlying health conditions, proximity to his release date, and rehabilitation—constitute "extraordinary and compelling reasons" that warrant a reduction; (3) Mr. Rodriguez is not a danger to his community; and (4) the factors under § 3553(a) favor reducing Mr. Rodriguez's sentence. Therefore, I will grant the motion.

---

[6] The government agrees that Rodriguez's motion is properly before the Court because he has complied with § 3582(c)(1)(A)'s 30-day lapse provision. *See* 18 U.S.C. § 3582(c)(1)(A) (providing that a prisoner can file a motion with the court upon the "lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility.").

## A. The Court may decide whether "extraordinary and compelling reasons" exist

Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C. § 3852(c). Under § 3852(c)(1)(A)(i), a court may reduce a prisoner's sentence "if it finds that" (1) "extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." Prior to 2018 only the Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate-release motions." *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).

The BOP rarely did so. The BOP was first authorized to file compassionate-release motions in 1984. From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates  . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id.* The report also found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.*

Against this backdrop, Congress passed and President Trump signed the First Step Act in 2018, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Brown*, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First*

*Step Act of 2018: An Overview* 1 (2019)).  In an effort to improve and increase the use of the compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.[7]  Congress made this change in § 603(b) of the First Step Act.  Section 603(b)'s purpose is enshrined in its title: "Increasing the Use and Transparency of Compassionate Release."  Section 603(b) was initially a standalone bill that "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.'"  *Brown*, 411 F. Supp. 3d at 451 (quoting Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018)).

The amendment to § 3852(c)(1)(A) provided prisoners with two direct routes to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt . . . of such a request" by the warden of the defendant's facility, "whichever is earlier."  18 U.S.C. § 3852(c)(1)(A).  These changes gave the "district judge . . . the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to the prisoner's compassionate release request in a timely manner."  *United States v. Young*, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 3, 2020).  The substantive criteria of § 3582(c)(1)(A)(i) remained the same.

Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation . . . alone" does not suffice.  18 U.S.C. § 994(t).  Rather, Congress directed the Sentencing Commission to define the term.  *Id.*  The Commission did so prior to the passage

---

[7] S*ee also United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("The First Step Act was passed against the backdrop of documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants."); 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications.").

of the First Step Act, but has not since updated the policy statement. *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D). In subsections (A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id.* cmt. n.1(A)-(C). The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

Thus, implicitly recognizing that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes, the Commission made subsections (A)-(C) non-exclusive by creating a catchall that recognized that other "compelling reasons" could exist. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

The Commission has not updated its policy statement to account for the changes imposed by the First Step Act,[8] and the policy statement is now clearly outdated. The very first sentence of §1B1.13 constrains the entire policy statement to motions filed solely by the BOP. And an Application Note also explicitly confines the policy statement to such motions. *See* U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . . the court may reduce a term of imprisonment . . . ."); *id.* at cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]."); *see also Brown* at 449 (describing the old policy statement as "outdated," adding that the Commission "has not made the policy statement for the old [statutory] regime applicable to the new one."); *United States v. Ebbers*, --- F. Supp. 3d ----, 2020 WL 91399, at *4 (S.D.N.Y. 2020) (describing the old policy statement as "at least partly anachronistic").

Accordingly, a majority of district courts have concluded that the "old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." *United States v. Beck*, --- F. Supp. 3d ----, No. 13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also Brown*, 411 F. Supp. 3d at 451 ("[T]he most natural reading of the amended § 3582(c) . . . is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it."); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role."); *United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("Application Note 1(D)'s

---

[8] As several courts have recognized, the Commission is unable to update the Sentencing Guidelines because, at the moment, it lacks a sufficient number of appointed commissioners to take this action. *See, e.g.*, *United States v. Maumau*, No. 08-cr-00785, 2020 WL 806121, at *1 n.3 (Feb. 18, 2020).

prefatory language, which requires a [catchall] determination by the BOP Director, is, in

substance, part and parcel of the eliminated requirement that relief must be sought by the BOP

Director in the first instance. . . . [R]estricting the Court to those reasons set forth in §1B1.13

cmt. n.1(A)-(C) would effectively preserve to a large extent the BOP's role as exclusive

gatekeeper, which the First Step Act substantially eliminated . . . ."); *United States v. Young*,

2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to

determine the existence of an extraordinary and compelling reason, like the requirement for a

motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the

amendments implemented by the First Step Act."); *Maumau*, 2020 WL at *2-*3 (D. Utah Feb.

18, 2020) (collecting cases).

A smaller number of courts have concluded that the Sentencing Commission's policy

statement prevents district courts from considering any "extraordinary and compelling reasons"

outside of those listed in subsections (A)-(C) of the policy statement. *See, e.g., United States v.

Lynn,* 2019 WL 3805349, at *2-*5 (S.D. Ala. Aug. 12, 2019); *United States v. Shields*, 2019 WL

2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2

(S.D. Ga. Dec. 10, 2019).  The government urges this Court to follow these minority decisions.

The conclusion reached by the majority of courts is more persuasive.  It is true that

§3852(c)(1)(A) requires courts to act consistently with *applicable* policy statements under the

Sentencing Guidelines, but the Sentencing Commission simply has not issued a policy statement

that addresses prisoner-filed motions post-First Step Act:

> There is no policy statement applicable to motions for compassionate release filed
> by defendants under the First Step Act.  By its terms, the old policy statement
> applies to motions filed by the [BOP] Director and makes no mention of motions
> filed by defendants. . . . The Sentencing Commission has not amended or updated
> the old policy statement since the First Step Act was enacted, nor has it adopted a
> new policy statement applicable to motions filed by defendants.

*Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *5 (citations omitted). The introductory sentence of §1B1.13, "*[u]pon motion of the Director of the [BOP . . . the court may reduce a term of imprisonment*," limits the policy statement's scope to a procedural scheme exclusively involving the BOP that does not exist anymore. And comment 4 of §1B1.13's Application Note expressly states that "[a] reduction *under this policy statement may be granted only upon motion by the Director of the [BOP]*." Accordingly, by its own terms, the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions. In other words, for prisoner-filed motions, there is a gap left open that no "applicable" policy statement has addressed. Therefore, the policy statement may provide "helpful guidance" but does not limit the Court's independent assessment of whether "extraordinary and compelling reasons" exist under § 3582(c)(1)(A)(i). *See Beck* at *6; *Fox*, 2019 WL 3046086, at *3 ("I agree with the courts that have said that the Commission's existing policy statement provides helpful guidance . . . [but] is not ultimately conclusive given the statutory change.").

Minority cases like *Lynn* attempt to refute this point by minimizing the impact of the First Step Act's changes. *See Lynn*, 2019 WL 38505349, at *4 n.5 ("While Section 1B1.13 and application note 4 reference motions brought by BOP, this merely restates the restriction on proper movants [that existed] prior to the [First Step] Act . . . ."). The First Step Act, however, significantly altered the landscape of compassionate-release motions and created a procedural gap that the Sentencing Commission's policy statement never had a chance to address.

When the Commission wrote its policy statement, a motion could reach the court only through the BOP. By providing the catchall provision, the Commission recognized that it may be impossible to definitively predict what reasons may qualify as "extraordinary and

compelling." Rather than attempt to make a definitive prediction, the Commission covered all of its bases by ensuring that *every motion* to reach the court would have an opportunity to be assessed under the flexible catchall provision. At the time the Commission wrote, the catchall provision's BOP-focused language[9] accomplished that task, because every motion to reach the court necessarily had to be filed and approved by the BOP.

Under the First Step Act, however, it is possible for inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for relief. Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where nobody in the BOP *ever* decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions.

It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. But under the minority view, that is exactly what would happen: prisoners in this situation would never have the chance for the BOP to assess their claim under the catchall provision and would never get the chance for this kind of flexible review in the district court, since under the minority view, the court would be constrained to the specific criteria in subsections (A)-(C) of the policy statement.[10] This would have the perverse effect of *penalizing* prisoners who take advantage of

---

[9] *See* U.S.S.G. §1B1.13 cmt. n.1(D) (providing for relief if, "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).").

[10] The minority bases this view on the BOP-focused language of the policy statement's catchall provision. *See* U.S.S.G. §1B1.13 cmt. n.1(D) (asking only the BOP Director to determine if other extraordinary and compelling circumstances exist).

the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate.

That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications."). Under the minority view, Congress would have created a two-tiered system that poses a Sophie's Choice to prisoners with unresponsive wardens: (1) opt for quicker relief at the cost of a disadvantageous standard with no catchall; or (2) endure delay—and, possibly, complete inaction—to retain a more flexible standard. Congress sought to help, not hinder, these sorts of prisoners, and clearly did not intend to create this outcome. Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.

Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term "extraordinary and compelling." Because the Sentencing Commission has not issued a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach. Accordingly, as a result of the First Step Act, there is simply a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill. Nothing in

§ 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these. Rather, the statute's text directly instructs *courts* to "find that" extraordinary circumstances exist.[11]

Therefore, this Court has discretion to assess whether Mr. Rodriguez presents "extraordinary and compelling reasons" for his release outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement.[12] Of course, this policy statement remains informative in guiding my determination. *See, e.g.*, *Fox*, 2019 WL 3046086, at *3 ("[T]he Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive . . . ."); *Beck*, 2019 WL 2716505, at *7 ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment . . . ."); *United States v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020) ("[T]he Court may independently evaluate whether [defendant] has

---

[11] Indeed, the compassionate-release provision was first introduced in 1984—with the same "consistent with applicable policy statements" requirement—but the Sentencing Commission did not issue a policy statement until 2006. *See Young*, 2020 WL 1047815, at *3-*4 (providing history of the compassionate-release statute and the Commission's policy statement). Surely courts were not required to refrain from assessing "extraordinary and compelling circumstances" in that interim period. Until the Commission updates its policy statement in light of the First Step Act, the same point applies here.

[12] Accepting the minority view—which appears to treat the BOP's internal guidance on the catchall provision as definitive—also ignores the point that courts "do not generally accord deference to one agency's interpretation of a regulation issued and administered by another agency." *Chao v. Community Tr. Co.*, 474 F.3d 75, 85 (3d Cir. 2007) (quoting *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 7 (D.C. Cir. 2003)). While it is true that Congress provides that courts must act consistently with the Sentencing Commission's policy statements, Congress never delegated any authority to the BOP to define the term "extraordinary and compelling," nor did it ever instruct courts to act consistently with the BOP's internal guidance. *Accord United States v. Ebbers*, --- F. Supp. 3d ----, 2020 WL 91399, at *4 n.6 (S.D.N.Y. 2020) ("[N]o statute directs the Court to consult the BOP's rules or guidelines, and no statute delegates authority to the BOP to define the requirements for compassionate release. . . . Moreover, the First Step Act reduced the BOP's control over compassionate release and vested greater discretion with the courts. Deferring to the BOP would seem to frustrate that purpose."); *cf. U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("[W]hile federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities—private or sovereign—absent affirmative evidence of authority to do so."); *Fund for Animals v. Kempthorne*, 538 F.3d 124, 132 (2d Cir. 2008) (same).

raised an extraordinary and compelling reason for compassionate release . . . [but §1B1.13's

policy statement] remain[s] as helpful guidance to courts . . . .").

### B. Extraordinary and compelling reasons exist here

Mr. Rodriguez's circumstances—particularly the outbreak of COVID-19 and his

underlying medical conditions that place him at a high risk should he contract the disease—

present "extraordinary and compelling reasons" to reduce his sentence. Black's Law Dictionary

defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common."

*Extraordinary*, Black's Law Dictionary (11th ed. 2019). It defines "compelling need" as a "need

so great that irreparable harm or injustice would result if it is not met." *Compelling Need*,

Black's Law Dictionary (11th ed. 2019).

Mr. Rodriguez has shown extraordinary and compelling reasons to reduce his sentence.

First, he suffers from underlying health conditions that render him especially vulnerable to

COVID-19. Second, prison is a particularly dangerous place for Mr. Rodriguez at this moment.

Third, he has served almost all of his sentence and has shown commendable rehabilitation while

in prison. None of these reasons *alone* is extraordinary and compelling. Taken together,

however, they constitute reasons for reducing his sentence "[b]eyond what is usual, customary,

regular, or common," and reasons "so great that irreparable harm or injustice would result if [the

relief] is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling

Need*, Black's Law Dictionary (11th ed. 2019).

### i.   Mr. Rodriguez's Health Conditions Make Him Especially Vulnerable to COVID-19

Mr. Rodriguez's health conditions put him at high risk of grave illness or death if he gets

infected with coronavirus. Dr. Cameron Baston, Assistant Professor of Clinical Medicine at the

University of Pennsylvania Perelman School of Medicine, reviewed Mr. Rodriguez's medical

records from 2018 to 2020 and found that Mr. Rodriguez is in the "higher risk category" for

developing more serious disease. Baston Decl. ¶¶ 14-17, Def. Reply Br. Ex. B, ECF No. 134-2.

Mr. Rodriguez has Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension,

obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver

disease." *Id.* ¶ 15. Dr. Baston explained that "Mr. Rodriguez is in the higher risk category as a

result of the immunosuppression from his preexisting condition, Type 2 Diabetes." *Id.* ¶ 16.

Further, "[w]ere he to contract the virus, he would be at a higher risk of morbidity and mortality

due to his liver abnormalities, obesity, and hypertension" and "would also be at a higher risk to

require more advanced support such as ventilation and oxygenation." *Id.* ¶¶ 17-18.

Preliminary research has borne out Dr. Baston's professional opinion. An early World

Health Organization report on COVID-19 found that "[i]ndividuals at highest risk for severe

disease and death include people . . . with underlying conditions such as hypertension [and]

diabetes."[13] While the preliminary overall fatality rate in the report was 3.8%, the fatality rate for

people with diabetes was 9.2%.[14] The fatality rate for people with hypertension was 8.4%.[15] The

---

[13] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[14] *Id.* The report noted that these figures represented the "crude fatality ratio." The Joint Mission acknowledged the challenges of reporting crude fatality ratio early in an epidemic. The overall fatality rate in the report is higher than current global estimates, but these numbers nonetheless show that fatality rates for people with diabetes and hypertension are elevated.

[15] *Id.* The relationship between hypertension and elevated risk from COVID-19 is not fully understood. Some experts say that high blood pressure alone is not a risk factor, but that it may be a risk factor when combined with another underlying health condition. *See* Rob Stein, *High Blood Pressure Not Seen As Major Independent Risk For COVID-19*, National Public Radio (Mar. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/20/818986656/high-blood-pressure-not-seen-as-major-independent-risk-for-covid-19. Other experts believe that COVID-19 strains the heart, making people with hypertension more vulnerable to the disease. *See* Anna Medaris Miller et al., *10 common health conditions that may increase risk of death from the coronavirus, including diabetes and heart disease*, Business Insider (Mar. 23, 2020), https://www.businessinsider.com/hypertension-diabetes-conditions-that-make-coronavirus-more-deadly-2020-3 (noting that 76% of people in Italy who died from

Centers for Disease Control and Prevention also explains that "[p]eople of any age" with "certain underlying medical conditions" are at high risk of severe illness from COVID-19.[16] It names diabetes as one such condition.

The government argues that Mr. Rodriguez's "conditions are not unusual" and notes that the BOP classifies him in its lowest medical care level, for "inmates who are generally healthy with limited needs for clinician evaluation and monitoring." Resp. in Opp'n to Mot. Reduce Sentence 8-9, ECF No. 129 ("Resp. Br."). In the absence of a deadly pandemic that is deadlier to those with Mr. Rodriguez's underlying conditions, these conditions would not constitute "extraordinary and compelling reasons." It is the confluence of COVID-19 and Mr. Rodriguez's health conditions that makes this circumstance extraordinary and compelling.

      ii.    Mr. Rodriguez Cannot Adequately Protect Himself Against Infection in Prison

Given Mr. Rodriguez's vulnerability to COVID-19, prison is a particularly dangerous place for him. COVID-19 is now inside FCI Elkton. Many of the recommended measures to prevent infection are impossible or unfeasible in prison. The government's assurances that the BOP's "extraordinary actions" can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease at the facility where Mr. Rodriguez is housed. *See* Resp. Br. 10. Indeed, Congress and the Department of Justice are increasingly recognizing the danger of COVID-19 outbreaks in prison and encouraging steps to release some inmates. *See infra* at 18.

---

COVID-19 had hypertension). Mr. Rodriguez has hypertension and diabetes, so hypertension is probably a risk factor for him in either case.

[16] *People who are at higher risk for severe illness*, Centers for Disease Control & Prevention (Mar. 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

Prisons are ill-equipped to prevent the spread of COVID-19. Public health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer.[17] Joseph J. Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection. The crowded conditions, in both sleeping areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate transmission.

Amon Decl. ¶ 20, Def. Reply Br. Ex. A, ECF No. 134-1. Some jails and prisons have already become COVID-19 hotspots. For instance, the infection rate in New York City jails is far outpacing the infection rate in the city as a whole.[18] FCI Oakdale, a BOP facility in Louisiana, recently "exploded with coronavirus" cases, leading to the death of an inmate and positive test

---

[17] *See, e.g.*, *How to Protect Yourself*, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; Dr. Asaf Bitton, *Social distancing in the coronavirus pandemic — maintaining public health by staying apart*, Boston Globe (Mar. 14, 2020), https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-pandemic-maintaining-public-health-by-staying-apart/.

[18] *See* Elizabeth Weill-Greenberg, *New York City Jails Have an Alarmingly High Infection Rate, According to an Analysis by the Legal Aid Society*, The Appeal (Mar. 26, 2020), https://theappeal.org/new-york-city-jails-coronavirus-covid-19-legal-aid-society/.

results for thirty other inmates and staff.[19]  As of March 31, 2020, the BOP has reported that two

inmates at FCI Elkton—Rodriguez's facility—have tested positive for COVID-19.[20]

       The BOP cannot adequately protect Mr. Rodriguez from infection, especially in light of

his vulnerability and the presence of COVID-19 in FCI Elkton.

       The BOP's containment measures have already proven insufficient to prevent the spread

of COVID-19. As of March 26, the BOP reported eighteen known cases of COVID-19 among

inmates and staff.[21] Just four days later, the BOP reported fifty-two cases, an inmate had died,

and COVID-19 had reached FCI Elkton.[22] The BOP's reported cases are rapidly growing and

almost certainly underestimate the true number of infections. For instance, as of March 29, the

BOP only listed eight COVID-19 cases at FCI Oakdale, while the Washington Post reported

thirty-one.[23] Testing is also scarce throughout the country.[24] Within the BOP, not all inmates

with symptoms are being tested or quarantined.[25] Further, the BOP's protocols for screening

inmates and staff depend on documented risk of exposure. Preliminary research indicates that

---

[19] Kimberly Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, Washington Post (Mar. 29 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html.

[20] *COVID-19 Tested Positive Cases*, Federal Bureau of Prisons (accessed Mar. 31, 2020), https://www.bop.gov/coronavirus/index.jsp.

[21] *Id.* (accessed Mar. 26, 2020).

[22] *Id.* (accessed Mar. 30, 2020); *Inmate Death at FCI Oakdale I*, Bureau of Prisons (Mar. 28, 2020), https://www.bop.gov/resources/news/pdfs/20200328_press_release_oak_death.pdf

[23] *Compare* Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, *supra* note 19, *with COVID-19 Tested Positive Cases*, Federal Bureau of Prisons (accessed Mar. 29, 2020), https://www.bop.gov/coronavirus/index.jsp.

[24] *See, e.g.*, Robert P. Baird, *Why Widespread Coronavirus Testing Isn't Coming Anytime Soon*, New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/why-widespread-coronavirus-testing-isnt-coming-anytime-soon.

[25] *See* Michael Balsamo & Michael R. Sisak, *Federal prisons struggle to combat growing COVID-19 fears*, AP (Mar. 27, 2020), https://apnews.com/724ee94ac5ba37b4df33c417f2bf78a2.

undocumented cases of coronavirus, including those of people who have not yet begun to show symptoms, are responsible for a significant portion of the virus's transmission.[26]

The situation at FCI Elkton in particular is alarming. The first cases of COVID-19 appeared there *after* the government assured the Court that the BOP was taking aggressive action to contain the disease. Elkton is filled to capacity and appears to have few tests.[27] Mr. Rodriguez represents that inmates at Elkton do not have adequate soap or disinfectant, are still housed together in large groups, and share a thermometer without sanitization, against critical public health recommendations. Reply Br. 1. These representations are consistent with reports of conditions in federal prisons, including at Elkton.[28] At Elkton, prisoners themselves are responsible for cleaning and sanitation.[29]

Recognizing the risk of COVID-19 outbreaks in prisons, Congress, the President, and the Department of Justice have begun encouraging steps to release some prisoners to safer home environments. The coronavirus relief bill enacted on March 27 allows the Attorney General to

---

[26] *See* Ruiyun Li et al., *Substantial undocumented infection facilitates the rapid dissemination of novel coronavirus (SARS-CoV2)*, Science (Mar. 16, 2020), https://doi.org/10.1126/science.abb3221 (86% of Chinese cases before January 23 were undocumented, and undocumented cases were the infection source for 79% of documented cases); Zhanwei Du et al., *Serial Interval of COVID-19 among Publicly Reported Confirmed Cases*, 26 Emerging Infectious Diseases (Mar. 19, 2020), https://doi.org/10.3201/eid2606.200357 (as of February 8, 12.6% of reported infections in China were caused by pre-symptomatic transmission).

[27] *See* Deanne Johnson, *Two positive tests reported at Elkton prison*, Morning Journal (Mar. 31, 2020), https://www.morningjournalnews.com/news/local-news/2020/03/two-positive-tests-reported-at-elkton-prison/; Stan Boney, *Union president wants change after 2 Elkton prison inmates test positive for COVID-19*, WKBN (Mar. 30, 2020), https://www.wkbn.com/news/coronavirus/2-positive-cases-of-covid-19-confirmed-at-columbiana-county-prison/.

[28] *See* Michael Balsamo & Michael R. Sisak, *Federal prisons struggle to combat growing COVID-19 fears*, *supra* note 25; Deanne Johnson, *Two positive tests reported at Elkton prison*, *supra* note 27; Kindy, *An explosion of coronavirus cases cripples a federal prison in Louisiana*, *supra* note 19; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, New York Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[29] *See Inmate Information Handbook*, *Federal Bureau of Prisons FCI Elkton, Ohio* at 9, Bureau of Prisons (2012), https://www.bop.gov/locations/institutions/elk/ELK_aohandbook.pdf.

expand the BOP's ability to move prisoners to home confinement. *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2) (2020). This congressional action came after Attorney General William Barr sent a memo to the Director of the BOP recognizing that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."[30] Attorney General Barr accordingly requested that the BOP use its statutory authority to release certain inmates to home confinement.[31] *Id.* While he also expressed confidence in the BOP's "ability to keep inmates in our prisons as safe as possible from the pandemic sweeping across the globe," the situation has changed swiftly since he wrote the memo and the BOP's reported COVID-19 cases have since tripled.

    iii.    <u>Mr. Rodriguez is Close to His Release Date and has Demonstrated Rehabilitation</u>

Mr. Rodriguez has served the vast majority of his sentence, seventeen years. He is a year and a half away from his release date, assuming continued good behavior. He is a year away from eligibility for home confinement. Keeping him in prison for one more year makes a marginal difference to his punishment. But the difference to his health could be profound. That is why being so close to his release date in a long sentence adds to the extraordinary and compelling reasons to reduce his punishment.

---

[30] Memo. from Attorney Gen. William Barr to Director of BOP, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[31] Mr. Rodriguez will not be statutorily eligible to be released to home confinement for about a year. Therefore, he is not among those who could be released under Attorney General Barr's memo. I note, however, that Mr. Rodriguez meets many of the discretionary factors outlined in the memo for good candidates for release. He is particularly vulnerable to COVID-19; he is housed in a low-security facility; he has shown overall good conduct and no violent conduct in prison; he has a reentry plan that will maximize public safety; and I find below that he does not pose a danger to others or the community. *See id.*

He has also shown rehabilitation in prison. While serving his sentence, Mr. Rodriguez took GED classes and earned his GED. *See* U.S. Probation Office Memo (Mar. 31, 2020). In 2019, he completed an apprenticeship in computer operations. He has also taken classes about fitness and nutrition, anger management, parenting, financial education, decision-making, and hobbies. Furthermore, Mr. Rodriguez has had only two infractions in seventeen years of incarceration, one for alcohol and one for having a cell phone. Neither were violent or raise concerns about recidivism.

The government objects that rehabilitation is not an appropriate basis for granting compassionate release. It cites Congress's directive to the Sentencing Commission that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Mr. Rodriguez's rehabilitation *alone* would not constitute an extraordinary and compelling reason. But the qualifier "alone" implies that rehabilitation can contribute to extraordinary and compelling reasons. That is how the Commission has understood the statute. *See* U.S.S.G. § 1B1.13 cmt. n.3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, *by itself*, an extraordinary and compelling reason for purposes of this policy statement.") (emphasis added); *Brown*, 411 F. Supp. 3d at 449 ("[T]he Commission implies that rehabilitation may be considered with other factors."). I consider rehabilitation in conjunction with the other reasons outlined here.[32]

---

[32] I do not find the purported changes in Department of Justice (DOJ) policy to be extraordinary and compelling reasons. Whether or not this could be an appropriate basis for compassionate release, Mr. Rodriguez has not demonstrated that he would be charged differently today. He presents no evidence that any official DOJ policy would have made a difference to his designation under the Armed Career Criminal Act, the law that made his prior state drug convictions the predicate for a fifteen-year mandatory minimum sentence. He also fails to show that under current DOJ policy he would not have been charged with violating 18 U.S.C. § 924(c).

Indeed, no single reason would provide a basis for reducing Mr. Rodriguez's sentence. Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.

### C. Mr. Rodriguez is not a danger to others or the community

The Commission's policy statement, which provides helpful guidance, provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

Mr. Rodriguez is not a danger to the safety of others or to the community under the factors listed in in 18 U.S.C. § 3142(g). Section 3142(g) sets out the factors courts must consider in deciding whether to release a defendant pending trial. These factors weigh both the defendant's possible danger to the community and the defendant's likelihood to appear at trial. Only the former is relevant here. The factors that weigh danger to the community include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Mr. Rodriguez's criminal history involves a series of convictions for drug dealing as well as the firearm offenses in this case. While this history is serious, I find that Mr. Rodriguez does not pose a danger to others. Nothing in his record suggests that he has been violent. The firearms charges related to a gun Mr. Rodriguez disclosed to police officers when they were executing a

search warrant on his home. While he pleaded guilty to possessing a firearm in furtherance of a drug offense, there was no evidence that he used the gun during the drug transactions or at any other time. *See Beck*, 2019 WL 2716505, at *10 (noting in similar circumstances that "there was no evidence or indication that [defendant] ever used or pointed a gun at anyone or that she threatened anyone with a firearm"). His history of drug dealing is seventeen years behind him, and nothing in his prison record raises concerns about violence or drug dealing.

I also find that Mr. Rodriguez is not a danger to the community during this pandemic because he has a home to return to—where he can self-quarantine—and an adequate reentry plan, as verified by the Probation Office.

### D. The sentence reduction is consistent with the Section 3553(a) factors

Finally, the Court must "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). The applicable sentencing factors warrant a sentence reduction for Mr. Rodriguez. Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here. The applicable factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> . . . [and]
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

18 U.S.C. § 3553(a). The statute also mandates: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." *Id.*

The first factor is "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* § 3553(a)(1). As described above, Mr. Rodriguez's extensive criminal history is mostly composed of low-level drug dealing. The predicate offenses to his mandatory minimum sentences were non-violent. He has shown rehabilitation and good conduct over the past seventeen years.

The second factor is the need for the sentence imposed to serve the enumerated purposes of punishment. *Id.* § 3553(a)(2). The court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes." *Id.* § 3553(a). Mr. Rodriguez has served seventeen years, most of the original sentence imposed. Seventeen years is a long time—long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of Mr. Rodriguez. Rather than being long enough to provide Mr. Rodriguez with needed medical care, it may interfere with his ability to get needed medical care. To prolong his incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

The final relevant factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). Because Mr. Rodriguez has served the vast majority of his mandatory minimum sentence and is a year and a half away from release, granting his motion sufficiently minimizes sentence disparities between him and similarly situated defendants.

## II.     CONCLUSION

Mr. Rodriguez has now served the lion's share of his sentence.  But his sentence did not include incurring a great and unforeseen risk of severe illness or death. For this reason, I will

grant Mr. Rodriguez's motion for a sentence reduction. I will sentence him to time served, six years of supervised release, and a supervised release condition that he must remain in home quarantine for at least 14 days and until further order of the Court.

   S/ANITA B. BRODY, J.
ANITA B. BRODY, J.

Copies **VIA ECF** on  04/01/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

         -against-

WILSON PEREZ,

                 Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  _4/1/2020_____

17 Cr. 513-3 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Wilson Perez, a prisoner serving his sentence at the Metropolitan Detention Center (the "MDC"), moves for a reduction of his term of imprisonment under the federal compassionate release statute, codified at 18 U.S.C. § 3582(c)(1)(A). Def. Letter, ECF No. 92. For the reasons stated below, Perez's motion is GRANTED.

## BACKGROUND

    On October 21, 2019, Perez pleaded guilty to kidnapping and conspiracy in violation of 18 U.S.C. § 1201. ECF No. 85. On January 2, 2020, the Court sentenced him to three years of imprisonment and two years of supervised release. ECF No. 89. "Perez has a well-documented history of medical complications which stem from injuries suffered during his incarceration." Gov't Letter at 3, ECF No. 95. While housed at the Metropolitan Correctional Center, he was the victim of two vicious beatings, resulting in a broken jaw and shattered bones around his eye socket; both attacks sent him to the hospital and necessitated reconstructive surgeries of his face, with the second surgery requiring metal implants. *See* Sentencing Tr. 9:8–18, ECF No. 74. Although Perez's physicians directed that he receive follow-up care, such care was repeatedly delayed or difficult to obtain. *See id.* 10:22–12:17. He continues to suffer from pain and persistent vision problems. Because Perez has been detained since his arrest on September 27, 2017, ECF No. 17, his prison sentence is set to terminate on April 17, 2020, Def. Letter at 1.

Perez requests release in advance of that date because he is at risk of contracting, and experiencing serious complications from, COVID-19 if he remains at the MDC.  *Id.* at 1–2.  He spends most of each day with a cellmate in a small cell "that is barely large enough for a single occupant," where he is "breathing recirculated air" and "unable to practice proper hygiene."  *Id.* at 1. Additionally, Perez "is in pain and not receiving pain medication."  *Id.*  The Federal Bureau of Prisons (the "BOP") acknowledges that COVID-19 is present within the MDC.  *See* COVID-19 Tested Positive Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/.  The Government does not object to Perez's release on the merits, conceding that Perez has a "heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues," and that "he has less than a month remaining on his sentence."  Gov't Letter at 3.  But the Government questions the Court's authority to act on Perez's application, arguing that he has not exhausted the administrative remedies under § 3582(c)(1)(A), which requires that a defendant seeking compassionate release present his application to the BOP and then either (1) administratively appeal an adverse result if the BOP does not agree that his sentence should be modified, or (2) wait for 30 days to pass.  Gov't Letter at 3–4.

On March 26, 2020, Perez submitted to the BOP his application for a sentence modification. ECF No. 96 at 4.  To date, the BOP has not acted on that request.  The Court holds, however, that Perez's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic.  And the Court agrees with the parties that this threat also constitutes an extraordinary and compelling reason to reduce Perez's sentence to time served.  Accordingly, Perez's motion is GRANTED.

**DISCUSSION**

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify

terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except
> that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or
> upon motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on
> the defendant's behalf or the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of probation or supervised release with or
> without conditions that does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section 3553(a) to the extent
> that they are applicable, if it finds that--
>
> (i)     extraordinary and compelling reasons warrant such a reduction . . . and that
>         such a reduction is consistent with applicable policy statements issued by the
>         Sentencing Commission.

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), Perez must

both meet the exhaustion requirement and demonstrate that "extraordinary and compelling

reasons" warrant a reduction of his sentence.  The Court addresses these requirements in turn.

    I.    Exhaustion

Section 3582(c)(1)(A) imposes "a statutory exhaustion requirement" that "must be strictly

enforced." *United States v. Monzon*, No. 99 Cr. 157, 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4,

2020) (citing *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004) (internal quotation marks

and alterations omitted)).[1]  The Court may waive that requirement only if one of the recognized

exceptions to exhaustion applies.

    "Even where exhaustion is seemingly mandated by statute . . . , the requirement is not

absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503

---

[1] The Court need not decide whether § 3582(c)'s exhaustion requirement is a jurisdictional requirement or merely a
mandatory claim-processing rule. *See Monzon*, 2020 WL 550220, at *2 (describing split between courts on that
question).

U.S. 140, 146–47 (1992)).[2]  There are three circumstances where failure to exhaust may be excused. "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." *Id.*  Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id.* at 119.  Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id.*

All three of these exceptions apply here.  "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.  Moreover, the relief the agency might provide could, because of undue delay, become inadequate.  Finally, and obviously, [Perez] could be unduly prejudiced by such delay." *Washington*, 925 F.3d at 120–21; *see also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").  Here, even a few weeks' delay carries the risk of catastrophic health consequences for Perez.  The Court concludes that requiring him to exhaust administrative

---

[2] The Supreme Court has stressed that for "a statutory exhaustion provision . . . Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016).  Even when faced with statutory exhaustion requirements, however, the Supreme Court has allowed claims to proceed notwithstanding a party's failure to complete the administrative review process established by the agency "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate," so long as the party presented the claim to the agency.  *Mathews v. Eldridge*, 424 U.S. 319, 330 (1976). That reasoning explains the Second Circuit's holding that even statutory exhaustion requirements are "not absolute." *Washington*, 925 F.3d at 118.  Perez has presented his claim to the BOP, *see* ECF No. 96 at 1, so the situation here is analogous.

remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.

To be sure, "the policies favoring exhaustion are most strongly implicated" by challenges to the application of existing regulations to particular individuals. *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996) (internal quotation marks, citation, and alterations omitted). Ordinarily, requests for a sentence reduction under § 3582(c) would fall squarely into that category. But "courts should be flexible in determining whether exhaustion should be excused," *id.* at 151, and "[t]he ultimate decision of whether to waive exhaustion . . . should also be guided by the policies underlying the exhaustion requirement." *Bowen*, 476 U.S. at 484. The provision allowing defendants to bring motions under § 3582(c) was added by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), in order to "increas[e] the use and transparency of compassionate release." 132 Stat. 5239. Requiring exhaustion generally furthers that purpose, because the BOP is best situated to understand an inmate's health and circumstances relative to the rest of the prison population and identify "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A)(i). In Perez's case, however, administrative exhaustion would defeat, not further, the policies underlying § 3582(c).

Here, delaying release amounts to denying relief altogether. Perez has less than three weeks remaining on his sentence, and pursuing the administrative process would be a futile endeavor; he is unlikely to receive a final decision from the BOP, and certainly will not see 30 days lapse before his release date. Perez asks that his sentence be modified so that he can be released now, and not on April 17, 2020, because remaining incarcerated for even a few weeks increases the risk that he will contract COVID-19. He has had two surgeries while incarcerated, and continues to suffer severe side effects such as ongoing pain and persistent vision problems. ECF No. 96 at 4. As the Government

5

concedes, Perez faces a "heightened risk of serious illness or death from COVID-19 due to his pre-existing medical issues." Gov't Letter at 3. Requiring exhaustion, therefore, would be directly contrary to the purpose of identifying and releasing individuals whose circumstances are "extraordinary and compelling."

Accordingly, the Court holds that Perez's undisputed fragile health, combined with the high risk of contracting COVID-19 in the MDC, justifies waiver of the exhaustion requirement.[3]

    II.   <u>Extraordinary and Compelling Reasons for Release</u>

The Court also finds that Perez has set forth "extraordinary and compelling reasons" to reduce his sentence to time served. 18 U.S.C. § 3582(c)(1)(A)(i). The Government does not dispute that Perez has done so. Gov't Letter at 3. And Perez's medical condition, combined with the limited time remaining on his prison sentence and the high risk in the MDC posed by COVID-19, clears the high bar set by § 3582(c)(1)(A)(i).

The authority to define "extraordinary and compelling reasons" has been granted to the United States Sentencing Commission, which has defined that term at U.S.S.G. § 1B1.13, comment n.1. *See United States v. Ebbers*, No. 02 Cr. 11443, 2020 WL 91399, at *4–5 (S.D.N.Y. Jan. 8, 2020). Two components of the definition are relevant. First, extraordinary and compelling reasons for modification exist where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13

---

[3] A number of courts have denied applications for sentence modification under § 3582(c)(1)(A) brought on the basis of the risk posed by COVID-19 on the ground that the defendants failed to exhaust administrative remedies. *See, e.g., United States v. Zywotko*, No. 2:19 Cr. 113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Garza*, No. 18 Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Eberhart*, No. 13 Cr. 00313, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Hernandez*, No. 19 Cr. 834, 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Gileno*, No. 19 Cr. 161, 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020). But in several of those cases, the defendant was not in a facility where COVID-19 was spreading, and in none of them did the defendant present compelling evidence that his medical condition put him at particular risk of experiencing deadly complications from COVID-19. In this case, unlike those, Perez has established that enforcing the exhaustion requirement carries the real risk of inflicting severe and irreparable harm to his health.

comment n.1(A)(ii).  Perez's recent surgeries, and his persistent pain and vision complications, satisfy that requirement.  Confined to a small cell where social distancing is impossible, Perez cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus.  And although he may recover in the future from the surgeries and their complications, there is no defined timeline for that recovery; certainly, he is not expected to recover within the remainder of his sentence.

The Honorable Lorna G. Schofield recently granted an application for sentence reduction under § 3582(c) under similar circumstances.  *See United States v. Campagna*, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020).  Judge Schofield approved the request of a defendant confined to the Brooklyn Residential Reentry Center (the "RCC") stating that his "compromised immune system, taken in concert with the COVID-19 public health crisis, constitutes an extraordinary and compelling reason to modify [d]efendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the RCC."  *Id.* at *3 (citing U.S.S.G. § 1B1.13 comment. n.1(A)). The same justifications apply here.

Second, U.S.S.G. § 1B1.13 comment. n.1(D) authorizes release based on "an extraordinary and compelling reason other than, or in combination with, the [other] reasons described."  Perez meets this requirement as well, because he has weeks left on his sentence, is in weakened health, and faces the threat of a potentially fatal virus.  The benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave.

Accordingly, the Court finds that Perez has demonstrated extraordinary and compelling reasons justifying his release.

7

**CONCLUSION**

For the reasons stated above, Perez's motion for a reduction of his term of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) is GRANTED.  Perez's term of imprisonment is reduced to time served.  It is ORDERED that Perez be released immediately to begin his two-year term of supervised release.

The Clerk of Court is directed to terminate the motion at ECF No. 92.

SO ORDERED.

Dated: April 1, 2020
      New York, New York

_____
ANALISA TORRES
United States District Judge

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 2:18-CR-0232-TOR-15 |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE |
| TERESA ANN GONZALEZ, | |
| Defendant. | |

BEFORE THE COURT are Defendant's Motion for Reduction of Sentence and Motion to Expedite the same. ECF Nos. 829, 830. These matters were submitted for consideration without oral argument. The Court has reviewed the record and files herein, the completed briefing, and is fully informed. For the reasons discussed below, Defendant's Motion for Sentence Reduction is granted.

## BACKGROUND

On December 18, 2018, an indictment was filed charging Defendant with nine counts of mail fraud and conspiracy to commit mail and wire fraud, in

ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE ~ 1

violation of 18 U.S.C. §§ 1341, 1343, 1346.  ECF No. 1.  On June 13, 2019,

Defendant pleaded guilty to Count 73, conspiracy to commit mail and wire fraud.

ECF Nos. 443, 444.  On January 21, 2020, this Court sentenced Defendant to ten

months imprisonment, followed by a three-year term of supervised release.  ECF

No. 777.  On February 19, 2020, Defendant began serving her term of

imprisonment by reporting to the Spokane County Jail, pending Bureau of Prisons'

designation and transfer.  ECF No. 829 at 1.  Defendant's projected release date is

December 18, 2020.

On March 23, 2020, Defendant's counsel contacted the Bureau of Prisons to

determine which office could process her compassionate release request based on

her medical condition.  The Bureau of Prisons communicated that because

Defendant was not yet in a designated facility, there was no one able to process her

request.  The Bureau of Prisons' employee indicated that the exhaustion of

administrative appeals process was no applicable or possible and suggested

contacting the sentencing Court for relief.

Defendant argues that she should be granted compassionate release based on

her chronic medical conditions, the nature of the medical care she has received at

the Spokane County Jail, and the risk of exposure and death from the COVID-19

pandemic.

//

1    The government opposes Defendant's motion for compassionate release

2 reduction because she has not exhausted administrative remedies and she does not

3 present circumstances justifying such extraordinary relief.  ECF No. 831.

4    **DISCUSSION**

5    **A.  Eligibility for Compassionate Release**

6    Federal courts have the statutory authority to modify an imposed term of

7 imprisonment for two reasons: compassionate release under 18 U.S.C. § 3582(c)(1)

8 or based on a change in the sentencing guidelines under 18 U.S.C. § 3582(c)(2).

9 Until recently, motions for compassionate release could only be brought to the

10 Court by the Director of the Bureau of Prisons.  18 U.S.C. § 3582(c)(1)(A) (2002).

11 However, after the December 2018 passage of the First Step Act, defendants may

12 now bring their own motions for compassionate release after exhausting

13 administrative remedies within the Bureau of Prisons.  18 U.S.C. § 3582(c)(1)(A)

14 (2018).

15    The Court finds that Defendant has effectively exhausted her administrative

16 remedies by petitioning the BOP, giving them notice, and being told she does not

17 have any other administrative path or remedies she can pursue.  Any further

18 attempt to exhaust administrative remedies at this time would be futile.

19 Accordingly, the Defendant's motion for reduction of sentence is properly before

20 the Court.

1    A defendant may be eligible for compassionate release: (1) if the Court finds

2 "extraordinary or compelling reasons" to warrant a sentence reduction; or (2) if the

3 defendant is at least 70 years old, has served at least 30 years in prison pursuant to

4 a sentence imposed for the offense for which the defendant is currently imprisoned,

5 and the defendant is determined not to pose a risk of danger to the community. 18

6 U.S.C. § 3582(c)(1)(A). Under either eligibility prong, the Court must also find

7 that a sentence reduction is "consistent with applicable policy statements issued by

8 the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The

9 Sentencing Guidelines instruct that the Court should consider the sentencing

10 factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate

11 release, and that the Court should not grant a sentence reduction if the defendant

12 poses a risk of danger to the community, as defined in the Bail Reform Act.

13 U.S.S.G. § 1B1.13.

14  **B. Extraordinary and Compelling Reasons**

15    Defendant moves for compassionate release on the grounds that

16 "extraordinary and compelling reasons" justify a sentence reduction. ECF No. 829

17 at 13-21. The First Step Act did not define what "extraordinary and compelling

18 reasons" warrant a sentence reduction, but the compassionate release statute directs

19 the Court to consider the Sentencing Commission's policy statements when

20 deciding compassionate release motions. 18 U.S.C. § 3582(c)(1)(A).

1     The Sentencing Commission's policy statement on sentence reduction

2  mirrors the language of the compassionate release statute, but it has not yet been

3  updated to reflect the procedural changes implemented by the First Step Act.

4  U.S.S.G. § 1B1.13.  "While that particular policy statement has not yet been

5  updated to reflect that defendants (and not just the [Bureau of Prisons ("BOP")])

6  may move for compassionate release, courts have universally turned to U.S.S.G. §

7  1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that

8  may warrant a sentence reduction."  *United States v. McGraw*, No. 2:02-cr-00018-

9  LJM-CMM, 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019) (gathering cases).

10  The sentence reduction policy statement outlines four categories of circumstances

11  that may constitute "extraordinary and compelling reasons" for a sentence

12  reduction: (1) the defendant suffers from a medical condition that is terminal or

13  substantially diminishes the defendant's ability to provide self-care in a

14  correctional environment; (2) the defendant is at least 65 years old, is experiencing

15  a serious deterioration in health due to the aging process, and has served at least 10

16  years or 75% of his or her term of imprisonment; (3) family circumstances

17  involving the death or incapacitation of the caregiver of the defendant's minor

18  child or the incapacitation of the defendant's spouse or registered partner; or (4)

19  other reasons, other than or in combination with the other listed circumstances, that

20  are extraordinary and compelling.  U.S.S.G. § 1B1.13, Application Note 1.

ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE ~ 5

1    Here, Defendant moves for compassionate release on the grounds that her

2    multiple chronic illnesses and difficulty treating them while in custody constitute

3    "extraordinary and compelling reasons" for a sentence reduction.  ECF No. 829.

4    Because Defendant does not allege that her present conditions are terminal or

5    diminish her ability to provide self-care while in custody, her motion for

6    compassionate release is best addressed under the "other reasons" category.

7    Defendant, age 64, has chronic obstructive pulmonary disease (COPD),

8    including significant emphysema.  ECF Nos. 762 (sealed medical records), 700 at

9    19 (sealed Presentence Investigation Report).  Defendant alleges that her medical

10   conditions have worsened while incarcerated without her prescribed inhaler and

11   that she struggles to breathe daily.  ECF No. 829 at 18.  Because she is housed in a

12   local jail facility where most inmates are recently arrested and in pretrial

13   confinement, there is constant and significant turnover of new people coming in

14   and out of the facility from off the streets.  *Id*. at 19.  Because it is impossible to

15   practice social distancing or isolation in a jail setting, the pandemic will be

16   devastating when it reaches jail populations.

17   Defendant is the most susceptible to the devastating effects of COVID-19.

18   She is in the most susceptible age category (over 60 years of age) and her COPD

19   and emphysema make her particularly vulnerable.

20   *//*

ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE ~ 6

**C. Sentencing Commission Policy Statements**

The Sentencing Guidelines instruct that the Court should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release, and that the Court should not grant a sentence reduction if the defendant poses a risk of danger to the community, as defined in the Bail Reform Act.  U.S.S.G. § 1B1.13.

Defendant does not present a risk of danger to the community as articulated in 18 U.S.C. § 3142(g).  On January 14, 2019, Defendant was released pending trial without incurring any violations through sentencing.  The underlying criminal conduct was not a crime of violence, but rather white-collar fraud.  The Court has reviewed all the factors to be considered in imposing a sentence, 18 U.S.C. § 3553(a), and does not find any one factor or combination of factors to preclude the remedy here.

That other Defendants received home detention does not impact the Court's decision here.  Each Defendant presents with an individualized level of culpability, life circumstances and personal background that warrants individualized sentences.

The Court was aware of Defendant's underlying medical condition and took that into consideration at the time of sentencing.  In normal times, Defendant's condition would be manageable.  These are not normal times, however.

1    The Court will exercise its discretion to reduce Defendant's sentence

2   because extraordinary and compelling reasons warrant such a reduction.

3   **ACCORDINGLY, IT IS HEREBY ORDERED:**

4      1. Defendant's Motion to Expedite, ECF No. 830, is **GRANTED**.

5      2. Defendant's Motion for Reduction of Sentence, ECF No. 829, is

6          **GRANTED.**

7      3. Simultaneously herewith, the Court will enter an AMENDED Judgment

8          imposing a sentence of "time served" and converting the remaining term

9          of incarceration into eight (8) months of home detention as an additional

10         condition of supervised release.

11     4. The United States Marshal Service and/or the United States Bureau of

12         Prisons shall promptly release Defendant from custody.

13     The District Court Executive is directed to enter this Order and furnish

14   copies to counsel, the United States Marshal Service, and the Probation Office.

15     **DATED** March 31, 2020.

16   

17                            THOMAS O. RICE
                        Chief United States District Judge

18

19

20

ORDER GRANTING DEFENDANT'S MOTION TO REDUCE SENTENCE ~ 8