## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **NO. 1:17-CR-00034** |
| | * | |
| **REALITY LEIGH WINNER** | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT'S REPLY IN SUPPORT OF
### MOTION FOR COMPASSIONATE RELEASE

Defendant Reality Leigh Winner ("**Defendant**" or "**Reality**"), by her undersigned attorneys and pursuant to 18 U.S.C. 3582(c), hereby files this Reply Memorandum in Support of her Motion for Compassionate Release.

### INTRODUCTION

The Republic is fragile. Ronald Reagan said that "Freedom … is never more than one generation away from extinction," in his inaugural address as Governor of the State of California in 1967. And it is. In a country where individuals enjoy more freedoms and opportunities, and society places a high value on human rights, we incarcerate more people per capita than any of our developed peers.  The First Step Act ("**FSA**"), enacted in 2018, sought to remediate this issue, in part, by providing prisoners an avenue to freedom from incarceration in times of "extraordinary and compelling" need with an option to petition the Court for compassionate release. Now, this Court must decide whether it will go against the tide of its brethren District Courts and limit freedom or, will it join the majority of the District Courts in this country and find that it may grant Reality, an at-risk inmate, in an at-risk institution, compassionate release in the face of a global pandemic?  Surely, logic, jurisprudence, compassion, and fairness compel release.

**ARGUMENT**

**I.    The BOP's Response to the COVID-19 Pandemic is Insufficient.**

The reporting of the Bureau of Prisons ("**BOP**"), which BOP's Office of Public Affairs admits is understated,[1] confirms that total numbers of confirmed infections within the federal prison system have *more than doubled* since Reality's Motion was filed *less than two weeks ago*.

> *As of 04/21/2020, there are **540 federal inmates** and **323 BOP staff** who have confirmed positive test results for COVID-19 nationwide … There have been **23** federal inmate deaths and **0** BOP staff member deaths attributed to COVID-19 disease.*[2]

Moreover, "Testing of prisoners has been limited, so the true infection rate is thought to be much higher."[3]  Indeed, the BOP has admitted in recent filings that it does not have enough tests.[4]

With each passing day, COVID-19 continues to spread like wildfire throughout the BOP system.  Facilities are taking drastic measures that illustrate the exigency of these circumstances. "Most recently, the entire population of FCI Otisville camp (111) inmates was sent to quarantine in preparation for release to home confinement."[5]  At FCI Oakdale, it has gotten so bad that

---

[1] Walter Pavlo, *AG William Barr's Memo to Bureau of Prisons:  'Time Is Of The Essence'* (April 4, 2020),  https://www.forbes.com/sites/walterpavlo/2020/04/04/ag-william-barrs-new-memo-to-bureau-of-prisons-time-is-of-the-essence/#634a22376805 (last accessed April 21, 2020) (*quoting* Sue Allison, spokeswoman for BOP) ("The goal of our reporting is to provide the public with insight as to the current status of our COVID-19 response at various facilities. As can be seen from various state websites, for example Maryland, reporting of cases while tied to positive cases, does not necessarily account for unconfirmed cases.").

[2] *See* Federal Bureau of Prisons, COVID-19 Cases, *https://www.bop.gov/coronavirus/* (last accessed on April 21, 2020) (emphasis added).

[3] Josh Gerstein, *Virus-wracked federal prisons again expand release criteria* (April 11, 2020) https://www.politico.com/news/2020/04/11/federal-prison-release-criteria-coronavirus-179835 (last accessed April 21, 2020).

[4]  Newsletter to Federal Prisoners, Internal Memo Toughens Cares Act Home Confinement Standards (April 20, 2020) https://www.lisa-legalinfo.com/newsletter-to-federal-prisoners/ (last accessed on April 21, 2020).

[5] *Id.*

"correctional officers were told to stop testing people and just assume anyone with symptoms had been infected."[6]

Yet, in pleadings across the country, like the one filed presently, *see* ECF No. 345, federal prosecutors continue to assure courts that the situation in BOP facilities is under control. These representations claim that BOP's facilities have comprehensive precautionary measures in place to prevent the transmission of COVID-19, and in any case, the facilities are well-equipped to deliver care. But, these empty claims are demonstrably inaccurate.[7] Moreover, despite the best intentions of the Department of Justice ("**DOJ**") and Attorney General William Barr's admonitions that "time is of the essence,"[8] the BOP is dragging its feet. The agency lacks the resources necessary to fix the problem. As a result, Reality – a vulnerable, non-violent, first time offender with underlying conditions, who has less than 20 months left to serve on a sentence of more than five years – is exposed.

---

[6] *Id.*

[7] *See* Letter from David Patton et al., Co-Chairs of the Federal Public & Community Defenders Legislative Committee, to Hon. William P. Barr, Atty. Gen. 3 (Apr. 1, 2020), https://www.fd.org/sites/default/files/covid19/defender_letter_ag_barr_re_covid-19_4-1-20_0.pdf (last accessed April 21, 2020), a true and correct copy of which is attached hereto as **Exhibit A**. This Court may consider Exhibit A (and the other exhibits attached hereto) on reply because good cause exists. "While the Court has a liberal briefing rule, *see Podger v. Gulfstream Aerospace Corp.,* 212 F.R.D. 609, 609 (S.D. Ga. 2003) ("parties may file as many reply briefs as they want"), it has not yet clarified whether new arguments may be raised within such briefs without good cause." *Pattee v. Georgia Ports Auth.*, 477 F. Supp. 2d 1253, 1272 n.8 (S.D. Ga. 2006) (allowing additional argument and support to be raised in reply brief). Good cause exists here because Defendant must respond to the Government's claims about the BOP's preparedness for this epidemic and because Defendant did not anticipate that the Government would take the position that she did not submit an administrative request when she unequivocally did. Defendant is permitted to attach documents to her reply brief that rebut the arguments the Government raises, for the first time, in its opposition. *Id.*

[8] Memo from Attorney Gen. William Barr to Director of BOP (April 3, 2020), *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (April 3, 2020), https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

The BOP is reporting that it has now placed an additional 1,280 inmates on home confinement. But, the BOP has some 177,000 inmates under its care, and the majority of those who have been moved into home confinement come from a handful of states including New York, New Jersey, Ohio, Colorado, and California.[9]  Indeed, the BOP's own webpage confirms that the BOP's focus is "starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton and similarly-situated facilities to determine which inmates are suitable for home confinement."[10]

This sounds promising and appears to align with Attorney General Barr's direction for prisoners in *certain* facilities (like FCI Otisville in New York, FCI Oakdale, FCI Danbury, and FCI Elkton); however AG Barr's guidance to prioritize problem facilities was *not* to the exclusion of others. And even in places like FCI Oakdale, where there have been at least five (5) inmate deaths, the BOP response is so inadequate and slow that the ACLU has sued the facility "for not releasing inmates fast enough."[11]  So, if inmates in priority facilities cannot get their cases reviewed fast enough, what does it mean for people like Reality?  The BOP has forgotten her.

  a.  **BOP is Not Equipped to Handle a Pandemic**

First, BOP is claiming, and the is Government representing, that they never received Reality's request.[12]  But, attached hereto as **Exhibit B** is a true and correct copy of the Declaration

---

[9] Elie Honig, *Releasing prisoners during Covid-19 crisis makes good sense* (April 20, 2020), https://www.cnn.com/2020/04/20/opinions/covid-19-prosecutors-prison-release-honig/index.html (last accessed April 21, 2020).

[10] *See* Federal Bureau of Prisons, Update on COVID-19 and Home Confinement (April 5, 2020), https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last accessed April 21, 2020).

[11] *See* Luke Barr, Bureau of Prisons coronavirus response under fire:  'Reactive,' not 'proactive,' inmates, staff say, https://abcnews.go.com/Health/bureau-prisons-coronavirus-response-fire-reactive-proactive-inmates/story?id=70063263; *see also* West Centrals Best, *ACLU Suing FCI Oakdale 1 For Not Releasing Inmates Fast Enough* (April 6, 2020), https://abcnews.go.com/Health/bureau-prisons-coronavirus-response-fire-reactive-proactive-inmates/story?id=70063263 (last accessed April 21, 2020).

[12] *See* ECF No. 345 at p. 11, n.4.

of Alison Johnston Grinter, Esq., which establishes the great lengths Reality and her local, Texas-based counsel took to be sure that BOP received her request for release and to serve the remainder of her sentence in home confinement due to the COVID-19 pandemic. The fact that the BOP claims they have not received it is troubling. But it also epitomizes the BOP's unpreparedness and lack of resources necessary to adequately respond to the unique challenges presented by the COVID-19 pandemic. This unpreparedness and resource issue create additional risk for the facilities and prisoners that have been subrogated to higher priority facilities and prisoners – because it is well documented that all of these facilities are at tremendous risk.[13]

Second, whenever BOP *does* decide to acknowledge Reality's request, the BOP may determine that Reality is not "eligible for home confinement" under the existing statutory tools available to BOP and/or the standards Attorney General Barr's memos establish (including BOP's interpretation of and response thereto).[14]  Various comprehensive memoranda have been written to explain the vast limitations on the BOP under the existing framework, including concerns that the requirement for a "minimum" score under the PATTERN assessment and the existence of various categorical, offense-based exclusions may prevent a large number of prisoners from consideration, among other criteria set forth in the Barr memos.[15]

Relief from the Court may be the only remedy left at the disposal of prisoners who the BOP determines are not eligible for priority treatment under Attorney General Barr's revised rubric.

---

[13] *See e.g.*, **Exhibits A**, **C**, and **D**, generally.

[14] *See e.g.,* Memo. from Attorney Gen. William Barr to Director of BOP, *Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[15] See e.g., Brennan Center for Justice at NYU School of Law Center for American Progress, *Expanding BOP's Response to the Novel Coronavirus, and Helping States Safely Reduce their Prison Populations* (April 16, 2020), https://www.brennancenter.org/sites/default/files/2020-04/BC%20Letter%20to%20DOJ%20final_0.pdf (last accessed April 21, 2020), attached hereto as **Exhibit C**; *see also* Legal Information Services Associates, LLC, Newsletter to Federal Prisoners, dated April 20, 2020, attached hereto as **Exhibit D**.

Notably, experts believe this criteria disqualifies the majority of inmates in the federal prison system from consideration.[16]  So, if the BOP determines Reality is ineligible for release into home confinement <u>or</u> if her request is not reviewed by the BOP (i.e., the status quo), her only remedy is via the "catchall provision" of the "compassionate release" statute (i.e., the same statute under which her Motion has been filed), which was recently modified "to expand[ ] compassionate release … and expedite [ ] compassionate release applications." [17]  The legal significance of the recent amendments is discussed in greater detail, *infra,* and in Reality's original Motion.

Third, **257 additional inmates** have been infected, **198 additional staff** have been infected, and **15 additional inmates have died** since Reality filed her Motion on April 10, 2020.[18] Reality does not have additional time to wait for the BOP to try to locate her paperwork – which was submitted weeks ago.  There are now thirty-five (35) reported cases in nearby Fort Worth FMC as the virus spreads like wildfire through Texas,[19] including its first inmate death announced April 22, 2020.[20]  And although the BOP continues to report just two (2) cases in FMC Carswell,

---

[16] *Id.* ("[P]eople with a 'minimum' score under PATTERN likely comprise a relatively small percentage of the prison population.") (*citing* Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System, U.S. Department of Justice*, 2019, 58-62, https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf) (In the general PATTERN model, 20 percent of people in a sample set used by the DOJ to evaluate the tool received a "minimum score").

[17] 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of the First Step Act).

[18] These and any other aggregate figures presented herein are based on the numbers publicized on BOP's website, available at, *https://www.bop.gov/coronavirus/,* as of April 21, 2020.

[19] *See* Federal Bureau of Prisons, COVID-19 Cases, *https://www.bop.gov/coronavirus/* (last accessed on April 21, 2020).

[20] *See* USDOJ BOP Press Release, *Inmate death at FMC Fort Worth* (April 22, 2020), available at https://www.bop.gov/resources/news/pdfs/20200422_press_release_ftw.pdf (last visited April 22, 2020).

these numbers and the circumstances at the facility continue to be questioned (appropriately) by public reporting outlets and inmates.[21]  They may even share staff and resources.

### b.  The Conditions at FMC Carswell Are Particularly Dangerous.

Mendy Read-Forbes, Inmate No. 22253-031, describes an epidemiological nightmare at FMC Carswell: "We have run out of toilet paper, we have run out of pads…We've had no soap for our bathrooms.  It is crazy.  We get out one time a day for 10 minutes.  We walk to the chow hall, we get hot lunch and we come back with bologna every night."[22]  The article expounds:

> *…tensions are high after more than a week without recreation or activities.  There are about 250 women in her housing unit but only about 120 chairs…They sleep four to a cell and less than three feet apart.  Everyone's expected to wear the same disposable mask every day.  The phones are in pretty heavy use but Forbes hasn't seen anyone sanitize them…[23]*

"Basically I just wiped it off on my shirt hoping not to get it.  We are not implementing anything that should be implemented," Forbes said.[24]

> *…Even scarier, the unit across the hall was put under quarantine because of a suspected coronavirus case…But officers still move between that quarantined unit and hers…[25]*

"So whatever they've got…we're going have…," Forbes said.[26]  "The conditions are bad for us, we're all really scared, and they aren't telling us anything."[27]

> *…And earlier this month, KXAS-TV reported that a pregnant inmate in her 30s was rushed from the prison to a hospital for an emergency C-section.  She's now in critical care on a ventilator, but the baby, born premature, was doing well, according to the report…[28]*

---

[21] *See e.g.*, Christopher Connelly, *'We're All Really Scared':  Life in Federal Lockup Remains Uncertain During COVID-19 Outbreak* (April 13, 2020), https://www.keranews.org/post/were-all-really-scared-life-federal-lockup-remains-uncertain-during-covid-19-outbreak (last accessed April 21, 2020).

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

The Government goes to great lengths to assure the Court that appropriate precautions are being taken, but in truth, the current conditions at FMC Carswell violate the Center for Disease Control's (CDC) well-established social-distancing guidelines – and that's putting it kindly. Reality has reported to counsel various concerns about her current situation including:

- There are four (4) inmates in her cell with her, no more than three (3) feet away from her;

- They are in their cells together approximately eleven (11) hours per day, not including the time they are asleep;

- She was unable to clean the telephone before she used it to speak to counsel, meaning any airborne droplets coughed, sneezed, or exhaled on to the telephone from any prior caller remained on the telephone when it was her turn to use it, only increasing her risk of exposure;

- Her requests for medical prescriptions (Zoloft) have been ignored, in contradiction of the assertion that she is still receiving the medical care she needs in the midst of the BOP's pandemic-induced facility restrictions;

- She has seen people taken out on stretchers, indicating that the BOP's reported number of cases are understated; and

- BOP staff are regularly getting sick, further proving the BOP's reported number of cases are understated.  The only plausible explanation for the lack of additional reported cases on the BOP webpage is that BOP is not doing enough testing in the facility or the test results have not come back yet.

Notably, reports like this are surfacing frequently, specifically as it pertains to FMC Carswell, where inmates report that conditions now are "worse than before the lockdown because it is harder to social distance."[29] "'We are breathing on each other,' said Sandra Shoulders [Inmate No. 47308-424], who has been at Carswell for two years and has four years left on a drug offense.

---

[29] *See also* Mark Dent and Kaley Johnson, *Sick, elderly and fearing coronavirus:  Life inside Fort Worth's women's federal prison* (April 20, 2020), https://www.star-telegram.com/news/special-reports/article242042671.html (last accessed April 21, 2020).

'It's four people in a room. It's very overcrowded, it's very nasty here.'"[30] "'They are trying to separate us but there is no way to (be) separated because of the overcrowding,' said inmate Kimberli Himmell [Inmate No. 64708-060] via email, who has stage five kidney failure and stage three breast cancer."[31] "Most meals are sack lunch bologna sandwiches…," "not all of the staff and inmates wear masks, and many of the inmates lack soap or don't use it."[32]

As set forth in her Motion, these conditions fly in the face of all guidance issued by the CDC and other leading authorities on preventing the spread of COVID-19 and exacerbate Reality's underlying conditions, making her even more susceptible to the deadly virus that is confirmed present in the facility.  As set forth in her original Motion, Ms. Winner is immunocompromised due to her various pre-existing medical conditions now exacerbated by the facility "lockdown."

Regrettably, the Government argues that Reality should have known what she was signing up for and should have considered her underlying conditions when she entered her plea.  Of course, aside from being insensitive, this argument also appears to be disingenuous.  Reality was doing well – indeed no infractions or disciplinary issues of any kind – until the COVID-19 pandemic occurred, and her facility was caught off guard and unprepared.  One thing Reality did not sign up for is a possible death sentence, or a punitive penalty that may leave her grievously ill. She will, however, agree to any conditions that will allow her to serve the remainder of her sentence in home confinement – in rural Texas, where her family lives, an area conducive to social distancing that has generally escaped serious devastation from COVID-19 – and spare her infection with a virus that has already taken twenty-two (22) inmate lives.

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

## II.     Reality *Did* Submit an Administrative Request, and the BOP's Mishandling of Her Request Illustrates Why This Court Must Act Now.

On April 8, 2020, Reality submitted not one, but *two*, administrative requests to the Warden at FMC Carswell.[33] Reality made her *first* request on the BOP's standard form BP-229 for administrative requests with the oversight of Bill Pendergraft, her BOP correctional counselor.[34] This request was apparently rejected.[35] Reality made her *second* administrative request via a handwritten letter, submitted to her BOP case manager Mary Gruszka.[36] Despite these two requests, the BOP and the Government still claim they have no record of her ever making them.[37] Mr. Pendergraft and Ms. Gruszka are Reality's BOP liaisons.  Reality has done all that the law requires, and BOP has failed her. This Court cannot wait for a BOP answer or remedy – for Reality's sake, it must act now.

In his opinion issued on April 13, 2020, widely-respected Judge Rakoff of the Southern District of New York held that having to wait the full thirty days under 18 U.S.C. 3582(c) does not serve the intent and purpose the FSA was to serve in expediting requests:

> That the statute gives the defendant this choice [to exhaust administrative remedies or wait 30 days] is crucial to understanding Congress's intent. Generally, Congress imposes exhaustion requirements in order to "serve[] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy*, 503 U.S. at 145. But the hybrid requirement in this statute —- either exhaust or wait 30 days -- substantially reduces the importance of the first purpose, as it allows a defendant to come to court before the agency has rendered a final decision. Indeed, anyone familiar with the multiple demands that the BOP has faced for many years in this era of mass incarceration can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial. Congress was determined not to let such exigencies interfere with the right of a defendant to be heard in court on his motion for compassionate release, and hence only limited him to 30 days before he could come to court in the ordinary

---

[33] *See* **Ex. B** at ¶¶ 8, 11.

[34] *See id.* at ¶¶ 6, 9.

[35] *Id.* at Ex. C ("The form … that I filled out was rejected….").

[36] *Id.*  at ¶ 8, 10.

[37] ECF No. 345 at p. 11, n.4.

course. Thus, the reduction of the wait period to a mere 30 days also "unquestionably reflects" a third purpose, i.e., "congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released." *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 4 (S.D.N.Y. Apr. 3, 2020).[38]

Therefore, Judge Rakoff appropriately decided he had the discretion to waive 18 U.S.C. 3582(c)'s exhaustion requirement.  Otherwise, strict enforcement of the 30-day period would not serve the Congressional objective in light of the COVID-19 pandemic's "capacity to spread in swift and deadly fashion".[39]  The Court should do the sensible thing here and recognize the same: it may waive 18 U.S.C. 3582(c)'s exhaustion requirement and act on Reality's request.

## III.   Section 3582(c)'s Administrative Exhaustion Requirement is a Claims-Processing Rule, Not a Jurisdictional Rule.

The Government argues that administrative exhaustion under 18 U.S.C. § 3582(c) is a jurisdictional rule, mandating exhaustion before this Court may consider Reality's motion.  This argument fails. The Section 3582(c)'s administrative exhaustion requirement is a claim-processing rule, as opposed to a jurisdictional precondition, that can be waived.[40]  The U.S. Supreme Court has emphasized the necessity of observing "the important distinctions between jurisdictional prescriptions and claim-processing rules."[41] Claim-processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified

---

[38] *United States v. Haney*, No. 1:19-cr-541-JSR, ECF No. 27 (S.D.N.Y. Apr. 13, 2020).
[39] *Id.*
[40] *See United States v. Brown*, No. 18-cr-56-jdp, ECF No. 59 (W.D.Wi. Apr. 8, 2020) (citing *Bowles v. Russel*, 551 U.S. 205, 211–12 (2007) (noting "the jurisdictional distinction between court-promulgated rules and limits enacted by Congress")); *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) ("The Court has therefore stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times."); *Hamer v. Neighborhood Hous. Servs. of Chicago,* 138 S. Ct. 13, 17 (2017) ("Mandatory claim-processing rules are less stern.").
[41] *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010).

times."[42] Because claim-processing rules do not "govern[] a court's adjudicatory capacity," they may, in certain cases, be waivable by the parties or by the courts.[43]

The U.S. Supreme Court has adopted a "bright line" test for when to classify statutory restrictions as jurisdictional.[44] A rule qualifies as jurisdictional only if "Congress has clearly stated that the rule is jurisdictional."[45] "[A]bsent such a clear statement," the Supreme Court has cautioned, "courts should treat the restriction as nonjurisdictional in character," with the specific goal of "ward[ing] off profligate use of the term 'jurisdiction.'"[46] In considering whether Congress has spoken clearly, courts consider both the language of the statute and its "context, including . . . [past judicial] interpretation[s] of similar provisions."[47]

While the Eleventh Circuit has not addressed the question of whether the exhaustion requirement in Section 3582(c)(1)(A) is jurisdictional, in a related context it has found with several federal appellate courts that the language of that subsection is non-jurisdictional, in interpreting a different portion of 18 U.S.C. §3582(c).[48]

Accordingly, subsection (c) generally should not be understood to impose jurisdictional requirements. While prior holdings governing compassionate release under earlier versions of the

---

[42] *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).

[43] *Id.*

[44] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006).

[45] *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013).

[46] *Id.*

[47] *Reed Elsevier*, 559 U.S. at 168.

[48] *United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment. . . [n]or is subsection (c) phrased in jurisdictional terms."); *see also United States v. Caraballo- Martinez*, 866 F.3d 1233, 1243 (11th Cir. 2017) (considering the Court's jurisdictional authority to consider successive motions under Section 3582(c)); *United States v. Beard*, 745 F.3d 288, 291 (7th Cir. 2014) (holding Section 3582(c) has no jurisdictional limitation); *United States v. Trujillo*, 713 F.3d 1003, 1005 (9th Cir. 2013) (holding Section 3582(c) has no jurisdictional limitation); *United States v. Weatherspoon*, 696 F.3d 416, 421 (finding no jurisdictional restriction under Section 3582(c)); *see also United States v. Green*, 886 F.3d 1300, 1306 (10th Cir. 2018) (same).

statute may create an ongoing requirement that defendants submit a request to the BOP before

filing compassionate release motions on their own, the waiting period the statute prescribes cannot

be applied as a jurisdictional requirement.

## IV. Reality Does Not Need to Allege a Qualifying Medical Condition to be Eligible for Compassionate Release Under 3582(c).

The Government further argues that Reality should be denied compassionate release

because she lacks a qualifying medical condition.   This is wrong.   Reality reiterates, and

incorporates by reference, her arguments from her opening Memorandum as to why this Court is

not limited to considering only medical conditions in determining whether extraordinary and

compelling circumstances exist for granting her release.[49]

And in any event, her brief establishes that Reality is immunocompromised, one of the

enumerated categories of "People Who Are at Higher Risk for Severe Illness"[50] identified by the

CDC in its "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in

Correctional and Detention Facilities."[51]   In other words, she *does* have a qualifying medical

condition, as characterized by the CDC, on top of her susceptibility to pneumonia and other

presently untreated but well documented mental and physical health issues.   To state otherwise, as

the Government does, is simply wrong – and yet another example of why it is incumbent upon this

Court to act: the Department of Justice and the Bureau of Prisons simply view Reality as a

---

[49] *See* ECF No. 341-1 at p. 5-11.

[50] CDC Coronavirus Disease 2019 (COVID-19), *People Who Are at Higher Risk for Severe Illness* (April 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 21, 2020).

[51] CDC Coronavirus Disease 2019 (COVID-19), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (April 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed April 21, 2020).

"defendant" or a "convict" when this situation compels a more personal review of Reality as a vulnerable human being in a precarious position.

Nonetheless, the real issue the Court faces here is whether it will join the majority of District Courts in this country that recognize the Sentencing Commission's policy statement is outdated and needs to be updated in light of the FSA.[52]  Or whether it will be on the other side of history and cling to a line of jurisprudence that goes against the current trend of American sentencing law, against the plain language of the statute, and against compassion and common sense in extraordinary circumstances.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant Reality "compassionate release" under 18 U.S.C. § 3583(c)(1)(A) and allow her to serve the remainder of her sentence at home with her family in light of the COVID-19 pandemic.  Moreover, and notwithstanding this Court's denial of Reality's request to expedite the briefing of her Motion – a request many other District Courts have appropriately granted in view of the exigency of the circumstances – Reality respectfully requests that this Court expedite its ruling, especially in light of the Government's "there's nothing to see here" position and in view of the well-documented and herein-demonstrated inaction by the BOP.

Respectfully submitted,

BY:   */s/ Joe D. Whitley*
       Joe D. Whitley (Ga. Bar No. 756150)
       Admitted *Pro Hac Vice*

       Brett A. Switzer (Ga. Bar No. 554141)
       **BAKER, DONELSON, BEARMAN,**
       **CALDWELL & BERKOWITZ, P.C.**
       3414 Peachtree Rd., NE Suite 1600
       Atlanta, GA  30326

---

[52] *Id.* at p. 7.

(404) 577-6000
JWhitley@bakerdonelson.com
BSwitzer@bakerdonelson.com

Matthew S. Chester (La. Bar No. 36411)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
201 St. Charles Ave., Suite 3600
New Orleans, LA  70170
(504) 566-5200
MChester@bakerdonelson.com

Thomas H. Barnard (Az. Bar No. 020982)
Admitted *Pro Hac Vice*
**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, P.C.**
100 Light Street.
Baltimore, MD  21202
(410) 685-1120
TBarnard@bakerdonelson.com

**ATTORNEYS FOR DEFENDANT**
**REALITY LEIGH WINNER**

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to counsel of record for all parties.

*/s/ Joe D. Whitley*
Joe D. Whitley