**Federal Public & Community Defenders**
**Legislative Committee**

52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738

**Co-Chairs**

**David Patton**
**Executive Director**
**Federal Defenders of New York**

**Jon Sands**
**Federal Defender**
**District of Arizona**

April 1, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Barr:

We write on behalf of the Federal Public and Community defenders. At any given time, Defenders and others appointed under the Criminal Justice Act represent 90 percent of all federal defendants because they cannot afford counsel.

On March 19, 2020, we wrote to you to warn that our jails and prisons were in "grave and imminent danger."[1] We urged you to take "immediate and decisive action" to address the impending spread of COVID-19 among incarcerated persons.[2] That same day, the Bureau of Prisons (BOP) confirmed the first presumed-positive COVID-19 cases in the federal prison system.[3]

Despite our warnings—and those of Congress, policy groups, and public health and legal experts—the Department of Justice (DOJ) has failed to respond appropriately to this global pandemic. Instead, DOJ's response rests on its view that that "many inmates will be safer in BOP facilities."[4] DOJ has relied on this false premise to oppose release in a wide range of cases, and as the foundation of policies such as your March 26, 2020, "Memorandum for Director of Bureau Prisons." ("March 26 Policy").[5] That policy fails to take advantage of DOJ's existing tools to transfer

---

[1] Letter from David Patton, et al., Co-Chair of the Federal Public & Community Defenders Legislative Committee, to Hon. William P. Barr, Atty. Gen. 3 (Mar. 19, 2020) ("Defender Letter").

[2] *Id.*

[3] *See* Cassidy McDonald, *Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/ ("*Conflicting Orders on Coronavirus Response*").

[4] Memorandum from Hon. William P. Barr, Atty. Gen. to Michael Carvajal, Director of the Bureau of Prisons 1 (Mar. 26, 2020), https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[5] *See id.*; *see also id.* at 2 (directing a discretionary factor for transfer to home confinement be "verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility," and "[w]e should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19.").

Federal Public & Community Defenders
Legislative Committee

52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738

vulnerable and low-risk inmates quickly to home confinement.[6] Instead, it erects a complex set of procedural and logistical hurdles to home confinement.[7] These hurdles are largely arbitrary, bear little nexus to the current public health crisis, and will disparately harm persons of color. This inadequate response to COVID-19 continues to endanger the individuals who live and work in BOP facilities.

You now have the authority, under the CARES Act, to allow BOP to transfer many more people to the relative safety of home confinement.[8] But you have not made the finding necessary to allow BOP to do so.[9] Instead, yesterday BOP announced a new plan ("Phase 5") that amounts to no more than a 14-day lockdown for all federal prisoners.[10] It is certain to fail. The real problem—as public health experts agree—is that there are simply too many people in the prisons. The only rational, humane response to this crisis is to greatly reduce the prison population. Locking people down in institutions with inadequate medical care and poor sanitation is not the answer.

This past Saturday, March 28, 2020, marked a grim milestone. Patrick Estell Jones, 49, became the first individual in BOP custody to die of COVID-19.[11] He was serving a sentence in a low-security facility for a non-violent crack cocaine offense.[12] His death will surely not be the last. The day after Mr. Jones's death, the Washington Post reported that 30 more inmates and staff at Oakdale had tested positive for COVID-19.[13] The numbers of positive-COVID-19 cases in BOP are beginning to exponentially escalate: on March 27, 2020, BOP's website reported a total of 18 COVID-19 positive

---

[6] *See* Defender Letter, at 5-6; Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary & Hon. Karen Bass, Chair, Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, to Hon. William P. Barr, Atty. Gen. 2-5 (Mar. 30, 2020); Letter from Hon. Richard J. Durbin, U.S. Senator et al., to Hon. William P. Barr, Atty. Gen. 1-2 (Mar. 23, 2020); Letter from Hon. Kamala D. Harris, U.S. Senator, to Michael Carvajal, Director, Fed. Bureau of Prisons 1 (Mar. 19, 2020). *See also* Letter from Hon. Elizabeth Warren, U.S. Senator et al., to Michael Carvajal, Director, Fed. Bureau of Prisons (Mar. 20, 2020).

[7] *See* Timothy Williams et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, NY Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html ("*Jails Are Petri Dishes*").

[8] *See Coronavirus Aid, Relief, and Economic Security Act*, H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2) (2020) ("CARES Act") (requiring you to make this finding in order to broaden BOP's authority to release individuals to home confinement).

[9] *Id.*

[10] *See* Fed. Bureau of Prisons, *BOP – COVID-19 Action Plan: Phase 5*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 1, 2020).

[11] *See* Sarah N. Lynch, *Prisoner Serving Time For Drug Charge is First U.S. Inmate to Die from COVID-19*, Reuters (Mar. 28, 2020), https://www.reuters.com/article/us-heath-coronavirus-prison-death/federal-inmate-serving-time-for-drug-charge-is-first-inmate-to-die-from-covid-19-idUSKBN21G04T.

[12] *See id.; see also* Motion for Sentence Reduction Under Section 404 of the First Step Act, *United States v. Patrick Estell Jones*, No, 07-CR-022-ADA (W.D. Tex. Nov. 1, 2019), ECF No. 182, at 7, 16, 21.

[13] *See* Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana*, Wash. Post (Mar. 29, 2020), https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html ("*Explosions of Coronavirus Cases*").

Federal Public & Community Defenders
Legislative Committee

52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738

inmates and staff;[14] today, it reports 59 confirmed cases.[15] There are increasing reports of positive diagnoses of individuals detained in federal pretrial custody by the United States Marshals Service.[16] These diagnoses are "almost certainly an undercount."[17]

Many in the federal prison population are at grave risk of severe illness or death. There are approximately 10,000 individuals over the age of 60 presently in federal custody, and one third of all individuals in BOP custody have preexisting conditions.[18] But there are measures that DOJ can take now to avert catastrophe. We urge you to immediately reduce the number of people entering federal detention and aggressively transfer or release individuals who are already incarcerated into the community.

### A. Jails and Prisons are Unprepared and Unsafe. Experts Agree that Rapid Decarceration is Necessary to Prevent a Deadly COVID-19 Outbreak.

DOJ's claim that individuals are safer in BOP facilities than in the community is contradicted by the realities of institutional confinement, BOP's documented failure to provide adequate care, and the consensus of public health experts that decarceration is necessary to slow COVID-19's transmission.

Even in the best of times, prisons and jails have "long been known to be associated with high transmission probabilities of infectious diseases."[19] Incarcerated individuals "are at special risk of infection" and "infection control is challenging."[20] Prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infection]."[21]

---

[14] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update Web Archive* (Mar. 27, 2020), https://web.archive.org/web/20200327045124/https://www.bop.gov/coronavirus/ (last visited Mar. 31, 2020).

[15] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update,* https://www.bop.gov/coronavirus/ (last visited Apr. 1, 2020).

[16] *See* Seth Freed Wessler, *The Coronavirus Has Spread to the US Marshals' Detention Empire*, Mother Jones (Apr. 1, 2020), https://www.motherjones.com/politics/2020/04/us-marshals-coronavirus-pretrial-detainees/.

[17] *See* Williams, *'Jails Are Petri Dishes'*; *see also* Walter Palvo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#3e4556d7ba32.

[18] *See U.S. Indictment of Venezuelan President Maduro Transcript: William Barr Speech*, Rev.com, 53:19 (Mar. 27, 2020), https://www.rev.com/blog/transcripts/u-s-indictment-of-venezuelan-president-maduro-transcript-william-barr-speech ("Barr Transcript").

[19] Letter from Patricia Davidson, Dean, Johns Hopkins School of Nursing, et al., to Hon. Larry Hogan, Governor of Maryland (Mar. 25, 2020), https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (co-signed by over 200 faculty members of Johns Hopkins Bloomberg School of Public Heath, School of Nursing, and School of Medicine) ("Johns Hopkins Letter").

[20] Open Letter from Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, et al. to Vice President Mike Pence and Other Federal, State and Local Leaders 4 (Mar. 2, 2020), https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (co-signed by 814 experts in public health, law and human rights); *see also* Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047-155 (2007), https://doi.org/10.1086/521910.

[21] Letter from Dr. Sandro Galea, Dean, Boston University School of Public Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-

Incarcerated individuals share bathrooms, sinks, and showers. They eat together, and sleep in close proximity to each other. They often lack access to basic hygiene items, much less the ability to regularly disinfect their living quarters.[22] "The conditions and reality of incarceration makes prisons and jails tinderboxes for the spread of disease."[23] In short, "our jails are petri dishes."[24]

BOP is not exempt from this reality. A 2015 Bureau of Justice Statistics report found that persons incarcerated in state and federal prisons and jails were more likely than the general population to have a chronic condition or an infectious disease.[25] And BOP and its staff have acknowledged that infection control is difficult in the prison setting.[26] BOP facilities remain overcrowded. Low, medium, and high facilities are all operating at overcapacity and BOP's total inmate population exceeds the rated capacity of its prisons by an average of 12 to 19 percent.[27] Simply put, CDC recommendations such as social distancing are "impossible to achieve in our federal prisons and immigration facilities as things currently stand."[28] Locking people in their cells for the next 14 days will not change this fact.

Indeed, BOP has proven incapable of protecting the people within its walls—even on an ordinary day.[29] In 2016, DOJ's Office of Inspector General (OIG) found that BOP experienced chronic

---

Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions) ("Public Health Experts' Letter").

[22] *See e.g.*, David Patton, Exec. Director, *Statement from Federal Defenders of New York*, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html; Public Health Experts' Letter, at 1; *Williams, 'Jails Are Petri Dishes'*; Brie Williams et al., *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs Blog (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/ ("*Unique Challenges*"); *see also* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020) https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits ("*Sick Staff*") (noting access to hand sanitizer varies by facility).

[23] Kindy, *Explosions of Coronavirus Cases* (quoting Udi Ofer, director of the American Civil Liberties Union's Justice Division).

[24] Williams, *'Jails Are Petri Dishes'*.

[25] *See* Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012*, U.S. Dep't of Justice, Ofc. of Justice Programs, Bureau of Justice Statistics (Rev. Oct. 4, 2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[26] *See* Fed. Bureau of Prisons, *Program Statement 6190.04: Infectious Disease Management* (Jun. 3, 2014), https://www.bop.gov/policy/progstat/6190_004.pdf.; Williams, *'Jails Are Petri Dishes'*; Hamilton, *Sick Staff*; *see also* Barr Transcript, at 48:57.

[27] *See* Fed. Bureau of Prisons, *Federal Bureau of Prisons Program Fact Sheet* (rev. July 31, 2019), .https://www.bop.gov/about/statistics/docs/program_fact_sheet_20191004.pdf.; *see also* U.S. Dep't of Justice, *FY2020 Performance Budget Congressional Submission Federal Prison Systems Buildings and Facilities* 3, https://www.justice.gov/jmd/page/file/1144631/download (last visited Apr. 1, 2020).

[28] Public Health Experts' Letter, at 1.

[29] *See, e.g.*, U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf ("*Medical Staffing Challenges*"); U.S. Dep't of Justice

medical staff shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions.[30] From 2010 to 2014, BOP's total medical staff was "approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal' care," and 12 institutions were so medically understaffed that they were described as "crisis level."[31] Lack of adequate staffing has resulted in medical personnel and other non-correctional staff working as guards,[32] and has made wait times for individuals to receive even routine medical care unacceptably long.[33]

Moreover, BOP's care for its rapidly aging population—a population that is at grave risk for complications from COVID-19—has been woefully inept.[34] According to OIG, BOP lacks appropriate staffing levels and infrastructure to address the needs of aging inmates.[35] Overcrowding prevents BOP from placing aging individuals in facilities that best address their medical needs.[36] Aging persons could wait years for routine medical equipment like eyeglasses or dentures.[37] These overcrowded and understaffed facilities cannot provide routine care on a good day, let alone during a global pandemic.

A chorus of public health experts has confirmed that immediate decarceration is necessary to avoid a humanitarian crisis in our prisons and jails.[38] Correctional experts agree, warning that "America's 7,000 jails, prisons, juvenile and immigration detention centers are completely unequipped to handle

---

Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf ("*Aging Inmate Population*").

[30] *Medical Staffing Challenges*, at i, 1-2.

[31] *Id.* at 1.

[32] *See Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. 2-4 (2019) (statement of Kathleen Hawk Sawyer, Director, Fed. Bureau of Prisons), https://docs.house.gov/meetings/JU/JU08/20191017/110089/HHRG-116-JU08-Wstate-SawyerK-20191017.pdf; Hamilton, *Sick Staff*.

[33] *See Aging Inmate Population*, at 17-19.

[34] *See* Centers of Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): People Who Are At Higher Risk for Severe Illness*, https://bit.ly/2vgUt1P (last visited Mar. 31, 2020).

[35] *See Aging Inmate Population*, at i-ii.

[36] *See id.* at 25-26.

[37] *See id.* at 17-19. One incarcerated individual requested dentures in 2010 and had still not received them when he was interviewed by OIG years later. He said "this makes it extremely hard to eat because he cannot chew food." *Id.* at 18. Another aging person had waited two years for an eye examination and was using a magnifying glass in the interim. *Id.* at 19.

[38] *See, e.g., Public Health Experts' Letter*, at 1; *Johns Hopkins Letter*, at 2-3; *Unique Challenges*, at 5; *Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention: Interim Guidance*, World Health Organization 4 (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1.

Federal Public & Community Defenders
Legislative Committee

52 Duane Street, 10th Floor
New York, NY 1007
Tel: (212) 417-8738

this pandemic,"[39] and absent swift action, we will "see devastation that is unbelievable."[40] DOJ must heed these warnings now.

Sadly, we know what will happen if DOJ declines to act. Rikers Island, a New York State correctional institution, did not heed expert advice to rapidly reduce its prison population.[41] COVID-19 has infected the institution at an exponential rate:[42] Rikers now suffers an infection rate that is seven times higher than the rest of New York City and is seventy-five times higher than the United States.[43] Rikers is no outlier. The Cook County jail in Chicago went from two positive COVID-19 cases to 101 confirmed cases in a week.[44] The progression of COVID-19 in these facilities is a bellwether of what will come if DOJ does not swiftly decarcerate.

### B. DOJ's Claims in Court that its Jails and Prisons are Safe during the COVID-19 Pandemic are False.

In pleadings across the country, federal prosecutors have assured courts not only that the situation in BOP facilities is under control, but that detention in BOP facilities is safer than release to the community.[45] Across jurisdictions, and regardless of the facility in question, DOJ's arguments are the

---

[39] Robin McDowell & Margie Mason, *Locked up: No Masks, Sanitizer as Virus Spreads Behind Bars*, APNews / SFGate (Mar. 29, 2020), https://www.sfgate.com/news/medical/article/Fear-behind-bars-as-the-coronavirus-spreads-15163433.php.

[40] David Montgomery, *'Prisons are Bacteria Factories'; Elderly Most at Risk*, Stateline, PewTrusts (Mar. 25, 2020), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/03/25/prisons-are-bacteria-factories-elderly-most-at-risk.

[41] *See* Jean Casella & Katie Rose Quandt, *US Jails Will Become Death Traps in the Coronavirus Pandemic*, The Guardian (Mar. 30, 2020), https://www.theguardian.com/commentisfree/2020/mar/30/jails-coronavirus-us-rikers-island ("From a public health and public safety standpoint, the solution to this crisis is quite simple: let them go.").

[42] *See, e.g.*, Katie Shepard, *'Trapped on Rikers': Jails and Prisons Face Coronavirus Catastrophe as Officials Slowly Authorize Releases*, Wash. Post (Mar. 23, 2020), https://www.washingtonpost.com/nation/2020/03/23/coronavirus-rikers-island-releases/ (noting that the chief physician for Rikers Island warned "a storm is coming . . . We have told you who is at risk. Please let as many people out as you possibly can."); Chelsea Rose Marcius, *Coronavirus Has Left Nearly 800 Inmates Quarantined in NYC Jails*, New York Daily News (Mar. 29, 2020), https://www.nydailynews.com/coronavirus/ny-coronavirus-quarantine-inmates-city-jails-rikers-island-20200329-r4ozbsavc5c35bhkqk6zuwm35y-story.html; *see also* Meagan Flynn, *Top Doctor at Rikers Island Calls the Jail a 'Public Health Disaster Unfolding Before our Eyes*, Wash. Post (Mar. 31, 2020), https://www.washingtonpost.com/nation/2020/03/31/rikers-island-coronavirus-spread/.

[43] *See* The Legal Aid Society, *COVID-19 Infection Tracking in NYC Jails*, https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last visited Mar. 29, 2020). The infection rate in Rikers is also exponentially higher than the rates in Wuhan, China and Lombardy, Italy.

[44] *See* Williams, *'Jails are Petri Dishes'*.

[45] *See, e.g.,* Gov't's Resp. to Def.'s Mot. for Temporary Release, *United States v. Michael Calvert*, No. 19-cr-40068 (D. Kan. Mar. 17, 2020), ECF No. 146, at 4 ("In other words, the defendant is essentially quarantined from the public. However, he contends that it is necessary and compelling to leave that environment to live in the public where the risk of contracting the virus is arguably higher."); Gov't's Resp. in Opp. to Def.'s Emergency Mot. for Pretrial Release, *United States v. Jermain French*, No. 19-cr-00946 (N.D. Ill. Mar. 25, 2020), ECF No. 33, at 14-15 ("Defendant erroneously presumes that his risk of contracting COVID-19 is greater in custody than out; but currently defendant is in a detention facility where no known instances of the virus are present, where social contact with the outside world is suspended, and apparently where entrants (staff and inmates) to the facility are screened and measures to isolate high-risk individuals are in progress, compared to the general public in Illinois, where the risk of contracting the virus is arguably higher."); Gov't's Opp. to Def.'s Mot. to Amend Conditions of Release, *United States v. Tabares-Salinas*, No. 20-cr-437 (S.D. Cal.

same: it asserts that its jails and prisons have comprehensive precautionary measures in place to prevent the transmission of COVID-19, and in any case, are well-equipped to deliver care. These representations are demonstrably false. BOP's modified operations policy, even as written, is woefully inadequate.[46] And BOP staff, including correctional officers, have publicly reported dangerous and unhygienic conditions across the country.[47] Incarcerated individuals and staff have filed multiple lawsuits that set forth failures within these facilities in stark detail.[48]

BOP's modified operations are facially insufficient and—as the increasing number of positive cases demonstrate—all but ensure the rapid transmission of COVID-19 within its facilities.[49] The protocol is deficient in several ways. First, the modified operations do not sufficiently address pre-symptomatic spread of COVID-19 among staffers, contractors, and inmates. For example, only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subjected to "[e]nhanced screening." And this "enhanced screening" only requires temperature checks and self-reporting—it does not require staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people. Since most COVID-19 transmission occurs pre-symptomatically, and some people show no symptoms at all, these

---

Mar. 19, 2020), ECF No. 12, at 2 (arguing that the "speculation" of an outbreak at the detainee's facility "is both unsubstantiated and unwarranted: there are no known cases of COVID-19 at the facility and no evidence that the facility's staff is unprepared to address such cases if they should arise").

[46] *See* Fed. Bureau of Prisons, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited on March 31, 2020).

[47] *See, e.g.*, Mitch Smith, et al., *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times (Mar. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Mar. 30, 2020) ("*Coronavirus in the U.S.*"); Kindy, *An Explosion of Coronavirus Cases*; Hamilton, *Sick Staff*; Darius Jaafari, *Federal Government Said it Halted Prison Transfers. They're Still Happening*, PA Post (Mar. 23, 2020), https://papost.org/2020/03/23/federal-government-said-it-halted-prison-transfers-theyre-still-happening/; McDonald, *Conflicting Orders on Coronavirus Response*.

[48] *See* Maxine Bernstein, *Federal Prison Workers File Suit Seeking Hazardous Pay After Guards Exposed to Coronavirus in Louisiana Lockup*, The Oregonian (Mar. 30, 2020), https://bit.ly/2yr3pTD (BOP correctional officers from Oregon and Louisiana are named plaintiffs in a lawsuit that "alleges federal employees have been working in close proximity to people and surfaces infected with the novel coronavirus without sufficient protective gear since Jan. 27 and continue to do so."); Williams, '*Jails are Petri Dishes*' ("[A] lawsuit filed late Friday asked the federal court in Brooklyn to order the immediate release of about 540 federal prisoners there identified as 'particularly vulnerable' to the virus because of their age or underlying health conditions."); *see also* The Public Defender Service, *PDS Publications & Legal Resources, Banks v. Booth—Challenging Life-Threatening Lack of COVID-19 Precautions at the D.C. Jail*, available at https://bit.ly/3bDbYsD (filings for a lawsuit brought by a class of incarcerated persons in the custody of a facility that also houses individuals in federal pretrial custody).

[49] *See* Fed. Bureau of Prisons, *Implementing Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited on Mar. 31, 2020).

"enhanced screenings" are simply inadequate.[50] The screening tool used for prison contractors is similarly defective.[51]

In any case, BOP's own staff reports that the agency is failing to respond to COVID-19 in its facilities. The accounts are staggering: the New York Times "spoke[] with more than a dozen workers in the Bureau of Prisons," who reported that "federal prisons are ill-prepared for a coronavirus outbreak. Many lack basic supplies like masks, hand sanitizer, and soap."[52] A BOP employee in Atlanta explained that staff does not have enough gloves, masks, or other supplies to respond to this outbreak. Nor do they "have enough space to properly quarantine inmates."[53] Staff at FCI Tallahassee, a low-security facility, described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature."[54] And a union representative at FCI Oakdale recounted that BOP was slow to shut down a prison labor program in

---

[50] *See* European Centre for Disease Prevention and Control, *Rapid Risk Assessment: Coronavirus Disease 2019 (COVID-19) Pandemic: Increased Transmission in the EU/EEA and the UK – Seventh Update* (Mar. 25, 2020), https://www.ecdc.europa.eu/en/publications-data/rapid-risk-assessment-coronavirus-disease-2019-covid-19-pandemic ("[t]he proportion of pre-symptomatic transmission [has been] estimated to be around 48% to 62%"); *see also* Sam Whitehead, *CDC Director on Models For the Months to Come: 'This Virus is Going to Be With Us,'* NPR (Mar. 31, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us ("[W]e have pretty much confirmed [ ] that a significant number of individuals that are infected actually remain asymptomatic. That may be as many as 25%.").

[51] *See* Fed. Bureau of Prisons, *Visitor/Volunteer/Contractor COVID-19 Screening Tool*, https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf (last visited Apr. 1, 2020); For example, the contractor screening tool asks contractors whether they have traveled to several foreign locations including South Korea (9,887 confirmed cases), or Japan (2,178 confirmed cases) in the last 14 days. It does not bother to screen for those who have traveled to, for instance, Spain (102,136 cases), Germany (72,383 cases), or elsewhere in the United States (189,633 cases). *See COVID-19 Map – Johns Hopkins Coronavirus Resource Center*, Johns Hopkins University & Medicine, https://coronavirus.jhu.edu/map.html (last visited Apr. 1, 2020). This tool also fails to screen for pre-symptomatic spread or whether contractors are practicing social distancing.

BOP provides conflicting information about inmate screening. It claims to require all newly admitted asymptomatic inmates to be quarantined for at least 14 days. *See* Fed. Bureau of Prisons, *BOP – COVID-19 Action Plan: Phase 5*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 1, 2020) (Background on Phases 1-4). But the inmate screening tool does not reflect this process: instead directing staff to conduct "normal intake" so long as an inmate has not traveled to a CDC-determined risk location or had close contact with anyone *diagnosed* with COVID-19 in the last 14 days. *See* Fed. Bureau of Prisons, *Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool*, https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_20200202.pdf (last visited Apr. 1, 2020). Phase 5 of BOP's COVID-19 Action Plan, effective today, purports to significantly decrease inmate movement by requiring that incarcerated individuals at every institution be "secured in their assigned cells/quarters." *See BOP – COVID-19 Action Plan: Phase Five*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. But this plan does not appear to correct the defective screenings of staff, contractors or inmates, nor does it change the reality that individuals remain in close quarters—still sharing living space, bathrooms, showers, laundry, recreation areas, and computer and phone access.

[52] Smith, *Coronavirus in the U.S.*

[53] *Id.*

[54] Hamilton, *Sick Staff.*

the facility; the program was not shut down until after an inmate tested positive for COVID-19. Now, "people [keep] getting sick back to back to back to back."[55]

### C. The March 26 Policy Erects Complex Barriers that Unnecessarily Limit Transfers to the Relative Safety of Home Confinement.

The most tragic aspect of the impending medical disaster within BOP is that DOJ has ample statutory authority to return people to the community through home confinement, as opposed to incarceration. Our hopes when you announced a memorandum to BOP to "increase the use of home confinement,"[56] were dashed upon reading the March 26 Policy itself. Rather than increase the use of home confinement, the policy erects unnecessary barriers to—and sets arbitrary criteria for prioritizing access to—the relative safety of home confinement.

Congress has repeatedly directed DOJ to use home confinement expansively in response to the COVID-19 crisis.[57] Well before this pandemic, Congress issued in the First Step Act multiple statutory directives calling for BOP to make broad use of its home confinement authorities.[58] In April 2019, BOP directed staff to comply with these directives without qualification.[59] Last week, Congress unanimously passed, and President Trump signed into law, the Coronavirus Aid, Relief, and Economic Security Act, or the "CARES Act."[60] The CARES Act broadens your authority, and that of BOP, to place individuals on home confinement. On Monday, March 29, 2020, House Judiciary Committee Chairman Jerrold Nadler and Subcommittee on Crime Chairwoman Karen Bass urged you to "use every tool at your disposal to release as many prisoners as possible, to protect them from COVID-19."[61]

Instead of exercising your authority under the CARES Act and finding that the COVID-19 pandemic is "materially affect[ing] the functioning of BOP,"[62] you have rested on your assertion

---

[55] Kindy, *An Explosion of Coronavirus Cases.*

[56] Barr Transcript.

[57] *See* Press Release, U.S. Senator Dick Durbin, *Durbin, Grassley, Colleagues Press Trump Administration to Transfer Vulnerable Inmates to Home Confinement* (Mar. 23, 2020), https://bit.ly/2xGxLAN; Press Release, H. Comm. on the Judiciary, *After Rising Numbers of Federal Prisoners Test Positive for COVID-19 & First COVID-19 related Death Reported in Federal Prison, Nadler & Bass Renew Call for DOJ to Take Action* (Mar. 30, 2020), https://bit.ly/2xIFQ87; Press Release, H. Comm. on the Judiciary, *Nadler & Bass Demand Answers from DOJ About Federal Bureau of Prisons & U.S. Marshals Service Response to Coronavirus* (Mar. 19, 2020), https://bit.ly/2JvvJGo; Press Release, H. Comm. on the Judiciary, *Chairman Nadler Asks DOJ About BOP & U.S. Marshals Service Response to Coronavirus & Seeks Answers Regarding Health & Safety of Those in Federal Prisons* (Mar. 12, 2020), https://bit.ly/2UuX4z0; Press Release, U.S. Senator Kamala Harris, *Harris Demands Information on Coronavirus Preparedness in Federal Prisons* (Mar. 5, 2020), https://bit.ly/33YGL0t.

[58] *See* Defender Letter at 5, n. 16.

[59] *See* Fed. Bureau of Prisons, Operations Memorandum: 001-2019 at 2, Home Confinement (Apr. 4, 2019).

[60] *See* H.R. 748 § 6002 at Div. B, Tit. II, Sec. 12003(b)(2).

[61] Press Release, H. Comm. on the Judiciary, *After Rising Numbers of Federal Prisoners Test Positive for COVID-19 & First COVID-19 related Death Reported in Federal Prison, Nadler & Bass Renew Call for DOJ to Take Action* (Mar. 30, 2020).

[62] CARES Act at § 12003(b)(2).

that "many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care." This is a false narrative with catastrophic consequences. Based on this premise, your Policy imposes the upside-down requirement that BOP determine "for each individual inmate" that "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19." In light of the incontestable evidence, there should be a presumption that home confinement is the safest option for all. Moreover, this upside-down requirement is impractical. It defies reason to believe that BOP's already understaffed medical departments—likely increasingly overtaxed by the COVID-19 crisis—will be able to swiftly conduct this calculus on an individualized basis.[63]

The March 26 Policy also imposes an arbitrary hierarchy for access to safety that lacks a nexus to public health. For example, you direct BOP staff to give "priority treatment" to inmates who score as "minimum" risk under BOP's risk-assessment tool, PATTERN. Chairman Nadler and Subcommittee Chair Bass immediately objected to your use of PATTERN in this manner, warning that it was "created for an entirely different purpose," and "is still an incomplete tool."[64] We agree with them on these points, as well as their concerns about "possible racial/ethnic and gender bias" associated with the tool. Indeed, the only publicly reported data on the demographic impact of PATTERN confirms that its use here will have a racially disparate impact on black males. DOJ's data shows that black males are far less likely than white males to have a PATTERN score that puts them in the "minimum" category: only 7% of black men score as minimum risk, compared with 30%—almost one third—of white men.[65]

Also arbitrary and divorced from any valid public health or public safety consideration is the March 26 Policy's direction to deprioritize "inmates . . . who have incurred a BOP violation within the last year." But an individual can receive a BOP violation for innocuous conduct, such as smoking where prohibited or using abusive or obscene language.[66] Moreover, the arbitrariness of receiving a BOP violation is exacerbated by the minimal due process in BOP disciplinary actions and the likely varied enforcement practices from one BOP facility to another.

We also are concerned that the March 26 Policy deems individuals "ineligible" for home confinement based on "some offenses."[67] You do not disclose what is included on this list of "ineligible" offenses. This is a new and significant limitation on home confinement that is neither statutorily mandated, nor articulated in existing BOP policy. Neither the First Step Act's directive that BOP "place prisoners with lower risk levels and lower needs on home confinement for the

---

[63] *See* Memo from Emily Galvin-Almanza, Senior Legal Counsel, The Justice Collaborative, *Re: Barr BOP Memo*, (Mar. 26, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/TJC-Reponse-Home-Confinement-Memo-Mar-2020.pdf.

[64] Press Release, H. Comm. on the Judiciary, *Nadler & Bass Renew Call for DOJ to Take Action*, at 4.

[65] *See* U.S. Dep't of Just., *The First Step Act of 2018: Risk and Needs Assessment System* 62, tbl. 8 (2019) ("DOJ Report") (reporting 29.7% of white males in the developmental sample fall in the minimum risk category while only 7% of black males fall in that same category).

[66] *See* Dep't of Justice, Bureau of Prisons, Inmate Discipline Program, Program Statement 5270.09, tbl. 1, (July 8, 2011).

[67] March 26 Policy at 2.

| Federal Public & Community Defenders  Legislative Committee | 52 Duane Street, 10th Floor  New York, NY 1007  Tel: (212) 417-8738 |
|---|---|

maximum amount of time permitted," nor the CARES Act expansion of the amount of time permitted, exclude any inmate from consideration for home confinement. There is no constitutional or statutory authority for DOJ to "play[] roulette with people's lives" because of their offense of conviction.[68] "Imprisonment is meant to punish by restricting liberty, not by exposure to illness."[69]

Finally, the March 26 Policy directs BOP to place any individual into a "14-day quarantine period" before that individual is discharged from BOP. The very reason that prisons are so unsafe during a pandemic is because of the inability to safely quarantine patients. The Washington Post has reported that at FCI Oakdale, "all . . . prison staff have now been exposed to the virus."[70] We agree that measures should be taken to ensure medical care and safe housing for at-risk individuals upon exit from BOP. But under no circumstances should their time in BOP custody be extended for an illusory "quarantine" that will have dangerous consequences for individuals, the facility where they are detained, and the surrounding community.

The COVID-19 pandemic must and can be addressed immediately. We welcome any opportunity to provide you with additional information and support for these critical and time-sensitive next steps.

Sincerely,

s/
David Patton
Executive Director, Federal Defenders of New York
Co-Chair, Federal Defender Legislative Committee

s/
Jon Sands
Federal Public Defender for the
District of Arizona
Co-Chair, Federal Defender Legislative Committee

s/
Lisa Freeland
Federal Public Defender for the
Western District of Pennsylvania
Chair, Defender Services Advisory Group

cc:   Mr. Michael Carvajal, Director, Federal Bureau of Prisons

---

[68] Williams, '*Jails are Petri Dishes.*'

[69] Rachel Barkow, *Our Leaders Have the Power to Release People in Prison. Now they Must Use It* (Mar. 27, 2020), https://bit.ly/3dP5Ak7.

[70] Kindy, *An Explosion of Coronavirus Cases.*