

April 16, 2020

Hon. William P. Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

**Re:   Expanding BOP's Response to the Novel Coronavirus, and Helping States Safely Reduce their Prison Populations**

Dear Attorney General Barr:

We write to ask that the Department of Justice ("DOJ") take a leadership role in helping the nation's criminal justice systems adapt to the challenges presented by the novel coronavirus.

America's prisons and jails present unique health dangers,[1] and are especially vulnerable to the spread of infectious disease[2] — problems that the outbreak of the novel coronavirus throw into sharp relief.[3] Absent additional interventions, COVID-19 will continue spreading through incarcerated populations, and our nation's correctional officers and staff, at an alarming rate.[4]

We thank you for the steps you have taken to respond to this crisis, including expanding the use of home confinement by the Bureau of Prisons ("BOP"). As you acknowledge, the BOP has a "profound obligation to protect the health and safety of all inmates" requires nothing less.[5] Yet more must be done to stop the spread of the novel coronavirus behind bars. Even if the BOP's recent lockdown slows transmission among people who remain imprisoned in its facilities, it will also stretch tensions behind bars even further. And, correctional administrators nationwide face similar pressures.[6]

---

[1] Michael Massoglia & Brianna Remster, "Linkages Between Incarceration and Health," *Public Health Reports* 134, no. 1 (2019): 8S-14S, https://journals.sagepub.com/doi/epub/10.1177/0033354919826563 ("incarceration is associated with worse health for all formerly incarcerated persons compared with never incarcerated persons").

[2] See, e.g., David Cloud, *On Life Support: Public Health in the Age of Mass Incarceration*, Vera Institute of Justice, 2014, 12 https://www.vera.org/publications/on-life-support (noting an example of the rapid spread of drug-resistant tuberculosis behind bars).

[3] See Daniel A. Gross, "'It Spreads Like Wildfire': The Coronavirus Comes to New York's Prisons," *The New Yorker*, March 24, 2020, https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons.

[4] Lauren-Brooke Eisen, "How Coronavirus Could Affect U.S. Jails and Prisons," *Brennan Center for Justice*, March 13, 2020, https://www.brennancenter.org/our-work/analysis-opinion/how-coronavirus-could-affect-us-jails-and-prisons.

[5] Memorandum from Attorney General William P. Barr to Director of the Federal Bureau of Prisons Michael Carvajal, April 3, 2020, Office of the Attorney General, 1, https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000.

[6] The BOP ordered a 14-day lockdown on March 31, 2020. Federal Bureau of Prisons, "Bureau of Prisons COVID-19 Action Plan: Phase Five," March 31, 2020, https://www.bop.gov/resources/news/pdfs/20200331_press_release_action_plan_5.pdf. As similar measures are

---

Brennan Center for Justice at New York University School of Law
120 Broadway, Suite 1750    New York, NY 10271

We therefore urge you to take two important steps. First, we ask that you expand the use of home confinement even further, as detailed below.

Second, the DOJ can encourage states to respond more proactively to this crisis. We therefore ask that you circulate a "Dear Colleague" letter among state criminal justice stakeholders — including governors, prosecutors, judges, correctional administrators, and public defenders — urging them to work together to adopt policies to limit the virus's impact. Those policies should include (1) releasing people from prison who do not pose a public safety threat, thus decreasing population density and viral transmission risk; and (2) improving health behind bars by making hygiene products and medical services broadly available. This guidance would underscore the federal government's commitment to zealously confronting a threat to the wellbeing of imprisoned people and those who work in correctional institutions nationwide.

We explain both proposals below. Thank you for your attention to this important matter.

## I.   The DOJ Should Continue Expanding the Use of Home Confinement.

First, we urge you to use your authority under the CARES Act to its maximum effect. Under ordinary circumstances, the BOP can transfer people to home confinement for "10 percent of the term of imprisonment," or six months — whichever is shorter.[7] The CARES Act provides for a significant expansion of this authority if the Attorney General concludes that "emergency conditions will materially affect the functioning of" the prison system.[8]

Your April 3rd memorandum makes that finding and broadens home confinement eligibility to include "all at-risk inmates," starting with those in facilities hit hardest by the virus.[9] But the memorandum recommends that transfer decisions continue to be "guided by" the factors listed in your March 26th memorandum.[10] Several criteria from that earlier memorandum could unnecessarily limit the reach of the newly expanded home confinement authority.[11] We therefore urge you to revisit and revise March 26th guidance as follows:[12]

---

implemented nationwide, at least one nonviolent protest has broken out in a state correctional facility, and "signs of stress" are emerging elsewhere. Keri Blakinger, "Coronavirus Restrictions Stoke Tensions in Lock-Ups Across U.S.," *The Marshall Project*, April 2, 2020, https://www.themarshallproject.org/2020/04/02/coronavirus-restrictions-stoke-tensions-in-lock-ups-across-u-s.

[7] 18 U.S.C. § 3624(c)(2).
[8] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 12003(a)(2), (b)(2), 134 Stat. 281, 515-16 (2020).
[9] Barr April 3 memorandum, 2.
[10] Barr April 3 memorandum, 2. For the criteria themselves, see Memorandum from Attorney General William P. Barr to Director of the Federal Bureau of Prisons Michael Carvajal, March 26, 2020, Office of the Attorney General, 1-2, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.
[11] Defense attorneys have described at length other recommended changes to these criteria. Letter from David Patton et al. to Attorney General William P. Barr, April 1, 2020, https://www.fd.org/sites/default/files/covid19/other_resources/defender_letter_ag_barr_re_covid-19_4-1-20.pdf; Letter from David Patton et al. to Attorney General William P. Barr, March 19, 2020, https://sentencing.typepad.com/files/20200319--letter-to-ag-barr-et-al.-re-covid-19.pdf.
[12] Some have already noted, correctly, that leaving the March 26th guidance in place sends "mixed messages" to BOP administrators. Lisa Freeland et al., "We'll See Many More Covid-19 Deaths in Prison if Barr and Congress Don't Act Now," *Washington Post*, April 6, 2020, https://www.washingtonpost.com/opinions/2020/04/06/covid-19s-threat-prisons-argues-releasing-at-risk-offenders.

- First, your March 26th memorandum asks the BOP to prioritize transfers of imprisoned people who have a "minimum" risk of recidivating according to PATTERN, the risk and needs assessment tool created by the First Step Act.[13] However, people with a "minimum" score under PATTERN likely comprise a relatively small percentage of the prison population.[14] And as we have previously written, PATTERN is an imperfect system, one that relies on a broad definition of recidivism that may overstate the actual risk of reoffending, and may also perpetuate racial disparities.[15] Even if the BOP makes decisions "guided by" a person's PATTERN score, at-risk people should not be denied transfer based substantially on a "score" assigned to them by an unproven and arguably flawed tool that was not designed for this purpose.

- Relatedly, categorical, offense-based exclusions prevent administrators from making the individualized determinations called for when evaluating people for transfer to home confinement.

We also ask that you move quickly to address serious implementation issues in the newly expanded home confinement program. Reports from family members describe people having their transfers revoked at the last moment, and healthy people being quarantined in the same unit as those suspected of having COVID-19.[16]

Lastly, it is well established that recidivism drops sharply with age — and the BOP should bear this fact in mind when making release decisions about the more than 10,000 people in federal prison who are over the age of 61.[17] The BOP could consider establishing a presumption of transfer for people of advanced age who, for whatever reason, do not qualify for other programs (such as compassionate release).

---

[13] Barr March 26 memorandum, 2, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

[14] In the general PATTERN model, 20 percent of people in a sample set used by the DOJ to evaluate the tool received a "minimum" score. Just 7 percent of Black men received a "minimum" score. Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System*, U.S. Department of Justice, 2019, 58-62, https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system_1.pdf.

[15] See Letter from Ames C. Grawert to David B. Muhlhausen, Ph.D., September 3, 2019, 2-5, https://www.brennancenter.org/our-work/research-reports/brennan-centers-public-comment-first-step-acts-risk-and-needs-assessment. The DOJ considered revising PATTERN to narrow its definition of recidivism, but ultimately declined to do so, citing a lack of "access to accurate and complete data for case dispositions." The DOJ also claims to have revised PATTERN to reduce racial disparities, but has yet to offer data to fully support that claim. Office of the Attorney General, *The First Step Act of 2018: Risk and Needs Assessment System — Update*, U.S. Department of Justice, 2020, 8-11, 13-14, https://nij.ojp.gov/sites/g/files/xyckuh171/files/media/document/the-first-step-act-of-2018-risk-and-needs-assessment-system-updated.pdf.

[16] Josh Gerstein, "U.S. Prisons' Virus-Related Release Policies Prompt Confusion," *Politico*, Apr. 10, 2020, https://www.politico.com/news/2020/04/10/us-prisons-virus-related-release-policies-prompt-confusion-178691.

[17] The U.S. Sentencing Commission found that "offenders over sixty years old at the time of release had a recidivism rate of 16.0 percent," sharply lower than the general population. *Recidivism Among Federal Offenders: A Comprehensive Overview*, U.S. Sentencing Commission, 2016, 5, 23 & n.56, https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview. For the number of vulnerable people behind bars, see Nathan James & Michael A. Foster, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release*, Congressional Research Service, Report. No. R46297, 2020, 4, https://crsreports.congress.gov/product/pdf/R/R46297.

## II.    The DOJ Should Encourage Criminal Justice Stakeholders to Safely Reduce their Prison Populations and Improve Hygiene Behind Bars.

Next, we ask that you circulate a "Dear Colleague" letter to key state policymakers, offering guidance and best practices on how to safely reduce state prison populations and improve prison hygiene. Recipients should include, but need not be limited to, governors, probation and parole officials, state chief judges, attorneys general, prosecuting attorneys, correctional administrators, and public defenders. Consistent with DOJ policy, this letter would be limited to offering "non-binding advice on technical issues" and express the DOJ's commitment to safeguarding the safety and civil rights of imprisoned people and those who work in correctional facilities.[18]

The health challenges faced by the BOP are not unique to federal prisons. Fortunately, several states have already risen to the occasion, taking steps that range from a temporary halt on prison commitments to early releases.[19] Drawing on these examples, your letter could encourage state decisionmakers to take the following steps:

**Expand compassionate release programs.**

Like the federal system, many states provide opportunities for people who are sick or older to be released from incarceration early.[20] The authority to grant such "compassionate release" varies widely by state. While some are lenient, others require people to meet a relatively narrow set of criteria.[21] We ask that you encourage state decisionmakers to, wherever possible, work together to cut through the "red tape" limiting compassionate release in their jurisdictions, and ensure that this relief is offered as broadly as possible under state law. Administrators should focus on releasing people who are especially vulnerable to COVID-19 due to their age or preexisting health conditions.

**Release people nearing the end of their sentence.**

Research indicates that many prison sentences are longer than necessary to achieve public safety goals.[22] Even under the best conditions, the final months or even years of imprisonment may not serve any legitimate deterrent or punitive purpose. With the outbreak of COVID-19,

---

[18] DOJ policy forbids issuing guidance documents that impose affirmative legal obligations or serve "as a substitute for rulemaking," but expressly permits the issuance of technical guidance such as the letter envisioned here. See Memorandum from Attorney General Jeff Sessions to All Components, November 16, 2017, Office of the Attorney General https://www.justice.gov/opa/press-release/file/1012271/download. Statutes reflecting the DOJ's mandate to safeguard the safety and civil rights of imprisoned people include, but are not limited to, the Civil Rights of Institutionalized Persons Act of 1980. See 42 U.S.C. § 1997a.
[19] See "Reducing Jail and Prison Populations During the Covid-19 Pandemic," Brennan Center for Justice, March 27, 2020, last modified April 1, 2020, https://www.brennancenter.org/our-work/research-reports/reducing-jail-and-prison-populations-during-covid-19-pandemic.
[20] For more on federal early release programs, see James & Foster, *Federal Prisoners and COVID-19*, 10-13.
[21] See Mary Price, *Compassionate Release in the States*, FAMM Foundation, 2018, 13, 17, https://famm.org/our-work/compassionate-release/everywhere-and-nowhere.
[22] See Lauren-Brooke Eisen et al, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Center for Justice, 2016, 8, 35-41, https://www.brennancenter.org/our-work/research-reports/how-many-americans-are-unnecessarily-incarcerated.

the diminishing marginal benefits of those final months of imprisonment must be contrasted with the increasing *risks* associated with prolonged incarceration. Every day behind bars means another day of elevated exposure to a potentially deadly disease.

Acknowledging that new calculus, we ask that you advise state policymakers to use every available policy tool to cut short prison sentences that are already nearing their end. Depending on state and local law, authorities may be able to accomplish this goal by expanding merit-time credits or accelerating parole hearings. Your letter should specifically encourage authorities to think creatively about their legislative and regulatory options. Cooperation across agencies may enable people to more aggressively confront this crisis.

**Work with prosecutors to delay prison commitments.**

We note that the DOJ recently changed its pretrial detention policy, encouraging federal prosecutors to "consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic," and "consider not seeking [pretrial] detention to the same degree we would under normal circumstances." This step will help people avoid the elevated infection risk associated with incarceration.[23] We urge you to recommend that states adopt similar guidelines.

Many people who have been convicted of crimes but not yet sentenced remain in the community or detained in a local jail. Depending on state law, correctional administrators may be able to suspend new prison commitments on their own authority, keeping these people out of the prison system for the duration of the pandemic.[24] But even if they lack the authority to take this step on their own, state prison administrators could work with judges, defense attorneys, and prosecutors to delay sentencing proceedings, effectively postponing rather than forfeiting the right to seek a prison sentence. State prosecutors could also be encouraged to agree to motions seeking release from jail pending sentencing, and work with judges to set appropriate release conditions for people receiving such relief.[25]

---

[23] Memorandum from Attorney General William P. Barr to All Heads of Departments and All United States Attorneys, April 6, 2020, Office of the Attorney General, 2 https://www.justice.gov/file/1266901/download.

[24] See Emmanuel Camarillo, "Illinois Prisons Halt Admissions from County Jails to Slow Spread of Coronavirus," *Chicago Sun-Times*, March 26, 2020, https://chicago.suntimes.com/2020/3/26/21196581/illinois-prisons-coronavirus-halt-admissions.

[25] See, e.g., N.Y. CRIM. PROC. L. § 530.45(1) (permitting judges to, upon application of the defendant, set less restrictive release conditions "before sentencing" in certain cases and for certain offenses); ME. STAT. tit. 15, § 1051(1) (permitting someone convicted of a crime to apply for bail "pending imposition of sentence").

**In cooperation with private vendors, waive commissary charges for hygiene products, waive fees for phone calls and other forms of communication, and suspend copays for medical services for the duration of the crisis.**

For many people behind bars, soap and hand sanitizers are unavailable, or are luxuries that they simply cannot afford, placing the entire prison system at greater risk of infection.[26] To address this problem, we recommend that you urge state correctional administrators to suspend all commissary charges related to soap and personal hygiene products for the duration of the pandemic. This policy change can reduce disease transmission at very little cost to states. Arizona, Minnesota, and Pennsylvania have already taken similar steps.[27] Your guidance should recommend that other states follow their example.

With in-person visitation canceled across the country, imprisoned people and their families face incredible stress, aggravated by uncertainty about safety and health behind bars and the difficulty of staying in touch with each other. We therefore ask that you also encourage states to, in cooperation with private vendors, completely suspend charges for mail, phone calls, and video communication for the duration of this crisis. Some vendors, such as JPay, have already begun offering specific services at reduced prices.[28] These are important first steps, but (in many cases) still leave cost barriers between families and their increasingly isolated loved ones behind bars. Thankfully, the BOP recently made video visitation and phone calls free to all people in its custody.[29] We ask that you encourage states to do the same.

Lastly, state prisons must provide free healthcare to imprisoned people throughout this crisis. Free medical care will encourage quick diagnosis and treatment and help halt the further spread of infection. Thankfully, according to one source, at least forty-seven states now provide free medical care to imprisoned people with COVID-19 symptoms.[30] We ask that you urge the remaining three states — Delaware, Hawaii, and Nevada — to follow their example.

Some of these recommendations should also be implemented in the federal system. We have heard that the BOP waived its prohibition on alcohol-based hand sanitizers, but others have reported commissary spending caps that interfere with purchasing hygiene products, limited

---

[26] Conor Friedersdorf, "Can't We at Least Give Prisoners Soap?," *The Atlantic*, April 1, 2020, https://www.theatlantic.com/ideas/archive/2020/04/make-soap-free-prisons/609202/; Eisen, "How Coronavirus Could Affect U.S. Jails and Prisons"; Keri Blakinger & Beth Schwartzapfel, "When Purell is Contraband, How Do You Contain Coronavirus?," *The Marshall Project*, March 6, 2020, https://www.themarshallproject.org/2020/03/06/when-purell-is-contraband-how-do-you-contain-coronavirus.
[27] See "Reducing Jail and Prison Populations During the Covid-19 Pandemic," Brennan Center for Justice, March 27, 2020, last modified April 13, 2020, https://www.brennancenter.org/our-work/research-reports/reducing-jail-and-prison-populations-during-covid-19-pandemic.
[28] See "CDCR, GTL, JPay Expand Communication Access," *California Department of Corrections and Rehabilitation*, last modified March 30, 2020, https://www.cdcr.ca.gov/covid19/cdcr-gtl-jpay-expand-communication-access; "PRESS RELEASE: Department of Corrections Negotiates Free Calls and Reduced Digital Costs for Incarcerated Population," *Washington Department of Corrections*, last modified March 20, 2020, https://www.doc.wa.gov/news/2020/03202020p.htm.
[29] Josh Hendel, "Federal Prisons Make Inmate Calling, Video Visits Free During Pandemic," *Politico*, April 14, 2020, https://www.politico.com/news/2020/04/14/federal-prisons-make-inmate-calling-free-186383.
[30] "Responses to the COVID-19 Pandemic," Prison Policy Initiative, last modified April 14, 2020, https://www.prisonpolicy.org/virus/virusresponse.html.

opportunities for cleaning living spaces during the lockdown, and poor access to cleaning and protective supplies for correctional officers and imprisoned people alike.[31] Such poor conditions will surely contribute to the spread of COVID-19.

* * * * *

Over the past month, the Department of Justice has taken important steps to limit the impact of the novel coronavirus on the health and safety of those held in and working in our correctional system. We ask that you continue to adapt to these challenging circumstances and lead the nation's law enforcement agencies in developing their response.

Respectfully,

Brennan Center for Justice at NYU School of Law

Center for American Progress

#cut50

FAMM

FreedomWorks

Justice Action Network

National Association of Criminal Defense Lawyers

R Street Institute

---

[31] See Sadie Gurman et al., "Coronavirus Puts a Prison Under Siege," *Wall Street Journal*, April 6, 2020, https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030?mod=searchresults&page=1&pos=1.